No. 15-7057

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

BRIAN WRENN, *et al.*,
APPELLEES,

v.

DISTRICT OF COLUMBIA, *et al.*,
APPELLANTS.

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**MOTION OF APPELLANTS FOR A STAY PENDING APPEAL AND AN
IMMEDIATE ADMINISTRATIVE STAY**

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

On May 18, 2015, the district court (Scullin, J.) entered a preliminary injunction barring the District of Columbia and Metropolitan Police Department Chief Cathy Lanier ("District") from uniformly enforcing a key provision in local legislation regulating the issuance of licenses to carry concealed handguns in public. The injunction requires the District to issue a license to any named plaintiff or member of the Second Amendment Foundation, regardless of whether the applicant has "good reason" for carrying a handgun outside the home, so long as he is otherwise qualified.

The District moves this Court to stay the preliminary injunction pending appeal. And because the District faces irreparable harm immediately, it additionally moves for the Court to enter a brief administrative stay while it receives briefing on and considers whether to grant a full stay pending appeal.

The District has moved for a stay pending appeal in the district court, but has been unable to secure timely relief. *Cf.* Fed. R. App. P. 8(a)(1), (2)(A) (requiring a party "ordinarily" to move in the district court, but not if doing so would be "impracticable"). The court will not even consider the motion until a hearing on July 7, 2015—*six weeks* after the motion was filed—and the court denied the District's requests to expedite the matter (rejecting the District's offer to forgo argument) or enter an administrative stay while the motion is pending. Time is of the essence, and the District cannot wait for the district court to act.

This Court should immediately order an administrative stay, and then a full stay pending appeal. Such relief will preserve the status quo—allowing the District to enforce a scheme that balances public safety with the safety of individuals especially at risk of assault outside the home—while the district court considers the constitutionality of the "good reason" standard on a complete record, as opposed to the minimal record compiled for preliminary-injunction purposes. Three federal circuits have considered provisions similar to the District's "good reason" standard, and all three have upheld the standard, citing the same considerations the District relies on here. Especially given the weakness of plaintiffs' showing of a threat of irreparable injury—their theory is that they need *not* show any particularized need to carry handguns—a stay is warranted.

## BACKGROUND

**1.      The District Enacts A Licensing Scheme Carefully Crafted To Balance Public Safety With An Individual's Need For Self-Defense.**

In July 2014, in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), the district court (Scullin, J.) struck down the District's longstanding prohibition on the public carrying of handguns. In response, the Council of the District of Columbia enacted comprehensive legislation to permit the issuance of licenses to carry concealed handguns if, among other qualifications, the applicant has either "good reason to fear injury to his or her person or property" or "any other proper reason for carrying a pistol." D.C. Act 20-621 § 3(b) (Feb. 6, 2015).

2

To show "good reason to fear injury," an applicant must "show[] . . . a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." *Id.* § 2(f). "[O]ther proper reason for carrying a concealed pistol . . . shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person." *Id.*[1]

The Council based the "good reason" standard on similar provisions in New York, Maryland, and New Jersey, all of which "have withstood constitutional challenges in federal courts of appeal." Committee on the Judiciary and Public Safety, D.C. Council, Report on Bill 20-930, at 2, 9 & n.39 (Nov. 26, 2014) ("Comm. Rep.") (citing *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012); *Woollard v. Gallagher*, 712 F.3d 865, 880 (4th Cir. 2013); *Drake v. Filko*, 724 F.3d 426, 440 (3d Cir. 2013)), *available at* http://lims.dccouncil.us /Download/32576/B20-0930-CommitteeReport1.pdf. After considering testimony from experts and members of the public and reviewing comprehensive empirical

---

[1]     The Act is projected to become law after layover with Congress on June 16, 2015.  *See* Council of the District of Columbia, B20-0930—License to Carry a Pistol Amendment Act of 2014, *available at* http://lims.dccouncil.us/Legislation /B20-0930.  These provisions are already in effect under the License to Carry a Pistol Temporary Amendment Act of 2014, D.C. Law 20-169, *available at* http://lims.dccouncil.us/Download/32567/B20-0927-SignedAct.pdf.

studies, the Council concluded that "right-to-carry laws are associated with substantially higher rates of aggravated assault, rape, robbery and murder." *Id.* at 17 (citing studies). It found "undeniable" the fact that "introducing a gun into any conflict can escalate a limited danger into a lethal situation," and that this "danger extends to bystanders and the public at large." *Id.* at 18. Finding that the District has a "substantial governmental interest in public safety and crime prevention," the Committee concluded that the "good reason" standard "offers a reasonable, balanced approach to protecting the public safety and meeting an individual's specific need for self-defense." *Id.* at 18-19.

On October 22, 2014, the Metropolitan Police Department ("MPD") issued regulations to establish procedures for licensing the concealed carrying of firearms. 61 D.C. Reg. 11,519 (Oct. 31, 2014). The regulations, which are modeled after standards applied in New York, Maryland, and New Jersey, implement the legislation and define "good reason" as the Council directed. 24 DCMR § 2333.1 (published at 62 D.C. Reg. 1138 (Jan. 23, 2015)). To show the necessary "special need for self-protection distinguishable from the general community," *id.*, an applicant must "allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person" and that these threats "are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger." 24 DCMR

§ 2333.2. "The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry license." 24 DCMR § 2333.5.

Alternatively, an applicant can demonstrate any "other proper reason" for carrying a handgun in public, such as employment that requires the personal transport of "large amounts of cash or other highly valuable objects" or the need to protect a family member who has "good reason" but "cannot act in defense of himself or herself." 24 DCMR § 2334.1.

## 2. The Preliminary Injunction Bars The District From Applying The "Good Reason" Standard To Named Plaintiffs And Any Member Of The Plaintiff Second Amendment Foundation While Their Lawsuit Is Pending.

On February 3, 2015, the three named plaintiffs and the Second Amendment Foundation brought this action in the district court, claiming that the "good reason" standard violates the Second Amendment. ECF Record Document ("RD") 1. Three days later, they moved for a preliminary injunction barring enforcement of the standard while litigation is pending. RD 6.

On May 18, 2015, the court granted the motion (without a hearing) and enjoined the District from enforcing the "good reason" standard against the named plaintiffs and members of the Second Amendment Foundation. RD 13, at 22. *First*, it found the plaintiffs likely to prevail on the merits. RD 13, at 7-18. It held that the Second Amendment provides a right "to carry handguns in public for self-

defense" and that the "good reason" standard "has far more than a '*de minimis*' effect" on that right.  RD 13, at 8, 11.  The court recognized that, under *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"), it should review the law under "intermediate scrutiny," which requires "a tight 'fit' between its firearm registration requirements and a substantial governmental interest"—"a fit that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective."  RD 13, at 12-13.  The court, however, then disagreed with the District about how to apply the intermediate-scrutiny standard, holding that "deference should be given to the [District's] stated governmental interest[s]," but not its conclusion that the "good reason" standard "did not burden the right substantially more than was necessary."  RD 13, at 13-14.  It then found that the District had "failed to demonstrate . . . any relationship, let alone a tight fit," between the "good reason" standard and public safety, explaining that applicants who meet this standard are no less likely to "present a risk to" the public "or commit violent crimes" than those who do not.  RD 13, at 16-17.

*Second*, the court found that the plaintiffs would suffer irreparable harm without a preliminary injunction.  RD 13, at 18-19.  It reasoned that, even though they could not demonstrate any special danger requiring them to carry a handgun in self-defense, the right to do so is "intangible and unquantifiable" and irreparable harm is therefore "presumed."  RD 13, at 18.

