IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| BRIAN WRENN, et al., ) | Case No. 15-7057 |
| ) | |
| Plaintiffs-Appellees, ) | |
| ) | |
| v. ) | |
| ) | |
| DISTRICT OF COLUMBIA, et al., ) | |
| ) | |
| Defendants-Appellants. ) | |
| ) | |
| _____) | |

## OPPOSITION TO DEFENDANTS' EMERGENCY MOTION FOR ADMINISTRATIVE STAY

Defendants-Appellants' Emergency Motion for an Administrative Stay is procedurally deficient and untimely. Moreover, a complete understanding of what the District Court ordered—and did not order— reveals that there is no emergency or other basis for seeking an administrative stay.[1] Indeed, notwithstanding the pleadings, Defendant Lanier has conceded that much in speaking to the press.

---

[1] In due time, Plaintiffs-Appellees will address the motion for a stay pending appeal.

1

ARGUMENT

I. DEFENDANTS FAIL TO DESCRIBE THE ALLEGED EMERGENCY, OR WHY THEY DID NOT SEEK RELIEF AT ANY TIME THROUGHOUT THE THREE WEEKS FOLLOWING THE ISSUANCE OF THE INJUNCTION.

Circuit Rule 27(f) provides, with respect to emergency motions, that

> The motion on which expedited action is sought must be labeled an "Emergency Motion" and the request for expedition must state the nature of the emergency and the date by which court action is necessary. The motion must be filed at least 7 days before the date by which court action is necessary or counsel must explain why it was not so filed. Counsel for the party seeking expedition must communicate the request and the reasons there for in person or by telephone to the clerk's office and to opposing counsel.

The Court's Handbook of Practice and Procedure stresses the importance of describing the emergency and the reasons for not having moved sooner:

> Because many motions for stay are filed on an emergency basis, Circuit Rules 8, 18, and 27(f), which prescribe the procedures for seeking emergency relief, should be reviewed carefully. In particular, counsel or a party must identify the motion as an "Emergency Motion," and file it at least 7 days before the date on which court action is necessary, or explain why the motion could not have been filed sooner. Where counsel or a party gives only a vague or general explanation as to why it was not filed at least 7 days before the date of the requested court action, the Court may conclude that expedited consideration of the motion is unwarranted.

D.C. Circuit Handbook of Practice and Internal Procedures at 32 (2015).

Defendants seek an "immediate" administrative stay, but they have not given even a "vague or general explanation" as to why they did not move sooner. After all, the injunction was issued May 18, 2015—nearly a month before Defendants' "emergency" stay request. If, as Defendants now claim, "[t]ime is of the essence, and the District cannot wait for the district court to act," Motion at 1, why did they wait over a week to first seek an "immediate" stay from the District Court (filed May 26)?

Waiting over a week to seek any sort of stay is an inexplicable response to an alleged "emergency," but Defendants' conduct following the District Court's immediate denial of their stay request, on May 28, is even more puzzling. The District Court had set Defendants' motion for stay pending appeal for argument on July 7. Defendants knew, as of May 28, that the injunction would remain in force for over a month. But instead of immediately noticing an appeal and seeking emergency relief, Defendants waited another four days—to again ask the District Court for an administrative stay.

3

And when that request was almost immediately denied, on June 2—unsurprisingly, as nothing had changed since the District Court denied Defendants' administrative stay request five days earlier—did Defendants rush to this Court with their "emergency," because "time is of the essence" and they "cannot wait?"

No. They waited over a week, again, just to notice their appeal.

Plaintiffs will not speculate as to what advantage Defendants perceived in delaying their notice of appeal and request for immediate relief. But the rules do require, as the Court should fairly expect, *some* explanation for Defendants' dilatory approach to this "emergency."

II. DEFENDANTS' MOTION FOR "EMERGENCY" ADMINISTRATIVE STAY IS UNTIMELY.

Defendants could have definitely moved sooner. Considering the magnitude of the alleged harm (overstated, see infra), this request should have been made on May 18 or 19, upon issuance of the preliminary injunction. It should have absolutely been made by May 28, when the District Court rejected it. Or perhaps on June 2, when the District Court rejected the request a second time. Instead, the notice of appeal was not filed until June 10, and no request for emergency relief was made until June 11.

Defendants' motion, coming at this very late date, cannot be a timely response to an "emergency."

III. THERE IS NO EMERGENCY.

Defendants' slow response to the injunction was not irrational. There is, in fact, no true "emergency."

