NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 15-7057

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

BRIAN WRENN, *et al.*,
APPELLEES,

v.

DISTRICT OF COLUMBIA, *et al.*,
APPELLANTS.

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**BRIEF OF THE DISTRICT OF COLUMBIA AND
METROPOLITAN POLICE DEPARTMENT CHIEF CATHY LANIER**

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—The District of Columbia and Metropolitan Police Department Chief Cathy Lanier are appellants here and defendants below.  Brian Wrenn, Joshua Akery, Tyler Whidby, and the Second Amendment Foundation, Inc., are appellees here and plaintiffs below.  *Amici curiae* for appellants include Brady Center to Prevent Gun Violence, Everytown for Gun Safety, and DC Appleseed Center for Law & Justice.  The National Rifle Association of America will participate as *amicus curiae* for appellees.

B. *Rulings under review*.—The District and Chief Lanier appeal an order issued on May 18, 2015, by District Court Judge Frederick J. Scullin, Jr., granting plaintiffs' motion for a preliminary injunction (ECF Docket No. 13).

C. *Related cases*.—In July 2014, in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), the district court (Scullin, J.) struck down the District's prohibition on the public carrying of handguns.  An appeal was filed (No. 14-7180) but was voluntarily dismissed in light of amendments to the District's gun laws.  Plaintiffs filed this action as a "related case" in the district court, presumably because at the time a post-judgment motion was pending in *Palmer* that challenged the constitutionality of the amended law challenged here.  That motion was denied on May 18, 2015.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES..........................................................1

STATEMENT OF THE CASE............................................................2

    1.    The District Of Columbia's System For Licensing The Carrying Of Handguns In Public........................................................2

    2.    The District Court's Preliminary Injunction. .......................7

STANDARD OF REVIEW ...............................................................9

SUMMARY OF ARGUMENT .........................................................10

ARGUMENT .............................................................................14

    I.    Plaintiffs Are Not Likely To Prevail On The Merits Of Their Claim That The Constitution Requires A "Shall-Issue" Nation.........14

        A.    The district court misapplied intermediate scrutiny. ...............15

            1.    The district court erred as a matter of law by refusing to defer to the Council's predictive findings. .......................................................15

            2.    The district court's legal error is apparent in its treatment of the opinions of three federal appellate courts upholding the "good reason" standard under intermediate scrutiny. ...................................20

        B.    Under a proper view of the law, the District is likely to prevail on the merits...............................................23

            1.    The evidence offered by the Council............................23

            2.    The evidence the District is likely to introduce on a full record.......................................................28

3.  The Council's tailoring of the "good reason" standard to accomplish its objectives. ............................32

C.  The district court properly refused to review the "good reason" standard under a more rigorous level of review. .........36

1.  If there is a constitutional right to carry a handgun in densely populated public places, it is not at the core of the Second Amendment. ....................................37

2.  The "good reason" standard does not "destroy" the right to keep and bear arms for self-defense. .................48

II.  The District Court Wrongly Presumed Irreparable Harm To Plaintiffs And Then Balanced The Equities In Their Favor. .............51

A.  Plaintiffs bear an especially high burden of proof because they seek to change the status quo rather than preserve it. .......51

B.  Plaintiffs have not demonstrated that they are likely to suffer irreparable harm if the "good reason" standard is enforced while this litigation is pending. ...................................53

C.  The preliminary injunction will cause the District and the public to suffer irreparable harm. .............................................56

CONCLUSION ........................................................................................................59

# TABLE OF AUTHORITIES*

## *Cases*

*Ambach v. Bell*, 686 F.2d 974 (D.C. Cir. 1982).......................................................19

*Bonidy v. USPS*, 790 F.3d 1121 (10th Cir. 2015)............................................ 35, 45

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .................................................... 51, 53, 55

*Cincinnati v. Discovery Network*, 507 U.S. 410 (1993) ..........................................46

*Dearth v. Lynch*, 791 F.3d 32 (D.C. Cir. 2015) ......................................................38

*District of Columbia v. Heller*,
554 U.S. 570 (2008)............................ 2, 3, 36, 37, 39, 42, 43, 44, 47, 48, 49, 50, 55

**Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) .......... 4, 20, 21, 22, 23, 36, 39, 44, 50

*Edenfield v. Fane*, 507 U.S. 761 (1993) ................................................................46

*Found. on Econ. Trends v. Heckler*, 756 F.2d 143 (D.C. Cir. 1985) ............... 10, 43

*Friedman v. Highland Park*, 784 F.3d 406 (7th Cir. 2015)............................ 44, 56

*Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*,
698 F.3d 1295 (10th Cir. 2012) .................................................................51

*Wisc. Gas v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)...............................................53

*Gilardi v. HHS*, 733 F.3d 1208 (D.C. Cir. 2013).................................................28

**Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011)................... 8, 15, 16, 17, 18, 19, 20, 27, 37, 38, 45

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ............................... 18, 24

**Kachalsky v. Cnty. of Westchester*,
701 F.3d 81 (2d Cir. 2012)................................. 4, 20, 21, 22, 36, 39, 41, 45, 49, 55

---

\*        Authorities upon which we chiefly rely are marked with asterisks.

*Kachalsky v. Cacace*, 817 F. Supp. 2d 235 (S.D.N.Y. 2011)...................................49

*Keystone Bituminous Coal v. DeBenedictis*, 480 U.S. 470 (1987)..........................47

*Koon v. United States*, 518 U.S. 81 (1996)........................................................ 10, 17

*Lorillard Tobacco v. Reilly*, 533 U.S. 525 (2001) .................................................28

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...............................................53

*Martinez v. Mathews*, 544 F.2d 1233 (5th Cir. 1976)..............................................51

*Maryland v. King*, 133 S. Ct. 1 (2012) .................................................................56

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)..........................................................15

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................................3, 14

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009).............................55

*Nat'l Taxpayers Union v. United States*, 68 F.3d 1428 (D.C. Cir. 1995) ...............54

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................... 9, 23, 56

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978)....................................... 46, 47

*Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014) ........................3

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *vacated pending reh'g en banc*, 781 F.3d 1106 (2015) ......................................................... 16, 17, 19

*Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013).............................. 39, 40, 48

*Punnett v. Carter*, 621 F.2d 578 (3d Cir. 1980)......................................................51

*\*Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013).................... 15, 16, 18, 33, 38

*Sherbert v. Verner*, 374 U.S. 398 (1963) ........................................................ 46, 47

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011)...................................................9

*United States v. Skoien*, 587 F.3d 803, 809 (7th Cir. 2009) ...................................48

*Stanley v. USC*, 13 F.3d 1313 (9th Cir. 1994) ........................................................51

*Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27 (2d Cir. 1995) .................. 51, 52

*Turner Broad. Sys. v. FCC*, 512 U.S. 622 (1994) ........................................... 15, 49

*\*Turner Broad. Sys. v. FCC*, 520 U.S. 180 (1997) ....... 15, 16, 17, 18, 19, 27, 34, 49

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ........................................... 39

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) .................... 44, 48, 58

*United States v. O'Brien, 391 U.S. 367 (1968)* ........................................................ 46

*United States v. Salerno*, 481 U.S. 739 (1987) ........................................................ 20

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
425 U.S. 748 (1976) ....................................................................................................... 46

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ............................................... 16

*Winter v. NRDC*, 555 U.S. 7 (2008) ........................................................................ 55

*\*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) ....... 4, 20, 21, 22, 31, 32, 35,
36, 39, 48

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) .......................... 46

## Constitutional Provisions

U.S. Const. Amend. II ...................................................................................... passim

## Statutes

2 Edw. 3, 258, ch. 3 (1328) ...................................................................... 40, 41, 42

18 U.S.C. § 930 ............................................................................................................. 50

27 Stat. 116 (1892) ................................................................................................. 2, 42

28 U.S.C. § 1331 ............................................................................................................. 1

28 U.S.C. § 1292(a)(1) .................................................................................................... 1

47 Stat. 651, ch. 465, § 4 (1932) .............................................................................. 42

57 Stat. 586, ch. 296 (1943) ...................................................................2, 42

1694 Mass. Laws 12, No. 6 ...........................................................................41

1859 N.M. Laws 94, § 2 ................................................................................41

1870 S.C. Laws 402, No. 288 ........................................................................41

1870 W. Va. Laws 702, ch. 153, § 8...............................................................42

1871 Tex. Laws 1322, art. 6512 .....................................................................42

1873 Minn. Laws 1025, § 17 ..........................................................................42

An Act to Prevent the Carrying of Dangerous Weapons in the City of Washington (Nov. 4, 1857) ..................................................................................42

An Act to Prevent the Carrying of Concealed and Dangerous Weapons in the City of Washington (Nov. 18, 1858) .............................................................42

D.C. Code § 7-2502.02(a)(4) ...........................................................................3

D.C. Code § 7-2509.06(a)...............................................................................50

D.C. Code § 7-2509.11(1)(A) ...........................................................................3

D.C. Code § 7-2509.11(1)(B) ...........................................................................4

D.C. Code § 7-2502.01(a) (2001) .....................................................................2

D.C. Code § 7-2502.02(a)(4) (2001) .................................................................2

D.C. Code § 22-4504 (2009 Supp.) ...................................................................3

D.C. Code § 22-4504.01 ................................................................................49

D.C. Code § 22-4506(a)...............................................................................3, 8

D.C. Code of 1818 at 253-54 .........................................................................41

Md. Const. of 1776, art. III, § 1 .....................................................................41

Revised Code of the District of Columbia at 570...............................................42

1 DCMR § 1202 .............................................................................................7

1 DCMR § 1221.6 ................................................................................2

24 DCMR § 2333.1 ..............................................................................6

24 DCMR § 2333.2 ...........................................................................6, 7

24 DCMR § 2333.4 ..............................................................................7

24 DCMR § 2334.1 ..............................................................................7

Nebraska City, Neb., Ordinance no. 7 (1872) ...........................................43

Nashville, Tenn., Ordinance Ch. 108 (1873) .............................................43

Dodge City, Kan., City Ordinances no. 16, § 11 (Sept. 22, 1876) ..........................43

Los Angeles, Cal., Ordinance Nos. 35-36 (1878) ...........................................43

Salina, Kan., Ordinance No. 268 (1879) .................................................43

Syracuse, N.Y., Ordinances Ch. 27 (1885) .........................................43, 44

Dallas, Tex., Ordinance of July 18, 1887 (1887) .........................................44

Checotah, Okla., Ordinance No. 11 (1890) ...............................................44

Rawlins, Wyo., Rev. Ordinances Art. 7 (1893) ...........................................44

