NOT YET SCHEDULED FOR ORAL ARGUMENT

———————————

No. 15-7057

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

BRIAN WRENN, *et al.*,
APPELLEES,

v.

DISTRICT OF COLUMBIA, *et al.*,
APPELLANTS.

———————————

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————

**JOINT APPENDIX**

———————————

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

# TABLE OF CONTENTS

District Court ECF Docket ................................................................................. 1

Complaint, RD 1 .......................................................................................... 7

Declaration of Brian Wrenn, RD 6-3 ............................................................ 21

Declaration of Joshua Akery, RD 6-4 ........................................................... 23

Declaration of Tyler Whidby, RD 6-5 ........................................................... 25

Notice of License Denial, Wrenn, RD 6-6 ...................................................... 28

Notice of License Denial, Akery, RD 6-7 ....................................................... 29

Notice of License Denial, Whidby, RD 6-8 .................................................... 30

Concealed Carry Pistol License Application (Blank), RD 6-9 ....................... 31

Instructions for Submitting an Application for a Concealed Carry License,
RD 6-10 ...................................................................................................... 36

Declaration of Alan Gottlieb, RD 6-11 ......................................................... 38

Committee on the Judiciary and Public Safety, D.C. Council, Report on
Bill 20-930 (Nov. 26, 2014) ......................................................................... 40

Memorandum Opinion Entering Preliminary Injunction, RD 13 ................... 228

APPEAL,TYPE-E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:15-cv-00162-FJS

WRENN et al v. DISTRICT OF COLUMBIA et al

Assigned to: Judge Frederick J. Scullin, Jr

  Cases: 1:09-cv-01482-FJS
         1:15-cv-01327-KBJ

Case in other court: USCA, 15-07057

Cause: 42:1983 Civil Rights Act

Date Filed: 02/03/2015

Jury Demand: Defendant

Nature of Suit: 950 Constitutional - State Statute

Jurisdiction: Federal Question

**Plaintiff**

**BRIAN WRENN**                          represented by **Alan Gura**
                                                        GURA & POSSESSKY, PLLC
                                                        105 Oronoco Street
                                                        Suite 305
                                                        Alexandria, VA 22314
                                                        (703) 835-9085
                                                        Fax: (703) 997-7665
                                                        Email: alan@gurapossessky.com
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOSHUA AKERY**                         represented by **Alan Gura**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**TYLER WHIDBY**                         represented by **Alan Gura**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**SECOND AMENDMENT
FOUNDATION, INC.**                       represented by **Alan Gura**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DISTRICT OF COLUMBIA**                 represented by **Andrew J. Saindon**
                                                        D.C. OFFICE OF ATTORNEY
                                                        GENERAL
                                                        441 4th Street, NW
                                                        Sixth Floor South

**JA 1**

Washington, DC 20001-2714
(202) 724-6643
Fax: (202) 730-1470
Email: andy.saindon@dc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chad Alan Naso**
OFFICE OF THE ATTORNEY
GENERAL, DISTRICT OF
COLUMBIA
441 Fourth Street, NW
6th Floor South
Washington, DC 20001
(202) 724-7854
Email: chad.naso@dc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CATHY L. LANIER**                  represented by **Andrew J. Saindon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chad Alan Naso**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/03/2015 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0090-3982157) filed by BRIAN WRENN, SECOND AMENDMENT FOUNDATION, INC., TYLER WHIDBY, JOSHUA AKERY. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons)(Gura, Alan) (Entered: 02/03/2015) |
| 02/03/2015 | 2 | NOTICE OF RELATED CASE by All Plaintiffs. Case related to Case No. 09-1482. (Gura, Alan) (Entered: 02/03/2015) |
| 02/03/2015 | 3 | Corporate Disclosure Statement by SECOND AMENDMENT FOUNDATION, INC.. (Gura, Alan) (Entered: 02/03/2015) |
| 02/03/2015 | | Case Assigned to Judge Frederick J. Scullin, Jr. (rd) (Entered: 02/03/2015) |
| 02/03/2015 | 4 | SUMMONS (3) Issued Electronically as to CATHY L. LANIER, DISTRICT OF COLUMBIA, District of Columbia Attorney General, and the District of Columbia Mayor. (Attachments: # 1 Consent Form, # 2 Notice of Consent)(rd) (Entered: 02/03/2015) |
| 02/06/2015 | 5 | NOTICE of Appearance by Andrew J. Saindon on behalf of All Defendants |

| | | |
|---|---|---|
| | | (Saindon, Andrew) (Entered: 02/06/2015) |
| 02/06/2015 | 6 | MOTION for Preliminary Injunction by JOSHUA AKERY, SECOND AMENDMENT FOUNDATION, INC., TYLER WHIDBY, BRIAN WRENN (Attachments: # 1 Request for Expedited Consideration (LCvR 65.1(d)), # 2 Memorandum in Support, # 3 Declaration of Brian Wrenn, # 4 Declaration of Joshua Akery, # 5 Declaration of Tyler Whidby, # 6 Exhibit A, # 7 Exhibit B, # 8 Exhibit C, # 9 Exhibit D, # 10 Exhibit E, # 11 Declaration of Alan Gottlieb, # 12 Text of Proposed Order)(Gura, Alan) (Entered: 02/06/2015) |
| 02/06/2015 | | Set Deadlines as to the # 6 MOTION for Preliminary Injunction: Response to Motion due by 2/20/2015. Reply to Response to Motion due by 2/27/2015. (Scullin, Frederick) (Entered: 02/06/2015) |
| 02/12/2015 | 7 | Consent MOTION for Extension of Time to *Respond to the Complaint* by DISTRICT OF COLUMBIA, CATHY L. LANIER (Attachments: # 1 Text of Proposed Order)(Saindon, Andrew) (Entered: 02/12/2015) |
| 02/12/2015 | 8 | ORDER: It is hereby ORDERED that the # 7 Consent Motion for Extension of Time is GRANTED. It is further ORDERED that the District's response to the Complaint is due on or before two weeks from the date of the Court's decision on plaintiffs' pending Motion for Preliminary Injunction. Signed by Judge Frederick J. Scullin, Jr. on 2/12/2015. (Scullin, Frederick) (Entered: 02/12/2015) |
| 02/20/2015 | 9 | Memorandum in opposition to re 6 MOTION for Preliminary Injunction filed by DISTRICT OF COLUMBIA, CATHY L. LANIER. (Attachments: # 1 Exhibit Act of Dec. 9, 1809, # 2 Exhibit 1857 Code ch 141 sec 16, # 3 Exhibit Act of Nov. 4, 1857 & Act of Nov. 18, 1858, # 4 Text of Proposed Order)(Saindon, Andrew) (Entered: 02/20/2015) |
| 02/27/2015 | 10 | REPLY to opposition to motion re 6 MOTION for Preliminary Injunction filed by JOSHUA AKERY, SECOND AMENDMENT FOUNDATION, INC., TYLER WHIDBY, BRIAN WRENN. (Gura, Alan) (Entered: 02/27/2015) |
| 03/27/2015 | 11 | NOTICE *re: Peruta* by DISTRICT OF COLUMBIA, CATHY L. LANIER (Attachments: # 1 Exhibit)(Saindon, Andrew) (Entered: 03/27/2015) |
| 04/02/2015 | 12 | NOTICE *of Dismissal of Palmer appeal* by JOSHUA AKERY, SECOND AMENDMENT FOUNDATION, INC., TYLER WHIDBY, BRIAN WRENN re 6 MOTION for Preliminary Injunction (Gura, Alan) (Entered: 04/02/2015) |
| 05/18/2015 | 13 | STAYED PURSUANT TO 26 USCA ORDER.....MEMORANDUM-DECISION AND ORDER: The Court hereby ORDERS that Plaintiffs' # 6 motion for a preliminary injunction is GRANTED as noted herein. The Court further ORDERS that counsel shall appear for a conference with the Court on 7/7/2015 at 11:00 a.m. to discuss an expedited schedule for the resolution of this case. Signed by Judge Frederick J. Scullin, Jr. on 5/18/2015. (Scullin, Frederick) Modified on 6/16/2015 (zmm). (Entered: 05/18/2015) |
| 05/19/2015 | | DEPOSIT of Funds into the Registry of the Court in the amount of $ 1,000.00, Receipt Number 4616070156 pursuant to 13 Memorandum-Decision and Order by Plaintiffs. (jf) (Entered: 05/20/2015) |
| 05/26/2015 | 14 | MOTION for Order to Show Cause *re CONTEMPT* by JOSHUA AKERY, SECOND AMENDMENT FOUNDATION, INC., TYLER WHIDBY, BRIAN |

**JA 3**

| | | |
|---|---|---|
| | | WRENN (Attachments: # 1 Declaration of Lawrence Westbrook Powers, # 2 Exhibit A, # 3 Text of Proposed Order)(Gura, Alan) (Entered: 05/26/2015) |
| 05/26/2015 | | TEXT NOTICE: of Hearing on the # 14 Motion for Order to Show Cause *re CONTEMPT*. Oral Argument is set for 7/7/2015 at 11:00 AM before Judge Frederick J. Scullin, Jr. Response to Motion due 6/22/2015. Reply to Response to Motion due 6/26/2015. Please note that the conference scheduled for 11:00 AM on 7/7/2015 will immediately follow oral argument on this motion. (Scullin, Frederick) (Entered: 05/26/2015) |
| 05/26/2015 | 15 | MOTION to Stay *Pending Appeal and for Immediate Administrative Stay* by DISTRICT OF COLUMBIA, CATHY L. LANIER (Attachments: # 1 Text of Proposed Order)(Saindon, Andrew) (Entered: 05/26/2015) |
| 05/26/2015 | 16 | Memorandum in opposition to re 15 MOTION to Stay *Pending Appeal and for Immediate Administrative Stay OPPOSITION TO MOTION FOR IMMEDIATE ADMINISTRATIVE STAY* filed by JOSHUA AKERY, SECOND AMENDMENT FOUNDATION, INC., TYLER WHIDBY, BRIAN WRENN. (Attachments: # 1 Text of Proposed Order)(Gura, Alan) (Entered: 05/26/2015) |
| 05/28/2015 | 17 | ORDER: The Court hereby ORDERS that Defendants' # 15 motion for an immediate administrative stay is DENIED. The Court further ORDERS that Plaintiffs shall file their papers in opposition to Defendants' # 15 motion for a stay pending appeal on or before June 22, 2015. The Court further ORDERS that Defendants shall file any papers in further support of their motion for a stay pending appeal on or before June 26, 2015. The Court further ORDERS that counsel shall appear for oral argument in support of, and in opposition to, Defendants' motion for a stay pending appeal on July 7, 2015 at 11:00 a.m. Signed by Judge Frederick J. Scullin, Jr. on 5/28/2015. (Scullin, Frederick) (Entered: 05/28/2015) |
| 05/28/2015 | 18 | NOTICE *of filing of Praecipe re: Lawrence W. Powers* by DISTRICT OF COLUMBIA, CATHY L. LANIER (Attachments: # 1 Exhibit Declaration of Sgt Colin Hall)(Saindon, Andrew) (Entered: 05/28/2015) |
| 05/29/2015 | | Set/Reset Deadlines: Plaintiffs' response to 15 motion for a stay pending appeal due by 6/22/2015. Defendants to file any papers in further support of their motion for a stay pending appeal by 6/26/2015. (zmm) (Entered: 05/29/2015) |
| 06/01/2015 | 19 | MOTION to Expedite *the Briefing and Hearing Schedule for Defendants Motion to Stay or, in the Alternative, Retain the Current Schedule But Grant an Administrative Stay* by DISTRICT OF COLUMBIA, CATHY L. LANIER (Attachments: # 1 Text of Proposed Order, # 2 Text of Proposed Order)(Saindon, Andrew). Added MOTION to Stay on 6/2/2015 (znmw). (Entered: 06/01/2015) |
| 06/01/2015 | 20 | ANSWER to Complaint with Jury Demand by DISTRICT OF COLUMBIA, CATHY L. LANIER.(Naso, Chad) (Entered: 06/01/2015) |
| 06/02/2015 | 21 | NOTICE *of filing of Praecipe re: legislative gap* by DISTRICT OF COLUMBIA, CATHY L. LANIER (Saindon, Andrew) (Entered: 06/02/2015) |
| 06/02/2015 | 22 | ORDER: The Court hereby ORDERS that Defendants' # 19 Motion is DENIED. Signed by Judge Frederick J. Scullin, Jr. on 6/2/2015. (Scullin, Frederick) (Entered: 06/02/2015) |

# JA 4

| 06/04/2015 | 23 | REPLY re 18 Notice (Other) filed by JOSHUA AKERY, SECOND AMENDMENT FOUNDATION, INC., TYLER WHIDBY, BRIAN WRENN. (Attachments: # 1 Declaration of Joseph T. Brown, # 2 Declaration Garret Hebenstreit, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C)(Gura, Alan) (Entered: 06/04/2015) |
|---|---|---|
| 06/10/2015 | 24 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 17 Order, Set Deadlines/Hearings,,,, 13 Order on Motion for Preliminary Injunction, by CATHY L. LANIER, DISTRICT OF COLUMBIA. Fee Status: No Fee Paid. Parties have been notified. (Saindon, Andrew) (Entered: 06/10/2015) |
| 06/11/2015 | 25 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the fee was an Appeal by the DC Government re 24 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 06/11/2015) |
| 06/12/2015 | | USCA Case Number 15-7057 for 24 Notice of Appeal to DC Circuit Court, filed by CATHY L. LANIER, DISTRICT OF COLUMBIA. (md) (Entered: 06/15/2015) |
| 06/12/2015 | 26 | ORDER of USCA as to 24 Notice of Appeal to DC Circuit Court, filed by CATHY L. LANIER, DISTRICT OF COLUMBIA. ORDERED, that the district courts order filed May 18, 2015, granting plaintiffs motion for a preliminary injunction, be stayed pending further order of the court. USCA Case Number 15-7057. (rd) (Entered: 06/15/2015) |
| 06/22/2015 | 27 | Memorandum in opposition to re 14 MOTION for Order to Show Cause *re CONTEMPT* filed by DISTRICT OF COLUMBIA, CATHY L. LANIER. (Attachments: # 1 Text of Proposed Order)(Saindon, Andrew) (Entered: 06/22/2015) |
| 06/22/2015 | 28 | Memorandum in opposition to re 15 MOTION to Stay *Pending Appeal and for Immediate Administrative Stay* filed by JOSHUA AKERY, SECOND AMENDMENT FOUNDATION, INC., TYLER WHIDBY, BRIAN WRENN. (Attachments: # 1 Text of Proposed Order)(Gura, Alan) (Entered: 06/22/2015) |
| 06/24/2015 | 29 | TEXT ORDER: Due to a change in the Court's calendar, the Court hereby ORDERS that oral arguments regarding the pending motions in this case are cancelled. The pending motions will be decided on the submitted papers. The Court further ORDERS that the scheduling conference in this case is adjourned without date. IT IS SO ORDERED by Judge Frederick J. Scullin, Jr. on 6/24/2015. (Scullin, Frederick) (Entered: 06/24/2015) |
| 06/26/2015 | 30 | REPLY to opposition to motion re 14 MOTION for Order to Show Cause *re CONTEMPT* filed by JOSHUA AKERY, SECOND AMENDMENT FOUNDATION, INC., TYLER WHIDBY, BRIAN WRENN. (Gura, Alan) (Entered: 06/26/2015) |
| 06/26/2015 | 31 | REPLY to opposition to motion re 15 MOTION to Stay *Pending Appeal and for Immediate Administrative Stay* filed by DISTRICT OF COLUMBIA, CATHY L. LANIER. (Saindon, Andrew) (Entered: 06/26/2015) |
| 07/06/2015 | 32 | ORDER: The Court hereby ORDERS that Plaintiffs' # 14 motion to hold |

Defendants in contempt is DENIED. The Court further ORDERS that Defendants' # 15 motion for a stay pending appeal is DENIED as moot. Signed by Judge Frederick J. Scullin, Jr. on 7/6/2015. (Attachments: # 1 USCA Order) (Scullin, Frederick) (Entered: 07/06/2015)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/24/2015 13:27:46 | | | |
| **PACER Login:** | us7107:2656424:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:15-cv-00162-FJS |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

# JA 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRIAN WRENN, | ) | Case No. |
| 2887 Chancellors Way, N.E. | ) | |
| Washington, DC 20007 | ) | **COMPLAINT** |
| | ) | |
| JOSHUA AKERY, | ) | |
| 1330 New Hampshire Ave., N.W, #1011 | ) | |
| Washington, DC 20036 | ) | |
| | ) | |
| TYLER WHIDBY, | ) | |
| 1201 Potomac Drive | ) | |
| Merritt Island, FL 32952 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SECOND AMENDMENT FOUNDATION, INC. | ) | |
| 12500 N.E. 10th Place | ) | |
| Bellevue, WA 98005 | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| Serve: Mayor Muriel Bowser | ) | |
| c/o Office of Attorney General | ) | |
| 1 Judiciary Square | ) | |
| 441 4th Street, N.W., 6th Fl. South | ) | |
| Washington, D.C. 20001 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CATHY LANIER, | ) | |
| 300 Indiana Avenue, N.W. | ) | |
| Washington, DC 20004 | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**JA 7**

## COMPLAINT

**COME NOW** the Plaintiffs, Brian Wrenn, Joshua Akery, Tyler Whidby, and Second Amendment Foundation, Inc., by and through undersigned counsel, and complain of the defendants:

THE PARTIES

1.      Plaintiff Brian Wrenn is a natural person and a citizen of the United States and of the District of Columbia.

2.      Plaintiff Joshua Akery is a natural person and a citizen of the United States and of the District of Columbia.

3.      Plaintiff Tyler Whidby is a natural person and a citizen of the United States and of Florida. He also lives and works for a portion of each year in Virginia.

4.      Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including Washington, D.C. The purposes of SAF include promoting the exercise of the right to keep and bear arms; and education, research, publishing and legal action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control. SAF brings this action on behalf of its members. Plaintiffs Wrenn, Akery, and Whidby are SAF members.

5.      Defendant District of Columbia is a municipal entity organized under the Constitution and laws of the United States.

**JA 8**

6.     Defendant Cathy Lanier is the Police Chief of the District of Columbia's Metropolitan Police Department. Defendant Lanier is responsible for executing and administering the District of Columbia's laws, customs, practices, and policies at issue in this lawsuit; has enforced the challenged laws, customs and practices against plaintiffs, and is in fact presently enforcing the challenged laws, customs and practices against plaintiffs. Defendant Lanier is sued in both her individual and official capacities.

JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983.

8.     Venue lies in this Court pursuant to 28 U.S.C. § 1391.

STATEMENT OF FACTS

*The Regulatory Scheme*

9.     As modified by current emergency legislation, D.C. Act 20-0564, 62 D.C. Reg. 866, D.C. Code § 22-4504(a) provides, "No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon." The first violation of this section by a non-felon, carrying an unlicensed handgun outside the home, is punishable by a fine and imprisonment of up to five years.

10.     From 1932 until 2009, D.C. Code § 22-4506(a) purportedly authorized the District of Columbia's Police Chief to issue licenses to carry handguns. But "[i]t [was] common knowledge . . . that with very rare exceptions licenses to carry pistols have not been issued in the District of Columbia for many years and [were] virtually unobtainable." *Bsharah* v. *United*

3

**JA 9**

*States*, 646 A.2d 993, 996 n.12 (D.C. 1994). The section was repealed, effective May 20, 2009.

See D.C. Act 17-690, 56 D.C. Reg. 1162, 1165 (Jan. 16, 2009).

11.     As revived by current emergency legislation, D.C. Code § 22-4506(a) provides:

The Chief of the Metropolitan Police Department ("Chief") may, upon the application of any person having a bona fide residence or place of business within the District of Columbia, or of a person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue, if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed.

12.     The current form of D.C. Code § 22-4506(a) is essentially unchanged from its previous iteration. In reviving the provision, the City Council and Mayor intended to reinstate the same licensing standards previously reflected by the provision. See Press Release, *Mayor Gray, Chairman Mendelson and Councilmember Wells Propose Emergency Firearm Legislation*.

13.     Under current emergency legislation, a provision to be codified at D.C. Code § 7-2509.11 provides that the Police Chief "shall issue rules . . . including rules:

(1) To establish criteria for determining when an applicant has, pursuant to section 6 of the Pistols and Other Dangerous Weapons Act [D.C. Code § 22-4506]:

"(A) Demonstrated a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life;

"(B) Demonstrated any other proper reason for carrying a concealed pistol, which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person;

14.     Permanent legislation containing the same provisions has passed the D.C. City Council and is expected to become law. At all times relevant to the acts and omissions referenced

4

**JA 10**

in this complaint, substantially similar provisions were in force in the District of Columbia. See

D.C. Act 20-447, 61 D.C. Reg. 10765; D.C. Act 20-462, 61 D.C. Reg. 11814.

     15.    Defendant Lanier has adopted various regulations regarding the licensing of

individuals to carry handguns, including:

- "A person shall demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life." 24 D.C.M.R. § 2333.1;

- "For the purposes of satisfying the specifications of § 2333.1, a person shall allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person. The person shall also allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger." 24 D.C.M.R. § 2333.2;

- "The person shall provide all evidence of contemporaneous reports to the police of such threats or attacks, and disclose whether or not the applicant has made a sworn complaint to the police or the courts of the District of Columbia concerning any threat or attack." 24 D.C.M.R. § 2333.3;

- "The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry license." 24 D.C.M.R. § 2333.4; and

- "A person may allege any other proper reason that the Chief may accept for obtaining a concealed carry license which may include: (a) Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person; or (b) The need for a parent, son, daughter, sibling, or other adult member of the immediate family to provide protection of a family member who is physically or mentally incapacitated to a point where he or she cannot act in defense of himself or herself, and the family member who is physically or mentally incapacitated can demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life in the manner described in § 2333." 24 D.C.M.R. § 2334.1.

JA 11

16.     Defendants promulgate a "Concealed Carry Pistol License Application" form,

required of all individuals seeking to apply for a concealed carry license under D.C. Code § 22-

4506(a). The third page of that form begins as follows:

**Basis for a Request for a Concealed Carry Pistol**

Under District law, an applicant must demonstrate that either they [sic] have good reason
to fear injury to himself or herself or property or they [sic] have another proper reason for
carrying a concealed pistol.

> *Please check the box below that is the basis of your application and attach the
> additional documentation as described on the Instructions form.*

**[ ] Good reason to fear injury to person or property**: You fear injury to yourself and
can show a special need for self-protection, such as evidence of specific threats or
previous attacks which demonstrate a special danger to your life.

**[ ] Other proper reason to carry a concealed pistol**: Your employment requires that
you handle large amounts of cash or valuables that you must transport on your person. Or
you are the adult member of a family that needs to provide protection for a family
member who is physically or mentally incapacitated to a point where he or she cannot act
in defense of himself or herself or his or her property.

17.     An attachment to Defendants' "Concealed Carry Pistol License Application" form

entitled "Basis for Request for a Concealed Carry Pistol" license instructs: "District of Columbia

law requires you to demonstrate that: (1) you have good reason to fear injury to yourself or your

property; or (2) you have another proper reason for carrying a concealed pistol."

18.     Accordingly, the "Basis for Request" form requests a personal statement as to the

applicant's "Good Reason" or "Other Proper Reason" for seeking a license. With respect to a

"Good reason," the form provides:

**Demonstration of Good Reason to Fear Injury to Person or Property**

To demonstrate a good reason to fear injury to yourself, you must:

6

**JA 12**

● Show a special need for self-protection distinguishable from the general community, as supported by evidence of specific threats or previous attacks which demonstrate a special danger to your life.

● Allege serious threats of death or serious bodily harm, any attacks on yourself, or any theft of property from your person.

● Allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger.

● Provide all evidence of contemporaneous reports to the police of such threats or attacks, and disclose whether or not you made a sworn complaint to the police or the courts of the District of Columbia concerning any threat or attack.

**Pursuant to District of Columbia law, the fact that you live or work in a high crime area shall not by itself establish a good reason to fear injury to yourself or your property for the issuance of a concealed carry license.**

19.    With respect to "Other Proper Reason," the "Basis for Request" form provides:

**Demonstration of Other Proper Reason for a Concealed Carry License**

This may include: (1) employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported on your person; or (2) the need for you to provide protection of a family member who is physically or mentally incapacitated to a point where that family member cannot act in defense of himself or herself, or his or her property. You can include any documents (such as police reports or court documents) and/or personal statements to demonstrate that you have a proper reason to be issued a Concealed Carry License.

20.    Defendants' "Instructions for Submitting an Application for a Concealed Carry

Pistol License" provide:

In the **Basis for Request for a Concealed Carry Pistol** section of the application, you must demonstrate that either you have a good reason to fear injury to yourself or your property, or you have another proper reason for carrying a concealed pistol. You must submit a personal statement and any evidence or documentation that supports the basis for your request. If you include any statements from a third party, the statements must be made under oath and before a notary.

21.    An applicant must affirm the application and its supporting statements under oath.

7

# JA 13

22.     Defendant Lanier will not issue a concealed handgun carry permit to any applicant who lacks either "Good Reason" or an "Other Proper Reason" for seeking the permit.

23.     Ordinary citizens who are otherwise fully qualified to obtain concealed handgun carry permits from Defendant Lanier cannot obtain such permits if they fail to disclose on their application either a "Good Reason" or an "Other Proper Reason" for seeking the permit.

*The Regulatory Scheme's Application Against Plaintiffs*

24.     Plaintiffs Brian Wrenn and Joshua Akery each possess validly registered handguns within the District of Columbia, as do other members of Plaintiff SAF. Akery is licensed by Pennsylvania and Utah to carry a concealed handgun for self-defense. Whidby possesses handguns that are registerable in the District of Columbia for carriage by non-residents, and holds a Florida license to carry a concealed handgun for self-defense. Other SAF members, including Washington, D.C. residents, hold handgun carry licenses from jurisdictions throughout the United States.

25.     Wrenn, Akery, and Whidby, and other members of Plaintiff SAF would each carry a functional handgun in public in the District of Columbia for self-defense, but refrain from doing so for fear of arrest, prosecution, fine, and imprisonment on account of their inability to obtain a concealed handgun carry permit for lack of "Good Reason" or "Other Proper Reason."

26.     Wrenn, Akery, and Whidby each applied to Defendant Lanier for a license to carry a handgun because each wishes to lawfully carry a handgun in the District of Columbia for self-defense. Apart from the "Good Reason" or "Other Proper Reason" requirement, Wrenn, Akery and Whidby would each be able to qualify for a Washington, D.C. license to carry a handgun.

# JA 14

27.     Wrenn, Akery, Whidby, and other SAF members who would otherwise be qualified to carry handguns in Washington, D.C., cannot "show a special need for self-protection, such as evidence of specific threats or previous attacks which demonstrate a special danger to [their lives]." They cannot "[a]llege serious threats of death or serious bodily harm, any attacks on [themselves], or any theft of property from [their] person[s]." They cannot "[a]llege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger," and have made no police or court reports in Washington, D.C. relating to such threats.

28.     Wrenn, Akery and other SAF members who would otherwise be qualified to carry handguns in Washington, D.C., do not have employment that "requires that [they] handle large amounts of cash or valuables that [they] must transport on [their] person[s]," and they are not required to provide protection for any "family member who is physically or mentally incapacitated to a point where that family member cannot act in defense of himself or herself or his or her property."

29.     Accordingly, neither Wrenn nor Akery attempted to demonstrate a "Good Reason" or "Other Proper Reason" for obtaining a handgun carry permit in applying to Defendant Lanier.

30.     On January 27, 2015, Defendant Lanier denied Wrenn's application for a license to carry a handgun on grounds that Wrenn did not

> Demonstrate a good reason to fear injury to person or property, or other proper reason for a concealed carry license. Specifically, the applicant did not meet the minimum requirement of showing: "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that

**JA 15**

demonstrate a special danger to the applicant's life," (D.C. Official Code § 7-2509.11(1)(A)) and therefore did not receive further consideration.

31.     On January 27, 2015, Defendant Lanier denied Akery's application for a license to

carry a handgun on grounds that Akery did not

> Demonstrate a good reason to fear injury to person or property, or other proper reason for a concealed carry license. Specifically, the applicant did not meet the minimum requirement of showing: "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life," (D.C. Official Code § 7-2509.11(1)(A)) and therefore did not receive further consideration.

32.     Whidby is a federal firearms licensee, doing business in Leesburg, Virginia.

Whidby applied to Defendant Lanier for a license to carry a handgun because he wishes to

lawfully carry a handgun in the District of Columbia for self-defense and the defense of his

family, including young children, who are not physically able to defend themselves on account of

their age. At the time Whidby applied, 24 D.C.M.R. § 2334.1 did not require that the family

member to be protected demonstrate a special need under § 2333. Whidby also at times lawfully

transports firearms through the District of Columbia in connection with his business. Whidby

included those reasons as the "Good Reason" and "Other Proper Reason" for seeking a handgun

carry license.

33.     On January 23, 2015, Defendant Lanier denied Whidby's application for a license

to carry a handgun on grounds that Whidby did not

> Demonstrate a good reason to fear injury to person or property, or other proper reason for a concealed carry license. Specifically, the applicant did not meet the minimum requirement of showing: "Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person." (D.C. Official Code § 7-2509.11(1)(A).  The applicant also wrote that he has two family members that are physically or mentally incapacitated, the applicant did not demonstrate that the referenced family member(s) had a "special need

10

# JA 16

for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life (D.C. Official Code § 7-2509.11(1)(A))  and therefore did not receive further consideration.

34.     It is futile for other SAF members lacking a "Good Reason" or "Other Proper Reason" as described on Defendants' application forms to apply to Defendant Lanier for a license to carry a handgun.

35.     Other SAF members lacking a "Good Reason" or "Other Proper Reason" as described on Defendants' application forms refrain from applying to Defendant Lanier for a license to carry a handgun because doing so would be futile.

COUNT ONE
U.S. CONST., AMEND. II, 42 U.S.C. § 1983
AGAINST ALL DEFENDANTS

36.     Paragraphs 1 through 35 are incorporated as though fully stated herein.

37.     The Second Amendment right to bear arms includes the right to carry functional, loaded handguns in public areas for the purpose of self-defense. This right, like others, is subject to some degree of regulation, but its status as a right precludes the government from regulating it out of existence or forcing individuals to prove their entitlement to its exercise.

38.     Individuals cannot be required to prove a "good reason" or "other proper reason" for the exercise of fundamental constitutional rights, including the right to keep and bear arms. The right to bear arms is enjoyed by the general community of law-abiding, responsible adults, who are presumptively entitled   as the concept of a "right" is understood in the United States of America   to carry handguns for the purpose of self-defense without needing to prove any special reason for doing so, such as "a special need for self-protection distinguishable from the general

# JA 17

community as supported by evidence of specific threats or previous attacks that demonstrate a

special danger to [one's] life."

39.    Nor is the constitutional interest in carrying handguns for self-defense limited to

individuals holding "employment of a type that requires the handling of large amounts of cash or

other valuable objects that may be transported upon [their] person." The core Second

Amendment self-defense interest is primarily an interest defending life, not cash or valuables.

40.    D.C. Code § 22-4506(a)'s grant of discretion to refuse the issuance of licenses to

carry handguns ("may issue"); its requirement that handgun carry license applicants have a "good

reason to fear injury to his or her person or property or has any other proper reason for carrying a

pistol;" the requirements of  D.C. Code § 7-2509.11 that the Police Chief issue rules to establish

the criteria for "good reason" and "other proper reason" for carrying a handgun, including the

minimum requirements set forth therein; and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4

and 2334.1, each violate the Second Amendment to the United States Constitution and are

invalid and unlawful (1) on their face; and (2) as applied to the individual plaintiffs and other

law-abiding, responsible members of SAF who otherwise would qualify for a Washington, D.C.

license to carry a handgun, damaging Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are

therefore entitled to declaratory and injunctive relief against the enforcement of these provisions.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against

Defendants as follows:

1.    An order permanently enjoining defendants, their officers, agents, servants,

employees, and all persons in active concert or participation with them who receive actual notice

**JA 18**

of the injunction, from denying handgun carry licenses to applicants who meet the requirements of D.C. Code § 22-4506(a) and all other current requirements for the possession and carrying of handguns under District of Columbia law;

2.      An order permanently enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the requirement of D.C. Code § 22-4506(a) that handgun carry license applicants have a "good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol," including, but not limited to, the manner in which that requirement is defined by D.C. Code § 7-2509.11 and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4 and 2334.1, against Brian Wrenn, Joshua Akery, Tyler Whidby, and other SAF members;

3.      An order permanently enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the requirement of D.C. Code § 22-4506(a) that handgun carry license applicants have a "good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol," including, but not limited to, the manner in which that requirement is defined by D.C. Code § 7-2509.11 and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4 and 2334.1, against all applicants;

4.      Declaratory relief consistent with the injunction;

5.      Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988; and

6.      Any other further relief as the Court deems just and appropriate.

13

**JA 19**

Dated: February 3, 2015                    Respectfully submitted,

                                           Alan Gura (D.C. Bar No. 453449)
                                           Gura & Possessky, PLLC
                                           105 Oronoco Street, Suite 305
                                           Alexandria, VA 22314
                                           703.835.9085/Fax 703.997.7665

                              By:   /s/ Alan Gura_____
                                    Alan Gura

                                    Attorney for Plaintiffs

**JA 20**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRIAN WRENN, et al., | ) | Case No. 15-162-FJS |
| | ) | |
| Plaintiffs, | ) | **DECLARATION OF** |
| | ) | **BRIAN WRENN** |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **DECLARATION OF BRIAN WRENN**

I, Brian Wrenn, am competent to state, and declare the following based on my personal knowledge:

1.     I am a resident of the District of Columbia and a United States citizen over 21 years of age. I am fully qualified to possess handguns under federal and District of Columbia law, and I possess a handgun that is lawfully registered in the District of Columbia.

2.     I would carry a functional handgun in public for self-defense, but refrain from doing so because I fear arrest, prosecution, and fine, as I do not possess a license to publicly carry a handgun in the District of Columbia.

3.     I have reviewed the requirements to obtain a handgun carry license from Washington, D.C. Police Chief Lanier. Apart from the "Good Reason" or "Other Proper Reason" requirement, I would be able to qualify for a Washington, D.C. license to carry a handgun.

4.     I cannot "show a special need for self-protection, such as evidence of specific threats or previous attacks which demonstrate a special danger to [my] life." I cannot "[a]llege serious threats of death or serious bodily harm, any attacks on [myself], or any theft of property from [my] person." I cannot "[a]llege that the threats are of a nature that the legal possession of a

## **JA 21**

pistol is necessary as a reasonable precaution against the apprehended danger," and have made no police or court reports in Washington, D.C. relating to such threats.

5.      I also do not have employment that "requires that the handling of large amounts of cash or other highly valuable objects that must be transported on [my] person," and I am not required "to provide protection of a family member who is physically or mentally incapacitated to a point where that family member cannot act in defense of himself or herself, or his or her property."

6.      Nevertheless, I applied for a Washington, D.C. permit to carry a handgun. I did not attempt to allege a "Good Reason" or "Other Proper Reason" as defined by that form because I did not believe I met those requirements.

7.      Exhibit A is a true and correct copy of a letter I received from the Metropolitan Police Department, denying my application for a license to carry a handgun.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 3 day of February, 2015

Brian Wrenn

**JA 22**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRIAN WRENN, et al., | ) | Case No. 15-162-FJS |
| | ) | |
| Plaintiffs, | ) | **DECLARATION OF** |
| | ) | **JOSHUA AKERY** |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF JOSHUA AKERY

I, Joshua Akery, am competent to state, and declare the following based on my personal knowledge:

1.       I am a resident of the District of Columbia and a United States citizen over 21 years of age. I am fully qualified to possess handguns under federal and District of Columbia law, and I possess a handgun that is lawfully registered in the District of Columbia. I am licensed by Pennsylvania and Utah to carry a concealed handgun for self-defense.

2.       I would carry a functional handgun in public for self-defense, but refrain from doing so because I fear arrest, prosecution, and fine, as I do not possess a license to publicly carry a handgun in the District of Columbia.

3.       I have reviewed the requirements to obtain a handgun carry license from Washington, D.C. Police Chief Lanier. Apart from the "Good Reason" or "Other Proper Reason" requirement, I would be able to qualify for a Washington, D.C. license to carry a handgun.

4.       I cannot "show a special need for self-protection, such as evidence of specific threats or previous attacks which demonstrate a special danger to [my] life." I cannot "[a]llege serious threats of death or serious bodily harm, any attacks on [myself], or any theft of property

**JA 23**

from [my] person." I cannot "[a]llege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger," and have made no police or court reports in Washington, D.C. relating to such threats.

5.       I also do not have employment that "requires that the handling of large amounts of cash or other highly valuable objects that must be transported on [my] person," and I am not required "to provide protection of a family member who is physically or mentally incapacitated to a point where that family member cannot act in defense of himself or herself, or his or her property."

6.       Nevertheless, I applied for a Washington, D.C. permit to carry a handgun. I did not attempt to allege a "Good Reason" or "Other Proper Reason" as defined by that form because I did not believe I met those requirements.

7.       Exhibit B is a true and correct copy of a letter I received from the Metropolitan Police Department, denying my application for a license to carry a handgun.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 3ʳᵈ day of February, 2015

_____
Joshua Akery

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRIAN WRENN, et al., | ) | Case No. 15-162-FJS |
| | ) | |
| Plaintiffs, | ) | **DECLARATION OF** |
| | ) | **TYLER WHIDBY** |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF TYLER WHIDBY

I, Tyler Whidby, am competent to state, and declare the following based on my personal knowledge:

1.      I am a resident of Florida and a United States citizen over 21 years of age. I am also a Federal Firearms Licensee, and operate a gun store in Virginia, where I spend a portion of every year. I frequently travel to Washington, D.C., including with my family, and I also lawfully transport firearms through the District of Columbia in connection with my business. I am fully qualified to possess handguns under federal and District of Columbia law, and I possess a handgun that is capable of being registered in the District of Columbia. I am licensed by Florida to carry a concealed handgun for self-defense.

2.      I would carry a functional handgun in public for self-defense and for the defense of my family in the District of Columbia, but refrain from doing so because I fear arrest, prosecution, and fine, as I do not possess a license to publicly carry a handgun in the District of Columbia.

**JA 25**

3.      I have reviewed the requirements to obtain a handgun carry license from Washington, D.C. Police Chief Lanier. Apart from the "Good Reason" or "Other Proper Reason" requirement, I would be able to qualify for a Washington, D.C. license to carry a handgun.

4.      I cannot "show a special need for self-protection, such as evidence of specific threats or previous attacks which demonstrate a special danger to [my] life." I cannot "[a]llege serious threats of death or serious bodily harm, any attacks on [myself], or any theft of property from [my] person." I cannot "[a]llege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger," and have made no police or court reports in Washington, D.C. relating to such threats.

5.      I did believe, however, that I had "Other Proper Reasons" for obtaining a handgun carry permit. First, the firearms and related inventory that I transport through the District of Columbia are highly valuable and attractive targets for theft. Second, as the father of young children, it is my responsibility to protect them from any violent crime as they are not physically capable of defending themselves on account of their age. Third, I believe my general interest in self-defense is a sufficient reason to carry a handgun for self-defense.

6.      Accordingly, I applied for a Washington, D.C. permit to carry a handgun. I recognize that since I applied, Chief Lanier amended her regulation to clarify that the family members in need of protection by another must have their own independent "Good Reason" for a handgun carry permit.

**JA 26**

7.     Exhibit C is a true and correct copy of a letter I received from the Metropolitan

Police Department, denying my application for a license to carry a handgun.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the __ day of February, 2015

_____
Tyler Whidby



# Concealed Carry Pistol License Application
## Notice of Denial

Metropolitan Police Department · Firearms Registration · 300 Indiana Ave, NW · Washington, DC 20001 · (202) 727-4275

## Applicant Information

| Wrenn | Brian | Alexander | |
|---|---|---|---|
| *Last Name* | *First Name* | *Middle Initial* | |
| 2887 Chancellors Way NE | Washington | DC | 20007 |
| *Home Street Address* | *City* | *State* | *ZIP Code* |

January 27, 2015

Dear applicant:

The Firearms Regulations Control Act of 1975, (D.C. Official Code § 7-2501 et seq.), and Chapter 23 (Guns and Other Weapons) of Title 24 (Public Space and Safety) of the District of Columbia Municipal Regulations (DCMR), establish the qualifications and procedures for the issuance of a license to carry a concealed pistol. Based on these criteria, your application has been **denied**. The applicant did not:

> Meet the basic eligibility requirements for registering a firearm or obtaining a license to carry a concealed pistol.

> Meet the standards of suitability required to obtain a concealed carry license.

XX    Demonstrate a good reason to fear injury to person or property, or other proper reason for a concealed carry license.

Specifically, the applicant did not meet the minimum requirement of showing: "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life," (D.C. Official Code § 7-2509.11(1)(A)) and therefore did not receive further consideration.

You may appeal this decision by submitting a written request to the Concealed Pistol Licensing Review Board to review the decision within fifteen (15) days after receipt of this notice. The request should be mailed to: *Office of the City Administrator, Concealed Pistol Licensing Review Board // 1350 Pennsylvania Avenue, NW, Suite 513 // Washington, DC 20004.* Details of this process are included in the enclosed materials.

Sincerely,

Colin Hall
Sergeant, Firearms Registration Section
Designee of the Chief, Metropolitan Police Department

## JA 28



# Concealed Carry Pistol License Application
## Notice of Denial

---

Metropolitan Police Department · Firearms Registration · 300 Indiana Ave, NW · Washington, DC 20001 · (202) 727-4275

## Applicant Information

| Akery | Joshua | Scott |
|---|---|---|
| *Last Name* | *First Name* | *Middle Initial* |

| 1330 New Hampshire Ave. NW #1011 | Washington | DC | 20036 |
|---|---|---|---|
| *Home Street Address* | *City* | *State* | *ZIP Code* |

January 27, 2015

Dear applicant:

The Firearms Regulations Control Act of 1975, (D.C. Official Code § 7-2501 et seq.), and Chapter 23 (Guns and Other Weapons) of Title 24 (Public Space and Safety) of the District of Columbia Municipal Regulations (DCMR), establish the qualifications and procedures for the issuance of a license to carry a concealed pistol. Based on these criteria, your application has been **denied**. The applicant did not:

  Meet the basic eligibility requirements for registering a firearm or obtaining a license to carry a concealed pistol.

  Meet the standards of suitability required to obtain a concealed carry license.

XX  Demonstrate a good reason to fear injury to person or property, or other proper reason for a concealed carry license.

Specifically, the applicant did not meet the minimum requirement of showing: "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life," (D.C. Official Code § 7-2509.11(1)(A)) and therefore did not receive further consideration.

You may appeal this decision by submitting a written request to the Concealed Pistol Licensing Review Board to review the decision within fifteen (15) days after receipt of this notice. The request should be mailed to: *Office of the City Administrator, Concealed Pistol Licensing Review Board // 1350 Pennsylvania Avenue, NW, Suite 513 // Washington, DC 20004*. Details of this process are included in the enclosed materials.

Sincerely,

Colin Hall
Sergeant, Firearms Registration Section
Designee of the Chief, Metropolitan Police Department

 **Concealed Carry Pistol License Application**
Notice of Denial

Metropolitan Police Department · Firearms Registration · 300 Indiana Ave, NW · Washington, DC 20001 · (202) 727-4275

## Applicant Information

| Whidby | Tyler | M |  |
| --- | --- | --- | --- |
| *Last Name* | *First Name* | *Middle Initial* | |
| 1201 Potomac Drive | Merritt Island | FL | 32952 |
| *Home Street Address* | *City* | *State* | *ZIP Code* |

January 23, 2015

Dear applicant:

The Firearms Regulations Control Act of 1975, (D.C. Official Code § 7-2501 et seq.), and Chapter 23 (Guns and Other Weapons) of Title 24 (Public Space and Safety) of the District of Columbia Municipal Regulations (DCMR), establish the qualifications and procedures for the issuance of a license to carry a concealed pistol. Based on these criteria, your application has been **denied**. The applicant did not:

      Meet the basic eligibility requirements for registering a firearm or obtaining a license to carry a concealed pistol.

      Meet the standards of suitability required to obtain a concealed carry license.

XX      Demonstrate a good reason to fear injury to person or property, or other proper reason for a concealed carry license.

Specifically, the applicant did not meet the minimum requirement of showing: "Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person." (D.C. Official Code § 7-2509.11(1)(A)  The applicant also wrote that he has two family members that are physically or mentally incapacitated, the applicant did not demonstrate that the referenced family member(s) had a "special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life (D.C. Official Code § 7-2509.11(1)(A)) and therefore did not receive further consideration.

You may appeal this decision by submitting a written request to the Concealed Pistol Licensing Review Board to review the decision within fifteen (15) days after receipt of this notice. The request should be mailed to: *Office of the City Administrator, Concealed Pistol Licensing Review Board // 1350 Pennsylvania Avenue, NW, Suite 513 // Washington, DC 20004.* Details of this process are included in the enclosed materials.

Sincerely,

Colin Hall
Sergeant, Firearms Registration Section

**JA 30**



# Concealed Carry Pistol License Application

**Metropolitan Police Department**

---

Firearms Registration Section · 300 Indiana Avenue, NW · Washington, DC 20001 · 202-727-4275

## Applicant Information

Last Name _____ First Name _____ Middle Name _____

Home Street Address _____ City _____ State _____ ZIP Code _____

Occupation /Name of Business _____

If Applying as a Business Owner: Business/Occupation Street Address     City     State     ZIP Code

Home Phone Number _____ Work Phone Number _____ Email Address (Optional) _____

Date of Birth (mm/dd/yyyy) _____ Place of Birth _____

Driver's License State & ID Number or Other Government-Issued Photo Identification Description & ID Number

Sex _____ Race _____ Height _____ Weight _____ Eye Color _____ Hair Color _____

## Statement of Eligibility

**Please answer each of the following questions by marking the appropriate box.**

1. ☐Yes ☐No   Have you ever been convicted of a crime of violence, weapons offense, any other violation of the Firearms Control Regulation Act of 1975, or a felony in any jurisdiction (including any crime punishable by imprisonment for a term exceeding one year)?

2. ☐Yes ☐No   Are you under indictment for a crime of violence or a weapons offense?

3. ☐Yes ☐No   Have you been convicted within the past five years for a narcotics or dangerous drug offense, a threat to do bodily harm, or for assault?

4. ☐Yes ☐No   Have you been acquitted of any criminal charge by reason of insanity or adjudicated a chronic alcoholic by any court within the past five years?

5. ☐Yes ☐No   Have you been voluntarily or involuntarily committed to any mental hospital or institution within the past five years?

6. ☐Yes ☐No   Do you suffer from any physical defect that would make it unsafe for you to possess and use a firearm safely and responsibly?

## JA 31

7.  ☐Yes  ☐No    Have you been found negligent in any firearm related mishap causing death or injury to another person?

8.  ☐Yes  ☐No    Have you provided accurate and true facts on this application?

9.  ☐Yes  ☐No    Have you ever been dishonorably discharged from the U.S. Armed Forces?

10. ☐Yes  ☐No    Were you a citizen of the United States who has renounced his or her citizenship?

11. ☐Yes  ☐No    Are you legally blind? (Legally blind means your vision is not impaired more than 20/200 visual acuity in the better eye, or your vision cannot be improved to be better than 20/200, or you do not have a loss of vision due wholly or in part to impairment of field vision or to other factors which affect the usefulness of vision to a like degree. If the Firearms Registration Section determines there are reasonable grounds to believe that the certification provided is not accurate, you may be required to obtain a certification from a licensed optometrist that you meet the vision requirements as stated above.)

12. ☐Yes  ☐No    Have you been convicted of two or more violations for driving under the influence within the past five years?

13. ☐Yes  ☐No    Have you been the subject of a civil protection order within the past five years?

14. ☐Yes  ☐No    Have you been convicted of a misdemeanor intrafamily offense?

15. ☐Yes  ☐No    Are you an alcoholic, addict, or habitual user of a controlled dangerous substance?

***If you answer yes to any of the next five questions, you must attach the additional documentation as described on the Instructions form.***

16. ☐Yes  ☐No    Are you seeking to register a pistol concurrently with this application?

17. ☐Yes  ☐No    Do you currently suffer – or have you suffered in the past five years – from any mental illness or condition that creates a substantial risk that you are a danger to yourself or others?

18. ☐Yes  ☐No    Do you have a bona fide residence in the District of Columbia?

19. ☐Yes  ☐No    Do you have a bona fide place of business in the District of Columbia?

20. ☐Yes  ☐No    Do you have a bona fide residence or place of business in the United States and are licensed to carry a concealed pistol by another State?

## Firearms Training Background

1.  Have you completed at least 16 hours of training from an MPD-certified firearms training instructor?                              ☐ Yes          ☐ No

2.  Have you completed at least two hours of range training from an MPD-certified firearms training instructor?                        ☐ Yes          ☐ No

3.  Have you completed training in District of Columbia laws on firearms and self-defense? (There is no exemption from this requirement.)          ☐ Yes          ☐ No

**If you answered "Yes" to all three questions above, you can skip the next three questions.**

4.  Are you requesting an exemption from the firearms training course requirements in either Question 1 or 2 above?                     ☐ Yes          ☐ No

5.  Which requirement(s) are you requesting an exemption:
    ☐ 16 hours of firearms training          ☐ 2 hours of range training

6.  If you answered "No" to Question 4, do you intend to complete the firearms training requirements within 45 days if your application is preliminarily approved by MPD?          ☐ Yes          ☐ No

## JA 32

## Basis for Request for a Concealed Carry Pistol

Under District law, an applicant must demonstrate that either they have good reason to fear injury to himself or herself or property or they have another proper reason for carrying a concealed pistol.

*Please check the box below that is the basis of your application and*
*attach the additional documentation as described on the Instructions form.*

☐ **Good reason to fear injury to person or property**: You fear injury to yourself and can show a special need for self-protection, such as evidence of specific threats or previous attacks which demonstrate a special danger to your life.

☐ **Other proper reason to carry a concealed pistol**: Your employment requires that you handle large amounts of cash or valuables that you must transport on your person. Or you are the adult member of a family that needs to provide protection for a family member who is physically or mentally incapacitated to a point where he or she cannot act in defense of himself or herself or his or her property.

## Authorization to Disclose Mental Health Records

If you checked "Yes" on Question 17 on page 2 of this application, you must authorize the D.C. Department of Behavioral Health, or any other similar agency or department of another state, to disclose to the Metropolitan Police Department information on whether you: (1) Suffer from a mental disorder and have a history of violence; or (2) Have been voluntarily or involuntarily committed to a mental health facility or an institution that provides treatment or services for individuals with mental disorders.

By signing here, you hereby make the authorization stated in the preceding paragraph.

_____          _____

Applicant's signature                                                    Date

## Applicant Affirmation

In signing this Concealed Carry Pistol License Application, I am affirming under oath each of the following declarations:

- I have provided true and accurate information in this document and any supporting documents attached to this application.
- I understand that any knowing material omission or false statement made by or provided by me as part of this application may be considered grounds for denial of a concealed carry license or revocation for a license falsely obtained.
- I understand that making a false statement is punishable by criminal penalties under D.C. Official Code § 22-2405.
- I am not prohibited under federal or District of Columbia law (or the law of the state of my residence) from possessing a firearm.
- I shall be responsible for compliance with all federal and District of Columbia laws, rules, regulations, and procedures that are applicable to a Concealed Carry Pistol License.

_____          _____

Applicant's signature                                                    Date

## JA 33



# Concealed Carry Pistol License Application
### Basis for Request for a Concealed Carry Pistol

**Metropolitan Police Department · Firearms Registration Section · 300 Indiana Avenue, NW
Washington, DC 20001 · 202-727-4275**

## Applicant Information

| | | |
|---|---|---|
| *Last Name* | *First Name* | *Middle Name* |

| | | | |
|---|---|---|---|
| *Home Street Address* | *City* | *State* | *ZIP Code* |

District of Columbia law requires you to demonstrate either that: (1) you have good reason to fear injury to yourself or your property; or (2) you have another proper reason for carrying a concealed pistol.

## Demonstration of Good Reason to Fear Injury to Person or Property

To demonstrate a good reason to fear injury to yourself, you must:

- Show a special need for self-protection distinguishable from the general community, as supported by evidence of specific threats or previous attacks which demonstrate a special danger to your life.
- Allege serious threats of death or serious bodily harm, any attacks on yourself, or any theft of property from your person.
- Allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger.
- Provide all evidence of contemporaneous reports to the police of such threats or attacks, and disclose whether or not you made a sworn complaint to the police or the courts of the District of Columbia concerning any threat or attack.

***Pursuant to District of Columbia law, the fact that you live or work in a high crime area shall not by itself establish a good reason to fear injury to yourself or your property for the issuance of a concealed carry license.***

You can also include any supporting statements from third parties, **but the statements must be made under oath and before a notary**.

## Demonstration of Other Proper Reason for a Concealed Carry License

This may include: (1) employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported on your person; or (2) the need for you to provide protection of a family member who is physically or mentally incapacitated to a point where that family member cannot act in defense of himself or herself, or his or her property. You can include any documents (such as police reports or court documents) and/or personal statements to demonstrate that you have a proper reason to be issued a Concealed Carry License.

**You may provide a separate document with your personal statement or you may use the reverse side of this document. If you use the reverse side of this document to have a third party provide their statement, their statement must be made under oath, before a notary, and signed by the notary, including the notary's seal.**

## JA 34

**Statement**

Name of person applying for a Concealed Carry Pistol License: _____

Name of Person providing this statement: _____

Signature of person providing this statement: _____

Date: _____

JA 35

 **Instructions for Submitting an Application for a Concealed Carry Pistol License**

**Metropolitan Police Department · Firearms Registration Section**
300 Indiana Avenue, NW · Washington, DC 20001 · 202-727-4275 · www.mpdc.dc.gov

Pursuant to recent amendments to the Firearms Regulations Control Act of 1975 (D.C. Act 20-447), anyone wishing to carry a concealed pistol must submit an application to the Metropolitan Police Department, including proof of firearms training and the basis for requesting a concealed carry pistol license.

The requirements for a concealed carry pistol license are found in Title 24, Chapter 23, Sections 2332-2346 of the District of Columbia Municipal Regulations (included in this package). Applicants for a Concealed Carry Pistol License should review the applicable regulations to understand District requirements.

**Checklist for submission of a Concealed Carry Pistol License application:**

1. Complete the Concealed Carry Pistol License Application, including signing and dating the form.
2. In the **Statement of Eligibility** section of the application:
   - If you checked "Yes" to Question 16, then you must also submit firearm registration Form PD-219 and accompanying documents. This is available at on our website or you may call the Firearms Registration Section for assistance. <u>You may apply to register one handgun at the same time that you submit your Concealed Carry Pistol License application and you will not be charged the $13.00 firearm registration fee.</u>
   - If you checked "Yes" to Question 17, then you must:
     - Sign and date the Authorization to Disclose Mental Health Records section of the application; and
     - Submit a report <u>notarized under oath</u> from a registered psychologist or psychiatrist, with whom you have a bona fide patient relationship, stating that the psychologist or psychiatrist has examined you within six months of your application submission date and found you to no longer be suffering from any mental illness or condition that creates a substantial risk that you are a danger to yourself or others.
   - If you checked "Yes" to Question 18, then you must provide <u>two</u> or more of the following types of documentation:
     - Voter registration with current residence address.
     - Motor vehicle license or registration with current residence address.
     - Withholding and payment of individual income taxes indicating the address of the residence, such as: copies of certified District or state income tax returns, and copies of certified federal tax returns filed with the IRS.
     - Certified deed, lease, or rental agreement for real property indicating the current residence address.
     - Cancelled checks or receipts for mortgage or rental payments.
     - Utility bills and payment receipts with current residence address.
     - Copies of credit card or brokerage account statements mailed to the applicant at the current residence address.
     - Copy of bank account statement in the name of the applicant at the current residence address.
     - Copies of automobile insurance statements mailed to the applicant at the current residence address.

**JA 36**

- o If you checked "Yes" to Question 19, you must provide documentation, such as a valid business license or certificate of occupancy, that shows the name and address of the business.
- o If you answered "Yes" to Question 20, then you must provide the same types of documentation as required for Questions 18 or 19 and proof of concealed carry permit/license issued by another state.

3. In the **Firearms Training Background** section of the application:
- o If you answered "Yes" to Questions 1, 2, and 3, the MPD-certified firearms instructor must submit the Certificate of Completion to the Firearms Registration Section, skip Questions 4 through 6.
- o If you answered "No" to any of the first three questions, you must answer Questions 4 through 6 and provide supporting documentation.
- o If you answered "Yes" to Question 4, then you must check the applicable box(es) in Question 5. All applicants must be trained on District of Columbia law on firearms and self-defense; you cannot request an exemption from it.
  - If you are requesting an exemption to the firearms training course requirements, Section 2336.3 of the regulations requires you to provide supporting documentation, such as:

  - Firearms training provided by the National Rifle Association
  - Retired law enforcement officer credentials
  - Armed special police officer license
  - DD Form 214 if it shows special training for marksmanship
  - Hunting license

- o If you answered "No" to Question 4, then you must complete the firearms training course requirements – including training on District of Columbia law on firearms and self-defense – within 45 days if your Concealed Carry Pistol License application is preliminarily approved by the Metropolitan Police Department. Please answer "Yes" to Question 6 in this section to indicate you understand this requirement.

4. In the **Basis for Request for a Concealed Carry Pistol** section of the application, you must demonstrate that either you have good reason to fear injury to yourself or your property, or you have another proper reason for carrying a concealed pistol. You must submit a personal statement and any evidence or documentation that supports the basis for your request. If you include any statements from a third party, the statements must be made under oath and before a notary.

Bring all the items noted above to the Firearms Registration Section at 300 Indiana Avenue, NW, Room 3058, Washington, DC 20001. The hours of operation are Monday through Friday, 9 a.m. to 5 p.m.  When you submit your application to the Firearms Registration Section, you will be photographed and fingerprinted (if your fingerprints are not already on file with the Metropolitan Police Department).

You may pay the $75 application fee by credit card, or a cashier's check, certified check, or money order payable to the D.C. Treasurer. If your fingerprints are not on file, you will be required to pay an additional $35. No personal checks or cash are accepted.

If you have any questions, please contact the Firearms Registration Section at 202-727-4275.

**JA 37**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRIAN WRENN, et al., | ) | Case No. 15-162 |
| | ) | |
| Plaintiffs, | ) | **DECLARATION OF** |
| | ) | **ALAN GOTTLIEB** |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF ALAN GOTTLIEB

I, Alan Gottlieb, am competent to state, and declare the following based on my personal

knowledge:

1.      I am the Executive Vice President of the Second Amendment Foundation, Inc.

(SAF).

2.      SAF is a non-profit membership organization incorporated under the laws of

Washington with its principal place of business in Bellevue, Washington.

3.      SAF has over 650,000 members and supporters nationwide, including the District

of Columbia.

4.      The purposes of SAF include education, research, publishing and legal action

focusing on the constitutional right to privately own and possess firearms, and the consequences

of gun control.

5.      The issues raised by, and consequences of, Defendants' policies, are of great

interest to SAF's constituency.

6.      Brian Wrenn, Joshua Akery, and Tyler Whidby are members of SAF. Countless

other law-abiding, responsible adult SAF members, in the District of Columbia and throughout

**JA 38**

the nation, would carry handguns for self-defense, but refrain from doing so because they fear

arrest, prosecution, incarceration and fine at Defendants' hands for lack of a permit to carry a

handgun recognized by Washington, D.C. authorities. These SAF members would qualify for and

obtain a Washington, D.C. handgun carry license but for the "Good Reason" or "Other Proper

Reason" requirement. They refrain from applying for a Washington, D.C. handgun carry license

because doing so is futile without a "Good Reason" or "Other Proper Reason" beyond their

Second Amendment interest in self-defense.

7.     SAF is proud to bring this action on behalf of its members.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 3ᴿᴰ day of February, 2015.

_Alan M. Gottlieb_
Alan Gottlieb

**JA 39**

# COUNCIL OF THE DISTRICT OF COLUMBIA
## COMMITTEE ON THE JUDICIARY AND PUBLIC SAFETY
### COMMITTEE REPORT
1350 Pennsylvania Avenue, NW, Washington, DC 20004

**TO:** All Councilmembers

**FROM:** Councilmember Tommy Wells, Chairperson
Committee on the Judiciary and Public Safety

**DATE:** November 25, 2014

**SUBJECT:** Report on Bill 20-930, "License to Carry a Pistol Amendment Act of 2014"

The Committee on the Judiciary and Public Safety, to which Bill 20-930, the "License to Carry a Pistol Amendment Act of 2014" was referred, reports favorably thereon, with amendments, and recommends approval by the Council.

## CONTENTS

| | | |
|---|---|---|
| I. | Background And Need | 1 |
| II. | Legislative Chronology | 19 |
| III. | Position Of The Executive | 20 |
| IV. | Comments Of Advisory Neighborhood Commissions | 21 |
| V. | Summary Of Testimony | 21 |
| VI. | Impact On Existing Law | 26 |
| VII. | Fiscal Impact | 26 |
| VIII. | Section-By-Section Analysis | 27 |
| IX. | Committee Action | 35 |
| X. | Attachments | 36 |

Bill 20-930, the License to Carry a Pistol Amendment Act of 2014, was introduced on September 23, 2014, by Chairman Mendelson and Councilmember Wells, co-sponsored by Councilmembers Orange, Barry, and Bonds, and referred to the Committee on the Judiciary and Public Safety.[1] On October 16, 2014, the Committee held a public hearing on the bill; a summary of the testimony provided at the hearing is found below in section V.

## I.   BACKGROUND AND NEED

On July 24, 2014, the U.S. District Court for the District of Columbia ruled in *Palmer v. District of Columbia* that the District's total ban on the carrying of handguns outside the home is unconstitutional.[2] The Court also prohibited the District from "completely banning the carrying

---

[1] On October 20, 2014, Bill 20-930 was re-referred sequentially to the Committee on the Judiciary and Public Safety and then to the Committee of the Whole.
[2] *Tom G. Palmer v. District of Columbia*, July 24, 2014 (docket entry 51 on July 26, 2014), case no. 1:09-cv-01482-FJS, U.S. District Court for the District of Columbia.

of handguns in public for self-defense by otherwise qualified non-residents based solely on the fact that they are not residents of the District."[3]

The executive and the Council worked closely on the District's legislative response to *Palmer*, in order to ensure that the District's laws and regulations would be in compliance with the decision while also balancing the government's interest in public safety. This interest is heightened given the District's role as the nation's capital. The result was emergency legislation,[4] passed by the Council on September 23, 2014, and Bill 20-930. Both the emergency and permanent legislation follow the models of states such as New York, New Jersey, and Maryland, which have adopted a similar licensing scheme and which have withstood Constitutional challenges in federal courts of appeal.

Bill 20-930 is sound legislation that will enhance public safety in the District, while comporting with the requirements of the Second Amendment of the U.S. Constitution. The main provisions of this legislation are discussed in greater detail below.

## SUMMARY OF GUN CONTROL IN THE DISTRICT OF COLUMBIA

The process of regulating the carrying of pistols in the District of Columbia dates back to at least 1857. The common law regulated the carry of pistols when a person was "without reasonable cause to fear an assault or other injury or violence to his person . . . ."[5] Some 75 years later, and two years before adoption of the National Firearms Act of 1934, Congress enacted An Act To control the possession, sale, transfer and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes ("Pistols and Other Dangerous Weapons Act").[6]

The then-newly elected Council of the District of Columbia adopted the Firearms Control Regulations Act of 1975.[7] Codified as chapter 25 of Title 7, the Firearms Control Regulations Act imposes a broad regulatory scheme on the acquisition, possession, and transfer of firearms. The act requires registration of all firearms, restricts who may register a firearm, and prohibits certain firearms entirely. Until 2008, the act also prohibited all private individuals from registering a handgun. In 2008, the Supreme Court, in *District of Columbia v. Heller*, held that the Second Amendment of the Constitution guarantees an individual's right to possess a firearm for the lawful purpose of self-defense within the home, thereby invalidating the District's then-total ban on handguns.[8] It also struck down the District's safe storage provision[9] – a provision

---

[3] *Id.* at p. 17.
[4] License to Carry a Pistol Emergency Amendment Act of 2014, Act 20-447 (expires Jan. 7, 2015).
[5] Revised Code of the District of Columbia Prepared Under the Authority of the Act of Congress at 570 (A.O.P. Nicholson, Washington 1857).
[6] 47 Stat. 650 (approved July 8, 1932) (codified at D.C. OFFICIAL CODE § 22-4501 *et seq.*). Although amended periodically during the last 70 years, this act remains in effect and is codified as Chapter 45 of Title 22 of the D.C. Official Code.
[7] D.C. Law 1-85, effective September 24, 1976 (codified at D.C. OFFICIAL CODE § 7-2501.01 *et seq.*).
[8] 554 U.S. 570, 635 (2008).
[9] *Id.* at 571.

that required all firearms, including rifles and shotguns be kept unloaded and disassembled or bound by a trigger lock because it lacked an explicit exception for self-defense.

Following the *Heller* case, the Council revised the 1975 Firearms Control Regulations Act through the Firearms Control Amendment Act of 2008[10], "seeking to accommodate that constitutional right while also protecting the community from gun violence."[11] The 2008 act included registration requirements for handguns and clarification regarding safe storage. It also included several strong public safety measures, including the prohibition of possession of dangerous assault weapons and large-capacity ammunition magazines – military-style devices commonly employed in mass shootings. Other changes included limiting the number of handguns any one individual may register at one time, though not the total that an individual may possess, and adding being convicted of an intrafamily offense to the list of disqualifications to registration.[12]

These changes were subsequently challenged in *Heller v. District of Columbia* (known as *Heller II*), where the plaintiffs argued that the registration requirements were unconstitutional restrictions on their Second Amendment rights.[13,14] The District Court upheld the constitutionality of the law; on appeal, the D.C. Circuit upheld most aspects of the 2008 act, including the District's ban on assault weapons and large-capacity ammunition magazines, and the registration requirement as it applied specifically to handguns.[15] The rest of the case was sent back to the District Court in order to gather more facts.[16] On May 15, 2014, the District Court, in a memorandum opinion, held that the District's efforts to "combat gun violence and promote public safety were done so in a constitutionally permissible manner."[17]

While *Heller II* was being litigated, another case challenging the District's gun laws was being argued. In 2009, several plaintiffs joined together in *Palmer v. District of Columbia* to file suit against the District because they were denied a permit to carry a handgun outside their homes, or because they were denied carry permits because they were not District residents.[18] On July 24, 2014, the District Court for the District of Columbia issued the *Palmer* decision, ruling that the District's "complete ban on the carrying of handguns in public is unconstitutional."[19] The Court also prohibited the District from "completely banning the carrying of handguns in

---

[10] D.C. Law 17-0372, effective March 31, 2009.

[11] *Heller v. District of Columbia*, ___ F.Supp.2d ----, 2014 WL 1978073 (D.D.C.) at *1.

[12] The Council also revisited firearms regulation in 2012, eliminating vision requirements, except for the legally blind; modifying the training requirements; and eliminating most limitations on what ammunition a registrant may possess. *See* D.C. Law 19-170, Firearms Amendment Act of 2012 (effective Sept. 26, 2012).

[13] *See Heller v. District of Columbia*, 698 F.Supp.2d 179, 181 (D.D.C.2010).

[14] The Committee notes that since the *Heller* decision, there have been 3,307 handguns and 1,814 long guns registered in the District (as of October 3, 2014; data provided by Chief Lanier during questioning at Oct. 16, 2014 hearing for Bill 20-930).

[15] *Heller v. District of Columbia (Heller II)*, 670 F3d 1244, 1264 (D.C.Cir.2011).

[16] *Id.*

[17] *Heller v. District of Columbia*, ___ F.Supp.2d ___, 2014 WL 1978073 (D.D.C.) at *1.

[18] *Palmer v. District of Columbia*, *supra* n.1.

[19] *Id.* at 16.

public for self-defense by otherwise qualified non-residents based **solely** on the fact that they are not residents of the District."[20] (emphasis in original)

It is with this background that Bill 20-930 was developed and is considered. The Committee notes that none of these cases, not even *Palmer*, stand for unregulated and absolute gun ownership, carrying, or use.[21] These decisions have recognized that sensible regulation of gun ownership and behavior designed to protect the public and law enforcement officers that does not prohibit gun use by responsible individuals is within the scope of the Second Amendment.

## UNIQUENESS OF THE DISTRICT

Before the Committee discusses the provisions of Bill 20-930, the context within which the District's firearms law and regulations operate is also useful.

Cities across the country are grappling with gun violence. The problem is not limited to violent crime, but includes accidental shootings and suicide. It is a substantial problem, both as a matter of public safety and public health. Dense, urban jurisdictions have higher rates of violent crime than suburbs and rural areas, and when it comes to crime, handguns are very effective. As a result, major cities such as New York and Chicago utilize a variety of gun control regulations. Washington, D.C. is no different and has been regulating firearms since the Congressional act of 1932.

While the District of Columbia shares the problem of gun violence with other dense, urban jurisdictions, its public safety and national security concerns are greater. It is the home of the President of the United States; four U.S. presidents have been assassinated by gunfire (two in the District), and at least five others have been shot at, including Ronald Reagan who was seriously wounded outside a local hotel in 1981. The Secret Service will not disclose all incidents where it has recovered firearms associated with threats on the President, but we do know they happen; indeed, just two years ago someone hit the White House with gun fire. The consequences of an assassination would be grave to the nation.

The District is home to all high-ranking federal officials and members of Congress. The January 2011 assassination attempt of then-Congresswoman Gabrielle Giffords highlights the concern, as well as the heavy security protecting a number of Cabinet Secretaries including the Secretary of State and the Attorney General. All of the Congressional leadership (e.g., the Speaker of the House and the majority and minority leaders of both the House and Senate) are under constant protection by the Capitol Police. The Capitol Police will not disclose all incidents where they have recovered firearms associated with threats on members of Congress, but we do know they happen. In 1998 two Capitol Police officers were killed trying to stop a shooter; in 1970 and 1983 bombs exploded in the Capitol; in 1954, five Congressmen were shot by Puerto

---

[20] *Id.* at 16-17.
[21] *See*, e.g. *Palmer* at 15: stating that the government can "place some reasonable restrictions on carrying of handguns."

Rican nationalists. These incidents speak to the constancy of security needs far greater than present in any other U.S. city.

The District also is home to a diplomatic corps more extensive and omnipresent than anywhere else in the country. Virtually every nation has a presence in the District, as do foreign missions. As outlined in this Committee's report on Bill 19-614 (the "Firearms Amendment Act of 2012"), threats are a constancy for the diplomatic corps. Although the Secret Service did not provide Committee requests for details, it requested that the emergency legislation preceding Bill 20-930 prohibit carrying within a buffer surrounding every embassy and chancery in the District. Here again, the security presence speaks to the difference between the District and other major U.S. cities.

In her testimony before the Committee on Bill 20-930, Chief Cathy Lanier stated that the frequency of movements and security details makes it both difficult and undesirable to provide protection in the same manner as in other cities – namely, to clear the streets. For instance, in other cities streets are cleared of automobiles, essentially closed off, to accommodate a Presidential visit, while in the District the President travels so frequently and on so many different routes that, while traffic may be stopped (for the President, but not other dignitaries), the streets are not cleared.

The District presents a "unique attraction to mentally ill persons who are a danger to themselves and to others . . . this is not rural Oklahoma or open-sky Montana. It isn't every-kid-grows-up-hunting Kentucky. This is the crowded national capital city filled with high-value security targets,"[22] as evidenced this fall when a mentally disturbed man broke his way into the East Room of the White House, just minutes after the President left.

Police Chief Cathy Lanier discussed the uniqueness of the District in her testimony before the Committee on Bill 20-930:

> The proposed law would prohibit concealed carry licensees from carrying handguns in the types of places that firearms have been traditionally prohibited such as government buildings, premises where alcohol is sold and served, schools and universities, and in circumstances where protection of public officials, visiting dignitaries, and demonstrators is paramount. The latter is critical here in the District of Columbia. As the Supreme Court noted in *Heller*, "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are constitutional.

> As I have testified before, the District of Columbia, as the seat of the federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day, is a city filled with sensitive places from a public safety perspective. Our laws should reflect that reality. Government facilities, dignitaries, and public servants are prime targets for terrorists, both foreign and domestic. Protecting government officials and infrastructure is a challenge for every city

---

[22] Testimony of Rev. Robert Schenck, public witness, at the public hearing on Bill 20-930 on Oct. 16, 2014, p. 2.

in the United States. But in the District the likelihood of attack is higher, and the challenges to protecting the city are greater. As recently as 2011, we saw an assassination attempt on the president – where fortunately the only thing the shooter hit was the White House – and another shooter firing at military installations. Both of these incidents were carried out by a lone gunman, angry at one facet or another of the U.S. government.

The high-profile human targets—from the nation's top elected leaders to the more than 400 foreign dignitaries that make official visits to DC each year—are an obvious and potentially attractive target. The District is also vulnerable due to the sheer volume of secure motorcades traveling in Washington on any given day. The daily movements around the city of the President, Vice President, and their families, and the approximately 3,000 foreign dignitaries spending time in our city each year means that all of our roadways are a challenge to secure. And as the September 19th incident earlier this year at the White House demonstrated, even the home and office of the President of the United States are not easy to secure. Law enforcement needs to be able to prohibit guns from entering the perimeter of a secure area in order to be able to lessen the likelihood that an armed gunman will be able to make it close to protected targets.[23]

The Chief testified that the threat level for dignitaries can change frequently; for example, certain dignitaries consistently require higher levels of security similar to what is provided for presidential movements, such as shutting down areas around hotels and using full motorcade security, particularly when those visits coincide with times of conflict. Because of the consistent presence of a variable number of high-value targets, there is a threat level and a coincident level of concern on behalf of law enforcement that simply does not exist elsewhere.

In addition to assisting the Secret Service with daily movements of the President, Vice President, and foreign dignitaries around the city, MPD also provides security support for more than 4,000 special events annually. The District is also unique because of what the buildings and location represent all around the world:

> Symbolically, we stand out with so many targets like the White House, the Monument, or the Capitol. That backdrop stands out for people who want to do harm to the United States government.[24]

The District's unique status is also reflected in the type of training the Metropolitan Police Department receives. Chief Lanier testified the Department receives training with the

---

[23] Testimony of Cathy L. Lanier, Chief of Police, Metropolitan Police Department, at the public hearing on Bill 20-930 on Oct. 16, 2014 [hereinafter Chief Lanier Oct.16, 2014 testimony].
[24] Chief Lanier Oct. 16, 2014 verbal testimony. The Chief has previously noted that the Federal Government considers the Supreme Court building to be so sensitive that, no matter who one is, he or she cannot wear their firearm in the building. "I would argue that similar caution should apply to the District of Columbia. [T]he District of Columbia, as the seat of the Federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day, is a city filled with "sensitive" places. Our laws should reflect that reality." Testimony of Cathy L. Lanier, Chief of Police, Metropolitan Police Department, at the hearing on the "Impact of Proposed Legislation on the District of Columbia's Gun Laws" before the U.S. House of Representatives Committee on Oversight & Government Reform on Sept. 9, 2008.

Secret Service, as well as training involving very large demonstrations, dignitary protection, and other events related to the activities and circumstances that exist here – training that other city police departments do not receive.[25] Both the United States Capitol Police and the United States Secret Service submitted recommendations to the Committee on Bill 20-930, further exemplifying the special nature of the District of Columbia.[26] The Secret Service cited its "unique protective mission responsibilities in the District of Columbia" as the reason for its high interest in Bill 20-930:

> While the Secret Service's protective operations occur around the world, given that the President, First Family, Vice President, foreign leaders, and other protectees reside, visit and work here, we maintain a particularly high level of protection-related activities with the District . . .[27]

Because DC has so many high-value targets, it is also heavily patrolled and protected by the more than two dozen law enforcement entities that operate here. The District's distinctive geography is helpful in this regard. At just 68 square miles – and 10 percent water – the District is completely contained in a dense urban setting. At some point the presence of law enforcement crosses a psychological line between providing public safety and infringing upon a sense of freedom. Citizens of the United States take pride in the freedom granted to them through the Constitution – freedom of expression, freedom of movement. But increasing the posting of armed officers, or clearing streets of all automobiles and restricting pedestrian movement except through checkpoints, tips society away from the freedom and openness we value in our society. At some point the Second Amendment infringes on the First Amendment.

It must be noted that when the Founding Fathers and the states drafted and ratified the Second Amendment, they were not considering today's armament. Today's firearms were inconceivable to the Founding Fathers; today's pistols are similar to their 18th Century counterparts in name only. Flintlock pistols were unreliable, inaccurate, unrifled, single-shot, ball-shot, and slow to load. Breachloading firearms were four generations away, and semiautomatic firing mechanisms with hollow-point bullets were unimaginable. The Founding Fathers were not oblivious to public safety, and the then-unimaginable lethality of today's firearms requires restrictions in the nation's capital such as provided by Bill 20-930.

It must also be noted, because the District's response to gun control has engendered criticism from gun enthusiasts across the country, that the regulation of firearms must differ between jurisdictions. The circumstances unique to the District require a regulatory system different than perhaps any other jurisdiction, and especially, far different than what would be necessary for public safety in a rural place.

---

[25] Chief Lanier Oct. 16, 2014 verbal testimony.
[26] *See* submitted statements in section V.
[27] *See* letter dated November 14, 2014 from A.T. Smith, Deputy Director, United States Secret Service, to the Honorable Tommy Wells, Chairman, Committee on the Judiciary and Public Safety (p. 1).

## SPECIFIC PROVISIONS OF BILL 20-930

The development of Bill 20-930 has been guided by the analysis and decisions in other urban areas and reflects the District's significant interests in protecting public safety and preventing crime,[28] while providing a mechanism for those individuals who have a specialized need for self-defense.

To achieve this balance, Bill 20-930 revives the District's longstanding concealed carry law, with minor amendment, as section 3(b) of the bill.[29] Section 6 of the Pistols and Other Dangerous Weapons Act was approved July 8, 1932 and provided the parameters for issuing licenses to carry:

> The superintendent of police of the District of Columbia may . . . issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the *applicant has a good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed.*[30] (emphasis added)

The District's previous regulations implementing the Pistols and Other Dangerous Weapons Act stated that for the purposes of satisfying the "have reason to fear injury to his or her person or property or any other proper reason" clause, the applicant "shall allege serious threats of death or serious bodily harm to his or her person or theft or destruction of property in writing, under oath. The applicant shall also allege that the threats are of a nature that the legal possession of a pistol would provide adequate protection."[31]

This revival of the original concealed carry law reinstates the District as a "may issue" jurisdiction – where the issuing authority has discretion in granting permits to carry concealed handguns.[32] Of the 50 states, four do not require a permit to carry. The other 46 have permit requirements, but the mechanisms differ: Nine states have "may issue" laws; the remaining 37 states have "shall issue" laws, which require the issuing authority to grant most permits, though at least 20 of these provide the issuing authority with some discretion.[33] For example, in Georgia,

---

[28] There can be little question that preventing crime and promoting public safety are important government goals. *See, e.g., United States v. Salerno,* 481 U.S. 739, 750 (2nd Cir. 1987); *Schall v. Martin,* 467 U.S. 252, 264 (1984).

[29] Under *Heller,* "longstanding" prohibitions are presumptively lawful. *Kachalsky v. County of Westchester,* 701 F.3d 81 at 90, n. 11.

[30] 47 Stat. 650 at 651.

[31] 24 DCMR 2303.11; previously contained in Article 52 of the Police Regulations, 1955 Edition-1968 Reprint, Title 35, District of Columbia Rules and Regulations (DCRR the predecessor of the DCMR).

[32] Gun Control States' Laws and Requirements for Concealed Carry Permits Vary across the Nation, U.S. Government Accountability Office, Report to Congressional Requesters (July 2012) GAO-12-717, p. 5 (accessed Oct. 19, 2014 at http://www.gao.gov/assets/600/592552.pdf).

[33] Information compiled at Law Center to Prevent Gun Violence, http://smartgunlaws.org/concealed-weapons-permitting-policy-summary/ (accessed Oct. 19, 2014).

a "shall issue" state, issuing authorities may deny the permit if they determine, among other things, that the applicant is not of good moral character.[34]

In the "may issue" states, issuing authorities may issue a permit to eligible individuals after considering additional requirements, such as the applicant's history and personal character.[35] Maryland, for example, issues handgun permits to residents who can demonstrate a good and substantial reason for needing a permit. Maryland's issuing authority is responsible for making the determination of what constitutes a good and substantial reason, "such as a finding that the permit is necessary as a reasonable precaution against apprehended danger."[36] In New Jersey, a Superior Court judge issues permits if he or she believes that the applicant satisfies the requirement of good character, familiarity with safe handling, and a justifiable need to carry a handgun.[37] New York requires "proper cause," which is demonstrated by "a special need for self-protection" that is distinguishable from that of the general community.[38] These provisions all have been upheld in federal court as constitutional.[39]

### Application requirements

Section 902[40] enumerates the requirements for applicants who wish to carry a concealed weapon. The applicant must certify and demonstrate to the satisfaction of the Chief that he or she is (1) at least 21 years of age; (2) meets all the requirements for a person registering a firearm under existing law; (3) does not currently suffer nor has suffered in the previous five years from any mental illness or condition that creates a substantial risk that he or she is a danger to himself or herself or others; (4) has completed at least 16 hours of firearms training, conducted by a certified instructor, that covers enumerated topics; (5) has completed at least two hours of range training; and (6) any procedures the Chief may establish by rule.

---

[34] *See* Ga. Code Ann. § 16-11-129(d)(4): ". . . the judge of the probate court shall issue an applicant a license or renewal license to carry any weapon unless facts establishing ineligibility have been reported or unless the judge determines such applicant has not met all the qualifications, is not of good moral character, or has failed to comply with any of the requirements contained in this Code section."

[35] GAO, *supra* n. 22, at p.13.

[36] Md. Code Ann. Pub. Safety § 5-306(a)(6).

[37] NJAC 13:54-2.3. "Justifiable Need" is defined as "the urgent need for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun." (NJ Admin Code 13:54-2.4(d)(1)).

[38] N.Y. Penal Law § 400.00(2)(f). Examples include employment that requires handling cash/valuable negotiable objects; threats documented in police reports; other documentation of a specific threat to the applicant; target practice; and hunting.

[39] *Woolard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) (upholding Maryland's "good and substantial reason standard"); *Drake v. Filko*, 724 F.3d 426 (3rd Cir. 2013) (cert denied- May 5, 2014) (upholding New Jersey's "justifiable need" standard stating it qualifies as a "presumptively lawful, longstanding regulation and therefore does not burden conduct within the scope of the Second Amendment's guarantee."); *Kachalsky v. County of Westchester*, 701 F.3d 81 (2nd Cir. 2012) (upholding New York's "proper cause" standard: "Limiting Handgun possession to persons who have an articulable basis for believing they will need the weapon for self defense is in the best interest of public safety and outweighs the need to have a handgun for an unexpected confrontation.").

[40] For the purposes of discussing the provisions of Bill 20-930, the committee report refers directly to the individual sections created in the new Title IX, found in subsection 2(e) of Bill 20-930 (i.e. "section 907").

Existing firearm registration requirement. In order to legally possess a firearm in the District of Columbia, an individual must have registered the weapon, pursuant to The Firearms Control Regulations Act of 1975, effective September 24, 1976 (D.C. Law 1-85; D.C. Official Code § 7-2501.01 et seq.). Accordingly, in order for an applicant to qualify for a carry permit, the applicant must first meet the requirements to possess a firearm in the District, which section 902(a)(2) makes clear. This requirement ensures compliance with District registration laws, and verifies an applicant's eligibility to possess and ultimately carry a firearm. It also ensures that nonresidents who apply for a carry permit do so understanding what weapons are allowed in the District.

Mental health requirement. Forty-four states regulate the possession of a firearm by the mentally ill. Bill 20-930 reaffirms the District's longstanding carry regulations, which required the applicant be of sound mind and free of mental illness or disorder for the past five years.[41] The committee print expands section 902(a)(3) to provide the Chief with the authority to consider information that the applicant who has suffered in the previous five years from such a condition no longer suffers from that condition, echoing a provision in the original carry regulations. Section 902(a)(3)(A) requires that the applicant "does not currently suffer from any mental illness or condition that creates a substantial risk that he or she is a danger to himself or herself or others," a standard that exists explicitly in several states and is reflected indirectly in the others.[42]

Training requirement. The Committee believes training in the safe handling and use of firearms is essential for any owner, but is particularly critical for those who carry in public, where untrained use of a firearm may result in injury to innocent bystanders. Section 902(a)(4) requires a carry permit applicant to have completed at least 16 hours of training by a certified instructor, which includes principles of safety, marksmanship, care and use, local law, situational awareness, conflict management, and the use of deadly force. Section 902(a)(5) requires that the applicant has completed at least two hours of range training conducted by a certified instructor, including shooting a qualification course of 50 rounds of ammunition from a maximum distance of 45 feet.

Such training requirements are not unusual[43] or burdensome.[44] More than half of the states require a carry applicant to demonstrate they have received training in firearm use and/or safety. Federal courts have agreed that such training is essential for public safety. As Judge Richard Posner, writing for the U.S. Court of Appeals for the Seventh Circuit, noted, "some states sensibly require an applicant for a handgun permit establish his competence in handling

---

[41] 24 DCMR 2303.4 and 2303.5.

[42] See, e.g. Ariz. Rev. Stat. §§13-3101-02; Cal. Welfare and Inst. Code §§ 8100 – 8108; Md. Pub. Safety Code § 5-133; Neb. Rev. Stat. § 69-2433; and S.D. Codified Laws § 23-7-7.1.

[43] See, e.g. Md. PUBLIC SAFETY Code Ann. § 5-306 (5).

[44] Some media outlets, reporting on the emergency regulations issued pursuant to the post-Palmer emergency Act 20-447, have implied that the District has set up a barrier by requiring training but not having any certified trainers. However, as detailed in the emergency regulations and application instructions, individuals can request preliminary approval from MPD for their concealed pistol license application, and, if granted, will then have 45 days to meet the training requirements. In addition, some applicants for a concealed pistol license may be eligible for an exemption from most of the firearms training requirements.

firearms. A person who carries a gun in public but is not well trained in the use of firearms is a menace to himself and others."[45] Indeed, one concealed carry proponent – himself a plaintiff in *Heller* and *Palmer* – testified regarding the importance of carry applicants being properly trained:

> What they need to do is practice. 16 hours is a good start, I would encourage more. We encourage people to do "dry fire" practice, practicing presses, reloading and drawing with an empty firearm. These are skills that you lose if you don't practice them over time. If someone doesn't practice for a couple of months they're going to be rusty.[46]

As with existing training requirements for the registration to possess a firearm, section 902(c) exempts from the carrying training requirement an individual who can demonstrate that he or she has received firearms training in the U.S. military or can otherwise demonstrate that a firearms training or safety course has been completed that is at least equal to that required by section 902(a)(4) and (5).

Additionally, under section 902(d), any applicant may satisfy the training component by demonstrating the applicant has met similar requirements in his or her own residence. This provision ensures that Bill 20-930's training requirements are not repetitive for nonresidents – or new residents – who possess such training and seek a carry permit in the District. The 1932 Pistols and Other Dangerous Weapons Act also allowed for carry permits for nonresidents, provided they met the other requirements of the law, including the good reason to fear injury provision.

In-person application. Section 907(f) requires an applicant to appear for an in-person interview at MPD headquarters, for purposes including verification of the applicant's identity and verification of the information submitted as part of the applicant process for a carry license. At a minimum, the in-person application is essential to verify the applicant's identity and ensure there is no fraud. This requirement is also not unusual. A cursory review finds similar standards in counties in California, Nebraska, North Carolina, and Pennsylvania. Additionally, the in-person discussion will assist both the Chief and the applicant in the consideration of good cause for a carry permit.

### Licensee duties

Section 904 enumerates the duties of concealed carry licensees. Section 904(b) requires a licensee to notify the Chief of the loss, theft, or destruction of the license and any change in name or address. Subsection (c) requires the licensee to carry the license and the registration certificate whenever the licensee carries the pistol. Subsection (d) dictates what a licensee must do when stopped by a law enforcement officer, specifically that the licensee must disclose to the officer that he or she is carrying a concealed pistol, present the license and registration, identify the pistol's location, and comply with all lawful orders and directions from the officer. Chief

---

[45] *Moore v. Madigan*, 702 F.3d 933, 941 (7th Cir. 2012) (striking down the Illinois ban on carrying in public).
[46] Verbal testimony of George L. Lyon, Jr., President, DC Chapter, Community Association for Firearms Education, at the public hearing on Bill 20-930 on Oct. 16, 2014.

Lanier testified at the public hearing for Bill 20-930 that federal law allows sworn officers to carry their weapons off duty and outside their sworn jurisdiction, but requires the sworn officers to disclose to other law enforcement who they are and how they are carrying. She stated that the requirements in Bill 20-930 are modeled on the federal requirements and are reasonable procedures to protect both law enforcement and the licensees.[47]

*Revocation and suspension of licenses*

Section 905 includes a provision for the revocation of a license upon a finding that the licensee no longer meets the standards and requirements of the law, and includes the ability to appeal to the Concealed Pistol Licensing Review Board. The committee print for Bill 20-930 amends this section to include summary suspension, without a hearing, when the Chief has determined that the conduct of a licensee presents an imminent danger to the health and safety of the public or a member of the public. The provision includes the right to a hearing within 72 hours of a timely request and then a decision within 72 hours of such a hearing. These provisions are in addition to section 906, which details that a licensee may not carry a pistol while impaired.

*Sensitive places*

In *Heller*, the Supreme Court pointed out that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are presumptively lawful.[48] Almost every state places some restrictions on where concealed firearms may be carried. The most common areas identified as sensitive and in need of this prohibition include schools, jails, courthouses, and other government buildings.[49] Restrictions exist for a wide range of other locations. For example, prohibitions on carrying exist for college campuses (20 states) [50], establishments that serve alcohol (17 states), places of worship (12 states), polling places (10 states), and public sporting events (six states), among others.[51] States also permit private businesses and other private institutions to ban guns from their premises.[52]

Bill 20-930 aims to be as clear as possible regarding prohibitions on concealed carry; licensees must be able to easily understand where they can and cannot carry their firearms. Section 907 approaches this in three ways: sensitive locations, sensitive circumstances, and presumptions.

---

[47] Section 901(2) defines law enforcement officer for the purposes of Title IX to include MPD reserve officers, special police officers appointed pursuant to D.C. Official Code § 5-129.02, and campus and university special police officers appointed pursuant to 6A DCMR § 1200 *et seq.*; however, it should not be construed to designate these entities as law enforcement agencies.

[48] *Heller*, 554 U.S. at 626 (n. 26 states, "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.").

[49] Law Center to Prevent Gun Violence, *supra* n. 22.

[50] "Guns on Campus: Overview", National Conference of State Legislatures, March 7, 2014, http://www.ncsl.org/research/education/guns-on-campus-overview.aspx (accessed Oct. 19, 2014); 23 other states allow each college or university to make the decision to ban or allow concealed carry on campus.

[51] Law Center to Prevent Gun Violence, *supra* n. 22.

[52] *Supra*, n. 40 (Posner noting existing limits on carrying concealed weapons).

Locations. In the bill as introduced, the list of sensitive places where carrying is prohibited was limited to 14 categories or circumstances, which primarily reflected government buildings and property, facilities that serve children or other vulnerable populations, businesses that serve alcohol, confined spaces such as buses and sports arenas, large gatherings, and sensitive locations unique to the District. The committee print expands this list by two. The print also includes "any polling place while voting takes place" to ensure that residents may exercise their fundamental right to vote without fear or intimidation, something protected even in states with high rates of gun ownership, such as Texas, Arkansas, and South Carolina.[53] The final addition is the U.S. Naval Observatory and its grounds, which is the home of the Vice President of the United States, and was included at the request of the U.S. Secret Service.[54]

Two witnesses at the public hearing on Bill 20-930 raised concerns about the prohibition of carrying on public transportation, section 907(a)(6) of the introduced bill. Public transportation in the District is particularly crowded and the use of a weapon in such a confined space would most certainly result in injury to innocent bystanders.[55] Additionally, the Washington Metropolitan Area Transit Authority ("WMATA") specifically requested inclusion of its vehicles and Metrorail stations.[56] Accordingly, the committee print retains this prohibition in section 907(a)(8), but does make two changes to the paragraph. First, the print adds Metrorail transit stations, to make it explicit that concealed pistols are not allowed therein, as requested by WMATA.[57] Second, the print strikes the phrase "but not including taxicab operators." The committee believes that taxi drivers are no more likely to be subject to specific threats or previous attacks than any other resident. An individual taxi operator may still apply with a specific need. In addition, the committee print defines public transportation in section 907(g)(3) as "any publicly owned or operated commercial vehicle, including any DC Circulator bus, DC Streetcar, MetroAccess vehicle, Metrobus, or Metrorail train."[58]

Circumstances. Bill 20-930 also takes into consideration two circumstances unique to the District: movements of dignitaries and high-ranking officials, and demonstrations in public places. As introduced, the bill prohibited concealed carry in these circumstances, requiring a buffer zone up to 1,000 feet, and specifying that no criminal penalty would attach unless the licensee was advised by a law enforcement officer that the movement or demonstration was occurring and the licensee was ordered to leave the area until he or she removed the pistol and the licensee did not comply.

---

[53] Testimony of Tracy Zorpette, Washington, D.C. Chapter Advocacy Lear, Moms Demand Action for Gun Sense in America, at the public hearing on Bill 20-930 on Oct. 16, 2014 (p. 2).
[54] Supra, n. 25 at p. 2.
[55] Other jurisdictions have similar prohibitions. See e.g. 430 Ill. Comp. Stat. 66/65(a)(8) (Prohibiting carrying on any bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds).
[56] WMATA meeting with council staff, Aug. 25, 2014; see also Letter dated Oct. 30, 2014 from Ronald A. Pavlik, Jr., Chief, Metro Transit Police.
[57] The Committee notes that this addition extends to Metrorail transit stations only, not to bus stops or bus shelters; someone carrying a pistol should not be prohibited from seeking shelter from the rain, for instance.
[58] The committee does not intend for this definition to extend to Capital Bikeshare.

One witness at the public hearing said the 1000-foot buffer zone is overbroad and irrational.[59] The Committee disagrees. First, the language read "within 1,000 feet, or other lesser distance designated by the Chief," which means the perimeter is set by the Chief for the particular movement or demonstration. In many situations, the perimeter will not be that large, but law enforcement may need such a distance for other circumstances that require additional security. Second, the 1,000-foot buffer has been used previously in District law to draw drug-free and gun-free zones around areas of particular sensitivity, such as day care centers, schools, and public libraries.[60]

The Committee agrees, however, with the Chief's testimony that it would be difficult for the police to comply with the personal notification requirement in Bill 20-930 as introduced.[61] The committee print amends these sections to reflect common sense notification: a licensee should not carry where the "law enforcement agency provides notice of the perimeter by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the area of protection obvious" in the event of protected movements, and in the event of demonstrations, where the "law enforcement agency provides notice of the perimeter by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the area of the demonstration obvious". This alleviates the personal notification burden on police and relies on posted signs or other obvious signs of police perimeters. However, although a licensee is prohibited from carrying within these designated areas, no criminal penalty applies unless (a) the above presence or notice has occurred, or (b) the licensee is informed by an officer that it is a designated area and fails to leave.

<u>Presumptions</u>. Bill 20-930, as introduced, also contains two presumptions in section 907(b): (1) private residences are presumed to prohibit concealed carry unless the property owner or person in control of the premises communicates authorization personally to the licensee in advance, and (2) non-residential private property is presumed to allow concealed carry, unless posted with conspicuous signage prohibiting carry or unless the owner or authorized agent communicates the prohibition personally to the licensee. The committee print of Bill 20-930 adds an additional presumption, providing a presumed prohibition in places of worship, unless the property is posted with conspicuous signage allowing concealed pistols, or the owner or person in control of the premises communicates authorization personally to the licensee in advance.[62] There are at least a dozen stated that include houses of worship on a prohibited locations list or as presumptively prohibited locations.[63] The Committee received testimony in support of this addition at the public hearing, as well as in submitted statements.[64]

---

[59] *See* George Lyon Oct. 16, 2014 testimony (p. 4).
[60] D.C. Official Code § 48-904.07a and § 22-4502.01, respectively.
[61] Chief Lanier Oct. 16, 2014 testimony (p. 3).
[62] However, such places of worship may not authorize concealed carry when services are conducted in locations already prohibited by section 907(a).
[63] *See, e.g.* A.C.A. §5-73-306(16)(A); O.C.G.A. §16-11-127(b)(4); La. R.S. §40:1379.3(N)(8); MCLS §§28.425o(e); Miss. Code Ann. §45-9-101(13); R.R.S. Neb. §69-2441(1)(a); Ohio Rev. Code Ann. §2923.126(B)(6).
[64] *See, e.g.* submitted statement from Terry Lynch, Executive Director, The Downtown Cluster of Congregations; *see also* testimony at the public hearing on Bill 20-930 on Oct. 16, 2014 by Dean Gary Hall, Washington National Cathedral; Bishop Mariann Budde, Episcopal Diocese of Washington; Patricia Riley Johnson, Canon Missioner at the Washington National Cathedral; Rev. Rebecca Justice Schunior, St. Mark's Episcopal Church, Capitol Hill; Rev.

*Review process*

Bill 20-930, as introduced, includes section 908, which establishes the Concealed Carry Licensing Review Board for the purposes of hearing appeals from a denial of any application or renewal application for a carry license, as well as a revocation of a carry license. The committee print also provides the Review Board with the authority to hear appeals from summary suspensions, consistent with the new subsection 905(b). The committee print expands the membership of the Review Board from five to seven members, and changes the makeup of the Review Board to (1) remove the Chief Judge of the Superior Court or his or her designee (at the request of the sitting Chief Judge); and (2) include three public members, one who is a mental health professional and two District residents with experience in the operation, care, and handling of firearms. The Committee believes the addition of these public members will provide other important perspectives to the Review Board.

The remaining provisions of section 908 remain substantially the same, though reworded for clarity and consistency. The committee print clarifies that the Review Board may conduct hearings using three member panels; for those panels, two members shall constitute a quorum, and the decisions of the panels will be considered final decisions of the Review Board. This clarification was made to ensure the Review Board could provide timely response to any request for a hearing. One final subsection, 905(g), was included to ensure any party – including the Chief of Police – aggrieved by a final action of the Review Board may file an appeal.

*Privacy concerns*

When the Council considered the License to Carry a Pistol Emergency Amendment Act[65] of 2014, there was discussion on the dais related to the emergency bill's exemption of concealed carry license information from the Freedom of Information Act.[66] Upon amendment, that section was removed from the emergency legislation.[67] However, under current MPD policy, personally identifiable information provided by applicants on firearms-registration forms is considered exempt from disclosure to the public as "a clearly unwarranted invasion of personal privacy."[68] During discussion at the public hearing on Bill 20-930, Chief Lanier testified that the Department releases general information only, such as the number of guns registered per zip code, and stated her concerns on publicizing personal information:

> Suppose that person is someone who has obtained that permit because they transport large amounts of cash or valuables. By making that a public record, you're now letting people know they carry large amounts of cash and valuables. Same thing for a victim of

---

Dr. Crystal A. Kuykendall, Esq., Associate Minister, Shiloh Baptist Church; and Tracy Zorpette Washington, D.C. Chapter Advocacy Lear, Moms Demand Action for Gun Sense in America.
[65] Act 20-447 (expires Jan. 7, 2015).
[66] Freedom of Information Act of 1976, effective March 25, 1977 (D.C.Law 1-96; D.C. Official Code § 2-532); *see generally,* video of Sep. 23, 2014 discussion at Bill History, http://lims.dccouncil.us/Legislation/B20-0926 (accessed Nov. 1, 2014).
[67] *See* Amendment #3 (Grosso) at Bill History, http://lims.dccouncil.us/Legislation/B20-0926 (accessed Nov. 1, 2014).
[68] *Heller II* at *2.

domestic violence . . . I don't think making that public serves the interest of public safety, and it could increase the risk for somebody who has already demonstrated that they have a specific threat.[69]

The Committee shares the concerns about the impact such disclosure might have on licensees. Accordingly, the committee print for Bill 20-930 retains section 909.

## *Rulemaking*

Legislation routinely delegates reasonable implementation rulemaking to the Mayor in a *pro forma* clause. Bill 20-930, however, sets out minimum standards to ensure that the implementing regulations appropriately address a number of significant provisions. Section 908(e) directs the Mayor to issue rules establishing procedures for a contested case review of any appeal, including the manner and time of appeals, and procedures for the Review Board to assign panels of three Review Board members to conduct hearings and issue final decisions.

Section 911 directs the Chief of Police to issue rules to implement the provisions of Bill 20-930. Specifically, the rules must (1) establish criteria for meeting the good or other proper reason for carrying a concealed pistol requirement, and the applicant's suitability to carry a concealed pistol requirement; (2) establish the type and amount of ammunition that may be carried concealed; (3) establish the methods by which a pistol may be carried; (4) establish all application forms, investigation procedures, background checks, and fees necessary to process an application; (5) specify procedures or requirements specific to non-residents; (6) specify requirements for signage on any private property prohibiting concealed carry therein; and (7) establish renewal procedures.

## *Non-residents*

The *Palmer* decision stated that the District could not ban otherwise qualified non-residents from public carrying for self-defense based solely on the fact that they are not residents of the District. Bill 20-930 addresses this concern by providing a mechanism for non-residents to obtain carry licenses. In section 3(b), the bill revives Section 6 of the License to Carry a Pistol Amendment Act, which specifies that any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States may apply for a concealed carry license, so long as the applicant "has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed." For the non-resident who lives in a state that does not require a license to carry a concealed pistol, he or she may also apply for a carry license, provided that he or she meets the same requirements.

---

[69] Chief Lanier Oct. 16, 2014 verbal testimony; the Chief's concerns were shared by George L. Lyon, Jr., who testified that making the identity of carry license holders public was an "utterly dangerous idea" that would "put innocent victims of stalking and crime at such risk."

Additionally, under section 902(d), any applicant may satisfy the training component by demonstrating the applicant has met similar requirements in his or her own state of residence. This provision ensures that the training requirements of Bill 20-930 are not repetitive for nonresidents or new residents who possess such training and seek a carry permit in the District.

## CONCLUSION

### *General Observations*

The Committee has felt far greater opposition to Bill 20-390 than support, both from councilmembers and the public. Nonetheless, the court has made clear that a complete ban on carrying is inconsistent with the Second Amendment. Despite criticism, the Committee believes a regulatory scheme is possible that: (1) Sufficiently vets applicants to ensure that licensees are presumably safe people – knowledgeable about gun safety and use, no proclivity to violence, and no issue with mental illness; and (2) Minimizes the need for law enforcement (MPD, Secret Service, Capitol Police, etc.) to turn the District into a semi-police state with restricted freedom for its citizens.

Second Amendment supporters criticize the Bill as not going far enough to permit un-infringed carrying. Although the legality of gun regulation must be viewed in light of Second Amendment jurisprudence, the criticism should still be discussed. The most common criticism is that the District will be a safer place with gun carrying citizens:

> The notion stems from a paper published in 1997 by economists John Lott and David Mustard, who looked at county-level crime data from 1977 to 1992 and concluded that "allowing citizens to carry concealed weapons deters violent crimes and it appears to produce no increase in accidental deaths."[70]

There has been significant research since the Lott and Mustard study. A 2004 analysis from the National Research Council concluded that there was no credible statistical evidence that right-to-carry laws reduced crime. Most recently, an analysis out of Stanford University finds that:

> The totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher rates of aggravated assault, rape, robbery and murder. (internal quotation marks omitted)[71]

---

[70] Christopher Ingraham, *More guns, more crime: New research debunks a central thesis of the gun rights movement*, WASHINGTON POST, WONKBLOG, November 14, 2014, http://www.washingtonpost.com/blogs/wonkblog/wp/2014/11/14/more-guns-more-crime-new-research-debunks-a-central-thesis-of-the-gun-rights-movement/.

[71] Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford research shows*, STANFORD REPORT, November 14, 2014, http://news.stanford.edu/news/2014/november/donohue-guns-study-111414.html.

This is consistent with anecdotal observations by Chief Lanier at the October 16 public hearing on Bill 20-930. In response to questions she stated that she had not seen a reduction in crime as a result of the reinstatement of handgun registration in the District following the *Heller* decision. She noted that burglaries had gone up after *Heller*; she was not suggesting a cause and effect, rather, that the ability of residents to now possess guns in their home did not seem to deter burglaries.

In this regard, the Committee notes its own observation that much of the District's violent crime is the result of gang members carrying guns. It may be that they are illegal, but the fact that they are carrying provokes gun violence, rather than lessens it, between gang members.

In addition, a study published in The New England Journal of Medicine in 1991 looked specifically at the effect of gun control in the District and concluded that:

> Restrictive licensing of handguns was associated with a prompt decline in homicides and suicides by firearms in the District of Columbia. No such decline was observed for homicides or suicides in which guns were not used, and no decline was seen in adjacent metropolitan areas where restrictive licensing did not apply. [72]

### *Reasonable Regulation*

It is clear from the caselaw that reasonable regulations are permissible under the Second Amendment. Even in *Palmer*, the Court noted that under *Heller* and its progeny, the Second Amendment right is "not unlimited":

> Furthermore, it is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. Rather, it is a right subject to traditional restrictions, which themselves and this is a critical point tend to show the scope of the right. (For now, we state that a longstanding presumptively lawful regulatory measure . . . would likely [burden conduct] outside the ambit of the Second Amendment.) (citations, internal quotations omitted) [73]

It is undeniable that introducing a gun into any conflict can escalate a limited danger into a lethal situation. In response to a question by Council Chairman Phil Mendelson about the inclusion of training on situational awareness, conflict management, and the decisions on use of deadly force, *Heller* and *Palmer* plaintiff George L. Lyons, Jr. replied that "any confrontation or fight that you have could end up escalating into a deadly force encounter." When the deadly force being used is a gun, the danger extends to bystanders and the public at large. When considering concealed carry in a densely populated city, it is clear that the balancing equation must include the District's substantial governmental interest in public safety and crime prevention.

---

[72] Colin Loftin, Ph.D., David McDowell, Ph.D., Brian Wiersema, and Talbert J. Cottey, M.S., <u>Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia</u>, *The New England Journal of Medicine*, Vol. 325, No. 23 at 1615 (1991).
[73] *Palmer, supra* n. 16 at 11.

A law to regulate the carrying of firearms in our city . . . provides a unique opportunity to press the public safety purpose of regulating gun use to its utmost, where it is most needful of such regulation: outside the home, in a densely populated area that also happens to be our Nation's capital; where danger to members of the public and vulnerability of government officials to armed attack is particularly sensitive; where we all have a right to be free from criminal and negligent gunfire; and where responsible gun use requires the strictest level of supervision while respecting our Constitution, mindful of the posture of the Supreme Court.[74]

The jurisprudence is unclear whether the Second Amendment confers a right of self-defense outside the home. The Committee notes, however, that the government's role in protecting citizens and promoting public safety has evolved dramatically in 225 years. A handful of constables who may have been on duty in 1789 have since been replaced by a Metropolitan Police Department with approximately 4,000 sworn (and armed) officers – and MPD is but one of over two-dozen police forces operating within the District of Columbia. Further, as with all rights protected under the Bill of Rights, the Second Amendment is not unfettered and must be balanced against other rights: the right of citizens to associate freely without fear either of an omnipresent police force or of an armed citizen who is a little too quick to shoot.

Bill 20-930 offers a reasonable, balanced approach to protecting the public safety and meeting an individual's specific need for self-defense. Built-in safeguards to the Chief's discretion, including the Concealed Carry Licensing Review Board and the right to appeal, further this balanced approach. For all the reasons explained above, the Committee recommends approval of Bill 20-930, as amended.

## II.   LEGISLATIVE CHRONOLOGY

September 23, 2014    Bill 20-930, "License to Carry a Pistol Amendment Act of 2014", is introduced by Chairman Mendelson and Councilmember Wells.

September 23, 2014    Bill 20-930 is referred to the Committee on the Judiciary and Public Safety.

September 26, 2014    Abbreviated Notice of Intent to act on Bill 20-930 is published in the *District of Columbia Register.*

September 26, 2014    Notice of a Public Hearing is published in the *District of Columbia Register.*

October 16, 2014     The Committee on the Judiciary and Public Safety holds a public hearing on Bill 20-930.

---

[74] Testimony of Doug Pennington, public witness, at the hearing on Bill 20-930 on Oct. 16, 2014 (p. 5).

October 20, 2014      Bill 20-930 is re-referred sequentially to the Committee on the Judiciary and the Public Safety and the Committee of the Whole.

October 24, 2014      The re-referral is published.

November 25, 2014   The Committee on the Judiciary and Public Safety marks-up Bill 20-930.

## III. POSITION OF THE EXECUTIVE

*Cathy Lanier, Chief, Metropolitan Police Department*, testified on behalf of the executive in support of Bill 20-930. She stated that the legislation maintains the District's "commitment to keeping guns out of wrong hands, while fully respecting the Second Amendment of the U.S. Constitution." Chief Lanier provided a brief overview of the *Palmer* ruling, the joint effort by the Executive, Council Chairman Phil Mendelson, and Councilmember Tommy Wells to develop the legislative response, and the key elements of the bill. She also discussed the uniqueness of the District of Columbia, stating that as the seat of the federal government, it is "a city filled with sensitive places from a public safety perspective." She stated that protecting government officials and infrastructure is challenging in every city, but "in the District the likelihood of attack is higher, and the challenges to protecting the city are greater," with so many critical official and symbolic buildings, monuments, events, public officials, dignitaries, and public servants present in the city every day. She cited the recent security breaches into the White House as examples of the importance of prohibiting guns from entering the perimeter of a secure area.

Chief Lanier also urged the Council to make three changes to the list of places where carrying handguns would be prohibited First, she urged the Council to expand the prohibition of handguns in government buildings to also include the surrounding grounds and parking lots. She cited two examples of law enforcement officers in Virginia and Pennsylvania gunned down in police parking lots. Second, she urged the Council to remove the requirements that a law enforcement officer advised a licensee that a public gathering, dignitary movement, or demonstration is occurring and ordered the licensee to leave before criminal penalties apply. Instead, she argued, notice should be satisfied by signs at event entrances, in advertisements, and tickets. Third, she urged the Council to preclude taxi drivers from being able to obtain a carry permit based only on their status as a taxi driver.

Chief Lanier further made it known that the police department was presently at work on emergency regulations to issue no later than October 22nd. She stated that these regulations would be based in part of prior District regulations, and in part on models from Maryland, New York, and New Jersey, whose licensing programs have been found to be constitutional by their respective federal Courts of Appeal. Finally, she concluded her remarks by explaining that any trainer already certified to provide firearm training for special police officers will be able to be certified to train new licensees simply by providing training curriculum for initial certification.

## IV.  COMMENTS OF ADVISORY NEIGHBORHOOD COMMISSIONS

The Committee did not receive testimony from any Advisory Neighborhood Commission.

## V.  SUMMARY OF TESTIMONY AND STATEMENTS

The Committee on the Judiciary and Public Safety held a public hearing on Bill 20-930 on Thursday, October 16, 2014. The testimony summarized briefly below is from that hearing. A copy of the witness list is attached to this report and the hearing record, including copies of the full testimony, is available from the Office of the Secretary.

*Brian Wrenn, Public Witness:* Mr. Wrenn testified in opposition to the bill. He expressed a belief that the bill is overly restrictive of where a licensee may carry a firearm. In particular, he cited the restriction against being within 1,000 of a dignitary, as their movements are unpredictable, and the restriction against public transit, as many people ride Metro or Metrobus. Mr. Wrenn further postulated reasons why the bill violates the *Palmer* decision, and why allow "non-criminals" to carry firearms would make the city safer. He further stated that with advances in technology, including 3D printers, there will be an increase in illegally obtained or possessed firearms everywhere.

*Dr. Ankoor Shah, Pediatrician and Member, DC Chapter of the American Academy of Pediatrics:* Dr. Shah shared the story of a five year old girl who accidentally shot herself in the head and died using her father's gun, that had been left loaded and unlocked in a bedroom. He stated that over 2,000 children 18 years old and younger were unintentionally injured by a firearm in 2013. He noted that the bill's language of "on or about a person" with regard to a carried firearm implies a potential danger for children. A firearm should only be allowed on a person's body or in a locked box; anything short of that will endanger children.

*Reverend Crystal Kuykendall, Shiloh Baptist Church:* Rev. Kuykendall spoke her personal experiences with gun violence, and urged the Council to enact a law that gives discretion to the Chief of Police to issue carry permits; requires the Chief to affirm that an applicant has a legitimate need to carry a loaded, hidden handgun; requires the applicant to be cleared through the National Instant Background Check System; requires the applicant to have at least 16 hours of training; and includes houses or worship as locations in which the carrying of load, hidden handguns is prohibited.

*Reverend Rebecca Justice Schunior, Associate Rector, St. Mark's Episcopal Capitol Hill:* Rev. Schunior testified about the nature of violence, the ability of any person to commit it, and the importance of prohibiting firearms from houses of worship, where people "we bring our deepest passions."

*Patricia Johnson, Canon Missioner, Washington National Cathedral:* Ms. Johnson testified on behalf of Dean Gary Hall of the Washington National Cathedral and Bishop Mariann Budde of the Episcopal Diocese of Washington. Ms. Johnson requested the Council include houses of worship in the list of prohibited locations.

**JA 60**

**Reverend Robert Schenck, Public Witness:** Rev. Schenck testified in favor of the bill, but recommended removal of the requirement that applicants must prove they have good reason to fear for their lives or safety. He also spoke about DC's unique attraction to mentally ill and delusional persons owing to the concentration of government institutions and workers. He also stated that data demonstrates that the presence of lethal weapon in the home greatly increases the potential of deadly domestic violence, successful suicide, and grave injury or death to children, and that requiring 16 hours of training is only the beginning of mastering one's emotions, intellect, bodies, and souls to yield the lethal power safely.

**Kris Hammond, Public Witness:** Mr. Hammond is a Ward 5 resident and testified that the high standards imposed on a person seeking a handgun carry permit would place DC outside the mainstream of American law today. He expressed disagreement with certain of the prohibited locations and requested the Council provide rationales for each prohibition, including in government owned or controlled buildings and at permitted public gatherings. He concluded by opining that law abiding registrants do not commit gun crime.

**Antonio Goicochea, Public Witness:** Mr. Goicochea, of McLean, VA, testified in opposition to the bill and called it "deliberately burdensome." He also asserted that concealed carry reduces crime. He recommended that the District enact legislation more in line with laws in Alaska, Arkansas, Arizona, Wyoming, and Vermont.

**Doug Pennington, Public Witness:** Mr. Pennington, a Ward 5 resident, testified about the legal backdrop upon which the bill is written. He made three recommendations for the bill, including (1) enacting a "Barney Fife" rule to automatically and temporarily suspend gun carry licenses of those who fire their weapons accidentally; (2) before issuing a gun carry license, investigate applications who were respondents in any domestic violence complaint but in which no civil protection order or criminal conviction results; and (3) include a specific provision to prohibit an applicant convicted of any stalking offense from being issued a gun carry license.

**George L. Lyon, Jr., President, DC Chapter of Community Association for Firearms Education:** Mr. Lyon testified in opposition to the bill. He discussed his background as a DC resident, firearms enthusiast, and legal party in the *District of Columbia v. Heller* case. He strongly criticized the proposition to publish the identities of carry license holders and the requirement that applicants prove their specific need for self-protection. He further criticized the prohibition on restaurants and public transportation, saying that such prohibitions go even beyond the laws in other restrictive, shall issue states like California, Hawaii, Maryland, Massachusetts, New Jersey, and New York. He urged the legalization of drugs, the improvement of the mental health system, and the loosening up of the carry requirements and restrictions. He also argued that allowing increased carry permits does not increase crime and provided statistics.

**Tracy Zorpette, Advocacy Lead, DC Chapter Advocate Lead, Moms Demand Action for Gun Sense in America:** Ms. Zorpette testified in favor of the bill. She stated her belief that the bill borrows the best provisions from the concealed carry laws in other jurisdictions and will provide a model for the nation. Additionally, she suggested three changes to the bill to reverse the presumption allowing guns on private property, to add houses of worship and polling places

**JA 61**

to the prohibited locations list, and to allow journalists and scholars to FOIA records on licenses for scholarship purposes.

*Matthew Bergstrom, Managing Partner, Arsenal Attorneys*: Mr. Bergstrom testified that his law firm represents thousands of gun owners across America and that he was speaking on behalf of "the many clients who have contacted [him] with their concerns about Bill 20-930." He called the bill vague and inconsistent, setting up subjective standards and creating overly complex compliance requirements. He also commented on the wisdom of a shall issue scheme.

*Ron Campbell, Public Witness:* Mr. Campbell testified in opposition to the bill. He spoke about his experiences with gun violence as the owner of an automotive shop in DC.

*Martin Moulton, Public Witness:* Mr. Moulton spoke about his personal experience of gun violence in and around Shaw and asserted that ending the war on drugs, regulating and licensing all drugs like alcohol and tobacco would go a long way toward decreasing criminal gun violence.

*Jackie, Public Witness:* Jackie testified at the public hearing in opposition to Bill 20-930, but did not provide a written statement.

In addition to the testimony above, the following statements were submitted for the record:

*Lee F. Satterfield, Chief Judge, Superior Court of the District of Columbia*, submitted a letter to the Chairman declining to serve as a member of the Concealed Pistol Licensing Review Board or designating another Superior Court associate or senior judge to serve in his stead. Chief Judge Satterfield cited Rule 3.9 of the Code of Judicial Conduct, which states that a judge "shall not . . . perform other judicial functions apart from the judge's official" and suggested it would be more appropriate to appoint a retired Superior court judge to serve on the Board.

*Kim C. Dine, Chief of Police, United States Capitol Police*, submitted comments for the record. Chief Dine highlighted the U.S. Capitol Police's (USCP) daily partnership with the MPD and stated that Bill 20-930 directly impacts the USCP's law enforcement duties and responsibilities in maintaining security and safety within DC. On behalf of the USCP, Chief Dine requested three amendments: (1) the addition of the phrase "including U.S. Capitol Buildings and Grounds" in section 907(a)(10); the addition of a phrase detailing additional prohibitions related to the work of the USCP for protected movements in section 907(a)(12); and the addition of the phrase "other than federal property" in the prohibition in section 907(a)(13). Chief Dine stated that "given the statutory responsibilities of the U.S. Capitol Police and federal statutes prohibiting firearms on federal property, as well as the specific Capitol Buildings and Ground prohibitions enumerated in federal and D.C. statutes, these edits are essential to effective law enforcement within the District of Columbia."

*Ronald A. Pavlik, Jr., Chief, Metro Transit Police*, submitted written testimony urging an amendment to the bill that would clearly prohibit firearms from any WMATA Metrorail station or building.

*A.T. Smith, Deputy Director, United States Secret Service*, submitted comments for the record supporting the Council's efforts to clearly define the circumstances surrounding an individual's ability to carry a concealed weapon in the District. Deputy Director Smith outlined the unique nature of the District, and made two recommendations specific to the Secret Service's protective mission. First, he requested adding the Vice Presidents residence and surrounding area to the list of locations where carrying a pistol is prohibited. Second, he requested the provision related to high-ranking officials moving under MPD protection be expanded to include where a protectee has arrived at his or her intended destination or had temporarily stopped en route to that destination.

*Terry Lynch, Executive Director, The Downtown Cluster of Congregations*, submitted a letter requesting that houses of worship and their related facilities be included among the locations where concealed carry is prohibited. He noted that he believe at least 14 states have such a prohibition, including Kansas, Louisiana, Michigan, Mississippi, Missouri, Nebraska, North Dakota, South Carolina, Texas, Utah, Virginia and Wyoming. Mr. Lynch wrote that it "is popularly understood houses of worship serve as sanctuaries - places where there should be freedom from threats, violence and danger. Persons should be able to attend worship services of their choice secure in the knowledge that they are indeed sanctuaries."

*Rev. Alfonso Harrod-McKendrie, Simms Brookland UMC; Dr. Helen S. Fleming, Douglas Memorial UMC; Dr. Bernard Hillen Beaad, Foundry UMC; Rev. Joe Liles Sr., Bright Light Church; Rev. Donald Robinson, First Baptist Church; Rev. Charles B. Jackson, St. John Baptist; Rev. Monica M. Lowe Howard, New Day Church of Christ; Dr. Lewis T. Tait Jr., Faith Bible Church; Andre H. Owen, St. Phillips Baptist Church; Joyce McKeithon, St. John Baptist Church; Dr. Earl D. Trent Jr., Florida Ave Baptist Church; Rev. Raymond Bell, Solad Baptist Church; Rev. Eldridge Spearman, Mt. Jezreel Baptist Church; Patricia R. Johnson, Washington National Cathedral; Preston Horribal, Washington National Cathedral; Jan Core, Washington National Cathedral* submitted a sign-on letter requesting that houses of worship be on the list of prohibited places.

*Rev. Dr. Barbara A. Reynolds, Chaplain, Black Women for Positive Change*, submitted written testimony opposing allowing the carry law to permit the carrying of firearms into churches.

*DC residents Meghan Abrams, Miriam Szubin, Aliza Glasner, Anna Ravvin, Cheryl Aaron, Josh, Rachel Brandenburg, and Stacey Apter,* each submitted statements opposing the section 907(b) presumption that businesses and private property allow concealed carry. All urged the Council to reverse the presumption and instead require establishments that want to allow guns to put conspicuous signs up. As frequent patrons of retail stores and restaurants, they stated they should feel safe inside establishments. Also, sharing the perspective as parents of young children, they want to know what new precautions they will have to take before taking their children out.

*Katerina Herodotou, Partner, Meeps Vintage*, submitted a statement in opposition to the presumption for businesses. She wrote that requiring businesses across the District to post

conspicuous signage is undesirable and a better policy would reverse the presumption. She also posed several questions, including: (1) Where is the immunity clause? (2) What if a business does not post a conspicuous sign and something goes wrong? (3) Can the business be held liable? She concluded that guns have no business in small, crowded, and enclosed areas, which describes most of the businesses in DC's dense urban setting.

*Barbara Ward, DC Resident*, submitted testimony that she opposes allowing concealed weapons on the business property and premises in Adams Morgan.

*Dr. Jodi Zender*, no residency listed, submitted testimony opposing the bill for several reasons. She asserted that "may issue" means that getting a gun could be too late for many with specific threats against applicants. She also criticizes the bill's training requirement, the in-person interview, the delegation of rulemaking, the 1000-foot limitations, and the "numerous and unprecedented hurdles to acquiring a license to carry under this bill." Moreover, she wrote that MPD would have "essentially unfettered discretion."

*Marshall Brinson, Pensacola, FL*, submitted testimony in opposition to the bill, finding it unresponsive to *Palmer*. He also stated that he wants to know how the bill will allow nonresidents to receive concealed carry permits.

*Dawn Longenecker, Director, Discipleship Year Program at the Festival Center, Inc., and Joseph P. Deck III, Festival Center Executive Director*, submitted testimony opposing any legislation allowing people to carry concealed weapons.

*Michael Scott, Director, D.C. Catholic Conference*, submitted written testimony in favor of the bill, however requested the Council include houses of worship in the list of prohibited locations.

*Joe Sternlieb, President, and Natalie Avery, Executive Director, DC BID Council*, submitted a joint letter expressing serious concerns about the bill's presumption that any private property that is not a residence permits licensees to carry a pistol onto the property. The authors expressed concern that businesses posting a conspicuous sign prohibiting guns would negatively change the look and feel of the city's commercial districts and place an undue burden on the businesses.

*Adam Crain, Secretary of the Board, Adams Morgan Partnership Business Improvement District ("AMPBID")*, submitted a resolution unanimously passed by AMPBID expressing their opposition to the bill's presumption that any private property that is not a residence permits licensees to carry a pistol onto the property.

*Everytown for Gun Safety* submitted comments on Bill 20-930, stating the bill "strikes an appropriate balance between granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets" of the nation's capital (citing *Woollard v. Gallagher*). The organization further commended the Council for "striking an appropriate, fully constitutional balance between allowing law-abiding gun owners to carry concealed weapons in public and protecting residents and visitors in the

District." The organization also recommended that the provisions regarding FOIA be amended to allow aggregate or general information to be released to persons conducting journalist or academic research.

**Brian Malte, Senior National Policy Director, Brady Campaign to Prevent Gun Violence:** Law enforcement discretion is important b/c it provides law enforcement with the ability to prevent dangerous and potentially violent people from carrying a concealed handgun in public. B20-930 respects the balance between public safety and the Second Amendment.

**Juliet A. Leftwich, Legal Director, Law Center to Prevent Gun Violence**, submitted comments on the bill, stating the Law Center believes B20-930 creates a lawful, common sense regulatory scheme to govern the issuance of concealed weapons licenses in the District and to protect public safety. The Law Center proposed several amendments, including (1) clarifying that persons seeking to carry a loaded handgun to and from their place of business must obtain a concealed weapons license; (2) narrowing the FOIA exception so that it prohibits the disclosure of personal information regarding individuals who have applied for, received, or had a license revoked, while permitting disclosure of aggregate information regarding such individuals; (3) adding places of worship to the prohibited places; and (4) clarifying the meaning of the term "defensive pistol and ammunition selection" in the provision governing safety training. Ms. Leftwich further stated that the possession of loaded, hidden guns in public created a significant threat to public safety, and that many states take reasonable steps to minimize the risks created by the presence of hidden guns in public by limiting licenses only to those with specific need, requiring safety training and testing, restricting the locations where guns may be carried, and limiting the duration of the license.

## VI.   IMPACT ON EXISTING LAW

Bill 20-930 amends the Firearms Control Regulations Act of 1975 to make several conforming amendments related to carrying concealed pistols and adds a new Title IX to provide the related definitions, application requirements, license expiration and renewal provisions, duties of licensees, revocation and suspension of licenses provisions, prohibitions on carrying while impaired, a list of locations and circumstances where carrying a concealed pistol is prohibited, for the establishment of a Review Board, an exception to the Freedom of Information Act, penalties, and a rulemaking provision.

The bill also amends revives section 6 of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes; and to make conforming amendments therein related to carrying concealed pistols.

Finally, Bill 20-930 repeals section 101 of the Omnibus Public Safety and Justice Amendment act of 2009.

## VII.   FISCAL IMPACT

The attached November 25, 2014 Fiscal Impact Statement from the Chief Financial Officer states that funds are sufficient to implement Bill 20-930.

## VIII.   SECTION-BY-SECTION ANALYSIS

Section 1      States the short title of Bill 20-930.

Section 2      Amends the Firearms Control Regulations Act of 1975 as follows:

(a) Adds "place of business of the registrant" to where a person may temporarily possess a firearm registered to another person provided that person is not otherwise prohibited from possessing a firearm and reasonably believes such possession is necessary to prevent imminent death or great bodily harm to himself or herself.

(b) Amends the exceptions for prohibitions on registering a pistol to include self-defense within a person's place of business or as part of the license to carry application.

(c) Adds stalking offenses to the list of offenses that disqualify an applicant from receiving a firearm registration.

(d) Provides that records related to registration are not to be made available under the Freedom of Information Act.

(e) Adds a conforming reference in the penalties section to the new Title IX, created below.

(f) Adds a new Title IX – License to Carry a Pistol as follows:
- Section 901 provides definitions.

- Section 902 provides application requirements:
(a) The applicant shall certify and demonstrate to the Chief's satisfaction that the applicant:
    o (1) Is at least 21 years of age;
    o (2) Meets all existing requirements for registering a firearm and has a registration certificate for the pistol the applicant wants to carry concealed;
    o (3) Has not suffered from any mental illness or condition in the previous 5 years that created risk of danger to self or others; or has been cleared from such illness or condition;
    o (4) Has completed a firearms training course or combination of courses that meets specific requirements;
    o (5) Has completed at least 2 hours of range training;
    o (6) Follows any procedures established by rule.

**JA 66**

(b) Requires that the applicant have certification from the firearms instructor stating that the applicant (1) Demonstrated satisfactory completion of the requirement; and (2) Possesses the proper knowledge, skills, and attitude to carry a concealed pistol.

(c) Provides that the training requirements may be satisfied if the applicant submits evidence that he or she has already received, as determined by the Chief, is equal or greater training than required in subsection (a)(4)(5).

(d) Provides that any component of the training requirement may be satisfied by demonstrating to the satisfaction of the Chief, that the applicant has already met that component as part of a successful application to carry elsewhere in the United States.

(e) Requires the applicant to attest to the truth of the information required under penalty of perjury.

(f) Requires an in-person interview at MPD for purposes including verification of the applicant's identity and verification of the information submitted as part of the application process.

- Section 903 provides for expiration and renewal of licenses:
  (a) States licenses expire no later than 2 years, unless revoked.

  (b) Explains what is required of the applicant to be eligible for renewal, including continuing to meet all of the initial application requirements, (except that only 4 hours of training and 2 hours of range practice within the previous 12 months are required) and any other procedures the Chief may establish by rule); and that timely renewal is the licensee's responsibility.

  (c) Provides that persons who have renewal applications denied by appeal to the Concealed Pistol Licensing Review Board within 15 days of notice of the denial.

- Section 904 provides the duties of licensees:
  (a) Requires the licensee to comply with all limits and conditions stated in the issuance of the license;

  (b) Requires the licensee to notify the Chief in writing (1) immediately upon discovery of the loss, theft, or destruction of the license; and (2) within 30 days of a change in the licensee's name or address as it appears on the license.

**JA 67**

(c) Requires the licensee to carry the license to carry and the registration of the pistol, each time the pistol is carried.

(d) Requires the licensee, when stopped by the police for an investigative stop, to disclose he or she is carrying a pistol, present the license and registration, disclose where the pistol is located, and comply with all lawful directions and orders from the officer, including giving the pistol to the officer for so long as necessary for the safety of the officer or the public.

(e) Provides that these duties are in addition to any other requirements imposed by this act or applicable law.

(f) Provides that violating this section subjects the licensee to revocation of the license and any other penalty provided by law.

- Sec. 905. Revocation of licenses.
  (a) Chief can revoke if the licensee no longer meets the standards and requirements.

  (b) Anybody (including USAO & OAG) can apply to MPD for revocation. Any person who knows a licensee no longer meets requirements can notify the Chief or officer (who may then take action as appropriate).

  (c) Any person whose license has been revoked may, within 15 days of notice of the revocation, appeal to the Review Board.

- Sec. 906. Carrying while impaired.
  (a) Prohibits a licensee from carrying while impaired.

  (b) Provides that failure to submit to field sobriety, breathalyzer, or urine tests after reasonable suspicion has been established are grounds for immediate revocation and seizure of the license.

  (c) Provides that a violation of this section subjects the licensee to any existing penalties and license revocation.

  (d) Defines "impaired" to mean that a licensee has consumed alcohol or a drug or a combination thereof and that it has affected the licensee's behavior in a way that can be perceived or noticed.

- Sec. 907. Prohibitions on carrying licensed pistols.
  (a) Provides a list of locations and circumstances where licensees are prohibited to carry:

(1) Any building or office occupied by the District government, its agencies, or instrumentalities;

(2) The buildings and grounds, including any adjacent parking lot, of any childcare facility, preschool, public or private elementary or secondary school, or any public or private college or university;

(3) Any hospital or any office where medical or mental health services are the primary services provided;

(4) Any penal institution, secure juvenile residential facility, or halfway house;

(5) Any polling place while voting takes place:

(6) Any public transportation vehicle, including the Metrorail transit system and its stations;

(7) Any premises, or portion thereof, licensed as a tavern or nightclub;

(8) Any stadium or arena;

(9) Any gathering or special event open to the public; provided that no criminal prosecution shall occur unless the organizer or the District provided notice in advance and by posting signs or the licensee has been ordered by a law enforcement officer to leave and has not complied.

(10) The public memorials on the National Mall and along the Tidal Basin, and any area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol buildings and grounds;

(11) The area around the White House between Constitution Avenue, N.W., and H Street, N.W., and between 15th Street, N.W., and 17th Street, N.W.;

(12) The U.S. Naval Observatory and its grounds, and from the perimeter of its fence to the curb of Massachusetts Avenue, N.W. from 34th Street, N.W. south on Massachusetts Avenue, N.W. to Observatory Circle, N.W.;

(13) Within a perimeter designated by the Chief when a dignitary or high-ranking official is moving under protection; provided that no criminal prosecution shall occur unless there was notice of the perimeter or the licensee has been ordered by a law enforcement officer to leave and has not complied;

(14) Within a perimeter designated by the Chief of a demonstration in a public place; provided that no criminal prosecution shall occur unless there was notice of the perimeter or route, or the licensee has been ordered by a law enforcement officer to leave and has not complied;

(15) Any prohibited circumstance that the Chief determines by rule; provided, that for spontaneous circumstances, no criminal penalty shall apply unless the licensee has notice of the prohibition and has failed to comply.

(b) Provides presumptions related to concealed carry in specific locations:

JA 69

(1) Provides that any private residence shall be presumed to prohibit concealed pistols unless the property owner or person in control of the premises otherwise authorized and communicated personally to the licensee in advance of entry.

(2) Provides that any church, synagogue, mosque, or other place where people regularly assemble for religious worship shall be presumed to prohibit concealed pistols unless the property is posted with conspicuous signage allowing concealed pistols, or the owner or authorized agent communicates such allowance personally to the licensee in advance of entry onto the property, provided that such places may not authorize concealed pistols where services are conducted in locations on the list of prohibited places listed in subsection (a).

(3) Provides that any private property that is not a residence shall be presumed to permit a licensee carrying a concealed pistol to enter the property unless conspicuous signage prohibiting concealed pistols is posted, or the owner or authorized agent communicates such prohibition personally to the licensee.

(c) Requires a licensee who approaches any prohibited location or is subject to any prohibited circumstance to (1) secure the pistol in a vehicle if one is available; or (2) immediately leave the prohibited location or circumstance.

(d) Provides that a licensee shall not be in violation of this section (1) while on adjacent roads or sidewalks; or (2) while driving a vehicle into and immediately parking at any location listed in subsection (a)(2) or (3) of this section, for the purpose of picking up or dropping off a student or a child; provided, that the licensee shall secure the concealed weapon, before leaving the parked vehicle.

(e) Prohibits a licensee to carry a pistol openly.

(f) Provides that a licensee who violates this section shall be subject to revocation of his or her license in addition to any other penalty provided by law.

(g) Defines demonstration, public transportation, and residence.

Sec. 908. Concealed Pistol Licensing Review Board.

(a) Establishes a review board to hear appeals from carry application or denials, summary suspension or restriction of a license; or revocation of a license.

(b) Establishes the membership of the Review Board as consisting of seven members (the United States Attorney for the District of

Columbia or his or her designee; the Attorney General for the District of Columbia or his or her designee; and five members appointed by the Mayor: a mental health professional from the Department of Behavioral Health; a former sworn officer of a law enforcement agency other than MPD; one mental health professional; and two District residents with experience in the operation, care, and handling of firearms); establishes the process of appointment, the terms, vacancy appointments, and removal; and states that members shall serve without compensation but may receive actual and necessary expenses incurred in the performance of official duties.

(c) Requires the Mayor to provide hearing facilities and administrative support from existing resources in fiscal year 2015.

(d) Provides that four members shall constitute a quorum, except that two members shall be a quorum when hearing panels of three members are assigned to conduct a hearing and make a final decision; also provides that the hearing panel shall include at least one member from the USAO, OAG, or former law enforcement.

(e) Requires the Mayor to establish hearing procedures by rule.

(f) Provides that Board meetings and hearings shall be confidential and closed to the public.

(g) Provides that any person or the Chief aggrieved by a final action of the Board may file an appeal.

- Sec. 909. Freedom of information exception; report.
  (a) Provides that records related to those who have applied, received, or had revoked any license are not to be made available under the Freedom of Information Act; provided that aggregate data may be used for the purposes of the public report in subsection (b).
  (b) Requires MPD to make public a report, every 2 years, that includes information on the number of licenses issued in the most recent 2-year period; the total number of valid licenses; the number of licensees convicted of a crime involving a pistol in the most recent 2-year period; the number of pistols for which a license was issued that were reported lost or stolen in the reporting period; and the number of pistols for which a license was issued that were found or recovered as stolen that were unreported by a licensee as lost or stolen in the most recent 2-year period.

- Sec. 910. Penalties.

(a) Provides that except as otherwise provided in this title, a person convicted of a violation of a provision of this title, rules or regulations issued under authority of this title, shall be fined according to the Criminal Fine Proportionality Act or imprisoned for not more than 180 days.

(b) Provides that civil fines, penalties, and fees may be imposed as alternative sanctions.

(c) Provides that all prosecutions for violations of this title shall be brought by OAG.

- Sec. 911. Rules.
Requires the Chief to issue rules to implement the provisions of this act, including rules:

(1) To establish criteria for determining when an applicant has:

(A) Demonstrated a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life;

(B) Demonstrated any other proper reason for carrying a concealed pistol, which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person; and

(C) Demonstrated the applicant's suitability to carry a concealed pistol, which shall at a minimum include evidence that the applicant meets the requirements of section 902;

(2) To establish the type and amount of ammunition that may be carried concealed by a licensee;

(3) To establish the methods by which a pistol may be carried, including any standards for safe holstering;

(4) To establish all application forms, investigation procedures, background checks, and fees necessary to process an application for a license to carry a concealed pistol;

(5) To specify any procedures or requirements specific to non-residents who apply to carry a concealed pistol, with regard to the registration requirements in this act;

(6) To specify requirements for signage on any private premises where the owner or person in control of the premises prohibits carrying concealed pistols, pursuant to section 907(b); and

(7) To establish procedures for the renewal of licenses.

Section 3    Amends An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to

prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-4501 *et seq.*) as follows:

(a) Amends the lead-in language in Section 4(a) to reflect the addition of the ability to carry concealed; and makes a conforming amendment to reflect a concealed carry license.

(b) Revives section 6, Issuance of a license to carry a pistol, with five subsections:

- Subsection (a) provides that the Chief of Police may issue a concealed carry license to (1) any person with a residence or business in the District; or (2) any person with a residence or business in the United States and a concealed carry license issued by a lawful authority, for not more than 2 years, if the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and is otherwise suitable to be so licensed.

- Subsection (b) provides that a non-resident who lives in a state that does not require a carry license may apply for a carry license in the District, provided he or she meets the same reasons and requirements in subsection (a).

- Subsection (c) provides that the Chief may limit the geographic area, circumstances, or times in which the license is effective and may revoke the license for good cause.
- Subsection (d) provides that the license application must be on a form prescribed by the Chief, that includes name, address, description, photograph, and signature of the licensee.
- Subsection (e) provides for an appeal to the Concealed Pistol Licensing Review Board.

Section 4    Repeals section 101 of the Omnibus Public Safety and Justice Amendment act of 2009, effective Dec. 10, 2009 (D.C. Law 18-88; D.C. Official Code § 22-2511), which made it unlawful for a person to be voluntarily in a motor vehicle if that person knows that a firearm is in the vehicle, unless the firearm is being lawfully carried or lawfully transported. This section was held unconstitutional in Conley v. United States, 2013 D.C. App. LEXIS 633, - A.3d – (Sept. 26, 2013).

Section 5    Adopts the fiscal impact statement.

Section 6    Provides the effective date.

## IX.   COMMITTEE ACTION

On November 25, 2014, the Committee met to consider B20-930, the "License to Carry a Pistol Amendment Act of 2014". The meeting was called to order at 10:50 am. After ascertaining a quorum (Chairperson Wells and Councilmembers Bonds, Cheh, and Evans present, with Chairman Mendelson also in attendance), Chairperson Wells made opening remarks, providing background on gun regulation in the District and the impact of the *Heller* and *Palmer* decisions, before discussing changes in the committee print. He then moved the print with leave for staff and the General Counsel to make technical and conforming changes.

Councilmember Cheh began the discussion, commenting that the bill reflected an enormous effort. She then moved an amendment to reverse the presumption for non-residential property from one of permission to carry a concealed pistol on the premises unless otherwise notified of a prohibition, to one of prohibition from carrying a concealed pistol on the premises unless otherwise notified of permission. Chairman Mendelson argued against this amendment, stating that this amendment would essentially prohibit licensees from carrying anywhere. He also stated that the Council has a responsibility to ensure that the bill is not overwhelming stacked against the person allowed to carry. Councilmember Bonds concurred, stating that while the amendment reflected her personal feelings, the Council must address the *Palmer* ruling. Chairperson Wells also stated that the amendment reflected his personal feelings, but that as a Councilmember, he has an obligation to ensure that the District's laws reflect the reality imposed by the *Palmer* court. Chairperson Wells then called for a vote on the amendment, which failed 3-1 (Chairman Mendelson, Chairperson Wells, and Councilmember Bonds voting against; Councilmember Cheh voting for; and Councilmember Evans absent).

Councilmember Cheh then moved a second amendment, which would require MPD to collect and make public aggregate data regarding the number of licenses issued, the number of licensee convicted of a crime involving a pistol, and the number of pistols reported lost or stolen in order to better analyze the consequences of our concealed carry law. Councilmember Cheh stated that having this aggregate, anonymous data would put the District in a better position to glean some basic information about the consequences of the concealed carry law. Chairperson Wells accepted this amendment as friendly.

Following the discussion, the vote on the print was unanimous. Chairperson Wells then moved the report with leave for staff to make technical, editorial, and conforming changes. After an opportunity for discussion, the vote on the report was unanimous.

The meeting adjourned at 11:40 am.

**JA 74**

# X.   ATTACHMENTS

1.   Bill 20-930 as introduced
2.   Witness list
3.   1857 law
4.   1932 law
5.   Police Regulations Act 50-55 (1968)
6.   1974 regulations
7.   Statements from the Chief of Police, the U.S. Secret Service, and the U.S. Capitol Police
8.   Christopher Ingraham, *More guns, more crime: New research debunks a central thesis of the gun rights movement*, Washington Post, November 14, 2014
9.   Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford research shows*, STANFORD REPORT, November 14, 2014
10.  *Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia*, The New England Journal of Medicine, 1991
11.  Fiscal impact statement
12.  Legal sufficiency determination by the General Counsel
13.  Comparative Print
14.  Committee Print for Bill 20-930

# 1

Bill 20-930, as introduced

# COUNCIL OF THE DISTRICT OF COLUMBIA
## 1350 Pennsylvania Avenue, N.W.
## Washington D.C. 20004

## Memorandum

To :      Members of the Council

From :    Nyasha Smith, Secretary to the Council

Date :    October 20, 2014

Subject : Re-Referral of Proposed Legislation

Notice is given that the attached proposed legislation was introduced in the Committee of the Whole on Tuesday, September 23, 2014. Copies are available in Room 10, the Legislative Services Division.

TITLE: "License to Carry a Pistol Amendment Act of 2014", B20-0930

INTRODUCED BY: Chairman Mendelson and Councilmember Wells

CO-SPONSORED BY: Councilmembers Orange, Barry, and Bonds

The Chairman is re-referring this legislation sequentially to the Committee on Judiciary and Public Safety and Committee of the Whole.

Attachment

cc: General Counsel
    Budget Director
    Legislative Services

**JA 77**

_____          _____
Councilmember Tommy Wells                              Chairman Phil Mendelson

A BILL

_____

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

_____

Chairman Phil Mendelson introduced the following bill which was referred to the Committee on

_____.

To amend the Firearms Control Regulations Act of 1975 to permit individuals to register a
firearm for self-defense in their place of business, to provide a Freedom of Information
Act exception, to specify application requirements for applying to carry a concealed
pistol, to specify the duration of such licenses and certain requirements for renewal of
licenses, to outline duties of licensees, to provide for revocation of licenses, to create a
criminal offense of carrying while impaired, to specify prohibitions on licensees, to
establish a Concealed Pistol Licensing Review Board and specify the term and other
requirements for the Board, to provide a Freedom of Information Act exception; to
specify penalties, to require the Mayor to issue rules, and to make other technical
changes; and to amend An Act To control the possession, sale, transfer and use of pistols
and other dangerous weapons in the District of Columbia, to provide penalties, to
prescribe rules of evidence, and for other purposes to permit the Chief of Police to issue
licenses to carry a concealed pistol to District residents and non-residents provided
certain conditions are met.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this

act may be cited as the "License to Carry a Pistol Amendment Act of 2014".

Sec. 2. The Firearms Control Regulations Act of 1975, effective September 24, 1976

(D.C. Law 1-85, D.C. Official Code § 7-2501.01 *et seq.*), is amended as follows:

1

JA 78

(a)  Section 201(b)(4) (D.C. Official Code § 7-2502.01(b)(4)) is amended by striking the phrase "the home" and inserting the phrase "the home or place of business" in its place.

(b)  Section 202(a)(4)(C) (D.C. Official Code § 7-2502.02(a)(4)(C)) is amended to read as follows:

"(C)  Any person who seeks to register a pistol:

"(1)  For use in self-defense within that person's home or place of business; or

"(2)  As part of the application process for a license to carry a concealed pistol pursuant to section 902; or".

(c)  New section 211a is added to read as follows:

"Sec. 211a.  Freedom of information exception.

"Any record regarding individuals who have applied, received, or had revoked any registration issued pursuant to this title shall not be made available as a public record under section 202 of the Freedom of Information Act of 1976, effective March 25, 1977 (D.C. Law 1-96; D.C. Official Code § 2-532).".

(d)  Section 706(a) (D.C. Official Code § 7-2507.06(a)) is amended by striking the phrase "Except as provided in sections 205, 208, 702, and 807" and inserting the phrase "Except as provided in sections 205, 208, 702, 807, and Title IX" in its place.

(e)  A new Title IX is added to read as follows:

"TITLE IX – LICENSES TO CARRY A PISTOL.

"Sec. 901.  Definitions.

"For purposes of this title:

2

**JA 79**

1     "(1) "Concealed pistol" means a loaded or unloaded pistol carried on or about a person

2     entirely hidden from view of the public, or carried on or about a person in a vehicle in such a

3     way as it is entirely hidden from view of the public.

4         "(2) "Law enforcement officer" means a sworn member of the Metropolitan Police

5     Department (MPD) or of any other law enforcement agency operating and authorized to make

6     arrests in the District of Columbia, and includes any MPD reserve officer, any special police

7     officers appointed pursuant to An Act Making appropriations to provide for the expenses of the

8     government of the District of Columbia for the fiscal year ending June thirtieth, nineteen

9     hundred, and for other purposes, approved March 3, 1899 (30 Stat. 1057; D.C. Official Code § 5-

10    129.02), and campus and university special police officers appointed pursuant to the College and

11    University Campus Security Amendment Act of 1995, effective October 18, 1995 (D.C. Law 11-

12    63; 6A DCMR § 1200.1 et seq.).

13        "(3) "License" means a license to carry a concealed pistol issued pursuant to Title 22.

14        "(4) "Licensee" means a person who has been issued a license pursuant to Title 22.

15        "(5) "Title 22" means section 6 of An Act To control the possession, sale, transfer and

16    use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to

17    prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C.

18    Official Code § 22-4506).

19        "Sec. 902. Application requirements.

20        "(a) A person who submits an application pursuant to Title 22 shall certify and

21    demonstrate to the satisfaction of the Chief that he or she:

22            "(1) Is at least 21 years of age;

3

1               "(2) Meets all of the requirements for a person registering a firearm pursuant to

2    this act, and has obtained a registration certificate for the pistol that the person is applying to

3    carry concealed;

4               "(3) Does not currently suffer nor has suffered in the previous 5 years from any

5    mental illness or condition that creates a substantial risk that he or she is a danger to himself or

6    herself or others;

7               "(4) Has completed a firearms training course, or combination of courses,

8    conducted by an instructor (or instructors) certified by the Chief that includes at least 16 hours of

9    training, and covers the following:

10               "(A) Firearm safety;

11               "(B) Firearm nomenclature;

12               "(C) The basic principles of marksmanship;

13               "(D) The care, cleaning, maintenance, loading, unloading, and storage of

14    pistols;

15               "(E) Situational awareness, conflict management, and moral and ethical

16    decisions on the use of deadly force;

17               "(F) Defensive pistol and ammunition selection; and

18               "(G) All applicable District and federal firearms laws, including the

19    requirements of this act, An Act To control the possession, sale, transfer and use of pistols and

20    other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of

21    evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-

22    4501 *et seq.*), and District law pertaining to self-defense;

4

1                "(5) Has completed at least 2 hours of range training conducted by an instructor

2   certified by the Chief, including shooting a qualification course of 50 rounds of ammunition

3   from a maximum distance of 15 yards (45 feet); and

4                "(6) Follows any procedures the Chief may establish by rule.

5       "(b) An applicant shall satisfy the requirements of subsection (a)(4) and (5) of this

6   section with a certification from the firearms instructor that:

7                "(1) The applicant demonstrated satisfactory completion of the requirement; and

8                "(2) The applicant possesses the proper knowledge, skills, and attitude to carry a

9   concealed pistol.

10      "(c) An applicant shall be exempt from the requirements of subsection (a)(4) and (5) of

11   this section if he or she has submitted evidence that he or she has received firearms training in

12   the United States military, or has otherwise completed firearms training conducted by a firearms

13   instructor that, as determined by the Chief, is equal to or greater than that required under

14   subsection (a)(4) and (5) of this section.

15      "(d) A non-resident applicant for a license may satisfy any component of the

16   requirements of subsection (a)(4) and (5) of this section by demonstrating to the satisfaction of

17   the Chief that the applicant has met that particular component as part of a successful application

18   to carry a pistol concealed upon his or her person issued by the lawful authorities of any state or

19   subdivision of the United States.

20      "(e)(1) An applicant shall sign an oath or affirmation attesting to the truth of all the

21   information required by Title 22 and this section.

22                "(2) Any declaration, certificate, verification, or statement made for purposes of

23   an application for a license to carry a concealed pistol pursuant to this act shall be made under

5

1 penalty of perjury pursuant to section 401 of the District of Columbia Theft and White Collar

2 Crime Act of 1982, effective December 1, 1982 (D.C. Law 4-164; D.C. Code § 22-2402).

3 "(f) An applicant is required to appear for an in-person interview at the Metropolitan

4 Police Department headquarters, for purposes including verification of the applicant's identity

5 and verification of the information submitted as part of the application process for a license.

6 "Sec. 903. Expiration and renewal of licenses.

7 "(a) Licenses shall expire no later than 2 years after the date of issuance unless revoked

8 by the Chief or renewed pursuant to this title.

9 "(b)(1) A licensee shall be eligible for renewal of a license if:

10 "(A) The licensee continues to meet all of the initial standards and

11 application requirements set forth in Title 22 and section 902, except that with regard to section

12 902(a)(4), only 4 hours of such training shall be required;

13 "(B) With regard to section 902(a)(5), the licensee provides proof of 2

14 hours of range practice within the previous 12 months; and

15 "(C) Follows any procedures the Chief may establish by rule.

16 "(2) Timely renewal shall be the responsibility of the licensee, pursuant to any

17 procedures the Chief may establish by rule.

18 "(3) A renewal license shall expire no later than 2 years after the date of issuance

19 unless revoked by the Chief or renewed pursuant to this act.

20 "(c) Any person whose renewal application has been denied may, within 15 days of

21 notice of the denial, appeal to the Concealed Pistol Licensing Review Board established pursuant

22 to section 908.

23 "Sec. 904. Duties of licensees.

6

1       "(a) A licensee shall:

2       "(1) Notify the Chief in writing of the loss, theft, or destruction of the license

3 (including the circumstances if known) immediately upon discovery of such loss, theft, or

4 destruction; and

5       "(2) Notify the Chief in writing within 30 days of a change in the licensee's name

6 or address as it appears on the license.

7       "(b) A licensee shall have on or about his or her person each time the pistol is carried in

8 the District of Columbia:

9       "(1) The license; and

10       "(2) The registration certificate for the pistol being carried, issued pursuant to this

11 act.

12       "(c) If a law enforcement officer initiates an investigative stop of a person carrying a

13 concealed pistol pursuant to Title 22, the person, and any other licensee who is with the person at

14 the time of the investigative stop, shall:

15       "(1) Disclose to the officer that he or she is carrying a concealed pistol pursuant

16 to Title 22;

17       "(2) Present the license and registration certificate;

18       "(3) Identify the location of the concealed pistol; and

19       "(4) Comply with all lawful orders and directions from the officer, including

20 allowing a pat down of his or her person and permitting the law enforcement officer to take

21 possession of the pistol for so long as is necessary for the safety of the officer or the public.

22       "(d) A licensee shall comply with all limits and conditions stated in the issuance of the

23 license.

7

**JA 84**

1    "(e) The duties set forth in this section are in addition to any other requirements imposed
2    by this act or applicable law.

3    "(f) In addition to any other penalty in the law, any person who violates subsection (c) of
4    this section shall be subject to revocation of his or her license.

5    "Sec. 905. Revocation of Licenses.

6    "(a) The Chief may revoke a license upon a finding that the licensee no longer meets the
7    standards and requirements of Title 22 and this title, or as a penalty as specified in this act.

8    "(b) The United States Attorney for the District of Columbia, the Attorney General for
9    the District of Columbia, or any person may apply to the Metropolitan Police Department at any
10   time for revocation of a license. Any person having knowledge that a licensee no longer meets
11   the requirements of this act or the requirements of Title 22 may so notify the Chief or any other
12   law enforcement officer who may take such action as may be appropriate.

13   "(c) Any person whose license has been revoked may, within 15 days of notice of the
14   revocation, appeal to the Concealed Pistol Licensing Review Board established pursuant to
15   section 908.

16   "Sec. 906. Carrying while impaired.

17   "(a) A licensee may not carry a pistol while impaired.

18   "(b) In addition to any other penalty in the law, any person who violates this section
19   shall be subject to revocation of his or her license.

20   "(c) Upon establishing reasonable suspicion that a licensee has been consuming drugs or
21   alcohol, a licensee's failure to submit to one or more field sobriety, breathalyzer, or urine tests,
22   administered to determine whether the licensee is impaired while carrying a pistol, shall be
23   grounds for immediate revocation and seizure of the license.

8

1     "(d)  For the purposes of this section, "impaired" means a licensee has consumed alcohol

2     or a drug or a combination thereof and that it has affected the licensee's behavior in a way that

3     can be perceived or noticed.

4         "Sec. 907.  Prohibitions on carrying licensed pistols.

5         "(a)  No person holding a license shall carry a pistol in the following locations or under

6     the following circumstances:

7              "(1)  Any building owned or under the control of the District of Columbia, its

8     agencies, and instrumentalities;

9              "(2)  The building and grounds, including any adjacent parking lot, of any public,

10    public charter, or private elementary or secondary school; or any public or private college or

11    university;

12             "(3)  Any pre-school or child care facility;

13             "(4)  Any public or private hospital, or other building where medical or mental

14    health services are the primary services provided;

15             "(5)  Any penal institution, secure juvenile residential facility, and any halfway

16    house;

17             "(6)  Any public transportation vehicle, such as a bus, train, taxicab, streetcar, and

18    including the Metrorail Transit system, but not including vehicles without passengers such as

19    bicycles, and not including the vehicle operators unless prohibited by his or her employer;

20             "(7)  Any premises or portion thereof, licensed under Title 25 of the District of

21    Columbia Official Code, where alcoholic beverages are served, or are sold and consumed on

22    premises, but not including premises with small-sample tasting permits;

9

1               "(8) Any public gathering or special event conducted on property open to the

2 public that requires the issuance of a permit from the District or federal government or their

3 agencies or instrumentalities, provided that no criminal penalty shall apply unless:

4                        "(A) The licensee has been advised by a law enforcement officer that

5 such a public gathering or special event is occurring; and

6                        "(B) The licensee has been ordered by the law enforcement officer to

7 leave the area of the special event or gathering until the licensee removes the pistol from his or

8 her possession in compliance with applicable law and the licensee has not complied with the

9 order;

10               "(9) Any stadium or arena;

11               "(10) The public memorials on the National Mall and along the Tidal Basin, and

12 any area where firearms are prohibited under federal law or by a federal agency or entity;

13               "(11) The area around the White House, namely: between Constitution Avenue

14 and H Street and between 15th and 17th Streets, all Northwest;

15               "(12) Within 1,000 feet, or other lesser distance designated by the Chief or his or

16 her designee, when a dignitary or high ranking official of the United States or a state, local, or

17 foreign government is moving under the protection of the Metropolitan Police Department

18 ("MPD"), or other law enforcement agency assisting or working in concert with MPD, provided

19 that no criminal penalty shall apply unless:

20                        "(A) The licensee has been advised by a law enforcement officer that

21 such a dignitary or official movement is occurring; and

10

1          "(B) The licensee has been ordered by the law enforcement officer to

2    leave the area of the movement until the licensee removes the pistol from his or her possession in

3    compliance with applicable law and the licensee has not complied with the order;

4          "(13) Within 1,000 feet, or other lesser distance designated by the Chief or his or

5    her designee, of a demonstration in a public place, provided that no criminal penalty shall apply

6    unless:

7          "(A) The licensee has been advised by a law enforcement officer that a

8    demonstration is occurring at the public place; and

9          "(B) The licensee has been ordered by the law enforcement officer to

10   leave the area of the demonstration until the licensee removes the pistol from his or her

11   possession in compliance with applicable law and the licensee has not complied with the order;

12   and

13         "(14) Any prohibited circumstance that the Chief determines by rule, provided

14   that for spontaneous circumstances, no criminal penalty shall apply unless the licensee has notice

15   of the prohibition and has failed to comply.

16   "(b)(1) Any private residence shall be presumed to prohibit the presence of concealed

17   pistols unless otherwise authorized by the property owner or person in control of the premises

18   and communicated personally to the licensee in advance of entry onto the residential property.

19         "(2) For 90 days immediately following the effective date of the License to Carry

20   a Pistol Emergency Amendment Act of 2014, passed on an emergency basis on September 23,

21   2014 (Enrolled version of Bill 20-X), for any private property not a residence, the owner or

22   person in control of the property shall be presumed to prohibit the presence of concealed pistols

23   unless the owner or person in control of the property authorizes entry by a licensee carrying a

11

1  pistol; thereafter, for any private property not a residence, the owner or person in control of the

2  private property shall be presumed to permit a licensee carrying a pistol to enter the owner's

3  property unless the property is posted with conspicuous signage prohibiting concealed pistols, or

4  the owner or authorized agent communicates such prohibition personally to the licensee.

5      "(c) Whenever a licensee carries a concealed pistol and approaches any prohibited

6  location, or is subject to any prohibited circumstance, the licensee shall:

7          "(1) If the licensee is in a vehicle or if a vehicle is readily available, immediately

8  secure the pistol in the manner prescribed in section 4b(b) of An Act To control the possession,

9  sale, transfer and use of pistols and other dangerous weapons in the District of Columbia, to

10  provide penalties, to prescribe rules of evidence, and for other purposes, approved July 8, 1932

11  (47 Stat. 650; D.C. Official Code § 22-4501 *et seq.*); or

12          "(2) If the licensee does not have a vehicle available, immediately leave the

13  prohibited location or circumstance.

14      "(d) A licensee shall not be in violation of this section:

15          "(1) While he or she is traveling along any public street, road, or highway

16  (including any adjacent public sidewalk) that touches the perimeter of any of the premises under

17  subsection (a) of this section or that are prohibited under subsection (b) of this section if the

18  concealed pistol is carried on his or her person in accordance with this act, or is being transported

19  by the licensee in accordance with section 4b of An Act To control the possession, sale, transfer

20  and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties,

21  to prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C.

22  Official Code § 22-4504.02); or

12

1         "(2) While driving a vehicle into and immediately parking at any location listed

2 in subsection (a)(2) or (3) of this section, for the purpose of picking up or dropping off a minor

3 child, provided that the licensee shall secure the concealed weapon in accordance with section

4 4b(b) of An Act To control the possession, sale, transfer and use of pistols and other dangerous

5 weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for

6 other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-4504.02(b)) prior

7 to leaving the parked vehicle.

8         "(e) A licensee shall not carry a pistol openly or otherwise in a manner that is not

9 concealed.

10         "(f) In addition to any other penalty in the law, any person who violates this section shall

11 be subject to revocation of his or her license.

12         "(g) For the purposes of this section:

13         "(1) "Demonstration" means one or more persons demonstrating, picketing,

14 speechmaking, marching, holding a vigil, or engaging in any other similar conduct that involves

15 the communication or expression of views or grievances and that has the effect, intent, or

16 propensity to attract a crowd or onlookers. "Demonstration" does not include the casual use of

17 property by visitors or tourists that does not have the effect, intent, or propensity to attract a

18 crowd or onlookers.

19         "(2) "Public place" means a place to which the general public has access and a

20 right to occupy for business, entertainment, or other lawful purpose. "Public place" is not

21 limited to a place devoted solely to the uses of the public, and includes:

22         "(A) The front or immediate area or parking lot of a store, restaurant,

23 tavern, shopping center, or other place of business;

13

1    "(B) A public building, including its grounds and curtilage;

2    "(C) A public parking lot;

3    "(D) A public street, sidewalk, or right-of-way;

4    "(E) A public park; and

5    "(F) Other public grounds.

6    "(3) "Residence" means an actual dwelling place or abode, and does not include

7    any adjacent common areas or commercial property.".

8    "Sec. 908. Concealed Pistol Licensing Review Board.

9    "(a) There is established a Concealed Pistol Licensing Review Board ("Board") for the

10   purpose of hearing appeals from:

11   "(1) A denial of any application or renewal application for a license to carry a

12   concealed pistol in the District pursuant to this act, or

13   "(2) A revocation of a license to carry a concealed pistol.

14   "(b) The Board's membership shall be comprised as follows:

15   "(1) A mental health professional employed by the Department of Behavioral

16   Health, appointed by the Mayor;

17   "(2) A representative from the Office of the Attorney General for the District of

18   Columbia, appointed by the Attorney General;

19   "(3) A representative from the United States Attorney's Office for the District of

20   Columbia ("USAO"), appointed by the United States Attorney for the District of Columbia. If

21   the USAO declines to provide a representative, the Mayor shall appoint a person who is a former

22   employee of the USAO;

14

1    "(4) The Chief Judge of the Superior Court of the District of Columbia or his or

2    her designee, or if the Chief Judge declines to serve or appoint a designee, a person appointed by

3    the Mayor who is a retired judge of the Superior Court of the District of Columbia; and

4        "(5) One public member appointed by the Mayor, who shall be a current or

5    former sworn officer of a law enforcement agency other than the Metropolitan Police

6    Department.

7        "(c) Each member shall serve a 4-year term.

8        "(d) The initial terms shall begin on the date a majority of the members have
9
10   been sworn in, which shall become the anniversary date for all subsequent appointments.
11
12       "(e) A vacancy on the Board shall be filled in the same manner in which the original

13   appointment was made.

14       "(f) A Board member whose term has expired may continue to serve as a member until a

15   replacement member has been appointed.

16       "(g) A member appointed to replace a member who has resigned, dies, or is no longer

17   able to serve (as determined by the Board) shall serve for the remainder of the unexpired term of

18   the member being replaced.

19       "(h) The Board shall elect a chairperson by majority vote on an annual basis.

20       "(i) Three members of the Board shall constitute a quorum, except that the Board may

21   only take official action when at least one of the following members is present:

22       "(1) The representative from the Office of the Attorney General for the District of

23   Columbia designated pursuant to subsection (b)(2) of this section;

24       "(2) The representative from the United States Attorney's Office for the District

25   of Columbia designated pursuant to subsection (b)(3) of this section; or

15

1         "(3) The current or former sworn officer of a law enforcement agency other than

2 the Metropolitan Police Department representative designated pursuant to subsection (b)(5) of

3 this section.

4         "(j) Members shall serve without compensation, but shall receive actual and necessary

5 expenses incurred in the performance of their official duties.

6         "(k) The Mayor shall provide hearing facilities and administrative support for the Board

7 from existing resources for the current fiscal year.

8         "(l)(1) Within 30 days after the date that a majority of the Board members are sworn in

9 pursuant to subsection (d) of this section, the Mayor, by rule, shall establish hearing procedures

10 for a contested case review of any appeal from a denial of an application or renewal application

11 for a license or revocation of a license, including procedures for the Board to assign panels of 3

12 Board members to conduct such hearings pursuant to subsection (i) of this section.

13         "(2) The rules shall include that the burden of production of evidence, and the

14 burden of persuasion, at any hearing before the Board shall be upon the applicant or licensee that

15 is challenging any denial of an application or renewal application or revocation of a license.

16         "(m) The meetings and hearings conducted by the Board shall be confidential and not

17 open to the public.

18         "Sec. 909. Freedom of information exception.

19         "Any record regarding individuals who have applied, received, or had revoked any

20 license shall not be made available as a public record under section 202 of the Freedom of

21 Information Act of 1976, effective March 25, 1977 (D.C. Law 1-96; D.C. Official Code § 2-

22 532).".

23         "Sec. 910. Rules.

16

1    "(a)  The Chief of the Metropolitan Police Department, pursuant to Title I of the District

2    of Columbia Administrative Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C.

3    Official Code § 2-501 *et seq.*), shall, by October 22, 2014, issue rules to implement the

4    provisions of this act, including rules:

5            "(1)  To establish criteria for determining when an applicant has, pursuant to

6    section 6 of An Act To control the possession, sale, transfer and use of pistols and other

7    dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of

8    evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-

9    4506):

10           "(A)  Demonstrated a good reason to fear injury to his or her person,

11   which shall at a minimum require a showing of a special need for self-protection distinguishable

12   from the general community as supported by evidence of specific threats or previous attacks

13   which demonstrate a special danger to the applicant's life;

14           "(B)  Demonstrated any other proper reason for carrying a concealed

15   pistol, which shall at a minimum include types of employment that require the handling of cash

16   or other valuable objects that may be transported upon the applicant's person; and

17           "(C)  Demonstrated the applicant's suitability to carry a concealed pistol,

18   which shall at a minimum include evidence that the applicant meets the requirements of section

19   902;

20           "(2)  To establish the type and amount of ammunition that may be carried

21   concealed by a licensee;

22           "(3)  To establish the methods by which a pistol may be carried concealed

23   including any standards for safe holstering;

17

1                    "(4)  To establish all application forms, investigation procedures, background

2    checks, and fees necessary to process an application for a license;

3                    "(5)  To specify any procedures or requirements specific to non-residents, who

4    apply to carry a concealed pistol pursuant to Title 22, with regard to the registration requirements

5    in this act;

6                    "(6)  To specify requirements for signage on any private premises where the

7    owner or person in control of the premises prohibits carrying concealed pistols, pursuant to

8    section 907(b); and

9                    "(7)  To establish procedures for the renewal of licenses.

10    "Sec. 911.  Penalties.

11    "(a)(1)  Except as otherwise provided in this title, a person convicted of a violation of a

12    provision of this title, or rules or regulations issued under the authority of this title, shall be fined

13    not more than the amount set forth in section 101 of the Criminal Fine Proportionality

14    Amendment Act of 2012, effective June 11, 2013 (D.C. Law 19-317; D.C. Official Code § 22-

15    3571.01), or imprisoned for not more than 180 days.

16                    (2)  Civil fines, penalties, and fees may be imposed as alternative sanctions for

17    any infraction of the provisions of this title, or any rules or regulations issued under the

18    authority of this title.

19    "(b)  All prosecutions for violations of this title shall be brought in the name of the

20    District of Columbia and prosecuted by the Office of the Attorney General for the District of

21    Columbia.

22    Sec. 3.  An Act To control the possession, sale, transfer and use of pistols and other

23    dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of

18

1    evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-

2    4501 *et seq.*) is amended as follows:

3         (a)  Section 4(a) (D.C. Official Code § 22-4504(a)) is amended as follows:

4              (1) The lead-in language is amended as follows:

5                   (A) Strike the phrase "a pistol" and insert the phrase "a pistol, without a

6    license issued pursuant to District of Columbia law" in its place.

7                   (B) Strike the phrase "capable of being so concealed".

8              (2) Paragraph (1) is amended by striking the phrase "a pistol" and inserting the

9    phrase "a pistol, without a license issued therefor pursuant to District of Columbia law" in its

10   place.

11        (b)  Section 6 (D.C. Official Code § 22-4506) is revived as of the effective date of the

12   "License to Carry a Pistol Emergency Amendment Act of 2014," passed on an emergency basis

13   on September 23, 2014 (Enrolled version of Bill 20-X), and is amended to read as follows:

14        "Sec. 6.  Issuance of a license to carry a pistol.

15        "(a)  The Chief of the Metropolitan Police Department ("Chief") may, upon the

16   application of any person having a bona fide residence or place of business within the District of

17   Columbia, or of any person having a bona fide residence or place of business within the United

18   States and a license to carry a pistol concealed upon his or her person issued by the lawful

19   authorities of any State or subdivision of the United States, issue a license to such person to carry

20   a pistol concealed upon his or her person within the District of Columbia for not more than 2

21   years from the date of issue, if it appears that the applicant has good reason to fear injury to his

22   or her person or property or has any other proper reason for carrying a pistol, and that he or she

23   is a suitable person to be so licensed.

19

**JA 96**

1 "(b) A non-resident who lives in a state that does not require a license to carry a

2 concealed pistol may apply to the Chief for a license to carry a pistol concealed upon his or her

3 person within the District of Columbia for not more than 2 years from the date of issue, provided

4 he or she meets the same reasons and requirements set forth in subsection (a) of this section.

5 "(c) For any person issued a license pursuant to this section, or renewed pursuant to

6 section 903 of The Firearms Control Regulations Act of 1975, effective September 24, 1976

7 (D.C. Law 1-85, D.C. Official Code § 7-2501.01 *et seq.*), the Chief may limit the geographic

8 area, circumstances, or times of the day, week, month, or year in which the license is effective,

9 and may revoke the license for good cause.

10 "(d) The application for a license to carry shall be on a form prescribed by the Chief.

11 The license shall be in a form prescribed by the Chief and shall bear the name, address,

12 description, photograph, and signature of the licensee.

13 "(e) Any person whose application has been denied or license revoked may, within 15

14 days of notice of the denial, appeal to the Concealed Pistol Licensing Review Board established

15 pursuant to section 908 of The Firearms Control Regulations Act of 1975, effective September

16 24, 1976 (D.C. Law 1-85, D.C. Official Code § 7-2501.01 *et seq.*).".

17 Sec. 4. Fiscal impact statement.

18 The Council adopts the fiscal impact statement in the committee report as the fiscal

19 impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act,

20 approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

21    Sec. 5. Effective date.

22         This act shall take effect following approval by the Mayor (or in the event of veto by the

23    Mayor, action by the Council to override the veto), a 60-day period of Congressional review as

24    provided in section 602(c)(2) of the District of Columbia Home Rule Act, approved December

25    24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(2)), and publication in the District of

26    Columbia Register.

# 2

Witness List

COUNCIL OF THE DISTRICT OF COLUMBIA
COMMITTEE ON THE JUDICIARYAND PUBLIC SAFETY
NOTICE OF PUBLIC HEARING
1350 Pennsylvania Avenue, NW, Washington, D.C. 20004
Agenda and Witness List

COUNCILMEMBER TOMMY WELLS, CHAIRPERSON
COMMITTEE ON THE JUDICIARY AND PUBLIC SAFETY

ANNOUNCES A PUBLIC HEARING ON

BILL 20-930, THE "LICENSE TO CARRY A PISTOL AMENDMENT ACT OF 2014"

Thursday, October 16, 2014
10:30 a.m.
John A. Wilson Building, Room 500
1350 Pennsylvania Avenue, NW Washington, D.C. 20004

## Agenda and Witness List

A. CALL TO ORDER

B. OPENING REMARKS

C. GOVERNMENT WITNESS
1. Cathy Lanier                          Chief, Metropolitan Police Department

D. PUBLIC WITNESSES
1. Brian Wrenn                           Public Witness
2. Dr. Ankoor Shah                       Pediatrician; Member, DC Chapter of the
                                         American Academy of Pediatrics
3. Reverend Crystal Kuykendall           Shiloh Baptist Church
4. Reverend Rebecca Justice Schunior     Associate Rector, St. Mark's Episcopal
                                         Capitol Hill
5. Patricia Johnson                      Canon Missioner, Washington National
                                         Cathedral
6. Robert Schenck                        Public Witness
7. Kris Hammond                          Public Witness
8. Antonio Goicochea                     Public Witness
9. Doug Pennington                       Public Witness
10. George L. Lyon, Jr.                  President, DC Chapter of Community
                                         Association for Firearms Education
11. Tracy Zorpotte                       Advocacy Lead, DC Chapter at Moms
                                         Demand Action for Gun Sense in America
12. Matthew Bergstrom                    Managing Partner, Arsenal Attorneys
13. Ron Campbell                         Public Witness
14. Martin Moulton                       Public Witness
15. Jackie *(no written statement)*      Public Witness

**JA 100**

# 3

Revised Code of the District of Columbia Prepared
Under the Authority of the Act of Congress
(A.O.P. Nicholson, Washington 1857)

# NOTE.

The undersigned, commissioners appointed by virtue of "An act to improve the laws of the District of Columbia, and to codify the same," approved March 3, 1855, herewith submit the result of their labors. The framer of that act was the Hon. HENRY MAY, formerly a citizen of this District, who, from an extensive practice in our courts, was made fully aware of the evils, from which it was intended by that law to relieve us. The people of this District will, in a great degree, be indebted to the exertions of that gentleman for any benefits which may result to them from this Code.

The commissioners were required " to revise, simplify, digest, and codify the laws of said District, and also the rules and principles of practice, of pleadings, of evidence, and conveyancing." The Code itself is the best commentary on the manner in which that duty has been discharged. The laws which it was made their duty "to revise and simplify," consisted, in the language of the Maryland declaration of rights, of such of the English statutes as existed at the time of the first emigration to Maryland, and "which by experience have been found applicable to local and other circumstances, and of such others as have been since made in England or Great Britain, and have been introduced, used, and practised by the courts of law and equity ;" also of the declaration of rights, constitution, and statutes of Maryland, passed prior to the 27th day of February, 1801, as modified by the constitution and laws of the United States.

Our statute law thus flowing from three distinct sources, is almost necessarily inconsistent in many of its parts. Much of it is also obsolete. Much of it is disfigured by the prejudices of a past age. In many cases, the circumstances that called forth the statute have since passed away, or been materially changed. But perhaps the best founded complaint of all is the entire absence of any statutory provisions in relation to matters which, in the progress of time and development of society, have been made the subjects of legislation in almost every other civilized community.

Digitized by Google

Deeply impressed with these views, the commissioners have endeavored, in the preparation of this Code, to give to the people of this District the benefit of provisions which, in many cases, have even been adopted by those from whom we have derived our present system. In no instance where there has been a departure from former law has any principle or provision been introduced which has not the sanction of modern, and, as we believe, enlightened legislation.

The law of March 3, 1855, required that this Code should be approved by a majority of the board appointed to consider the same. The members of that board have certified to the President of the United States that they have considered the provisions thereof, and do unanimously approve the same. In further pursuance of said law, it is now submitted to the people of this District for their consideration.

ROBT. OULD,
WM. B. B. CROSS.

WASHINGTON CITY,
*November,* 1857.

Digitized by Google

JA 103

Sec. 2. On the trial of every indictment, the party accused shall be allowed to be heard by counsel, and he may defend himself, and he shall have a right to produce witnesses and proofs in his favor, and to be confronted with the witnesses who are produced against him.

Sec. 3. No person indicted for an offence shall be convicted thereof, unless by confession of his guilt in open court, or by admitting the truth of the charge against him by his plea or demurrer, or by the verdict of a jury, accepted and recorded by the court.

Sec. 4. No person shall be held to answer on a second indictment for any offence of which he has been acquitted by the jury, upon the facts and merits, on a former trial; but such acquittal may be pleaded by him in bar of any subsequent prosecution for the same offence, notwithstanding any defect in the form or in the substance of the indictment on which he was acquitted.

Sec. 5. No person who is charged with any offence against the law, shall be punished for such offence, unless he shall have been duly and legally convicted thereof in a court having competent jurisdiction of the cause and of the person.

# CHAPTER 141.

### OF PROCEEDINGS TO PREVENT AND DETECT THE COMMISSION OF CRIMES.

SECTION
1. Officers authorized to keep the peace.
2. Complaint; how made.
3. Arrest.
4. Trial; recognizance to keep the peace.
5. Party; when to be discharged.
6. Refusing to recognise, to be committed.
7. Party, when discharged; and complainant, when to pay costs.
8. Payment of costs in other cases.
9. Appeal allowed.
10. On appeal, witnesses to recognise.
11. Proceedings upon an appeal.
12. Recognizance; when to remain in force.
13. Persons committed for not recognising; how discharged.
14. Recognizances to be transmitted to the court.

SECTION
15. Recognizances; when to be required on view of the court or magistrate.
16. Persons who go armed may be required to find sureties for the peace, &c.
17. Proceedings when person is suspected of selling liquor contrary to law.
18. Surety may surrender his principal, who may recognise anew.

SEARCH WARRANTS.

19. Search warrants for property stolen.
20. In what other cases to be issued.
21. } Warrant; to whom directed, and when
22. } and how executed.
23. Property seized may be kept as evidence, and then restored to owner or destroyed.

SECTION

CORONERS' INQUESTS.

24. Coroners' inquests; when to be held.
25. Coroner to issue a warrant to constable to summon jury. Form of warrant.
26. Penalty for constable's or juror's neglect.
27. Jurors; how empanneled and sworn.
28. Witness; how summoned, &c.
29. Oath of witnesses.
30. When and how post mortem to be made, or chemical analysis to detect poison; and fees, &c., for same.
31. Testimony of witnesses reduced to writing.
32. Inquisition; how taken, and form thereof.

SECTION

33. Coroner; duty in case of felonious killing, &c.
34. Burial of dead body and payment of costs.
35. Jury to report money, &c., found; and same, how disposed of.
36. When coroner to publish description of deceased.
37. Duty of officer in relation to such money.
38. Coroner, failing to pay over same.
39. Property on body to be sold and disposed of as money.
40. When justice of the peace to act as coroner.

SECTION 1. The judge of the criminal court, or any judge of the circuit court, in vacation as well as in term, and also all justices of the peace, shall have power to cause all laws made for the preservation of the public peace to be kept, and, in the execution of that power, may require persons to give security to keep the peace, or for their good behavior, or both, in the manner provided in this chapter.

SEC. 2. Whenever complaint shall be made to any such magistrate that any person has threatened to commit an offence against the person or property of another, the magistrate shall examine the complainant, and any witness who may be produced, on oath, and reduce such complaint to writing, and cause the same to be subscribed by the complainant. A wife may pray surety of the peace against her husband, or anybody else may pray such surety, in her behalf, against him, and such person shall, in such proceeding, be deemed the complaining witness.

SEC. 3. If, upon examination, it shall appear that such affidavit is made only to secure the protection of the law, and not from anger or malice, and that there is just cause to fear that any such offence may be committed, the magistrate shall issue a warrant under his hand, reciting the substance of the complaint, and requiring the officer to whom it may be directed forthwith to apprehend the person complained of and bring him before such magistrate, or some other magistrate or court having jurisdiction of the cause.

SEC. 4. When the party complained of is brought before the magistrate, he shall be heard in his defence, and he may be required to enter into a recognizance, with sufficient sureties, in such sum as the

Digitized by Google

magitrate shall direct, to keep the peace towards all the people of this District, and especially towards the person requiring such security, for such term as the magistrate may order, not exceeding one year, but shall not be bound over to the next court, unless he is also charged with some other offence for which he ought to be held to answer at such court.

Sec. 5. Upon complying with the order of the magistrate, the party complained of shall be discharged.

Sec. 6. If the person so ordered to recognise shall refuse or neglect to comply with such order, the magistrate shall commit him to the county jail during the period for which he was required to give security, or until he shall so recognise; stating in the warrant the cause of commitment, with the sum and the time for which security was required.

Sec. 7. If, upon examination, it shall not appear that there is just cause to fear that any such offence will be committed by the party complained of, he shall be forthwith discharged; and if the magistrate shall deem the complaint unfounded, frivolous, or malicious, he shall order the complainant to pay the costs of prosecution, who shall thereupon be answerable to the magistrate and the officer for their fees as for his own debt.

Sec. 8. When no order respecting the costs is made by the magistrate, they shall be allowed and paid in the same manner as costs before justices in criminal prosecution; but in all cases where a person is required to give security for the peace, or for his good behavior, the court or magistrate may further order that the costs of prosecution, or any part thereof, shall be paid by such person, who shall stand committed until such costs are paid, or he is otherwise legally discharged.

Sec. 9. Any person aggrieved by the order of any justice of the peace requiring him to recognise as aforesaid, may, on giving the security required, appeal to the criminal court at its next session to be discharged therefrom.

Sec. 10. The magistrate from whose order an appeal is so taken shall require such witnesses as he may think necessary to support the complaint, to recognise for their appearance at the court to which the appeal is made.

Sec. 11. The criminal court may affirm the order of the justice or

Digitized by Google

discharge the appellant, or may require the appellant to enter into a new recognizance, with sufficient sureties, in such sum and for such time as the court shall think proper, and may also make such order in relation to the costs of prosecution as may be deemed just and reasonable.

SEC. 12. If any party appealing shall fail to prosecute his appeal, his recognizance shall remain in full force and effect, as to any breach of the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as a security for any costs which shall be ordered by the court appealed to, to be paid by the appellant.

SEC. 13. Any person committed for not finding sureties, or refusing to recognise, as required by the court or magistrate, may be discharged by any judge or justice of the peace on giving such security as was required.

SEC. 14. Every recognizance taken pursuant to the foregoing provisions shall be transmitted by the magistrate to the criminal court on or before the first day of the next term, and shall be there filed by the clerk.

SEC. 15. Every person who shall, in the presence of any officer mentioned in the first section of this chapter, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person who, in the presence of such officer, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognise for keeping the peace, or being of good behavior, for a term not exceeding one year, and in case of refusal may be committed as before directed.

SEC. 16. If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided.

SEC. 17. If any justice of the peace suspect any person of selling, by retail, wine or ardent spirits, or a mixture thereof, contrary to law, he shall summon the person and such witnesses as he may think

Digitized by Google

proper, to appear before him; and, upon such person appearing, or failing to appear, if the justice, on examining the witnesses on oath, find sufficient cause, he shall inform the district attorney, or other proper officer, that a prosecution or suit may be instituted, and shall recognise the material witnesses to appear at the next term of the court before which the case is heard. Such justice may also require the person suspected to enter into a recognizance to keep the peace and be of good behavior for any time not exceeding one year. If such recognizance be given, the condition thereof shall be deemed to be broken if, during the period for which it is given, such person shall sell, by retail, wine or ardent spirits, or a mixture thereof, contrary to law.

SEC. 18. Any surety in a recognizance to keep the peace, or for good behavior, or both, shall have authority and right to take and surrender his principal, and, upon such surrender, shall be discharged and exempt from all liability for any act of the principal, subsequent to such surrender, which would be a breach of the condition of the recognizance. Such person may recognise anew, with sufficient sureties, before any justice of the peace, for the residue of the term, and be thereupon discharged.

### SEARCH WARRANTS.

SEC. 19. When complaint shall be made on oath to any magistrate authorized to issue warrants in criminal cases, that personal property has been stolen or embezzled, or obtained by false tokens or pretences, and that the complainant believes that it is concealed in any particular house or place, the magistrate, if he be satisfied that there is reasonable cause for such belief, shall issue a warrant to search for such property.

SEC. 20. Any such magistrate may also, upon a like complaint made on oath, issue search warrants, when satisfied that there is reasonable cause, in the following cases, to wit:

First, to search for and seize any counterfeit or spurious coin, forged bank notes, and other forged instruments, or any tools, machines, or materials, prepared or provided for making either of them;

Secondly, to search for and seize any books pamphlets, ballads, printed papers, or other things containing obscene language, or obscene prints, pictures, figures, or descriptions, manifestly tending

Digitized by Google

to corrupt the morals of youth, and intended to be sold, loaned, circulated or distributed, or to be introduced into any family, school or place of education;

Thirdly, to search for and seize lottery tickets, or materials for a lottery, unlawfully made, provided, or procured, for the purpose of drawing a lottery;

Fourthly, to search for and seize any gaming apparatus or implements used, or kept and provided to be used, in unlawful gaming, in any gaming house, or in any building, apartment, or place resorted to for the purpose of unlawful gaming;

Fifthly, to search for any harbored runaway slave.

SEC. 21. All search warrants shall be directed to the marshal of the District, or his deputy, or to any constable, commanding such officer to search, in the day time, the house or place where the stolen property or other things, for which he is required to search, are believed to be concealed, which place and property or things to be searched for shall be designated and described in the warrant; and to bring such stolen property or other things, when found, and the persons in whose possession the same shall be found, before the magistrate who issued the warrant, or before some other magistrate or court having cognizance of the case.

SEC. 22. If there be satisfactory evidence that any property stolen or embezzled, or obtained by false tokens or pretences, or that any of the other things for which a search warrant may be issued by the provisions of this chapter, are concealed, kept, prepared or used, in any particular house or place, a warrant may be issued by any two magistrates, to authorize a public officer to search such house or place in the night time, and to bring the property or things described in the warrant, if found, and the persons in whose possession the same shall be found, before either of the magistrates who issued the warrant, or before some other magistrate or court having cognizance of the case.

SEC. 23. If any such search warrant be executed by the seizure of a runaway slave, he shall be returned to the owner, or committed to jail as a runaway, by the justice before whom he is brought; and if it be executed by the seizure of other property, or of any of the things aforesaid, the same shall be safely kept by order of the justice, to be used in evidence; and as soon afterwards as may be, such stolen

Digitized by Google

or embezzled property shall be restored to its owner, and the other things specified burnt or otherwise destroyed under the direction of such justice.

## CORONERS' INQUESTS.

Sec. 24. Coroners shall take inquests upon the view of the dead bodies of such persons only as shall be supposed to have come to their death by violence, and not when death is believed to have been occasioned by casualty, or to have happened in a course of nature.

Sec. 25. As soon as the coroner shall have notice of the dead body of any person, supposed to have come to his death by violence, found or lying within this county, he shall make his warrant to a constable requiring him forthwith to summon six good and lawful men of the county to appear before such coroner, at the time and place expressed in the warrant, which may be issued with or without a seal, and in substance as follows:

——— ———, *ss.*

To A B, constable of ———, Greeting :

You are hereby required immediately to summon six good and lawful men of the county of ———, to appear before me, ——— ———, coroner of said county, at the dwelling house of ——— ———, (or at a place called ———,) within the city, (or town, or county) of ———, at the hour of ———, then and there to inquire, upon the view of the body of ——— ———, there lying dead, when, how, and by what means he came to his death. Hereof fail not.

Given under my hand the ——— day of ———, in the year ———.

——— ———, *Coroner.*

Sec. 26. The constable to whom such warrant shall be directed and delivered shall forthwith execute the same, and shall, at the time mentioned in the warrant, repair to the place where the dead body is, and make return thereof to the coroner, and of his doings thereon, under his hand; and any constable who shall unnecessarily neglect or fail to execute or return such warrant, shall be fined the sum of twenty dollars; and if any person summoned as a juror shall fail to appear, without reasonable excuse therefor, he shall be fined the sum of ten dollars. If the six jurors returned shall not all appear, the coroner may require the constable, or any other officer whom he shall appoint, to return other jurors, from the body of the county, and not from bystanders, to complete the number.

SEC. 27. When the jurors who have been summoned appear, the coroner shall call over their names, and then, in view of the body, he shall administer to them the following oath:

You solemnly swear that you will diligently inquire, and true presentment make, on behalf of the United States, when, how, and by what means, the person, whose body lies here dead, came to his death; and you shall return a true inquest thereof, according to your knowledge and such evidence as shall be laid before you: So help you God.

SEC. 28. The coroner may issue subpœnas for witnesses, returnable forthwith, or at such time and place as he shall therein direct; and the attendance of all persons served with such subpœna may be enforced in the same manner, by the coroner, and subject to the same penalties, as if they had been served with a subpœna to attend a court of justice.

SEC. 29. An oath to the following effect shall be administered to the witnesses by the coroner:

You solemnly swear that the evidence which you shall give to this inquest, concerning the death of the person here lying dead, shall be the truth, the whole truth, and nothing but the truth: So help you God.

SEC. 30. The coroner, in all cases where the cause of death shall be doubtful, shall call to his aid some competent surgeon, who, when he may deem the same necessary, shall make a post mortem examination of the body, and report, in writing, signed by him, the condition of the same, together with his opinion as to the cause of death. The coroner shall also cause to be made, by a competent person, an analysis of the stomach and its contents, when poison is supposed to have been taken or administered; and a like report shall be made by the chemist or other person employed, as is required of a surgeon. Fees for said services shall be paid out of the treasury of the United States, and shall, within the following limits, be determined by the judge of the criminal court. For the external examination of the body, from five to ten dollars; for dissection of body before interment, from ten to twenty dollars; for dissection of body after disinterment, from twenty to thirty dollars; for making a chemical analysis, from ten to forty dollars. The expenses of analysis, apart from the fee, shall be paid in like manner, but shall in no case exceed the sum of

Digitized by Google

JA 111

ten dollars, unless previously sanctioned by the judge of the criminal court.

Sec. 31. The testimony of all witnesses examined before any inquest shall be reduced to writing by the coroner, or some other person by his direction, and be subscribed by the witnesses.

Sec. 32. The jury, upon the inspection of the dead body, and after hearing the testimony of the witnesses, and making all needful inquiries, shall draw up and deliver to the coroner their inquisition, under their hands, in which they shall find and certify when, how, and by what means the deceased person came to his death, and his name, if it was known, a minute description of his person, together with all the material circumstances attending his death; and if it shall appear that he was killed feloniously, the jurors shall further state who were guilty, either as principals or accessories, if known, or were in any manner the cause of his death; which inquisition may be, in substance, as follows:

———— —— ss. An inquisition taken at ———, in the county of ———, on the —— day of ———, in the year ——, before —— ——, corner of the said county, upon the view of the body of —— ——, (or a person,) there lying dead, by the oaths of the jurors whose names are hereunto subscribed, who, being sworn to inquire, on behalf of the United States, when, how, and by what means the said —— —— (or person) came to his death, upon their oaths do say, (then insert description of person, and when, how, and by what persons, means, weapon, or instrument he was killed.) In testimony whereof, the said coroner and the jurors of this inquest have hereunto set their hands, the day and year aforesaid.

Sec. 33. If the jury find that any murder, manslaughter, assault, or other offence has been committed on the person of the deceased, the coroner shall bind over, by recognizance, such witnesses as he shall think proper, to appear and testify at the next session of the criminal court; he shall also return to the same court the inquisition, written evidence, and all recognizances and examinations by him taken, and may commit to jail any witnesses who shall refuse to recognise in such manner as he shall direct.

Sec. 34. If any person charged by the inquest with having committed such offence shall not be in custody, the coroner shall have the same power as a justice of the peace to issue process for his

apprehension, and such warrant shall be made returnable before any justice of the peace, or other magistrate or court having cognizance of the case, who shall proceed therein as if such person had been arrested on complaint duly made.

SEC. 35. When the coroner shall take an inquest upon the view of the dead body of a stranger, or, being called for that purpose, shall not think it necessary, on view of such body, that any inquest should be taken, he shall cause, in the absence of other provision, the body to be decently buried; and if the coroner shall certify that, to the best of his knowledge and belief, the person found dead was a stranger, not belonging to this District, the expenses of burial, with the coroner's fees, and all the expenses of the inquisition, if any was taken, shall be paid to the coroner from the treasury of the United States, the account of such expenses being first examined and allowed by the judge of the criminal court; in all other cases the expenses of the inquisition only shall be paid, in like manner, by the United States.

SEC. 36. The coroner shall require the jury empanneled, to make a report, signed by them and the coroner, and to be returned with the inquisition, giving the amount of money or other valuables found on or with the dead body, and such money or other property, if there be no person to take charge of the same, shall be placed in the hands of the judge of the orphans' court, and by him paid over to the person authorized to receive the same, on being called for. But so much thereof as may be necessary may, in the event of the deceased being a stranger, be appropriated to paying his burial expenses.

SEC. 37. In case the body shall not be identified, it shall be the duty of the coroner to publish, in some newspaper printed in this District, a description of the deceased, and the amount of money or other valuables found in his possession. And though the body may be identified, if money or other valuables be found thereon, and no person entitled thereto shall claim the same within sixty days, it shall be the duty of the coroner to give public notice, as aforesaid, of the facts. The cost of such advertising shall be paid in like manner as the expense of the inquisition.

SEC. 38. It shall be the duty of the said judge, if said money shall not be called for within one year from the time of his receiving the

Digitized by Google

same, to loan it out on the most advantageous terms he can, taking bond and good security, and the proceeds therefrom shall be applied to the maintenance of the public schools, in the manner hereinbefore provided with regard to fines. Such money, without interest, may be claimed at any time thereafter by the parties entitled to the same.

SEC. 39. If any coroner shall fail to pay to the judge of the orphan's court the money or other property which may come into his hands as aforesaid, within three months of its receipt, it shall be the duty of said judge to sue for and collect the same in his own name, annexing his title, before the circuit court; and for such delinquency the coroner shall be fined a sum not exceeding five hundred dollars.

SEC. 40. The judge of the orphans' court shall cause to be sold, as property is sold on execution, by the marshal, all property found on a dead body and remaining unclaimed sixty days, and the proceeds of such sale shall be disposed of as is required in case of money so found.

SEC. 41. When the coroner shall be absent from the District, or unable to attend, any justice of the peace may hold the inquest, and shall proceed in all respects as coroners are directed by the foregoing provisions, and subject to the same penalties.

# CHAPTER 142.

OF THE ARREST AND EXAMINATION OF OFFENDERS, COMMITMENT FOR TRIAL, AND TAKING BAIL.

SECTION

1. Officers empowered to act under this chapter.
2. Complaint, warrant, and summonses for witnesses.
3. What officers may bail, and when.
4. Prisoners; when to be brought before magistrate, on arrest, &c.
5. Magistrate, if he take bail, to return the recognizance to court, &c.
6. Magistrate may adjourn the examination, &c.
7. In case of default, magistrate to certify recognizance to criminal court.

SECTION

8. Proceedings when the party fail to recognise.
9.
10.
11.
12. } Manner of conducting the examination.
13.
14.
15. Testimony may be reduced to writing.
16. Prisoner; when to be discharged.
17. Prisoner; when to be bailed, or committed.
18. Witnesses to recognise.

40

Digitized by Google

# 4

An Act To control the possession, sale, transfer and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes

47 Stat. 650 (approved July 8, 1932)

States, for the purpose of having such communication delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to such addressee in the United States, and as a result thereof such communication is delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to the address to which it is directed in the United States, then such person shall be punished in the same manner and to the same extent as provided in section 1 of this Act: *Provided,* That any person violating this section may be prosecuted either in the district into which such letter or other communication was carried by the United States mail for delivery according to the direction thereon, or in which it was caused to be delivered by the United States mail to the person to whom it was addressed.

*Punishment for.*

*Proviso. Jurisdiction.*

Approved, July 8, 1932.

---

[CHAPTER 465.]

AN ACT

July 8, 1932.
[H. R. 8754.]
[Public, No. 275.]

To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes.

*Unauthorized use, etc., of pistols and other dangerous weapons in District of Columbia.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

*Definitions.*

## DEFINITIONS

*"Pistol."*

SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length.

*"Sawed-off shot-gun."*

"Sawed-off shotgun," as used in this Act, means any shotgun with a barrel less than twenty inches in length.

*"Machine gun."*

"Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading.

*"Person."*

"Person," as used in this Act, includes, individual, firm, association, or corporation.

*"Sell" and "purchase," etc.*

"Sell" and "purchase" and the various derivatives of such words, as used in this Act, shall be construed to include letting on hire, giving, lending, borrowing, and otherwise transferring.

*"Crime of violence."*

"Crime of violence" as used in this Act, means any of the following crimes, or an attempt to commit any of the same, namely: Murder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary.

## COMMITTING CRIME WHEN ARMED

*Committing crime of violence when armed. Punishment for.*

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the

crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

### PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

Persons forbidden to possess certain firearms.

Sec. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

Convicted of a crime.

### CARRYING CONCEALED WEAPONS

Sec. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

Illegally carrying, etc., dangerous weapon.

### EXCEPTIONS

Exceptions.

Sec. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

Law enforcement officers.

Army, Navy, or Marine Corps.

National Guard, etc., on duty.

Other organizations.

Carrying to places of assembly, etc.

Manufacturer, etc.

### ISSUE OF LICENSES TO CARRY

Licenses.

Sec. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

## SELLING TO MINORS AND OTHERS

Selling to minors or others.

Sec. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

## TRANSFERS REGULATED

Time, etc., provisions.

Sec. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law-enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded.  At the time of applying for the purchase

Register to be kept.

of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the

Limitation.

other copy for six years. No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the

Wholesale trade.

superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

## DEALERS TO BE LICENSED

Dealers to be licensed.

Sec. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun, sawed-off shotgun, or blackjack without being licensed as hereinafter provided.  No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed-off shotgun, or blackjack.

## DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

Conditions, etc., for issuing dealers' licenses. *Ante*, p. 652.

Sec. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read.

3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia.

4. A true record shall be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners, of all pistols, machine guns, and sawed-off pistols in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale.

*Records.*

5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years.

6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

*Display, etc., forbidden.*

### FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine gun, sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

*False information or evidence forbidden.*

### ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol, machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: *Provided, however,* That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

*Alteration, etc., of identification marks prohibited.*

*Proviso. Experimental work.*

### EXCEPTIONS

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

*Toys, etc., excepted.*

### POSSESSION OF CERTAIN DANGEROUS WEAPONS

Possession of certain dangerous weapons forbidden.

Proviso.
Exceptions.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: *Provided, however,* That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly appointed law-enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under section 10 of this Act.

### PENALTIES

Punishment for violations.

SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

### CONSTITUTIONALITY

Invalidity of any provision not to affect remainder.

SEC. 16. If any part of this Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this Act.

### CERTAIN ACTS REPEALED

Vol. 31, p. 1328, repealed.

SEC. 17. The following sections of the Code of Law for the District of Columbia, 1919, namely, sections 855, 856, and 857, and all other Acts or parts of Acts inconsistent herewith, are hereby repealed.

Approved, July 8, 1932.

---

[CHAPTER 466.]

### JOINT RESOLUTION

July 8, 1932.
[H. J. Res. 462.]
[Pub. Res., No. 35.]

Making an appropriation to provide transportation to their homes for veterans of the World War temporarily quartered in the District of Columbia.

World War veterans. Appropriation for, to provide transportation from District of Columbia to their homes.
*Post,* p. 701.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That to enable the Administrator of Veterans' Affairs, upon the request of any honorably discharged veteran of the World War, temporarily quartered in the District of Columbia, who is desirous of returning to his home, to provide such veteran with railroad transportation thereto prior to July 15, 1932, together with travel subsistence at the rate of 75 cents per day, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $100,000: *Provided,*

Proviso.
Credited as a loan.

That all amounts expended under this appropriation in behalf of any veteran shall constitute a loan without interest which, if not repaid to the United States, shall be deducted from any amounts payable to such veteran on his adjusted-service certificate.

Approved, July 8, 1932.

# 5

Article 52 of the Police Regulations, 1955 Edition-1968 Reprint, Title 35, District of Columbia Rules and Regulations (DCRR the predecessor of the DCMR)

# POLICE
# TRAFFIC AND MOTOR
# VEHICLE REGULATIONS
## OF THE
# DISTRICT OF COLUMBIA



JA 122

Office of the General Counsel
Metropolitan Police Department

# POLICE REGULATIONS

OF THE

# DISTRICT OF COLUMBIA



Amended to
August 12, 1968

JA 123

For sale by the Department of Licenses and Inspections, District Building.
Per Copy                                                             $4.50

PRINTING DIVISION

JA 124

# TABLE OF CHANGES—Continued

| Article and Section No. (or other divisions) | Commissioners' Order No. | Commissioners' Order Date of | Revised Page No. and Date Printed | |
|---|---|---|---|---|
| Sec. 2 (a) | 63-2076 | Oct. 10, 1963 | 152E4 | (1-10-64) |
| Sec. 2 (a) | 66-1498 | Sept. 27, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 65-1230 | Aug. 26, 1965 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-1596 | Oct. 18, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-1595 | Oct. 18, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-604-A | May 6, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-812-A | June 10, 1966 | 154E4 | (5-10-67) |
| Sec. 2 (a) | 66-866-A | June 23, 1966 | 134 | (5-10-67) |
| Sec. 2 (a) | 66-959 | July 7, 1966 | 138 | (5-10-67) |
| Sec. 2(a) | 67-544 | April 27, 1967 | 152-E4 | (1-30-68) |
| Sec. 3 | 61-1206 | July 11, 1961 | 152E4 | (8-29-61) |
| Sec. 4 | 61-1206 | July 11, 1961 | 152E5 | (8-29-61) |
| Sec. 5 | 61-1206 | July 11, 1961 | 152E6 | (8-29-61) |
| Sec. 6 | 61-1206 | July 11, 1961 | 152E7 | (8-29-61) |
| Sec. 7 | 61-1206 | July 11, 1961 | 152E7 | (8-29-61) |
| Sec. 7 (b) | 67-445 | April 4, 1967 | 152E9 | (5-10-67) |
| Sec. 8 | 61-1206 | July 11, 1961 | 152E9 | (8-29-61) |
| Art. 44 | | | | |
| Sec. 1, 9 | 63-1355 | June 6, 1963 | 152E10 | (7-11-63) |
| Art. 45 | 67-1481 | Sept. 28, 1967 | 152-E12 | (1-30-68) |
| Art. 45 | | | | |
| Sec. 1 | 63-2437 | Dec. 31, 1963 | 152E12 | (2-10-64) |
| Art. 46 | 64-225 | Feb. 18, 1964 | 152E18 | (3-31-64) |
| | | | 152E17 | |
| Art. 47 | 65-768 | June 10, 1965 | 152E-18 | (9-30-65) |
| Sec. 4 (i) | 68-222 | Mar. 11, 1968 | 152-E25 | (8-12-68) |
| *Sec. 6 | 68-744 | Nov. 18, 1968 | 152-E25 | (4-25-69) |
| Sec. 10 | 68-222 | Mar. 11, 1968 | 152-E28 | (8-12-68) |
| Art. 48 | 68-432 | June 19, 1968 | 152E-28 | (8-12-68) |
| *Art. 50 thru 55 | 68-500 | July 19, 1968 | 152E-33 | (4-25-69) |
| | 69-39a | Jan. 30, 1969 | | |
| Appendix A | | | 152F | (11-29-57) |
| Sec. 1 2 | | | 152G | (11-29-57) |
| Sec. 3, 4 | | | 152H | (11-29-57) |
| Sec. 5 | | | 152I | (11-29-57) |
| Sec. 6 | | | 152J | (11-29-57) |
| Sec. 7 | | | 152K | (11-29-57) |
| Sec. 8 | | | 152L | (11-29-57) |
| Sec. 9, 10 | | | 152M | (11-29-57) |
| Sec. 11 | | | 152N | (11-29-57) |
| Sec. 12, 13, 14 | | | 152O | (11-29-57) |
| Sec. 15, 16, 17, 18, 19 | | | 152P | (11-29-57) |
| Sec. 20, 21 | | | | |
| Appendix B | | | 152Q | (11-29-57) |
| Part I, II | | | | |
| Appendix C | | | 152R | (11-29-57) |
| Part I | | | 152S | (3-4-65) |
| Appendix D | | | 178 | (7-27-56) |
| Index | | | 182 | (10-12-56) |
| Index | | | 188 | (10-12-56) |
| Index | | | | |

## ARTICLE 50. DEFINITIONS

**Section 1.** When used in these Regulations (Article 50 through 55 of the Police Regulations of the District of Columbia), unless the context requires otherwise, the terms "pistol," "sawed-off shotgun," "machine gun," "person," and "sell" and "purchase" shall have the meanings ascribed to them in the Act of Congress entitled "An act to control the possession, sale, transfer and use of pistols and other dangerous weapons in the District of Columbia," as amended, approved July 8, 1932 (47 Stat. 650, D. C. Code, sec. 22-3201 et seq.). Other terms used in these Regulations, unless the context otherwise requires, shall have the meanings ascribed to them as follows:

(a) "Commissioner" means the Commissioner of the District of Columbia or his designated agent.

(b) "Chief of Police" and "Chief" mean the Chief of Police of the Metropolitan Police Department of the District of Columbia or his designated agent.

(c) "District" means the District of Columbia.

(d) "Firearm" means any pistol, rifle or shotgun which will or is designed to, or may readily be converted to, expel a projectile by the action of an explosive; or the frame or receiver of any such pistol, rifle, or shotgun; but does not include a firearm that is not designed or redesigned to use rim fire or center fire fixed ammunition or manufactured in or before 1898.

(e) "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use energy of the explosive in a fixed metallic cartridge to fire a single projectile through a rifle bore for each single pull of the trigger.

(f) "Short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and a weapon made from a rifle, whether by alteration, modification, or otherwise, if such weapon as modified has an overall length of less than twenty-six inches.

(g) "Shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

(h) "Ammunition" means ammunition or cartridge cases, primers, bullets, or propellant powder designed for use in any firearm, machine gun, short-barrel rifle or sawed-off shotgun.

(i) The term "destructive device" means any firearm, weapon or automatic weapon which is not a pistol, rifle, shotgun, sawed-off shotgun or machine gun defined herein and includes any

explosive not commonly used for lawful commercial purposes, explosive bomb, poison gas bomb, tear gas or tear gas bomb, grenade, mine, rocket, missile, or similar device; and includes any type of weapon which will, or is designed to or may readily be converted to expel a projectile by the action of any explosive and having any barrel with a bore of one-half inch or more in diameter; excluding however,

    (1) a pneumatic gun, spring gun, or B-B gun which expels a single globular projectile not exceeding .18 inch in diameter;

    (2) any device used exclusively for the firing of stud cartridges, explosive rivets, or similar industrial ammunition; or

    (3) any device used exclusively for signalling or safety, and required or recommended by the United States Coast Guard or the Interstate Commerce Commission.

(j) "Dealer" means (i) any person engaged in the business of selling firearms or ammunition, (ii) any person engaged in the business of manufacturing or repairing firearms or of making or fitting special barrels, stocks or trigger mechanisms to firearms, or (iii) any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm or ammunition as security for the payment or repayment of money. The term "licensed dealer" means any dealer licensed under the provisions of these Regulations.

(k) "Manufacturing" means manufacturing, producing, making or remaking any firearm, destructive device or ammunition for sale or distribution."

(l) "Act" means the Act of Congress, entitled "An Act to control the possession, sale, transfer and use of pistols and other dangerous weapons, in the District of Columbia, as amended, approved July 8, 1932 (41 Stat. 650, D. C. Code, sec. 22-3201 **et seq.**).

(m) The term "these Regulations" means the regulations and provisions contained in Articles **50** through **55** of the Police Regulations of the District of Columbia as adopted by the District of Columbia Council and any orders issued by the Commissioner pursuant to authority transferred to him by the Council in such Articles.

(n) "Carry" means to carry, transport or possess on or about one's person, or in such close proximity to one's person as to be easily and readily accessible.

### ARTICLE 51. REQUIRING THE REGISTRATION OF FIREARMS IN THE DISTRICT OF COLUMBIA

**Section 1.** Except as herein provided, no person shall within the District, possess, or keep under his control, or sell or otherwise dispose of any pistol, or rifle or shotgun unless such person is the

holder of a valid registration certificate for such pistol, rifle or shotgun.

**Sec. 2** (a) Each licensed dealer who sells a pistol, rifle or shotgun to a person in whose possession the pistol, rifle or shotgun must be registered shall require from the purchaser a completed application for the registration of the pistol, rifle or shotgun and shall file the application with the Chief of Police at the time of sale.

(b) Each person who within the District possesses, or keeps under his control any pistol, rifle or shotgun purchased or acquired prior to the effective date of these Regulations, shall make an application to register such pistol, rifle or shotgun within 120 days immediately following the effective date of these Regulations.

(c) Each person who brings into the District any pistol, rifle or shotgun acquired outside of the District, or who causes a rifle or shotgun to be lawfully delivered to him within the District, shall make an application to register such pistol, rifle or shotgun within forty-eight hours after he brings such pistol, rifle or shotgun into the District or within forty-eight hours after such rifle or shotgun is delivered to him in the District.

(d) Each person within the District who otherwise acquires possession or control of any pistol, rifle or shotgun shall make an application to register such pistol, rifle or shotgun within forty-eight hours after he acquires possession or control of the same; except as provided in Art. 55, sec. 6 of these Regulations.

(e) The executor or administrator of an estate containing a registered firearm shall promptly notify the Chief of Police of the death of the registered owner, and at the time of any transfer of the firearm, shall return the registration certificate for the firearm to the Chief. The executor or administrator of an estate containing an unregistered firearm shall make an application to transfer such firearm within thirty days of his appointment or qualification.

**Sec. 3** (a) Each application required by this Article shall contain when filed with the Chief of Police the following information:

(1) "The name, occupation, residence and business address, and date of birth of the applicant. Where the applicant is not a natural person, this information shall refer to principal officer of the applicant, and shall contain in addition the name and address of the applicant."

(2) "The make, model, caliber, or gauge, manufacturer's identification number, serial number and other identifying marks of the pistol, rifle or shotgun; and

(3) "The name and address of the person from whom the firearm was acquired, and the date and place of acquisition."

(b) Each application to register a pistol, rifle, or shotgun shall be made in duplicate on forms provided by the Chief of Police and

be signed by the applicant. The original shall be filed with the Chief of Police, and the duplicate shall be retained by the applicant as temporary evidence of registration. The Chief of Police, after receipt of a duly filed application, shall send to the applicant a numbered registration certificate identifying the applicant as the registered owner of the pistol, rifle or shotgun described in the application.

**Sec. 4.** No information or evidence obtained from an application to register a firearm required to be submitted or retained by a natural person in order to comply with any section of this Article or orders issued by the Chief of Police implementing this Article shall be used as evidence against such natural person in any criminal proceeding with respect to the violation of law occurring prior to or concurrently with the filing of the application containing the information or evidence; **Provided,** that this section shall not apply to any violation of subsections (a) and (b) of Art. 55, Sec. 1 respecting such application.

**Sec. 5.** A fee, in an amount fixed by the Commissioner, shall be paid upon the application for a registration certificate, but such fee shall not exceed $2.00 for each pistol, rifle or shotgun registered, and the fee need not be uniform for all pistols, rifles or shotguns registered to a single person; **Provided,** that no natural person, regardless of the number of guns acquired or owned by him prior to the effective date of these regulations shall be required to pay a registration fee hereunder in excess of $100 for the registration of all firearms acquired by him prior to the effective date of these Regulations.

**Sec. 6.** Any person within the District carrying or having in his immediate possession any pistol, rifle or shotgun for which a registration certificate has been issued as provided in these Regulations shall have such certificate on his person or within his immediate custody. Any person having such possession of a pistol, rifle or shot gun shall upon demand exhibit such certificate to a law enforcement officer. The failure of any person to exhibit such certificate as provided herein shall be cause for the revocation of any and all certificates issued to him under these Regulations.

**Sec. 7.** It shall be the duty of the registered owner of a pistol, rifle or shotgun—

(a) to notify the Chief of Police in writing of the loss, theft or destruction of a registration certificate; or of any change of name or address from that recorded on a registration certificate, within forty-eight hours following discovery of such loss, theft or destruction, or of any change of name or address. Failure to notify the Chief of Police shall be grounds for revocation of the registration certificate.

(b) to notify the Chief of Police in writing of the sale, transfer or other disposition of any pistol, rifle or shotgun registered to him within forty-eight hours following such sale, transfer or disposition, except as provided for in Art. 55, Sec. 6 of these Regulations. Such notification shall contain—

> (1) the name, residence and business address within the District, the occupation, and date of birth of the person to whom the pistol, rifle or shotgun has been sold or transferred;
> (2) the make, model, caliber or gauge, manufacturer's identification number, serial number, and other identifying marks of the pistol, rifle or shotgun sold or transferred; and
> (3) the number of the registration certificate issued to the registered owner.

(c) to return to the Chief of Police of registration certificate for any pistol, rifle or shotgun which is lost, stolen or destroyed, or which he sells, transfers or otherwise disposes of at the time he notifies the Chief of Police of such loss, theft, destruction, sale, transfer or other disposition.

**Sec. 8.** No person shall within the District—

(a) lend or give, or allow the use of a registration certificate issued to him by any other person for identification; **Except,** that when a registered owner of a pistol, rifle or shotgun lends or delivers the same to another person in accordance with the provisions of Art. 55, sec. 6 of these Regulations he shall deliver to such other person the registration certificate for each pistol, rifle or shotgun so loaned or delivered.

(b) represent himself as the owner of a registration certificate issued to another person.

**Sec. 9.** (Deleted)

**Sec. 10.** This Article of these Regulations shall not apply to—

(a) any person licensed under Art. 55 of these Regulations as a licensed retail dealer; **Provided,** that this exception shall only apply to pistols, rifles or shotguns acquired by such person in the normal conduct of his business and kept by such person at his place of business; and further **Provided,** that this exception shall not apply to such person for any pistol, rifle or shotgun kept by him for his private use or protection, or for the protection of his business; or

(b) any non-resident of the District participating in any lawful recreational activity in the District involving the use of pistols, rifles or shotguns; or transporting such pistol, rifle or shotgun to or from such lawful recreational activity; **Provided,** that such non-resident shall upon demand of any enforcement officer exhibit proof that his possession of such pistol, rifle or shotgun is registered and

legal in the jurisdiction in which he resides; or proof of residence in a jurisdiction which does not require registration of a pistol, rifle or shotgun;

(c) any officer, agent or employee of the District of Columbia or the Federal Government, or any officer, agent or employee of the government of any state or subdivision thereof, or any member of the Armed Forces of the United States, the National Guard or the Organized Reserves, when such officer, agent, employee or member is authorized to carry a pistol, rifle or shotgun and who is carrying a pistol, rifle or shotgun while on duty in the performance of his official authorized functions; or

## ARTICLE 52.   REGULATING THE SALE AND CARRYING OF FIREARMS IN THE DISTRICT OF COLUMBIA

**Section 1.**  (a) Any person who is not subject to any of the disabilities enumerated in Sec. 7 of the Act (D.C. Code, sec. 22-3207) shall be entitled to purchase a pistol within the District, and a seller is lawfully entitled to sell a pistol to such a person. No such person shall be denied the purchase of a pistol except as provided in the Act.

(b) Any person who meets the requirement of Sec. 6 of the Act (D. C. Code, sec. 22-3206) shall be entitled to carry a pistol within the District, and no such person shall be denied a license to carry a pistol except as provided in the Act.

(c) Any person who is not subject to any of the disabilities set forth in sec. 5 (c) of this article shall be entitled to purchase and carry a rifle or shotgun in the District, and a seller shall be entitled to sell a rifle or shotgun to such a person.

**Sec. 2.**  (a) No person shall carry either openly or concealed on or about his person any pistol unless he possesses a valid license therefor issued to him pursuant to Sec. 4 of the Act (D. C. Code, sec. 22-3204); except as otherwise authorized by said section of the Act.

(b) No person shall purchase, own, possess or carry on or about his person any rifle or shotgun unless he possesses a valid rifle and shotgun license therefor issued to him pursuant to Sec. 5 of this Article.

(c) No person shall within the District sell or transfer any rifle or shotgun to a purchaser who is not a retail dealer licensed under Art. 54 of these Regulations; and no person who is not a licensed retail dealer shall purchase or otherwise acquire any rifle or shotgun from any seller unless—

(1) the purchaser exhibits to the seller a valid rifle and shotgun license issued according to Section 5 of this Article; and

(2) the seller forwards to the Chief of Police at the time of the sale the purchaser's application register the rifle or shotgun being sold pursuant to Art. 51, Sec. 2 (a) of these Regulations; or within forty-eight hours following the sale, a written notification of sale pursuant to Art. 51, Sec 8 (b).

(d) No person within the District shall import or cause to be delivered to him within the District any rifle or shotgun unless he shall within forty-eight hours following delivery to him, submit an application to register the rifle or shotgun pursuant to Art. 51, Sec. 2 (c) of hese Regulations.

**Sec. 3.** Each person who required by Sec. 8 of the Act (D. C. Code, Sec. 22-3208) to submit a statement when applying to purchase a pistol, or who is required by Sec. 4 of the Act (D. C. Code, sec. 22-3204) to have a license to carry a pistol, or who is required by sec. 2 (b) of this Article to have a license to purchase or carry a rifle or shotgun shall submit such statement to the seller or an application for such license directly to the Chief of Police in the form and number prescribed by the Chief.

**Sec. 4.** (a) Each statement on application to purchase a pistol shall be signed by the applicant purchaser and the seller, and each application for a license shall be signed by the applicant for the license.

(b) Each such statement or application shall contain that information prescribed by the Chief of Police which in his judgment is necessary to conduct efficient and thorough investigations, and to effectuate the purposes of the Act and these Regulations. Each statement or application shall contain at least the following information:

(1) the full name, and any other name by which the applicant is or has been known;

(2) the home address, and any other address at which the applicant has resided within five years immediately prior to the submission of the statement or application.

(3) the present business or occupation, any business or occupation in which the applicant has engaged for five years immediately prior to the application, and the addresses of such businesses or places of employment;

(4) the date and place of birth of the applicant;

(5) the sex of the applicant;

(6) a statement by the applicant that he is not ineligible to purchase or possess a pistol under Section 7 of the Act (D. C. Code, sec. 22-3207) or not ineligible for a license to carry a pistol under Sec. 6 of the Act (D. C. Code, sec. 22-3206), or not ineligible under Sec. 5 (c) of this Article to purchase or carry a rifle or shotgun; and indicating whether he has previously been denied any pistol, or rifle or shotgun

license, registration certificate or permit by the Federal Government or any state government or subdivision thereof including the District Government; and whether he has been involved in any mishap involving a pistol, or rifle or shotgun, including the date, place, and circumstances and the names of any persons injured or killed;

(7) a statement by the applicant of his need to purchase or carry a pistol, rifle or shotgun, and his intended use of the same;

(8) the caliber, make, model, manufacturer's identification number, serial number, and any other identifying marks on the pistol, rifle or shotgun to be purchased or carried; and

(9) the name and address of the seller, and his retail license number if he is a licensed dealer under Art. 55 of these Regulations.

(c) The Chief of Police may require each applicant to be finger-printed if this in his judgment is necessary to conduct efficient and thorough investigations and to effectuate the purposes of the Act and these Regulations; **Provided,** that any person who has been fingerprinted by the Chief within five years prior to sub-mitting his statement or application shall not be fingerprinted again if he offers other satisfactory proof of his identity. In addi-tion, the Chief may require each applicant for a license to carry a pistol, or a rifle or shotgun to submit with his application two full face, black and white photographs of himself, 1-3/4 by 1-7/8 inches in size which shall have been taken within thirty days of the filing of the application.

**Sec. 5.** (a) No person shall be approved by the Chief of Police to purchase a pistol if the Chief after investigation determines that a pistol could not lawfully be sold to such person under Section 7 of the Act (D. C. Code, Sec. 22-2307).

(b) No person shall be issued a license to carry a pistol by the Chief of Police if the Chief after investigation determines that such person is ineligible for such license under Section 6 of the Act (D. C. Code, Sec. 3206).

(c) Except as provided for in subsection (d) of this section, no person shall be issued a license to purchase or carry a rifle or shotgun if the Chief of Police determines after investigation that such person—

(1) is under the age of twenty-one years;

(2) is not of sound mind; **Provided,** that the Chief of Police shall determine that the person is not of sound mind to pur-chase, possess and carry a rifle or shotgun if he determines that such person has been adjudicated mentally incom-petent, or has been acquitted of any criminal charge by reason of insanity by any court or has been adjudicated a

chronic alcoholic by any court **and Provided,** that three years after such conviction adjudication or acquittal, the Chief of Police shall disregard the disabilities of this subsection if, after an investigation, he is satisfied that the applicant is mentally and physically capable of owning, possessing and using a pistol in a safe and responsible manner.

(3) is a drug addict; **Provided,** that the Chief of Police shall determine that the person is a drug addict if he determines that such person (i) is an abusive user of narcotic drugs as defined by section 4731 of the Internal Revenue Code 1954, as amended (Aug. 16, 1954, 68A Stat. 557, ch. 736; Apr. 22, 1960, 74 Stat. 57 Pub. L. 88–429, sec. 4(a), (b); 26 U.S.C., sec. 4731); or (ii) is an abusive user of dangerous drugs as defined by or under the Act entitled the "Dangerous Drug Act for the District of Columbia", approved July 24, 1956 (70 Stat. 612, title II, sec. 202 D. C. Code, sec. 33–701);

(4) has been convicted in any jurisdiction of a crime involving the use of physical force against a person punishable by imprisonment for more than one year, or is under indictment for such a crime; or

(5) he has been convicted in any jurisdiction of any of the following offenses punishable by imprisonment for less than one year: any offense involving a physical assault; any offense committed while carrying a firearm or weapon; using, possessing or selling any narcotic or dangerous drug; or any violation of a law restricting the sale, receipt, possession, use or transportation of a firearm or destructive device; **Provided,** that three years after such conviction, the Chief of Police may disregard the disabilities of this subsection if, after an investigation, he is satisfied that the applicant is mentally and physically capable of owning, possessing and using a rifle or shotgun in a safe and responsible manner; or

(6) suffers from a physical defect which would make it unsafe for him to use a rifle or shotgun; or

(7) has indicated by threatening speech or other behavior that he is likely to make unlawful use of a rifle or shotgun; or

(8) has been adjudicated negligent in a firearms mishap causing death or injury to another human being; or

(9) is otherwise ineligible to purchase or possess a pistol under section 3 of the Act (D. C. Code, sec. 22–3203).

(d) The Chief of Police shall deny a rifle or shotgun license if the Chief determines, after investigation or test, that the applicant—

(1) does answer to one or more of the descriptions

enumerated in subparagraphs (c) (1) through (c) (9) of this section; or

(2) has failed to demonstrate satisfactorily a knowledge of the laws of the District of Columbia pertaining to rifles and shotguns and the safe and responsible use of the same in accordance with tests and standards prescribed by the Chief of Police; or

(3) has vision less than that required to obtain a valid driver's license under the laws of the District; **Provided,** that possession of a valid driver's license shall be prima facie evidence that an applicant's vision is not deficient.

(e) The Chief of Police shall issue to applicant a numbered rifle and shotgun license if the Chief determines, after investigation that the applicant does not answer to any of the descriptions enumerated in subparagraphs (c) (1) through (c) (9) of this section.

(f) The Chief of Police may issue to an applicant between the ages of eighteen and twenty-one years old who is otherwise qualified under subsection (c) a numbered restricted rifle and shotgun license if—

(1) the application is accompanied by a signed statement by the parent or guardian of the applicant (i) that the applicant has the permission of the parent or guardian to use a rifle or shotgun, and (ii) that the parent or guardian assumes civil liability for all damages resulting from the actions of the applicant in the use of the rifle or shotgun; and

(2) if the applicant is not disqualified by subsection (d) in any respect except his age.

**Sec. 6.** Any person in the District carrying of having in his immediate possession any pistol for which a license has been issued to him pursuant to sec. 6 of the Act (D. C. Code, sec. 22–3206), or any rifle or shotgun for which a license has been issued to him pursuant to sec. 5(e) or (f) of this Article, shall have such license within his immediate possession, and upon demand of any law enforcement officer shall exhibit his license.

**Sec. 7.** Any rifle and shotgun license issued under this Article—

(a) may include such reasonable restrictions and prohibitions consistent with applicable laws of the District with respect to the possession, purchase or carrying about of such rifle or shotgun as the Chief of Police may deem essential to the public safety or in the public interest; any license issued under section 3(d) of this Article shall be limited to use of the rifle or shotgun for sport or recreation, only during daylight hours, and only in the presence and under the supervision of a person licensed under section 5(e) of this Article.

(b) may be revoked by the Chief of Police when he has reason to believe that the licensee no longer has the qualification requisite for the issuance of such a license: **Provided,** that the Chief of Police shall first issue and serve upon the licensee, an order to show cause why his license should not be revoked. This licensee may request in writing a hearing before the Chief within 5 days, and the Chief shall grant such hearing within 15 days. If the licensee does not request a hearing or show proper cause why his license should not be revoked the Chief of Police shall issue and serve upon the licensee an order revoking the license and no license issued under these Regulations shall be in effect beyond the date of an order revoking such a license.

(c) shall expire five years after issuance unless sooner revoked.

**Sec. 8.** (a) Section 2 (a) of this Article shall not apply to—

(1) any person directly transporting a registered pistol to the business address of a licensed dealer for purpose of repair or sale, or to any person directly transporting such pistol from the business address of a licensed dealer to his residence, place of business or other land owned by him after the purchase or repair.

(2) Any person directly transporting a registered pistol to the residence, place of business or land owned by the purchaser after the private sale of such pistol approved by the Chief of Police;

(3) any person directly transporting any pistol to any police precinct house to surrender the same to the Chief of Police;

(4) any nonresident of the District actively participating in any lawful recreational activity in the District involving the use of a pistol, or transporting such pistol directly to or directly from such lawful recreational activity; **Provided,** that such nonresident shall upon demand of any law enforcement officer exhibit proof that his carrying about of a pistol is permitted and legal in the jurisdiction in which he resides; or proof of residence in a jurisdiction which does not license the carrying about of a pistol;

(5) any officer, agent or employee of the District of Columbia or the Federal Government, or any officer, agent or employee of the government of any state or subdivision thereof, or any member of the Armed Forces of the United States, the National Guard, or the Organized Reserves, when such officer, agent, employee or member is authorized to carry a pistol, and is carrying a pistol while on duty in the performance of his official authorized functions; or

(6) the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice as required by Section 5 of Act (D. C. Code, Sec. 22-3205).

(b) Any pistol carried by any person not having a licensed issued under these Regulations shall be carried in a closed container or securely wrapped, and while being carried shall be kept unloaded. Containers of such pistols or such securely wrapped pistols shall be carried in open view.

**Sec. 9.** (a) Section 2 (b) of this Article shall not apply to—

(1) any person directly transporting any rifle or shotgun to any police precinct house to surrender the same to the Chief of Police;

(2) any nonresident of the District actively participating in any lawful recreational activity in the District involving the use of a rifle or shotgun, transporting a rifle or shotgun directly to or directly from such lawful recreational activity; **Provided,** that such nonresident shall upon demand of any law enforcement officer exhibit proof that his carrying about of a rifle or shotgun is permitted and legal in the jurisdiction in which he resides; or proof of residence in a jurisdiction which does not license the carrying about of a rifle or shotgun;

(3) any officer, agent or employee of the District of Columbia or the Federal Government, or any officer, agent or employee of the government of any state or subdivision thereof, or any member of the armed forces of the United States, the National Guard or the Organized Reserves, when such officer, agent, employee or member is authorized to carry a rifle or shotgun, and who is carrying a rifle or shotgun while on duty in the performance of his official authorized functions;

(4) any person between the ages of 15 and 18 years of age uses a rifle or shotgun as authorized by Art. 55, sec. 8(b) of these Regulations.

(b) Notwithstanding any provision of this Article, it shall be lawful in the District for a seller to sell a rifle or shotgun to a nonresident of the District who is a citizen of the United States and who does not have a license issued under this Article; **Provided,** that such nonresident purchaser possesses and exhibits to the seller a valid license or permit for the purchase, possession or use a rifle or shotgun issued to him by the United States government or by any state or subdivision thereof.

(c) Any rifle or shotgun being carried shall, except when lawful use is imminent, be unloaded and securely wrapped or encased in a closed container.

## ARTICLE 53: REGULATING THE
## SALE OF FIREARM AMMUNITION

**Section 1.** No person shall within the District sell or otherwise transfer ammunition for a firearm to another unless

(a) The sale or transfer is made in a face-to-face transaction;

(b) The purchaser exhibits at the time of the sale or transfer a valid certificate of registration issued under these regulations;

(c) The ammunition sold or transferred is of the same caliber or gauge as the firearm described in the certificate of registration and suitable for use therein;

(d) The purchaser signs a receipt for the ammunition, which receipt shall be maintained by the seller for six months.

**Sec. 2.** No person shall within the District of Columbia purchase or possess ammunition for a firearm unless he is the holder of a valid certificate of registration issued under the regulations; and unless the ammunition is of the same gauge or caliber as the firearm described in the certificate of registration issued to such person.

**Sec. 3.** For purposes of Secs. 1 and 2 above, a valid firearm registration certificate issued by the United States or any state or subdivision thereof shall be sufficient to authorize ammunition sales to and purchases by persons who are not residents of the District.

**Sec. 4.** This Article shall not apply to sales or transfers to government agencies, duly appointed law enforcement officers, or persons duly licensed as dealers of weapons under Section 10 of the Act (D. C. Code, sec. 22-3210).

**Sec. 5.** This Article shall not apply to bona fide collectors of ammunition who are purchasing ammunition for their collections. Any such collector may obtain an ammunition collector's certificate from the Chief of Police, upon proof, submission of a statement, verified by the Chief, that he is, in fact, a bona fide collector. This certificate shall be exhibited to the seller whenever the collector purchases ammunition for his collection. The seller shall keep records of all ammunition sales to collectors for six months.

## ARTICLE 54: REGULATING AND LICENSING
## DEALERS IN DANGEROUS WEAPONS

**Section 1.** (a) No person shall within the District engage in the business of selling, or manufacturing, or repairing any pistol,

rifle, shotgun, or ammunition without first obtaining a license as provided in sec. 2 of this Article.

(b) The Commissioner may grant licenses, effective for not more than one year from date of issue, permitting the licensee to sell, or to manufacture, or to repair pistols, rifles, shotguns or ammunition. Whenever any such licensee breaches any condition upon which his license was issued or violates any provision of these Regulations or of any provision of section 7 of the Act (D. C. Code, sec. 22–3207), which is applicable to any such licensee or any applicable regulation made pursuant to such Act, the license shall be suspended or revoked and the licensee shall be subject to punishment as provided in these Regulations.

(c) The Commissioner is authorized and empowered to fix, and from time to time increase or decrease, fees for any services rendered under this Article. The Commissioner shall increase, decrease, or fix fees in such amount as will in the judgment of the Commissioner approximate the cost to the District of administering this Article.

**Sec. 2.** (a) The Chief of Police shall within 30 days of receipt of an application issue a license to deal in firearms to any person who is not ineligible to purchase a pistol, rifle or shotgun under these Regulations and who has not previously violated any of the conditions set forth in Art. 54, secs. 5 and 6 of these Regulations.

(b) Each application for a license to deal in firearms or ammunition shall be in the form prescribed by the Chief of Police; and shall be signed by the Chief of Police; and shall be signed by the applicant and shall contain—

　　(1) the full name of the applicant;

　　(2) the home address of the applicant;

　　(3) the address of the establishment to be licensed and the principal place of business of the applicant;

　　(4) and such other information as may be required by the Chief of Police.

**Sec. 3.** A license to deal in firearms or ammunition may be revoked or suspended by the Chief of Police when he has reason to believe the licensee—

(a) ceases to qualify for a license under Sec. 2 (a) of this Article; or

(b) fails to comply with any of the conditions imposed by Art. 54, secs. 5 and 6; **Provided,** that the Chief of Police shall first issue and serve upon the licensee, an order to show cause why his license should not be revoked. The licensee may request in writing a hearing before the Chief within 5 days, and the Chief shall grant such hearing within 15 days. If the licensee does not request a hearing or show proper cause why his license should

not be revoked the Chief of Police shall issue and serve upon the licensee an order revoking the license and no license issued under this Article shall be in effect beyond the date of an order revoking such a license.

**Sec. 4.** (a) Any dealer within the District who transports or delivers firearms to another dealer in the District shall, before delivery of the firearm, furnish to the Chief of Police an invoice listing his name, his home and business addresses, his license number, the name and address of the dealer to whom such firearms are to be delivered, the place of origin of the shipment, the quantity of firearms transported, and the serial number of each firearm in the shipment.

(b) If such shipment is by common carrier, a copy of the invoice shall be delivered to the common carrier. No common carrier shall knowingly deliver a shipment of firearms to a dealer within the District without having received a copy of such invoice. The Copy of the invoice shall be left with the dealer at the time of delivery.

(c) If such shipment is by other than common carrier, the copy of the invoice shall be furnished to the dealer at the time of delivery.

**Sec. 5.** (a) No person licensed under this Article shall sell a pistol, rifle, shotgun, or ammunition to any person whom he knows or has reasonable cause to believe is ineligible to own a pistol, rifle or shotgun under Section 7 of the Act (D. C. Code, Sec. 22–3207) or Article 52, Sec. 5 (c) of these Regulations.

(b) Each licensed dealer shall keep at his place of business a true record in book form of all pistols, rifles, and shotguns in his possession or under his control which he has acquired to sell or offer for sale, and shall, upon demand exhibit such record book to any policeman or law enforcement officer exercising his official duty. Each licensed dealer must enter upon such record book for each pistol, rifle, and shotgun in his possession the information required for pistols by section 10 of the Act (D. C. Code, sec. 22–3210 (4), and the name and address of the purchaser when such items are sold.

(c) Each licensed dealer shall submit a periodic report to the Chief of Police on all sales of ammunition. The Chief of Police shall fix the times when such reports are due, and he may establish such other procedures under this subsection as he deems necessary. Such periodic reports shall contain—

    (1) the name and address of each purchaser of ammunition during that period;

(2) the number on the registration certificate issued under Article 2 of these Regulations which exhibited by the purchaser; and

(3) the quantity and description of the ammunition sold to each purchaser during the period.

(d) Each licensed dealer shall otherwise conform to all provisions of the Act, and nothing contained in these Regulations shall be construed to excuse noncompliance with any provision of the Act.

**Sec. 6.** (a) No licensed dealer shall display any pistol, rifle or shotgun, or ammunition in windows visible from a street or sidewalk. All pistols, rifles and shotguns and ammunition shall be kept in a securely locked place at all times except those firearms or ammunition being shown to a customer, repaired or otherwise worked on.

(b) No licensed dealer shall knowingly permit any person in his establishment to display, sell or repair any pistol, rifle, shotgun or ammunition if such person would not be qualified for a licensed to carry a pistol issued under Section 6 of the Act (D. C. Code, Sec. 22–3206) or if such person has not received from the Chief of Police approval to display, sell or repair any pistol, rifle, shotgun or ammunition in said establishment, **Provided,** that this subsection shall not apply to any relative of the licensed dealer who is eighteen years old or older, if otherwise qualified under Section 6 of the Act (D. C. Code, Sec. 22-3206).

**Sec. 7.** Beginning one year after the effective date of these Regulations, no retail dealer licensed under this Article shall sell or offer for sale in the District any pistol, rifle or shotgun, which does not have imbedded into the metal portion of such pistol, rifle or shotgun a unique manufacturer's identification number or serial number unless the retail dealer shall have imbedded into the metal portion of such pistol, rifle or shotgun a unique dealer's identification number.

**Sec. 8.** (a) No pawnbroker in the District shall sell or offer for sale any firearm or ammunition, or loan money secured by mortgage, deposit or pledge of any firearm or ammunition without obtaining a license under this Article.

(b) No licensed dealer shall take or receive any firearm by way of mortgage, pledge or pawn without also taking and retaining during the term of such pledge or pawn, the registration certificate of the firearm mortgaged, pledged or pawned. If such firearm is not redeemed, the dealer shall return the registration certificate to the Chief of Police and register the firearm in his own name.

## ARTICLE 55. MISCELLANEOUS PROVISIONS

**Section 1.** (a) It shall be unlawful for any person purchasing any pistol, rifle, shotgun or ammunition, or applying for any certificate of registration or license under these Regulations, or in giving any information pursuant to the requirements of these Regulations, to give false information or offer false evidence of his identity.

(b) It shall be unlawful for anyone to forge or alter any application, registration certificate, temporary evidence of registration, or license submitted, retained or issued under these Regulations.

(c) It shall be unlawful for any person within the District to change, alter, remove, or obliterate the name of the maker, model, manufacturer's identification number, serial number, or other mark of identification on any pistol, rifle or shotgun; **Provided,** that nothing contained in this section shall apply to any officer or agent of any department or agency of the United States or the District Government who is engaged in research or experimental work.

(d) It shall be unlawful for any person within the District to own, possess, sell, offer for sale, purchase or offer to purchase any destructive device, or military type weapon including weapons known as hand grenades, cannons, anti-tank guns and bazookas; **Provided,** that this section shall not apply to any agency or department of the District of Columbia or Federal Government or to any person licensed or authorized by the Federal Government to own, possess, sell or purchase such weapons.

**Sec. 2.** (a) If any person within the District voluntarily delivers and abandons to the Metropolitan Police Department any pistol or rifle or shotgun during an amnesty period which the Chief of Police is hereby authorized to proclaim at regular intervals, the voluntary delivery of such weapon shall preclude the arrest and prosecution of such person on a charge of violating any provisions of these Regulations with respect to the weapon voluntarily delivered. A voluntary delivery of any pistol or rifle or shotgun shall be made to any police precinct and such weapon shall be securely wrapped and unloaded.

(b) Any person within the District may summon a police officer to his residence or place of business for the purpose of voluntarily delivering to a police officer a pistol or rifle or shotgun which shall be securely wrapped and unloaded.

**Sec. 3.** Notwithstanding any provision of Art. 52 or Art. 54 of these Regulations, an application to transfer a pistol or a rifle or shotgun license shall not be required for the transfer of a pistol, rifle or shotgun upon the death of an owner thereof to his heir

or legatee whether the transfer be by testamentary bequest or by the laws of intestacy; **Provided,** that the heir or legatee shall be subject to all other provisions of these Regulations; and **Provided,** that if the heir or legatee does not qualify to possess or carry the pistol, rifle or shotgun under these Regulations, he may possess the same for the purposes of sale for a period not to exceed 60 days.

**Sec. 4.** (a) When an application for a registration certificate under Art. 51 or a license under Art. 52 or Art. 54 of these Regulations is denied, or when the Chief of Police fails to act on any such application within 30 days of its receipt, or when such registration certificate or license is revoked as provided for these Regulations, the aggrieved party may within five days appeal in writing to the Commissioner, and the Commissioner shall schedule a hearing before him within 15 days after the appeal has been made. Any ruling from such hearing and any order of the Commissioner denying an application for a dealer license made pursuant to Art. 55 of these Regulations shall be subject to appropriate judicial review.

(b) The Commissioner is authorized to make orders to carry out the purposes of these Regulations, including without limitation orders prescribing the form, content, and requirements respecting the number of copies of reports, applications, or certificates required under or authorized by these Regulations and for recording and identifying each firearm owned, possessed or under the custody or control of a person; providing for the keeping and disposition of records by persons selling, purchasing, manufacturing, repairing, or delivering firearms and ammunition covered by these Regulations and further regulating the conduct of the business required to be licensed under these Regulations.

(c) The Commissioner may prohibit the sales of ammunition when he determines that the design, construction or material composition of such ammunition makes it unsuitable or unsafe for any lawful use.

**Sec. 5.** Whenever any firearm, ammunition or destructive device is found within the District in an automobile, boat or other vehicle, or in any dwelling unit, business establishment or other structure or building, it shall be prima facie evidence that such firearm, ammunition or destructive device is in the possession of the occupants of the vehicle, structure or building; or, if the vehicle, structure or building is unoccupied, it shall be prima facie evidence of possession by the registered owner in the case of a vehicle, or by the last known occupants or owner in the case of a vehicle, or by the last known occupants or owner in the case of a structure or building.

**JA 143**

**Sec. 6.** Except for transfers to licensed dealers, no person shall loan or otherwise allow another person to possess, carry or use any firearm unless such firearm is being loaned for a legitimate purpose, and for a period not to exceed 30 days; and unless—

"(a) the person to whom the firearm is loaned possesses a valid license for such firearm issued to him pursuant to section 6 of the Act (D. C. Code, Sec. 22-3206) or to Art. 52 of these Regulations; or

(b) such person to whom the firearm is loaned is at least fifteen years of age, does not possess a valid license because of his age, and is a member or student of an organization or school which teaches firearm safety and use. Where such circumstances exist, it shall be lawful to loan a rifle or shotgun to such person for instruction, military or military type drill, or legitimate recreational activity; **Provided,** that the use of the rifle or shotgun is immediately supervised by a person licensed pursuant to Art. 52 of these Regulations; and **Provided,** the rifle or shotgun is registered to the organization, school, parent or guardian of the user; and **Further Provided,** that the rifle or shotgun is surrendered immediately following its use to the organization, school, or parent or guardian of the user."

**Sec. 7.** (a) Except as provided in the immediately preceding section, no person shall within the District keep any firearm or ammunition for, or intentionally make any firearm or ammunition available to any person who would not qualify under these Regulations for a License for such firearm.

(b) No person shall hold a firearm or loan any money on a firearm as security for the payment or repayment of any debut or pledge, except as otherwise provided for in Art. 55, sec. 8 of these Regulations.

**Sec. 8.** No person shall within the District sell or otherwise transfer a firearm or ammunition to a purchaser who is under the influence of alcohol or a narcotic or dangerous drug. No person shall within the District carry or use any firearm while under the influence of alcohol or a narcotic or dangerous drug.

**Sec. 9.** "The Chief of Police is hereby authorized to issue and promulgate such other orders, rules and regulations as he deems necessary to carry out the purposes of the Act and these Regulations."

**Sec. 10.** (a) "Applications required by these Regulations for registration or licensing of firearms possessed, purchased or acquired by, or delivered to, persons within the District prior to the effective date of these regulations must be submitted within 120 days after that date. No such person shall be deemed in default under the registration provisions of these regulations if his application to register is submitted within that time. Nor shall

any such person be deemed in default under the licensing provisions of these regulations while his application for a license, submitted within that time, is still pending.

(b) The registration and licensing requirements established by these regulations shall be immediately effective, from the effective date of these Regulations, for firearms purchased or acquired by, or delivered to, persons within the District after that date."

**Sec. 11.** Any person who violates any provision of these Regulations shall, upon conviction be fined not more than $300, or be imprisoned for not more than ten days; **Except** that any dealer who violates any provision of Article 55 of these Regulations shall upon conviction be fined not more than $300 or be imprisoned for not more than ninety days; and **Provided,** that the penalties prescribed herein for violating these Regulations shall not supersede but shall supplement all statutes, other regulations, or municipal actions of the District of Columbia or the United States under which similar conduct is prohibited and penalties for engaging therein are prescribed.

**Sec. 12.** Any provision of any Regulation of the District inconsistent with any provision of these Regulations is hereby repealed.

**Sec. 13.** If any provision of these Regulations or the application thereof to any person or circumstance is held invalid, the remainder of these Regulations and the application of such provision to other persons not similarly situated or to other circumstances shall not be affected thereby.

**Sec. 14.** "These Regulations shall become effective on February 15, 1969; provided that the Chief of Police may accept applications for registration of firearms immediately upon adoption of these Regulations." (C.O. 68–500 and C.O. 69–39a)

# 6

24 DCMR 2303 and 2304

(1974)

## 2303 APPLICATION REQUIREMENTS FOR LICENSES FOR CONCEALED WEAPONS

2303.1 The residence requirements for a license to carry a concealed weapon shall be as follows:

    (a)    Applicant shall have a bona fide residence or place of business in the District of Columbia; or

    (b)    If the applicant does not have a bona fide residence or place of business in the District of Columbia, the applicant shall have a bona fide residence or place of business within the United States, and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of that State or sub-division of the United States.

2303.2 No applicant shall be a person prohibited from possessing a pistol under D.C. Code §§22-3201 through §22-3217 (1981).

2303.3 Applicant shall be of sound mind. The Chief of Police or his or her designated agent may presume an applicant is not of sound mind if any of the following conditions are present:

    (a)    Applicant was previously determined by a court or administrative agency to be of unsound mind;

    (b)    Applicant was found not guilty of a crime by reason of insanity;

    (c)    Applicant was ever civilly committed to a mental institution, whether that commitment was voluntary or involuntary;

    (d)    Applicant received treatment for a mental disorder on a regular basis;

    (e)    A reliable witness or witnesses supplies the Chief of Police a written, notarized statement that the applicant is of unsound mind; or

    (f)    Observation by police officials indicate that the applicant is not mentally competent. In this instance, at least two (2) officials of the rank of Sergeant or above shall state in writing their conclusion and facts supporting their conclusion that the applicant is mentally incompetent.

2303.4 The Chief of Police or his or her designated agent may disregard the impediments of §§2303.3 (a), (b), (c) or (d) if five (5) years have elapsed since the last recorded treatment or judicial determination of mental incompetence.

2303.5 To rebut a presumption that the applicant is of unsound mind, an applicant may offer the notarized report of a registered psychologist or psychiatrist that the psychologist or psychiatrist has examined the applicant within six (6) months prior to submitting the statement and found the applicant to be of sound mind.

2303.6 The Chief of Police or his or her designated agent may require the applicant to submit to psychiatric testing by a psychiatrist or psychologist selected by the Chief of Police at the expense of the Metropolitan Police Department.

2303.7 No applicant shall ever have been convicted in the District of Columbia or elsewhere of a felony or shall ever have been convicted of violation of any of the following:

    (a)    D.C. Code §§22-3201 through 22-3217 (1981); or

(b) A weapons offense in any jurisdiction.

2303.8 No applicant shall be any of the following:

 (a) Under indictment for a felony or facing criminal misdemeanor charges involving wrongful use of a firearm in any jurisdiction;

 (b) Charged in any competent court in any jurisdiction of a felony at the time his or her application is pending;

 (c) A fugitive from justice or have previously been convicted of a firearm violation in any jurisdiction; or

 (d) An alcoholic, or a user of illegal narcotic or hallucinogens.

2303.9 Applicant shall comply with the following requirements:

 (a) Be over twenty-one (21) years of age;

 (b) Be free from physical defects which would impair his or her safe use of the weapon, such as paralysis of hand or arm, poor vision, or lack of coordination due to age;

 (c) Have reason to fear injury to his or her person or property or any other proper reason;

 (d) Be properly trained and experienced in the use, functioning, and safe operation of the pistol; and

 (e) Present a certificate from a certified firing range stating that the applicant has satisfactorily completed a course of supervised training approved by the Chief of Police with the weapon from which the license is requested and is fully familiar with the use and servicing of the weapon.

2303.10 Applicant shall test fire his or her weapon at the standard police course under Metropolitan Police Department supervision to demonstrate his or her ability to shoot accurately and safely. An additional fee of twenty dollars ($20) shall be required for this service. However, this test and fee shall not be required for license renewals.

2303.11 For the purposes of satisfying the specifications of §2303.9(c), applicant shall allege serious threats of death or serious bodily harm to his or her person or theft or destruction of property in writing, under oath. The applicant shall also allege that the threats are of a nature that the legal possession of a pistol would provide adequate protection.

2303.12 The Chief of Police or his or her designated agent shall conduct and investigation into the allegations of the applicant to determine if the alleged threats are serious and factual and are of a nature that can be protected by carrying a pistol. Factors to be considered include the substance of the alleged threat, whether or not the applicant made a timely report to the police of such threats, and whether or not the applicant has made a sworn complaint to the police in the courts of the District of Columbia.

2303.13 The Chief of Police or his or her designated agent shall find that normal police protection, a commission as a Special Police Officer pursuant to D.C. Code §4-114 (1981), or at the discretion of the Chief of Police, special police protection is insufficient to protect the applicant from the alleged threat to his or her person or property.

2303.14    An example of "any other proper reason" used to satisfy the requirements of §2303.9(c) may
           include an application by a parent, son, daughter, sibling or other adult member of the immediate
           family of the person for the protection of the other person who is physically or mentally
           incapacitated to a point where he or she cannot act in defense of himself or herself, or his or her
           property.

2303.15    "Any other proper reason" shall not include the carrying of a pistol to or from the place of
           purchase of the weapon, or to or from the place of target practice, sporting or recreational activity.

           SOURCE: Final Rulemaking published at 21 DCR 413 (September 3, 1974).

## 2304    LICENSES FOR CONCEALED WEAPONS

2304.1    A license granted for concealed weapons shall be valid for one (1) month from the date of issuance.

2304.2    A license may be renewed at the end of one (1) month upon a written showing of continue d need for the license. Applicants who fail to apply for a renewed license before the expiration date, shall be required to pay the application fee for re-application.

2304.3    Only one (1) weapon shall be carried pursuant to a license. The description and serial number of the weapon shall be part of the license. A new license shall be required for each different weapon carried.

2304.4    At the time of the initial interview with the Chief of Police or his or her designated agent, applicant shall bring the pistol which he or she will carry pursuant to the license and the holster or holsters in which the weapon will be carried.

2304.5    Applicant shall surrender possession of the weapon and holster to the Metropolitan Police Department for a check to determine whether the weapon was reported stolen, to verify that the weapon is safe, in good operating condition, and to obtain test fired ballistics specimens for future comparison if the weapon is fired and to ensure that the holster(s) meets minimum standards for safe carrying of the weapon.

2304.6    If the weapon is reported stolen, the weapon shall not be returned to the applicant until it is properly processed through the Metropolitan Police Department Property Division and a determination of the rightful owner is made.

2304.7    If the pistol is found not to be in good operating condition, the pistol shall be returned to the applicant. No license shall be issued for a pistol which is not in the rightful possession of the applicant or which is not in good operating condition.

2304.8    The pistol for which the license is applied shall be a five (5) or six (6) shot revolver of no greater than a thirty-eight (.38) calibre. Automatic or semi-automatic pistols shall not be approved.

2304.9    Ammunition for the weapon may be no greater in size than a one hundred fifty-eight (158) grain round nose lead bullet and have a velocity of no greater than eight hundred feet (800 ft.) per second. Each weapon shall be carried in a holster approved by the Chief of Police or his or her designated agent.

2304.10    Any intentional false statement made on an application can be grounds for criminal charges for making a false report to the police under this chapter.

2304.11    Any information contained on the application for a license to carry a pistol shall be available to any law enforcement agency for law enforcement purposes. Otherwise, the information contained on the application for a license to carry a pistol shall be considered confidential and shall not be released without the written permission of the applicant.

2304.12    An applicant shall identify all known medical and mental records and sign written release for the Chief of Police or his or her designated agent to obtain the records. These records shall be used only for determining eligibility to be licensed to carry a pistol and for no other purpose.

2304.13    This section shall apply to all applicants for a license to carry a pistol and all renewals of licenses currently possessed.

2304.14    Each licensee shall submit a report to the Chief of Police each time he or she fires his or her weapon. The report shall state the complete details of the shooting of the weapon.

2304.15    An applicant shall register the pistol for which the license will apply.

2304.16    A license to carry a weapon shall be required whether the weapon is to be carried openly or on or about the person in a concealed manner.

2304.17    Applicants shall first be personally interviewed by the Chief of Police or his or her designated agent at which time applicant shall be fingerprinted and photographed and shall obtain an application form.

2304.18    Applications shall be made in writing only on the forms provided by the Chief of Police or his or her designated agent for that purpose.

2304.19    Applicants shall submit to the Chief of Police or his or her designated agent the following:

     (a)      A completed application; and

     (b)      The required fee of two dollars ($2) which is non-refundable.

2304.20    Upon receipt of a duly filed application, the Chief of Police or his or her designated agent shall, within thirty (30) days, do the following:

     (a)      Determine whether the application shall be approved;

     (b)      Determine whether the application shall be denied;

     (c)      Determine whether the applicant shall submit further information including further personal interviews or medical information, if necessary; and

     (d)      Notify the applicant in writing that his or her application has been approved or disapproved.

2304.21    Upon notification that his or her application has been approved, the Chief of Police, or his or her designated agent shall, within ten (10) days, issue the applicant a license to carry a pistol.

2304.22    An issued license may be revoked for any reason which would act as a bar to an original application for a license. In addition, a license may be revoked for misuse of the weapon. Misuse includes, but is not limited to the following:

     (a)      Firing warning shots; and

     (b)      Playing or "clowning" with the weapon.

2304.23    Revocation shall be in writing and shall be served in the same manner a civil process in the D.C. Superior Court.

2304.24    If the Chief of Police or his or her designated agent has not sent notice to the applicant that the application has been approved within thirty (30) days of the date of application, the application shall be presumed to be denied.

2304.25    Application forms shall include a written release of medical records necessary for a determination that the applicant is a suitable person to be licensed to carry a pistol.

SOURCE: Final Rulemaking published at 21 DCR 413, 417 (September 3, 1974).

# 7

Testimony:

Chief of Police, MPD

U.S. Secret Service

U.S. Capitol Police

**Government of the District of Columbia**



**Metropolitan Police Department**

Testimony of
## Cathy L. Lanier
## Chief of Police

# *License to Carry a Pistol Amendment Act of 2014*

Committee on the Judiciary & Public Safety
## Tommy Wells, Chair
Council of the District of Columbia
October 16, 2014

John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

**JA 153**

Good morning, Councilmember Wells, members of the Committee, and guests. As the Chief of Police, I am testifying on behalf of the Executive in support of the *License to Carry a Pistol Amendment Act of 2014*. As you know, the Executive has worked closely with Chairman Mendelson and you to draft this legislation in response to the ruling by the U.S. District Court in the case of *Palmer v. District of Columbia*. The *Palmer* ruling, which may be subject to revision after further consideration by the district court or in an appeal, is the first in the District finding that a person's Second Amendment right to keep and bear arms for self-defense must extend beyond the home. The judge's ruling in the case – that there is a constitutional right to carry a handgun in public for self-defense – goes beyond the 2008 Supreme Court ruling in *Heller v. District of Columbia*, which ruled that there is a constitutional right to have a handgun for self-defense specifically in the home. The proposed bill maintains our commitment to keeping guns out of the wrong hands, while fully respecting the Second Amendment of the U.S. Constitution.

Since the ruling was made public on July 26, 2014, the Executive has worked closely with Chairman Mendelson and Councilmember Wells on emergency and the proposed permanent legislation amending the District's laws to conform to the Court's ruling. The legislation determines the essential guidelines about who can carry a handgun and where, by adapting a 1931 law enacted by Congress that authorized the Chief of Police to issue a license to carry a concealed pistol if it appears that the applicant has demonstrated:

- Good reason to fear injury to his or her person, including evidence of specific threats or previous attacks;
- Any other proper reason for carrying a pistol, such as employment that requires the applicant to transport cash or other valuables upon the applicants person; and
- That the applicant is a suitable person to be so licensed.

The proposed legislation follows models of states such as New York, New Jersey, and Maryland, which have adopted a similar licensing scheme, each of which has had its state licensing scheme upheld against Constitutional challenges by a federal court of appeals.

Other highlights of the draft bill include that anyone applying for a concealed carry license must:

- Meet the existing requirements for a person to register a firearm;
- Successfully complete a training program on gun safety and relevant District laws; and
- Establish that he or she does not currently suffer nor has suffered in the previous five years from any mental illness or condition that creates a substantial risk that he or she is a danger to him or herself or others.

In response to the court ruling, the legislation also establishes that a non-resident may obtain a license to carry a concealed pistol if they meet the same standards as a District resident. So an applicant from outside the District must meet all other eligibility requirements, aside from residing in or owning a business in the District.

1

In addition to including criminal and civil penalties for license-holders who fail to follow the duties and requirements for licensees, the law establishes a 5-person panel to hear appeals for any denials or revocations of licenses. The panel will include a representative from the mental health profession, as well as a prosecutor and a current or former law enforcement officer not employed by MPD.

The proposed law would prohibit concealed carry licensees from carrying handguns in the types of places that firearms have been traditionally prohibited such as government buildings, premises where alcohol is sold and served, schools and universities, and in circumstances where protection of public officials, visiting dignitaries, and demonstrators is paramount. The latter is critical here in the District of Columbia. As the Supreme Court noted in *Heller*, "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are constitutional.

As I have testified before, the District of Columbia, as the seat of the federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day, is a city filled with sensitive places from a public safety perspective. Our laws should reflect that reality. Government facilities, dignitaries, and public servants are prime targets for terrorists, both foreign and domestic. Protecting government officials and infrastructure is a challenge for every city in the United States. But in the District the likelihood of attack is higher, and the challenges to protecting the city are greater. As recently as 2011, we saw an assassination attempt on the president – where fortunately the only thing the shooter hit was the White House – and another shooter firing at military installations. Both of these incidents were carried out by a lone gunman, angry at one facet or another of the U.S. government.

The high-profile human targets are an obvious and potentially attractive target. The District is vulnerable due to the sheer volume of secure motorcades traveling in Washington on any given day. The daily movements around the city of the President, Vice President, and their families, and the approximately 3,000 foreign dignitaries on official visits or just spending time in our city each year means that all of our roadways are a challenge to secure. And as the September 19th incident earlier this year at the White House demonstrated, even the home and office of the President of the United States has some vulnerability. Law enforcement needs to be able to prohibit guns from entering the perimeter of a secure area in order to be able to lessen the likelihood that an armed gunman will be able to make it close to protected targets.

I would urge the Council to make three changes to the list of places from which handguns will be prohibited.

- First, although the proposed bill prohibits handguns from government buildings, it should be broadened to prohibit them from the grounds and parking lots. We note, for example, the fatal shooting at the Pennsylvania State Police barracks in Blooming Grove, and the 2006 fatal

shooting in the District suburb of Fairfax, Virginia[1]. In both instances, officers were gunned down in police parking lots during shift changes. While these two examples are of police, according to a 2013 study published by the U.S. Department of Justice, government employees are more than three times as likely as private-sector employees to be victims of workplace violence.[2] While prohibiting guns from being carried in the lots is not sufficient to stop a determined gunman, it does give police the authority to stop anyone in the parking lot or on the grounds that they have a reasonable suspicion is armed. This can help to save lives. Of course, people seeking to register a gun at the police headquarters can still bring their unloaded gun. Moreover, the provision in Section 907(d)(2) allows a firearm to be stored in compliance with lawful transportation requirements in relevant parking lots. This currently applies to subsections (a)(2) and (3), and can be expanded to cover (a)(1).

- Secondly, subsections 907(a)(8), (12), and (13) all indicate that guns can be prohibited from certain events or locations, but provide however, that no criminal penalty shall apply unless:

  A) The licensee has been advised by a law enforcement officer that such a public gathering, dignitary movement, or demonstration is occurring; and

  B) The licensee has been ordered by the law enforcement officer to leave the area until he or she removes the handgun from his or her possession in compliance with the law.

We have several concerns about these provisions. For one, the licensee should not need to be personally informed of the requirement. There are plenty of opportunities to provide due notice to a licensee, including event materials, signs at all entrances, advertisements, and tickets. It may be a reasonable defense that a licensee did not have due notice, but officers should not have to determine that fact on the spot before being able to take action against someone with a gun at an event open to the public. Moreover, event organizers should not have to rely on hiring police officers to notify attendees that firearms are prohibited. Imagine, for instance, how many officers would be needed at the Barbecue Battle—an annual competition held in the District among restaurants from around the country and dozens of entertainers from around the country—in order to ensure personal notice to licensees? If the fact that the event is a gun-free event is both posted and advertised, that should be sufficient for notice purposes. In addition, once so notified that firearms are prohibited, licensees are already required to know District law directing them to remove the handgun from the event. They should not therefore have another legal defense, to unnecessarily complicate prosecution, that they were not personally directed by law enforcement to remove the gun from the event.

---

[1] http://www.washingtonpost.com/wp-dyn/content/article/2006/05/08/AR2006050800968.html
[2] US Department of Justice, Bureau of Justice Statistics. *Special Report: Workplace Violence Against Government Employees, 1994-2011.*

- Lastly, the bill would prohibit carrying a concealed handgun on all public transportation except for taxi drivers, who would be authorized to apply for a handgun. We urge the ban to extend to taxi cabs as well. Taxi drivers are no more likely to be subject to specific threats or previous attacks than any other resident. Indeed, one would think it would be more difficult for a person to stalk or ambush a taxi driver because of the randomness of their daily travel. On the other hand, a potential passenger should not have to worry about whether their taxi driver is armed. In New York City, neither taxi drivers nor passengers can carry a firearm. We think this is a better plan for public safety.

We urge the Council to consider these changes to the legislation.

In addition to the legislation, more detailed regulations will be appropriate to establish the process for getting a license to carry a handgun. In consult with District lawyers, the MPD is writing the regulations, based in part on our review of previous regulations in the District and on models from Maryland, New York, and New Jersey, whose licensing programs have already been found to be constitutional by their respective federal Courts of Appeal. To ensure that interested applicants can apply, most of the emergency regulations will be issued no later than October 22nd. Emergency regulations on obtaining certification to provide training will be issued by Monday so that potential trainers can apply for certification. To help ensure that training is available for licensees, any trainer who is already certified to provide firearm training for special police officers -- who are essentially the highest level of private building security -- will only need to provide training curriculum for initial certification.

This concludes my prepared remarks. At this time, I will be happy to address any of your questions.

4



U.S. Department of Homeland Security
## UNITED STATES SECRET SERVICE
Washington, D.C. 20223

November 14, 2014

The Honorable Tommy Wells
Chairman
Committee on Judiciary and Public Safety
1350 Pennsylvania Ave. NW, Suite 109
Washington, DC 20004

Dear Chairman Wells:

I am writing to highlight the United States Secret Service's perspective on the proposed "License to Carry a Pistol Amendment Act of 2014," which is currently under your committee's consideration. Given the Secret Service's unique protective mission responsibilities in the District of Columbia, we are highly interested in this proposal and have reviewed the draft permanent legislation. I appreciate the opportunity to provide you with both our overall perspective on the bill and suggestions for your consideration.

While the Secret Service's protective operations occur around the world, given that the President, First Family, Vice President, foreign leaders, and other protectees reside, visit and work here, we maintain a particularly high level of protection-related activities within the District pursuant to our duties under 18 U.S.C. §§ 3056 and 3056A. Beyond our permanent operations at the White House, Vice President's Residence, and around the numerous foreign missions located in the District, the Secret Service often secures venues around the District and transports the President and other protectees throughout it.

As a result of these responsibilities, the Secret Service supports the D.C. Council's efforts to clearly define the circumstances surrounding an individual's ability to carry a concealed weapon within the District. Based on our review of the draft legislation, we suggest your consideration of two important items specific to our protective mission:

- Similar to the specific reference to the prohibition of carrying a concealed weapon in the area around the White House Complex, we suggest a specific reference to a 50 foot area beyond the perimeter fence surrounding the U.S. Naval Observatory and the grounds where the Vice President's Residence is located.

- In its current form, the legislation establishes a 1,000 feet zone around dignitaries and other high ranking officials (where handguns would remain prohibited) when they are moving under the protection of the Metropolitan Police Department

**JA 158**

(MPD). We suggest eliminating the requirement that a protectee in these instances must be "moving" so that the 1,000 feet zone may also include situations when a protectee has arrived at his or her intended destination or has temporarily stopped en route to that destination. Further, because the movements of Secret Service protectees within the District may not involve MPD assistance, we suggest clarifying that this provision also applies to protectees of other agencies with arrest authority in the District, such as the Secret Service Uniformed Division.

Again, I thank you for your willingness to consider our perspective on this piece of legislation. I would like to highlight that the Secret Service's mission success is directly tied to the unwavering support of our partners at the local, state and Federal levels. In particular, we greatly appreciate the MPD and the strong partnership we maintain with it. If you require any additional information from the Secret Service as you consider this bill, I encourage you to contact me.

Respectfully,

A.T. Smith

cc: The Honorable Phil Mendelson, Chairman,
Council of the District of Columbia

**JA 159**



PHONE: 202-224-9806

# UNITED STATES CAPITOL POLICE
OFFICE OF THE CHIEF
119 D STREET, NE
WASHINGTON, DC 20510-7218

October 15, 2014

Phil Mendelson, Chairman
Council of the District of Columbia
John A. Wilson Building
1350 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Pmendelson@dccouncil.us

Councilmember Tommy Wells, Chairperson
Committee on the Judiciary & Public Safety
Council of the District of Columbia
John A. Wilson Building
1350 Pennsylvania Ave., N.W.
Washington, D.C. 20004
twells@dccouncil.us

Subject: D.C. Bill 20-930, *License to Carry Pistol Amendment Act of 2014*

Dear Chairman Mendelson and Chairperson Wells:

Thank you for the opportunity to comment on D.C. Bill 20-930, the "License to Carry Pistol Amendment Act of 2014." It is my understanding that a hearing will take place on Thursday, October 16, 2014, on this bill and that you have invited comment on the bill that will be made part of the official record provided it is submitted no later than Thursday, October 30, 2014. I respectfully request that my comments on behalf of the U.S. Capitol Police be made part of the official record on this important bill.

As a daily partner with the Metropolitan Police Department and as a federal law enforcement entity fulfilling its statutory duties, Bill 20-930 directly impacts our law enforcement duties and responsibilities in maintaining security and safety within the District of Columbia. Therefore, the U.S. Capitol Police submitted comments to the draft legislation through MPD which do not currently appear in the legislation before the Committee and the D.C. Council and which we would like to have included in the permanent bill.

To highlight our comments, which are few in number, the U.S. Capitol Police requests that Capitol Buildings and Grounds be specifically listed as areas where firearms may not be possessed, concealed or not. As you are aware, federal law and D.C. law prohibit firearms within Capitol Buildings and Grounds. See 40 U.S.C. § 5104(e) and D.C. Code 10-503.16(a). Therefore, I respectfully request that new Title IX, Licenses to Carry a Pistol, Section 907(a) be further amended by the language in red to read as follows:

> *(10) The public memorials on the National Mall and along the Tidal Basin, and any other area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol Buildings and Grounds;*

*Nationally Accredited by the Commission on Accreditation for Law Enforcement Agencies, Inc.*

## JA 160

...

    *(12) Within 1,000 feet, or other lesser distance designated by the Chief,* <u>*his or her designee, or the Chief of the U.S. Capitol Police, when a dignitary or*</u> <u>*high ranking official of the United States or a state, local, or foreign government*</u> <u>*is moving under the protection of the MPD or the U.S. Capitol Police, or other*</u> <u>*law enforcement agency assisting or working in concert with MPD; provided*</u> <u>*that no criminal penalty shall apply unless:*</u>

...

    *(13) Within 1,000 feet, or other lesser distance designated by the Chief* *or his or her designee, of a demonstration in a public place,* <u>*other than federal*</u> <u>*property,*</u> *provided no criminal penalty shall apply unless:*

...

Given the statutory responsibilities of the U.S. Capitol Police and federal statutes prohibiting firearms on federal property, as well as the specific Capitol Buildings and Grounds prohibitions enumerated in federal and D.C. statutes, these edits are essential to effective law enforcement within the District of Columbia.

I sincerely appreciate your solicitation of comments and acceptance of U.S. Capitol Police comments into the official record. I look forward to working with you and the Metropolitan Police Department in enforcing the governing laws and maintaining our cooperative relationships. Thank you for your long record of leadership for public safety.

Thank you again for your consideration as you move forward with this important legislation.

Very respectfully,

Kim C. Dine
Chief of Police

Cc:    Chief Cathy L. Lanier
        Metropolitan Police Department

        Nicole Goines, Administrative Clerk
        Committee on the Judiciary and Public Safety
        Council of the District of Columbia
        ngoines@dccouncil.us

**JA 161**

# 8

JA 162

X

Sunday, November 16 2014

UTC Aerospace Systems' Aces 5™ Ejection Seat **PROTECTING AMERICA'S ACES.**

United Technologies  Carrier | Otis | Pratt & Whitney | Sikorsky | UTC Aerospace Systems  **LEARN MORE**

Ad

**Wonkblog**

# More guns, more crime: New research debunks a central thesis of the gun rights movement

[f]  [y]  [in]  [✉]  [+]

BUYPOWER CARD  Capital One  LEARN MORE >

A  🖨  💬 176

**By Christopher Ingraham** November 14 ✉

Follow @_cingraham

Making the world safer, or less safe? (Flickr user Robert Nelson / CC)

"More guns, less crime" - surely you've heard this mantra before? There's even an entire book devoted to it. As Emily Badger noted awhile back, it has become a staple of our national gun control debate: "The idea that more guns lead to less crime appears on gun policy 'fact sheets,' as evidence debunking gun control 'myths,' in congressional committee reports."

Advertisement

**The Most** Popular

All Over

The notion stems from a paper published in 1997 by economists John Lott and David Mustard, who looked at county-level crime data from 1977 to 1992 and concluded that "allowing citizens to carry concealed weapons deters violent crimes and it appears to produce no increase in accidental deaths." Of course, the study of gun crime has advanced significantly since then (no thanks to Congress). Some researchers have gone so far as to call Lott and Mustard's original study "completely discredited."

One of the major critiques of the study came from the National Research Council, which in 2004 extended the data through the year 2000 and ultimately concluded that "with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." Or in other words, "More guns, less crime? ¯\_(ツ)_/¯"

Now, Stanford law professor John Donohue and his colleagues have added another full decade to the analysis, extending it through 2010, and have concluded that the *opposite* of Lott and Mustard's original conclusion is true: more guns equal *more* crime.

"The totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher rates" of aggravated assault, robbery, rape and murder, Donohue said in an interview with the Stanford Report. The

ST. LOUIS POST-DISPATCH
Mizzou wins with offensive explosion     X

THE BALTIMORE SUN
Agents question North Carolina man discovered with missing...

FAST COMPANY
How To Make New Friends As An Adult

**Our Online Games**
Play right from this page

**Spider Solitaire**
**Genre(s):** Card
Spider Solitaire is known as the king of all solitaire games!

**52 card pickup**
**Genre(s):** Card
Pick up cards as fast as you can!

**Tri-Peaks Solitaire**
**Genre(s):** Card
Reveal cards as you clear your way to the top!

**Carniball**
**Genre(s):** Arcade
This amusement park classic will bring back some joyous memories

X

evidence suggests that right-to-carry laws are associated with an 8 percent increase in the incidence of aggravated assault, according to Donohue. He says this number is likely a floor, and that some statistical methods show an increase of 33 percent in aggravated assaults involving a firearm after the passage of right-to-carry laws.

These findings build on and strengthen the conclusions of Donohue's earlier research, which only used data through 2006. In addition to having nearly two decades' worth of additional data to work with, Donohue's findings also improve upon Lott and Mustard's research by using a variety of different statistical models, as well as controlling for a number of confounding factors, like the crack epidemic of the early 1990s.

These new findings are strong. But there's rarely such a thing as a slam-dunk in social science research. Donohue notes that "different statistical models can yield different estimated effects, and our ability to ascertain the best model is imperfect." Teasing out cause from effect in social science research is often a fraught proposition.

But for this very reason it's important for policymakers on both sides of the gun control debate to exercise caution in interpreting the findings of any one study. Gun rights advocates have undoubtedly placed too much stock in Lott and Mustard's original study, which is now going on 20 years old. The best policy is often

informed by good research. And as researchers revisit their data and assumptions, it makes sense for policymakers to do the same.

X

Christopher Ingraham writes about politics, drug policy and all things data. He previously worked at the Brookings Institution and the Pew Research Center.

# 9

Stanford Report, November 14, 2014

# Right-to-carry gun laws linked to increase in violent crime, Stanford research shows

*Stanford research reaffirms that right-to-carry gun laws are connected with an increase in violent crime. This debunks – with the latest empirical evidence – earlier claims that more guns actually lead to less crime.*

By Clifton B. Parker

New Stanford research confirms that right-to-carry gun laws are linked to an increase in violent crime.

Right-to-carry or concealed-carry laws have generated much debate in the past two decades – do they make society safer or more dangerous?

While there is no federal law on concealed-carry permits, all 50 states have passed laws allowing citizens to carry certain concealed firearms in public, either without a permit or after obtaining a permit from local government or law enforcement.



Vartanov Anatoly/Shutterstock

Research co-authored by law Professor John Donohoe finds that right-to-carry gun laws are linked to an increase in violent crime.

Recently published scholarship updates the empirical evidence on this issue. Stanford law Professor John J. Donohue III, Stanford law student Abhay Aneja and doctoral student Alexandria Zhang from Johns Hopkins University were the co-authors of the study.

"Trying to estimate the impact of right-to-carry laws has been a vexing task over the last two decades," said Donohue, the C. Wendell and Edith M. Carlsmith Professor of Law, in an interview.

He explained that prior research based on data through 1992 indicated that the laws decreased violent crime. But in 2004, he noted, the National Research Council issued a report that found that even extending this data through 2000 revealed no credible statistical evidence these particular laws reduced crime.

### 'Totality of the evidence'

Now, Donohue and his colleagues have shown that extending the data yet another decade (1999-2010) provides the most convincing evidence to date that right-to-carry laws are associated with an increase in violent crime.

**JA 168**

"The totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher rates" of aggravated assault, rape, robbery and murder, said Donohue.

The strongest evidence was for aggravated assault, with data suggesting that right-to-carry (RTC) laws increase this crime by an estimated 8 percent – and this may actually be understated, according to the researchers.

"Our analysis of the year-by-year impact of RTC laws also suggests that RTC laws increase aggravated assaults," they wrote.

The evidence is less strong on rape and robbery, Donohue noted. The data from 1979 to 2010 provide evidence that the laws are associated with an increase in rape and robbery.

The murder rate increased in the states with existing right-to-carry laws for the period 1999-2010 when the "confounding influence" of the crack cocaine epidemic is controlled for. The study found that homicides increased in eight states that adopted right-to-carry laws during 1999-2010.

### Research obstacles, next step

"Different statistical models can yield different estimated effects, and our ability to ascertain the best model is imperfect," Donohue said, describing this as the most surprising aspect of the study.

He said that many scholars struggle with the issue of methodology in researching the effects of right-to-carry laws. But overall, his study benefits from the recent data.

Donohue suggested it is worth exploring other methodological approaches as well. "Sensitive results and anomalies – such as the occasional estimates that right-to-carry laws lead to higher rates of property crime – have plagued this inquiry for over a decade," he said.

### Media Contact

John J. Donohue III, Stanford Law School: (650) 721-6339, donohue@law.stanford.edu

Clifton B. Parker, Stanford News Service: (650) 725-0224, cbparker@stanford.edu

---

© Stanford University. All Rights Reserved. Stanford, CA 94305. (650) 723-2300.

**JA 169**

# 10

# SPECIAL ARTICLE

## EFFECTS OF RESTRICTIVE LICENSING OF HANDGUNS ON HOMICIDE AND SUICIDE IN THE DISTRICT OF COLUMBIA

Colin Loftin, Ph.D., David McDowall, Ph.D., Brian Wiersema, and Talbert J. Cottey, M.S.

**Abstract** *Background.* Whether restricting access to handguns will reduce firearm-related homicides and suicides is currently a matter of intense debate. In 1976 the District of Columbia adopted a law that banned the purchase, sale, transfer, or possession of handguns by civilians. We evaluated the effect of implementing this law on the frequency of homicides and suicides.

*Methods.* Homicides and suicides committed from 1968 through 1987 were classified according to place of occurrence (within the District of Columbia or in adjacent metropolitan areas where the law did not apply), cause (homicide or suicide), mechanism of death (firearms or other means), and time of occurrence (before or after the implementation of the law). The number of suicides and homicides was calculated for each month during the study period, and differences between the mean monthly totals before and after the law went into effect were estimated.

*Results.* In Washington, D.C., the adoption of the gun-licensing law coincided with an abrupt decline in homicides by firearms (a reduction of 3.3 per month, or 25 percent) and suicides by firearms (reduction, 0.6 per month, or 23 percent). No similar reductions were observed in the number of homicides or suicides committed by other means, nor were there similar reductions in the adjacent metropolitan areas in Maryland and Virginia. There were also no increases in homicides or suicides by other methods, as would be expected if equally lethal means were substituted for handguns.

*Conclusions.* Restrictive licensing of handguns was associated with a prompt decline in homicides and suicides by firearms in the District of Columbia. No such decline was observed for homicides or suicides in which guns were not used, and no decline was seen in adjacent metropolitan areas where restrictive licensing did not apply. Our data suggest that restrictions on access to guns in the District of Columbia prevented an average of 47 deaths each year after the law was implemented. (N Engl J Med 1991;325:1615-20.)

BY any measure, firearms — especially handguns — are a leading instrument of violent injury. In 1987, firearms accounted for 32,919 fatalities in the United States: 18,144 suicides, 12,665 homicides, and 2110 unintentional fatalities, legal interventions (killings by law-enforcement officials), or deaths of undetermined type.[1] Sixty percent of all homicides and suicides during this year were committed with guns,[1] and handguns accounted for three fourths of the homicides by firearms.[2]

A central question in research on the prevention of gun-related mortality is whether restricting access to handguns would reduce deaths by firearms.[3] One approach to the issue is to examine patterns of mortality associated with changes in local, state, or national regulations. In 1976 the District of Columbia adopted one of the most restrictive handgun policies in the nation. The law prohibited the purchase, sale, transfer, and possession of handguns by civilians in Washington, D.C., unless a citizen already owned the handgun and had registered it under an existing system.[4] We conducted an interrupted time-series study to determine whether the implementation of the law reduced gun-related homicides and suicides.

### METHODS

#### The Law

The District of Columbia's Firearms Control Regulations Act was signed by the mayor on July 23, 1976, and went into effect on September 24, 1976. A restraining order issued on December 9, 1976, interrupted its enforcement for 49 days, but the Appeals Court

of the District of Columbia reinstated the law, and its provisions became fully effective again on February 21, 1977.[5]

The law restricts the possession of firearms to persons who hold registration certificates. Persons who owned firearms at the time the law was implemented and who had registered them under the provisions of the 1968 code were given 60 days to reregister them. After the initial reregistration period, handguns became "unregisterable" and therefore illegal. Newly acquired rifles and shotguns can be registered if they are obtained in person from a licensed dealer in the district and if the owner meets specified requirements relating to age, criminal record, physical fitness, and knowledge of firearms laws and safe use. Finally, the law requires that registrants keep firearms unloaded and disassembled or locked up except while they are being used for lawful recreational purposes or when they are kept at a place of business. The penalty originally specified for violation of the law was 10 days in jail and a $300 fine. It was increased to one year in jail and a $1,000 fine in March 1981.

#### Study Design

We undertook a longitudinal study, comparing the mean monthly numbers of gun-related homicides and suicides in the District of Columbia before the law was implemented with the numbers after its implementation. Comparisons with other areas and other types of deaths were used to determine whether the observed differences were specific to the District of Columbia. For comparison we used suicides and homicides committed in the district without firearms, homicides and suicides committed with firearms in adjacent metropolitan areas in Maryland and Virginia, and homicides and suicides committed without firearms in the adjacent metropolitan areas.

#### Definition and Classification of Cases

Monthly totals of homicides and suicides in the District of Columbia and suburban Maryland and Virginia during the period 1968 through 1987 (the last year for which data were available) were obtained from tapes produced by the National Center for Health Statistics (NCHS).[1] The cases were classified according to place of occurrence (within the District of Columbia or in an adjacent metropolitan area), cause of death (homicide or suicide), mode

From the Violence Research Group, Institute of Criminal Justice and Criminology, University of Maryland at College Park, 2220 Lefrak Hall, College Park, MD 20742-8235, where reprint requests should be addressed to Dr. Loftin.

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 11, 2016. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

JA 171

Table 1. Mean Numbers of Homicides and Suicides per Month, According to Jurisdiction and Method, before and after the Implementation of the District of Columbia Law.

| TYPE OF FATALITY AND LOCATION | BEFORE THE LAW | CHANGE AFTER THE LAW* | | | t-STATISTIC |
|---|---|---|---|---|---|
| | no./mo | no./mo | SE | % | |
| **Homicide** | | | | | |
| District of Columbia | | | | | |
| Gun-related | 13.0 | −3.3 | 0.49 | −25 | −6.73 |
| Non-gun-related | 7.3 | −0.3 | 0.36 | −4 | −0.83 |
| Maryland and Virginia | | | | | |
| Gun-related | 5.8 | −0.4 | 0.35 | −7 | −1.14 |
| Non-gun-related | 3.0 | 0.7 | 0.26 | 23 | 2.69 |
| **Suicide** | | | | | |
| District of Columbia | | | | | |
| Gun-related | 2.6 | −0.6 | 0.20 | −23 | −3.00 |
| Non-gun-related | 4.4 | −0.4 | 0.29 | −9 | −1.38 |
| Maryland and Virginia | | | | | |
| Gun-related | 9.2 | 1.1 | 0.45 | 12 | 2.44 |
| Non-gun-related | 9.9 | −0.2 | 0.49 | −2 | −0.41 |

*Difference between the mean number of fatalities per month before the implementation of the gun-licensing law and the mean number after its implementation.

of death (firearms or other means), and month of occurrence. The adjacent metropolitan areas were the parts of the Washington, D.C.–Maryland–Virginia Standard Metropolitan Statistical Area (SMSA) as constituted in 1967,[6] exclusive of the District of Columbia. Specifically, this area included the cities of Alexandria, Fairfax, and Falls Church, Virginia; Arlington, Fairfax, Loudoun, and Prince William counties in Virginia; and Montgomery and Prince George's counties in Maryland.

The cause and mechanism of death in each case were classified according to the codes in the *International Classification of Diseases, 8th Revision* (ICD-8) and *International Classification of Diseases, 9th Revision, Clinical Modification* (ICD-9-CM).[7,8] Four groups were defined: homicide by firearms (codes E965 in ICD-8 and E965.0 through

E965.4 in ICD-9-CM); homicide by other means (E960 through E964 and E966 through E969 in ICD-8, and E960 through E964 and E965.5 through E969 in ICD-9-CM); suicide by firearms (E955 in ICD-8 and E955.0 through E955.4 in ICD-9-CM); and suicide by other means (E950 through E954 and E956 through E959 in ICD-8, and E950 through E954 and E955.5 through E959 in ICD-9-CM). Unintentional deaths (E922) and deaths caused by firearms in which the intent was unknown (E980 through E989) were excluded because the monthly frequencies were too low for meaningful analysis. A further refinement that would have classified deaths as caused by specific types of firearms, such as handguns, was not possible because the ICD-8 codes did not distinguish handguns from other firearms. In all, eight separate 240-month time series (105 months before the implementation of the law and 135 months thereafter) were analyzed. The first month after the law went into effect was October 1976.

As a check against possible effects of changes in the population, we conducted a similar analysis using annual mortality rates. For the District of Columbia, which is treated as a state for reporting purposes, annual population estimates from 1968 through 1987 for five age groups (<5, 5 through 19, 20 through 44, 45 through 64, and ≥65 years) were taken from NCHS vital-statistics records.[9] For the adjacent metropolitan areas, population estimates according to age were not available, but total population estimates for 1968 through 1987 were obtained from the Census Bureau's *Current Population Reports* (the values for 1969, 1978, and 1979 were interpolated, because county-level estimates were not generated by the Census Bureau for those years).[10,11] For the District of Columbia, age-standardized rates were calculated by the direct method, with the population of the district enumerated in the 1970 census as the standard.[12] Crude rates were calculated for the surrounding metropolitan areas. The first year after the law was implemented that is included in the annual analysis is 1977.

## Statistical Analysis

Statistical inferences were based on two approaches. First, the observations were assumed to be independently sampled from the populations in the District of Columbia before and after the im-



Figure 1. Number of Homicides by Firearms per Month in Washington, D.C.
The horizontal lines show the means before and after the implementation of the gun-licensing law, indicated by the vertical line.

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 27, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

JA 172



Figure 2. Number of Suicides by Firearms per Month in Washington, D.C.
The horizontal lines show the means before and after the implementation of the gun-licensing law, indicated by the vertical line.

plementation of the law. According to this model, the difference between the mean monthly rates of fatalities is an estimate of the magnitude of the intervention (i.e., the effect of the law), and the statistical significance of the differences can be assessed with the usual t-test.[13] Second, because observations in time series are often not independent (that is, they are serially correlated), we also applied Box and Tiao's methods[14] for intervention analysis. Box–Tiao methods are based on the autoregressive, integrated, moving-average time-series models proposed by Box and Jenkins.[15] Following a strategy recommended by Box and Jenkins, we used the data to identify and estimate appropriate models for within-series correlation. Components representing the effect of the intervention (the law) were then added. For each series, we considered models in which change was abrupt and permanent, gradual and permanent, or abrupt and temporary.[16] All these analyses were conducted with use of algorithms in the SCA Statistical System software.[17]

For the analysis of the data on monthly frequency, serial correlation was minimal; therefore, the simple t-test statistics are presented. For some of the annual mortality rates, there was evidence of a relatively strong serial correlation among the observations. For these series, statistical inferences are based on the more complex Box–Tiao models. Details about the Box–Tiao estimates are available elsewhere.* All P values are two-tailed.

## RESULTS

In the District of Columbia, the mean frequency of both suicides and homicides by firearms declined by about one quarter in the period after the law went into effect (Table 1). Gun-related homicides, with a mean

---

*See NAPS document no. 04909 for four pages of supplementary material. Order from NAPS c/o Microfiche Publications, P.O. Box 3513, Grand Central Station, New York, NY 10163-3513. Remit in advance (in U.S. funds only) $7.75 for photocopies or $5 for microfiche. Outside the U.S. and Canada add postage of $4.50 ($1.75 for microfiche postage). There is a $15 invoicing charge on all orders filled before payment.

of 13.0 per month before the law was implemented, declined to a mean of 9.7 per month thereafter (Fig. 1). Similarly, suicides in which guns were used declined from a mean of 2.6 per month to 2.0 per month (Fig. 2). When we used both a sampling model that assumed independent observations (Table 1) and one that assumed serial dependence of observations,* these differences between the means before and after the law went into effect were statistically significant (P<0.001 for homicides and P = 0.005 for suicides). Accordingly, the data are consistent with a model in which there was a decrease in the number of deaths by firearms after the law was implemented.

In contrast, none of the comparison time series showed declines of similar magnitude during the same period. Non-gun-related homicides (Fig. 3) and non-gun-related suicides (Fig. 4) in the District of Columbia declined only slightly (by 0.3 per month, or 4 percent, for homicides, and by 0.4 per month, or 9 percent, for suicides). Neither of these differences was statistically significant.

The adjacent areas in Maryland and Virginia, which were not subject to the change in gun regulations, did not have declines in gun-related homicides and suicides similar to those observed in the District of Columbia. The mean for gun-related homicides in these adjacent areas after the District of Columbia law was implemented was lower by 0.4 homicide per month (a decline of 7 percent), but the rate of suicides in which guns were used was higher by 1.1 per month (an increase of 12 percent). Neither difference represents a statistically significant decline.

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 22, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

JA 173



Figure 3. Number of Homicides by Means Other than Firearms per Month in Washington, D.C.
The horizontal lines show the means before and after the implementation of the gun-licensing law, indicated by the vertical line.

The series of cases in Maryland and Virginia provide additional evidence that the decline in fatalities was specific to suicides and homicides by firearms in the District of Columbia. Homicides committed with other weapons in Maryland and Virginia increased by 23 percent, or 0.7 homicide per month, whereas the frequency of suicides by other methods changed very little: there was a decrease of 0.2 suicide per month, or 2 percent.

The analysis of annual mortality rates gave results similar in general pattern to those of the analysis of the monthly data. The Box–Tiao estimates are available elsewhere.* In the District of Columbia the rates of both homicides and suicides by firearms declined in the period after the law went into effect ($P<0.001$ and $P = 0.085$, respectively); at the same time, the rate of homicides committed by other means increased ($P = 0.082$) and that of suicides by other means did not change ($P = 0.653$). In the surrounding metropolitan area there were no significant changes in the annual mortality rates.

In summary, there was an abrupt decline in both suicides and homicides by firearms that coincided with the implementation of the restrictive licensing law. The reductions were specific to fatalities involv-

ing guns in the District of Columbia. No similar reduction was observed in homicides or suicides committed without guns, nor were there reductions in the adjacent areas of Maryland and Virginia, where the provisions of the law were not in effect.

## DISCUSSION

The strongest argument for attributing the reductions in homicides and suicides by firearms in the District of Columbia to the restrictive licensing law is the relative implausibility of alternative explanations. Earlier studies of the District of Columbia law, which were published a few years after the law was implemented,[18,19] were limited by a paucity of data and by the investigators' failure to compare deaths by firearms and deaths by other means. These studies demonstrated declines in violent crime but did not successfully show that the declines were limited to the District of Columbia or to violence involving guns. Accordingly, critics noted that the declines were probably due to confounding demographic trends or to unrelated criminal-justice policies.[20,21]

In the light of our study, alternative explanations appear implausible. The pattern of change in mortality rates that would be predicted from the effects of the gun law is specific and is unlikely to be simulated by coincidental changes in demographic, economic, cultural, or social factors. For example, economic factors might alter the homicide rate or the suicide rate, but it is unlikely that they would affect only deaths involving guns and that the changes would be limited to the

*See NAPS document no. 04909 for four pages of supplementary material. Order from NAPS c/o Microfiche Publications, P.O. Box 3513, Grand Central Station, New York, NY 10163-3513. Remit in advance (in U.S. funds only) $7.75 for photocopies or $5 for microfiche. Outside the U.S. and Canada add postage of $4.50 ($1.75 for microfiche postage). There is a $15 invoicing charge on all orders filled before payment.

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 27, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

**JA 174**



Figure 4. Number of Suicides by Means Other than Firearms per Month in Washington, D.C.
The horizontal lines show the means before and after the implementation of the gun-licensing law, indicated by the vertical line.

District of Columbia. Similarly, improvements in the medical treatment of gunshot wounds since the Vietnam War or marked changes in the activities of the drug underworld might have reduced gun-related fatalities, but the expected pattern of changes would not be those that we observed. Improved medical treatment would be available in both the city and the suburbs, and changes in the drug underworld would not influence both homicides and suicides. Furthermore, the analysis of mortality rates indicates that the declines in homicides and suicides by firearms were not due to changes in characteristics of the resident population. The population estimates are, of course, subject to error, and complex changes in high-risk groups are also possible. Nevertheless, the population at risk was the same for both gun-related and non-gun-related mortality. Therefore, the differences between the rate of mortality by firearms and that of mortality due to other causes cannot be attributed to a failure to study the appropriate population.

The best explanation for the District of Columbia data is the weapon-choice theory developed by Zimring,[22] Cook,[23] and others.[24,25] According to this view, assaults, whether against others or self-directed, vary with respect to intent to kill. Some are characterized by a sustained, single-minded determination, whereas in others the intention is more episodic and ambivalently motivated. If the resolve is weak or short-lived, the relative frequency with which a particular type of weapon is used will be influenced by its availability.[23] The key element in the theory is that

firearms are more likely to cause death than are other weapons that are likely to be substituted. It follows that even if there is no change in the number of assaults or suicide attempts, a reduction in the availability of guns will result in a reduction in the number of deaths. The theory recognizes that people with more deadly intent may tend to select guns rather than other means, but it assumes that the association is less than perfect. Some people select guns because they are determined to kill, but others do so only because a gun is readily available.

The observations in the District of Columbia fit the predictions of the Zimring–Cook theory well. Especially interesting is the fact that in the District of Columbia there were no compensating increases in homicides or suicides by methods other than guns, as has been suggested in other studies.[26,27] The effects of the law were apparently truly preventive, in the sense that there was an overall reduction in the number of deaths. There may have been an increase in nonlethal injuries from weapons other than guns, but surveillance data on nonfatal injuries are not available.

The most surprising feature of the District of Columbia experience is the magnitude and suddenness of the effect. Observers expected the gun-licensing law to have limited or gradual effects because it "grandfathered" previously registered handguns and did not directly remove existing guns from their owners. In addition, observers argued that social conditions, including high levels of criminal violence and fear of victimization, were not affected and that there would

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 27, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

JA 175

thus continue to be a high level of demand for illegal guns that could easily be supplied from neighboring jurisdictions.[23,28] In spite of these limitations, the law reduced gun-related suicides and homicides substantially and abruptly. Because people voluntarily disposed of guns or altered their patterns of storage and use, or because it was more difficult to obtain a new gun, the District of Columbia had about 47 fewer gun deaths each year after the restrictive licensing law was implemented.

The facts that the frequency of gun-related homicides remained high in the District of Columbia after the gun law went into effect and that there have been dramatic increases in homicides very recently are not incompatible with the argument that the restrictive licensing law had a preventive effect on homicides. The number of homicides is determined by many factors other than legal restrictions on access to guns. Since the economic and social conditions in the district are similar to those associated with high rates of homicide in other cities, it is not surprising that the frequency of homicide remained high in the District of Columbia or that in the district, as in many other cities in the late 1980s, there were dramatic increases in homicides attributable to the spread of "crack" cocaine.[23,29,30] It is reasonable to assume that the restrictions on access to guns in the district continued to exert a preventive effect even as homicide rates were driven up by conflict over drugs and other factors.

The data from the District of Columbia provide strong evidence that restrictive licensing of handguns reduced gun-related homicides and suicides, but they have limited usefulness in generalizing to other jurisdictions or to other policies designed to limit access to handguns. Comparative studies of other gun-licensing laws would provide information on which to base wider generalizations and increase our understanding of the factors that influence the preventive effect of licensing laws.

## REFERENCES

1. Department of Health and Human Services, National Center for Health Statistics. Mortality detail files, 1968 to 1987. Ann Arbor, Mich.: Inter-university Consortium for Political and Social Research [distributor], 1990 (computer files).
2. Federal Bureau of Investigation. Crime in the United States, 1987. Washington, D.C.: Federal Bureau of Investigation, 1988.
3. Mercy JA, Houk VN. Firearm injuries: a call for science. N Engl J Med 1988;319:1283-5.
4. District of Columbia Firearms Control Regulations Act (D.C. Law 1-85), D.C. Code Ann. §6-2301, et seq. (1990). Charlottesville, Va.: Michie, 1990.
5. Wentworth E. Strict gun control law revived by Court of Appeals. Washington Post. February 5, 1977:B1.
6. Bureau of the Budget. Standard metropolitan statistical areas. Washington, D.C.: Government Printing Office, 1967.
7. National Center for Health Statistics. International classification of diseases, adapted for use in the United States. 8th rev. Washington, D.C.: Government Printing Office, 1967. (PHS publication no. 1693.)
8. Department of Health and Human Services. ICD-9-CM: international classification of diseases, clinical modification. 3rd ed., 9th rev. Vol. 1. Washington, D.C.: Government Printing Office, 1989. (DHHS publication no. (PHS) 89-1260.)
9. National Center for Health Statistics. Vital statistics of the United States. Vol. 2. Mortality, part A. 1968 to 1987. Washington, D.C.: Government Printing Office, 1972–1990.
10. Bureau of the Census. Current population reports 1968 to 1974. Series P-25. Nos. 432, 517, 537, 629, 688, 694. Washington, D.C.: Government Printing Office, 1969–1977.
11. Idem. Current population reports 1974 to 1987. Series P-26. Nos. 75-46, 76-20, 76-46, 77-20, 77-46, 78-20, 78-46, 85-MD-C, 85-VA-C, 88-B. Washington, D.C.: Government Printing Office, 1976–1990.
12. Idem. Census of the population, 1970, characteristics of the population, District of Columbia. Vol. 1. Part 10. Washington, D.C.: Government Printing Office, 1973.
13. Cochran WG. Planning and analysis of observational studies. New York: John Wiley, 1983.
14. Box GEP, Tiao GC. Intervention analysis with applications to economic and environmental problems. J Am Stat Assoc 1975;70:70-9.
15. Box GEP, Jenkins GM. Time-series analysis: forecasting and control. Rev. ed. San Francisco: Holden-Day, 1976.
16. McDowall D, McCleary R, Meidinger EE, Hay RA. Interrupted time series analysis. Beverly Hills, Calif.: Sage, 1980.
17. Liu LM, Hudak GB, Box GEP, Muller ME, Tiao GC. The SCA statistical system: reference manual for forecasting and time series analysis. Version III for MSDOS. DeKalb, Ill.: Scientific Computing Associates, 1986 (computer software program).
18. Nicholson R, Garner A. The analysis of the Firearms Control Act of 1975: handgun control in the District of Columbia. Washington, D.C.: United States Conference of Mayors, 1980.
19. Jones ED III. The District of Columbia's "Firearms Control Regulations Act of 1975": the toughest handgun control law in the United States — or is it? Ann Am Acad Polit Soc Sci 1981;455:138-49.
20. Wright JD, Rossi PH, Daly K. Under the gun: weapons, crime, and violence in America. New York: Aldine, 1983.
21. Valentine PW. Study cites decline over last 3 years in handgun crime. Washington Post. June 29, 1980:B1.
22. Zimring F. Is gun control likely to reduce violent killings? U Chicago Law Rev 1968;35:721-37.
23. Cook PJ. The technology of personal violence. In: Tonry M, ed. Crime and justice: an annual review of research. Vol. 14. Chicago: University of Chicago Press, 1991:1-71.
24. Baker SP. Without guns, do people kill people? Am J Public Health 1985;75:587-8.
25. Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crime, assaults, and homicide: a tale of two cities. N Engl J Med 1988;319:1256-62.
26. Rich CL, Young JG, Fowler RC, Wagner J, Black NA. Gun suicide: possible effects of some specific legislation. Am J Psychiatry 1990;147:342-6.
27. Sloan JH, Rivara FP, Reay DT, Ferris JAJ, Kellermann AL. Firearm regulations and rates of suicide: a comparison of two metropolitan areas. N Engl J Med 1990;322:369-73.
28. Zimring FE. Handguns in the twenty-first century: alternative policy futures. Ann Am Acad Polit Soc Sci 1981;455:1-10.
29. Office of Criminal Justice Plans and Analysis, Statistical Analysis Center. Homicide in the District of Columbia. Washington, D.C.: Office of Criminal Justice Plans and Analysis, 1988.
30. Morin R. Demographic line between slain, slayer indistinguishable. Washington Post. January 1, 1989:A1.

The New England Journal of Medicine
Downloaded from nejm.org at GEORGE MASON UNIVERSITY on February 27, 2012. For personal use only. No other uses without permission.
Copyright © 1991 Massachusetts Medical Society. All rights reserved.

**JA 176**

# 11

Fiscal Impact Statement

# Government of the District of Columbia
## Office of the Chief Financial Officer



Jeff DeWitt
Chief Financial Officer

## MEMORANDUM

| | |
|---|---|
| **TO:** | **The Honorable Phil Mendelson**<br>**Chairman, Council of the District of Columbia** |
| **FROM:** | **Jeff DeWitt**<br>**Chief Financial Officer** |
| **DATE:** | **November 25, 2014** |
| **SUBJECT:** | **Fiscal Impact Statement – License to Carry a Pistol Amendment Act of 2014** |
| **REFERENCE:** | **Bill 20-930, Draft Committee Print as shared with the Office of Revenue Analysis on November 24, 2014** |

## Conclusion

Funds are sufficient in the FY 2015 through FY 2018 budget and financial plan to implement the bill.

## Background

In July 2014, a United States District Court judge ruled that the District's ban on carrying of ready-to-use handguns out in public was unconstitutional.[1] Immediately following the ruling, the Metropolitan Police Department (MPD) issued guidance to its officers making it clear that possession of a properly registered handgun in public may not be a criminal offense in and of itself.[2] That guidance was recinded upon the District's successful request for a stay[3] of the ruling so the District could rewrite the law to conform to the judge's initial decision.

---

[1] Tom G. Palmer, George Lyon, Edward Raymond, Amy McVey, and Second Amendment Foundation v. District of Columbia and Cathy Lanier, --- F.Supp.2d ----, 2014 WL 3702854, D.D.C., July 24, 2014 (NO. 1:09-CV-1482 (FJS)).
[2] This did not prohibit officers from making arrests or seizing weapons associated with a criminal act, requiring proof of registration, or enforcing federal laws against a person who is ineligible to possess a gun at any time.
[3] Palmer v. District of Columbia, --- F.Supp.2d ----, 2014 WL 3702854, D.D.C., July 29, 2014 (NO. 1:09-CV-1482 (FJS)).

The Honorable Phil Mendelson
FIS: Bill 20-930, "License to Carry a Pistol Amendment Act of 2014," Draft Committee Print as shared with
the Office of Revenue Analysis on November 24, 2014

On September 23, 2014, the Council of the District of Columbia passed emergency legislation[4] that
adopted a concealed carry policy[5] for handguns, which requires that the weapon be hidden from
public view. The bill expands and makes permanent the emergency legislation.

The bill allows for licensing of individuals for carrying handguns so long as the applicant is 21 years
of age or older, meets the requirements for registration of a firearm, does not suffer from any
mental illness, and demonstrates the appropriate need to carry a handgun. MPD will issue rules[6] on
what constitutes appropriate need for a person to request a concealed carry permit, but the bill sets
forth a general standard that fear of injury or professional activities that require carrying cash or
valuables would be considered as appropriate reasons.

Before receiving a license, applicants must complete the required training.[7] The Chief of Police
("Chief") has the discretion to consider training requirements met if the applicant can show
sufficient firearms training through the United States military or through the process of obtaining a
concealed carry permit in another jurisdiction. If approved, the license is valid for two years; but if
the application or renewal is denied, the applicant or licensee can appeal the decision to the
Concealed Pistol Licensing Review Board.

The bill requires the following:

- Always carrying the carry-license and handgun registration when carrying the gun;
- Disclosing the presence of a concealed weapon during an investigative stop by MPD;
- Never carrying while impaired;[8] and
- Not carrying in restricted areas as designated by the bill or the Chief.[9] Some locations and
  buildings in the District prohibit concealed carry;[10] others prohibit it unless the owner
  expressly allows it;[11] while others are assumed to allow carry unless the owner expressly
  prohibits it.[12]

Carry-licenses can be revoked or a licensee penalized[13] if he or she does not comply with the bill's
requirements. Any individual, including the United States Attorney or District's Attorney General,
can request a license revocation if there is reason to believe the person would no longer be eligible

---

[4] License to Carry a Pistol Emergency Amendment Act of 2014, effective September 23, 2014 (D.C. Act 20-447;
61 DCR 10765).
[5] As opposed to open carry which allows for the carrying of a handgun in plain sight.
[6] MPD issued emergency and proposed rules on October 31, 2014 (D.C. Register, Volume 61, Notice ID
5160805), but they may need to be amended.
[7] This includes 16 hours of classroom training and 2 hours of range training that includes at least 50 rounds
at a maximum distance of 15 yards.
[8] Having consumed alcohol or drugs in a manner that alters behavior.
[9] A licensee cannot be penalized by entering a restricted area as determined by the Chief unless the licensee
has been notified of the restricted area, instructed to vacate the area, and has refused. In the case of a
restricted area around a dignitary or high-ranking official, the United States Secret Service can also designate
a perimeter.
[10] Including District government buildings, childcare and educational institutions, hospitals, penal
institutions, establishments where alcohol is sold and consumed on premises, public transportation
(including the Metrorail system), near the White House, and at the Naval Observatory.
[11] This includes private residences and places of religious worship.
[12] This includes private properties that are not residences.
[13] The penalty is a fine of up to $1,000 or imprisonment for up to 180 days.

The Honorable Phil Mendelson
FIS: Bill 20-930, "License to Carry a Pistol Amendment Act of 2014," Draft Committee Print as shared with
the Office of Revenue Analysis on November 24, 2014

for a license. The Chief may also immediately suspend or restrict a license if he or she believes there
is imminent danger to a person or the public.

The seven-member Concealed Pistol Licensing Review Board ("Board") will hear any appeals
hearing requests for the denial of an initial or renewal application. Members include the United
States Attorney, the Attorney General, a Department of Behavioral Health professional, a formal law
enforcement officer,[14] and three public members. The burden of producing evidence and
persuading the Board is upon the applicant or licensee. License holders may request a hearing
within fifteen days of a denial of an application or renewal, or within seventy-two hours of the
suspension or restriction of a license by the Chief.

Lastly, the bill prohibits any information about an individual who applies for, receives, or has a gun
registration or carry license revoked from being disclosed through a Freedom of Information Act
Request.[15]

## Financial Plan Impact

Funds are sufficient in the FY 2015 through FY 2018 budget and financial plan to implement the
bill.

All licensing provisions associated with a concealed carry permit have been implemented with the
Metropolitan Police Department's existing resources and no new resources are required over the
four-year financial plan period.

The Office of the Attorney General (OAG) will be responsible for implementing the Concealed Pistol
Licensing Review Board, which will hold hearings upon request for any denied application or
renewal. OAG expects to meet the requirements of the Board with existing resources, but at this
time there is very little information to project what kind of workload this Board may receive. The
District should closely monitor the number of hearing requests since a significant number of
hearings would pressure OAG resources and require additional funds or staff.

---

[14] Other than a former MPD official.
[15] Freedom of Information Act of 1976, effective March 25, 1977 (D.C. Law 1-96; D.C. Official Code § 2-532).

JA 180

# 12

Legal Sufficiency



OFFICE OF THE GENERAL COUNSEL
Council of the District of Columbia
1350 Pennsylvania Avenue NW, Suite 4
Washington, DC 20004
(202) 724-8026

## MEMORANDUM

**TO:**      **Councilmember Tommy Wells**

**FROM:**    **V. David Zvenyach, General Counsel**       Certified by V. David Zvenyach
General Counsel
Council of the District of Columbia

**DATE:**    **November 25, 2014**

**RE:**      **Legal sufficiency determination for Bill 20-930, the
License to Carry a Pistol Amendment Act of 2014**

The measure is legally and technically sufficient for Council
consideration.

Bill 20-930 amends the Firearm Control Regulations Act of 1975, effective
September 24, 1976 (D.C. Law 1-85; D.C. Official Code § 7-2501.01 *et
seq.*), to:

(1) Permit a person to register a firearm for self-defense in their
home or place of business;[1]

(2) Provide Freedom of Information Act exceptions for records
regarding individuals who have applied for, received, or had
revoked a pistol registration or license to carry a concealed
pistol.

(3) Establish application requirements for a license to carry a
concealed pistol, including requirements for completion of a
firearms training course and range training;

(4) Provide that a license to carry a concealed pistol shall expire 2
years after the date of issuance and set forth requirements for
renewal of the license;

(5) Provide for summary revocation, suspension, and permanent
revocation of a license to carry a concealed pistol;

(6) Prohibit the carrying of a concealed pistol while impaired;

---

[1] Under current law, a person may only register a firearm for use of self-defense in
that person's home. *See* D.C. Official Code § 7-2502.02(a)(4)(C).

**JA 182**

(7) Establish prohibitions on carrying a concealed pistol in specified locations, including District buildings, hospitals, penal institutions, public transportation vehicles and metro stations, and premises licensed as a tavern or nightclub, and in specified circumstances, including circumstances in which a property owner or religious place of worship has not expressly allowed the carrying of a concealed pistol; and

(8) Establish the Concealed Pistol Licensing Review Board to hear appeals from a denial of an application or renewal application to carry a concealed pistol, summary suspension of or restriction on the license to carry a concealed pistol, or permanent revocation of a license to carry a concealed pistol; and to

(9) Set forth penalties.

Bill 20-930 also makes conforming amendments.

I am available if you have any questions.

VDZ

# 13

Comparative Print

Committee on the Judiciary and Public Safety
Bill 20-930
Comparative Print

DIVISION I. GOVERNMENT OF DISTRICT
TITLE 7. HUMAN HEALTH CARE AND SAFETY
SUBTITLE J. PUBLIC SAFETY
CHAPTER 25. FIREARMS CONTROL
UNIT A. FIREARMS CONTROL REGULATIONS
SUBCHAPTER II. FIREARMS AND DESTRUCTIVE DEVICES

§ 7-2502.01. Registration requirements

(a) Except as otherwise provided in this unit, no person or organization in the District of Columbia ("District") shall receive, possess, control, transfer, offer for sale, sell, give, or deliver any destructive device, and no person or organization in the District shall possess or control any firearm, unless the person or organization holds a valid registration certificate for the firearm. A registration certificate may be issued:

(1) To an organization if:

(A) The organization employs at least 1 commissioned special police officer or employee licensed to carry a firearm whom the organization arms during the employee's duty hours; and

(B) The registration is issued in the name of the organization and in the name of the president or chief executive officer of the organization;

(2) In the discretion of the Chief of Police, to a police officer who has retired from the Metropolitan Police Department;

(3) In the discretion of the Chief of Police, to the Fire Marshal and any member of the Fire and Arson Investigation Unit of the Fire Prevention Bureau of the Fire Department of the District of Columbia, who is designated in writing by the Fire Chief, for the purpose of enforcing the arson and fire safety laws of the District of Columbia;

(4) To a firearms instructor, or to an organization that employs a firearms instructor, for the purpose of conducting firearms training; or

(5) To a person who complies with, and meets the requirements of, this unit.

(b) Subsection (a) of this section shall not apply to:

(1) Any law enforcement officer or agent of the District or the United States, or any law enforcement officer or agent of the government of any state or subdivision thereof, or any member of the armed

forces of the United States, the National Guard or organized reserves, when such officer, agent, or member is authorized to possess such a firearm or device while on duty in the performance of official authorized functions;

(2) Any person holding a dealer's license; provided, that the firearm or destructive device is:

(A) Acquired by such person in the normal conduct of business;

(B) Kept at the place described in the dealer's license; and

(C) Not kept for such person's private use or protection, or for the protection of his business;

(3) With respect to firearms, any nonresident of the District participating in any lawful recreational firearm-related activity in the District, or on his way to or from such activity in another jurisdiction; provided, that such person, whenever in possession of a firearm, shall upon demand of any member of the Metropolitan Police Department, or other bona fide law enforcement officer, exhibit proof that he is on his way to or from such activity, and that his possession or control of such firearm is lawful in the jurisdiction in which he resides; provided further, that such weapon shall be transported in accordance with § 22-4504.02;

(4) Any person who temporarily possesses a firearm registered to another person while in ~~the home~~ **the home or place of business** of the registrant; provided, that the person is not otherwise prohibited from possessing firearms and the person reasonably believes that possession of the firearm is necessary to prevent imminent death or great bodily harm to himself or herself; or

(5) Any person who temporarily possesses a firearm while participating in a firearms training and safety class conducted by a firearms instructor.

(c) For the purposes of subsection (b)(3) of this section, the term "recreational firearm-related activity" includes a firearms training and safety class.

DIVISION I. GOVERNMENT OF DISTRICT
TITLE 7. HUMAN HEALTH CARE AND SAFETY
SUBTITLE J. PUBLIC SAFETY
CHAPTER 25. FIREARMS CONTROL
UNIT A. FIREARMS CONTROL REGULATIONS
SUBCHAPTER II. FIREARMS AND DESTRUCTIVE DEVICES
§ 7-2502.02. Registration of certain firearms prohibited

(a) A registration certificate shall not be issued for a:

(1) Sawed-off shotgun;

(2) Machine gun;

(3) Short-barreled rifle;

(4) Pistol not validly registered to the current registrant in the District prior to September 24, 1976, except that the prohibition on registering a pistol shall not apply to:

(A) Any organization that employs at least one commissioned special police officer or other employee licensed to carry a firearm and that arms the employee with a firearm during the employee's duty hours;

(B) A police officer who has retired from the Metropolitan Police Department;

(C) Any person who seeks to register a pistol for use in self-defense within that person's home; or

**(C) Any person who seeks to register a pistol:**

**(i) For use in self-defense within that person's home or place of business; or**

**(ii) As part of the application process for a license to carry a concealed pistol pursuant to section 902; or**

(D) A firearms instructor, or an organization that employs a firearms instructor, for the purpose of conducting firearms training.

(5) An unsafe firearm prohibited under § 7-2505.04;

(6) An assault weapon; or

(7) A .50 BMG rifle.
(b) Repealed.

**DIVISION I.  GOVERNMENT OF DISTRICT**
**TITLE 7.  HUMAN HEALTH CARE AND SAFETY**
**SUBTITLE J.  PUBLIC SAFETY**
**CHAPTER 25.  FIREARMS CONTROL**
**UNIT A.  FIREARMS CONTROL REGULATIONS**
**SUBCHAPTER II.  FIREARMS AND DESTRUCTIVE DEVICES**

**§ 7-2502.03. Qualifications for registration; information required for registration**

(a) No registration certificate shall be issued to any person (and in the case of a person between the ages of 18 and 21, to the person and his signatory parent or guardian) or organization unless the Chief determines that such person (or the president or chief executive in the case of an organization):

(1) Is 21 years of age or older; provided, that the Chief may issue to an applicant between the ages of 18 and 21 years old, and who is otherwise qualified, a registration certificate if the application is accompanied by a notarized statement of the applicant's parent or guardian:

(A) That the applicant has the permission of his parent or guardian to own and use the firearm to be registered; and

(B) The parent or guardian assumes civil liability for all damages resulting from the actions of such applicant in the use of the firearm to be registered; provided further, that such registration certificate shall expire on such person's 21st birthday;

(2) Has not been convicted of a weapons offense (but not an infraction or misdemeanor violation under D.C. Official Code § 7-2502.08, § 7-2507.02, § 7-2507.06, or § 7-2508.07) or a felony in this or any other jurisdiction (including a crime punishable by imprisonment for a term exceeding one year);

(3) Is not under indictment for a crime of violence or a weapons offense;

(4) Has not been convicted within 5 years prior to the application of any:

(A) Violation in any jurisdiction of any law restricting the use, possession, or sale of any narcotic or dangerous drug;

(B) A violation of D.C. Official Code § 22-404, regarding assaults and threats, or D.C. Official Code § 22-407, regarding threats to do bodily harm, or a violation of any similar provision of the law of another jurisdiction;

(C) Two or more violations of D.C. Official Code § 50-2201.05(b), or, in this or any other jurisdiction, any law restricting driving under the influence of alcohol or drugs;

(D) Intrafamily offense punishable as a misdemeanor, including any similar provision in the law of another jurisdiction; or

(E) Misdemeanor violation pursuant to § 7-2507.02 or § 7-2507.06; **or**

**(F) Violation of section 503 of the Omnibus Public Safety and Justice Amendment Act of 2009, effective December 10, 2009 (D.C. Law 18-88; D.C. Official Code § 22-3133);**

(5) Within the 5-year period immediately preceding the application, has not been acquitted of any criminal charge by reason of insanity or has not been adjudicated a chronic alcoholic by any court; provided, that this paragraph shall not apply if such person shall present to the Chief, with the

application, a medical certification indicating that the applicant has recovered from such insanity or alcoholic condition and is capable of safe and responsible possession of a firearm;

(6) Within the 5 years immediately preceding the application, has not been voluntarily or involuntarily committed to any mental hospital or institution; provided, that this paragraph shall not apply, if such person shall present to the Chief, with the application, a medical certification that the applicant has recovered from whatever malady prompted such commitment;

(6A) Within the 5 years immediately preceding the application, has not had a history of violent behavior.

(7) Does not appear to suffer from a physical defect which would tend to indicate that the applicant would not be able to possess and use a firearm safely and responsibly;

(8) Has not been adjudicated negligent in a firearm mishap causing death or serious injury to another human being;

(9) Is not otherwise ineligible to possess a firearm under § 22-4503;

(10) Has not failed to demonstrate satisfactorily, in accordance with a test prescribed by the Chief, a knowledge of the laws of the District of Columbia pertaining to firearms and, in particular, the requirements of this unit, the responsibilities regarding storage, and the requirements for transport; provided, that once this determination is made with respect to a given applicant for a particular firearm, it need not be made again for the same applicant with respect to a subsequent application for a firearm or for the renewal of a registration certificate pursuant to § 7-20502.07a;

(11) Is not blind, as defined in D.C. Official Code § 7-1009(1);

(12) (A) Has not been the respondent in an intrafamily proceeding in which a civil protection order was issued against the applicant pursuant to § 16-1005; provided, that an applicant who has been the subject of such an order shall be eligible for registration if the applicant has submitted to the Chief a certified court record establishing that the order has expired or has been rescinded for a period of 5 years or more; or

(B) Has not been the respondent in a proceeding in which a foreign protection order, as that term is defined in § 16-1041, was issued against the applicant; provided, that an applicant who has been the subject of such an order shall be eligible for registration if the applicant has submitted to the Chief a certified court record establishing that the order has expired or has been rescinded for a period of 5 years;

(13) (A) Has completed a firearms training and safety class provided free of charge by the Chief; or

(B) Has submitted evidence of any of the following:

(i) That the applicant has received firearms training in the United States military;

(ii) A license from another state for which firearms training is required, where the training, as determined by the Chief, is equal to or greater than that provided under subparagraph (A) of this paragraph; or

(iii) That the applicant has otherwise completed a firearms training or safety course conducted by a firearms instructor that, as determined by the Chief, is equal to or greater than that conducted under subparagraph (A) of this paragraph; and

(14) Has not been prohibited from possessing or registering a firearm pursuant to § 7-2502.08.

(b) Every person applying for a registration certificate shall provide on a form prescribed by the Chief:

(1) The full name or any other name by which the applicant is known;

(2) The present address and each home address where the applicant has resided during the 5-year period immediately preceding the application;

(3) The present business or occupation of the applicant and the address and phone number of the employer;

(4) The date and place of birth of the applicant;

(5) The sex of the applicant;

(6) Whether (and if so, the reasons) the District, the United States or the government of any state or subdivision of any state has denied or revoked the applicant's license, registration certificate, or permit pertaining to any firearm;

(7) A description of the applicant's role in any mishap involving a firearm, including the date, place, time, circumstances, and the names of the persons injured or killed;

(8) Repealed.

(9) The caliber, make, model, manufacturer's identification number, serial number, and any other identifying marks on the firearm;

(10) The name and address of the person or organization from whom the firearm was obtained, and in the case of a dealer, his dealer's license number;

(11) Where the firearm will generally be kept;

(12) Whether the applicant has applied for other registration certificates issued and outstanding;

(13) Such other information as the Chief determines is necessary to carry out the provisions of this unit.

(c) Every organization applying for a registration certificate shall:

(1) With respect to the president or chief executive of such organization, comply with the requirements of subsection (b) of this section; and

(2) Provide such other information as the Chief determines is necessary to carry out the provisions of this unit.

(d) Repealed.

(e) The Chief shall register no more than one pistol per registrant during any 30-day period; provided, that the Chief may permit a person first becoming a District resident to register more than one pistol if those pistols were lawfully owned in another jurisdiction for a period of 6 months prior to the date of the application.

**(§ 7-2502.11.) Sec. 211a.  Freedom of information exception.**

**Any record regarding individuals who have applied, received, or had revoked any registration issued pursuant to this title shall not be made available as a public record under section 202 of the Freedom of Information Act of 1976, effective March 25, 1977 (D.C. Law 1-96; D.C. Official Code § 2-532).**

**§ 7-2507.06. Penalties**

(a) ~~Except as provided in §§ 7-2502.05, 7-2502.08, 7-2507.02, and 7-2508.07~~ Except as provided in sections 205, 208, 702, 807, and Title IX, any person convicted of a violation of any provision of this unit shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned for not more than 1 year, or both; except that:

(1) A person who knowingly or intentionally sells, transfers, or distributes a firearm, destructive device, or ammunition to a person under 18 years of age shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned for not more than 10 years, or both.

(2) (A) Except as provided in subparagraph (B) of this paragraph, any person who is convicted a

second time for possessing an unregistered firearm shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned not more than 5 years, or both.

(B) A person who in the person's dwelling place, place of business, or on other land possessed by the person, possesses a pistol, or firearm that could otherwise be registered, shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned not more than 1 year, or both.

(3) (A) A person convicted of possessing more than one restricted pistol bullet in violation of § 7-2506.01(a)(3) may be sentenced to imprisonment for a term not to exceed 10 years and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 1 year and shall not be released from prison or granted probation or suspension of sentence prior to serving the mandatory-minimum sentence, and, in addition, may be fined not more than the amount set forth in § 22-3571.01.

(B) A person convicted of possessing a single restricted pistol bullet in violation of § 7-2506.01(a)(3) shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned for not more than 1 year, or both.

(b) (1) For the following violations of this unit, the prosecution may, in the operation of its discretion, offer an administrative disposition whereby a person may immediately resolve his or her case upon payment of a fine, in an amount set by the Board of Judges of the Superior Court of the District of Columbia; provided, that the person is not concurrently charged with another criminal offense arising from the same event, other than an offense pursuant to § 7-2502.01 or § 7-2506.01:

(A) Possession of an unregistered firearm pursuant to § 7-2502.01;

(B) Unlawful possession of ammunition (but not possession of more than one restricted pistol bullet) pursuant to § 7-2506.01; and

(C) Possession of a single restricted pistol bullet pursuant to § 7-2507.06(a)(3)(B); provided, that the person did not also possess a firearm at the time of arrest.

(2) In determining whether to offer an administrative disposition pursuant to this subsection, the prosecution, in the operation of its discretion, may consider, among other factors, whether at the time of his or her arrest, the person was a resident of the District of Columbia and whether the person had knowledge of § 7-2502.01, § 7-2506.01, or § 7-2507.06(a)(3)(B).

(3) An administrative disposition pursuant to this subsection is not a conviction of a crime and shall not be equated to a criminal conviction. The fact that a person resolved a charge through an administrative disposition pursuant to this subsection may not be relied upon by any court of the District of Columbia or any agency of the District of Columbia in any subsequent criminal, civil, or administrative proceeding or administrative action to impose any sanction, penalty, enhanced sentence, or civil disability.

(4) At the time of the prosecution's offer of an administrative disposition, the person may elect to proceed with the criminal case in lieu of an administrative disposition.

(5) The Mayor, pursuant to subchapter I of Chapter 5 of Title 2 [§ 2-501 et seq.], may issue rules to implement the provisions of this subsection. The rules may provide procedures and criteria to be used in determining when the prosecution, in the operation of its discretion, may offer the option of an administrative disposition pursuant to this subsection.

### § 7-2508.05. Sharing of registration information; Freedom of Information Act exception

(a) Gun offender registration information shall not be made available except as authorized under subsection (b) of this section. No gun offender registration information shall be available as a public record under § 2-532.

(b) The Chief is authorized to make gun offender registration information available to other local, state, or federal government agencies.

### NEW TITLE IX
### TITLE IX – LICENSES TO CARRY A PISTOL.

### "Sec. 901. Definitions.

"For the purposes of this title, the term:

"(1) "Concealed pistol" means a loaded or unloaded pistol carried on or about a person entirely hidden from view of the public, or carried on or about a person in a vehicle in such a way as it is entirely hidden from view of the public.

"(2) "Law enforcement officer" means a sworn member of the Metropolitan Police Department or of any other law enforcement agency operating and authorized to make arrests in the District of Columbia, and includes any MPD reserve officer, any special police officers appointed pursuant to section 202 of An Act Making appropriations to provide for the expenses of the government of the District of Columbia for the fiscal year ending June thirtieth, nineteen hundred, and for other purposes, approved March 3, 1899 (30 Stat. 1057; D.C. Official Code § 5-129.02), and campus and university special police officers appointed pursuant to the College and University Campus Security Amendment Act of 1995, effective October 18, 1995 (D.C. Law 11-63; 6A DCMR § 1200 et seq.).

"(3) "License" means a license to carry a concealed pistol issued pursuant to section 6 of the Pistols and Other Dangerous Weapons Act.

"(4) "Licensee" means a person who has been issued a license pursuant to section 6 of the Pistols and Other Dangerous Weapons Act.

"(5) "Child" means any person under 18 years of age.

"(6) "MPD" means the Metropolitan Police Department.

"(7) "Section 6 of the Pistols and Other Dangerous Weapons Act" means section 6 of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-4506).

"**Sec. 902. Application requirements.**

"(a) A person who submits an application pursuant to section 6 of the Pistols and Other Dangerous Weapons Act shall certify and demonstrate to the satisfaction of the Chief that he or she:

"(1) Is at least 21 years of age;

"(2) Meets all of the requirements for a person registering a firearm pursuant to this act, and has obtained a registration certificate for the pistol that the person is applying to carry concealed;

"(3)(A) Does not currently suffer from any mental illness or condition that creates a substantial risk that he or she is a danger to himself or herself or others; or

(B) If he or she has suffered in the previous 5 years from any mental illness or condition that created a substantial risk that he or she was a danger to himself or herself or others, no longer suffers from any mental illness or condition that creates a substantial risk that he or she is a danger to himself or herself or others;

"(4) Has completed a firearms training course or combination of courses, conducted by an instructor (or instructors) certified by the Chief, which includes at least 16 hours of training, and covers the following:

"(A) Firearm safety;

"(B) Firearm nomenclature;

"(C) Basic principles of marksmanship;

"(D) Care, cleaning, maintenance, loading, unloading, and storage of pistols;

"(E) Situational awareness, conflict management, and use of deadly force;

"(F) Selection of pistols and ammunition for defensive purposes; and

"(G) All applicable District and federal firearms laws, including the requirements of this act, An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other

purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-4501 *et seq.*), and District law pertaining to self-defense.);

"(5) Has completed at least 2 hours of range training, conducted by an instructor certified by the Chief, including shooting a qualification course of 50 rounds of ammunition from a maximum distance of 15 yards (45 feet); and

"(6) Follows any procedures the Chief may establish by rule.

"(b) An applicant shall satisfy the requirements of subsectios (a)(4) and (a)(5) of this section with a certification from the firearms instructor that the applicant:

"(1) Demonstrated satisfactory completion of the requirement; and

"(2) Possesses the proper knowledge, skills, and attitude to carry a concealed pistol.

"(c) An applicant may be exempt from some or all of the requirements of subsections (a)(4) and (a)(5) of this section if the applicant has submitted evidence that he or she has received firearms training in the United States military or has otherwise completed firearms training conducted by a firearms instructor that, as determined by the Chief, is equal to or greater than that required under subsections (a)(4) and (a)(5) of this section.

"(d) An applicant for a license may satisfy any component of the requirements of subsections (a)(4) and (a)(5) of this section by demonstrating to the satisfaction of the Chief that the applicant has met that particular component as part of a successful application to carry a concealed pistol issued by the lawful authorities of any state or subdivision of the United States.

"(e)(1) An applicant shall sign an oath or affirmation attesting to the truth of all the information required by section 6 of the Pistols and Other Dangerous Weapons Act and this section.

"(2) Any declaration, certificate, verification, or statement made for purposes of an application for a license to carry a concealed pistol pursuant to this act shall be made under penalty of perjury pursuant to section 401 of the District of Columbia Theft and White Collar Crime Act of 1982, effective December 1, 1982 (D.C. Law 4-164; D.C. Official Code § 22-2402).

"(f) An applicant is required to appear for an in-person interview at the MPD headquarters, for purposes including verification of the applicant's identity and verification of the information submitted as part of the application process for a license.

**"Sec. 903. Expiration and renewal of licenses.**

"(a) Licenses shall expire no later than 2 years after the date of issuance unless revoked by the Chief or renewed pursuant to this title.

"(b)(1) A licensee shall be eligible for renewal of a license if:

"(A) The licensee continues to meet the requirements of section 6 of the Pistols and Other Dangerous Weapons Act and section 902, except that:

"(i) With regard to section 902(a)(4), only 4 hours of such training shall be required for renewal; and

"(ii) With regard to section 902(a)(5), the licensee shall provide proof of 2 hours of range practice within the previous 12 months; and

"(B) Follows any procedures the Chief may establish by rule.

"(2) Timely renewal shall be the responsibility of the licensee, pursuant to any procedures the Chief may establish by rule.

"(c) Any person whose renewal application has been denied may, within 15 days of notice of the denial, appeal to the Concealed Pistol Licensing Review Board established pursuant to section 908.

**"Sec. 904. Duties of licensees.**

"(a) A licensee shall comply with all limits and conditions stated in the issuance of the license.

"(b) A licensee shall notify the Chief in writing:

"(1) Immediately upon discovery of the loss, theft, or destruction of the license and include the circumstances of the loss, theft, or destruction, if known; and

"(2) Within 30 days of a change in the licensee's name or address as it appears on the license.

"(c) A licensee shall have on or about his or her person each time the pistol is carried in the District:

"(1) The license; and

"(2) The registration certificate for the pistol being carried, issued pursuant to this act.

"(d) If a law enforcement officer initiates an investigative stop of a person carrying a concealed pistol pursuant to section 6 of the Pistols and Other Dangerous Weapons Act, the person, and any other licensee who is with the person at the time of the investigative stop, shall:

"(1) Disclose to the officer that he or she is carrying a concealed pistol;

"(2) Present the license and registration certificate;

"(3) Identify the location of the concealed pistol; and

"(4) Comply with all lawful orders and directions from the officer, including allowing a pat down of his or her person and permitting the law enforcement officer to take possession of the pistol for so long as is necessary for the safety of the officer or the public.

"(e) The duties set forth in this section are in addition to any other requirements imposed by this act or applicable law.

"(f) In addition to any other penalty provided by law, any person who violates this section shall be subject to revocation of his or her license.

"Sec. 905. Revocation and suspension of licenses.

"(a)(1) The Chief may revoke a license upon a finding that the licensee no longer meets the requirements of section 6 of the Pistols and Other Dangerous Weapons Act and this title, or as a penalty as specified in this act.

"(2) The United States Attorney for the District of Columbia, the Attorney General for the District of Columbia, or any person may apply to the MPD at any time for revocation of a license.

"(3) Any person having knowledge that a licensee no longer meets the requirements of this act or the requirements of section 6 of the Pistols and Other Dangerous Weapons Act may so notify the Chief or any other law enforcement officer who may take such action as may be appropriate.

"(4) Any person whose license has been revoked may, within 15 days of notice of the revocation, appeal to the Concealed Pistol Licensing Review Board established pursuant to section 908.

"(b)(1) The Chief may summarily suspend or restrict, without a hearing, a license, when the Chief has determined that the conduct of a licensee presents an imminent danger to the health and safety of a person or the public.

"(2) At the time of the summary suspension or restriction of a license, the Chief shall provide the licensee with written notice stating the action that is being taken, the basis for the action, and the right of the licensee to request a hearing.

"(3) A licensee shall have the right to request a hearing within 72 hours after service of notice of the summary suspension or restriction of license. The Concealed Pistol Licensing Review Board shall hold a hearing within 72 hours of receipt of a timely request, and shall issue a written decision within 72 hours after the hearing.

"(4) Any person, aggrieved by a final revocation based upon a summary suspension may file an appeal in accordance with subchapter I of Chapter 5 of Title 2.

"Sec. 906. Carrying a pistol while impaired.

"(a) A licensee shall not carry a pistol while impaired.

"(b) Upon establishing reasonable suspicion that a licensee has been consuming drugs or alcohol, a licensee's failure to submit to one or more field sobriety, breathalyzer, or urine tests,

administered to determine whether the licensee is impaired while carrying a pistol, shall be grounds for immediate revocation and seizure of the license.

"(c) In addition to any other penalty provided by law, any person who violates this section shall be subject to revocation of his or her license.

"(d) For the purposes of this section, the term "impaired" means a licensee has consumed alcohol or a drug or a combination thereof and that it has affected the licensee's behavior in a way that can be perceived or noticed.

"**Sec. 907. Prohibitions on carrying licensed pistols.**

"(a) No person holding a license shall carry a pistol in the following locations or under the following circumstances:

"(1) Any building or office occupied by the District of Columbia, its agencies, or instrumentalities;

"(2) The building and grounds, including any adjacent parking lot, of any childcare facility, preschool, public or private elementary or secondary school; or any public or private college or university;

"(3) Any hospital, or any office where medical or mental health services are the primary services provided;

"(4) Any penal institution, secure juvenile residential facility, or halfway house;

"(5) Any polling place while voting takes place;

"(6) Any public transportation vehicle, including the Metrorail transit system and its stations;

"(7) Any premises, or portion thereof, licensed under Title 25 of the District of Columbia Official Code, , where alcoholic beverages are served, or are sold and consumed on premises, but not including premises with small-sample tasting permits issued pursuant to D.C. Official Code § 25-118;

"(8) Any stadium or arena;

"(9) Any gathering or special event open to the public; provided, that no licensee shall be criminally prosecuted unless:

"(A) The organizer or the District has provided notice prohibiting the carrying of pistols in advance of the event and by posted signage at the gathering or special event; or

"(B) The licensee has been ordered by a law enforcement officer to leave the area of the gathering and the licensee has not complied with the order;

"(10) The public memorials on the National Mall and along the Tidal Basin, and any area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol buildings and grounds;

"(11) The area around the White House between Constitution Avenue, N.W., and H Street, N.W., and between 15th Street, N.W., and 17th Street, N.W.;

"(12) The U.S. Naval Observatory and its grounds, and from the perimeter of its fence to the curb of Massachusetts Avenue, N.W. from 34th Street, N.W. south on Massachusetts Avenue, N.W. to Observatory Circle, N.W.;

"(13) (A) Within a perimeter designated by the Chief or his or her designee, the Chief of the U.S. Secret Service or his or her designee, but not more than 1,000 feet, when a dignitary or high-ranking official of the United States or a state, local, or foreign government is moving under the protection of the MPD, or other law enforcement agency assisting or working in concert with MPD; provided, that no licensee shall be criminally prosecuted unless:

"(i) The law enforcement agency provides notice of the perimeter by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the area of protection obvious;

"(ii) The District or federal government has provided notice prohibiting the carrying of pistols along a designated route or in a designated area in advance of the event, if possible, and by posted signage along a route or in a designated area; or

"(iii) The licensee has been ordered by a law enforcement officer to leave the area and the licensee has not complied with the order;

"(B) For the purposes of this paragraph, the term "moving" shall include any planned or unplanned stops, including temporary stops, in locations open to the public.

"(14) Within a perimeter designated by the Chief or his or her designee, but not more than 1,000 feet, of a demonstration in a public place; provided, that no licensee shall be criminally prosecuted unless:

"(A) The law enforcement agency provides notice of the perimeter by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the area of the demonstration obvious;

"(B) The District or federal government has provided notice prohibiting the carrying of pistols along a demonstration route or area in advance of the event, if possible, and by posted signage along a demonstration route or area; or

"(C) The licensee has been ordered by a law enforcement officer to leave the area and the licensee has not complied with the order;

"(15) Any prohibited location or circumstance that the Chief determines by rule; provided, that for spontaneous circumstances, no criminal penalty pursuant to section 910 shall apply unless the licensee has notice of the prohibition and has failed to comply.



"(b)(1) Any private residence shall be presumed to prohibit the presence of concealed pistols unless otherwise authorized by the property owner or person in control of the premises and communicated personally to the licensee in advance of entry onto the residential property.

"(2) Any church, synagogue, mosque, or other place where people regularly assemble for religious worship shall be presumed to prohibit the presence of concealed pistols unless the property is posted with conspicuous signage allowing concealed pistols, or the owner or authorized agent communicates such allowance personally to the licensee in advance of entry onto the property; provided, that such places may not authorize concealed pistols where services are conducted in locations listed in subsection (a) of this section.

"(3) Any private property not a residence, the owner or person in control of the private property shall be presumed to permit a licensee carrying a concealed pistol to enter the owner's property unless the property is posted with conspicuous signage prohibiting concealed pistols, or the owner or authorized agent communicates such prohibition personally to the licensee.

"(c) Whenever a licensee carries a concealed pistol and approaches any prohibited location under subsection (a) of this section, or is subject to any prohibited circumstance under subsection (b) of this section, the licensee shall:

"(1) If the licensee is in a vehicle or if a vehicle is readily available, immediately secure the pistol in the manner prescribed in section 4b(b) of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, effective May 20, 2009 (D.C. Law 17-388; D.C. Official Code § 22-4504.02(b) ); or

"(2) If the licensee does not have a vehicle available, immediately leave the prohibited location or circumstance.

"(d) A licensee shall not be in violation of this section:

"(1) While he or she is traveling along any public street, road, or highway, including any adjacent public sidewalk, that touches the perimeter of any of the premises under subsection (a) of this section or that are prohibited under subsection (b) of this section if the concealed pistol is carried on his or her person in accordance with this act, or is being transported by the licensee in accordance with section 4b of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, effective May 20, 2009 ( D.C. Law 17-388; D.C. Official Code § 22-4504.02); or

"(2) While driving a vehicle into and immediately parking at any location listed in subsection (a)( 2) of this section, for the purpose of picking up or dropping off a student or a child; provided, that the licensee shall secure the concealed weapon in accordance with section 4b(b) of An Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes,

effective May 20, 2009 (D.C. Law 17-388; D.C. Official Code § 22-4504.02(b)), before leaving the parked vehicle.

"(e) A licensee shall not carry a pistol openly or otherwise in a manner that is not concealed.

"(f) In addition to any other penalty provided by law, any person who violates this section shall be subject to revocation of his or her license.

"(g) For the purposes of this section, the term:

"(1) "Demonstration" means one or more persons demonstrating, picketing, speechmaking, marching, holding a vigil, or engaging in any other similar conduct that involves the communication or expression of views or grievances and that has the effect, intent, or propensity to attract a crowd or onlookers. The term "demonstration" does not include the casual use of property by visitors or tourists that does not have the effect, intent, or propensity to attract a crowd or onlookers.

"(2) "Public place" means a place to which the general public has access and a right to occupy for business, entertainment, or other lawful purpose. The term "public place" is not limited to a place devoted solely to the uses of the public, and includes:

"(A) The front or immediate area or parking lot of a store, restaurant, tavern, shopping center, or other place of business;

"(B) A public building, including its grounds and curtilage;

"(C) A public parking lot;

"(D) A public street, sidewalk, or right-of-way;

"(E) A public park; and

"(F) Other public grounds.

"(3) "Public transportation vehicle" means any publicly owned or operated commercial vehicle, including any DC Circulator bus, DC Streetcar, MetroAccess vehicle, Metrobus, or Metrorail train.

"(4) "Residence" means any building wholly or partly used or intended to be used for living and sleeping by human occupants, together with any fences, walls, sheds, garages, or other accessory buildings appurtenant to the building, and the area of land surrounding the building and actually or by legal construction forming one enclosure in which such a building is located, but does not include any adjacent common areas or commercial property contained in any part of the building.

"Sec. 908. Concealed Pistol Licensing Review Board.

"(a) There is established a Concealed Pistol Licensing Review Board ("Board") for the purpose of hearing appeals from:

"(1) A denial of any application or renewal application for a license to carry a concealed pistol in the District pursuant to this act;

"(2) A summary suspension or restriction of a license to carry a concealed pistol; or

"(3) A revocation of a license to carry a concealed pistol.

"(b)(1) The Board shall consist of 7 members as follows:

"(A) The United States Attorney ("USAO") for the District of Columbia or his or her designee. If the USAO declines to provide a representative, the Mayor shall appoint a person who is a former employee of the USAO;

"(B) The Attorney General for the District of Columbia or his or her designee;

"(C) A mental health professional employed by the Department of Behavioral Health, appointed by the Mayor;

"(D) A former sworn officer of a law enforcement agency other than the MPD, appointed by the Mayor;

"(E) Three public members appointed by the Mayor, as follows:

"(i) One mental health professional; and

"(ii) Two District residents with experience in the operation, care, and handling of firearms.

"(2) The appointment of members designated by subsections (b)(1) (D) and (b)(1)(E) of this section shall be made in accordance with the following provisions:

"(A) Each member shall be appointed for a term of 4 years, and shall continue to serve during that time as long as the member remains eligible for the appointment;

"(B) A member may be reappointed;

"(C) A Board member whose term has expired may continue to serve as a member until a replacement member has been appointed;

"(D) A person appointed to fill a vacancy occurring prior the expiration of a term shall serve for the remainder of the term or until a successor has been appointed; and

"(E) A member may be removed only for incompetence, neglect of duty, or misconduct.

"(3) The Mayor shall select a chairperson.

"(4) Members shall serve without compensation, but shall be compensated for actual and necessary expenses incurred in the performance of their official duties.

"(c) Four members of the Board shall constitute a quorum, except that 2 members shall be a quorum when hearing panels of 3 members are assigned by the Board to conduct a hearing and make a final decision required by this section. Each hearing panel shall contain at least one member designated by subsection (b)(1)(A), (B), or (D) of this section.

"(d)(1) Within 30 days after the date that a majority of the Board members are sworn in, the Mayor, by rule, shall establish hearing procedures for a contested case review of any appeal, including the manner and time of appeals, and procedures for the Board to assign panels of 3 Board members to conduct such hearings and issue final decisions, pursuant to subsection (d) of this section.

"(2) The rules shall include that the burden of production of evidence, and the burden of persuasion, at any hearing before the Board shall be upon the applicant or licensee that is challenging any denial of an application or renewal application or revocation of a license.

"(e) The meetings and hearings conducted by the Board shall be confidential and not open to the public.

"(f) Any person, or the Chief, aggrieved by a final action of the Board may file an appeal in accordance with subchapter I of Chapter 5 of Title 2. For purposes of this subsection, the definition of the term "person" in subchapter I of Chapter 5 of Title 2 shall include the Chief of the MPD.

**"Sec. 909. Freedom of information exception; report.**

"(a) Any record regarding individuals who have applied, received, or had revoked any license shall not be made available as a public record under section 202 of the Freedom of Information Act of 1976, effective March 25, 1977 (D.C. Law 1-96; D.C. Official Code § 2-532); provided, that aggregate data may be used for the purposes of the public report in subsection (b) of this section.

"(b) Every 2 years, the Metropolitan Police Department shall make public a report that includes the following information:

"(1) The number of licenses issued in the most recent 2-year period;

"(2) The total number of valid licenses;

"(3) The number of licensees convicted of a crime involving a pistol in the most recent 2-year period;

"(4) The number of pistols for which a license was issued that were reported lost or stolen in the most recent 2-year period; and

"(5) The number of pistols for which a license was issued that were found or recovered as stolen that were unreported by a licensee as lost or stolen in the most recent 2-year period.

**"Sec. 910. Penalties.**

"(a)(1) Except as otherwise provided in this title, a person convicted of a violation of a provision of this title, or rules or regulations issued under the authority of this title, shall be fined not more than the amount set forth in section 101 of the Criminal Fine Proportionality Amendment Act of 2012, effective June 11, 2013 (D.C. Law 19-317; D.C. Official Code § 22-3571.01), or imprisoned for not more than 180 days.

"(2) Civil fines, penalties, and fees may be imposed as alternative sanctions for any infraction of the provisions of this title, or any rules or regulations issued under the authority of this title.

"(b) All prosecutions for violations of this title shall be brought in the name of the District of Columbia and prosecuted by the Office of the Attorney General for the District of Columbia.

"Sec. 911. Rules.

"The Chief of the MPD, pursuant to Title I of the District of Columbia Administrative Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C. Official Code § 2-501 *et seq.*), shall issue rules to implement the provisions of the License to Carry a Pistol Amendment Act of 2014, as approved by the Committee on the Judiciary and Public Safety on November 25, 2014 (Committee print of Bill 20-930), including rules:

"(1) To establish criteria for determining when an applicant has, pursuant to section 6 of the Pistols and Other Dangerous Weapons Act:

"(A) Demonstrated a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life;

"(B) Demonstrated any other proper reason for carrying a concealed pistol, which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person; and

"(C) Demonstrated the applicant's suitability to carry a concealed pistol, which shall at a minimum include evidence that the applicant meets the requirements of section 902;

"(2) To establish the type and amount of ammunition that may be carried concealed by a licensee;

"(3) To establish the methods by which a pistol may be carried, including any standards for safe holstering;

"(4) To establish all application forms, investigation procedures, background checks, and fees necessary to process an application for a license to carry a concealed pistol;

"(5) To specify any procedures or requirements specific to non-residents who apply to carry a concealed pistol pursuant to section 6 of the Pistols and Other Dangerous Weapons Act, with regard to the registration requirements in this act;

"(6) To specify requirements for signage on any private premises where the owner or person in control of the premises prohibits carrying concealed pistols, pursuant to section 907(b); and

"(7) To establish procedures for the renewal of licenses.".

**DIVISION IV.  CRIMINAL LAW AND PROCEDURE AND PRISONERS**
**TITLE 22.  CRIMINAL OFFENSES AND PENALTIES**
**SUBTITLE VI.  REGULATION AND POSSESSION OF WEAPONS**
**CHAPTER 45.  WEAPONS AND POSSESSION OF WEAPONS**

**§ 22-4504.  Carrying concealed weapons; possession of weapons during commission of crime of violence; penalty**

(a) No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol **a pistol, without a license pursuant to District of Columbia law**, or any deadly or dangerous weapon capable of being so concealed. Whoever violates this section shall be punished as provided in § 22-4515, except that:

(1) A person who violates this section by carrying a pistol **a pistol, without a license issued therefor pursuant to District of Columbia law**, or any deadly or dangerous weapon, in a place other than the person's dwelling place, place of business, or on other land possessed by the person, shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned for not more than 5 years, or both; or

(2) If the violation of this section occurs after a person has been convicted in the District of Columbia of a violation of this section or of a felony, either in the District of Columbia or another jurisdiction, the person shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned for not more than 10 years, or both.

(a-1) Except as otherwise permitted by law, no person shall carry within the District of Columbia a rifle or shotgun. A person who violates this subsection shall be subject to the criminal penalties set forth in subsection (a)(1) and (2) of this section.

(b) No person shall within the District of Columbia possess a pistol, machine gun, shotgun, rifle, or any other firearm or imitation firearm while committing a crime of violence or dangerous crime as defined in § 22-4501. Upon conviction of a violation of this subsection, the person may be sentenced to imprisonment for a term not to exceed 15 years and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 5 years and shall not be released on parole, or granted probation or suspension of sentence, prior to serving the mandatory-minimum sentence.

(c) In addition to any other penalty provided under this section, a person may be fined an amount not more than the amount set forth in § 22-3571.01.

### Section 6 (§ 22-4506) revived to read as follows:

### Sec. 6. Issuance of a license to carry a pistol.

"(a) The Chief of the Metropolitan Police Department ("Chief") may, upon the application of any person having a bona fide residence or place of business within the District of Columbia, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue, if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed.

"(b) A non-resident who lives in a state that does not require a license to carry a concealed pistol may apply to the Chief for a license to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue; provided, that he or she meets the same reasons and requirements set forth in subsection (a) of this section.

"(c) For any person issued a license pursuant to this section, or renewed pursuant to section 903 of the Firearms Control Regulations Act of 1975, as approved by the Committee on the Judiciary and Public Safety on November 25, 2014 (Committee print of Bill 20-930), the Chief may limit the geographic area, circumstances, or times of the day, week, month, or year in which the license is effective, and may revoke the license for good cause.

"(d) The application for a license to carry shall be on a form prescribed by the Chief. The license shall be in a form prescribed by the Chief and shall bear the name, address, description, photograph, and signature of the licensee.

"(e) Except as provided in section 905(b) of the Firearms Control Regulations Act of 1975, as approved by the Committee on the Judiciary and Public Safety on November 25, 2014 (Committee print of Bill 20-930), any person whose application has been denied or whose license has been revoked may, within 15 days of notice of the denial, appeal to the Concealed Pistol Licensing Review Board established pursuant to section 908 of the Firearms Control Regulations Act of 1975, as approved by the Committee on the Judiciary and Public Safety on November 25, 2014 (Committee print of Bill 20-930).

**DIVISION IV. CRIMINAL LAW AND PROCEDURE AND PRISONERS**
**TITLE 22. CRIMINAL OFFENSES AND PENALTIES**

SUBTITLE I. CRIMINAL OFFENSES
CHAPTER 25A. PRESENCE IN A MOTOR VEHICLE CONTAINING A FIREARM

§ 22-2511. Presence in a motor vehicle containing a firearm

~~(a) It is unlawful for a person to be voluntarily in a motor vehicle if that person knows that a firearm is in the vehicle, unless the firearm is being lawfully carried or lawfully transported.~~

~~(b) It shall be an affirmative defense to this offense, which the defendant must prove by a preponderance of the evidence, that the defendant, upon learning that a firearm was in the vehicle, had the specific intent to immediately leave the vehicle, but did not have a reasonable opportunity under the circumstances to do so.~~

~~(c) (1) Except as provided in paragraph (2) of this subsection, a person who violates this section shall be fined not more than and, in addition, may be fined not more than the amount set forth in § 22-3571.01, imprisoned for not more than 5 years, or both.~~

~~(2) If the violation of this section occurs after a person has been convicted in the District of Columbia of a violation of § 22-4504(a), or of a felony, either in the District of Columbia or another jurisdiction, the person shall be fined not more than and, in addition, may be fined not more than the amount set forth in § 22-3571.01, imprisoned for not more than 10 years, or both.~~

~~(3) No person shall be sentenced consecutively for this offense and any other firearms offense arising out of the same incident. Any conviction under this section and any conviction for carrying or possessing the same firearm on the same occasion shall be considered as one conviction for purposes of any application of repeat offender sentencing provisions.~~

# 14

Committee Print

1 Committee on the Judiciary and Public Safety
2 Committee Print
3 November 25, 2014
4
5
6                                      A BILL
7
8                                     20-930
9
10
11            IN THE COUNCIL OF THE DISTRICT OF COLUMBIA
12
13                          _____
14
15
16  To amend the Firearms Control Regulations Act of 1975 to permit individuals to register a
17        firearm for self-defense in their place of business, to provide a Freedom of Information
18        Act exception, to specify application requirements for applying for a license to carry a
19        concealed pistol, to specify the duration of such licenses and requirements for renewal of
20        licenses, to establish duties of licensees, to provide for revocation of licenses, to create a
21        criminal offense of carrying while impaired, to specify prohibitions on licensees, to
22        establish a Concealed Pistol Licensing Review Board, to provide a Freedom of
23        Information Act exception; to specify penalties for violations, and to require the Mayor to
24        issue rules; and to amend An Act To control the possession, sale, transfer, and use of
25        pistols and other dangerous weapons in the District of Columbia, to provide penalties, to
26        prescribe rules of evidence, and for other purposes to authorize the Chief of Police to
27        issue licenses to carry a concealed pistol to District residents and non-residents provided
28        certain conditions are met.
29
30        BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this
31  act may be cited as the "License to Carry a Pistol Amendment Act of 2014".
32
33        Sec. 2. The Firearms Control Regulations Act of 1975, effective September 24, 1976
34  (D.C. Law 1-85; D.C. Official Code § 7-2501.01 *et seq.*), is amended as follows:
35        (a) Section 201(b)(4) (D.C. Official Code § 7-2502.01(b)(4)) is amended by striking the
36  phrase "the home" and inserting the phrase "the home or place of business" in its place.
37        (b) Section 202(a)(4)(C) (D.C. Official Code § 7-2502.02(a)(4)(C)) is amended to read as
38  follows:
39              "(C) Any person who seeks to register a pistol:
40                    "(i) For use in self-defense within that person's home or place of
41  business; or

1

**JA 209**

42          "(ii) As part of the application process for a license to carry a
43   concealed pistol pursuant to section 902; or".
44          (c) Section 203(a)(4) (D.C. Official Code § 7-2502.03(a)(4)) is amended as follows:
45          (1) Subparagraph (D) is amended by striking the word "or" at the end;
46          (2) Subparagraph (E) is amended by adding the word "or" and the end; and
47          (3) A new subparagraph (F) is added to read as follows:
48          "(F) Violation of section 503 of the Omnibus Public Safety and
49   Justice Amendment Act of 2009, effective December 10, 2009 (D.C. Law 18-88; D.C. Official
50   Code § 22-3133);".
51          (d) A new section 211a is added to read as follows:
52          "Sec. 211a.  Freedom of information exception.
53          "Any record regarding individuals who have applied, received, or had revoked any
54   registration issued pursuant to this title shall not be made available as a public record under
55   section 202 of the Freedom of Information Act of 1976, effective March 25, 1977 (D.C. Law 1-
56   96; D.C. Official Code § 2-532).".
57          (e) Section 706(a) (D.C. Official Code § 7-2507.06(a)) is amended by striking the phrase
58   "Except as provided in sections 205, 208, 702, and 807" and inserting the phrase "Except as
59   provided in sections 205, 208, 702, 807, and Title IX" in its place.
60          (f) A new Title IX is added to read as follows:
61          "TITLE IX – LICENSES TO CARRY A PISTOL.
62          "Sec. 901.  Definitions.
63          "For the purposes of this title, the term:
64          "(1) "Concealed pistol" means a loaded or unloaded pistol carried on or about a
65   person entirely hidden from view of the public, or carried on or about a person in a vehicle in
66   such a way as it is entirely hidden from view of the public.
67          "(2) "Law enforcement officer" means a sworn member of the Metropolitan
68   Police Department or of any other law enforcement agency operating and authorized to make
69   arrests in the District of Columbia, and includes any MPD reserve officer, any special police
70   officers appointed pursuant to section 202 of An Act Making appropriations to provide for the
71   expenses of the government of the District of Columbia for the fiscal year ending June thirtieth,
72   nineteen hundred, and for other purposes, approved March 3, 1899 (30 Stat. 1057; D.C. Official

2

73    Code § 5-129.02), and campus and university special police officers appointed pursuant to the

74    College and University Campus Security Amendment Act of 1995, effective October 18, 1995

75    (D.C. Law 11-63; 6A DCMR § 1200 *et seq.*).

76          "(3) "License" means a license to carry a concealed pistol issued pursuant to

77    section 6 of the Pistols and Other Dangerous Weapons Act.

78          "(4) "Licensee" means a person who has been issued a license pursuant to section

79    6 of the Pistols and Other Dangerous Weapons Act.

80          "(5) "Child" means any person under 18 years of age.

81          "(6) "MPD" means the Metropolitan Police Department.

82          "(7) "Section 6 of the Pistols and Other Dangerous Weapons Act" means section

83    6 of An Act To control the possession, sale, transfer, and use of pistols and other dangerous

84    weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for

85    other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-4506).

86        "Sec. 902. Application requirements.

87        "(a) A person who submits an application pursuant to section 6 of the Pistols and Other

88    Dangerous Weapons Act shall certify and demonstrate to the satisfaction of the Chief that he or

89    she:

90          "(1) Is at least 21 years of age;

91          "(2) Meets all of the requirements for a person registering a firearm pursuant to

92    this act, and has obtained a registration certificate for the pistol that the person is applying to

93    carry concealed;

94          "(3)(A) Does not currently suffer from any mental illness or condition that creates

95    a substantial risk that he or she is a danger to himself or herself or others; or

96          (B) If he or she has suffered in the previous 5 years from any mental

97    illness or condition that created a substantial risk that he or she was a danger to himself or herself

98    or others, no longer suffers from any mental illness or condition that creates a substantial risk

99    that he or she is a danger to himself or herself or others;

100         "(4) Has completed a firearms training course or combination of courses,

101    conducted by an instructor (or instructors) certified by the Chief, which includes at least 16 hours

102    of training, and covers the following:

103         "(A) Firearm safety;

| | |
|---|---|
| 104 | "(B) Firearm nomenclature; |
| 105 | "(C) Basic principles of marksmanship; |
| 106 | "(D) Care, cleaning, maintenance, loading, unloading, and storage of |
| 107 | pistols; |
| 108 | "(E) Situational awareness, conflict management, and use of deadly force; |
| 109 | "(F) Selection of pistols and ammunition for defensive purposes; and |
| 110 | "(G) All applicable District and federal firearms laws, including the |
| 111 | requirements of this act, An Act To control the possession, sale, transfer, and use of pistols and |
| 112 | other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of |
| 113 | evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22- |
| 114 | 4501 *et seq.*), and District law pertaining to self-defense.); |
| 115 | "(5) Has completed at least 2 hours of range training, conducted by an instructor |
| 116 | certified by the Chief, including shooting a qualification course of 50 rounds of ammunition |
| 117 | from a maximum distance of 15 yards (45 feet); and |
| 118 | "(6) Follows any procedures the Chief may establish by rule. |
| 119 | "(b) An applicant shall satisfy the requirements of subsections (a)(4) and (a)((5) of this |
| 120 | section with a certification from the firearms instructor that the applicant: |
| 121 | "(1) Demonstrated satisfactory completion of the requirements of subsections |
| 122 | (a)(4) and (a)(5) of this section; and |
| 123 | "(2) Possesses the proper knowledge, skills, and attitude to carry a concealed |
| 124 | pistol. |
| 125 | "(c) An applicant may be exempt from some or all of the requirements of subsections |
| 126 | (a)(4) and (a)(5) of this section if the applicant has submitted evidence that he or she has |
| 127 | received firearms training in the United States military or has otherwise completed firearms |
| 128 | training conducted by a firearms instructor that, as determined by the Chief, is equal to or greater |
| 129 | than that required under subsections (a)(4) and (a)(5) of this section. |
| 130 | "(d) An applicant for a license may satisfy any component of the requirements of |
| 131 | subsections (a)(4) and (a)(5) of this section by demonstrating to the satisfaction of the Chief that |
| 132 | the applicant has met that particular component as part of a successful application to carry a |
| 133 | concealed pistol issued by the lawful authorities of any state or subdivision of the United States. |
| 134 | "(e)(1) An applicant shall sign an oath or affirmation attesting to the truth of all the |

4

135     information required by section 6 of the Pistols and Other Dangerous Weapons Act and this
136     section.

137     "(2) Any declaration, certificate, verification, or statement made for purposes of
138     an application for a license to carry a concealed pistol pursuant to this act shall be made under
139     penalty of perjury pursuant to section 401 of the District of Columbia Theft and White Collar
140     Crime Act of 1982, effective December 1, 1982 (D.C. Law 4-164; D.C. Official Code § 22-
141     2402).

142     "(f) An applicant is required to appear for an in-person interview at the MPD
143     headquarters, for purposes including verification of the applicant's identity and verification of
144     the information submitted as part of the application process for a license.

145     "Sec. 903. Expiration and renewal of licenses.

146     "(a) Licenses shall expire no later than 2 years after the date of issuance unless revoked
147     by the Chief or renewed pursuant to this title.

148     "(b)(1) A licensee shall be eligible for renewal of a license if:

149     "(A) The licensee continues to meet the requirements of section 6 of the
150     Pistols and Other Dangerous Weapons Act and section 902, except that:

151     "(i) With regard to section 902(a)(4), only 4 hours of such training
152     shall be required for renewal; and

153     "(ii) With regard to section 902(a)(5), the licensee shall provide
154     proof of 2 hours of range practice within the previous 12 months; and

155     "(B) Follows any procedures the Chief may establish by rule.

156     "(2) Timely renewal shall be the responsibility of the licensee, pursuant to any
157     procedures the Chief may establish by rule.

158     "(c) Any person whose renewal application has been denied may, within 15 days of
159     notice of the denial, appeal to the Concealed Pistol Licensing Review Board established pursuant
160     to section 908.

161     "Sec. 904. Duties of licensees.

162     "(a) A licensee shall comply with all limits and conditions stated in the issuance of the
163     license.

164     "(b) A licensee shall notify the Chief in writing:

5

165                          "(1) Immediately upon discovery of the loss, theft, or destruction of the license
166 and include the circumstances of the loss, theft, or destruction, if known; and
167                          "(2) Within 30 days after a change in the licensee's name or address as it appears
168 on the license.
169                 "(c) A licensee shall have on or about his or her person each time the pistol is carried in
170 the District:
171                          "(1) The license; and
172                          "(2) The registration certificate for the pistol being carried, issued pursuant to this
173 act.
174                 "(d) If a law enforcement officer initiates an investigative stop of a person carrying a
175 concealed pistol pursuant to section 6 of the Pistols and Other Dangerous Weapons Act, the
176 person, and any other licensee who is with the person at the time of the investigative stop, shall:
177                          "(1) Disclose to the officer that he or she is carrying a concealed pistol;
178                          "(2) Present the license and registration certificate;
179                          "(3) Identify the location of the concealed pistol; and
180                          "(4) Comply with all lawful orders and directions from the officer, including
181 allowing a pat down of his or her person and permitting the law enforcement officer to take
182 possession of the pistol for so long as is necessary for the safety of the officer or the public.
183                 "(e) The duties set forth in this section are in addition to any other requirements imposed
184 by this act or applicable law.
185                 "(f) In addition to any other penalty provided by law, any person who violates this section
186 shall be subject to revocation of his or her license.
187                 "Sec. 905. Revocation and suspension of licenses.
188                 "(a)(1) The Chief may revoke a license upon a finding that the licensee no longer meets
189 the requirements of section 6 of the Pistols and Other Dangerous Weapons Act and this title, or
190 as a penalty as specified in this act.
191                          "(2) The United States Attorney for the District of Columbia, the Attorney
192 General for the District of Columbia, or any person may apply to the MPD at any time for
193 revocation of a license.
194                          "(3) Any person having knowledge that a licensee no longer meets the
195 requirements of this act or the requirements of section 6 of the Pistols and Other Dangerous

196   Weapons Act may so notify the Chief or any other law enforcement officer who may take such

197   action as may be appropriate.

198          "(4) Any person whose license has been revoked may, within 15 days of notice of

199   the revocation, appeal to the Concealed Pistol Licensing Review Board established pursuant to

200   section 908.

201          "(b)(1) The Chief may summarily suspend or restrict, without a hearing, a license, when

202   the Chief has determined that the conduct of a licensee presents an imminent danger to the health

203   and safety of a person or the public.

204          "(2) At the time of the summary suspension or restriction of a license, the Chief

205   shall provide the licensee with written notice stating the action that is being taken, the basis for

206   the action, and the right of the licensee to request a hearing.

207          "(3) A licensee shall have the right to request a hearing within 72 hours after

208   service of notice of the summary suspension or restriction of license. The Concealed Pistol

209   Licensing Review Board shall hold a hearing within 72 hours of receipt of a timely request, and

210   shall issue a written decision within 72 hours after the hearing.

211      "Sec. 906. Carrying a pistol while impaired.

212      "(a) A licensee shall not carry a pistol while impaired.

213      "(b) Upon establishing reasonable suspicion that a licensee has been consuming drugs or

214   alcohol, a licensee's failure to submit to one or more field sobriety, breathalyzer, or urine tests,

215   administered to determine whether the licensee is impaired while carrying a pistol, shall be

216   grounds for immediate revocation and seizure of the license.

217      "(c) In addition to any other penalty provided by law, any person who violates this

218   section shall be subject to revocation of his or her license.

219      "(d) For the purposes of this section, the term "impaired" means a licensee has consumed

220   alcohol or a drug or a combination thereof and that it has affected the licensee's behavior in a

221   way that can be perceived or noticed.

222      "Sec. 907. Prohibitions on carrying licensed pistols.

223      "(a) No person holding a license shall carry a pistol in the following locations or under

224   the following circumstances:

225          "(1) Any building or office occupied by the District of Columbia, its agencies, or

226   instrumentalities;

JA 215

227          "(2) The building and grounds, including any adjacent parking lot, of any
228    childcare facility, preschool, public or private elementary or secondary school; or any public or
229    private college or university;

230          "(3) Any hospital, or any office where medical or mental health services are the
231    primary services provided;

232          "(4) Any penal institution, secure juvenile residential facility, or halfway house;

233          "(5) Any polling place while voting takes place;

234          "(6) Any public transportation vehicle, including the Metrorail transit system and
235    its stations;

236          "(7) Any premises, or portion thereof, licensed under Title 25 of the District of
237    Columbia Official Code, where alcoholic beverages are served, or are sold and consumed on
238    premises, but not including premises with small-sample tasting permits issued pursuant to D.C.
239    Official Code § 25-118;

240          "(8) Any stadium or arena;

241          "(9) Any gathering or special event open to the public; provided, that no licensee
242    shall be criminally prosecuted unless:

243             "(A) The organizer or the District has provided notice prohibiting the
244    carrying of pistols in advance of the event and by posted signage at the gathering or special
245    event; or

246             "(B) The licensee has been ordered by a law enforcement officer to leave
247    the area of the gathering and the licensee has not complied with the order;

248          "(10) The public memorials on the National Mall and along the Tidal Basin, and
249    any area where firearms are prohibited under federal law or by a federal agency or entity,
250    including U.S. Capitol buildings and grounds;

251          "(11) The area around the White House between Constitution Avenue, N.W., and
252    H Street, N.W., and between 15th Street, N.W., and 17th Street, N.W.;

253          "(12) The U.S. Naval Observatory and its grounds, and from the perimeter of its
254    fence to the curb of Massachusetts Avenue, N.W. from 34th Street, N.W. south on Massachusetts
255    Avenue, N.W. to Observatory Circle, N.W.;

256          "(13) (A) Within a perimeter designated by the Chief or his or her designee, the
257    Chief of the U.S. Secret Service or his or her designee, but not more than 1,000 feet, when a

JA 216

258    dignitary or high-ranking official of the United States or a state, local, or foreign government is

259    moving under the protection of the MPD, or other law enforcement agency assisting or working

260    in concert with MPD; provided, that no licensee shall be criminally prosecuted unless:

261                    "(i) The law enforcement agency provides notice of the perimeter

262    by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other

263    means to make the area of protection obvious;

264                    "(ii) The District or federal government has provided notice

265    prohibiting the carrying of pistols along a designated route or in a designated area in advance of

266    the event, if possible, and by posted signage along a route or in a designated area; or

267                    "(iii) The licensee has been ordered by a law enforcement officer

268    to leave the area and the licensee has not complied with the order;

269                    "(B) For the purposes of this paragraph, the term "moving" shall include any

270    planned or unplanned stops, including temporary stops, in locations open to the public.

271                    "(14) Within a perimeter designated by the Chief or his or her designee, but not

272    more than 1,000 feet, of a demonstration in a public place; provided, that no licensee shall be

273    criminally prosecuted unless:

274                    "(A) The law enforcement agency provides notice of the perimeter by the

275    presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to

276    make the area of the demonstration obvious;

277                    "(B) The District or federal government has provided notice prohibiting

278    the carrying of pistols along a demonstration route or area in advance of the event, if possible,

279    and by posted signage along a demonstration route or area; or

280                    "(C) The licensee has been ordered by a law enforcement officer to leave

281    the area and the licensee has not complied with the order;

282                    "(15) Any prohibited location or circumstance that the Chief determines by rule;

283    provided, that for spontaneous circumstances, no criminal penalty pursuant to section 910 shall

284    apply unless the licensee has notice of the prohibition and has failed to comply.

285                    "(b)(1) Any private residence shall be presumed to prohibit the presence of concealed

286    pistols unless otherwise authorized by the property owner or person in control of the premises

287    and communicated personally to the licensee in advance of entry onto the residential property.

9

**JA 217**

288    "(2) Any church, synagogue, mosque, or other place where people regularly
289    assemble for religious worship shall be presumed to prohibit the presence of concealed pistols
290    unless the property is posted with conspicuous signage allowing concealed pistols, or the owner
291    or authorized agent communicates such allowance personally to the licensee in advance of entry
292    onto the property; provided, that such places may not authorize concealed pistols where services
293    are conducted in locations listed in subsection (a) of this section.
294        "(3) Any private property not a residence, the owner or person in control of the
295    private property shall be presumed to permit a licensee carrying a concealed pistol to enter the
296    owner's property unless the property is posted with conspicuous signage prohibiting concealed
297    pistols, or the owner or authorized agent communicates such prohibition personally to the
298    licensee.
299    "(c) Whenever a licensee carries a concealed pistol and approaches any prohibited
300    location under subsection (a) of this section, or is subject to any prohibited circumstance under
301    subsection (b) of this section, the licensee shall:
302        "(1) If the licensee is in a vehicle or if a vehicle is readily available, immediately
303    secure the pistol in the manner prescribed in section 4b(b) of An Act To control the possession,
304    sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to
305    provide penalties, to prescribe rules of evidence, and for other purposes, effective May 20, 2009
306    (D.C. Law 17-388; D.C. Official Code § 22-4504.02(b) ); or
307        "(2) If the licensee does not have a vehicle available, immediately leave the
308    prohibited location or circumstance.
309    "(d) A licensee shall not be in violation of this section:
310        "(1) While he or she is traveling along any public street, road, or highway,
311    including any adjacent public sidewalk that touches the perimeter of any of the premises under
312    subsection (a) of this section or that are prohibited under subsection (b) of this section if the
313    concealed pistol is carried on his or her person in accordance with this act, or is being transported
314    by the licensee in accordance with section 4b of An Act To control the possession, sale, transfer,
315    and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties,
316    to prescribe rules of evidence, and for other purposes, effective May 20, 2009 ( D.C. Law 17-
317    388; D.C. Official Code § 22-4504.02); or

318          "(2) While driving a vehicle into and immediately parking at any location listed in

319    subsection (a)( 2) of this section, for the purpose of picking up or dropping off a student or a

320    child; provided, that the licensee shall secure the concealed weapon in accordance with section

321    4b(b) of An Act To control the possession, sale, transfer, and use of pistols and other dangerous

322    weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for

323    other purposes, effective May 20, 2009 (D.C. Law 17-388; D.C. Official Code § 22-4504.02(b)),

324    before  leaving the parked vehicle.

325          "(e) A licensee shall not carry a pistol openly or otherwise in a manner that is not

326    concealed.

327          "(f) In addition to any other penalty provided by law, any person who violates this section

328    shall be subject to revocation of his or her license.

329          "(g) For the purposes of this section, the term:

330          "(1) "Demonstration" means one or more persons demonstrating, picketing,

331    speechmaking, marching, holding a vigil, or engaging in any other similar conduct that involves

332    the communication or expression of views or grievances and that has the effect, intent, or

333    propensity to attract a crowd or onlookers. The term "demonstration" does not include the casual

334    use of property by visitors or tourists that does not have the effect, intent, or propensity to attract

335    a crowd or onlookers.

336          "(2) "Public place" means a place to which the general public has access and a

337    right to occupy for business, entertainment, or other lawful purpose. The term "public place" is

338    not limited to a place devoted solely to the uses of the public, and includes:

339          "(A) The front or immediate area or parking lot of a store, restaurant,

340    tavern, shopping center, or other place of business;

341          "(B) A public building, including its grounds and curtilage;

342          "(C) A public parking lot;

343          "(D) A public street, sidewalk, or right-of-way;

344          "(E) A public park; and

345          "(F) Other public grounds.

346          "(3) "Public transportation vehicle" means any publicly owned or operated

347    commercial vehicle, including any DC Circulator bus, DC Streetcar, MetroAccess vehicle,

348    Metrobus, or Metrorail train.

11

349       "(4) "Residence" means any building wholly or partly used or intended to be used
350 for living and sleeping by human occupants, together with any fences, walls, sheds, garages, or
351 other accessory buildings appurtenant to the building, and the area of land surrounding the
352 building and actually or by legal construction forming one enclosure in which such a building is
353 located, but does not include any adjacent common areas or commercial property contained in
354 any part of the building.

355       "Sec. 908. Concealed Pistol Licensing Review Board.

356       "(a) There is established a Concealed Pistol Licensing Review Board ("Board") for the
357 purpose of hearing appeals from:

358       "(1) A denial of any application or renewal application for a license to carry a
359 concealed pistol in the District pursuant to this act;

360       "(2) A summary suspension or restriction of a license to carry a concealed pistol;
361 or

362       "(3) A revocation of a license to carry a concealed pistol.

363       "(b)(1) The Board shall consist of 7 members as follows:

364       "(A) The United States Attorney ("USAO") for the District of Columbia
365 or his or her designee. If the USAO declines to provide a representative, the Mayor shall appoint
366 a person who is a former employee of the USAO;

367       "(B) The Attorney General for the District of Columbia or his or her
368 designee;

369       "(C) A mental health professional employed by the Department of
370 Behavioral Health, appointed by the Mayor;

371       "(D) A former sworn officer of a law enforcement agency other than the
372 MPD, appointed by the Mayor;

373       "(E) Three public members appointed by the Mayor, as follows:

374       "(i) One mental health professional; and

375       "(ii) Two District residents with experience in the operation, care,
376 and handling of firearms.

377       "(2) The appointment of members designated by subsections (b)(1)(D) and
378 (b)(1)(E) of this section shall be made in accordance with the following provisions:

379         "(A) Each member shall be appointed for a term of 4 years, and shall

380 continue to serve during that time as long as the member remains eligible for the appointment;

381         "(B) A member may be reappointed;

382         "(C) A Board member whose term has expired may continue to serve as a

383 member until a replacement member has been appointed;

384         "(D) A person appointed to fill a vacancy occurring prior the expiration of

385 a term shall serve for the remainder of the term or until a successor has been appointed; and

386         "(E) A member may be removed only for incompetence, neglect of duty,

387 or misconduct.

388         "(3) The Mayor shall select a chairperson.

389         "(4) Members shall serve without compensation, but shall be compensated for

390 actual and necessary expenses incurred in the performance of their official duties.

391         "(c) Four members of the Board shall constitute a quorum, except that 2 members shall

392 be a quorum when hearing panels of 3 members are assigned by the Board to conduct a hearing

393 and make a final decision required by this section. Each hearing panel shall contain at least one

394 member designated by subsection (b)(1)(A), (B), or (D) of this section.

395         "(d)(1) Within 30 days after the date that a majority of the Board members are sworn in,

396 the Mayor, by rule, shall establish hearing procedures for a contested case review of any appeal,

397 including the manner and time of appeals, and procedures for the Board to assign panels of 3

398 Board members to conduct such hearings and issue final decisions, pursuant to subsection (d) of

399 this section.

400         "(2) The rules shall include that the burden of production of evidence, and the

401 burden of persuasion, at any hearing before the Board shall be upon the applicant or licensee that

402 is challenging any denial of an application or renewal application or revocation of a license.

403         "(e) The meetings and hearings conducted by the Board shall be confidential and not

404 open to the public.

405         "(f) Any person, or the Chief, aggrieved by a final action of the Board may file an

406 appeal in accordance with subchapter I of the District of Columbia Administrative Procedure

407 Act, approved October 21, 1968 (82 Stat. 1204; D.C. Official Code § 2-501 *et seq.*). For

408 purposes of this subsection, the definition of the term "person" shall include the Chief of the

409 MPD.

410        "Sec. 909. Freedom of information exception; report.

411        "(a) Any record regarding individuals who have applied, received, or had revoked any

412 license shall not be made available as a public record under section 202 of the Freedom of

413 Information Act of 1976, effective March 25, 1977 (D.C. Law 1-96; D.C. Official Code § 2-

414 532); provided, that aggregate data may be used for the purposes of the public report in

415 subsection (b) of this section.

416        "(b) Every 2 years, the Metropolitan Police Department shall make public a report that

417 includes the following information:

418        "(1) The number of licenses issued in the most recent 2-year period;

419        "(2) The total number of valid licenses;

420        "(3) The number of licensees convicted of a crime involving a pistol in the most

421 recent 2-year period;

422        "(4) The number of pistols for which a license was issued that were reported lost

423 or stolen in the most recent 2-year period; and

424        "(5) The number of pistols for which a license was issued that were found or

425 recovered as stolen that were unreported by a licensee as lost or stolen in the most recent 2-year

426 period.

427        "Sec. 910. Penalties.

428        "(a)(1) Except as otherwise provided in this title, a person convicted of a violation of a

429 provision of this title, or rules or regulations issued under the authority of this title, shall be fined

430 not more than the amount set forth in section 101 of the Criminal Fine Proportionality

431 Amendment Act of 2012, effective June 11, 2013 (D.C. Law 19-317; D.C. Official Code § 22-

432 3571.01), or imprisoned for not more than 180 days.

433        "(2) Civil fines, penalties, and fees may be imposed as alternative sanctions for

434 any infraction of the provisions of this title, or any rules or regulations issued under the

435 authority of this title.

436        "(b) All prosecutions for violations of this title shall be brought in the name of the

437 District of Columbia and prosecuted by the Office of the Attorney General for the District of

438 Columbia.

439        "Sec. 911. Rules.

| 440 | "The Chief of the MPD, pursuant to Title I of the District of Columbia Administrative |
| 441 | Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C. Official Code § 2-501 *et seq.*), |
| 442 | shall issue rules to implement the provisions of the License to Carry a Pistol Amendment Act of |
| 443 | 2014, as approved by the Committee on the Judiciary and Public Safety on November 25, 2014 |
| 444 | (Committee print of Bill 20-930), including rules: |
| 445 | "(1) To establish criteria for determining when an applicant has, pursuant to |
| 446 | section 6 of the Pistols and Other Dangerous Weapons Act: |
| 447 | "(A) Demonstrated a good reason to fear injury to his or her person, which |
| 448 | shall at a minimum require a showing of a special need for self-protection distinguishable from |
| 449 | the general community as supported by evidence of specific threats or previous attacks which |
| 450 | demonstrate a special danger to the applicant's life; |
| 451 | "(B) Demonstrated any other proper reason for carrying a concealed |
| 452 | pistol, which shall at a minimum include types of employment that require the handling of cash |
| 453 | or other valuable objects that may be transported upon the applicant's person; and |
| 454 | "(C) Demonstrated the applicant's suitability to carry a concealed pistol, |
| 455 | which shall at a minimum include evidence that the applicant meets the requirements of section |
| 456 | 902; |
| 457 | "(2) To establish the type and amount of ammunition that may be carried |
| 458 | concealed by a licensee; |
| 459 | "(3) To establish the methods by which a pistol may be carried, including any |
| 460 | standards for safe holstering; |
| 461 | "(4) To establish all application forms, investigation procedures, background |
| 462 | checks, and fees necessary to process an application for a license to carry a concealed pistol; |
| 463 | "(5) To specify any procedures or requirements specific to non-residents who |
| 464 | apply to carry a concealed pistol pursuant to section 6 of the Pistols and Other Dangerous |
| 465 | Weapons Act, with regard to the registration requirements in this act; |
| 466 | "(6) To specify requirements for signage on any private premises where the owner |
| 467 | or person in control of the premises prohibits carrying concealed pistols, pursuant to section |
| 468 | 907(b); and |
| 469 | "(7) To establish procedures for the renewal of licenses.". |

470        Sec. 3. An Act To control the possession, sale, transfer, and use of pistols and other

471    dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of

472    evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-

473    4501 *et seq.*), is amended as follows:

474        (a) Section 4(a) (D.C. Official Code § 22-4504(a)) is amended as follows:

475            (1) The lead-in language is amended as follows:

476                (A) Strike the phrase "a pistol" and insert the phrase "a pistol, without a

477    license issued pursuant to District of Columbia law" in its place.

478                (B) Strike the phrase "capable of being so concealed".

479            (2) Paragraph (1) is amended by striking the phrase "a pistol" and inserting the

480    phrase "a pistol, without a license issued therefor pursuant to District of Columbia law" in its

481    place.

482        (b) Section 6 (D.C. Official Code § 22-4506) is revived as of the effective date of the

483    License to Carry a Pistol Emergency Amendment Act of 2014, effective October 9, 2014 (D.C.

484    Act 20-447; 61 DCR 10765), and is amended to read as follows:

485       "Sec. 6. Issuance of a license to carry a pistol.

486       "(a) The Chief of the Metropolitan Police Department ("Chief") may, upon the

487    application of any person having a bona fide residence or place of business within the District of

488    Columbia, or of any person having a bona fide residence or place of business within the United

489    States and a license to carry a pistol concealed upon his or her person issued by the lawful

490    authorities of any State or subdivision of the United States, issue a license to such person to carry

491    a pistol concealed upon his or her person within the District of Columbia for not more than 2

492    years from the date of issue, if it appears that the applicant has good reason to fear injury to his

493    or her person or property or has any other proper reason for carrying a pistol, and that he or she

494    is a suitable person to be so licensed.

495       "(b) A non-resident who lives in a state that does not require a license to carry a

496    concealed pistol may apply to the Chief for a license to carry a pistol concealed upon his or her

497    person within the District of Columbia for not more than 2 years from the date of issue;

498    provided, that he or she meets the same reasons and requirements set forth in subsection (a) of

499    this section.

16

500     "(c) For any person issued a license pursuant to this section, or renewed pursuant to
501     section 903 of the Firearms Control Regulations Act of 1975, as approved by the Committee on
502     the Judiciary and Public Safety on November 25, 2014 (Committee print of Bill 20-930), the
503     Chief may limit the geographic area, circumstances, or times of the day, week, month, or year in
504     which the license is effective, and may revoke the license for good cause.
505     "(d) The application for a license to carry shall be on a form prescribed by the Chief. The
506     license shall be in a form prescribed by the Chief and shall bear the name, address, description,
507     photograph, and signature of the licensee.
508     "(e) Except as provided in section 905(b) of the Firearms Control Regulations Act of
509     1975, as approved by the Committee on the Judiciary and Public Safety on November 25, 2014
510     (Committee print of Bill 20-930), any person whose application has been denied or whose
511     license has been revoked may, within 15 days of notice of the denial, appeal to the Concealed
512     Pistol Licensing Review Board established pursuant to section 908 of the Firearms Control
513     Regulations Act of 1975, as approved by the Committee on the Judiciary and Public Safety on
514     November 25, 2014 (Committee print of Bill 20-930).
515     Sec. 4. Section 101 of the Omnibus Public Safety and Justice Amendment act of 2009,
516     effective Dec. 10, 2009 (D.C. Law 18-88; D.C. Official Code § 22-2511), is repealed.
517     Sec. 5. Fiscal impact statement.
518     The Council adopts the fiscal impact statement in the committee report as the fiscal
519     impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act,
520     approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).
521     Sec. 6. Effective date.
522     This act shall take effect following approval by the Mayor (or in the event of veto by the
523     Mayor, action by the Council to override the veto), a 60-day period of Congressional review as
524     provided in section 602(c)(2) of the District of Columbia Home Rule Act, approved December
525     24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(2)), and publication in the District of
526     Columbia Register.
527

The Council of the District of Columbia
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Dear Mayor-Elect Bowser, Chairman Mendelson and Council Members,

We represent the city's broad and diverse faith community. We believe and practice our faiths differently. However, we share the same values regarding peace, שָׁלוֹם (shalom), and سلام (salaam).

We come together to express our deep concern with the License to Carry a Pistol Amendment Act of 2014. The proposed legislation presumes that concealed pistols are permissible within houses of worship unless they post "conspicuous signage" prohibiting these pistols. This requirement is inappropriate and impractical in view of the overwhelming number of congregations that object to guns in their sacred spaces.

Moreover houses of worship are considered sanctuaries - places where people are safe from violence or the threat of violence. They are places for prayer, reflection, reconciliation, and solace. People should be able to do so without the fear of violence. They must be free to fulfill their spiritual needs at these holy places knowing they are indeed sanctuaries where peace is both sought and found.

The legislation prohibits pistols in numerous locations such as universities, schools, childcare facilities. We believe the legislation must also prohibit or presumptively prohibit pistols within houses of worship. Twelve other states---some with less restrictive gun laws---have similar prohibitions.

Accordingly we strongly urge you to revise the legislation to prohibit or presumptively prohibit pistols within our houses of worship.

Thank You.

cc: Mayor Vincent Gray


Respectfully yours,

The Rt. Rev. Marianne Edgar Budde
Bishop
Episcopal Diocese of Washington

Terrance Lynch
Executive Director
Downtown Cluster of Congregations

Talib M. Shareef, CMSgt, USAF-Retired
Imam / President
The Nation's Mosque, Masjid Muhammad

The Very Rev. Gary R. Hall
Dean
Washington National Cathedral

Rev. Susan Taylor
President
Founding Church of Scientology

Rev. Patrick Walker
President
Baptist Convention of D.C. and Vicinity

Monsignor John Enzler
President and CEO
Catholic Charities of the Archdiocese of Washington

Rev. Dr. James Coleman
Pastor
All Nations Baptist Church

Ronald Halber
Executive Director
Jewish Community Relations Council of Greater Washington

Michael Scott
Director
D.C. Catholic Conference

Dr. Stephanie E. Myers, National Co-Chair
National Co-Chair
Black Women for Positive Change

Rev. Mark Horak
Pastor
Holy Trinity Catholic Church

Patty Johnson
Canon Missioner
Washington National Cathedral

Rev. Dr. Barbara Reynolds
Chaplain
Black Women for Positive Change

Rev. David Bava
Pastor
Holy Redeemer Catholic Church

Rev. Rebecca Justice Schunior
Associate Rector
St. Mark's Episcopal Church, Capitol Hill

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**
_____

**BRIAN WRENN, JOSHUA AKERY,**
**TYLER WHIDBY, and SECOND AMENDMENT**
**FOUNDATION, INC.,**

                              **Plaintiffs,**


               v.                                         **1:15-CV-162**
                                                              **(FJS)**

**DISTRICT OF COLUMBIA and CATHY**
**L. LANIER,**

                              **Defendants.**
_____

**APPEARANCES**                          **OF COUNSEL**

**GURA & POSSESSKY, PLLC**               **ALAN GURA, ESQ.**
105 Oronoco Street, Suite 305
Alexandria, Virginia 22314
Attorneys for Plaintiffs

**OFFICE OF THE ATTORNEY**               **ANDREW J. SAINDON, ESQ.**
**GENERAL FOR THE DISTRICT**
**OF COLUMBIA**
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001-2714
Attorneys for Defendants

**SCULLIN, Senior Judge**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Currently before the Court is Plaintiffs' motion for a preliminary injunction.[1]

_____

[1] All references to page numbers in documents that are part of the Court's record are to the page numbers that the Court's electronic filing system generates and that appear in the top-right corner of each page.

**JA 228**

## II. BACKGROUND

Plaintiffs filed their complaint in this 42 U.S.C. § 1983 action on February 3, 2015.  Three days later, on February 6, 2015, they filed a motion for a preliminary injunction.

Plaintiffs' complaint contains only one cause of action, in which they seek both injunctive and declaratory relief.  Specifically, they request that the Court declare that D.C. Code § 22-4506(a)'s grant of discretion to the Police Chief  to refuse the issuance of licenses to carry handguns and its "good reason"/"proper reason" requirement, as well as the requirements of D.C. Code § 7-2709.11 that the Police Chief issue rules to establish the criteria for "good reason" and "other proper reason" for carrying a handgun, including the minimum requirements set forth therein and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4, and 2334.1 violate the Second Amendment to the United States Constitution on their face and as applied to the individual Plaintiffs and other law-abiding, responsible members of Plaintiff Second Amendment Foundation ("SAF"), who otherwise would qualify for a District of Columbia license to carry a handgun.  *See* Complaint at ¶ 40.  They also ask that the Court permanently enjoin Defendants from enforcing the same.

With regard to their instant motion for a preliminary injunction, the relief that Plaintiffs seek is limited to enjoining Defendants from applying the "good reason"/"proper reason" requirement of D.C. Code § 22-4506(a), including, but not limited to, the manner in which that requirement is defined in D.C. Code § 7-2509.11 and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4 and 2334.1, to applicants who otherwise meet the requirements of D.C. Code § 22-4506(a) and all other current requirements for possessing and carrying of handguns under District of Columbia law.

## III. DISCUSSION

**A.     Statutory scheme**

Before analyzing Plaintiffs' motion, it is necessary to set forth the provisions of the District of Columbia's licensing mechanism with which Plaintiffs take issue.  In response to this Court's July 24, 2014 Memorandum-Decision and Order in *Palmer v. Dist. of Columbia*, No. 1:09-CV-1482, 2014 WL 3702854 (D.D.C. July 24, 2014), the Council of the District of Columbia ("Council"), on September 23, 2014, voted unanimously to pass Bill 20-926, the "License to Carry a Pistol Emergency Amendment Act of 2014" (the "Emergency Act").  This Act became effective when the Mayor signed it on October 9, 2014.

The Council also introduced permanent legislation, the "License to Carry a Pistol Amendment Act of 2014," Bill 20-930, which was referred to its Committee on the Judiciary and Public Safety.  The Council conducted a public hearing on the permanent legislation on October 16, 2014, and the Committee mark-up occurred on November 25, 2014.  The first and second readings on the permanent legislation occurred in December 2014.  The permanent legislation was transmitted to Congress on March 6, 2015, and the projected law date is June 16, 2015.  *See* http://lims.dccouncil.us/Legislation/B20-0930?FromSearchResults  true (last visited on May 4, 2015).

Under the current legislation, D.C. Code § 22-4506(a) provides as follows:

> The Chief of the Metropolitan Police Department ("Chief") may, upon the application of any person having a bona fide residence or place of business within the District of Columbia, or of a person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol concealed upon his or

-3-

**JA 230**

her person within the District of Columbia for not more than 2 years from the date of issue, **if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed.** (emphasis added)

In addition, "[t]he Chief of [the Metropolitan Police Department] shall issue rules to

implement the provisions of the License to Carry a Pistol Amendment Act of 2014," including the

following rules:

(1) To establish criteria for determining when an applicant has, pursuant to section 6 of the Pistols and Other Dangerous Weapons Act:

(A) Demonstrated a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life;

(B) Demonstrated any other proper reason for carrying a concealed pistol, which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person; . . . .

Furthermore, Defendant Lanier, as Chief of the Metropolitan Police Department, has

adopted various regulations regarding the licensing of individuals to carry concealed handguns,

including the following:

A person shall demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life.  24 D.C.M.R. § 2333.1

For the purposes of satisfying the specifications of § 2333.1, a person shall allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person.  The person shall also allege that the threats are of a nature

-4-

**JA 231**

that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger.  24 D.C.M.R. § 2333.2

The person shall provide all evidence of contemporaneous reports to the police of such threats or attacks, and disclose whether or not the applicant has made a sworn complaint to the police or the courts of the District of Columbia concerning any threat or attack.  24 D.C.M.R. § 2333.3

The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry license.  24 D.C.M.R. § 2333.4

A person may allege any other proper reason that the Chief may accept for obtaining a concealed carry license which may include:

> (a) Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person; or

> (b) The need for a parent, son, daughter, sibling, or other adult member of the immediate family to provide protection of a family member who is physically or mentally incapacitated to a point where he or she cannot act in defense of himself or herself, and the family member who is physically or mentally incapacitated can demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life in the manner described in § 2333.  24 D.C.M.R. § 2334.1

**JA 232**

**B.       Standard for reviewing a motion for a preliminary injunction**

As stated, currently before the Court is Plaintiffs' motion for a preliminary injunction to enjoin Defendants from applying the "good reason"/"proper reason" requirement of D.C. Code § 22-4506(a), including, but not limited to, the manner in which that requirement is defined in D.C. Code § 7-2509.11 and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4 and 2334.1, to applicants who otherwise meet the requirements of D.C. Code § 22-4506(a) and all other current requirements for possessing and carrying of handguns under District of Columbia law.

A party seeking a preliminary injunction must demonstrate "'(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'" *Davis v. Billington*, No. 10-0036, 2014 WL 7204782, *2 (D.D.C. Dec. 19, 2014) (quoting *Chaplaincy*, 454 F.3d at 297).  When evaluating these factors, the District of Columbia Circuit uses a "'sliding-scale approach.'" *Id.* (citation and footnote omitted).  Under this approach, "'[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor.'" *Id.* (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)).[2]

Since "'a preliminary injunction is an extraordinary and drastic remedy, . . . the [party] seeking to invoke such stringent relief is obliged to establish a clear and compelling legal right

---

[2] As the court noted in *Henke v. Dep't of Interior*, 842 F. Supp. 2d 54 (D.D.C. 2012), the District of Columbia Circuit "has suggested, without deciding, that *Winter* [*v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008),] should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Id.* at 58 (citing *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).

-6-

**JA 233**

thereto based upon undisputed facts.'" *Id.* at *3 (quoting *In re Navy Chaplaincy*, 928 F. Supp. 2d

26, 36 (D.D.C.) (internal citations and quotation marks omitted), *aff'd*, 738 F.3d 425 (D.C. Cir.

2013)).  Moreover, "[a] party who seeks a mandatory injunction to change (rather than preserve) the

status quo 'must meet a higher standard than in the ordinary case by showing "clearly" that he or she

is entitled to relief or that "extreme or very serious damage" will result from the denial of the

injunction.'" *In re Guantanamo Bay Detainee Litig.*, 570 F. Supp. 2d 13, 17 n.3 (D.D.C. 2008)

(quoting *Veitch v. Danzig*, 135 F. Supp. 2d 32, 35 (D.D.C. 2001)).[3]

The Court will address each of these requirements in turn.

### *1. Likelihood of success on the merits*

As the court stated in *In re Guantanamo Bay Detainee Litig.*, "absent a 'substantial

indication' of likely success on the merits, 'there would be no justification for the court's intrusion

into the ordinary processes of administration and judicial review.'" *In re Guantanamo Bay Detainee*

*Litig.*, 570 F. Supp. 2d at 17 (quoting *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp.

2d 114, 140 (D.D.C. 1999)).  Thus, to obtain a preliminary injunction, Plaintiffs must first and

foremost establish that they are likely to succeed on the merits of their claim that the District of

Columbia's requirement that they demonstrate "good reason"/"proper reason" in order to obtain a

license to carry a concealed handgun in public for the purpose of self-defense violates their Second

Amendment right to bear arms.

---

[3] The Court notes that, although "[s]ome D.C. District Courts have held that mandatory injunctions [that change the status quo] require applicants to 'meet a higher standard . . .' . . . [i]t appears. . . that the D.C. Circuit has not yet adopted this rule. . . ." *Boivin v. US Airways, Inc.*, 297 F. Supp. 2d 110, 115 n.5 (D.D.C. 2003) (internal quotation and other citations omitted). Nonetheless, in view of the prevailing authority throughout the circuits, it seems appropriate to apply this standard.

**JA 234**

In *Palmer v. Dist. of Columbia*, No. 1:09-CV-1482, 2014 WL 3702854 (D.D.C. July 24, 2014), this Court concluded that the Second Amendment right to bear arms, although subject to traditional restrictions, includes the right to carry an operable handgun outside the home for self-defense. *See id.* at *6; *see also Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014); *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012). Therefore, consistent with its decision in *Palmer*, this Court again concludes that, although subject to traditional restrictions, there exists a right under the Second Amendment to carry handguns in public for self-defense. Having so concluded, the specific issue this Court must decide in the present case is whether Plaintiffs have established a likelihood of success on the merits of their claim that the District of Columbia's "good reason"/"proper reason" requirement violates that right because it impermissibly burdens their Second Amendment right to bear arms; that is, it unreasonably denies otherwise qualified individuals the right to carry a handgun for self-defense.

In *Heller v. Dist. of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"), the circuit court explained that, where there exist firearm regulations that may or may not burden the exercise of one's Second Amendment rights, it would adopt, as had other circuits, a two-step approach to determine the constitutionality of such firearm regulations. *See id.* at 1252 (citations omitted). The first step in this analysis requires that the court determine whether a particular statutory provision impinges on a right that the Second Amendment protects. *See id.* If it does, the court proceeds to determine whether the provision at issue unlawfully burdens that right under the appropriate level of constitutional scrutiny. *See id.* (citations omitted).

With respect to the first step of this analysis, the Supreme Court in *Heller* instructs that "longstanding" regulations are "presumptively lawful," *Dist. of Columbia v. Heller*, 554 U.S. 570,

626-27 & n.26 (2009); that is, "they are presumed not to burden conduct within the scope of the

Second Amendment." *Heller II*, 670 F.3d at 1253 (citations omitted).  The court in *Heller II*

explained that "this is a reasonable presumption because a regulation that is 'longstanding,' which

necessarily means it has long been accepted by the public, is not likely to burden a constitutional

right . . . ." *Id.*  However, a plaintiff may rebut this presumption by demonstrating that the

regulation has more than a *de minimis* effect on his right.  *See id.*

Defendants argue that, because the District of Columbia's regulation of the public carrying of

guns is "longstanding," its "good reason"/"proper reason" requirement is presumed not to violate

Plaintiffs' Second Amendment right to bear arms.  To support this position, Defendants note that the

District of Columbia has been regulating guns for more than two centuries.  *See* Dkt. No. 9 at 14.

For example, in 1801 the then-Town of Georgetown prohibited firing guns in its "inhabited parts."

*See id.* (citing Town of Georgetown Ordinance of Oct. 24, 1801).  In 1809, the City of Washington

similarly made it unlawful to fire guns "'within four hundred yards of any house . . . or on the

Sabbath.'"  *See id.* (quoting Act of the Corporation of the City of Washington of Dec. 9, 1809).  In

1857, the District of Columbia authorized the filing of civil complaints by "'any person having

reasonable cause to fear an injury or breach of the peace' against any person who 'shall go armed

with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable

cause to fear an assault or other injury or violence to his person, or to his family or property[.]'"  *See

id.* (quoting Revised Code of the District of Columbia, ch. 141, § 16 (1857)).  Also, in the same

year, the District of Columbia "made it unlawful to carry 'deadly or dangerous weapons, such as . . .

pistol[s].'"  *See id.* (quoting Act of the Corporation of the City of Washington of Nov. 4, 1857)

(citing Act of Nov. 18, 1858).

Defendants also note that, in 1892, Congress barred persons throughout the District of Columbia from having such weapons "'concealed about their person' outside of the person's 'place of business, dwelling house, or premises.'" *See id.* (quoting Act of July 13, 1892, ch. 159, 27 Stat. 116). Finally, "[i]n 1932, Congress required licenses for carrying pistols and other concealable weapons outside of one's home or place of business." *See id.* (citing Act of July 8, 1932, ch. 465, Pub. L. No. 72-275, 47 Stat. 651). Based on this history, Defendants assert that, "leaving aside the recent legislation, the District's regulation of firearms generally    and concealed weapons in particular    is manifestly 'longstanding' and therefore does not burden conduct within the scope of the Second Amendment." *See id.*[4]

In response, Plaintiffs point out that Defendants "advanced th[is] same argument in *Heller*, citing early public discharge laws for the proposition that there was no right to keep a gun for self-defense [and] [t]he Supreme Court rejected that argument." *See* Dkt. No. 10 at 15.

Plaintiffs also distinguish the 1857 law, which references a good-reason type requirement, but which Plaintiffs argue undermines Defendants' position. *See id.* The 1857 law "provided that an individual going armed 'without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property . . . find sureties for keeping the peace for a term not exceeding six months,' upon 'complaint of any person having reasonable cause to fear an injury or breach of the peace.'" *See id.* at 15-16. Plaintiffs assert that this means that a "complainant would have to establish 'reasonable cause' that the gun-carrier would injure him or breach the peace . . . [and] [d]oing so would result not in any criminal sanction or even prohibition on the carrying of

---

[4] Defendants reference decisions in other jurisdictions, in which the courts have found the legislative history to be longstanding. However, those decisions are not relevant to the District of Columbia's legislative history.

arms, but only the temporary posting of sureties.  That is a far cry from requiring the individual gun-carrier to prove a good reason for so doing."  *See id.* at 16.[5]  Finally, in 1943 the District of Columbia amended its statutes  to prohibit the unlicensed carrying of pistols, whether openly or concealed.  *See id.* at 17 (quoting *Cooke v. United States*, 275 F.2d 887, 889 n.3 (D.C. Cir. 1960)).[6]

Despite Defendants' lengthy dissertation of the District of Columbia's history of firearm regulation, with the possible exception of the 1857 statute, which refers to a "good-reason type" requirement that is clearly distinguishable from the requirement at issue here, Defendants have not presented any historical evidence to support their argument that the District of Columbia's "good reason"/"proper reason" requirement is longstanding.

In any event, as Plaintiffs point out, "the 'longstanding' inquiry is irrelevant" because the District of Columbia's "good reason"/"proper reason" requirement "has far more than a 'de minimis' effect on [their] rights   it completely bars the right from being exercised, at all times and places and in any manner, without exception."  *See* Dkt. No. 10 at 17.  Plaintiffs, as well as the vast majority of law-abiding citizens, who fail to satisfy the District of Columbia's "good reason"/"proper reason" requirement because they cannot "show a special need for self-protection distinguishable from the general community" or that they are engaged in a "type[] of employment that require[s] the handling

---

[5] In 1892, Congress enacted a statute that was effective until 1932, which proscribed the open carrying of handguns if carried with the intent to use them illegally.  A replacement law in 1932 continued the ban on the unlicensed concealed carrying of handguns but did not mention the open carrying of handguns.

[6] Plaintiffs assert that, "if in 1943, Congress had looked to the federal courts for constitutional guidance in enacting this provision, it would have only been misled by the then-emerging, erroneous 'collective rights' doctrine."  *See* Dkt. No. 10 at 17 (citing *United States v. Tot*, 131 F.2d 261, 266 (3d Cir. 1942), *rev'd on other grounds*, 319 U.S. 463 (1943); *Cases v. United States*, 131 F.2d 916, 921 (1st Cir. 1942)).

-11-

**JA 238**

of cash or other valuable objects that may be transported upon [their] person," are unable to exercise their fundamental right to bear arms for self-defense under the Second Amendment.  Thus, the Court concludes that the District of Columbia's "good reason"/"proper reason" requirement impinges on Plaintiffs' Second Amendment right to bear arms.

The Court must next determine whether that impingement unlawfully burdens that right.  To do that, the Court must first determine the degree of constitutional scrutiny to which this regulation is appropriately subject.  There are three levels of scrutiny that are potentially available to the Court when analyzing the constitutionality of a statute: rational basis review, intermediate scrutiny, and strict scrutiny.  In *Heller*, the Supreme Court made clear that courts may not apply rational basis review to a law that burdens protected Second Amendment conduct.  *See Heller*, 554 U.S. at 628 n.27.

Furthermore, in *Heller II*, the circuit court, in addressing the appropriate level of constitutional scrutiny to apply to the District of Columbia's firearm registration requirements, decided to apply intermediate scrutiny to those requirements.  *See Heller II*, 670 F.3d at 1257. Although the Court recognizes that there is a substantive difference between the registration requirements at issue in *Heller II* and the District of Columbia's "good reason"/"proper reason" requirement at issue in this case, the Court, nonetheless, concludes that intermediate scrutiny applies to this requirement as well.[7]

In *Heller II*, the circuit court held that intermediate scrutiny required that the District of

───────────────

[7] Other circuits likewise have found intermediate scrutiny to be the appropriate standard when reviewing firearms regulations vis-a-vis the Second Amendment.  *See, e.g., Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012).

**JA 239**

Columbia demonstrate that its firearm registration requirements were "'substantially related to an important governmental objective.'" *Heller II*, 670 F.3d at 1258 (quotation omitted).  The court explained that this meant that the District of Columbia had to establish a tight "fit" between its firearm registration requirements and a substantial governmental interest, "a fit 'that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.'"  *Id.* (quotation and other citation omitted).  In other words, the District of Columbia had to show that its firearms registration requirements were not broader than necessary to achieve its substantial government interest.  *See id.* (citing *Ward [v. Rock Against Reason]*, 491 U.S. [781], 782-83, 109 S. Ct. 2746 [(1989)]).

     In applying *Heller II* to the facts of this case, the Court concludes that, to pass muster under intermediate scrutiny, the District of Columbia must demonstrate that its "good reason"/"proper reason" requirement is not broader than necessary to achieve its substantial government interest in preventing crime and protecting public safety.  As the Ninth Circuit explained in *Peruta*, although the Supreme Court in *Turner Broad. Sys., Inc. v. FCC ("Turner II")*, 520 U.S. 180 (1997), instructed that courts must afford deference to the legislature's judgment when determining whether a statute could withstand intermediate scrutiny, the Court did so only with respect to the first part of that analysis.  *See Peruta*, 742 F.3d at 1177.  However, when assessing the "fit" between the government's important interest and the means that the government selected to advance that interest, the Court in *Turner II* did not afford any such deference to the legislature's decision.  *See id.*  Rather, it required that the government establish that its statute did not burden the right substantially more than was necessary to further its important interests.  *See id.* (quotation omitted); *cf. Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).  This Court agrees that deference should be given to the

District of Columbia's stated governmental interest in preventing crime and protecting public safety; however, *Taylor II*, as well as *Heller II* and *Peruta*, requires that the District of Columbia demonstrate that its "good reason"/"proper reason" requirement is not broader than necessary to achieve this important governmental interest.[8]

Plaintiffs argue that the District of Columbia's "good reason"/"proper reason" requirement fails intermediate scrutiny because it does not advance its interest in preventing crime or protecting public safety. *See* Dkt. no. 6-2 at 25. Specifically, this regulation is not directed at dangerous people, does not regulate the manner of carrying handguns, and does not impose any place restrictions. *See id.* (citing *Peruta*, 742 F.3d at 1176-77). To support this position, Plaintiffs rely on *Fletcher v. Haas*, 851 F. Supp. 2d 287 (D. Mass. 2012), and *Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012).

In *Fletcher*, the state law at issue barred lawful resident aliens from possessing guns. The court struck down the law, reasoning that, because the law was premised on the assumption that lawful permanent residents were categorically dangerous and all American citizens were trustworthy, it lacked even a reasonable basis and, thus, could not withstand either intermediate or strict scrutiny. *See Fletcher*, 851 F. Supp. 2d at 303. Likewise, in *Bateman*, the court struck down laws barring handgun carrying during so-called "states of emergency," finding that those laws effectively banned the public at large from carrying handguns for self-defense, conduct that was at the very core of the Second Amendment. *See Bateman*, 881 F. Supp. 2d at 716.

---

[8] It is in this regard that the Court finds the Second, Third and Fourth Circuits' application of intermediate scrutiny to the firearms licensing regulations before them uninstructive. In analyzing the regulations before them, these courts either afforded too much deference to the legislature's conclusions or did not address whether the statutes at issue were no broader than necessary to achieve the government's substantial objectives. *See Peruta*, 742 F.3d at 1177.

In response, Defendants argue that the District of Columbia's "good reason"/"proper reason" requirement reasonably furthers its important governmental interest in reducing the number of concealed weapons in public in order to reduce the risks to other members of the public and to reduce the disproportionate use of such weapons in the commission of violent crimes. *See* Dkt. No. 9 at 19.

Furthermore, Defendants cite to the Report of the District of Columbia Council's Committee on the Judiciary and Public Safety ("Committee Report"),[9] which, among other things, summarized the testimony that the Committee had received from Chief Lanier about the safety issues facing the District of Columbia.[10]  The Report also cited the empirical evidence that it had considered, which purported to show that "right-to-carry" laws were associated with substantially higher rates of aggravated assault, rape, robbery and murder.[11]

There is no dispute that the Committee Report sets forth in detail the reasons that the District of Columbia implemented the current licensing mechanism.  However, the issue here is not whether the District of Columbia's "good reason"/"proper reason" requirement is a reasonable or wise policy choice.  Rather, the issue is whether this requirement, no matter how well intended, violates the

---

[9] The Committee Report is available online at http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport1.pdf (last visited May 14, 2015).

[10] The Committee held a public hearing on Bill 20-930 on October 16, 2014.

[11] This evidence would appear to be contradicted by, among other things, the Federal Bureau of Investigation's *Uniform Crime Reports: Crime in the United States 2013, Table 4*, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/4tabled atadecoverviewpdf/table_4_crime_in_the_united_states_by_region_geographic_division_and_sta te_2012-2013.xls (last visited May 18, 2015.  The point is that the empirical evidence on this issue is not conclusive.

-15-

**JA 242**

Second Amendment.

While, as stated, Defendants argue that the District of Columbia's "good reason"/"proper reason" requirement relates reasonably to its interest in preventing crime and protecting public safety, they have not established that relationship.

The fact that an individual may be able to demonstrate a greater need for self-protection, and therefore meets the "good reason"/"proper reason" requirement, does not indicate, in any way, whether that person is less likely to misuse handguns or may be less dangerous. *See Drake*, 724 F.3d at 454 (Hardiman, C.J., dissenting).[12]  Nor does the District of Columbia's "good reason"/"proper reason" requirement make it less likely that those who meet this requirement will accidently shoot themselves or others or engage in criminal activity than those who cannot meet this requirement.  *See id.*  The fact that a person may have a greater need for self-protection says nothing about how limiting the carrying of handguns to such individuals would result in a reduction of risk to other members of the public or reduce violent crime.  Is the Court to conclude that people who do not have a heightened need for self-protection are more likely to commit violent crimes?

Furthermore, even if the Court were to accept the proposition that handguns are used disproportionately in the commission of violent crimes, how is that use related to whether or not a person has a greater need for self-protection?  Moreover, isn't it possible that even persons who cannot manifest a present need for self-protection are just as likely to be victims of a violent crime.  Simply put, the District of Columbia's "good reason"/"proper reason" requirement will neither make

---

[12] *See Drake*, 724 F.3d at 454 (Hardiman, C.J., dissenting) (stating that "it seems odd to suggest that one who obtains a handgun carry permit because he is in imminent danger is less likely to mishandle a gun than one who obtains a carry permit because he might want to exercise that right in the future even though he perceives no present danger").

it less likely that those who meet this requirement will present a risk to other members of the public or commit violent crimes than those who cannot meet this requirement. Therefore, after reviewing the record in this case, the Court finds that Defendants have failed to demonstrate that there is any relationship, let alone a tight fit, between reducing the risk to other members of the public and/or violent crime and the District of Columbia's "good reason"/"proper reason" requirement.

This conclusion should not be read to suggest that it would be inappropriate for the District of Columbia to enact a licensing mechanism that includes appropriate time, place and manner restrictions on the carrying of handguns in public.[13] The District of Columbia's arbitrary "good reason"/"proper reason" requirement, however, goes far beyond establishing such reasonable restrictions. Rather, for all intents and purposes, this requirement makes it impossible for the overwhelming majority of law-abiding citizens to obtain licenses to carry handguns in public for self-defense, thereby depriving them of their Second Amendment right to bear arms.

Accordingly, at this point in the litigation and based on the current record, the Court concludes that Plaintiffs have shown that they are likely to succeed on the merits of their claim that

---

[13] *See Heller*, 554 U.S. at 626-27 (noting that its opinion should not be construed to cast doubt on the validity of various "longstanding" time, place and manner restrictions on the possession, carrying, and sale of handguns); *Friedman v. City of Highland Park,* No. 14-3091, 2015 WL 1883498 (7th Cir. Apr. 27, 2015) (holding that a city ordinance that generally prohibited the possession, sale or manufacture of semi-automatic assault weapons and large capacity magazines did not violate the Second Amendment); *Heller v. Dist. of Columbia*, 45 F. Supp. 3d 35 (D.D.C. 2014) (holding that the challenged regulations pertaining to the registration of handguns did not violate the Second Amendment); *Parker v. Dist. of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007) (stating that "[t]he protections of the Second Amendment are subject to the same sort of reasonable [time, place and manner] restrictions that have been recognized as limiting, for instance, the First Amendment" (citation omitted)). *Cf. Ezell v. City of Chicago*, 651 F.3d 684, 714 (7th Cir. 2011) (stating that "historical context tells us that cities may take public safety into account in setting reasonable time, place and manner restrictions on the discharge of firearms within City limits").

# JA 244

the District of Columbia's "good reason"/"proper reason" requirement runs afoul of the Second Amendment.

### 2. Irreparable harm

In *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the Seventh Circuit addressed a Second Amendment challenge to the City of Chicago's Responsible Gun Owners Ordinance (the "Ordinance"), which the City had enacted four days after the Supreme Court's decision in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), which held that the Second Amendment applied to the States. The plaintiffs argued, among other things, that the Ordinance burdened the core Second Amendment right to possess firearms for self-defense because it conditioned possession on range training but simultaneously forbid range training everywhere in the City. The plaintiffs sought a preliminary injunction, but the district court denied their request. The Seventh Circuit reversed.

In addressing the requirement that the plaintiffs must establish irreparable harm in order to obtain a preliminary injunction, the court noted that for certain kinds of constitutional violations, particularly First Amendment claims, irreparable harm was presumed. *See Ezell*, 651 F.3d at 699 (citations omitted). The court explained that courts often presume that the loss of a First Amendment right causes irreparable harm "based on 'the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.'" *Id.* (quotation and other citation omitted). The court further explained that "[t]he Second Amendment protects similarly intangible and unquantifiable interests," which "cannot be compensated by damages." *Id.* (footnote omitted). Therefore, the court held that "the plaintiffs' harm [was] properly

-18-

## JA 245

regarded as irreparable and having no adequate remedy at law." *Id.* at 700.

This Court agrees with the Seventh Circuit's reasoning in *Ezell* and finds that Plaintiffs have established that they are likely to succeed on the merits of their claim that the District of Columbia's "good reason"/"proper reason" requirement was unconstitutional when enacted and continues to violate their Second Amendment right to bear arms for the purpose of self-defense every day that the District of Columbia continues to enforce it. Thus, the Court concludes that Plaintiffs have established that they will suffer irreparable harm if the Court does not grant their motion for a preliminary injunction.

### 3. Balance of the equities

Plaintiffs argue that, although they have suffered and will continue to suffer irreparable harm as long as Defendants continue to enforce their "good reason"/"proper reason" requirement, Defendants would not suffer any harm if the Court granted Plaintiffs' motion for a preliminary injunction. *See* Dkt. No. 6-2 at 28. They assert that Defendant Lanier virtually conceded that point when she commented on this Court's decision striking down the total carry ban stating, "'Law-abiding citizens that register firearms, that follow the rules, are not our worry.'" *See id.* at 28-29 (quotation and footnote omitted). Furthermore, Plaintiffs argue that they are not requesting anything that would "impact[] the city's handgun registration requirements, which are generally stricter than state licensing requirements (if any) for the carrying of handguns, nor would the injunction impact any city carry restrictions as to time, place, and manner." *See id.* at 29.

Finally, Plaintiffs assert that an injunction "would not result in unlicensed handgun carrying." *See* Dkt. No. 10 at 27. Rather, "[t]he District would still have among the most stringent

handgun carry licensing requirements in the country, requiring not just extensive training and background checks for applicants and registration of carried guns, but the full panoply of extreme (and dubious) restrictions upon licensed handgun carriers." *See id.*  Plaintiffs note that an injunction would not "stop background checks, or training, or registration, or any other thing that the District wishes to impose on handgun carry license applicants.  It [would] stop *only* the 'good/proper reason' requirement, and nothing else." *See id.* at 27-28.  Thus, Plaintiffs assert that, "[c]onsidering the extreme level of regulation untouched by the injunction, and the wealth of evidence demonstrating how licensed handgun carriers actually behave, . . ., the threat to the public harm would be virtually zero." *See id.* at 28.  On the other hand, Plaintiffs argue that "the benefit to individuals, who could defend themselves from violent crime, would be significant." *See id.*

To the contrary, Defendants argue that the balance of equities tips heavily in their favor because an injunction would allow an unknown number of people to carry concealed handguns in the District of Columbia, which, in turn, would increase the risk of a gun-related tragedy to both those carrying the guns and the general public.  *See* Dkt. No. 9 at 31-35.  Defendants' assertions misapprehend the scope of the injunction that Plaintiffs are seeking.

As noted, Plaintiffs seek a very limited injunction.  That is, they seek an injunction that only affects Defendants' ability to enforce the District of Columbia's "good reason"/"proper reason" requirement.  They are not, as Defendants argue, seeking to prevent Defendants from enforcing the other provisions of the licensing mechanism nor do they seek to prevent Defendants from enacting and enforcing appropriate time, place and manner restrictions.  Under these circumstances, the Court finds that the balance of the equities weighs in favor of granting Plaintiffs' request for a preliminary injunction.

### 4. The public interest

Plaintiffs argue that "[i]t is 'obvious' that 'enforcement of an unconstitutional law is always contrary to the public interest[,]'" *see* Dkt. No. 6-2 at 29 (quotation omitted); and, conversely, "enforcing the Constitution is *always* in the public interest[,]" *see* Dkt. No. 10 at 28.

Defendants, on the other hand, argue that it is Plaintiffs' interests, not the public's interest, that drive this lawsuit. *See* Dkt. No. 9 at 35. Furthermore, Defendants assert that "'when an injunction would "adversely affect a public interest . . . even temporarily . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.'" *See id.* (quoting *Goings v. Court Servs. & Offender Supervision Agency for the District of Columbia*, 786 F. Supp. 2d 48, 60-61 (D.D.C. 2011) (quoting *Yakus v. United States*, 321 U.S. 414, 440-41 (1944))). Defendants contend that, "[i]n this case, the public consequences of granting an injunction would be significant," in that allowing for additional weapons on the street, which would, in turn, increase the risk of mishaps, outweighs the individual's right to "self-identified personal safety." *See id.* at 36.

For the same reasons that the Court found that the balance of equities weighs in favor of Plaintiffs, the Court also finds that the public interest weighs in favor of Plaintiffs.


### C.    Bond Requirement

Rule 65 of the Federal Rules of Civil Procedure provides, in pertinent part, that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined . . . ." Fed. R. Civ. P. 65(c).

# JA 248

Plaintiffs argue that a court may dispense with this requirement when there is no risk of financial harm. *See* Dkt. No. 6-2 at 29 (citations omitted). Thus, Plaintiffs assert that the Court should dispense with the bond requirement in this case. *See id.*

Defendants did not address Plaintiffs' argument regarding this issue. Although it is true that Defendants would not suffer any financial damages if it were later determined that the Court wrongfully enjoined them from enforcing the District of Columbia's "good reason"/"proper reason" requirement, the Court finds it proper that Plaintiffs provide security in the amount of $1,000.00 pursuant to Rule 65(c).

## IV. CONCLUSION

After reviewing the entire file in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion for a preliminary injunction is **GRANTED**; and the Court further

**ORDERS** that Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction are enjoined from enforcing the requirement of D.C. Code § 22-4506(a) that handgun carry license applicants have a "good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol," including, but not limited to, the manner in which that requirement is defined by D.C. Code § 7-2509.11 and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4, and 2334.1, against Plaintiffs Brian Wrenn, Joshua Akery, Tyler Whidby, and other members of Plaintiff Second Amendment Foundation, Inc.; and the Court further

**JA 249**

**ORDERS** that Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, are enjoined from denying handgun carry licenses to applicants who meet the requirements of D.C. Code 22-4506(a) and all other current requirements for the possession and carrying of handguns under District of Columbia law; and the Court further

**ORDERS** that, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, Plaintiffs shall post security in the amount of $1,000.00; and the Court further

**ORDERS** that counsel shall appear for a conference with the Court on **Tuesday, July 7, 2015**, at **11:00 a.m.** to discuss an expedited schedule for the resolution of this case.

**IT IS SO ORDERED.**

Dated: May 18, 2015
        Syracuse, New York


_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge

-23-

JA 250

**CERTIFICATE OF SERVICE**

I certify that on August 27, 2015, electronic copies of this joint appendix

were served through the Court's ECF system, to:

Alan Gura, Esq.
Gura & Possessky, PLLC
105 Oronoco Street, Suite 305
Alexandria, VA 22314

/s/ Holly M. Johnson
HOLLY M. JOHNSON