# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

BRIAN WRENN, ET AL.,

*Plaintiffs-Appellees*,

*v.*

DISTRICT OF COLUMBIA, ET AL.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Columbia, No. 1:15-cv-162-FJS (Scullin, J.)

**BRIEF FOR AMICI CURIAE DC APPLESEED CENTER FOR
LAW & JUSTICE, DC FOR DEMOCRACY, DC VOTE, THE LEAGUE OF
WOMEN VOTERS OF THE DISTRICT OF COLUMBIA, AND FORMER
MAYOR ANTHONY A. WILLIAMS IN SUPPORT OF APPELLANTS**

WALTER A. SMITH, JR.
KEVIN HILGERS
DC APPLESEED CENTER
   FOR LAW & JUSTICE
1111 Fourteenth Street, NW
Washington, DC 20005
Tel.: (202) 289-8007
Fax: (202) 289-8009

PAUL R.Q. WOLFSON
FRANCESCO VALENTINI
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
paul.wolfson@wilmerhale.com

ALLISON TRZOP
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000
Fax: (617) 526-5000

September 3, 2015

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), amici curiae DC Appleseed Center for Law & Justice, DC for Democracy, DC Vote, The League of Women Voters of the District of Columbia, and Former Mayor Anthony A. Williams certify that:

## (A) Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellants, except for the following amici who are also joining this amicus brief: DC for Democracy, DC Vote, The League of Women Voters of the District of Columbia, and Former Mayor Anthony A. Williams. Amici are not aware of any other amici intending to participate in this appeal.

## (B) Rulings under Review

References to the rulings at issue appear in the Brief for Appellants.

## (C) Related Cases

*Palmer v. District of Columbia*, No. 1:09-cv-1482-FJS (Scullin, J.), involved a challenge to the District of Columbia's longstanding prohibition on the public carrying of handguns. An appeal (No. 14-7180) was filed but was voluntarily dismissed. Plaintiffs filed this action as a "related case" in the district court.

Dated: September 3, 2015

Respectfully submitted,

/s/  Paul R.Q. Wolfson

PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
paul.wolfson@wilmerhale.com

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, counsel for amici hereby certifies that:

1.      DC Appleseed Center for Law & Justice is a nonprofit corporation that does not have outstanding shares or debt securities in the hands of the public and does not have a parent company.  No publicly held company has a 10% or greater ownership interest in DC Appleseed Center for Law & Justice.

2.      DC for Democracy is a nonprofit corporation that does not have outstanding shares or debt securities in the hands of the public and does not have a parent company.  No publicly held company has a 10% or greater ownership interest in DC for Democracy.

3.      DC Vote is a nonprofit corporation that does not have outstanding shares or debt securities in the hands of the public and does not have a parent company.  No publicly held company has a 10% or greater ownership interest in DC Vote.

4.      The League of Women Voters of the District of Columbia is a nonprofit corporation that does not have outstanding shares or debt securities in the hands of the public and does not have a parent company.  No publicly held company has a 10% or greater ownership interest in The League of Women Voters of the District of Columbia.

Dated: September 3, 2015

Respectfully submitted,

/s/  Paul R.Q. Wolfson
PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
paul.wolfson@wilmerhale.com

## CIRCUIT RULE 29(d) STATEMENT

The amici joining in this brief are filing a separate brief from the brief for amicus Brady Center to Prevent Gun Violence and the brief for amicus Everytown for Gun Safety. The amici joining this brief have a distinct perspective—that of local organizations and leaders dedicated to improving the lives of the citizens of the District of Columbia and strongly committed to an effective, accountable local government in the District. Accordingly, a separate brief is necessary to permit the organizations and leaders joining this brief to provide, inter alia, their local perspective on the issues before the Court.

Dated: September 3, 2015

Respectfully submitted,

/s/ Paul R.Q. Wolfson
PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
paul.wolfson@wilmerhale.com

# TABLE OF CONTENTS

                                                                              Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

CIRCUIT RULE 29(d) STATEMENT.....................................................v

TABLE OF AUTHORITIES ................................................................ vii

STATEMENT OF INTEREST OF AMICI CURIAE..............................1

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT .........................................................................................5

I.     THE DISTRICT REASONABLY ADDRESSED THE PROBLEM OF GUN
       VIOLENCE BY REGULATING PUBLIC CARRYING OF FIREARMS........5

       A.     The Public Carrying Of Firearms Poses Grave Public
              Safety Concerns.....................................................................5

       B.     The Public Safety Risks Of The District Are Great And
              Unique ................................................................................12

II.    THE DISTRICT HAS CONSIDERABLE DISCRETION IN REGULATING
       THE PUBLIC CARRYING OF FIREARMS BECAUSE SUCH CONDUCT
       DOES NOT IMPLICATE THE CORE SECOND AMENDMENT RIGHT
       TO SELF-DEFENSE IN THE HOME....................................................19

       A.     The Second Amendment Right Recognized in Heller Is,
              At Core, Only A Right To Self-Defense Within The Home ...............19

       B.     Historical Evidence Confirms That The Public Carrying
              Of Firearms Lies Outside The Core Second Amendment
              Right ..................................................................................23

III.   IN APPLYING INTERMEDIATE SCRUTINY, THE COURT SHOULD
       RECOGNIZE THAT LOCAL LEGISLATORS HAVE APPROPRIATE
       LATITUDE TO ADDRESS THE PROBLEM OF GUN VIOLENCE IN
       THE DISTRICT'S UNIQUE CIRCUMSTANCES....................................26

CONCLUSION ...................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES*

## CASES

Page(s)

*Adams v. Clinton*, 90 F. Supp. 2d 35 (D.D.C. 2000) ................................................15

*Bonidy v. U.S. Postal Service*, 790 F.3d 1121 (10th Cir. 2015) ..............................9

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ........................27

*Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94 (1973) ......................................................................27

\* *District of Columbia v. Heller*, 554 U.S. 570 (2008) ............. 1, 4, 17, 19, 20, 23, 24

\* *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ........................................................21

\* *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)......................26, 28

*Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012)......................................21

\* *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012).........24, 28, 29, 30

*Little v. United States*, 989 A.2d 1096 (D.C. 2010)................................................22

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ....................................5, 20, 27

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) .......................................22, 23, 25

*Moore v. Madigan*, 708 F.3d 901 (7th Cir. 2013) ..................................................23

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) .............................22

*Peruta v. County of San Diego*, 781 F.3d 1106 (9th Cir. 2015) .............................22

\* *Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) .............................................29

*Sims v. United States*, 963 A.2d 147 (D.C. 2008) ..................................................22

*State v. Mitchell*, 3 Blackf. 229 (Ind. 1833)...........................................................24

---

\*     Authorities upon which DC Appleseed chiefly relies are marked with asterisks.

