IN THE

# United States Court of Appeals
# For the District of Columbia Circuit

———————————————

BRIAN WRENN, *et al.*,

Plaintiffs-Appellees,

v.

DISTRICT OF COLUMBIA and CATHY L. LANIER,

Defendants-Appellants.

———————————————

On Appeal Of An Order Of The United States District Court
For The District Of Columbia, Supporting Reversal
Case No. 1:15-cv-00162-FJS
Judge Frederick J. Scullin

---

## AMICUS CURIAE BRIEF OF BRADY CENTER TO PREVENT GUN VIOLENCE, THE LAW CENTER TO PREVENT GUN VIOLENCE, AND THE VIOLENCE POLICY CENTER IN SUPPORT OF APPELLANTS DISTRICT OF COLUMBIA AND CATHY L. LANIER

---

BRADY CENTER TO
PREVENT GUN VIOLENCE
Jonathan Lowy
Robert B. Wilcox, Jr.
Alla Lefkowitz
Kelly Sampson
840 First Street, N.E. Suite 400
Washington, D.C. 20002
(202) 370-8104
jlowy@bradymail.org

HOGAN LOVELLS US LLP
Adam K. Levin
Anna M. Kelly
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
adam.levin@hoganlovells.com
anna.kelly@hoganlovells.com

Christine E. MacGregor
1835 Market Street, 29th Floor
Philadelphia, PA 19103
(267) 675-4600
christine.macgregor@hoganlovells.com

Dated:        September 3, 2015

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), amici curiae Brady Center to Prevent Gun Violence, The Law Center to Prevent Gun Violence, and the Violence Policy Center certify that:

## A.    Parties and Amici.

1.    All parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for the Appellants, except for the following amici: The Law Center to Prevent Gun Violence and the Violence Policy Center.

2.    Amicus curiae The Brady Center to Prevent Gun Violence makes the following disclosures pursuant to D.C. Circuit Rules 26.1(a)-(b) and 28(a)(1)(A) and Federal Rules of Appellate Procedure 26.1 and 29(c)(4):

The Brady Center to Prevent Gun Violence has no parent company, nor does any publicly-held company have a 10% or greater ownership interest (such as stock or partnership shares) in the Center.

The Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Through its Legal Action Project, it has filed numerous amicus curiae briefs in cases involving firearms regulations in the Supreme Court of the United States and in federal Courts of Appeal, including *McDonald v. City of Chicago*, 561 U.S. 742, 870 n.13, 887 n.30, 891 n.34 (2010)

(Stevens, J., dissenting) (citing Brady Center brief), *United States v. Hayes*, 555

U.S. 415, 427 (2009) (citing Brady Center brief), *District of Columbia v. Heller*,

554 U.S. 570 (2008), and *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir.

2014) (reheard en banc on June 16, 2015).

3.      Amicus curiae The Law Center to Prevent Gun Violence makes the

following disclosures pursuant to D.C. Circuit Rules 26.1(a)-(b) and 28(a)(1)(A)

and Federal Rules of Appellate Procedure 26.1 and 29(c)(4):

The Law Center to Prevent Gun Violence has no parent company, nor does

any publicly-held company have a 10% or greater ownership interest (such as

stock or partnership shares) in the Center.

Amicus curiae the Law Center to Prevent Gun Violence ("the Law Center")

is a non-profit, national law center dedicated to reducing gun violence and the

devastating impact it has on communities.  The Law Center focuses on providing

comprehensive legal expertise to promote smart gun laws.  These efforts include

tracking all Second Amendment litigation nationwide and providing support to

jurisdictions facing legal challenges to their gun laws.  As an amicus, the Law

Center has provided informed analysis in a variety of firearm-related cases,

including *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v.*

*City of Chicago*, 561 U.S. 742 (2010).

4.     Amicus curiae The Violence Policy Center makes the following disclosures pursuant to D.C. Circuit Rules 26.1(a)-(b) and 28(a)(1)(A) and Federal Rules of Appellate Procedure 26.1 and 29(c)(4):

The Violence Policy Center has no parent company, nor does any publicly-held company have a 10% or greater ownership interest (such as stock or partnership shares) in the Center.

The Violence Policy Center is a non-profit organization that works to stop the broad-based public health crisis that is gun violence through research, advocacy, education, and collaboration.  The Center regularly submits and joins amicus briefs in cases that involve gun laws.

**B.     Ruling Under Review.**

References to the rulings at issue appear in the Brief for the Appellant.

**C.     Related Cases.**

There are three related cases of which undersigned counsel is aware:

a.     *Palmer, et al. v. District of Columbia and Cathy L. Lanier*, No. 1:15-CV-0001482-FJS (D.D.C. 2014).  Following the district court's grant of plaintiff's motion for summary judgment entered on the 26th and 29th day of July, 2014, defendants filed an appeal in the United States Court of Appeals for the District of Columbia Circuit on November 14, 2014.  Defendants then moved for voluntary dismissal of their appeal, which was granted on April 2, 2015.

b.    *Smith v. Government of the District of Columbia*, No. 1:15-CV-00737-RCL (D.D.C. 2015).  Plaintiff filed an action under 42 U.S.C. § 1983 alleging violations of her right to bear arms, to travel, and to equal protection under the law.  Defendant filed a motion to dismiss on July 20, 2015 arguing, *inter alia*, that plaintiff's complaint fails because the District's firearms licensing scheme withstands intermediate scrutiny.

c.    *Common Purpose USA, Inc. v. Lynch et al.*, No 1:15-cv-01327-KBJ (D.D.C. 2015).  Plaintiff filed an action under 28 U.S.C. §§ 2201-2202 seeking a declaratory judgment that, *inter alia*, the Second Amendment right to bear arms is limited to those enlisted in a well-regulated militia and that the District of Columbia's concealed carry laws prevent or interfere with the enforcement of federal law.