*Third*, the court found that "the balance of the equities weighs in favor of granting [the plaintiffs'] request for a preliminary injunction." RD 13, at 20. It disregarded the Council's concerns about public safety, explaining that the plaintiffs "seek a very limited injunction," which "only affects [the District's] ability to enforce [its] 'good reason' . . . requirement." RD 13, at 20.

## 3. The District Court Fails To Rule Promptly On The District's Stay Request.

The court issued the injunction on the evening of May 18, 2015. RD 13. On May 26, the District moved for a stay of the injunction pending appeal and requested an immediate administrative stay while the court considered the request. RD 15. Two days later, the court denied the administrative stay and set a briefing schedule that *sua sponte* enlarged the plaintiffs' deadline to oppose the motion by ten days (while shortening the District's reply deadline by three days), and scheduled oral argument for July 7, *six weeks* after the District had filed its stay motion. RD 17, at 2; *cf.* D.D.C. LCvR 7(b), (d) (normal response and reply times).

Concerned that the injunction would require the issuance of licenses before the court even considered its motion to stay, the District then promptly moved the court to expedite the briefing schedule—offering to forgo argument—or, alternatively, reconsider an administrative stay. RD 19, at 5. The District explained that the injunction already was causing "an immediate upswing" in concealed-carry applications—MPD had received 49 applications in the 11 days

after the injunction issued, in comparison to only 109 in the previous seven months.[2] RD 19, at 5. The district court denied the District's motion the next day without explanation. RD 22.

## DISCUSSION

### I. This Court Should Issue A Stay Pending Appeal To Preserve The Status Quo And Protect The Public While The Parties Litigate This Case.

The preliminary injunction effectively grants the plaintiffs full relief on a novel constitutional challenge to a provision the Council has found necessary to prevent an increase in gun violence. A stay would preserve the status quo while this Court considers whether the district court wrongly disturbed it.

In determining whether to issue a stay, the Court considers whether: (1) the appellant is likely to prevail on the merits; (2) it will suffer irreparable injury; (3) a stay will work irreparable harm on others; and (4) the public interest favors a stay. *Ambach v. Bell*, 686 F.2d 974, 979 (D.C. Cir. 1982). "These considerations are interdependent"—"[t]he persuasiveness of the threatened irreparable harm is greatly diminished when its prevention will visit similar harm on other interested parties," and "the required likelihood of success will vary with the balance of other factors." *Id.* Consideration of each of the factors strongly favors entering a stay here, especially when viewed in their totality.

---

[2]     MPD reports that it has now received 96 applications since the injunction was issued, less than a month ago.

8

## A.    The District is likely to succeed on the merits of its appeal.

The district court was required to consider these same factors, but it was the plaintiffs who bore the burden of proof. *Va. Petroleum Jobbers v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958). Indeed, because the relief changed the status quo rather than preserving it, they bore a higher burden—several circuits require proponents of mandatory injunctions to demonstrate that the facts and law "clearly favor" an injunction.[3] *Stanley v. USC*, 13 F.3d 1313, 1320 (9th Cir. 1994).

Although this Court reviews for abuse of discretion, it "must be conscious of whether [it is] reviewing findings of fact, conclusions of law, or . . . the balancing of the injunction factors." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 151 (D.C. Cir. 1985). It is "most deferential" to the "balancing of the injunction factors"; it applies "the usual 'clearly erroneous' standard" to questions of fact; and it is "least deferential on questions of law." *Id.* at 151-52. "If [the Court's] review of the trial court's action reveals that it rests on an erroneous premise as to the pertinent law, . . . [the Court] must examine the decision in light of the legal principles [it] believe[s] proper and sound." *Ambach*, 686 F.2d at 979.

-----

[3]    *See*, *e.g.*, *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 (2d Cir. 1995) ("clear showing" required); *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980) ("particularly heavy" burden); *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (moving party must be "clearly favor[ed]"); *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1301 (10th Cir. 2012) (factors must "weigh heavily and compellingly in [movant's] favor").

The district court wrongly found the plaintiffs likely to prevail on the merits of their constitutional challenge. It started correctly, following *Heller II* by deciding to apply intermediate scrutiny. RD 13, at 12. But it then refused to apply the standards for that test enumerated in *Heller II*. RD 13, at 13-14. This "erroneous premise as to the pertinent law," in and of itself, strongly indicates that the District will prevail in this appeal. *Ambach*, 686 F.2d at 979.

Under *Heller II*, a law survives intermediate scrutiny if it is "substantially related to an important governmental objective." 670 F.3d at 1258. "That is, the District must establish a tight 'fit' between the [challenged law] and an important or substantial governmental interest, a fit 'that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." *Id.* *Heller II* adopted the test articulated in *Turner Broadcasting Systems v. FCC*, 520 U.S. 180 (1997) ("*Turner II*"), and held that courts must "'accord substantial deference to the predictive judgments' of the legislature." 670 F.3d at 1259 (quoting *Turner II*, 520 U.S. at 195). Thus, as *Heller II* explained, the courts' role is simply to "'assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence.'" *Id.*

The district court, however, gave *no* deference to the Council's predictive judgment. RD 13, at 13-17 & n.8. Instead, it interpreted *Turner II* as "afford[ing] deference . . . only with respect to the first part of the analysis," but not in

"assessing the 'fit' between the government's important interest and the means . . . selected to advance that interest." RD 13, at 13. Thus, according to the district court, while "deference should be given to the [District's] stated . . . interest in preventing crime and protecting public safety," the District was required to independently "demonstrate that its 'good reason' . . . requirement is not broader than necessary to achieve this important governmental interest." RD 13, at 13-14.

This was legal error. The district court is bound by this Court's interpretation of *Turner II*'s intermediate-scrutiny test, especially as it relates to the regulation of firearms. And *Heller II* did not limit legislative deference to the Council's belief that the District's objectives are important (which the plaintiffs do not dispute). Instead, this Court deferred to the Council's judgment that its restrictions would serve the important interests of protecting police officers and controlling crime. 670 F.3d at 1262-63; *see id.* at 1269 ("It is not our place . . . to determine in the first instance whether banning semi-automatic rifles in particular would promote important law-enforcement objectives.").

At the very least, then, *Heller II* required the court to defer to the Council's judgment that the "good reason" standard would reduce gun-related crime. The Council relied on expert testimony and empirical studies, concluding that "[t]he totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher

rates of aggravated assault, rape, robbery and murder." Comm. Rep. 17. The district court simply rejected these studies, noting that "empirical evidence on this issue is not conclusive"—which, even if so, demanded deference to the Council's view. RD 14, at 15 & n.11. It then offered its *own* predictive judgment, finding that the "good reason" standard "will neither make it less likely that those who meet this requirement will present a risk to other members of the public or commit violent crimes than those who cannot meet this requirement" and that the District had therefore "failed to demonstrate that there is any relationship, let alone a tight fit, between [the "good reason" standard] and reducing the risk to other members of the public." RD 13, at 16-17. This error alone warrants reversal.

But there is more. The district court abused its discretion by failing to consider the decisions of the Second, Third, and Fourth Circuits, all of which have upheld similar licensure standards. *See Kachalsky*, 701 F.3d at 97; *Woolard*, 712 F.3d at 880; *Drake*, 724 F.3d at 440. Their analyses apply *a fortiori* to the District, an entirely urban jurisdiction with unique public-safety concerns. Yet the district court disposed of these cases in a footnote, finding them "uninstructive" because they "either afforded too much deference to the legislature's conclusions or did not address whether the statutes at issue were no broader than necessary to achieve the government's substantial objectives." RD 13, at 14 n.8. But those courts properly applied the deference required by *Turner II* (and required here by *Heller II*). And

they *did* address those legislatures' efforts to balance the needs of the public and the needs of certain individuals for special protection.