"MPD reports that it has now received 96 applications since the injunction was issued, less than a month ago." Motion at 8 n.2. That may be so, but Defendants do not report another critical fact: Plaintiffs never challenged, and the District Court did not enjoin, the operation of 24 D.C.M.R. §§ 2339.1, 2340.1, which afford Defendant Lanier ninety days to review applications for preliminary approval. If the applicant has not yet completed the required training (also not challenged or enjoined), the applicant has an additional 45 days to do so. See 24 D.C.M.R. § 2339.3(b).

Accordingly, even if all 96 post-injunction applications lack a "good" or "proper" reason, and even if they were all filed simultaneously with the injunction, no provisional approval of these applications would be expected until August 17, 2015—long after the motion for stay would be decided in the normal course of proceedings.

5

The only applications impacted by the injunction were those of the three individual plaintiffs, and any others that might have been pending as of May 18. Defendants did not reveal that number, but they should have. It must be much smaller than the "only 109 [applications, actually, 106, discounting Plaintiffs' individual applications, received] in the previous seven months," Motion at 8, as most of these applications were doubtless resolved within 90 days.

That brings the Court to the specific nature of the harm that the immediate stay would address:

> Granting an administrative stay would minimize unnecessary disruption and confusion. If no administrative stay were issued, the District will likely be forced to issue licenses—in the absence of "good reason"—while its motion to stay is pending before this Court. If this Court later were to grant the District's motion and issue a stay, the District would then have to withdraw the licenses that had been issued.

Motion at 20.

First, the District would not "have to withdraw the licenses that had been issued." That would be a choice—and a fairly simple one to make, because presumably Defendant Lanier knows which licenses are issued with, or without, a "good" or "proper" "reason." It would be exceedingly simple to revoke those licenses. 24 D.C.M.R. § 2341.1.

6

Second, it must be stressed, the District Court enjoined *only* the "good" or "proper" "reason" requirement. It left untouched the District's handgun registration requirements, which are already more strict than what is often required to obtain a carry license in other jurisdictions; the training and background check requirements; and all other time, place and manner restrictions regulating the carrying of handguns. Moreover, the District Court did not enjoin Defendants from adopting laws that would permit the denial of a handgun carry license where the police can articulate some reason as to why a particular applicant would pose a danger.

Finally, while the motion recounts the City Council's beliefs about the alleged hazards of tolerating the right to bear arms, constitutional cases do not turn on whether, as a normative matter, some constitutional feature makes for good or bad public policy. And the inquiry at this juncture is narrower still: will any harm flow from allowing a small handful of responsible, law-abiding adult citizens, who have undergone extensive training and whose backgrounds have been examined, to carry handguns for self-defense?

Defendants' motion is silent on the question, but Defendant Lanier has addressed it directly. Last July, the District Court struck down the city's complete prohibition on defensive handgun carry, *Palmer* v. *District of Columbia*, 59 F. Supp. 2d 173 (D.D.C. 2014), leaving the District with virtually no laws regulating the carrying of handguns. Defendant Lanier called for sensitive place restrictions, but otherwise offered, "Law-abiding citizens that register firearms, that follow the rules, are not our worry."[2]

"Not our worry" indeed. After all, forty-four states generally respect the right to bear arms, and experience less violent crime than does the District of Columbia. And many of these states track the outcomes of licensed permit holders.

There is, at least, no positive correlation between legal defensive handgun carrying and violent crime. The relationship is inverse.

---

[2] Mike DeBonis, "Security, not street crime, at risk after gun ruling, D.C. Police Chief Cathy Lanier says," *Washington Post*, July 30, 2014, available at http://www.washingtonpost.com/local/dc-politics/security-not-street-crime-at-risk-after-gun-ruling-dc-police-chief-cathy-lanier-says/2014/07/30/f8b17e1c-1808-11e4-9e3b-7f2f110c6265_story.html (last visited June 12, 2015)

According to the latest full-year FBI crime rate figures, for 2013,[3] the United States as a whole experienced 367.9 violent crimes per 100,000 people.[4] But the average violent crime rates of those jurisdictions where the carrying of handguns was tightly restricted on a "may issue" basis or completely forbidden was 456.46 per 100,000 people.[5]

Hard data confirms Defendant Lanier's "not our worry" position, as well as Judge Reinhardt's observation that "[c]arrying a gun, which is a Second Amendment right . . . cannot legally lead to a finding that the individual is likely to murder someone; if it could, half or even more of the people in some of our states would qualify as likely murderers." *Dickens* v. *Ryan*, 688 F.3d 1054, 1085 (9th Cir. 2012) (Reinhardt, J.,

---

[3]The Court should take judicial notice of information contained on government websites. *Denius* v. *Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003).