Wichita, Kan., Ordinance No. 1641 (1899) ...............................................44

McKinney, Tex., Ordinance No. 20 (1899) ................................................44

## Legislative History

Committee on the Judiciary and Public Safety, D.C. Council, Report on Bill
20-930 (Nov. 26, 2014) ......................2, 4, 5, 6, 21, 22, 23, 24, 25, 26, 27, 28, 33, 57

## Other

Ian Ayres & John Donohue, *Nondiscretionary Concealed Weapons Laws: A Case
Study of Statistics, Standards of Proof, and Public Policy*,
1 Am. L. & Econ. Rev. 436 (1999) ........................................................24

Ian Ayres & John Donohue, *More Guns, Less Crime Fails Again: The Latest Evidence from 1977-2006*, 6 Econ. J. Watch 218 (2009)........................................25

Ian Ayres & John Donohue, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stan. L. Rev. 1193 (2003) ............................................ 24, 29, 30, 31

Ian Ayres & John Donohue, *Yet Another Refutation of the More Guns, Less Crime Hypothesis*, 6 Econ. J. Watch 35 (2009)..................................................25

Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013)........................... 42, 43

Carl Bogus, *A Symposium on Firearms, the Militia, and Safe Cities*, 1 Alb. Gov't L. Rev. 440 (2008)....................................................... 35, 43

Charles Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Amer. J. Pub. Health 2034 (2009) ........................................31

Patrick Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1 (2012) .......... 40, 45

Philip Cook, *et al.*, *Criminal Records of Homicide Offenders*, 294 JAMA 598 (2005) ................................................................35

Philip Cook, *et al.*, *Gun Control After* Heller: *Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. Rev. 1041 (2009)...................................... 31, 32

Patrick Charles, *The Statute of Northampton by the Late Eighteenth Century: Clarifying the Intellectual Legacy*, 41 Fordham Urb. L.J. City Square 10 (2013) .................................................. 40, 41

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379 (2006)................................................................31

John Donohue, *Guns, Crime, and the Impact of State Right-to-Carry Laws*, 73 Fordham L. Rev. 623 (2004)..........................................................24

John Donohue, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* (Sept. 4, 2014) ................................................................ 24, 25

Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 Am. Econ. Rev. 468 (1998)..................29

ix

Everytown for Gun Safety, *Federally Mandated Concealed Carry Reciprocity: How Congress Could Undercut State Laws on Guns in Public* ..............................30

FBI, Crime in the United States (2012) ..................................................................30

Dennis Henigan, *The* Woollard *Decision and The Lessons of the Trayvon Martin Tragedy*, 71 Md. L. Rev. 1188 (2012) ...................................................... 28, 29, 40,48

Andrew Herz, *Gun Crazy: Constitutional False Consciousness and Dereliction of Dialogic Responsibility*, 75 B.U. L. Rev. 57 (1995)................................................ 47

John Lott & David Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. Legal Stud. 1 (1997) ..................................................................... 24

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 Int'l L. Rev. L. & Econ. 239 (1998).......................................29

Minnesota Drug & Violent Crime Task Forces, 2011 Annual Report....................35

Nat'l Research Council, *Firearms and Violence: A Critical Review* (2004) ..........24

Eric Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 126 Yale L.J. Forum, (forthcoming) (August 25, 2015) ............................................................................................. 41, 42

*Gun Control: States' Laws and Requirements for Concealed Carry Permits Vary Across the Nation*, U.S. Government Accountability Office, Report to Congressional Requesters, GAO-12-717 (July 2012) .............................................37

Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* (2011) ...................................................................................................................43

Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683 (2007)...................................................................................38

# GLOSSARY

JA             Joint Appendix

MPD          District of Columbia Metropolitan Police Department

RD            Record Document

## JURISDICTIONAL STATEMENT

The district court has jurisdiction over this Second Amendment case under 28 U.S.C. § 1331.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).  The preliminary injunction was entered on May 18, 2015, and the notice of appeal was timely filed on June 11, 2015.

## STATEMENT OF THE ISSUES

The District of Columbia appeals a preliminary injunction requiring it to issue licenses to carry handguns in public regardless of whether the applicant can demonstrate "good reason" to do so, as the District's legislature has required. Plaintiffs claim the Second Amendment categorically forbids this requirement. The issues are:

1. Whether the district court committed legal error by finding plaintiffs likely to prevail on the merits of their challenge to the "good reason" law, where the court held that it should be measured under intermediate scrutiny, but then refused to apply this test in accordance with binding precedent by deferring to the legislature's substantiated findings that the law will promote public safety while allowing public carrying by those with actual and articulable needs for armed self-defense.

2. Whether the district court erred in "presum[ing]" irreparable injury to plaintiffs, then balancing the equities in their favor, where they concede lacking

any "good reason" to believe they will be injured if they cannot carry handguns in public while this lawsuit is pending, and where the District will be irreparably harmed and the public interest obstructed if it cannot uniformly enforce this critically important public-safety provision while it is compiling a full record in the district court.

## STATEMENT OF THE CASE

**1.    The District Of Columbia's System For Licensing The Carrying Of Handguns In Public.**

For more than a century, the District of Columbia has regulated the carrying of handguns in public.  *See* Committee on the Judiciary and Public Safety, D.C. Council, Report on Bill 20-930 (Nov. 26, 2014), Joint Appendix ("JA") 41-42.  For much of that time, some carrying was allowed under a licensing scheme.  *See*, *e.g.*, 27 Stat. 116 (1892); 57 Stat. 586, ch. 296 (1943).  Starting in 1976, however, the District generally banned the possession of handguns.  D.C. Code §§ 7-2502.01(a), 7-2502.02(a)(4) (2001).

The Supreme Court found this ban unconstitutional in *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*"), under the Second Amendment, which directs that "the right of the people to keep and bear Arms, shall not be infringed." The Court held that the Second Amendment codified a pre-existing, individual right and that, "whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in

2

defense of hearth and home." 554 U.S. at 592, 635. In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court found this right "fully applicable to the States," but assured that "state and local experimentation with reasonable firearms regulation will continue." *Id.* at 750, 785.

In response to *Heller I*, the Council of the District of Columbia amended the law to allow use of handguns for self-defense in the home, which the Court described as the core right enshrined in the Second Amendment. D.C. Code § 7-2502.02(a)(4); *Heller I*, 554 U.S. at 628-30. Carrying handguns in public remained prohibited. D.C. Code § 22-4504 (2009 Supp.). The district court (Scullin, J.) struck down this carrying ban in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014). In response, the Council enacted comprehensive legislation to permit the issuance of concealed-carry licenses if, among other qualifications, the applicant has either "good reason to fear injury to his or her person or property" or "any other proper reason for carrying a pistol." D.C. Law 20-279, § 3(b), 62 D.C. Reg. 1944 (effective June 16, 2015) (codified at D.C. Code § 22-4506(a)). To show "good reason to fear injury," an applicant must demonstrate "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." D.C. Law 20-279, § 2(f) (codified at D.C. Code § 7-2509.11(1)(A)). "[O]ther proper reason … shall at a minimum include types of

3

employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person."  D.C. Code § 7-2509.11(1)(B).

The Council based the "good reason" standard on similar provisions in New York, Maryland, and New Jersey, all of which "have withstood constitutional challenges in federal courts of appeal."  JA 41, 48 & n.39 (citing *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013); *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013)).  This "revival of the original concealed carry law reinstates the District as a 'may issue' jurisdiction," unlike states with "'shall issue' laws, which require the issuing authority to grant most permits."  JA 47.  The Council credited empirical studies demonstrating that the "right-to-carry laws" enacted in "shall issue" states "are associated with substantially higher rates of aggravated assault, rape, robbery and murder."  JA 56.  It found "undeniable" that "introducing a gun into any conflict can escalate a limited danger into a lethal situation," and that this "danger extends to bystanders and the public at large."  JA 57.  Given the District's "substantial governmental interest in public safety and crime prevention," the Council concluded that the "good reason" standard "offers a reasonable, balanced approach to protecting the public safety and meeting an individual's specific need for self-defense."  JA 57-58.

4

The Council also found the licensing regime necessary to prevent federal and local law enforcement agencies from "turn[ing] the District into a semi-police state" in an effort to protect its thousands of "high-value security targets." JA 44, 56. Unlike any state, the District's "68 square miles … is completely contained in a dense urban setting." JA 46. And compared to other large cities, it has greater "public safety and national security concerns" given that "[i]t is the home of the President" and "all high-ranking federal officials and members of Congress," many of whom "are under constant protection" by the Secret Service or Capitol Police. JA 43, 46. It also "is home to a diplomatic corps more extensive and omnipresent than anywhere else in the country"—"approximately 3,000 foreign dignitaries spend[] time in our city each year"—and "threats are a constan[t] for the diplomatic corps." JA 44, 46. The District's Metropolitan Police Department ("MPD") "also provides security support for more than 4,000 special events annually." JA 45. Thus, "the District of Columbia, as the seat of the federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day, is a city filled with sensitive places from a public safety perspective." JA 44.

The Council noted that the city is already "heavily patrolled and protected by the more than two dozen law enforcement entities that operate here," few of which fall under the District's authority. JA 46. Without the licensing regime,

5

these entities would have to account for the increased risk associated with increased carrying—a result that, the Council found, would unfairly infringe on the constitutional rights of its citizenry.  JA 43-46.  "At some point the presence of law enforcement crosses a psychological line between providing public safety and infringing upon a sense of freedom.  Citizens of the United States take pride in the freedom granted to them through the Constitution—freedom of expression, freedom of movement."  JA 46.  "But increasing the posting of armed officers, or clearing streets of all automobiles and restricting pedestrian movement except through checkpoints, tips society away from the freedom and openness we value in our society."  JA 46.  Thus, "[t]he circumstances unique to the District require a regulatory system different than perhaps any other jurisdiction, and especially, far different than what would be necessary for public safety in a rural place."  JA 46.

Just like the Council's law, the regulations issued by MPD were modeled on standards applied in New York, Maryland, and New Jersey.  They define "good reason" as a "special need for self-protection distinguishable from the general community."  24 DCMR § 2333.1 (published at 62 D.C. Reg. 9781 (July 17, 2015)).  To satisfy this standard, an applicant must "allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person," and that "the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution."  24 DCMR

6

§ 2333.2.  "The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason … for the issuance of a concealed carry license."  24 DCMR § 2333.4.  Alternatively, an applicant can demonstrate any "other proper reason" for carrying a handgun in public, such as employment that requires the personal transport of "large amounts of cash or other highly valuable objects" or the need to protect a family member who has "good reason" but "cannot act in defense of himself or herself."  24 DCMR § 2334.1.