*Terry v. Ohio*, 392 U.S. 1 (1968) ..................................................................5

\* *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997) ...........27

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)............21, 29

*Williams v. State*, 10 A.3d 1167 (Md. 2011) ........................................21

\* *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013)..................9, 21, 29

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. art. I, § 8, cl. 17....................................................................15

Act of July 13, 1892, 27 Stat. 116............................................................23

Act of July 8, 1932, 47 Stat. 650..............................................................23

District of Columbia Self-Government and Governmental
    Reorganization Act, Pub. L. No. 93-198, 87 Stat. 774 (1973)
    (codified as amended at D.C. Code §§ 1-201.01 *et seq.*) ..............16

D.C. Code
    § 7-2502.02(a)(4) (2001) ..............................................................24
    § 7-2509.11(1)(A)...........................................................................4
    § 22-4506(a).....................................................................................4

City Act of Nov. 8, 1857...........................................................................23

City Act of Nov. 18, 1858.........................................................................23

## LEGISLATIVE MATERIALS

Committee on the Whole, D.C. Council, Report on Bill 20-930
    (Dec. 2, 2014) ..............................................................................11

Committee on the Judiciary and Public Safety, D.C. Council, Report
    on Bill 20-930, at 18 (Nov. 25, 2014) ...................... 5, 6, 9, 10, 14, 16, 17, 19

## OTHER AUTHORITIES

4 Blackstone, *Commentaries on the Laws of England* (1772) ................25

Bowling, *The Creation of Washington D.C.: The Idea and Location of the American Capital* (1991) .......................................................15

Centers for Disease Control and Prevention, *WISQARS Nonfatal Injury Reports, 2001-2013* .................................................6

CDC, *WISQARS Cost of Injury Reports* (2010) ......................................14

CDC, *WISQARS Injury Mortality Reports, 1999-2013* ............................6

CDC, *WISQARS Years of Potential Life Lost Before Age 65* ..................13

Charles*, The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1 (2012) .................................................25

Cook & Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379 (2005) .............................................9

Cook et al., *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. Rev. 1041, 1081 (2009) ...........................................8

Cress, *Whither Columbia? Congressional Residence and the Politics of the New Nation, 1776 to 1787*, 32 Wm. & Mary Q. 581 (1975) .............................................15

Dillon & Thompson, *The Right to Keep and Bear Arms for Public and Private Defense* (Part 3), 1 Cent. L.J. 259 (1874) .........................................25

Donohue et al., *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy*, NBER Working Paper 18294 (revised Nov. 2014)....................11

FBI, *A Study of Active Shooter Incidents in the United States Between 2000 and 2013* (2014).....................................7

FBI Uniform Crime Reports, *Crime in the United States* (2013)............12

FBI Uniform Crime Reports, *FBI Releases 2013 Crime Statistics* (2013)...........................................12

FBI Uniform Crime Reports, *Robbery by State, Types of Weapons* (2013)............................................................................................12

FBI Uniform Crime Reports, *Robbery by State, Types of Weapons* (2013)..............................................................................................6

FBI Uniform Crime Reports, tbl. 27 ................................................................6

FBI Uniform Crime Reports, tbl. 70 ................................................................6

The Federalist No. 43 (Madison) ..................................................................15

Gardiner, *The Compleat Constable* (3d ed. 1707) ....................................25

Hermann et al., *Local Journalist Among 6 Killed in 6 Days Across District of Columbia*, Wash. Post (May 28, 2015) .......................................13

Hermann, *Woman Shot in Shaw Dies of Wounds; Hers Is One of Several Weekend Homicides*, Wash. Post (May 26, 2015) ...........................13

Howell & Abraham, *The Hospital Costs of Firearm Assaults* 5 (Sept. 2013) ............................................................................................................14

Law Center to Prevent Gun Violence, *2013 State Scorecard: Why Gun Laws Matter* (2013) ..........................................................................9, 10

Lott & Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. Legal Studies 1 (1997)..........................................................10

Metropolitan Police Department, *Annual Report 2013* ...........................12

National Conference of State Legislatures, *Guns on Campus: Overview* (Feb. 23, 2015) ..............................................................................18

National Gang Center, *National Youth Gang Survey Analysis* ................6

National Park Service, *National Mall & Memorial Parks: District of Columbia*....................................................................................................18

National Research Council, *Firearms and Violence: A Critical Review* (2004)............................................................................................................10

Parker, *Right-To-Carry Gun Laws Linked to Increase in Violent Crime, Stanford Research Shows*, Stanford Report (Nov. 14, 2014) ......................................................................................... 11

Pomeroy, *An Introduction to the Constitutional Law of the United States* (1868) ...................................................................... 24

Smith & Siddiqui, *AU Graduate Gunned Down Outside Metro Station In Broad Daylight*, Wash. Post (Aug. 16, 2015) ........................................... 13

State Education Data Profiles, *National Center for Education Statistics 2012-2013* .................................................................. 18

U.S. Census Bureau, *State Population – Rank, Percent Change, and Population Density: 1980 to 2010* ................................................ 10

Violence Policy Center, *Concealed Carry Killers Background* .......................... 7, 8

Washington, D.C., Visitor Statistics (2013) ........................................................ 18

<center>**STATEMENT OF INTEREST OF AMICI CURIAE**[1]</center>

Amici are a broad and diverse group of organizations dedicated to improving the lives of the citizens of the District of Columbia. Amici represent leaders of the District's legal, business, and nonprofit communities. Amici are strongly committed to an effective, accountable local government in the District, and believe that substantial deference should be paid by the courts to decisions made by locally elected leaders on important local issues. One such issue is gun violence, which has long plagued the District and has once again been increasing in recent months. Amici therefore have a strong interest in this case, which threatens the D.C. Council's balanced efforts to address gun violence while preserving the right to self-defense.

DC Appleseed Center for Law & Justice ("DC Appleseed") is a nonprofit organization dedicated to solving pressing public policy problems facing the District and its metropolitan area, including gun violence. DC Appleseed's efforts have included the filing of amicus briefs with the Supreme Court in *District of Columbia*

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than the amici curiae, their members, or their counsel made a monetary contribution to its preparation or submission. The parties have consented to the filing of this brief. After the district court issued its decision granting the preliminary injunction in this case, Ronald C. Machen, Jr., a partner of Wilmer Cutler Pickering Hale and Dorr LLP and the former United States Attorney for the District of Columbia, was asked by Appellants to serve, pro bono, as an expert witness in this case. Mr. Machen has played no role in the drafting of this brief.

<center>- 1 -</center>

*v. Heller*, 554 U.S. 570 (2008), and with this Court in *Heller v. District of Columbia*, No. 14-7071. Several of the amici joining in this brief also signed those briefs.