## D.C. CIRCUIT RULE 29(d) STATEMENT

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel certifies that this separate brief is necessary because The Brady Center to Prevent Gun Violence, The Law Center to Prevent Gun Violence, and The Violence Policy Center have unique expertise in Second Amendment law and firearms policy issues, including a combined 74 years in gun litigation and analyses of concealed firearms laws and other gun policies.

/s/ Adam Levin
Adam K. Levin

HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
adam.levin@hoganlovells.com

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

D.C. CIRCUIT RULE 29(d) STATEMENT ..........................................................v

TABLE OF AUTHORITIES ................................................................. vii

INTRODUCTION ...................................................................................1

STATUTES AND REGULATIONS .......................................................2

STATEMENT OF IDENTITY, INTEREST IN CASE,
AND SOURCE OF AUTHORITY TO FILE...........................................3

ARGUMENT .........................................................................................3

    I.     THE "GOOD REASON" / "PROPER REASON"
          REQUIREMENT DOES NOT VIOLATE THE SECOND
          AMENDMENT. .........................................................................3

          A.     The District's Concealed Carry Regime Conforms
                  With "May Issue" Regimes Upheld By Other Circuits
                  As Constitutional .............................................................3

          B.     The District Court's Suggestion to Import First
                  Amendment Framework As An Alternative To The
                  "May Issue" Regime Is Problematic...............................7

    II.    SOCIAL SCIENCE CONFIRMS THAT THE DISTRICT'S
          "GOOD REASON" / "PROPER REASON"
          REQUIREMENT FURTHERS IMPORTANT
          GOVERNMENT INTEREST IN PUBLIC SAFETY .............9

          A.     Lethality Of Guns Creates Unique Dangers In The
                  Public Sphere..................................................................10

          B.     Public Carrying Increases Violent Crime .....................11

          C.     Permissive Concealed Carry Laws Hinder Law
                  Enforcement's Ability to Protect Themselves and the
                  Public..............................................................................16

CONCLUSION .....................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Bonidy v. United States Postal Serv.*,
  790 F.3d 1121 (10th Cir. 2015) ............................................................. 8

*Commonwealth v. Robinson*,
  600 A.2d 957 (Pa. Super. Ct. 1991) ...................................................... 16

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .............................................................................. 8

*\*Drake v. Filko*,
  724 F.3d 426 (3d Cir. 2013) ................................................................. 5

*Kachalsky v. Cnty. of Westchester*,
  No. 10-cv-5413 (S.D.N.Y. 2011) .......................................................... 9

*\*Kachalsky v. Cnty. of Westchester*,
  701 F.3d 81 (2d Cir. 2012) ........................................................... 5, 6, 7, 9

*Peruta v. Cnty. of San Diego*,
  742 F.3d 1144 (9th Cir. 2014), *reh'g en banc granted*,
  No. 10-56971(Mar. 26, 2015) .......................................................... 3, 4, 6

*Singleton v. United States*,
  998 A.2d 295 (D.C. Ct. App. 2010) ..................................................... 16

*Turner Broad. Sys., Inc. v. FCC*,
  520 U.S. 180 (1997) .............................................................................. 6

*United States v. Masciandaro*,
  638 F.3d 458 (4th Cir. 2011) ............................................................... 9

*\*Woollard v. Gallagher*,
  712 F.3d 865 (4th Cir. 2013) ............................................................... 5

\*Authorities upon which we chiefly rely are marked with asterisks.

**CONSTITUTIONAL PROVISIONS:**

U.S. Const. amend. I .................................................................7

U.S. Const. amend. II ...........................................3, 5, 7, 8, 9

**STATUTES:**

Cal. Penal Code §§ 26150 – 26225....................................4

Conn. Gen. Stat. §§ 29-28 – 29-30 ..................................4

Conn. Gen. Stat. § 29-32 .................................................4

Conn. Gen. Stat. § 29-32b ...............................................4

Conn. Gen. Stat. § 29-35 .................................................4

Conn. Gen. Stat. § 29-37 .................................................4

D.C. Code § 22-4506(a)....................................................2

Del. Code Ann. tit. 11, § 1441 ........................................4

Del. Code Ann. tit. 11, § 1442 ........................................4

Haw. Rev. Stat. Ann. § 134-9 .........................................4

Ind. Code Ann. § 35-47-2-3(e) ........................................4

Md. Code Ann., Pub. Safety §§ 5-301 – 5-314 ...............4

N.H. Rev. Stat. Ann. § 159:6(I)(b) ..................................4

N.J. Stat. Ann. § 2C:39-5 ................................................4

N.J. Stat. Ann. § 2C:58-3 ................................................4

N.J. Stat. Ann. § 2C:58-4 ................................................4

N.Y. Penal Law § 400.00..................................................4

R.I. Gen. Laws § 11-47-8 –11-47-18................................4

LEGISLATIVE MATERIALS:

*Council of the District of Columbia, Committee of the Whole, Committee
  Report on Bill 20-930, "License to Carry a Pistol Amendment Act of
  2014" (Dec. 2, 2014)......................................................................9, 12

*Council of the District of Columbia, Committee on the Judiciary & Public
  Safety, Committee Report on Bill 20-930, "License to Carry a Pistol
  Amendment Act of 2014" (Nov. 25, 2014), JA 40-227 ................................6, 11

OTHER AUTHORITIES:

*Abhay Aneja, John J. Donohue III, & Alexandria Zhang, *The Impact of
  Right to Carry Laws and the NRC Report: The Latest Lessons for the
  Empirical Evaluation of Law and Policy* 80-81 (National Bureau of
  Economic Research Working Paper No. 18294, 2014)......................................12

Ian Ayres & John J. Donohue III, *More Guns, Less Crime Fails Again: The
  Latest Evidence from 1977-2006*, 6 Econ. J. Watch 218 (May 2009)................13

Ian Ayres & John J. Donohue III, *Shooting Down the "More Guns, Less
  Crime" Hypothesis*, 55 Stanford L. Rev. 1194 (2003)......................................13

Ian Ayres & John J. Donohue III, *Yet Another Refutation of the More Guns,
  Less Crime Hypothesis—With Some Help From Moody and Marvell*,
  6 Econ J. Watch 351 (Jan. 2009) ......................................................................13

Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession
  and Gun Assault*, 99 Am. J. Pub. Health 2034 (2009) ......................................15

Philip Cook & Jens Ludwig, *Public Policy Perspectives Principles for
  Effective Gun Policy*, 73 Fordham L. Rev. 589 (2004)..........................10, 14, 15

Monica Davey & Mitch Smith, *Murder Rates Rising Sharply in Many U.S.
  Cities*, The New York Times (Aug. 31, 2015) ......................................................1

Will Greenberg, *Police chiefs from around the country meet in D.C. to
  discuss violent summer*, The Washington Post (Aug. 3, 2015)............................1

David Hemenway, *et al.*, *Gun use in the United States: results from two
  national surveys*, 6 Injury Prevention 263 (2000) ..............................................15

David Hemenway, *Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates*, 87 J. of Crim. L. and Criminology 1430 (1997) ..................................................................15

Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature*, 9 Aggression & Violent Behav. 417 (2004)...........12

Spencer Hsu & Rachel Weiner, *Federal appeals court lets new D.C. gun law stand, pending final ruling*, The Washington Post (June 29, 2015) ..................10

Law Center to Prevent Gun Violence, *Concealed Weapons Permitting Policy Summary* (Aug. 28, 2013) ................................................................4, 14

Law Center to Prevent Gun Violence, *Annual Gun Law State Scorecard 2014* (Dec. 2014) ..........................................................................................14

Colin Loftin, *et al.*, *Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia*, 325 New Eng. J. Med. 1615 (1991) ......................................................................15

Aamer Madhani, *Several big U.S. cities see homicide rates surge*, USA Today (July 10, 2014) .............................................................................1

David McDowall, *et al.*, *Easing Concealed Firearms Laws*, 86 Crim. L. & Criminology 193 (1995) .............................................................14

Matthew Miller, *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 Accident Analysis & Prevention 477 (Jul. 2000)...........................13

Matthew Miller *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988–1997*, 92 Am. J. Pub. Health 1988 (Dec. 2002)..........................................................12

Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford research shows*, Stanford News (Nov. 14, 2014) ....................11

Kara E. Rudolph, *et al.*, *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 Am. J. of Pub. Health 49 (2015)............................................................................................................14

Perry Stein, *D.C.'s summer gun violence: By the numbers and neighborhoods*, The Washington Post (Aug. 6, 2015) ........................................1

Violence Policy Center, *Concealed Carry Killers* ...................................................10

*Washington, DC 2013 Visitor Statistics*, Destination DC (2013)...........................11

Chuck Williams, *Alabama sheriffs question gun laws in wake of Rusty Houser shooting*, Ledger-Enquirer (Aug. 11, 2015) ...........................................5

**INTRODUCTION**

The District of Columbia's homicide rate is up 44% from last year.  Monica Davey & Mitch Smith, *Murder Rates Rising Sharply in Many U.S. Cities*, The New York Times (Aug. 31, 2015).[1]  Gun crimes in the District in June and July went up nearly 30% from the same time last year.  Perry Stein, *D.C.'s summer gun violence: By the numbers and neighborhoods*, The Washington Post (Aug. 6, 2015).[2]  This surge is nearly unprecedented; as D.C. Chief of Police Cathy L. Lanier explained, "We have not seen what we're seeing now in decades."  Will Greenberg, *Police chiefs from around the country meet in D.C. to discuss violent summer*, The Washington Post (Aug. 3, 2015).[3]  "[P]eople are dying[.]"  *Id.*

This dramatic increase in violence in D.C., as well as other major U.S. cities,[4] prompted police chiefs from across the country to meet in Washington,

---

[1]    *Available at* http://www.nytimes.com/2015/09/01/us/murder-rates-rising-sharply-in-many-us-cities.html?_r=0 (last visited Sept. 1, 2015).