In *Kachalsky*, which upheld New York's "proper cause" standard, the Second Circuit explained that, "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." 701 F.3d at 97 (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 665 (1994) ("*Turner I*")). It acknowledged "the existence of studies and data challenging the relationship between handgun ownership by lawful citizens and violent crime," but explained that "[i]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments." *Id.* at 47-48. It held that the state had reasonably "assess[ed] the risks and benefits of handgun possession and shap[ed] a licensing scheme to maximize the competing public-policy objectives." *Id.* at 48.

In *Woolard*, which upheld Maryland's "good-and-substantial-reason" standard, the Fourth Circuit credited the legislature's prediction that the standard would "advance[] the objectives of protecting public safety and preventing crime because it reduces the number of handguns carried in public." 712 F.3d at 879. The court found a tight fit between the standard and these goals, noting that, "[a]t the same time that it reduces the number of handguns carried in public, however,

the good-and-substantial-reason requirement ensures that those persons in palpable need of self-protection can arm themselves in public places." *Id.* at 880.

And in *Drake*, which upheld New Jersey's "justifiable need" standard, the Third Circuit credited "[t]he predictive judgment of New Jersey's legislators" that the standard "will further its substantial interest in public safety." 724 F.3d at 437. It too found a reasonable fit between the standard and this objective, noting that it "provide[s] 'a means to determine whether the increase in risk and danger borne by the public is justified by a demonstrated risk and danger borne to the person seeking to carry a handgun.'" *Id.* at 439. "In essence, New Jersey's schema takes into account the individual's right to protect himself from violence as well as the community at large's interest in self-protection." *Id.*

No circuit holds otherwise. Instead, the district court relied on the dissent in *Drake* and a Ninth Circuit panel decision, without recognizing that the decision had been vacated pending rehearing *en banc*. *See Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *vacated*, 781 F.3d 1106 (9th Cir. 2015). RD 13, at 13, 16 & n.12. This authority is not sufficient to warrant an injunction barring the District from enforcing its own standard, crafted to follow the example of the three states whose laws have been upheld. *See* Comm. Rep. 2, 9 & n.39.

Finally, it is important to note that the preliminary injunction is based on a record that will be developed substantially before final judgment. The plaintiffs

moved for a preliminary injunction just three days after they filed their complaint. RD 6. Even assuming the court did not misapply the law by requiring the District to independently "demonstrate that its 'good reason' . . . requirement is not broader than necessary to achieve this important governmental interest," it abused its discretion by assuming the District would not be able to do so on a full record. RD 13, at 13-14. The plaintiffs have brought a novel constitutional challenge to a key provision in the District's new licensing scheme, and they bore the burden to show a likelihood of ultimate success on the merits—meaning success after consideration of a full record relevant to the intermediate-scrutiny analysis the court agreed was warranted. As this Court explained in *Population Institute v. McPherson*, 797 F.2d 1062 (D.C. Cir. 1986), to warrant a stay pending appeal "[i]t will ordinarily be enough that the [appellant] has raised serious legal questions going to the merits, so serious, substantial, difficult as to make them a fair ground of litigation and thus for more deliberative investigation.'" *Id.* at 1078. The District has, at the very least, raised such substantial questions here.

**B.   The balance of the equities favors staying the preliminary injunction to preserve the status quo while this Court considers the District's appeal.**

The balance of the equities strongly favors staying the injunction—thereby preserving the status quo—pending the District's appeal of the preliminary injunction. *Ambach*, 686 F.2d at 979. The District will suffer irreparable harm if it

must issue licenses without "good reason," while the plaintiffs deny having any particularized need to carry a handgun in public while this appeal is pending. Moreover, given the District's strong likelihood of success on appeal, it would be entitled to a stay regardless. *Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985).

      1.    Absent a stay, the District and the public will suffer irreparable harm.

The District will be irreparably harmed, and the public interest obstructed, if a stay is denied. *Cf. Nken v. Holder*, 556 U.S. 418, 435-36 (2009) (noting that "[t]hese factors merge when the Government" is opposing a stay).

"[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)); *see also Strange v. Searcy*, 135 S. Ct. 940 (Feb. 9, 2015) (Thomas, J., dissenting) ("The equities and public interest . . . generally weigh in favor of enforcing duly enacted state laws."). The District also has an interest in the uniform application of its laws, and the injunction would establish two different legal regimes—one for the named plaintiffs and members of the Second Amendment Foundation, and another for everyone else. RD 13, at 22.

District residents, through their elected representatives, have made the decision that allowing the public carrying of guns without "good reason" is

inconsistent with public safety. They based this decision on empirical studies, expert testimony, and the reasoned analysis of other state legislatures and courts that have upheld those legislative judgments. The Council found that an increase in the number of handguns carried in public increases the risk of violent crime and the burden on the District's police force. Comm. Rep. 4-7, 17-19. These findings deserve deference. *Heller II*, 670 F.3d at 1258-59; *Turner II*, 520 U.S. at 195.

The district court, however, has refused to even consider the possibility of harm to the District and its people, stating incorrectly that the District simply "misapprehend[ed] the scope of the injunction." RD 13, at 20. According to the court, the injunction is "very limited" because it "only affects" the "good reason" standard, leaving the District free to "enforc[e] the other provisions of the licensing mechanism" or "enact[] . . . appropriate time, place and manner restrictions." RD 13, at 20. But the "good reason" standard is critically important. It is the heart of the plaintiffs' challenge and—as the analyses in *Kachalsky*, *Woolard*, and *Drake* demonstrate—it is the essential component of a scheme crafted to balance public safety with the needs of individuals particularly at risk. Without this standard, the District becomes a "right-to-carry" regime, despite the Council's legislative judgment based on empirical studies that such regimes are "associated with substantially higher rates of aggravated assault, rape, robbery and murder." Comm. Rep. 17. The district court was not free to disregard these harms.

2. The plaintiffs cannot demonstrate any irreparable harm if a stay is entered.

Although the District is the moving party here, it seeks only to maintain the status quo—a status altered by the plaintiffs' motion for interim relief in the district court. This Court should therefore take particular note of the plaintiffs' inability to demonstrate any non-speculative injury if the status quo is maintained while this appeal is pending (and while the case is litigated below). A plaintiff seeking interim injunctive relief must make a threshold showing of irreparable injury. *CityFed Fin. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). "[T]he injury must be both certain and great," "actual and not theoretical." *Wisconsin Gas v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time"; rather, "the party seeking injunctive relief must show that the injury complained of [is] of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (internal quotation marks omitted).

The plaintiffs cannot possibly satisfy this standard because their standing to challenge the "good reason" standard rests on their claim that they *cannot* demonstrate any particularized reason to fear harm. *See* RD 6-3, 6-4, 6-5 (affidavits of named plaintiffs). The district court, however, held that they did not need to demonstrate *any* particularized or imminent need to defend themselves in public with a handgun, instead finding "irreparable harm . . . *presumed*." RD 13, at 18

(emphasis added).  It likened the right to carry a handgun under the Second Amendment to the right to free expression under the First Amendment, explaining that both "protect[] similarly intangible and unquantifiable interests" that "cannot be compensated by damages."  RD 13, at 18.  But while First Amendment jurisprudence sometimes provides a useful structure for reviewing regulation of Second Amendment rights, the substance of those rights should not be conflated. *Cf. Kachalsky*. 701 F.3d at 91-92 (rejecting application of prior restraint doctrine for licensing scheme).  Free expression is an end in itself—it is so intrinsically valuable that, "where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006).  The right to keep and bear arms is not an end in itself.  As the Supreme Court explained in *District of Columbia v. Heller*, 554 U.S. 570 (2008), it is "the inherent right of self-defense" that is "central to the Second Amendment." *Id.* at 628.  If no occasion arises where a handgun is needed for self-defense, its absence cannot cause harm.