[4]*See* FBI, *Uniform Crime Reports: Crime in the United States 2013*, Table 4, available at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/4tabledatadecoverviewpdf/table_4_crime_in_the_united_states_by_region_geographic_division_and_state_2012-2013.xls (last visited June 12, 2015).

[5]*Id.* (averaging Massachusetts, 404.0; New Jersey, 285.6; New York, 389.8; Illinois, 372.5 [Illinois began issuing permits on a shall-issue basis in 2014]; **District of Columbia, 1289.1**; Maryland, 467.8; California, 396.2; Hawaii, 245.3; and Puerto Rico, 257.8. Plaintiffs excluded Delaware (479.1), where concealed carry permits are generally unavailable but open carrying is permissible).

dissenting). Law-abiding, responsible American adults who have undergone the type of licensing to which Defendants already subject mere handgun possessors are quite safe and responsible in carrying handguns for self-defense.

Through June 30, 2013, Michigan has issued 118,025 handgun carry licenses and revoked only 1402, barely over 1%, for any reason.[6] Tennessee, which currently has 504,384 handgun carry permits, revoked just 284 last year for any reason.[7] These revocations did not necessarily involve misuse of a firearm.

Texas and Florida, highly populated states with significant urban populations, who have issued handgun carry licenses for many years, provide additional information regarding the outcomes for licensed

---

[6] Michigan State Police Criminal Justice Information Center, *Concealed Pistol License Annual Report, July 1, 2012 to June 30, 2013*, available at http://www.michigan.gov/documents/ msp/CPLAnnual_ Report2013_463317_7.pdf (last visited June 12, 2015).

[7] *Current Valid Tennessee Handgun Permits by County*, available at http://www.tn.gov/ safety/stats/DL_Handgun/Handgun/Current_HG_ PermitHolders.pdf (last visited June 12, 2015); Tennessee Dep't of Safety & Homeland Security, *Handgun Carry Permit Statistics Calendar Year 2014*, at 5, available at http://www.tn.gov/safety/stats/ DL_Handgun/Handgun/HandgunReport2014Full.pdf (last visited June 12, 2015).

handgun carriers. For 2013, of 50,869 total serious criminal convictions in Texas, only 158—or 0.3106%—involved individuals licensed to carry defensive handguns, though even these did not necessarily have anything to do with handguns or their public carriage.[8]

Since 1987, Florida has issued 2,786,887 handgun carry licenses, and has revoked only 9,953 for any reason—barely over a third of one percent—of which at least 967 were later reinstated. Through 2010, only 168 revocations in that state involved the use of a firearm, though not necessarily in a public setting or involving violence.[9]

There is simply no support for the notion that law-abiding, responsible people duly trained and licensed to carry handguns pose any sort of meaningful public safety hazard, such that even the tiny

---

[8]Texas Dep't of Public Safety, *Conviction Rates for Concealed Handgun License Holders, Reporting Period 1/1/2013-12/31/2013*, available at http://www.txdps.state.tx.us/RSD/ CHL/Reports/Conviction RatesReport2013.pdf (last visited June 12, 2015).

[9]Florida Department of Agriculture and Consumer Services Division of Licensing, *Concealed Weapon or Firearm License Summary Report October 1, 1987 - May 31, 2015*, available at http://www.fresh from florida.com/content/download/7499/118851/cw_monthly.pdf (last visited June 12, 2015).

handful of applicants impacted by the injunction prior to August 17 must be immediately stripped of their licenses.

CONCLUSION

Defendants have failed to explain, let alone prove, the existence of any emergency. Their motion is untimely. And there is no emergency, considering the injunction's limited scope, and as confirmed by Defendant Lanier's candid lack of concern and the overwhelming weight of everyday experience throughout the country.

The motion for immediate administrative stay should be denied.

Dated: June 12, 2015            Respectfully submitted,

                                                   Alan Gura
                                                   Gura & Possessky, PLLC
                                                   105 Oronoco Street, Suite 305
                                                   Alexandria, VA 22314
                                                   703.835.9085/703.997.7665

                                     By:   /s/ Alan Gura
                                                   Alan Gura

                                                   Attorney for Appellees

CERTIFICATE OF SERVICE

I certify that on this 12th day of June, 2015, I filed the foregoing electronically with the Clerk of the Court using the CM/ECF System. I further certify that I will submit any required paper copies to the Court. I further certify that counsel for Defendants-Appellants is a registered CM/ECF user and will be served via the CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 12th day of June, 2015.

/s/ Alan Gura
Alan Gura

*Counsel for Plaintiffs-Appellees*