If the Chief of Police denies an application for a concealed-carry license, the applicant may appeal to the Concealed Pistol Licensing Review Board, 1 DCMR § 1202 (published at 62 D.C. Reg. 11123 (Aug. 10, 2015)), and then "pursue judicial review" if needed, 1 DCMR § 1221.6.

## 2.    The District Court's Preliminary Injunction.

On February 3, 2015, the three named plaintiffs and the Second Amendment Foundation brought this action against the District and MPD Chief Cathy Lanier, claiming that the "good reason" standard violates the Second Amendment.  JA 7-20.  Three days later, they moved for a preliminary injunction, arguing that the standard "[d]estroys the Second Amendment right."  ECF Record Document ("RD") 6-2, at 17.  Each named plaintiff submitted a declaration that he could not obtain a concealed carry license because he could not satisfy the "good reason" standard.  JA 21-27.  The District filed its response two weeks later.  RD 9.

7

On May 18, 2015, the court, without a hearing, granted the motion and enjoined the District from enforcing the "good reason" standard against the named plaintiffs and members of the Second Amendment Foundation.[1]  JA 249.  *First*, it found plaintiffs likely to prevail on the merits.  JA 234-45.  The court held that, under *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"), it should apply "intermediate scrutiny," which requires "a tight 'fit' between [the challenged regulation] and a substantial governmental interest."  JA 239-40.  The court, however, refused to defer to the Council's conclusion that the "good reason" standard would help prevent crime and promote public safety and "did not burden the [Second Amendment] right substantially more than was necessary."  JA 240-41.  Indeed, the court thought that its view that "the empirical evidence on this issue is not conclusive" would count against the District.  JA 242 n.11.  It thus held that the District had "failed to demonstrate … any relationship, let alone a tight fit," between the "good reason" standard and public safety, explaining that applicants who meet this standard are no less likely to "present a risk to" the public "or commit violent crimes" than those who do not.  JA 243-44.

---

[1]     Reacting to plaintiffs' argument that the Chief had "unbridled discretion" even when "good reason" is shown, RD 6-2, at 24, the court also enjoined the District from denying licenses to applicants "who meet the requirements of D.C. Code [§] 22-4506(a) and all other current requirements for the possession and carrying of handguns."  JA 250.  The regulations, however, do not give the Chief such free-ranging discretion in any event.

8

*Second*, the court found that plaintiffs would suffer irreparable harm without a preliminary injunction.  JA 245-46.  Although they did not assert, let alone demonstrate, any special danger requiring them to carry a handgun in self-defense, the court reasoned that their right to do so is "intangible and unquantifiable" and irreparable harm is therefore "presumed."  JA 245.

*Third*, the court found that "the balance of the equities weighs in favor of … a preliminary injunction."  JA 247.  It disregarded the Council's public-safety concerns, opining that plaintiffs "seek a very limited injunction" that "only affects [the District's] ability to enforce [its] 'good reason' … requirement."  JA 247.

The District filed a timely appeal and, on June 29, 2015, this Court stayed the preliminary injunction pending appeal.

## STANDARD OF REVIEW

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  A plaintiff seeking a preliminary injunction must establish that: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest."  *Id.*  The last two factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

9

Although this Court reviews for abuse of discretion, it "must be conscious of whether [it is] reviewing findings of fact, conclusions of law, or … the balancing of the injunction factors." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 151 (D.C. Cir. 1985). A court necessarily "abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

## SUMMARY OF ARGUMENT

The Supreme Court has recognized that the Second Amendment preserves, even if it limits, local jurisdictions' ability to craft firearm regulations to suit local needs and values. The Council has done just that, carefully crafting a public-carrying law that addresses the District's unique public-safety challenges while preserving an individual's ability to carry a handgun in public when there is a special self-defense need. Plaintiffs, however, take an absolutist view, claiming that the Constitution requires every jurisdiction in the nation—regardless of its particular needs and values—to allow anyone who meets threshold requirements to carry a handgun in populated public places.

The district court awarded a preliminary injunction on this novel constitutional challenge to a provision the Council and several state legislatures have found necessary to prevent gun violence. To justify this radical change in the status quo, however, plaintiffs must be extremely likely to prevail on the merits, and the probability that they will suffer actual and irreparable injury must outweigh

10

the interest of the District and the public in uniformly enforcing this important public-safety law while litigation is pending.  The district court committed legal error in finding plaintiffs met this high burden.

1.  The district court wrongly found plaintiffs likely to prevail on the merits. It held that the "good reason" standard should be reviewed under intermediate scrutiny, but it then failed to apply that test as required by binding precedent. Rather than deferring to the Council's predictive judgment that the law will help prevent crime and promote public safety—and that it is reasonably tailored to accomplish this—the court substituted its own predictive judgment, finding no relationship between the law and its objectives.  It should have instead followed the legal approach of the three circuits that, deferring appropriately, have unanimously rejected Second Amendment challenges to "good reason" regimes.

The Council's judgment was supported by more than the substantial evidence needed to survive intermediate scrutiny (and even more can be expected on a full record).  It relied on empirical studies, expert testimony, anecdotal experience, and common sense, concluding that any increase in handgun carrying in the District's densely populated public areas would increase the risk of criminal violence and public harm.  The district court rejected this evidence as "not conclusive."  But when evidence is inconclusive, courts as a matter of law must defer to the judgment of the legislature.

11

This same evidence provides substantial support for the Council's conclusion that the "good reason" standard is no broader than reasonably necessary to accomplish its objectives.  The district court criticized the law because it does not distinguish between people who are likely to misuse their handguns and those who are not.  But the "good reason" standard was never meant to predict which particular licensee is more likely to cause harm.  The Council properly recognized that, beyond threshold suitability standards, it is very difficult to predict whether a seemingly responsible person will misuse a handgun, much less whether his public carrying will injure someone through no fault of his own.  Thus, the Council concluded, *any* increase in public carrying increases the risk of public harm, regardless of whether the licensee can satisfy the "good reason" standard.  So it tailored the law in a different way, crafting a standard ensuring that the public bears this additional risk only for individuals with a special need to carry a handgun in public for self-defense.  Intermediate scrutiny requires a reasonable fit between a law and its objectives, not a perfect one, and the "good reason" standard satisfies this standard.

2. The district court also erred in its equitable analysis.  A preliminary injunction should issue only to prevent irreparable harm, and plaintiffs concede that they have no particular reason to fear injury if they cannot publicly carry a handgun while their lawsuit is pending.  Indeed, their theory of standing to

challenge the "good reason" requirement depends on their assertion that they do *not* have any special reason to fear such injury. The district court, however, found irreparable harm "presumed," invoking the presumed injury associated with the suppression of free speech. But speech has intrinsic value; it is an end in itself. The right to keep and bear arms is a means to an end: the ability to defend oneself (and others) from attack. If no occasion arises where a handgun is needed for self-defense, its absence cannot cause harm. If plaintiffs have no reason to believe they are likely to need a handgun in public while this litigation is pending, they cannot hope to establish irreparable harm. And this failure, in itself, warrants vacatur of the preliminary injunction.

The District, moreover, will be irreparably harmed, and the public interest will be obstructed, if it cannot uniformly enforce the "good reason" standard while the law is challenged. The government suffers irreparable injury whenever it is enjoined from effectuating statutes enacted by the people's representatives. For a public-safety measure such as this, the injury can be palpable. Unlike gun possession in the home, public carrying subjects vast numbers of people to safety risks against their will, especially in a crowded city like the District.

The "good reason" standard is critically important. It is the heart of plaintiffs' challenge, and an essential component of a system crafted to balance public safety with the needs of individuals particularly at risk. Without this

13

standard, the District becomes a "shall-issue" regime, despite the Council's prediction that this will increase rates of aggravated assault, rape, robbery and murder. The district court was not free to disregard these harms.

## ARGUMENT

## I.     Plaintiffs Are Not Likely To Prevail On The Merits Of Their Claim That The Constitution Requires A "Shall-Issue" Nation.

The District of Columbia is truly unique. Unlike any state, its entire jurisdiction is densely populated. Unlike any city, it is packed with thousands of high-ranking federal officials and diplomats from around the world, and it hosts hundreds of heavily attended events each year, including numerous political marches and protests. The Second Amendment preserves the ability of local jurisdictions "to devise solutions to social problems that suit local needs and values," *McDonald*, 561 U.S. at 784-85, and that is precisely what the Council has done through the "good reason" standard.

Against the weight of established precedent and the Council's considered judgment, plaintiffs press the unwavering argument that the Second Amendment requires the District—and, indeed, every jurisdiction in the nation, irrespective of local conditions—to allow carrying of handguns in public spaces without considering any particular license applicant's self-defense needs. Anything else, they say, "destroys … the right," which they take as an absolute right to carry a firearm without a good reason to do so. RD 6-2, at 17. They argue that the circuits

14

that have unanimously concluded otherwise are wrong, and that the quarter of the American population in "may-issue" jurisdictions must change to "shall-issue," no matter what they and their elected representatives wish and what the public-safety consequences will be.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). Plaintiffs did not satisfy this high burden because the District is likely to succeed on the merits.

**A.      The district court misapplied intermediate scrutiny.**

   1.   The district court erred as a matter of law by refusing to defer to the Council's predictive findings.

In *Heller II*, this Court adopted the intermediate-scrutiny test articulated in *Turner Broadcasting System v. FCC*, 512 U.S. 622 (1994) ("*Turner I*"), and 520 U.S. 180 (1997) ("*Turner II*").  670 F.3d at 1257-59.  It again applied intermediate scrutiny to firearm regulations in *Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013).  Both decisions recognized that, under intermediate scrutiny, the "fit" between the challenged law and the important governmental interest "[need only] be reasonable, not perfect." *Schrader*, 704 F.3d at 990.  It "is satisfied 'so long as the … regulation promotes a substantial government interest that would be achieved less effectively absent the regulation,'" and "the means chosen are not

15

substantially broader than necessary to achieve the government's interest." *Heller II*, 670 F.3d at 1258 (quoting, in parenthetical, *Ward v. Rock Against Racism*, 491 U.S. 781, 799-800 (1989)).