DC for Democracy is a leading unaligned progressive group of activists, community leaders, and everyday voters in the District of Columbia working for positive changes in our local and federal government and full citizenship rights through statehood for the people of Washington, D.C.

DC Vote is a national organization dedicated to securing voting representation and full equality for the disenfranchised residents of the District.

The League of Women Voters of the District of Columbia is a nonpartisan political organization that encourages informed and active participation of citizens in government, whose goal is to influence public policy through education and advocacy.

Anthony ("Tony") A. Williams, the former Mayor of Washington, D.C. (1999-2007), is the current Chief Executive Officer of the Federal City Council, an organization focusing the creative and administrative talents of Washington's business and professional leaders on major problems and opportunities facing the city. He is widely credited with leading the comeback of Washington, D.C. during his two terms as Mayor, restoring the finances of our Nation's capital, and improving the performance of government agencies, all while lowering taxes and investing in infrastructure and human services. Before his election as Mayor, he

was the independent Chief Financial Officer of the District from 1995 to 1998, working with and on behalf of local officials, the D.C. Financial Control Board, and the U.S. Congress.

## SUMMARY OF ARGUMENT

The District of Columbia has long been plagued by gun violence. That violence has inflicted calamitous human and financial costs on its residents. For decades, the District's elected representatives and law enforcement officials have attempted, with varying degrees of success, to reduce the level of violence and to mitigate the damage that it causes to the community.

Violence is a complex problem with many causes, and officials and citizens across the country have long debated the best ways to address it. Scholars have also reached differing conclusions about the effectiveness of various measures, including firearms regulations, intended to reduce violence. In the face of this debate, the Council of the District of Columbia surely acted responsibly in concluding that a significant increase in the number of firearms publicly carried on the streets of the city—even if carried lawfully and with a permit—would make the problem of gun violence worse, and certainly would not reduce the threat of violence, as some proponents of broad public-carry rights urge. And in reaching that conclusion, it was particularly reasonable for the Council to take into account the distinctive characteristics of the District—an entirely urban jurisdiction and, as

the Nation's capital, a jurisdiction charged with special responsibility to attend to the safety of public officials and visiting dignitaries.

This responsible approach works no damage to the right of self-defense recognized in *District of Columbia v. Heller*, 554 U.S. 570 (2008). Under the District's firearms laws, law-abiding persons may possess, at home, the firearms necessary to protect themselves, their families, and their property from violent incursion, as the Second Amendment, construed in *Heller*, requires. That zone of protection within the home accords with the special status accorded the home under other constitutional provisions. But by long tradition in the Anglo-American legal system, the government has broader discretion to regulate activity outside the home, including the carrying of firearms. And the District has reasonably concluded that, by permitting only those who can show an imminent and concrete threat to their personal safety on the city's streets to carry firearms, it has respected the central meaning of the Second Amendment while also protecting the rights of its residents, visitors, and public officials to traverse those streets with safety and security.[2]

---

[2] Plaintiffs' challenge and the district court's injunction focus on the District's "good reason" requirement, which generally requires applicants for concealed-carry licenses to demonstrate "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." D.C. Code § 7-2509.11(1)(A); *id.* § 22-4506(a).

# ARGUMENT

## I. THE DISTRICT REASONABLY ADDRESSED THE PROBLEM OF GUN VIOLENCE BY REGULATING PUBLIC CARRYING OF FIREARMS

### A. The Public Carrying Of Firearms Poses Grave Public Safety Concerns

The public carrying of firearms poses threats to public safety that are distinct from, and graver than, the danger that may result from possession of guns in the home. When firearms are confined to the home, their misuse—although tragic—affects a limited number of people. In contrast, when guns are fired in public places, "the danger extends to bystanders and the public at large," JA57 (Committee on the Judiciary and Public Safety, D.C. Council, Report on Bill 20-930, at 18 (Nov. 25, 2014) ("D.C. Council November Report"))—all individuals with little or no ability to take precautions. As Justice Harlan observed, "[c]oncealed weapons create an immediate and severe danger to the public." *Terry v. Ohio*, 392 U.S. 1, 31-32 (1968) (Harlan, J., concurring); *see also McDonald v. City of Chicago*, 561 U.S. 742, 887 (2010) (Stevens, J. dissenting) ("The State generally has a lesser basis for regulating private as compared to public acts, and firearms kept inside the home generally pose a lesser threat to public welfare as compared to firearms taken outside.").

The District acted reasonably in concluding that regulation of public carrying of firearms was necessary to address those dangers to the public. Gun

violence causes more than 30,000 deaths and 80,000 nonfatal injuries in the United

States every year.[3]  Although not all of these incidents occur in public, many do.

Law enforcement officers suffered more than 20,000 firearm assaults and 493

fatalities between 2003 and 2012,[4] making firearms by far the greatest threat to law

enforcement.  In 2013, Americans reported more than 120,000 robberies involving

firearms, with more than 1,500 occurring in the District.[5]  And the Department of

Justice estimates that there were more than 2,363 gang-related homicides in 2012

alone, a 23.6% increase since prior years.[6]  Gang violence is a particularly serious

problem in the District.  JA57 (D.C. Council November Report, at 18).

---

[3]     Centers for Disease Control and Prevention ("CDC"), *WISQARS Nonfatal Injury Reports, 2001-2013*, http://webappa.cdc.gov/sasweb/ncipc/nfirates2001 .html ("All Intents" and "Firearm" and "2013"); CDC, *WISQARS Injury Mortality Reports, 1999-2013*, http://webappa.cdc.gov/sasweb/ncipc/mortrate10_us.html ("All Intents" and "Firearm" and "2013").

[4]     FBI Uniform Crime Reports, tbl. 70 ("Law Enforcement Officers Assaulted, Type of Weapon and Percent Injured, 2003-2012"), http://www.fbi.gov/about-us/ cjis/ucr/leoka/2012/tables/table_70_leos_asltd_type_of_weapon_and_percent_inju red_2003-2012.xls; *id.* at tbl. 27 ("Law Enforcement Officers Feloniously Killed, Type of Weapon, 2003-2012"), https://www.fbi.gov/about-us/cjis/ucr/leoka/2012/ tables/table_27_leos_fk_type_of_weapon_2003-2012.xls.

[5]     FBI Uniform Crime Reports, *Robbery by State, Types of Weapons* (2013), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/ tables/table-21/table_21_robbery_by_state_types_of_weapons_2013.xls.

[6]     National Gang Center, *National Youth Gang Survey Analysis*, http://www.nationalgangcenter.gov/Survey-Analysis/Measuring-the-Extent-of- Gang-Problems#homicidesnumber.  While the study includes all gang-related homicides, a large percentage of gang-related homicides involve firearms.