[2]    *Available at* http://www.washingtonpost.com/news/local/wp/2015/08/06/d-c-s-summer-gun-violence-by-the-numbers-and-neighborhoods/ (last visited Sept. 3, 2015).

[3]    *Available at* http://www.washingtonpost.com/local/crime/police-chiefs-from-around-the-country-meet-in-dc-to-discuss-violent-summer/2015/08/03/e2ec8a9c-3a06-11e5-8e98-115a3cf7d7ae_story.html (last visited Aug. 17, 2015).

[4]    Aamer Madhani, *Several big U.S. cities see homicide rates surge*, USA Today (July 10, 2014), http://www.usatoday.com/story/news/2015/07/09/us-cities-homicide-surge-2015/29879091/ (describing that the murder rate in Baltimore, New Orleans, and St. Louis has jumped more than 33% from this time last year and that the number of shooting incidents in Chicago has increased by 21%).

D.C. last month to discuss possible explanations for the increase and propose solutions.  *Id.*  The recommended prescription: "more stringent gun laws" —not more guns in public.  *Id.*

Against this background, the District is fighting to simply maintain one of the principal tools it has to combat gun violence—its  current concealed carry permitting scheme, which limits the concealed carry of firearms to those individuals with a "good reason" / "proper reason" to do so.  *See* D.C. Code § 22-4506(a).  The District's scheme is modeled after statutes held constitutional by three different federal Courts of Appeal[5] and is based on sound social science evidence.[6]  Disregarding this precedent and evidence, the court below nonetheless granted a preliminary injunction preventing the District from enforcing one of its primary methods of reducing the number of guns in the streets of the nation's capital.  Memorandum-Decision and Order at 22, JA 228-50, at JA 247 ("Preliminary Injunction Order").  Now is not the time to decrease gun regulation in the District—the public interest demands that the preliminary injunction be denied.  Lives depend on it.

## STATUTES AND REGULATIONS

All applicable statutes, etc., are contained in the Brief for the Appellant.

---

[5]     *See infra* Section I.
[6]     *See infra* Section II.

## STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

Pursuant to Rule 29(a) and 29(c)(4) of the Federal Rules of Appellate Procedure, amici curiae received consent from all parties to file this brief. The interest of amici curiae in this case is set forth in the disclosures required by D.C. Circuit Rule 26.1(b). *See* Section A, *supra*, at i-iii.[7]

## ARGUMENT

## I. THE "GOOD REASON" / "PROPER REASON" REQUIREMENT DOES NOT VIOLATE THE SECOND AMENDMENT

### A. The District's Concealed Carry Regime Conforms With "May Issue" Regimes Upheld By Other Circuits As Constitutional

The District's "good reason" / "proper reason" requirement is far from a novel approach to gun violence prevention. Similar provisions that grant law enforcement limited discretion when issuing concealed carry permits have been upheld as constitutional in every state in which they have been challenged.[8]

---

[7] Pursuant to Rule 29(c)(5) of the Federal Rules of Appellate Procedure, no party or party's counsel authored this brief in whole or in part. No party, party's counsel, or person other than amici, its members, or its counsel, contributed money intended to fund preparation and submission of this brief.

[8] *See* Section I.A, *infra*, at 5. Further, in *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), a three-judge panel held that San Diego County's "good cause" permitting requirement violated the Second Amendment. *Id.* at 1167-68. Despite Appellees and the District Court's misguided reliance on this holding, *see* Preliminary Injunction Order, at 8, 13-14, 14 n.8, JA 235, 240-41, *Peruta* is no longer good law as the Ninth Circuit vacated the panel opinion and decided *sua sponte* to rehear the case en banc. *Peruta v. Cnty. of San Diego*, No. 10-56971

Generally, states regulate the carrying of concealed weapons in one of three ways: (1) enactment of "may issue" laws; (2) enactment of "shall issue" laws; or (3) imposing no permit requirement.[9]  Only five states fall into the final category.  The District joins nine "may issue" states.[10]  In these states, law enforcement officials are vested with the authority to determine whether to issue a concealed carry permit, but are guided by certain statutory criteria.  The remaining states fall into the broad "shall issue" category where the state will issue a permit if the applicant meets certain criteria.  In nineteen of the so-called "shall issue" states, officials retain some discretion to evaluate an application based on more qualitative criteria.[11]  Thus, officials in twenty-eight states and D.C. retain some authority to make determinations regarding who may carry a concealed weapon in public

---

(Mar. 26, 2015) (order granting petition for rehearing).  Argument was held on June 16, 2015 and the final ruling in *Peruta* is pending.

[9]    *See generally* Law Center to Prevent Gun Violence, *Concealed Weapons Permitting Policy Summary* (Aug. 28, 2013), http://smartgunlaws.org/concealed-weapons-permitting-policy-summary/#footnote_26_5701 [hereinafter Concealed Weapons Permitting Policy Summary].