*     *     *

This case involves important constitutional questions that affect the right of District residents to exercise some control over the quantity of handguns carried in public.  As the Supreme Court has explained:

19

We must be on our guard against depriving the processes of justice of their suppleness of adaptation to varying conditions. Especially in cases of extraordinary public moment, the individual may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted.

*Landis v. N. Am. Co.*, 299 U.S. 248, 256 (1936). This is just such a case, and the Court should find that the equities strongly favor a stay.

## II. This Court Should Enter An Immediate Administrative Stay While It Considers The District's Motion To Stay Pending Appeal.

The District further requests that this Court immediately issue an administrative stay of the preliminary injunction while it considers whether to grant a full stay pending appeal. Granting an administrative stay would minimize unnecessary disruption and confusion. If no administrative stay were issued, the District will likely be forced to issue licenses—in the absence of "good reason"—while its motion to stay is pending before this Court. If this Court later were to grant the District's motion and issue a stay, the District would then have to withdraw the licenses that had been issued. Given that the proceedings on the District's motion to stay likely will be brief, the requested relief is warranted.

## CONCLUSION

This Court should enter an immediate administrative stay while it considers this motion. It should then enter a full stay pending appeal.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

/s/ Holly M. Johnson
HOLLY M. JOHNSON
Assistant Attorney General
Bar Number 476331
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
(202) 715-7713 (fax)
June 2015                   holly.johnson@dc.gov

**ADDENDUM**

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici.*—The District of Columbia and Metropolitan Police Department Chief Cathy Lanier are the appellants here and the defendants below. Brian Wrenn, Joshua Akery, Tyler Whidby, and the Second Amendment Foundation, Inc., are the appellees here and the plaintiffs below. There are no amici at this time.

B. *Rulings under review.*—The District and Chief Lanier appeal an order issued on May 18, 2015, by District Court Judge Frederick J. Scullin, Jr., granting the plaintiffs' motion for a preliminary injunction (ECF Docket No. 13).

C. *Related cases.*—In July 2014, in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), the district court (Scullin, J.) struck down the District's longstanding prohibition on the public carrying of handguns. An appeal was filed but was voluntarily dismissed. Plaintiffs filed this action as a "related case" in the district court, presumably because at the time a post-judgment motion was pending in *Palmer* that challenged the constitutionality of the provision challenged here.

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 8(a)(2)**

I certify that on June 11, 2015, I notified counsel for the plaintiffs, Alan Gura, Esq., via voice mail and e-mail, that this motion would be filed today. He consents to electronic service of the motion.

/s/ Holly M. Johnson
HOLLY M. JOHNSON

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

_____

**BRIAN WRENN, JOSHUA AKERY,**
**TYLER WHIDBY, and SECOND AMENDMENT**
**FOUNDATION, INC.,**

                       **Plaintiffs,**

          **v.**                                **1:15-CV-162**
                                                        **(FJS)**

**DISTRICT OF COLUMBIA and CATHY**
**L. LANIER,**

                       **Defendants.**

_____

**APPEARANCES**                         **OF COUNSEL**

**GURA & POSSESSKY, PLLC**         **ALAN GURA, ESQ.**
105 Oronoco Street, Suite 305
Alexandria, Virginia 22314
Attorneys for Plaintiffs

**OFFICE OF THE ATTORNEY**        **ANDREW J. SAINDON, ESQ.**
**GENERAL FOR THE DISTRICT**
**OF COLUMBIA**
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001-2714
Attorneys for Defendants

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Currently before the Court is Plaintiffs' motion for a preliminary injunction.[1]

_____

[1] All references to page numbers in documents that are part of the Court's record are to the page numbers that the Court's electronic filing system generates and that appear in the top-right corner of each page.

**II. BACKGROUND**

Plaintiffs filed their complaint in this 42 U.S.C. § 1983 action on February 3, 2015.  Three

days later, on February 6, 2015, they filed a motion for a preliminary injunction.

Plaintiffs' complaint contains only one cause of action, in which they seek both injunctive

and declaratory relief.  Specifically, they request that the Court declare that D.C. Code § 22-

4506(a)'s grant of discretion to the Police Chief  to refuse the issuance of licenses to carry handguns

and its "good reason"/"proper reason" requirement, as well as the requirements of D.C. Code § 7-

2709.11 that the Police Chief issue rules to establish the criteria for "good reason" and "other proper

reason" for carrying a handgun, including the minimum requirements set forth therein and 24

D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4, and 2334.1 violate the Second Amendment to the

United States Constitution on their face and as applied to the individual Plaintiffs and other law-

abiding, responsible members of Plaintiff Second Amendment Foundation ("SAF"), who otherwise

would qualify for a District of Columbia license to carry a handgun.  *See* Complaint at ¶ 40.  They

also ask that the Court permanently enjoin Defendants from enforcing the same.

With regard to their instant motion for a preliminary injunction, the relief that Plaintiffs seek

is limited to enjoining Defendants from applying the "good reason"/"proper reason" requirement of

D.C. Code § 22-4506(a), including, but not limited to, the manner in which that requirement is

defined in D.C. Code § 7-2509.11 and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4 and 2334.1,

to applicants who otherwise meet the requirements of D.C. Code § 22-4506(a) and all other current

requirements for possessing and carrying of handguns under District of Columbia law.

## III. DISCUSSION

**A.      Statutory scheme**

Before analyzing Plaintiffs' motion, it is necessary to set forth the provisions of the District

of Columbia's licensing mechanism with which Plaintiffs take issue.  In response to this Court's July

24, 2014 Memorandum-Decision and Order in *Palmer v. Dist. of Columbia*, No. 1:09-CV-1482,

2014 WL 3702854 (D.D.C. July 24, 2014), the Council of the District of Columbia ("Council"), on

September 23, 2014, voted unanimously to pass Bill 20-926, the "License to Carry a Pistol

Emergency Amendment Act of 2014" (the "Emergency Act").  This Act became effective when the

Mayor signed it on October 9, 2014.

The Council also introduced permanent legislation, the "License to Carry a Pistol

Amendment Act of 2014," Bill 20-930, which was referred to its Committee on the Judiciary and

Public Safety.  The Council conducted a public hearing on the permanent legislation on October 16,

2014, and the Committee mark-up occurred on November 25, 2014.  The first and second readings

on the permanent legislation occurred in December 2014.  The permanent legislation was

transmitted to Congress on March 6, 2015, and the projected law date is June 16, 2015.  *See*

http://lims.dccouncil.us/Legislation/B20-0930?FromSearchResults  true (last visited on May 4,

2015).

Under the current legislation, D.C. Code § 22-4506(a) provides as follows:

> The Chief of the Metropolitan Police Department ("Chief") may, upon
> the application of any person having a bona fide residence or place of
> business within the District of Columbia, or of a person having a bona
> fide residence or place of business within the United States and a
> license to carry a pistol concealed upon his or her person issued by the
> lawful authorities of any State or subdivision of the United States,
> issue a license to such person to carry a pistol concealed upon his or

her person within the District of Columbia for not more than 2 years
from the date of issue, **if it appears that the applicant has good
reason to fear injury to his or her person or property or has any
other proper reason for carrying a pistol, and that he or she is a
suitable person to be so licensed.** (emphasis added)

In addition, "[t]he Chief of [the Metropolitan Police Department] shall issue rules to

implement the provisions of the License to Carry a Pistol Amendment Act of 2014," including the

following rules:

> (1) To establish criteria for determining when an applicant has,
> pursuant to section 6 of the Pistols and Other Dangerous Weapons
> Act:
>
> (A) Demonstrated a good reason to fear injury to his or her person,
> which shall at a minimum require a showing of a special need for self-
> protection distinguishable from the general community as supported
> by evidence of specific threats or previous attacks that demonstrate a
> special danger to the applicant's life;
>
> (B) Demonstrated any other proper reason for carrying a concealed
> pistol, which shall at a minimum include types of employment that
> require the handling of cash or other valuable objects that may be
> transported upon the applicant's person; . . . .