In assessing whether a law is "substantially related to an important governmental objective," *Heller II*, 670 F.3d at 1258, this Court "afford[s] 'substantial deference to the predictive judgments of [the legislature],'" *Schrader*, 704 F.3d at 990.   In doing so, it must defer to the legislature both "as to the harm to be avoided and to the remedial measures adopted for that end," *Turner II*, 520 U.S. at 196, because the legislature "'is "far better equipped than the judiciary" to make sensitive public policy judgments … concerning the dangers in carrying firearms and the manner to combat those risks,'" *Schrader*, 704 F.3d at 990.  Thus, in reviewing a law, the courts' role is simply to "'assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence.'"  *Heller II*, 670 F.3d at 1259.

Rather than according deference to the Council's predictive judgments about "the remedial measures adopted for that end," *Turner II*, 520 U.S. at 196, the district court, citing the vacated opinion in *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *vacated pending reh'g en banc*, 781 F.3d 1106 (2015), gave *no* deference to the Council's predictive judgments about "the 'fit' between the government's important interest and the means … selected to advance that

16

interest." JA 240-41 (citing *Peruta*, 742 F.3d at 1177). This reliance on *Peruta* was legal error, not just because the panel decision is no longer good law and conflicts with this Court's binding precedent in *Heller II* and *Schrader*, but because it is based on a misreading of *Turner II*.

Specifically, according to *Peruta* and the district court here, the Supreme Court "applied deference" in "Part II.A." of the *Turner II* decision, which found that a law requiring cable operators to carry local broadcasts would promote Congress's interest in preserving over-the-air television, but "applied no deference" in "Part II.B.," which found that the law "did not burden the right substantially more … than is necessary." 742 F.3d at 1177 (citing *Turner II*, 520 U.S. at 195, 213-14) (internal quotation marks omitted). Not so. Part II.B. of *Turner II* rejected a "more limited set of must-carry rules," noting that Congress had considered this option but made "a deliberate congressional choice to adopt the present levels of protection, *to which this Court must defer*." 580 U.S. at 219 (citing legislative history) (emphasis added); *id.* at 213 ("afford[ing] the Government latitude in designing a regulatory solution").[2] And it rejected a suggestion that users toggle between cable and network television with "'A/B'

---

[2]     Although *Turner II* considered alternatives to the challenged law, it took care to explain that, under intermediate scrutiny, laws "are not 'invalid simply because there is some imaginable alternative that might be less burdensome.'" 520 U.S. at 217.

switches," noting that Congress's decision to reject this alternative "was a reasonable one based on substantial evidence of technical shortcomings and lack of consumer acceptance." *Id.* at 221; *see id.* at 220 (describing legislative history).

In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Court again deferred to Congress on whether a law burdened a constitutional right substantially more than necessary, upholding a ban on the provision of "material support" to foreign terrorist organizations when it precluded pure speech that advanced only legitimate activities. *Id.* at 28-29. The Court held that Congress was "justified" in "reject[ing] the view that ostensibly peaceful aid would have no harmful effects," *id.* at 29, and that its "assessment … is entitled to deference," *id.* at 33.

This makes sense. If the Council is better equipped than the judiciary to determine "the degree to which" District laws should promote public safety, *see Turner II*, 520 U.S. at 193, and whether a firearm regulation will likely do so, *see Heller II*, 670 F.3d at 1269, it is also better equipped to determine whether the regulation is necessary to accomplish that goal. Indeed, these factors often are so intertwined they are treated as one. *See*, *e.g.*, *Turner II*, 520 U.S. at 211 (considering whether the challenged law "is necessary to prevent a substantial number of broadcast stations from losing cable carriage and suffering significant financial hardship"); *Schrader*, 704 F.3d at 990 (considering whether "to accomplish the goal of preventing gun violence 'firearms must be kept away from

18

persons, such as those convicted of serious crimes, who might be expected to misuse them'"). And the Council's expertise in policy matters "is not the sum of the matter"—courts "owe [a legislature's] findings an additional measure of deference out of respect for [its] authority to exercise the legislative power." *Turner II*, 520 U.S. at 196. To hold otherwise would "infringe on traditional legislative authority to make predictive judgments when enacting … regulatory policy." *Id.*

By refusing to defer to the Council's predictions about how the "good reason" standard would help prevent crime and promote public safety, the district court took a position that conflicts with established Supreme Court and Circuit precedent. This "erroneous premise as to the pertinent law," in itself, establishes that the district court abused its discretion in granting the preliminary injunction. *Ambach v. Bell*, 686 F.2d 974, 979 (D.C. Cir. 1982).[3]

---

[3]    Even if the vacated decision in *Peruta*—as opposed to *Turner II*, *Heller II*, and *Schrader*—was correct, the district court did not even afford the Council the limited deference described in *Peruta*, which interpreted *Turner II* as requiring deference to the legislature's judgment as to whether there is a real harm "*and* 'whether [the challenged law] will alleviate it in a material way.'" 742 F.3d at 1177 (quoting *Turner II*, 520 U.S. at 195) (emphasis added). Plaintiffs concede that this deference is required, Stay. Opp. 14, and in *Heller II*, this Court applied this deference to the Council's predictive judgment that a ban on assault weapons and large-capacity magazines would help protect police officers and prevent crime, 670 F.3d at 1262-63, 1269. Thus, at the very least, the district court is bound to

2.     The district court's legal error is apparent in its treatment of the opinions of three federal appellate courts upholding the "good reason" standard under intermediate scrutiny.

The district court notably failed to address the substance of decisions issued in the Second, Third, and Fourth Circuit, all of which upheld, under intermediate scrutiny, provisions similar to the District's "good reason" standard. *See Kachalsky*, 701 F.3d at 101; *Woolard*, 712 F.3d at 882; *Drake*, 724 F.3d at 440. The court should have recognized that these decisions offer valuable insight into how intermediate scrutiny applies to the "good reason" standard and what evidence the court should expect the District to introduce on a full record. Indeed, the evidence and analysis in these decisions influenced the Council's decision to adopt the "good reason" standard here. The decisions by these three circuits—when no circuit holds otherwise—strongly suggest that the District is likely to prevail on the merits.

These circuits have properly deferred to legislatures in assessing the "fit" of the "good reason" standard to the government's "substantial, indeed compelling … interest[] in public safety and crime prevention," *Kachalsky*, 701 F.3d at 97; *see United States v. Salerno*, 481 U.S. 739, 755 (1987). *Kachalsky* found that the New York legislature had reasonably "assess[ed] the risks and benefits of handgun

---

defer to the Council's judgment that the "good reason" standard will help prevent crime and promote public safety. *Id.*

possession and shap[ed] a licensing scheme to maximize the competing public-policy objectives." 701 F.3d at 99. The court acknowledged "the existence of studies and data challenging the relationship between handgun ownership by lawful citizens and violent crime," but explained that "[i]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments." *Id.* at 99. *Woollard* explained that Maryland's standard would "advance[] the objectives of protecting public safety and preventing crime because it reduces the number of handguns carried in public," while "ensur[ing] that those persons in palpable need of self-protection can arm themselves in public places." 712 F.3d at 879-80. And *Drake* credited legislators' "predictive judgment" that New Jersey's standard "will further its substantial interest in public safety," noting that it "provide[s] 'a means to determine whether the increase in risk and danger borne by the public is justified by a demonstrated risk and danger borne to the person seeking to carry a handgun.'" 724 F.3d at 437.

The reasoning of these circuits applies with even greater force here. Unlike those states, the District has no rural or unpopulated areas—it "is completely contained in a dense urban setting," with correspondingly "higher rates of violent crime than suburbs and rural areas." JA 43, 46. And "as the seat of the federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every

21

day," the District is "filled with sensitive places from a public safety perspective." JA 44. As the Council explained, these "circumstances unique to the District require a regulatory system different than perhaps any other jurisdiction, and especially, far different than what would be necessary for public safety in a rural place." JA 46.

The district court, however, disposed of *Kachalsky*, *Woollard*, and *Drake* in a footnote, finding them "uninstructive" because they "either afforded too much deference to the legislature's conclusions or did not address whether the statutes at issue were no broader than necessary to achieve the government's substantial objectives." JA 241 n.8. But that reasoning merely underscores the district court's legal error: as discussed, the deference applied by those circuits is required by Supreme Court precedent (as this Court has explained). And they *did* address the state legislatures' efforts to balance the needs of the public and the needs of certain individuals for special protection. *See Kachalsky*, 701 F.3d at 98-99; *Woollard*, 712 F.3d at 880; *Drake*, 724 F.3d at 439.

The district court instead relied on the dissent in *Drake* and dicta from the Ninth Circuit panel decision in *Peruta*, without acknowledging that the decision had been vacated the month before. JA 240-41 & n.8. None of these stray votes has commanded a majority of an appellate panel in an opinion that was not subsequently withdrawn. To warrant a preliminary injunction, "[m]ore than a mere

22

'possibility' of relief is required." *Nken*, 556 U.S. at 434. While it is possible that this Court will be swayed by the dissent in *Drake* or the vacated *Peruta* decision, for purposes of measuring likelihood of success on appeal, it is not likely. It is more likely that, on a full record, the Court will be persuaded by the uniform body of appellate precedent squarely holding—based on a proper understanding of intermediate scrutiny—that "good reason" standards are constitutional.

**B.    Under a proper view of the law, the District is likely to prevail on the merits.**

The District opposed plaintiffs' motion for injunctive relief just weeks after they filed their complaint—it had no reasonable opportunity to conduct discovery or marshal independent evidence, and the court ruled without even holding a hearing. JA 2-3. And yet the evidence the District proffered in the district court demonstrates that the District, not plaintiffs, is likely to prevail on a full record considering the deference properly due to the Council.

1.    The evidence offered by the Council.

The Council in its report substantiated its finding that the "good reason" standard will help prevent crime and promote public safety. It primarily relied on a 2014 Stanford University study led by Professor John Donohue III, an economist, legal scholar, and leading empirical researcher, who explained that "[t]he totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher rates of

23

aggravated assault, rape, robbery and murder." JA 56; *see* Donohue, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* (Sept. 4, 2014) ("Donohue 2014") (http://ssrn.com/abstract=2443681).

Donohue and Yale Law School Professor Ian Ayres began researching the effect of right-to-carry laws in response to a 1997 study that reported that they *decreased* violent crime. Donohue 2014, *supra*, at 5-7 (citing John Lott & David Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. Legal Stud. 1 (1997)); *see* Ayres & Donohue, *Nondiscretionary Concealed Weapons Laws: A Case Study of Statistics, Standards of Proof, and Public Policy*, 1 Am. L. & Econ. Rev. 436 (1999). They found the "more guns, less crime" conclusion impossible to replicate. *See*, *e.g.*, Ayres & Donohue, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stan. L. Rev. 1193 (2003) ("Ayres & Donohue 2003"); Donohue, *Guns, Crime, and the Impact of State Right-to-Carry Laws*, 73 Fordham L. Rev. 623 (2004).