For the 2000-2013 period, the FBI reported 160 "active shooter" incidents targeting random civilians, resulting in 486 deaths and 557 injuries.[7] More than 70% of these incidents occurred in either a commercial or an educational environment.[8] Contrary to the speculation of some, there appears to be little support for the proposition that more firearms among the general public would prevent mass shootings from occurring or limit their carnage—or at least the District could reasonably have so concluded. Even though some states currently have expansive "right to carry" laws, only one of these "active shooters" was stopped by a private citizen with a valid firearm permit before police arrived.[9] Another study reports that, since 2007, holders of concealed-handgun permits have been responsible for at least 29 mass shootings—casting doubt on the notion that only law-abiding persons will apply for weapons permits.[10] The same study finds

---

[7]    FBI, *A Study of Active Shooter Incidents in the United States Between 2000 and 2013*, at 6 (2014), https://www.fbi.gov/news/stories/2014/september/fbi-releases-study-on-active-shooter-incidents/pdfs/a-study-of-active-shooter-incidents-in-the-u.s.-between-2000-and-2013. The report excludes gang- and drug-related shootings, contained residential disputes, and conflicts arising from self-defense, among others. *Id.* at 44.

[8]    *Id.* at 6.

[9]    *Id.* at 14; *see also id.* at 11, 30.

[10]   Violence Policy Center, *Concealed Carry Killers Background*, http://concealedcarrykillers.org/concealed-carry-killers-background.

that, since 2007, there have been at least 568 incidents of non-self-defense killings involving private citizens with concealed-carry permits, resulting in 750 deaths.[11]

These statistics lend support to the Council's predictive judgment that a broader dissemination of weapons on the District's streets will increase gun violence—and certainly will not diminish it. That conclusion is hardly surprising. For criminals, handguns are the weapon of choice because their relatively small size and weight makes them easily concealable, providing the criminal with a valuable element of surprise vis-à-vis his victims and law enforcement. It was surely reasonable to conclude that, far from leading to more effective self-defense, widespread carrying of firearms will lead to more frequent use of guns *by criminals*, who will be more heavily armed (and quick to use their firearms) if they believe their victim is more likely to be armed.[12]

The public carrying of guns also has the potential to transform what would otherwise be arguments or non-fatal assaults into public affrays—armed confrontations likely to cause grievous harm or death. Both researchers and courts have recognized that "an increase in gun prevalence causes an intensification of criminal violence—a shift toward greater lethality, and hence greater harm to the

---

[11] *Id.*

[12] *See* Cook et al., *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. Rev. 1041, 1081 (2009) (survey showing that the higher likelihood that the victim is armed, the higher the likelihood the assailant will use a gun).

community."[13]  The D.C. Council itself emphasized this point as it considered the legislation now under review.  JA57 (D.C. Council November Report, at 18 ("It is undeniable that introducing a gun into any conflict can escalate a limited danger into a lethal situation.")).  And it reasonably concluded that this "escal[ation]" risk is particularly grave in a "densely populated city" like the District, where congestion increases the risk of frustration and small spats in the first place.  *Id.*

The reasonableness of the D.C. Council's judgment is confirmed by comparative analyses across jurisdictions, which show a correlation between restrictions on public carry and lower gun-related death rates.  As of 2013, nine of the ten states with the lowest gun death rates had enacted rigorous laws restricting public carrying.[14]  The only state among those ten that does not restrict public carrying is Maine, which is the least densely populated state in the eastern United

---

[13]     *E.g.*, Cook & Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379, 387 (2005); *see also, e.g.*, *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("Firearms may create or exacerbate accidents or deadly encounters[.]"); *Woollard v. Gallagher*, 712 F.3d 865, 879 (4th Cir. 2013) (similar).

[14]     Law Center to Prevent Gun Violence, *2013 State Scorecard: Why Gun Laws Matter*, tbl. (2013) ("2013 State Scorecard"), http://smartgunlaws.org/wp-content/uploads/2013/12/SCGLM-Final10-spreads-points.pdf.

States.[15]  At the other end of the spectrum, nine of the ten states with the highest gun death rates lack meaningful restrictions on public carry.[16]

Econometric analysis, which the D.C. Council also cited, further supports its predictive judgment that a more expansive "right to carry" would lead to increased gun violence.  The D.C. Council considered and rejected the notion—articulated in a 1997 paper by economists John Lott and David Mustard—that "allowing citizens to carry concealed weapons deters violent crimes."  JA56 (D.C. Council November Report, at 17).[17]  The D.C. Council first observed that a 2004 study by the National Research Council—which reflected the work of 16 leading academic experts—had concluded that "there was no credible statistical evidence that right-to-carry laws reduced crime."  *Id.*[18]  It then credited more recent research conducted by Professor John Donohue of Stanford Law School, which found that "'[t]he totality of the evidence based on educated judgments about the best statistical models suggests

---

[15]      U.S. Census Bureau, *State Population – Rank, Percent Change, and Population Density:  1980 to 2010*, http://www.census.gov/compendia/statab/2012/tables/12s0014.pdf.

[16]      2013 State Scorecard, tbl.

[17]      Lott & Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. Legal Studies 1 (1997).

[18]      *See* National Research Council, *Firearms and Violence: A Critical Review* 7 (2004).

that right-to-carry laws are associated with substantially *higher* rates of aggravated assault, rape, robbery and murder.'" *Id.* (emphasis added).[19]

Professor Daniel Webster, of the Johns Hopkins University School of Public Health, confirmed the soundness of the D.C. Council's conclusions in a separate letter.  D.C. Council, Committee on the Whole, Report on Bill 20-930, attachment 3 at 2 (Dec. 2, 2014), http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport2.pdf.  Professor Webster concluded that Professor Donohue's papers were the "most scientifically rigorous studies" on the subject. *Id.*  He endorsed Professor Donohue's findings that estimate "a nearly 33% increase in assaults with firearms associated with [right-to-carry] laws." *Id.*  In Professor Webster's opinion, "there is convincing evidence that [right-to-carry] laws increase violence committed with firearms" and that "laws giving law enforcement discretion in issuing permits to carry concealed firearms protect against gun violence." *Id.*

The analyses of the National Research Council, Professor Donohue, and Professor Webster cited by the D.C. Council significantly undermine the "more guns, less crime" hypothesis.  But even if reasonable minds could disagree about

---

[19]     *See* Parker, *Right-To-Carry Gun Laws Linked to Increase in Violent Crime, Stanford Research Shows*, Stanford Report (Nov. 14, 2014) (quoting Prof. Donohue), http://news.stanford.edu/news/2014/november/donohue-guns-study-111414.html; Donohue et al., *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy*, NBER Working Paper 18294 (revised Nov. 2014), http://www.nber.org/papers/w18294.

the issue, those studies at a minimum permitted the legislature to conclude, in its judgment, that more guns on the District's streets would lead to *more* violent crime, and that it was therefore appropriate to limit their proliferation while also respecting the right to self-defense.