[10]    The "may issue" states are as follows: California, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, New Jersey, New York, and Rhode Island.  *See* Cal. Penal Code §§ 26150-26225; Conn. Gen. Stat. §§ 29-28 – 29-30, 29-32, 29-32b, 29-35, 29-37; Del. Code Ann. tit. 11, §§ 1441, 1442; Haw. Rev. Stat. Ann. § 134-9; Md. Code Ann., Pub. Safety §§ 5-301 – 5-314; N.J. Stat. Ann. §§ 2C:58-3, 2C:58-4, 2C:39-5; N.Y. Penal Law § 400.00; R.I. Gen. Laws §§ 11-47-8-11-47-18.

[11]    For example, just as in the District of Columbia, two "shall issue" states, Indiana and North Dakota, require applicants to demonstrate a "proper purpose" for requiring a concealed carry permit.  Ind. Code Ann. §§ 35-47-2-3(e); N.H. Rev. Stat. Ann. §§ 159:6(I)(b).

spaces.  In other words, the "good cause" / "proper reason" standard represents the

considered judgment of the majority of state legislatures that limiting the number

of concealed weapons on the street furthers public safety.[12]

Not only are concealed-carry permitting schemes such as the District's far

from novel, they are no stranger to constitutional challenge.  The Second, Third,

and Fourth Circuits have upheld similar concealed-carry permitting regimes when

confronted with Second Amendment challenges.  *See Drake v. Filko*, 724 F.3d

426, 439-40 (3d Cir. 2013) (upholding New Jersey's "justifiable need"

requirement); *Woollard v. Gallagher*, 712 F.3d 865, 880 (4th Cir. 2013)

(upholding Maryland's "good and substantial reason" requirement); *Kachalsky v.*

*Cnty. of Westchester*, 701 F.3d 81, 100-01 (2d Cir. 2012) (upholding New York's

---

[12]     Notably, sheriffs in Alabama, currently a "shall issue" state, have begun
"speaking out about what they call serious concerns with the state's gun laws."
Chuck Williams, *Alabama sheriffs question gun laws in wake of Rusty Houser
shooting,* Ledger-Enquirer (Aug. 11, 2015), http://www.ledger-
enquirer.com/news/local/crime/article30723480.html.  John Russell Houser, who
killed two people then himself on July 23, 2015 in a Lafayette, La., movie theater,
was denied a concealed carry permit by the Russell County, Alabama Sheriff's
Office in 2006.  *Id.*  Since then, the Alabama legislature changed the state's gun
laws from "may issue" to "shall issue."  *Id.*  As the sheriff who denied Houser's
concealed permit carry explained, "[i]f he had walked into our office last month
under the same set of circumstances, I would not have been able to deny him that
permit.  You have taken the discretion away from the sheriffs."  *Id.*  The sheriff
continued, "when you start carrying a gun outside your house, there has to be
forethought about public safety.  And the Alabama legislature is taking away the
tools we have to deal with the issue . . . the most important tool is giving sheriffs
the ability to use common sense and judgment."  *Id.*

"proper cause" requirement). The Second Circuit recognized that "[i]n the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky*, 701 F.3d at 98 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)). Relying on these constitutionally-approved regimes, D.C. explicitly "follow[ed] the models of . . . New York, New Jersey, and Maryland" in crafting its own legislation. Council of the District of Columbia, Committee on the Judiciary & Public Safety, Committee Report on Bill 20-930, "License to Carry a Pistol Amendment Act of 2014" 2 (Nov. 25, 2014) ("Judiciary & Public Safety Committee Report"), JA 41.[13] Yet, the court below spurned the approach of other courts and disregarded the reasoned judgment of the District's elected representatives.[14]

---

[13]      *Available at* http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport1.pdf.

[14]      The district court dismissed the analyses of the Second, Third, and Fourth Circuits in a brief footnote stating that those cases were "uninstructive" because the courts "either afforded too much deference to the legislature's conclusions or did not address whether the statutes at issue were no broader than necessary." Preliminary Injunction Order, at 14 n.8, JA 241. The district court then ended the explanation by improperly providing a short citation to the vacated decision in *Peruta. Id.*

**B.     The District Court's Suggestion to Import First Amendment Framework As An Alternative To The "May Issue" Regime Is Problematic**

After enjoining D.C.'s concealed carry regime, the district court stated:

> This conclusion should not be read to suggest that it would be inappropriate for the District of Columbia to enact a licensing mechanism that includes appropriate time, place and manner restrictions on the carrying of handguns in public.

Preliminary Injunction Order, at 17, JA 244.

The district court's importation of the First Amendment's "time, place, and manner" restrictions into the Second Amendment context is problematic because, although the First Amendment can sometimes provide a useful analytical comparison, there are real and obvious differences between speech rights and carrying a gun in public. While prior restraint of speech restricts debate that is crucial to a healthy democracy, restrictions on gun use can save lives.[15] Second Amendment analysis is different from analysis under the First Amendment.[16] *Cf. Kachalsky*, 701 F.3d at 100

---

[15]     *See infra* Section II.