Furthermore, Defendant Lanier, as Chief of the Metropolitan Police Department, has

adopted various regulations regarding the licensing of individuals to carry concealed handguns,

including the following:

> A person shall demonstrate a good reason to fear injury to his or her
> person by showing a special need for self-protection distinguishable
> from the general community as supported by evidence of specific
> threats or previous attacks which demonstrate a special danger to the
> applicant's life.  24 D.C.M.R. § 2333.1
>
> For the purposes of satisfying the specifications of § 2333.1, a person
> shall allege, in writing, serious threats of death or serious bodily harm,
> any attacks on his or her person, or any theft of property from his or
> her person.  The person shall also allege that the threats are of a nature

-4-

that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger.  24 D.C.M.R. § 2333.2

The person shall provide all evidence of contemporaneous reports to the police of such threats or attacks, and disclose whether or not the applicant has made a sworn complaint to the police or the courts of the District of Columbia concerning any threat or attack.  24 D.C.M.R. § 2333.3

The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry license.  24 D.C.M.R. § 2333.4

A person may allege any other proper reason that the Chief may accept for obtaining a concealed carry license which may include:

> (a) Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person; or

> (b) The need for a parent, son, daughter, sibling, or other adult member of the immediate family to provide protection of a family member who is physically or mentally incapacitated to a point where he or she cannot act in defense of himself or herself, and the family member who is physically or mentally incapacitated can demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life in the manner described in § 2333.  24 D.C.M.R. § 2334.1

B.      **Standard for reviewing a motion for a preliminary injunction**

As stated, currently before the Court is Plaintiffs' motion for a preliminary injunction to

enjoin Defendants from applying the "good reason"/"proper reason" requirement of D.C. Code § 22-

4506(a), including, but not limited to, the manner in which that requirement is defined in D.C. Code

§ 7-2509.11 and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4 and 2334.1, to applicants who

otherwise meet the requirements of D.C. Code § 22-4506(a) and all other current requirements for

possessing and carrying of handguns under District of Columbia law.

A party seeking a preliminary injunction must demonstrate "'(1) a substantial likelihood of

success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted,

(3) that an injunction would not substantially injure other interested parties, and (4) that the public

interest would be furthered by the injunction.'" *Davis v. Billington*, No. 10-0036, 2014 WL

7204782, *2 (D.D.C. Dec. 19, 2014) (quoting *Chaplaincy*, 454 F.3d at 297).  When evaluating these

factors, the District of Columbia Circuit uses a "'sliding-scale approach.'" *Id.* (citation and footnote

omitted).  Under this approach, "'[i]f the movant makes an unusually strong showing on one of the

factors, then it does not necessarily have to make as strong a showing on another factor.'" *Id.*

(quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)).[2]

Since "'a preliminary injunction is an extraordinary and drastic remedy, . . . the [party]

seeking to invoke such stringent relief is obliged to establish a clear and compelling legal right

---

[2] As the court noted in *Henke v. Dep't of Interior*, 842 F. Supp. 2d 54 (D.D.C. 2012), the
District of Columbia Circuit "has suggested, without deciding, that *Winter* [*v. Natural Res. Def.
Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008),] should be read to
abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring Plaintiffs to
independently demonstrate both a likelihood of success on the merits and irreparable harm." *Id.*
at 58 (citing *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *Davis v. Pension Benefit
Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).

thereto based upon undisputed facts.'" *Id.* at *3 (quoting *In re Navy Chaplaincy*, 928 F. Supp. 2d 26, 36 (D.D.C.) (internal citations and quotation marks omitted), *aff'd*, 738 F.3d 425 (D.C. Cir. 2013)).  Moreover, "[a] party who seeks a mandatory injunction to change (rather than preserve) the status quo 'must meet a higher standard than in the ordinary case by showing "clearly" that he or she is entitled to relief or that "extreme or very serious damage" will result from the denial of the injunction.'" *In re Guantanamo Bay Detainee Litig.*, 570 F. Supp. 2d 13, 17 n.3 (D.D.C. 2008) (quoting *Veitch v. Danzig*, 135 F. Supp. 2d 32, 35 (D.D.C. 2001)).[3]

The Court will address each of these requirements in turn.

### 1. Likelihood of success on the merits

As the court stated in *In re Guantanamo Bay Detainee Litig.*, "absent a 'substantial indication' of likely success on the merits, 'there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.'" *In re Guantanamo Bay Detainee Litig.*, 570 F. Supp. 2d at 17 (quoting *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999)).  Thus, to obtain a preliminary injunction, Plaintiffs must first and foremost establish that they are likely to succeed on the merits of their claim that the District of Columbia's requirement that they demonstrate "good reason"/"proper reason" in order to obtain a license to carry a concealed handgun in public for the purpose of self-defense violates their Second Amendment right to bear arms.

---

[3] The Court notes that, although "[s]ome D.C. District Courts have held that mandatory injunctions [that change the status quo] require applicants to 'meet a higher standard . . .' . . . [i]t appears. . . that the D.C. Circuit has not yet adopted this rule. . . ." *Boivin v. US Airways, Inc.*, 297 F. Supp. 2d 110, 115 n.5 (D.D.C. 2003) (internal quotation and other citations omitted). Nonetheless, in view of the prevailing authority throughout the circuits, it seems appropriate to apply this standard.

In *Palmer v. Dist. of Columbia*, No. 1:09-CV-1482, 2014 WL 3702854 (D.D.C. July 24, 2014), this Court concluded that the Second Amendment right to bear arms, although subject to traditional restrictions, includes the right to carry an operable handgun outside the home for self-defense. *See id.* at *6; *see also Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014); *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012). Therefore, consistent with its decision in *Palmer*, this Court again concludes that, although subject to traditional restrictions, there exists a right under the Second Amendment to carry handguns in public for self-defense. Having so concluded, the specific issue this Court must decide in the present case is whether Plaintiffs have established a likelihood of success on the merits of their claim that the District of Columbia's "good reason"/"proper reason" requirement violates that right because it impermissibly burdens their Second Amendment right to bear arms; that is, it unreasonably denies otherwise qualified individuals the right to carry a handgun for self-defense.

In *Heller v. Dist. of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"), the circuit court explained that, where there exist firearm regulations that may or may not burden the exercise of one's Second Amendment rights, it would adopt, as had other circuits, a two-step approach to determine the constitutionality of such firearm regulations. *See id.* at 1252 (citations omitted). The first step in this analysis requires that the court determine whether a particular statutory provision impinges on a right that the Second Amendment protects. *See id.* If it does, the court proceeds to determine whether the provision at issue unlawfully burdens that right under the appropriate level of constitutional scrutiny. *See id.* (citations omitted).