In 2004, the National Research Council convened a panel of researchers who extended the "more guns, less crime" study to 2000; they too found no credible statistical evidence to support the claim. Donohue 2014, *supra*, at 15-20 (citing Nat'l Research Council, *Firearms and Violence: A Critical Review* (2004)). Over the next ten years, Ayres and Donohue tested the models applied in these earlier

studies—correcting for errors they uncovered, gathering more reliable crime data, and extending the study up to 2010. Donohue 2014, *supra*, at 21-75; *see also* Ayres & Donohue, *Yet Another Refutation of the More Guns, Less Crime Hypothesis*, 6 Econ. J. Watch 35 (2009); Ayres & Donohue, *More Guns, Less Crime Fails Again: The Latest Evidence from 1977-2006*, 6 Econ. J. Watch 218 (2009). Finally, in 2014, Donohue concluded that right-to-carry laws were likely to result in "substantially higher rates" of violent crime. JA 168-69.

Donohue acknowledged that "it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." Donohue 2014, *supra*, at 80. "But not being able to 'determine' with the level of certainty one strives for in academic work does not mean that one cannot offer conclusions at some lower level of certainty such as 'more probable than not.'" *Id.* "Since policymakers need to act, it is more useful to offer guidance as to which evidence is likely to be most reliable than to simply reject all evidence until the highest level of certainty has been attained." *Id.* And, Donohue reported, for each of the seven crime categories they studied, at least one of the most-favored models demonstrated a substantial increase after right-to-carry laws were enacted. *Id.* One model "suggest[ed] that [right-to-carry] laws increased every crime category [except murder] by at least 8 percent," *id.* at 80-81, and this "may understate the true harmful impact of [right-to-carry] laws" on "gun assaults," *id.* at 2.

25

These increased risks could have unparalleled consequences in this unique jurisdiction.  The District "is completely contained in a dense urban setting" and gun violence is particularly devastating in large cities, where there are "higher rates of violent crime than suburbs and rural areas," and where crowded public spaces make it all too likely that a stray bullet will hit an innocent bystander.  JA 43, 46.  It also "is the home of the President," "all high-ranking federal officials and members of Congress," and "a diplomatic corps more extensive and omnipresent than anywhere else in the country."  JA 43-44, 46.  As a result, "the likelihood of attack is higher" in the District than in any other city, "and the challenges to protecting the city are greater."  JA 45.  The Council predicted that a significant increase in public carrying would force federal law enforcement agencies to step up protection of thousands of high-risk targets, which could interfere with the rights of the people who live, visit, and work here.  JA 46.  "[I]ncreasing the posting of armed officers, or clearing streets of all automobiles and restricting pedestrian movement except through checkpoints, tips society away from the freedom and openness we value in our society."  JA 46.

The district court disregarded the 2014 Donohue study and its implications for the District's crowded streets.  It held that, because the "empirical evidence … is not conclusive," the District had "failed to demonstrate that there is any relationship … between [the "good reason" standard] and reducing the risk to other

26

members of the public." JA 242 & n.11, 244. But where evidence is "not conclusive," deference must be given to the *Council's* view, not plaintiffs'. As the Supreme Court explained in *Turner II*, because "[t]he Constitution gives to Congress the role of weighing conflicting evidence in the legislative process," courts "give considerable deference … to Congress' findings and conclusions," even "with respect to conflicting … predictions." 520 U.S. at 199. This Court has held that the Council is entitled to similar consideration: "It is not [the Court's] place … to determine in the first instance whether [a firearm restriction] would promote important law-enforcement objectives." *Heller II*, 670 F.3d at 1269.

   The Council also relied on the predictive judgments of the legislatures of New York, New Jersey, and Maryland, all of which have found the "good reason" standard necessary to prevent crime (and had those findings upheld by federal circuit courts). *See* JA 41, 48 & n.39. It relied on expert testimony from Chief Lanier and information from the Secret Service and Capitol Police explaining the District's special security concerns. *See* JA 43-46. It relied on anecdotal evidence, noting that "much of the District's violent crime is the result of gang members carrying guns" and, regardless of the illegality of the practice, "the fact that [gang members] are carrying provokes gun violence, rather than lessens it." JA 57. And it relied on common sense, finding it "undeniable" that "introducing a gun into any conflict can escalate a limited danger into a lethal situation" and that, "[w]hen the

27

deadly force being used is a gun, the danger extends to bystanders and the public at large." JA 57.

The district court was not free to ignore this evidence. In considering whether a law survives intermediate scrutiny, "empirical data [need not] come … accompanied by a surfeit of background information"—the government can "justify … restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense." *Lorillard Tobacco v. Reilly*, 533 U.S. 525, 555 (2001) (internal quotation marks omitted).

2.      The evidence the District is likely to introduce on a full record.

Moreover, even assuming the district court did not misapply the law by requiring the District to independently "demonstrate" that its law "is not broader than necessary," JA 241, it abused its discretion by assuming the District would not be able to do so on a full record, *see Gilardi v. HHS*, 733 F.3d 1208, 1222 (D.C. Cir. 2013) (considering evidence described in other cases, as well as published studies, in concluding that plaintiffs would likely prevail on full record).

"An impressive body of empirical evidence now shows that state laws making it easier to carry concealed weapons in public … have had the net effect of making those states more dangerous." Dennis Henigan, *The* Woollard *Decision and The Lessons of the Trayvon Martin Tragedy*, 71 Md. L. Rev. 1188, 1201

28

(2012). This is not limited to the 2014 Donohue study. For example, in 1998, a Georgetown University professor tested the "more guns, less crime" theory by using juveniles (who cannot qualify for public-carry permits) as a control group, and concluded that "shall-issue laws have resulted, if anything, in an *increase* in adult homicide rates." Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 Int'l L. Rev. L. & Econ. 239, 241 (1998). Another study that year applied corrected models to the "more guns, less crime" data and found that, "[f]or robbery, many states experience increases in crime" after enacting right-to-carry laws. Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 Am. Econ. Rev. 468, 473 (1998).

Plaintiffs, meanwhile, offer little in response. They characterize as "junk-science" a 1991 study cited by the Council, which linked the District's handgun ban to a drop in murders and suicides, noting that the study was based only on "*raw* numbers," which could be explained by other factors. RD 10, at 22. But this criticism cannot extend to Donohue's 2014 study, which corrected for these factors. Plaintiffs then point to an FBI spreadsheet showing that, in 2012-2013, states with right-to-carry laws experienced less violent crime than states without such laws. RD 10, at 23. But this generalized information is uninformative in light of the myriad factors that affect crime levels in different states. *See* Ayres &

29

Donohue 2003, *supra*, at 1207, 1215.  Indeed, plaintiffs' reliance on this raw data comes on the heels of their dismissal of a study because it relied on "*raw numbers*," and in the same paragraph as their concession that "correlation is not causation."  RD 10, at 22, 23.

Plaintiffs also argue that, because "shall-issue" states have revoked only a small percentage of public-carry licenses, "law-abiding, responsible American adults" must be "quite safe and responsible in carrying handguns for self-defense."  RD 10, at 24.  But this data is too compromised by unknown variables to hint at such a conclusion.  Three of the four low-revocation states cited by plaintiffs "have poorly administered, ineffective permitting systems that routinely let ineligible people slip through the cracks" in *obtaining* permits; it is unlikely they diligently pursue license revocation.  *See* Everytown for Gun Safety, *Federally Mandated Concealed Carry Reciprocity: How Congress Could Undercut State Laws on Guns in Public*, 13 (http://everytown.org/documents/2015/02/federally-mandated-concealed-carry-reciprocity.pdf).  And states can take these measures only when a perpetrator is identified.  Nationwide, only 46.8 percent of violent crimes were cleared by arrest or exceptional means in 2012, *see* FBI, Crime in the United States (2012)  (https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/offenses-known-to-law-enforcement/clearances), and "shall-issue" states may require more than an arrest to justify revocation.

Nor are the risks inherent in public carrying confined to conduct that would justify revocation.  A 2009 study of Philadelphia residents found that individuals who possessed a gun during an assault were 4.46 times more likely to be shot, and these odds *increased* to 5.45 when the victim had an opportunity to resist.  Charles Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Amer. J. Pub. Health 2034, 2037 (2009).  Handguns are often stolen and used against the carrier or used to commit a host of other crimes.  *See Woollard*, 712 F.3d at 879 (quoting Baltimore Police Department Commissioner, who attested that "criminals often target victims '*precisely because* they possess handguns,' and that Baltimore police have 'frequently investigated homicides and robberies where it appears that one, if not the primary, goal of the attacker was to deprive the victim of his handgun or other weapons'"); Ayres & Donohue 2003, *supra*, at 1205 ("[S]ome estimates suggest[] that as many as one million or more guns are stolen each year.").  And an upswing in public carrying may well encourage criminals to "shift toward greater lethality, and hence greater harm to the community."  Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379, 387 (2006).  "Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun."  Philip Cook, *et al.*, *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. Rev. 1041,

31

1081 (2009).  "If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal."  *Id.*

"Shall-issue" laws can also affect how police officers interact with the law-abiding public.  According to a former Baltimore Police Commissioner, the presence of a third person with a handgun in a confrontation between an officer and a suspect can "cause confusion as to which side of the confrontation the person is on, which could lead to hesitation by the police officer," with "potentially tragic circumstances" for "innocent victims, including the permit holder, innocent bystanders, and police officers."  *Woollard*, 712 F.3d at 879-80.  A former Police Chief for Baltimore County added that, "[i]f the number of legal handguns on the streets increased significantly, [police] officers would have no choice but to take extra precautions before engaging citizens, effectively treating encounters between police and the community that now are routine, friendly, and trusting, as high-risk stops, which demand a much more rigid protocol."  *Id.* at 880.  The District is likely to introduce this evidence, and more, on a full record.

                    3.     The Council's tailoring of the "good reason" standard to accomplish its objectives.

The district court also abused its discretion by failing to defer to the Council's conclusion that the "good reason" standard is not substantially more burdensome than necessary to accomplish its objectives.  Intermediate scrutiny

requires only that "the fit … be reasonable, not perfect." *Schrader*, 704 F.3d at 990. The District proffered ample evidence of such fit in the district court. It cited the 2014 Donohue study, which demonstrates that it is more likely than not that public-carry laws significantly increase violent crime. RD 9, at 19-20 & n.13. It cited evidence relied on by legislatures in New York, New Jersey, and Maryland, all of which found the "good reason" standard reasonably tailored to prevent an increase in gun violence. RD 9, at 17-18. And it cited the lay and expert witness testimony heard by the Council, which described security concerns unique to the District. RD 9, at 21 n.15.