**B.      The Public Safety Risks Of The District Are Great And Unique**

Although the District is not alone in regulating public carrying to promote public safety, it is unique in the special challenges it faces as *both* an all-urban jurisdiction and the Nation's capital.

1.      Despite improvements in recent decades, the District continues to suffer from the Nation's highest rate of violent crime—a rate more than three times the national average—as well as the highest rate of robberies involving firearms.[20] In 2013, the Metropolitan Police Department reported 104 homicides, 78 percent of which were committed with a firearm.[21]   And shootings on the city's streets too

---

[20]      FBI Uniform Crime Reports, *Crime in the United States* (2013), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/5tabledatadecpdf/table_5_crime_in_the_united_states_by_state_2013.xls; FBI Uniform Crime Reports, *FBI Releases 2013 Crime Statistics* (2013), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/summary-2013/2013-cius-summary-_final (rate per 100,000 inhabitants); FBI Uniform Crime Reports, *Robbery by State, Types of Weapons* (2013), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-21/table_21_robbery_by_state_types_of_weapons_2013.xls (per capita computation).

[21]      Metropolitan Police Department, *Annual Report 2013*, at 22, http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/MPD%20Annual%20Report%202013_lowres.pdf.

often claim the lives of innocent bystanders, as in the recent cases of Charnice

Milton, a 27-year-old journalist shot (by a person aiming for someone else) while

waiting for a bus after an assignment;[22] Tamera Gliss, a 31-year-old mother killed

by a stray bullet during a cookout on Memorial Day;[23] and Matthew Schlonsky, a

recent college graduate who met the same fate near the Shaw-Howard University

Metro station.[24] In 2013 alone, firearm-related homicides resulted in 2,253 years

of potential life lost in the District.[25]

Firearms-related violence also imposes enormous financial burdens on the

District. In 2010, deaths from firearms resulted in $170 million in work-loss cost

---

[22]   Hermann et al., *Local Journalist Among 6 Killed in 6 Days Across District of Columbia*, Wash. Post (May 28, 2015), https://www.washingtonpost.com/local/ crime/woman-shot-in-southeast-has-died-of-injuries/2015/05/28/a3782302-0528-11e5-bc72-f3e16bf50bb6_story.html.

[23]   Hermann, *Woman Shot in Shaw Dies of Wounds; Hers Is One of Several Weekend Homicides*, Wash. Post (May 26, 2015), http://www.washingtonpost.com/ local/crime/woman-shot-in-shaw-dies-of-injuries-one-of-several-weekend-homicides/2015/05/26/533b8e36-03a4-11e5-bc72-f3e16bf50bb6_story.html.

[24]   Smith & Siddiqui, *AU Graduate Gunned Down Outside Metro Station In Broad Daylight*, Wash. Post (Aug. 16, 2015), http://www.washingtonpost.com/ local/violent-week-in-shaw-includes-slaying-of-american-university-graduate/ 2015/08/16/7ab88bb0-442e-11e5-8ab4-c73967a143d3_story.html.

[25]   CDC, *WISQARS Years of Potential Life Lost Before Age 65* ("District of Columbia," "Homicide," "Firearms," and "2013"), http://webappa.cdc.gov/ sasweb/ncipc/ypll10.html.

for the District.[26]  Associated medical costs averaged $19,861 per death, most of it borne by taxpayers.[27]

These and similar statistics set the gun violence problem afflicting the District apart from the experience of "'rural Oklahoma,'" "'open-sky Montana,'" or "'every-kid-grows-up-hunting Kentucky.'"  JA44 (D.C. Council November Report, at 5).  The relevant comparison is, if any, with other densely populated areas.  And that is precisely where the Council looked for guidance; it "follow[ed] the model[s]" of New York, New Jersey, and Maryland, *id.* at 2—the laws of which have all been upheld against Second Amendment challenges.

2.      The District's status as the Nation's capital places upon it an additional, unique responsibility to protect the safety of government officials and visitors.

The very existence of the District as a distinct jurisdiction is rooted in a constitutional duty to ensure the safety of government officials and employees, and thus to preserve the continuity of the federal government's operations.  The Framers placed the District under exclusive federal authority to ensure that the

---

[26]     CDC, *WISQARS Cost of Injury Reports* (2010) ("Fatal Injuries," "Both Sexes," "All Ages," "District of Columbia"), http://www.cdc.gov/injury/wisqars/.

[27]     *Id.*; Howell & Abraham, *The Hospital Costs of Firearm Assaults* 5 (Sept. 2013), http://www.urban.org/sites/default/files/alfresco/publication-pdfs/412894-The-Hospital-Costs-of-Firearm-Assaults.PDF (52 percent of 2010 hospital costs for firearm assault injuries were paid by publicly-funded insurance (primarily Medicaid), with another 28 percent of hospital costs generated by the uninsured).

operations of the federal government would not be derailed by acts of violence or intimidation.  U.S. Const. art. I, § 8, cl. 17 (conferring exclusive authority to Congress over the District and "like Authority" over federal installations "for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings"); The Federalist No. 43, at 272 (Madison) ("[C]omplete authority over the seat of government" is necessary because, without it, "the public authority might be insulted and its proceedings interrupted").  This decision was taken in direct response to the Philadelphia Mutiny of 1783, in which several hundred soldiers of the Continental Army surrounded the Pennsylvania State House, where the Continental Congress was then situated.  Bowling, *The Creation of Washington D.C.: The Idea and Location of the American Capital* 30-34, 75-77 (1991); *Adams v. Clinton*, 90 F. Supp. 2d 35, 50 n.25 (D.D.C. 2000) (three-judge court; per curiam) (discussing history).  When Pennsylvania refused to summon the militia to protect Congress (as requested by the delegates), Congress was forced to leave town.  Cress, *Whither Columbia? Congressional Residence and the Politics of the New Nation, 1776 to 1787*, 32 Wm. & Mary Q. 581, 588 (1975).  The fact that the Framers created the District in large part to ensure the security of the federal government against the threat of gun-wielding protestors strongly undermines any

asserting that the Constitution prohibits Congress (and, by delegation, the District) from restricting the public carrying of guns on the District's streets.[28]

As the seat of the national government, the District is home to thousands of high-profile individuals who work, and often live, here. This includes not only the President, his Cabinet members, high-level executive officials, and members of Congress, but also "a diplomatic corps more extensive and omnipresent than anywhere in the country," and officers of multilateral institutions such as the International Monetary Fund and the World Bank. JA44 (D.C. Council November Report, at 5); *see also* JA43, 45. In addition, more than 400 non-resident foreign dignitaries make official visits to the District each year, and another 3,000 spend time here in one capacity or another. JA45.