[16]     The cases cited by the district court to illustrate the validity of alternative "time, place, and manner" restrictions, with one exception, all involve regulations of guns at the point of sale, such as the prohibition on selling guns to felons and the mentally ill or a ban on the sale of semi-automatic weapons. *See* Preliminary Injunction Order, at 17 n.13, JA 244 (citing cases). While important, these regulations cannot provide a useful analogy to this case. The District's concealed carry permitting scheme regulates guns at the point at which they enter the public sphere, not the point of sale. As explained more fully below, it is at exactly this

(rejecting plaintiffs' comparison of Second Amendment rights to the right to vote because "[s]tate regulation under the Second Amendment has always been more robust than of other enumerated rights"); *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("The risk inherent in firearms . . . distinguishes the Second Amendment right from other fundamental rights . . . which can be exercised without creating a direct risk to others.").

Further, alternative time, place, and manner restrictions that take effect *after* guns have entered the public sphere could create prohibitive administrability problems in the District of Columbia. For example, if more narrowly tailored restrictions allowed concealed carry of guns in certain areas or during certain times, D.C. law enforcement would need to ascertain whether concealed carry of guns is permitted during a specific situation before acting to prevent violent escalation. Injecting nuanced considerations into emotionally-charged and volatile situations involving guns prevents law enforcement from acting quickly to protect the public. *See* Dkt. 62,

point—when guns move from the private home to shared public space—where regulation becomes much more urgent as the potential for harm vastly increases. Moreover, the District's approach is most faithful to Supreme Court jurisprudence, which has only recognized a Second Amendment right in the home, *i.e.* before guns enter the public sphere. *See District of Columbia v. Heller*, 554 U.S. 570, 628-29 (2008).

Declaration of Andrew Lunetta, NYPD, at ¶ 14, *Kachalsky v. County of Westchester*, No. 10-cv-5413 (S.D.N.Y. 2011) ("The tactics and split-second decisions required during these encounters could become more complicated, and therefore more dangerous...").

It is not the court's role to second-guess the District's judgment in this realm given the legislature's "considerable authority—enshrined within the Second Amendment—to regulate firearm possession in public." *Kachalsky*, 701 F.3d at 97. The consequences of failing to appropriately regulate the Second Amendment are simply too dire to allow judicial usurpation. *See United States v. Masciandaro*, 638 F.3d 458, 475-76 (4th Cir. 2011) ("We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights.").

## II. SOCIAL SCIENCE CONFIRMS THAT THE DISTRICT'S "GOOD REASON" / "PROPER REASON" REQUIREMENT FURTHERS IMPORTANT GOVERNMENT INTEREST IN PUBLIC SAFETY

The District of Columbia's stated interest in enacting its "good reason" / "proper reason" requirement—"to protect the public safety"[17]—conforms with the most up-to-date social science research demonstrating that more guns in public

---

[17] Council of the District of Columbia, Committee of the Whole, Committee Report on Bill 20-930, "License to Carry a Pistol Amendment Act of 2014" 2 (Dec. 2, 2014) ("Committee of the Whole Report"), *available at* http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport2.pdf.

lead to increased violence. The presence of firearms in the public sphere augments the risk associated with gun violence in at least three ways.

## A.    Lethality Of Guns Creates Unique Dangers In The Public Sphere

First, guns create unique dangers in the public sphere. *See* Philip Cook & Jens Ludwig, *Public Policy Perspectives Principles for Effective Gun Policy*, 73 FORDHAM L. REV. 589, 590 (2004) ("Relative to other types of readily available weapons, guns are intrinsically more lethal, providing the assailant with the power to kill quickly, at a distance, and with little effort or sustained intent."). These dangers will multiply if the District is enjoined from enforcing the "good reason" / "proper reason" requirement. *See* Spencer Hsu & Rachel Weiner, *Federal appeals court lets new D.C. gun law stand, pending final ruling*, The Washington Post (June 29, 2015) ("After the order [granting the preliminary injunction], D.C. police reported receiving a surge of new applicants—96 in less than four weeks, compared with 109 over the previous seven months.").[18] Without this Court's intervention, more guns will enter public spaces, meaning that more people will be within range of a lethal firearm.

In fact, since 2007, at least 750 people have been killed by individuals with concealed carry permits. *See* Violence Policy Center, *Concealed Carry Killers*,

---

[18]    *Available at* http://www.washingtonpost.com/local/crime/federal-appeals-court-lets-new-dc-gun-law-stand-pending-final-ruling/2015/06/29/3aa1bd2a-1e78-11e5-bf41-c23f5d3face1_story.html (last visited Aug. 31, 2015).

*available at* http://concealedcarrykillers.org/ (last visited August 19, 2015).  This

number includes 17 law enforcement officers.  *Id.*  Importantly, a significant

number of these 750 deaths occurred during 29 mass shootings committed by

individuals with concealed carry permits.  *Id.*  The fact that more guns in public

threaten public safety may seem obvious, but it cannot be overstated, particularly

in D.C. which, apart from its over 650,000 residents, attracts over *19 million*

tourists each year. [19]

### B.    Public Carrying Increases Violent Crime

Second, public carrying increases violent crime.  Critically, the most up-to-

date research in this area has concluded that:

> [t]he totality of the evidence based on educated judgments about the
> best statistical models suggests that right-to-carry laws[20] are
> associated with substantially higher rates of aggravated assault, rape,
> robbery, and murder.

Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime,*

*Stanford research shows*, Stanford News (Nov. 14, 2014) (internal quotation

---

[19]    *Washington, DC 2013 Visitor Statistics*, Destination DC (2013), *available at*
http://destinationdc.dmplocal.com/dsc/collateral/Washington_DC_2013_Visitor_St
atistics_updated3-18-15.pdf (last visited July 22, 2015).  This number includes
over 3,000 foreign dignitaries making official visits to Washington, D.C. each
year.  Judiciary & Public Safety Committee Report, at 6, JA 45.

[20]    "Right to Carry" or "RTC" laws (also known as "shall issue" laws) describe
laws pursuant to which citizens carry concealed firearms either without a permit or
after obtaining a permit from local government or law enforcement.  Clifton B.
Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford
research shows*, Stanford News (Nov. 14, 2014).

omitted);[21] *see also* Abhay Aneja, John J. Donohue III, & Alexandria Zhang, *The*

*Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the*

*Empirical Evaluation of Law and Policy* 80-81 (National Bureau of Economic

Research Working Paper No. 18294, 2014) (suggesting that "RTC laws *increased*

*every crime category* by at least 8 percent, except murder (in that model, murder

rose 3 percent but it is not statistically significant).") (emphasis added).[22]  Daniel

Webster, professor at Johns Hopkins Bloomberg School of Public Health,

concluded that Aneja, Donohue, and Zhang's research is the "most scientifically

rigorous" to date, and reiterated that the research "suggests that laws giving law

enforcement discretion in issuing permits to carry concealed firearms ["may issue"

laws] protect against gun violence."  Committee of the Whole Report, at 69

(Attachment; Letter from Daniel Webster to Chairman of the D.C. Council).[23]

---

[21]     *Available at* http://news.stanford.edu/news/2014/november/donohue-guns-study-111414.html (last visited July 22, 2015).

[22]     Professor Donohue further explained that "if anything our 8 percent estimate . . . is likely to understate the true increases in aggravated assault caused by the RTC law."  *Id.*  Some statistical models "generated as estimate of a nearly 33 percent increase in assaults with firearms associated with RTC laws."  Committee of the Whole Report, at 69 (Attachment; Letter from Daniel Webster to Chairman of the D.C. Council).

[23]     Notably, even within the home, gun possession has been linked to increased violence.  *See e.g.*, Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide:  A Review of the Literature*, 9 Aggression & Violent Behav. 417 (2004) ("[H]ouseholds with firearms are at higher risk for homicide, and there is no net beneficial effect of firearm ownership."); Matthew Miller, *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States*,

These latest findings underscore earlier research that has repeatedly demonstrated that RTC laws lead to increased crime rates. *See e.g.*, Ian Ayres & John J. Donohue III, *Yet Another Refutation of the More Guns, Less Crime Hypothesis—With Some Help From Moody and Marvell*, 6 Econ J. Watch 35, 41 (Jan. 2009) ("[T]he vast bulk of the estimated effects . . . were suggestive of crime *increases* caused by RTC laws for seven of the nine FBI Index I crime categories.") (emphasis in original); Ian Ayres & John J. Donohue III, *More Guns, Less Crime Fails Again: The Latest Evidence from 1977-2006*, 6 Econ. J. Watch 218, 229 (May 2009) ("The one consistent finding that is statistically significant... is that RTC laws increase aggravated assault."); Matthew Miller, *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 Accident Analysis & Prevention 477, 477 (Jul. 2000) ("A statistically significant and robust association exists between gun availability and unintentional firearm deaths.").

It is now at the very least clear that "[n]o longer can any plausible case be made on statistical grounds that shall-issue laws are likely to reduce crime for all or even most states." Ian Ayres & John J. Donohue III, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stanford L. Rev. 1194, 1296 (2003). Instead,

---

*1988–1997*, 92 Am. J. Pub. Health 1988, 1988 (Dec. 2002) ("[I]n areas where household firearm ownership rates were higher, a disproportionately large number of people died from homicide."). An increase of guns in the streets is also logically likely to lead to an increase in guns in D.C. homes.

the majority of relevant research demonstrates that "policies to discourage firearms in public may help prevent violence."  David McDowall, *et al.*, *Easing Concealed Firearms Laws*, 86 Crim. L. & Criminology 193, 203 (1995); *see also* Kara E. Rudolph, *et al.*, *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 Am. J. of Pub. Health 49, 49 (2015) (concluding that Connecticut's permit-to-purchase law "was associated with a 40% reduction in Connecticut's firearm homicides rates during the first 10 years that the law was in place"); Philip Cook & Jens Ludwig, *Public Policy Perspectives Principles for Effective Gun Policy*, 73 Fordham L. Rev. at 592 ("[E]vidence suggests that… separat[ing] guns from violence would sharply reduce the number of victims killed in domestic violence, robberies, and routine altercations.").[24]

This conclusion has specifically been borne out in the District of Columbia:

> [r]estrictive licensing of handguns was associated with a prompt decline in homicides and suicides by firearms in the District of Columbia.  No such decline was seen in adjacent metropolitan areas where restrictive licensing did not apply.