With respect to the first step of this analysis, the Supreme Court in *Heller* instructs that "longstanding" regulations are "presumptively lawful," *Dist. of Columbia v. Heller*, 554 U.S. 570,

626-27 & n.26 (2009); that is, "they are presumed not to burden conduct within the scope of the Second Amendment." *Heller II*, 670 F.3d at 1253 (citations omitted).  The court in *Heller II* explained that "this is a reasonable presumption because a regulation that is 'longstanding,' which necessarily means it has long been accepted by the public, is not likely to burden a constitutional right . . . ." *Id.*  However, a plaintiff may rebut this presumption by demonstrating that the regulation has more than a *de minimis* effect on his right.  *See id.*

Defendants argue that, because the District of Columbia's regulation of the public carrying of guns is "longstanding," its "good reason"/"proper reason" requirement is presumed not to violate Plaintiffs' Second Amendment right to bear arms.  To support this position, Defendants note that the District of Columbia has been regulating guns for more than two centuries.  *See* Dkt. No. 9 at 14.  For example, in 1801 the then-Town of Georgetown prohibited firing guns in its "inhabited parts." *See id.* (citing Town of Georgetown Ordinance of Oct. 24, 1801).  In 1809, the City of Washington similarly made it unlawful to fire guns "'within four hundred yards of any house . . . or on the Sabbath.'"  *See id.* (quoting Act of the Corporation of the City of Washington of Dec. 9, 1809).  In 1857, the District of Columbia authorized the filing of civil complaints by "'any person having reasonable cause to fear an injury or breach of the peace' against any person who 'shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property[.]'"  *See id.* (quoting Revised Code of the District of Columbia, ch. 141, § 16 (1857)).  Also, in the same year, the District of Columbia "made it unlawful to carry 'deadly or dangerous weapons, such as . . . pistol[s].'"  *See id.* (quoting Act of the Corporation of the City of Washington of Nov. 4, 1857) (citing Act of Nov. 18, 1858).

Defendants also note that, in 1892, Congress barred persons throughout the District of Columbia from having such weapons "'concealed about their person' outside of the person's 'place of business, dwelling house, or premises.'" *See id.* (quoting Act of July 13, 1892, ch. 159, 27 Stat. 116). Finally, "[i]n 1932, Congress required licenses for carrying pistols and other concealable weapons outside of one's home or place of business." *See id.* (citing Act of July 8, 1932, ch. 465, Pub. L. No. 72-275, 47 Stat. 651). Based on this history, Defendants assert that, "leaving aside the recent legislation, the District's regulation of firearms generally    and concealed weapons in particular    is manifestly 'longstanding' and therefore does not burden conduct within the scope of the Second Amendment." *See id.*[4]

In response, Plaintiffs point out that Defendants "advanced th[is] same argument in *Heller*, citing early public discharge laws for the proposition that there was no right to keep a gun for self-defense [and] [t]he Supreme Court rejected that argument." *See* Dkt. No. 10 at 15.

Plaintiffs also distinguish the 1857 law, which references a good-reason type requirement, but which Plaintiffs argue undermines Defendants' position. *See id.* The 1857 law "provided that an individual going armed 'without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property . . . find sureties for keeping the peace for a term not exceeding six months,' upon 'complaint of any person having reasonable cause to fear an injury or breach of the peace.'" *See id.* at 15-16. Plaintiffs assert that this means that a "complainant would have to establish 'reasonable cause' that the gun-carrier would injure him or breach the peace . . . [and] [d]oing so would result not in any criminal sanction or even prohibition on the carrying of

---

[4] Defendants reference decisions in other jurisdictions, in which the courts have found the legislative history to be longstanding.  However, those decisions are not relevant to the District of Columbia's legislative history.

arms, but only the temporary posting of sureties.  That is a far cry from requiring the individual gun-carrier to prove a good reason for so doing."  *See id.* at 16.[5]  Finally, in 1943 the District of Columbia amended its statutes  to prohibit the unlicensed carrying of pistols, whether openly or concealed.  *See id.* at 17 (quoting *Cooke v. United States*, 275 F.2d 887, 889 n.3 (D.C. Cir. 1960)).[6]

Despite Defendants' lengthy dissertation of the District of Columbia's history of firearm regulation, with the possible exception of the 1857 statute, which refers to a "good-reason type" requirement that is clearly distinguishable from the requirement at issue here, Defendants have not presented any historical evidence to support their argument that the District of Columbia's "good reason"/"proper reason" requirement is longstanding.

In any event, as Plaintiffs point out, "the 'longstanding' inquiry is irrelevant" because the District of Columbia's "good reason"/"proper reason" requirement "has far more than a 'de minimis' effect on [their] rights    it completely bars the right from being exercised, at all times and places and in any manner, without exception."  *See* Dkt. No. 10 at 17.  Plaintiffs, as well as the vast majority of law-abiding citizens, who fail to satisfy the District of Columbia's "good reason"/"proper reason" requirement because they cannot "show a special need for self-protection distinguishable from the general community" or that they are engaged in a "type[] of employment that require[s] the handling

---

[5] In 1892, Congress enacted a statute that was effective until 1932, which proscribed the open carrying of handguns if carried with the intent to use them illegally.  A replacement law in 1932 continued the ban on the unlicensed concealed carrying of handguns but did not mention the open carrying of handguns.

[6] Plaintiffs assert that, "if in 1943, Congress had looked to the federal courts for constitutional guidance in enacting this provision, it would have only been misled by the then-emerging, erroneous 'collective rights' doctrine."  *See* Dkt. No. 10 at 17 (citing *United States v. Tot*, 131 F.2d 261, 266 (3d Cir. 1942), *rev'd on other grounds*, 319 U.S. 463 (1943); *Cases v. United States*, 131 F.2d 916, 921 (1st Cir. 1942)).

of cash or other valuable objects that may be transported upon [their] person," are unable to exercise their fundamental right to bear arms for self-defense under the Second Amendment.  Thus, the Court concludes that the District of Columbia's "good reason"/"proper reason" requirement impinges on Plaintiffs' Second Amendment right to bear arms.

The Court must next determine whether that impingement unlawfully burdens that right.  To do that, the Court must first determine the degree of constitutional scrutiny to which this regulation is appropriately subject.  There are three levels of scrutiny that are potentially available to the Court when analyzing the constitutionality of a statute: rational basis review, intermediate scrutiny, and strict scrutiny.  In *Heller*, the Supreme Court made clear that courts may not apply rational basis review to a law that burdens protected Second Amendment conduct.  *See Heller*, 554 U.S. at 628 n.27.

Furthermore, in *Heller II*, the circuit court, in addressing the appropriate level of constitutional scrutiny to apply to the District of Columbia's firearm registration requirements, decided to apply intermediate scrutiny to those requirements.  *See Heller II*, 670 F.3d at 1257.  Although the Court recognizes that there is a substantive difference between the registration requirements at issue in *Heller II* and the District of Columbia's "good reason"/"proper reason" requirement at issue in this case, the Court, nonetheless, concludes that intermediate scrutiny applies to this requirement as well.[7]

In *Heller II*, the circuit court held that intermediate scrutiny required that the District of

_____

[7] Other circuits likewise have found intermediate scrutiny to be the appropriate standard when reviewing firearms regulations vis-a-vis the Second Amendment.  *See, e.g., Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012).

Columbia demonstrate that its firearm registration requirements were "'substantially related to an important governmental objective.'" *Heller II*, 670 F.3d at 1258 (quotation omitted).  The court explained that this meant that the District of Columbia had to establish a tight "fit" between its firearm registration requirements and a substantial governmental interest, "a fit 'that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.'"  *Id.* (quotation and other citation omitted).  In other words, the District of Columbia had to show that its firearms registration requirements were not broader than necessary to achieve its substantial government interest.  *See id.* (citing *Ward [v. Rock Against Reason]*, 491 U.S. [781], 782-83, 109 S. Ct. 2746 [(1989)]).