The Council's conclusion that the "good reason" standard is reasonably tailored flows naturally from this evidence. *See* JA 58 (finding that the "good reason" standard "offers a reasonable, balanced approach to protecting the public safety and meeting an individual's specific need for self-defense"). If an increase in public carrying is likely to increase violent crime, escalate conflicts that otherwise might dissipate, and make it more likely that innocent bystanders will be shot, it is reasonable to conclude that a law limiting public carrying to those with a special self-defense need will help prevent these harms. And if federal law enforcement agencies are likely to respond to a substantial increase in public carrying by taking protective measures that interfere with the public's right to

freely travel in the District, it is reasonable to conclude that limiting public carrying to those with a special self-defense need will discourage such measures.

The district court downplayed these concerns, stating that the District could still enact "appropriate time, place and manner restrictions" on public carrying. JA 244. But neither the court nor plaintiffs have suggested an alternative that would prevent the increase in crime associated with right-to-carry laws. *Cf. Turner II*, 520 U.S. at 222 (rejecting subsidies as a less-burdensome alternative to challenged law because cable operators "ha[d] not proposed any particular subsidy scheme"). Instead, in accordance with plaintiffs' absolutist view of the Second Amendment, the preliminary injunction bars the District from enacting *any* measure that would ensure that the public bears this risk only for individuals with a special self-defense reason to carry a handgun in public. It is based on a theory that the District must be a "shall-issue" regime, required to face the very dangers the Council meant to prevent by enacting the "good reason" standard.

The court also found the "good reason" standard "arbitrary" because it is no "less likely that those who meet this requirement will present a risk to other members of the public or commit violent crimes than those who cannot meet this requirement." JA 243-44. This criticism, however, misunderstands the purpose of the standard. The Council recognized that, beyond obvious suitability standards that look to criminal and mental-health records (already applied in most "shall-

34

issue" states), it is difficult to predict whether a seemingly responsible person will misuse his handgun. Every citizen is law-abiding until he breaks the law, and the government cannot know in advance who will do so. *See* Philip Cook, *et al.*, *Criminal Records of Homicide Offenders*, 294 JAMA 598, 599 (2005) (noting that fewer than half of adults arrested for criminal homicide have prior felony convictions). Gangs, for instance, could travel with arms carried by members who have not acquired criminal records (or they could recruit such members). *See* Minnesota Drug & Violent Crime Task Forces, 2011 Annual Report, at 6 ("It is not unusual for some gang members … to have a permit to carry a firearm.") (http://archive.leg.state.mn.us/docs/2011/other/110935.pdf). Public carrying also "may create or exacerbate accidents or deadly encounters, as the longstanding bans on private firearms in airports and courthouses illustrate." *Bonidy v. USPS*, 790 F.3d 1121, 1126 (10th Cir. 2015). "Incidents such as bar fights and road rage that now often end with people upset, but not lethally wounded, take on deadly implications when handguns are involved." *Woollard*, 712 F.3d at 879; *cf.* Carl Bogus, *A Symposium on Firearms, the Militia, and Safe Cities*, 1 Alb. Gov't L. Rev. 440, 445 (2008) ("The largest percentage of murders [in the United States], more than 40%, occurs during arguments.").

The Council properly concluded that the issuance of *any* public-carry permit, regardless of whether it is based on "good reason," increases the likelihood of

35

public harm.  At the same time, the Council understood that some individuals do

have particularized needs to carry handguns for self-defense.  It then engaged in

tailoring that is entirely appropriate under the circumstances facing the District—

accepting some additional public risk, but only for individuals with a special self-

defense need to carry a handgun in public.  The "good reason" standard "provides

a means to determine whether the increase in risk and danger borne by the public is

justified by a demonstrated risk and danger borne to the person seeking to carry a

handgun." *Drake*, 724 F.3d at 437.  It is "the result of a 'careful balancing of the

interests involved' and not a general animus towards guns." *Kachalsky*, 701 F.3d

at 97 n.22; *see Woollard*, 712 F.3d at 881 (similar).

### C.    The district court properly refused to review the "good reason" standard under a more rigorous level of review.

*Heller I* found the District's handgun ban categorically unlawful because it

"totally ban[ned] handgun possession in the home," "where the need for defense of

self, family, and property is most acute." 554 U.S. at 628.  Plaintiffs argue that the

"good reason" standard is likewise categorically unlawful—or at least subject to

strict scrutiny—because it "[d]estroys" their "[f]undamental" right to carry a

handgun in public for self-defense. RD 6-2, at 16.

The district court was right to reject these arguments, because the "good

reason" standard is nothing like the handgun ban struck down in *Heller I*.  "Few

laws in the history of our Nation have come close to the severe restriction of the

36

District's handgun ban." *Heller I*, 554 U.S. at 629. The "good reason" standard, in contrast, currently applies in New York, New Jersey, Maryland, and California, which make up 23 percent of the population of the United States.[4] Delaware, Connecticut, Rhode Island, and Massachusetts also have "may-issue" laws that allow licensing officials to exercise discretion. *Gun Control: States' Laws and Requirements for Concealed Carry Permits Vary Across the Nation*, U.S. Government Accountability Office, Report to Congressional Requesters, GAO-12-717, at 5, 11 (July 2012) (http://www.gao.gov/assets/600/592552.pdf).

Moreover, unlike the handgun ban struck down in *Heller I*, the "good reason" standard does not implicate a right at the core of the Second Amendment, because any right to carry a firearm in populated public places has always been subject to strict regulation. Nor does it "destroy" any right—it applies only in the District's public places, and it allows people who most need to carry a handgun for self-defense to do so.

        1.    If there is a constitutional right to carry a handgun in densely populated public places, it is not at the core of the Second Amendment.

"The [Supreme] Court has not said, … and it does not logically follow, that strict scrutiny is called for whenever a fundamental right is at stake." *Heller II*, 670 F.3d at 1256. "Many, indeed most, of the Bill of Rights guarantees do not

---

[4]    Census data is available at http://quickfacts.census.gov/qfd/index.html.

trigger strict scrutiny." Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 694 (2007).

Since *Heller I*, this Court has found intermediate scrutiny applicable to every firearm regulation it has reviewed. It found intermediate scrutiny appropriate for the District's gun registration laws because they do "not severely limit" the core Second Amendment right. *Heller II*, 670 F.3d at 1257 (remanding for additional evidence). It applied intermediate scrutiny to the District's ban on assault weapons and large-capacity ammunition magazines because the law does not "prevent a person from keeping a suitable and commonly used weapon for protection in the home." *Id.* at 1262. And it applied intermediate scrutiny to a federal law barring firearm possession by convicted criminals because, although the burden "is certainly severe, it falls on individuals who cannot be said to be exercising the core of the Second Amendment right identified in *Heller*, i.e., 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Schrader*, 704 F.3d at 989. "[T]he overwhelming majority of cases from [this Court's] sister circuits" also have "applied intermediate scrutiny to various statutes regulating firearms." *Dearth v. Lynch*, 791 F.3d 32, 39 (D.C. Cir. 2015) (Henderson, J., dissenting) (remanded for unrelated findings).

If the District's "good reason" standard implicates the Second Amendment at all, it should also be measured under this standard. Anything stricter would be

inconsistent with the Supreme Court's recognition that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller I*, 554 U.S. at 634-35. "[L]ongstanding" prohibitions, those in place during the Framing era as well as those reaching well into the 1800s, are "presumptively lawful." *Id.* at 626-27 & n.6. And laws limiting public carrying in densely populated areas—especially without a special self-defense reason for doing so—are so longstanding that, on a full record, an entirely urban jurisdiction's adoption of the "good reason" standard will likely be held beyond the scope of the Second Amendment. *See*, *e.g.*, *Drake*, 724 F.3d at 434 (finding "good reason" standard beyond the scope); *Peterson v. Martinez*, 707 F.3d 1197, 1201 (10th Cir. 2013) (finding concealed-carry ban beyond the scope). Even on this limited record, the historical evidence at least demonstrates that the "good reason" standard does not implicate any right at the Second Amendment's *core*, making it inappropriate to apply any test more rigorous than intermediate scrutiny. *See*, *e.g.*, *Woollard*, 712 F.3d at 876 (applying intermediate scrutiny to "good reason" standard); *Kachalsky*, 701 F.3d at 96 (same); *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (applying intermediate scrutiny to ban on possession by domestic violence misdemeanant).

For as long as citizens have owned firearms, English and American law has restricted any right to carry in populated public places. In 1328, England enacted

the Statute of Northampton, which stated that "no Man great nor small" shall "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." 2 Edw. 3, 258, ch. 3 (1328). This law did not apply in the home. Patrick Charles, *The Statute of Northampton by the Late Eighteenth Century: Clarifying the Intellectual Legacy*, 41 Fordham Urb. L.J. City Square 10, 12 (2013) ("Charles 2013"). Nor did it apply in England's "unpopulated and unprotected enclaves." Patrick Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 19 (2012) ("Charles 2012"). But the general rule in populated public places was that "the authority to ensure the public peace rested with the local government authorities," not individually armed citizens. *Id.* at 20.

This broad prohibition continued into the 17th and 18th centuries, *id.* at 23-25, and the "tradition of restricting both the concealed and the open carry of firearms in public places … was reflected in various state laws immediately following the ratification of the Constitution," Henigan, *supra*, at 1202. Massachusetts, Virginia, North Carolina, Tennessee, Maine, Delaware, New Mexico, and South Carolina all adopted the public-carrying ban of the Statute of

40

Northampton,[5] and it was in effect through common law in New York, Connecticut, New Jersey, and Maryland.[6]   And "[m]ost states enacted laws banning the carrying of concealed weapons." *Kachalsky*, 701 F.3d at 95 (citing statutes).

When Congress established the District's judicial systems in 1801, it adopted "the laws of the state of Maryland as they now exist."   District of Columbia Organic Act, 2 Stat. 103 (1801).   Maryland had adopted the common law of England, Md. Const. of 1776, art. III, § 1, where "the Statute of Northampton and regulations touching upon public carriage were alive and well." Charles 2013, *supra*, at 20.   The first codification of the District's common law, completed by Judge William Cranch in 1818, included the Statute's ban on public carrying.   D.C. Code of 1818 at 253-54.   When the District's common law was again put in writing in 1857, the ban was tempered by the precursor to the "good

---

[5]     *See* Eric Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 126 Yale L.J. Forum, (forthcoming), at 11 n.49 (August 25, 2015), *available at* http://bit.ly/1U4WwLc (citing statutes); 1694 Mass. Laws 12, No. 6; 1859 N.M. Laws 94, § 2; 1870 S.C. Laws 402, No. 288.