Although official data on specific threats are not made public, JA43 (D.C. Council November Report, at 4), history shows that the threat is real. As the Council recounted, four sitting Presidents have been assassinated with firearms (two in the District), and five more have been shot at (including President Reagan, who was shot on the streets of the District). *Id.* As recently as 2011, a shooter opened fire on the White House, hitting an outside wall. JA45. Congress and its Members have also been targeted, most notably in the 1954 shooting of five

---

[28] The District has been delegated the authority and indeed the responsibility for protecting the public safety under the Home Rule Act. District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-198, 87 Stat. 774 (1973) (codified as amended at D.C. Code §§ 1-201.01 *et seq.*).

Congressmen inside the House chamber by Puerto Rican nationalists.  JA43-44.

Threats to the diplomatic corps are likewise a "constancy."  JA44.  Actual,

attempted, and planned political assassinations of notable foreign visitors to the

District are not unknown—including the murder of former Chilean ambassador

Orlando Letelier and his aide in Sheridan Circle in 1976 and the plot to assassinate

the Saudi ambassador in Georgetown in 2011.

Protecting these high-profile individuals presents a constant challenge for

law enforcement.  The numerous law enforcement agencies operating in the

District must coordinate their efforts as they protect high-level officials whose

motorcades crisscross the District, while at the same time ensuring that the

Nation's capital remains open for business and functional for its residents.  JA44

(D.C. Council November Report, at 5) (discussing unique protocol for the

President's motorcade in the District).  The difficulty of this task would be

compounded if public carrying of firearms were commonplace, as filling public

spaces with lawful guns would hinder police officers' efforts to target unlawful

guns by cloaking the latter in plain sight.

The District is also the location of numerous sensitive buildings and other

places.  The Supreme Court has recognized the long history of prohibitions on gun

possession in the proximity of such places.  *See Heller*, 554 U.S. at 626

("[N]othing in our opinion should be taken to cast doubt on … laws forbidding the

carrying of firearms in sensitive places such as schools and government buildings.").  There are hundreds of elementary and secondary schools in the District.[29]  Moreover, the District is home to the Nation's most prominent courts and several military installations, as well as numerous colleges and universities, another category of locations frequently shielded by state laws.[30]  And the District is dotted with landmarks that are visited by millions of people each year.  Between 2008 and 2013, the District accommodated more than 100 million visitors,[31] and sites such as the National Mall and the Lincoln Memorial have been the theater of the Nation's most high-profile demonstrations.

Although federal law already prohibits firearms in and around some federal facilities,[32] demonstrations frequently extend offsite.  Widespread public carrying of firearms would aggravate the risk of armed confrontations, robbing the public of its ability to rely upon the District's sites as platforms for larger discourse in the marketplace of ideas.  At a minimum, more guns on the District's streets would result in more reports of gun sightings, which would in turn require an increased

---

[29]     State Education Data Profiles, *National Center for Education Statistics 2012-2013*, http://nces.ed.gov/programs/stateprofiles/sresult.asp?mode=short&s1=11.

[30]     National Conference of State Legislatures, *Guns on Campus: Overview* (Feb. 23, 2015), http://www.ncsl.org/research/education/guns-on-campus-overview.aspx.

[31]     Washington, D.C., Visitor Statistics (2013), http://washington.org/sites/default/files/2013_Visitor_Statistics_v2_1.pdf.

[32]     *E.g.*, National Park Service, *National Mall & Memorial Parks: District of Columbia*, http://www.nps.gov/nama/learn/management/lawsandpolicies.htm.

police presence. But as the Council observed, flooding the streets with police is itself problematic, because "[a]t some point the presence of law enforcement crosses a psychological line between providing public safety and infringing upon a sense of freedom." JA46 (D.C. Council November Report, at 7).

## II. THE DISTRICT HAS CONSIDERABLE DISCRETION IN REGULATING THE PUBLIC CARRYING OF FIREARMS BECAUSE SUCH CONDUCT DOES NOT IMPLICATE THE CORE SECOND AMENDMENT RIGHT TO SELF-DEFENSE IN THE HOME

### A. The Second Amendment Right Recognized in *Heller* Is, At Core, Only A Right To Self-Defense Within The Home

*District of Columbia v. Heller*, 554 U.S. 570 (2008), recognized self-defense within the home as the core of the individual right secured by the Second Amendment. From its first sentence, the *Heller* Court made plain that the question presented did not extend beyond the home: "We consider whether a … prohibition on the possession of usable handguns *in the home* violates the Second Amendment to the Constitution." 554 U.S. at 573 (emphasis added). In analyzing the District's prohibition on firearm possession, the Court faulted the prohibition primarily because it "extend[ed] … to the home, where the need for defense of self, family, and property is most acute." *Id.* at 628. Then, when it summed up its holding, the Court emphasized that it was deciding the case on the narrowest grounds: "[W]e hold that the District's ban on handgun possession *in the home* violates the Second Amendment, as does its prohibition against rendering any lawful firearm *in the*

*home* operable for the purpose of immediate self-defense. … [T]he District must permit [Heller] to register his handgun and must issue him a license to carry it *in the home*." *Id.* at 635 (emphasis added).[33]

Several additional qualifications in *Heller* confirm that the Supreme Court intended to establish no more than the right to self-defense within the home. In declining to select the standard of scrutiny for future Second Amendment challenges, the Court explained that *Heller* could not "clarify the entire field" as part of its "first in-depth examination of the Second Amendment." 554 U.S. at 635. Then, in a clear signal that *Heller* was not intended to upset the heartland of firearms regulations, the Court emphasized that it was not casting doubt upon "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places … or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-627. And the Court explained that, although the Second Amendment is an individual right, it is "not unlimited" and may be restricted with appropriate justification. *Id.* at 626; *see also id.* at 594 (same). Given the Court's repeated emphasis on the home and disclaimers of a broader holding, *Heller* should not be read to suggest a Second Amendment right extending beyond the right to self-defense in the home.

---

[33] *McDonald v. City of Chicago* reiterated that *Heller*'s holding was limited to "the right to possess a handgun in the home for the purpose of self-defense." 561 U.S. 742, 791 (2010).