---

[24]    Data on gun deaths in each state supports this conclusion.  *See* Law Center to Prevent Gun Violence, *Annual Gun Law State Scorecard 2014*, http://gunlawscorecard.org/ (Dec. 2014) [hereinafter 2014 Scorecard]. The states with the five highest gun death rates (WY, LA, MS, AK, and AL) are states with either no concealed carry permitting requirement at all (WY, MS, and AK) or weak permitting requirements (LA and AL).  *Id.*; Concealed Weapons Permitting Policy Summary, *supra* note 8.  The five states with the *lowest* gun death rates (MA, HI, RI, NY, and NJ) are "may issue" states, similar to the District.  *Id.*

Colin Loftin, *et al.*, *Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia*, 325 New Eng. J. Med. 1615, 1615 (1991).[25]

Importantly, "guns did not seem to protect [even] those who possessed them from being shot in an assault." Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034, 2037 (2009); *see also* David Hemenway, *et al.*, *Gun use in the United States: results from two national surveys*, 6 Injury Prevention 263, 267 (2000) ("The possibility of using a gun in a social usefully manner—against a criminal during the commission of a crime—will rarely, if ever, occur for the average gun owner.").[26] Instead, "[g]uns are used to threaten and intimidate far more often than they are used for self-defense." *Id.* at 263.

---

[25] *Available at* http://www.nejm.org/doi/pdf/10.1056/NEJM199112053252305 (last visited Aug. 7, 2015); *see also* Philip Cook & Jens Ludwig, *Public Policy Perspectives Principles for Effective Gun Policy*, 73 Fordham L. Rev. 589, 608 (2004) ("[T]he data do suggest a reduction in gun use in criminal violence in the early years following [the implementation of stricter handgun regulations in Washington D.C.].").

[26] *Available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1730664/pdf/v006p00263.pdf; *see also* David Hemenway, *Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates*, 87 J. of Crim. L. and Criminology 1430, 1444 (1997) (concluding that self-reported survey results claiming incidents of gun use for self-defense are "huge overestimates").

### C. Permissive Concealed Carry Laws Hinder Law Enforcement's Ability to Protect Themselves and the Public

Third, law enforcement's ability to protect themselves and the public could be greatly restricted if officers were required to presume that a person carrying a firearm in public was doing so lawfully. When the carrying of guns in public is restricted, "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. Ct. 1991); *accord Singleton v. United States*, 998 A.2d 295, 302 (D.C. Ct. App. 2010) (holding that the officer "had a reasonable articulable suspicion that appellant was carrying a firearm, which permitted the officer to temporarily stop and frisk appellant"). By contrast, under a highly permissive concealed carry regime, an officer might not be deemed to have cause to arrest, search, or stop a person seen carrying a loaded gun, even though far less risky behavior could justify police intervention. Law enforcement should not have to wait for a gun to be fired before protecting the public.

**CONCLUSION**

The Court should reverse the district court's order and remand with

instructions to deny the preliminary injunction.


September 3, 2015                    Respectfully submitted,

                                     /s/ Adam K. Levin
                                     Adam K. Levin
                                     Anna M. Kelly
                                     HOGAN LOVELLS US LLP
                                     555 Thirteenth Street, N.W.
                                     Washington, DC 20004
                                     (202) 637-5600
                                     adam.levin@hoganlovells.com

                                     Christine E. MacGregor
                                     HOGAN LOVELLS US LLP
                                     1835 Market Street, 29th Floor
                                     Philadelphia, PA 19103
                                     (267) 675-4600
                                     christine.macgregor@hoganlovells.com

                                     Jonathan E. Lowy
                                     Robert B. Wilcox, Jr.
                                     Alla Lefkowitz
                                     Kelly Sampson
                                     BRADY CENTER TO PREVENT GUN
                                     VIOLENCE - LEGAL ACTION PROJECT
                                     840 First Street, N.E. Suite 400
                                     Washington, D.C. 20002
                                     (202) 370-8104
                                     jlowy@bradymail.org

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

1.     Exclusive of the exempted portions of the brief, as provided in Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure, the brief contains 5,407 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Rule 32(a)(7)(C)(i) of the Federal Rules of Appellate Procedure, the undersigned has relied upon the word count feature of this word-processing system in preparing this certificate.

/s/ Adam Levin
Adam K. Levin

HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
adam.levin@hoganlovells.com

Dated:     September 3, 2015

**CERTIFICATE OF SERVICE**

I, Adam K. Levin, hereby certify that on September 3, 2015 electronic copies of this amicus brief were served through the Court's CM/ECF system to:

Alan Gura, Esq.
Gura & Possessky, PLLC
105 Oronoco Street, Suite 305
Alexandria, VA 22314
alan@gurapossessky.com

*Counsel for Appellees*

Holly M. Johnson
Office of the Attorney General, District of Columbia
Office of the Solicitor General
441 4th Street, N.W.
One Judiciary Square, Sixth Floor
Washington, D.C. 20001
holly.johnson@dc.gov

*Counsel for Appellants*

/s/ Adam Levin
Adam K. Levin

HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
adam.levin@hoganlovells.com

Dated:       September 3, 2015