In applying *Heller II* to the facts of this case, the Court concludes that, to pass muster under intermediate scrutiny, the District of Columbia must demonstrate that its "good reason"/"proper reason" requirement is not broader than necessary to achieve its substantial government interest in preventing crime and protecting public safety.  As the Ninth Circuit explained in *Peruta*, although the Supreme Court in *Turner Broad. Sys., Inc. v. FCC ("Turner II")*, 520 U.S. 180 (1997), instructed that courts must afford deference to the legislature's judgment when determining whether a statute could withstand intermediate scrutiny, the Court did so only with respect to the first part of that analysis.  *See Peruta*, 742 F.3d at 1177.  However, when assessing the "fit" between the government's important interest and the means that the government selected to advance that interest, the Court in *Turner II* did not afford any such deference to the legislature's decision.  *See id.*  Rather, it required that the government establish that its statute did not burden the right substantially more than was necessary to further its important interests.  *See id.* (quotation omitted); *cf. Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).  This Court agrees that deference should be given to the

-13-

District of Columbia's stated governmental interest in preventing crime and protecting public safety; however, *Taylor II*, as well as *Heller II* and *Peruta*, requires that the District of Columbia demonstrate that its "good reason"/"proper reason" requirement is not broader than necessary to achieve this important governmental interest.[8]

Plaintiffs argue that the District of Columbia's "good reason"/"proper reason" requirement fails intermediate scrutiny because it does not advance its interest in preventing crime or protecting public safety. *See* Dkt. no. 6-2 at 25. Specifically, this regulation is not directed at dangerous people, does not regulate the manner of carrying handguns, and does not impose any place restrictions. *See id.* (citing *Peruta*, 742 F.3d at 1176-77). To support this position, Plaintiffs rely on *Fletcher v. Haas*, 851 F. Supp. 2d 287 (D. Mass. 2012), and *Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012).

In *Fletcher*, the state law at issue barred lawful resident aliens from possessing guns. The court struck down the law, reasoning that, because the law was premised on the assumption that lawful permanent residents were categorically dangerous and all American citizens were trustworthy, it lacked even a reasonable basis and, thus, could not withstand either intermediate or strict scrutiny. *See Fletcher*, 851 F. Supp. 2d at 303. Likewise, in *Bateman*, the court struck down laws barring handgun carrying during so-called "states of emergency," finding that those laws effectively banned the public at large from carrying handguns for self-defense, conduct that was at the very core of the Second Amendment. *See Bateman*, 881 F. Supp. 2d at 716.

---

[8] It is in this regard that the Court finds the Second, Third and Fourth Circuits' application of intermediate scrutiny to the firearms licensing regulations before them uninstructive. In analyzing the regulations before them, these courts either afforded too much deference to the legislature's conclusions or did not address whether the statutes at issue were no broader than necessary to achieve the government's substantial objectives. *See Peruta*, 742 F.3d at 1177.

-14-

In response, Defendants argue that the District of Columbia's "good reason"/"proper reason" requirement reasonably furthers its important governmental interest in reducing the number of concealed weapons in public in order to reduce the risks to other members of the public and to reduce the disproportionate use of such weapons in the commission of violent crimes. *See* Dkt. No. 9 at 19.

Furthermore, Defendants cite to the Report of the District of Columbia Council's Committee on the Judiciary and Public Safety ("Committee Report"),[9] which, among other things, summarized the testimony that the Committee had received from Chief Lanier about the safety issues facing the District of Columbia.[10]   The Report also cited the empirical evidence that it had considered, which purported to show that "right-to-carry" laws were associated with substantially higher rates of aggravated assault, rape, robbery and murder.[11]

There is no dispute that the Committee Report sets forth in detail the reasons that the District of Columbia implemented the current licensing mechanism.  However, the issue here is not whether the District of Columbia's "good reason"/"proper reason" requirement is a reasonable or wise policy choice.  Rather, the issue is whether this requirement, no matter how well intended, violates the

---

[9] The Committee Report is available online at http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport1.pdf (last visited May 14, 2015).

[10] The Committee held a public hearing on Bill 20-930 on October 16, 2014.

[11] This evidence would appear to be contradicted by, among other things, the Federal Bureau of Investigation's *Uniform Crime Reports: Crime in the United States 2013, Table 4*, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/4tabled atadecoverviewpdf/table_4_crime_in_the_united_states_by_region_geographic_division_and_sta te_2012-2013.xls (last visited May 18, 2015.  The point is that the empirical evidence on this issue is not conclusive.

Second Amendment.

While, as stated, Defendants argue that the District of Columbia's "good reason"/"proper reason" requirement relates reasonably to its interest in preventing crime and protecting public safety, they have not established that relationship.

The fact that an individual may be able to demonstrate a greater need for self-protection, and therefore meets the "good reason"/"proper reason" requirement, does not indicate, in any way, whether that person is less likely to misuse handguns or may be less dangerous. *See Drake*, 724 F.3d at 454 (Hardiman, C.J., dissenting).[12]  Nor does the District of Columbia's "good reason"/"proper reason" requirement make it less likely that those who meet this requirement will accidently shoot themselves or others or engage in criminal activity than those who cannot meet this requirement. *See id.*  The fact that a person may have a greater need for self-protection says nothing about how limiting the carrying of handguns to such individuals would result in a reduction of risk to other members of the public or reduce violent crime.  Is the Court to conclude that people who do not have a heightened need for self-protection are more likely to commit violent crimes?

Furthermore, even if the Court were to accept the proposition that handguns are used disproportionately in the commission of violent crimes, how is that use related to whether or not a person has a greater need for self-protection?  Moreover, isn't it possible that even persons who cannot manifest a present need for self-protection are just as likely to be victims of a violent crime. Simply put, the District of Columbia's "good reason"/"proper reason" requirement will neither make

---

[12] *See Drake*, 724 F.3d at 454 (Hardiman, C.J., dissenting) (stating that "it seems odd to suggest that one who obtains a handgun carry permit because he is in imminent danger is less likely to mishandle a gun than one who obtains a carry permit because he might want to exercise that right in the future even though he perceives no present danger").

it less likely that those who meet this requirement will present a risk to other members of the public or commit violent crimes than those who cannot meet this requirement.  Therefore, after reviewing the record in this case, the Court finds that Defendants have failed to demonstrate that there is any relationship, let alone a tight fit, between reducing the risk to other members of the public and/or violent crime and the District of Columbia's "good reason"/"proper reason" requirement.

This conclusion should not be read to suggest that it would be inappropriate for the District of Columbia to enact a licensing mechanism that includes appropriate time, place and manner restrictions on the carrying of handguns in public.[13]  The District of Columbia's arbitrary "good reason"/"proper reason" requirement, however, goes far beyond establishing such reasonable restrictions.  Rather, for all intents and purposes, this requirement makes it impossible for the overwhelming majority of law-abiding citizens to obtain licenses to carry handguns in public for self-defense, thereby depriving them of their Second Amendment right to bear arms.

Accordingly, at this point in the litigation and based on the current record, the Court concludes that Plaintiffs have shown that they are likely to succeed on the merits of their claim that

---

[13] *See Heller*, 554 U.S. at 626-27 (noting that its opinion should not be construed to cast doubt on the validity of various "longstanding" time, place and manner restrictions on the possession, carrying, and sale of handguns); *Friedman v. City of Highland Park,* No. 14-3091, 2015 WL 1883498 (7th Cir. Apr. 27, 2015) (holding that a city ordinance that generally prohibited the possession, sale or manufacture of semi-automatic assault weapons and large capacity magazines did not violate the Second Amendment); *Heller v. Dist. of Columbia*, 45 F. Supp. 3d 35 (D.D.C. 2014) (holding that the challenged regulations pertaining to the registration of handguns did not violate the Second Amendment); *Parker v. Dist. of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007) (stating that "[t]he protections of the Second Amendment are subject to the same sort of reasonable [time, place and manner] restrictions that have been recognized as limiting, for instance, the First Amendment" (citation omitted)).  *Cf. Ezell v. City of Chicago*, 651 F.3d 684, 714 (7th Cir. 2011) (stating that "historical context tells us that cities may take public safety into account in setting reasonable time, place and manner restrictions on the discharge of firearms within City limits").

the District of Columbia's "good reason"/"proper reason" requirement runs afoul of the Second Amendment.