[6]     *See* A Bill for the Office of Coroner and Constable (Mar. 1, 1882) (N.J. Constable Oath); John A. Dunlapp, The New York Justice (New York 1815); John M. Niles, The Connecticut Civil Officer: In Three Parts…: with Suitable and approved forms for each: together with numerous legal forms of common use and general convenience. 2nd ed., ch. 14 (Hartford, Conn. 1833); Md. Const. of 1776, art. III, § 1 (adopting English common law).

reason" standard—public carrying was allowed only for people with "reasonable cause to fear an assault or other injury or violence to his person."  Revised Code of the District of Columbia at 570.  Similar laws were adopted in Massachusetts, Wisconsin, Maine, Michigan, Virginia, Minnesota, Oregon, Pennsylvania, Texas, and West Virginia.[7]  From that point on, the District's laws strictly regulated open and/or concealed carrying, at some points banning public carrying altogether.  *See*, *e.g.*, An Act to Prevent the Carrying of Dangerous Weapons in the City of Washington (Nov. 4, 1857) (banning carrying); An Act to Prevent the Carrying of Concealed and Dangerous Weapons in the City of Washington (Nov. 18, 1858) (banning concealed carrying without repealing ban on open carrying); 27 Stat. 116 (1892) (banning concealed carrying without a license, which required good reason); 47 Stat. 651, ch. 465, § 4 (1932) (similar); 57 Stat. 586, ch. 296 (1943) (banning all carrying without a license, which required good reason).

The District's actions in this compact, urban jurisdiction were consistent with how the Statute of Northampton's public carrying ban was "geographically contextual and tailored to public places like 'Fairs' and 'Markets.'"  Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82, 113 (2013).  London began enacting

---

[7]    *See* Ruben & Conell, *supra*, at 12-13 & n.59, 14-15 & n.66 (quoting statutes); 1870 W. Va. Laws 702, ch. 153, § 8; 1871 Tex. Laws 1322, art. 6512; 1873 Minn. Laws 1025, § 17.

gun-control laws "[a]s early as the 1300s." *Id.* at 112; *see also Heller I*, 554 U.S. at 587 n.10 (quoting a 1704 law barring any person from "bear[ing] any Arms within London, and the Suburbs"). And in America, "[u]rban gun control was … a nationwide phenomenon, reaching from the harbors of Boston to the dusty streets of Tombstone." Blocher, *supra*, at 120. Indeed, this "urban/rural divide appears to have been even more pronounced out West," where "even the towns most associated with gun violence … required people to leave their weapons at the city limits when arriving in town." Blocher, *supra*, at 117 (citing Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 13 (2011); Dodge City, Kan., City Ordinances no. 16, § 11 (Sept. 22, 1876)). "Almost everyone carried firearms in the untamed wilderness," but "[i]n the frontier towns, … where people lived and businesses operated, the law often forbade people from toting their guns around." *Id.* (quoting Winkler, *supra*, at 165); *see also* Bogus, *supra*, at 464 (explaining that, even in the "Wild West," "'[t]hose entering the towns had to come disarmed, since it was against the law for anyone but law enforcement officials to carry a gun'"). By the late 1800s, many cities completely banned public carrying.[8]

---

[8]      *See*, *e.g.*, Nebraska City, Neb., Ordinance no. 7 (1872); Nashville, Tenn., Ordinance Ch. 108 (1873); Los Angeles, Cal., Ordinance Nos. 35-36 (1878); Salina, Kan., Ordinance No. 268 (1879); Syracuse, N.Y., Ordinances Ch. 27

Of course, not every city enacted such a ban, nor were measures uniformly enforced. "What history demonstrates is that states often disagreed as to the scope of the right to bear arms." *Drake*, 724 F.3d at 431. And this disagreement itself demonstrates that, during the Framing era, public carrying *in cities* was not a right but rather was subject to the policy judgments of local lawmakers. *Cf. Friedman v. Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) ("[T]he Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity.").

Although the historical evidence introduced thus far is not as extensive as what can be expected on a full record, it heightens the likelihood that the District, not plaintiffs, will prevail on the merits, because it suggests that the "*pre-existing right*" that the Second Amendment codified, *Heller I*, 554 U.S. at 592, did not encompass carrying in densely populated cities, let alone doing so without "good reason." But for purposes of this appeal, it is enough to conclude that these longstanding restrictions demonstrate that any right to publicly carry on the streets of the nation's capital, with no special self-defense reason to do so, is not at the Second Amendment's core, and that district court was therefore right to reject a level of review more rigorous than intermediate scrutiny. *See United States v.*

---

(1885); Dallas, Tex., Ordinance of July 18, 1887 (1887); Checotah, Okla., Ordinance No. 11 (1890); Rawlins, Wyo., Rev. Ordinances Art. 7 (1893); Wichita, Kan., Ordinance No. 1641 (1899); McKinney, Tex., Ordinance No. 20 (1899).

*Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("[T]his longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable."); *cf. Heller II*, 670 F.3d at 1260 (declining to resolve whether laws "impinge upon the right protected by the Second Amendment" because, assuming so, they survive intermediate scrutiny).

The reasons for restricting public carrying in early American cities apply with even greater force today. *See* Charles 2012, *supra*, at 48 (comparing the Framing-era gunman's ability to inflict "two deaths per minute" with the current "twelve, twenty-four, or as high as forty-eight potential deaths per minute"). "The risk inherent in firearms … distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test, such as the right to marry and the right to be free from viewpoint discrimination, which can be exercised without creating a direct risk to others." *Bonidy*, 790 F.3d at 1126. Intermediate scrutiny "places the burden on the government to justify its restrictions, while also giving governments considerable flexibility to regulate gun safety." *Id.* Thus, "while the state's ability to regulate firearms is circumscribed in the home, 'outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense.'" *Kachalsky*, 701 F.3d at 94.

45

Intermediate scrutiny is applied to laws regulating the exercise of other fundamental rights for similar reasons.  Commercial speech is "indispensable to the proper allocation of resources in a free enterprise system," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 765 (1976), but even the most burdensome content-based restrictions may be measured under intermediate scrutiny.  *See*, *e.g.*, *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 647 (1985).  This is because commercial speech "is 'linked inextricably' with the commercial arrangement that it proposes," *Edenfield v. Fane*, 507 U.S. 761, 767 (1993), and commerce is "an area traditionally subject to government regulation," *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978).  Thus, the government's "interest in preventing commercial harms justifies more intensive regulation." *Cincinnati v. Discovery Network*, 507 U.S. 410, 426 n.21 (1993).  And "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

So too for the free exercise of religion, where intermediate scrutiny applies to laws that ban "overt acts" that "pose[] some substantial threat to public safety, peace or order." *Sherbert v. Verner*, 374 U.S. 398, 403 (1963).  And an individual's right to use his private property for economic gain, protected under the

46

Fifth Amendment, is subject to regulation to ensure it is not "injurious to the health, morals, or safety of the community." *Keystone Bituminous Coal v. DeBenedictis*, 480 U.S. 470, 489 (1987). These restrictions are "properly treated as part of the burden of common citizenship"—"[w]hile each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others." *Id.* at 491.

The government has an even greater interest in regulating the conduct of its citizenry when that conduct involves carrying a deadly weapon in a populated public place. Just as there is a "'common-sense' distinction" between commercial and noncommercial speech, *Ohralik*, 436 U.S. at 455-56, and between religious beliefs and overt acts, *Sherbert*, 374 U.S. at 403, there is a common-sense distinction between carrying a handgun in one's home or business and carrying a handgun on the crowded streets of the nation's capital. A handgun in the home may increase the risk of domestic homicide, suicide, or accidental injury, *see Heller I*, 554 U.S. at 703 (Breyer, J., dissenting), but that risk is largely borne by those who live in or visit that home. Not so for public carrying, where a stray bullet can instantly destroy the lives of anyone who happens to be in the area. *See* Andrew Herz, *Gun Crazy: Constitutional False Consciousness and Dereliction of Dialogic Responsibility*, 75 B.U. L. Rev. 57, 60 n.7 (1995) ("[S]tray bullets are a particular problem in large cities.").

47

What is more, public carrying creates new potential for armed conflict, increasing the chances that "[i]ncidents such as bar fights and road rage" will "take on deadly implications," criminals will target carriers "precisely because they possess handguns," or "an additional person bearing a gun" will cause confusion during a police operation. *Woollard*, 712 F.3d at 779-80 (citing experts). "It is axiomatic that if the gun carrier accidentally discharges his gun in public, decides to settle an argument with his gun in public, makes a mistake in judgment with his gun in public, or commits a crime with his gun in public, the community-at-large is at risk of death or serious injury from those actions." Henigan, *supra*, at 1200. "Were [courts] to require strict scrutiny for firearm restrictions outside the home, they 'would likely foreclose an extraordinary number of regulatory measures, thus handcuffing lawmakers' ability to 'prevent[] armed mayhem' in public places," *Masciandaro*, 638 F.3d at 471 (quoting *United States v. Skoien*, 587 F.3d 803, 809 (7th Cir. 2009)), and "depriving them of 'a variety of tools for combating that problem,'" *id.* (quoting *Heller*, 554 U.S. at 636).

>    2.    The "good reason" standard does not "destroy" the right to keep and bear arms for self-defense.

Plaintiffs' response—their hyperbolic claim that the "good reason" standard "destroys" the right protected by the Second Amendment—is meritless. The standard is more akin to the "time, place, and manner restrictions" of protected speech, which "are subject to an intermediate level of scrutiny because in most

48

cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner I*, 512 U.S. at 642. A person does not need a license to bear a handgun in every location in the District—he can still carry an operable handgun in his home (where the need is most "acute," *Heller I*, 554 U.S. at 628) and his place of business. D.C. Code § 22-4504.01. Nor is a license required to transport a handgun for a lawful use within the District (such as a firing range) or a less densely populated area outside of the District for purposes of self-defense, hunting, or other lawful activity. *Id.*

Moreover, any law-abiding citizen can obtain a license if he can demonstrate a particularized need to carry a handgun in public for self-defense, and any law-abiding citizen could at some point find himself in this situation. *Cf. Heller I*, 554 U.S. at 630 (striking down law requiring firearms in the home to be kept inoperable, without an exception for self-defense). As the district court in *Kachalsky* explained, the "good reason" standard "does not function as an outright ban on concealed carry, but rather calls for individualized, case-by-case determinations regarding whether full-carry permit applicants have an actual and articulable—rather than merely speculative, potential, or even specious—need for self-defense." 817 F. Supp. 2d 235, 271 (S.D.N.Y. 2011). Referring to the standard as a "prohibition" "obfuscates what [the state] is actually doing"—

"*regulating* public carry by imposing an objective standard for issuance of a public carry permit." *Drake*, 724 F.3d at 433 n.9.