The majority of appellate courts have understood *Heller* precisely this way. The First and Fourth Circuit, for example, have declined to decide whether the right to bear arms applies *in any form* outside the home. *See Hightower v. City of Boston*, 693 F.3d 61, 72 & n.8, 74 (1st Cir. 2012) ("[I]nterest … in carrying concealed weapons outside the home is distinct from th[e] core interest [in self-defense within the home] emphasized in *Heller*."); *id.* (collecting cases recognizing *Heller*'s limits); *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011) ("On the question of *Heller*'s applicability outside the home environment, we think it prudent to await direction from the Court itself."); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) ("merely assum[ing] that the *Heller* right exists outside the home" in upholding Maryland's good-and-substantial-reason standard). The Third Circuit has also declined to resolve that question, making clear, however, that to the extent the right existed outside the home it would "most certainly operate[] in a different manner." *Drake v. Filko*, 724 F.3d 426, 430-431 & n.5 (3d Cir. 2013).

The Maryland Court of Appeals and the D.C. Court of Appeals have gone even further. In *Williams v. State*, 10 A.3d 1167 (Md. 2011), the Court of Appeals of Maryland held that a prohibition on the possession of handguns outside the home without a permit was "outside the scope of the Second Amendment" because it "permitted home possession," *id.* at 1178. Similarly, in *Sims v. United States*,

the D.C. Court of Appeals rejected a Second Amendment defense to a criminal indictment for carrying a pistol without a license, holding, on plain error review, that it "assuredly is not 'clear' and 'obvious' from *Heller*… that it dictates an understanding of the Second Amendment which would compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined." 963 A.2d 147, 150 (D.C. 2008); *see also Little v. United States*, 989 A.2d 1096, 1101 (D.C. 2010).

Two appellate decisions, *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), and *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), have recognized a Second Amendment right outside the home. But the Ninth Circuit's decision in *Peruta*—on which the district court in this case heavily relied—was vacated, and the Ninth Circuit is considering the case en banc. *Peruta v. County of San Diego*, 781 F.3d 1106, 1107 (9th Cir. 2015). The Seventh Circuit's decision in *Moore*— which involved an *absolute ban* on public carry, not a "good reason" framework such as the District's, 702 F.3d at 934—also provides no basis to invalidate the District's regulation of public carry. Although the Seventh Circuit correctly observed that neither *Heller* nor *McDonald* "addressed the question whether the Second Amendment creates a right of self-defense outside the home," 702 F.3d at 935, it inexplicably concluded nonetheless that "[t]he Supreme Court's interpretation of the Second Amendment therefore compels us to" strike down a

statewide ban on the public carrying of guns, *id.* at 942.  Further, the majority in

*Moore* essentially ignored the long history of strict regulation of public carrying—

clearly a guidepost of Second Amendment analysis post-*Heller*—instead invoking

clichés about "hostile Indians" in the "wild west."  *Id.* at 936; *see also id.* at 939

(declaring empirical research inconclusive); *contrast id.* at 944-946 (Williams, J.,

dissenting) (discerning no clear right to carry firearms in public at the Founding);

708 F.3d 901, 902 (7th Cir. 2013) (four-judge dissent from denial of rehearing en

banc).  Even accepting the Seventh Circuit's comments about life on the frontier,

they hardly support the conclusion that there is a core Second Amendment right to

armed self-defense in public in urban jurisdictions.

> **B.  Historical Evidence Confirms That The Public Carrying Of Firearms Lies Outside The Core Second Amendment Right**

*Heller* recognized that "longstanding prohibitions" on the use and carrying

of firearms are "presumptively lawful."  554 U.S. at 626-627 & n.26.  The

District's regulation of public carrying fits the bill and is consistent with the

experience of other jurisdictions.

Almost 160 years ago, the City of Washington made it illegal to publicly

carry "deadly or dangerous weapons, such as … pistol[s]."  City Act of Nov. 8,

1857; *see also* City Act of Nov. 18, 1858.  In 1892, Congress prohibited the

concealed carrying of pistols in the District without a license, which required good

reason.  Act of July 13, 1892, 27 Stat. 116; *see also* Act of July 8, 1932, § 4, 47

Stat. 650, 651 (1932). And, starting in 1976, the District effectively banned new handguns within its limits, D.C. Code § 7-2502.02(a)(4) (2001). Thus, although the provisions of the D.C. Code currently challenged by Appellees were enacted in response to the district court's *Palmer* decision, they stem from a longstanding District policy that strictly controls the public carrying of handguns within the Nation's capital and is presumptively lawful. *Heller*, 554 U.S. at 627 n.26.

The District's history is consistent with that of many states, where restrictions on public carry date back more than a century. In the 1800s, the majority of states banned the carrying of concealed weapons, and several states "went even further … bann[ing] *concealable* weapons (subject to certain exceptions) altogether whether carried openly or concealed." *Kachalsky v. County of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012) (emphasis added); *see also id.* at 90 (collecting statutes). When criminal defendants challenged the constitutionality of prohibitions on carrying concealed weapons, the courts turned those challenges aside, and held that the right to self-defense did not encompass an unlimited right to carry publicly. *See, e.g.*, *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833) ("[T]he statute of 1831, prohibiting all persons, except travelers, from wearing or carrying concealed weapons, is not unconstitutional."). Contemporary legal commentators similarly explained that the general right to self-defense "is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons." Pomeroy,

*An Introduction to the Constitutional Law of the United States* 157 (1868); *see also* Dillon & Thompson, *The Right to Keep and Bear Arms for Public and Private Defense* (Part 3), 1 Cent. L.J. 259, 287 (1874) ("[T]he peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons.").

Those early state prohibitions find their roots in even more ancient laws.[34] Most famously, the Statute of Northampton, enacted in 1328, outlawed any person from going armed in public. *Moore*, 702 F.3d at 944 (Williams, J., dissenting). The English authorities understood the statute, in the seventeenth and eighteenth centuries, to permit them to arrest any person "wear[ing] or carry[ing] any Daggers, Guns, or Pistols Charged." Gardiner, *The Compleat Constable* 18-19 (3d ed. 1707). By the time of the Founding, or shortly thereafter, the Statute of Northampton had been expressly incorporated by three of the colonies, each of which would presumably ratify the Second Amendment with the understanding that it was consistent with this broad prohibition. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 31-32 (2012) (Massachusetts, North Carolina, and Virginia). In short, the authority to strictly regulate or even prohibit the public carrying of

---

[34]    As Blackstone (whose commentaries would have been known to most lawyers at the time of the Founding) recounted, the lawgiver Solon prohibited any man from walking about Athens while in his armor. 4 Blackstone, *Commentaries on the Laws of England*, 149 (1772).

pistols and other dangerous weapons has consistently been part of the common law and was woven into the original understanding of the Second Amendment. The District's current law is fully in accord with those principles.