### 2. Irreparable harm

In *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the Seventh Circuit addressed a Second Amendment challenge to the City of Chicago's Responsible Gun Owners Ordinance (the "Ordinance"), which the City had enacted four days after the Supreme Court's decision in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), which held that the Second Amendment applied to the States. The plaintiffs argued, among other things, that the Ordinance burdened the core Second Amendment right to possess firearms for self-defense because it conditioned possession on range training but simultaneously forbid range training everywhere in the City. The plaintiffs sought a preliminary injunction, but the district court denied their request. The Seventh Circuit reversed.

In addressing the requirement that the plaintiffs must establish irreparable harm in order to obtain a preliminary injunction, the court noted that for certain kinds of constitutional violations, particularly First Amendment claims, irreparable harm was presumed. *See Ezell*, 651 F.3d at 699 (citations omitted). The court explained that courts often presume that the loss of a First Amendment right causes irreparable harm "based on 'the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.'" *Id.* (quotation and other citation omitted). The court further explained that "[t]he Second Amendment protects similarly intangible and unquantifiable interests," which "cannot be compensated by damages." *Id.* (footnote omitted). Therefore, the court held that "the plaintiffs' harm [was] properly

-18-

regarded as irreparable and having no adequate remedy at law." *Id.* at 700.

This Court agrees with the Seventh Circuit's reasoning in *Ezell* and finds that Plaintiffs have established that they are likely to succeed on the merits of their claim that the District of Columbia's "good reason"/"proper reason" requirement was unconstitutional when enacted and continues to violate their Second Amendment right to bear arms for the purpose of self-defense every day that the District of Columbia continues to enforce it.  Thus, the Court concludes that Plaintiffs have established that they will suffer irreparable harm if the Court does not grant their motion for a preliminary injunction.

### 3. Balance of the equities

Plaintiffs argue that, although they have suffered and will continue to suffer irreparable harm as long as Defendants continue to enforce their "good reason"/"proper reason" requirement, Defendants would not suffer any harm if the Court granted Plaintiffs' motion for a preliminary injunction.  *See* Dkt. No. 6-2 at 28.  They assert that Defendant Lanier virtually conceded that point when she commented on this Court's decision striking down the total carry ban stating, "'Law-abiding citizens that register firearms, that follow the rules, are not our worry.'"  *See id.* at 28-29 (quotation and footnote omitted).  Furthermore, Plaintiffs argue that they are not requesting anything that would "impact[] the city's handgun registration requirements, which are generally stricter than state licensing requirements (if any) for the carrying of handguns, nor would the injunction impact any city carry restrictions as to time, place, and manner."  *See id.* at 29.

Finally, Plaintiffs assert that an injunction "would not result in unlicensed handgun carrying."  *See* Dkt. No. 10 at 27.  Rather, "[t]he District would still have among the most stringent

handgun carry licensing requirements in the country, requiring not just extensive training and background checks for applicants and registration of carried guns, but the full panoply of extreme (and dubious) restrictions upon licensed handgun carriers." *See id.*  Plaintiffs note that an injunction would not "stop background checks, or training, or registration, or any other thing that the District wishes to impose on handgun carry license applicants.  It [would] stop *only* the 'good/proper reason' requirement, and nothing else." *See id.* at 27-28.  Thus, Plaintiffs assert that, "[c]onsidering the extreme level of regulation untouched by the injunction, and the wealth of evidence demonstrating how licensed handgun carriers actually behave, . . ., the threat to the public harm would be virtually zero." *See id.* at 28.  On the other hand, Plaintiffs argue that "the benefit to individuals, who could defend themselves from violent crime, would be significant." *See id.*

To the contrary, Defendants argue that the balance of equities tips heavily in their favor because an injunction would allow an unknown number of people to carry concealed handguns in the District of Columbia, which, in turn, would increase the risk of a gun-related tragedy to both those carrying the guns and the general public.  *See* Dkt. No. 9 at 31-35.  Defendants' assertions misapprehend the scope of the injunction that Plaintiffs are seeking.

As noted, Plaintiffs seek a very limited injunction.  That is, they seek an injunction that only affects Defendants' ability to enforce the District of Columbia's "good reason"/"proper reason" requirement.  They are not, as Defendants argue, seeking to prevent Defendants from enforcing the other provisions of the licensing mechanism nor do they seek to prevent Defendants from enacting and enforcing appropriate time, place and manner restrictions.  Under these circumstances, the Court finds that the balance of the equities weighs in favor of granting Plaintiffs' request for a preliminary injunction.

### 4. The public interest

Plaintiffs argue that "[i]t is 'obvious' that 'enforcement of an unconstitutional law is always contrary to the public interest[,]'" *see* Dkt. No. 6-2 at 29 (quotation omitted); and, conversely, "enforcing the Constitution is *always* in the public interest[,]" *see* Dkt. No. 10 at 28.

Defendants, on the other hand, argue that it is Plaintiffs' interests, not the public's interest, that drive this lawsuit.  *See* Dkt. No. 9 at 35.  Furthermore, Defendants assert that "'when an injunction would "adversely affect a public interest . . . even temporarily . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.'"  *See id.* (quoting *Goings v. Court Servs. & Offender Supervision Agency for the District of Columbia*, 786 F. Supp. 2d 48, 60-61 (D.D.C. 2011) (quoting *Yakus v. United States*, 321 U.S. 414, 440-41 (1944))).  Defendants contend that, "[i]n this case, the public consequences of granting an injunction would be significant," in that allowing for additional weapons on the street, which would, in turn, increase the risk of mishaps, outweighs the individual's right to "self-identified personal safety."  *See id.* at 36.

For the same reasons that the Court found that the balance of equities weighs in favor of Plaintiffs, the Court also finds that the public interest weighs in favor of Plaintiffs.

### C.     Bond Requirement

Rule 65 of the Federal Rules of Civil Procedure provides, in pertinent part, that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined . . . ."  Fed. R. Civ. P. 65(c).

Plaintiffs argue that a court may dispense with this requirement when there is no risk of financial harm.  *See* Dkt. No. 6-2 at 29 (citations omitted).  Thus, Plaintiffs assert that the Court should dispense with the bond requirement in this case.  *See id.*

Defendants did not address Plaintiffs' argument regarding this issue.  Although it is true that Defendants would not suffer any financial damages if it were later determined that the Court wrongfully enjoined them from enforcing the District of Columbia's "good reason"/"proper reason" requirement, the Court finds it proper that Plaintiffs provide security in the amount of $1,000.00 pursuant to Rule 65(c).

## IV. CONCLUSION

After reviewing the entire file in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion for a preliminary injunction is **GRANTED**; and the Court further

**ORDERS** that Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction are enjoined from enforcing the requirement of D.C. Code § 22-4506(a) that handgun carry license applicants have a "good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol," including, but not limited to, the manner in which that requirement is defined by D.C. Code § 7-2509.11 and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4, and 2334.1, against Plaintiffs Brian Wrenn, Joshua Akery, Tyler Whidby, and other members of Plaintiff Second Amendment Foundation, Inc.; and the Court further

**ORDERS** that Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, are enjoined from denying handgun carry licenses to applicants who meet the requirements of D.C. Code 22-4506(a) and all other current requirements for the possession and carrying of handguns under District of Columbia law; and the Court further

**ORDERS** that, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, Plaintiffs shall post security in the amount of $1,000.00; and the Court further

**ORDERS** that counsel shall appear for a conference with the Court on **Tuesday, July 7, 2015**, at **11:00 a.m.** to discuss an expedited schedule for the resolution of this case.

**IT IS SO ORDERED.**

Dated: May 18, 2015
    Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge

## CERTIFICATE OF SERVICE

I certify that on June 11, 2015, electronic copies of this motion were served

through the Court's ECF system, to:

Alan Gura, Esq.
Gura & Possessky, PLLC
105 Oronoco Street, Suite 305
Alexandria, VA 22314

/s/ Holly M. Johnson
HOLLY M. JOHNSON