In essence, the standard speaks not to *who* may carry a handgun, but *when* a handgun may be carried: after the applicant develops a non-speculative need for armed self-defense. That some people will never encounter such a need does not mean that any right has been destroyed. Any person could, at some point in time, find himself particularly threatened. When that happens, the District's law allows him to apply for a carry license—there is no quota or limit to the number of licenses that can be issued.

Indeed, though plaintiffs prefer a categorical approach, the Supreme Court has made clear that limitations on carrying do not destroy any Second Amendment right. It has recognized the presumptive validity of "[l]aws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *Heller I*, 554 U.S. at 626, and this alone effectively makes public carrying impossible for many people who live and work in the District. *See* 18 U.S.C. § 930 (barring carrying in federal facilities); D.C. Code § 7-2509.06(a) (barring carrying in District buildings). Plaintiffs do not suggest that these restrictions destroy those individuals' Second Amendment right, because these restrictions—no different from the "good reason" standard—constitute permissible regulation, not destruction of any right.

50

## II.    The District Court Wrongly Presumed Irreparable Harm To Plaintiffs And Then Balanced The Equities In Their Favor.

### A.    Plaintiffs bear an especially high burden of proof because they seek to change the status quo rather than preserve it.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  An injunction that "goes well beyond simply maintaining the status quo … is particularly disfavored." *Stanley v. USC*, 13 F.3d 1313, 1320 (9th Cir. 1994).  Several circuits require proponents of such relief to demonstrate that the facts and law "clearly favor" an injunction.  *Id.*; *see also Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 (2d Cir. 1995) ("clear showing" required); *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980) ("particularly heavy" burden); *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (moving party must be "clearly favor[ed]"); *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1301 (10th Cir. 2012) (factors must "weigh heavily and compellingly in [movant's] favor").

The preliminary injunction changed the status quo by barring the District from enforcing the "good reason" standard before it could even develop a record defending the law.  The district court appeared to acknowledge this, citing district

court decisions applying the heightened standard for mandatory injunctions (while noting that this Court "has not yet adopted this rule").  JA 234 & n.3.

In opposition to the District's motion to stay the injunction, plaintiffs argued that it is the District who has altered the status quo—that the injunction simply preserves the law as it existed before the District revived its licensing regime. Opp. to Stay 7-8.  They urged the Court to measure the status quo from the "brief time in *Palmer*'s wake" when "Americans were free to carry handguns … without … even bothering with a license."  *Id.* at 7.  This, however, is not a reasonable approach given that the District has, for over a century, strictly regulated or completely banned public carrying.  *See supra* pages 41-42.  Contrary to plaintiffs' argument, the "status quo" is not limited to the five days between July 24, 2014, when the district court in *Palmer* enjoined the District's longstanding ban on carrying handguns, and July 29, 2014, when the court stayed that injunction so the District could enact a licensing regime.  *See Palmer*, RD 51, 53.  In fact, the stay order was issued "*nunc pro tunc*," eliminating any gap in the District's licensing laws.  *Palmer*, RD 53, at 2.  Thus, the district court here properly found the heightened mandatory-injunction standard applicable.

**B.     Plaintiffs have not demonstrated that they are likely to suffer irreparable harm if the "good reason" standard is enforced while this litigation is pending.**

Under any applicable standard, plaintiffs have failed to meet their burden on the equities. A plaintiff seeking interim injunctive relief must make a threshold showing of irreparable injury, *Full Gospel Churches*, 454 F.3d at 297, yet plaintiffs concede that they have no particularized need to carry a handgun for self-defense.

"This [C]ourt has set a high standard for irreparable injury"—it "must be both certain and great," "actual and not theoretical." *Id.* "Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time'"; rather, the moving party "must show that the injury complained of [is] of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Wisc. Gas v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). To that end, "[t]he movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof that the harm is certain to occur in the near future." *Id.*

Plaintiffs, however, premise their standing on their claim that they *cannot* demonstrate any particularized reason to fear harm and therefore cannot satisfy the "good reason" standard. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (requiring "concrete and particularized" injury). In fact, each named plaintiff submitted a declaration attesting:

> I cannot "show a special need for self-protection, such as evidence of specific threats or previous attacks which demonstrate a special

53

danger to [my] life." I cannot "[a]llege serious threats of death or serious bodily harm, any attacks on [myself], or any theft of property from [my] person." I cannot "[a]llege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger," and have made no police or court reports in Washington, D.C. relating to such threats.

JA 21-27. Nor did the remaining plaintiff, the Second Amendment Foundation, suggest that its other members are different.[9] *See* JA 38-39. These concessions cannot be reconciled with plaintiffs' claim that they will suffer imminent harm if they are denied public-carry licenses while this lawsuit is pending.

The district court, however, held that plaintiffs did not need to demonstrate *any* particularized or imminent need to defend themselves in public with a handgun, because irreparable harm was "presumed." JA 245. It likened the right to keep and bear arms under the Second Amendment to the right to free expression under the First Amendment, explaining that both "protect[] similarly intangible and unquantifiable interests" that "cannot be compensated by damages." JA 245. But while First Amendment jurisprudence sometimes provides a useful structure for reviewing regulation of Second Amendment rights, the substance of those rights

---

[9]     Indeed, the Second Amendment Foundation has not even presented sufficient evidence to establish standing to seek the preliminary injunction, providing an alternative basis for vacatur of the injunction as to it. Organizational standing "requires 'more than allegations of damage to an interest in "seeing" the law obeyed or a social goal furthered.'" *Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995). It is not enough to claim, as the Second Amendment Foundation does, that "[t]he issues raised by, and consequences of, Defendants' policies, are of great interest to [its] constituency." JA38.

54

cannot be conflated. *Cf. Kachalsky*, 701 F.3d at 91-92 (rejecting application of prior-restraint doctrine for licensing system). Some constitutional rights, such as free expression, are so intrinsically valuable that "the irreparable nature of the harm may be presumed." *Full Gospel Churches*, 454 F.3d at 301 (free exercise of religion); *see Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (freedom from unreasonable seizure). The right to keep and bear arms, however, has no intrinsic value—it is not an end in itself. Rather, it is "the inherent right of self-defense" that is "central to the Second Amendment." *Heller I*, 554 U.S. at 628. If no occasion arises where a handgun is needed for self-defense, its absence cannot cause harm.

It is not enough for plaintiffs to claim that it is *possible* that they will suffer injury without the ability to carry a handgun in public. In *Winter v. NRDC*, 555 U.S. 7 (2008), the Supreme Court reiterated that the "irreparable harm" standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* Even if plaintiffs were highly likely to succeed on the merits (and they are not), their inability to point to any

55

imminent, non-speculative harm from the "good reason" standard independently justifies vacatur of the preliminary injunction.

### C.    The preliminary injunction will cause the District and the public to suffer irreparable harm.

At the same time as it "presumed" irreparable harm to the applicants, the district court improperly disregarded any possibility that preventing the District from enforcing its licensing standard would injure the public.  JA 245, 247.  This too was an abuse of discretion.  The District will be irreparably harmed, and the public interest obstructed, if it cannot enforce the "good reason" standard while it is compiling a full record in the district court.  *Cf. Nken*, 556 U.S. at 435.  "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers).  The District also has an interest in the uniform application of its laws, and the injunction would establish two different legal regimes: one for the named plaintiffs and members of the Second Amendment Foundation, and another for everyone else.

The result plaintiffs seek—automatic issuance of concealed-carry licenses to plaintiffs and any member of the Second Amendment Foundation meeting threshold requirements—would directly affect the District's public spaces.  Even laws that "make[] the public feel safer" offer "a substantial benefit," *Friedman*, 784 F.3d at 412, and the "good reason" standard does more than foster a perception

56

of safety.   Unlike possession in a person's home or place of business, public carrying subjects everyone who occupies those places to the dangers, intentional and accidental, presented by the handgun.   And District residents, through their elected representatives, have decided that allowing the public carrying of guns without "good reason" is inconsistent with public safety.

The district court, however, refused to even consider the possibility of harm to the District and its people, stating incorrectly that the District simply "misapprehend[ed] the scope of the injunction."  JA 247.  According to the court, the injunction is "very limited" because it "only" affects the "good reason" standard, leaving the District free to "enforc[e] the other provisions of the licensing mechanism" or "enact[] … appropriate time, place and manner restrictions."  JA 247.  But the "good reason" standard is critically important.  It is the heart of plaintiffs' challenge and—as the analyses in *Kachalsky*, *Woolard*, and *Drake* demonstrate—it is an essential component of a system crafted to balance public safety with the needs of individuals particularly at risk.  Without this standard, the District becomes a "shall-issue" regime, despite the Council's legislative judgment based on empirical studies that such regimes are "associated with substantially higher rates of aggravated assault, rape, robbery and murder."  JA 56.  The district court was not free to disregard these harms.

57

The review of public-carrying laws is "serious business"; courts "do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of [their] judicial chambers [they] miscalculated as to Second Amendment rights." *Masciandaro*, 638 F.3d at 475 (Wilkinson, J., concurring). "It is not far-fetched to think the *Heller* Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square. If ever there was an occasion for restraint, this would seem to be it." *Id.* at 475-76.

58

## CONCLUSION

The order granting the preliminary injunction should be reversed.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

/s/ Holly M. Johnson
HOLLY M. JOHNSON
Assistant Attorney General
Bar Number 476331
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
(202) 715-7713 (fax)
holly.johnson@dc.gov

August 2015

59

## CERTIFICATE OF SERVICE

I certify that on August 27, 2015, electronic copies of this brief were served through the Court's ECF system, to:

    Alan Gura, Esq.
    Gura & Possessky, PLLC
    105 Oronoco Street, Suite 305
    Alexandria, VA 22314

                              /s/ Holly M. Johnson
                              HOLLY M. JOHNSON

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 13,921 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point.

                              /s/ Holly M. Johnson
                              HOLLY M. JOHNSON