**III.    IN APPLYING INTERMEDIATE SCRUTINY, THE COURT SHOULD RECOGNIZE THAT LOCAL LEGISLATORS HAVE APPROPRIATE LATITUDE TO ADDRESS THE PROBLEM OF GUN VIOLENCE IN THE DISTRICT'S UNIQUE CIRCUMSTANCES**

This Court has set out a two-step approach for evaluating Second Amendment challenges: First, it asks whether the challenged statute "impinges upon a right protected by the Second Amendment"; second, it determines "whether the provision passes muster under the appropriate level of constitutional scrutiny." *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Heller II*). In that analysis, the Court determines the level of scrutiny based on "'the nature of the conduct being regulated and the degree to which the challenged law burdens the right.'" *Id.* at 1257. Strict scrutiny will apply to severe burdens on the "core" Second Amendment right, *id.*, namely "self-defense in the home," *id.* at 1255. By contrast, registration regulations that "'do not severely limit the possession of firearms'" are analyzed under intermediate scrutiny. *Id.* at 1257 (alteration omitted). Under intermediate scrutiny, the District must show "there is a substantial relationship or reasonable 'fit' between" the absolute ban on carrying firearms outside the home and its governmental interests. *Id.* at 1262.

Because the challenged sections of the D.C. Code apply only outside the home, no "core" Second Amendment rights are implicated, and the regulations are subject to, at most, intermediate scrutiny. In applying intermediate scrutiny, this Court should recognize that the District's regulations represent the legislature's predictive judgments about what measures will work to prevent and diminish gun violence—a problem that defies simple solutions, warrants close attention to local conditions, requires creativity and flexibility, and has challenged legislators in every jurisdiction for decades. In facing such a complex problem, the local legislature is best situated to hear and sift evidence about the effectiveness of firearms regulations. *See Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 196 (1997) ("This principle [of deference] has special significance in cases, like this one, involving congressional judgments concerning regulatory schemes of inherent complexity and assessments about the likely interaction of industries[.]"); *see also Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 103 (1973) (same); *McDonald v. City of Chicago*, 561 U.S. 742, 783 (2010) (plurality) (recognizing that "conditions and problems differ from locality to locality and that citizens in different jurisdictions have divergent views on the issue of gun control"); *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 440 (2002) (plurality) (local legislatures are "in a better position than the Judiciary to gather and evaluate data on local problems").

*Heller II*'s analysis of the District's ban on assault weapons is illustrative. The District's ban on semi-automatic rifles prohibited all possession of weapons "in common use," including any use of those weapons in the home for self-defense. *Heller II*, 670 F.3d at 1261. Even though the Court assumed that those firearms were used primarily for self-defense, it held that intermediate scrutiny was appropriate because the prohibition "d[id] not impose a substantial burden" upon "the core right protected by the Second Amendment." *Id.* at 1262. Analogous reasoning applies here. The District's regulation of public carrying does not affect the core of the Second Amendment right, *supra* pp. 19-26, but does promote the public's interests at large, *supra* pp. 5-12; responds to the unique security concerns of the District, *supra* pp. 12-19; and reasonably fits the District's legitimate interests.

The decisions of other courts of appeals confirm that, under intermediate scrutiny, reviewing courts should accord the legislature significant latitude to address the vexing problem of gun violence. In *Kachalsky*, the Second Circuit held that intermediate scrutiny was warranted for a law that "places substantial limits on the ability of law-abiding citizens to possess firearms for self-defense in public." 701 F.3d at 93. But the court declined to apply strict scrutiny to review this "substantial limit[]" because it does not burden the "'core'" of the Second Amendment right. *Id.* at 93 & n.17 (collecting cases). Likewise, the Fourth Circuit in *Woollard* confirmed that intermediate scrutiny applies "'to laws that

burden [any] right to keep and bear arms outside of the home.'" 712 F.3d at 876 (quoting *Masciandaro*, 638 F.3d at 470-471). To pass intermediate scrutiny, the government need only show a "'reasonable, not perfect'" fit between its interests and the imposed restriction. *Id.* at 878.

As both *Woollard* and *Kachalsky* recognize, an intermediate scrutiny standard must afford adequate deference to the local legislature, and its superior position to both assess the public risks of firearm possession outside the home, and what measures are necessary to mitigate those risks. *See Woollard*, 712 F.3d at 881 ("'[I]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments.'" (quoting *Kachalsky*, 701 F.3d at 99)). This Court has similarly concluded that it should defer to legislative judgments where public safety and firearms are concerned. *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013) (discussing *Kachalsky*). This approach is eminently sensible given the unique challenges of assessing the complex interactions of factors that affect public safety. And it is particularly critical in light of the unique needs present in the District. *See supra* pp. 12-19. In contrast, the district court's insistence on a perfect, mathematically ascertainable "fit" between the District's "good reason" requirement and the risk of injury to others has no place under intermediate scrutiny jurisprudence. To the extent the Court finds the Second Amendment implicated at all, this Court should adhere to *Schrader* and review the Council's

regulation of public carry through a properly deferential lens, as the Second Circuit and several other courts have done under analogous circumstances. *E.g.*, *Kalchalsky*, 701 F.3d at 97 (collecting authorities).

## CONCLUSION

The problem of gun violence in the Nation's Capital is a serious one—one that does not lend itself to easy solutions. The District's Council, Mayor, and police officials have addressed the problem in a thoughtful, thorough way that reasonably and sensibly protects public safety and national security interests, while also guarding the right of self-defense. Amici urge this Court to defer to the determinations of these local officials. The judgment of the district court should be reversed.

Dated: September 3, 2015

Respectfully submitted,

/s/ Paul R.Q. Wolfson

| | |
|---|---|
| WALTER A. SMITH, JR. | PAUL R.Q. WOLFSON |
| KEVIN HILGERS | FRANCESCO VALENTINI |
| DC APPLESEED CENTER | WILMER CUTLER PICKERING |
|    FOR LAW & JUSTICE |    HALE AND DORR LLP |
| 1111 Fourteenth Street, NW | 1875 Pennsylvania Avenue, NW |
| Washington, DC 20005 | Washington, DC 20006 |
| Tel.: (202) 289-8007 | Tel.: (202) 663-6000 |
| Fax: (202) 289-8009 | Fax: (202) 663-6363 |
| | paul.wolfson@wilmerhale.com |

ALLISON TRZOP
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
Tel.: (617) 526-6000
Fax: (617) 526-5000

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 6,891 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/  Paul R.Q. Wolfson
PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
paul.wolfson@wilmerhale.com

September 3, 2015

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3d day of September 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

<div style="margin-left: 50%;">

/s/ Paul R.Q. Wolfson
PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
paul.wolfson@wilmerhale.com

</div>

September 3, 2015