No. 15-7057
SCHEDULED FOR ORAL ARGUMENT NOVEMBER 20, 2015

In the United States Court of Appeals
for the District of Columbia Circuit

═══════════════════

BRIAN WRENN, JOSHUA AKERY, TYLER WHIDBY,
AND SECOND AMENDMENT FOUNDATION, INC.,

Plaintiffs-Appellees,

v.

DISTRICT OF COLUMBIA AND CATHY LANIER,

Defendants-Appellants.

═══════════════════

Appeal from an Order of the
United States District Court for the District of Columbia
The Hon. Frederick J. Scullin, Jr., Senior District Judge
(Dist. Ct. No. 1:15-cv-162-FJS)

─────────────

BRIEF FOR THE APPELLEES

─────────────

Alan Gura
GURA & POSSESSKY, PLLC
105 Oronoco Street
Suite 305
Alexandria, VA 22314
703.835.9085/703.997.7665

September 30, 2015          Counsel for Appellees

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### A.    PARTIES AND AMICI

Plaintiffs below were Brian Wrenn, Joshua Akery, Tyler Whidby, and Second Amendment Foundation, Inc. All plaintiffs are Appellees before this Court.

Defendants below were Cathy Lanier and the District of Columbia. All Defendants are Appellants before this Court.

No amici appeared in the District Court below.

Amici for Appellants in this Court are Brady Center to Prevent Gun Violence, Law Center to Prevent Gun Violence, Violence Policy Center, DC Appleseed Center for Law and Justice, DC for Democracy, DC Vote, League of Women Voters of the District of Columbia, Anthony A. Williams, Everytown for Gun Safety, and the states of California, Maryland, Illinois, Connecticut, Massachusetts, Hawaii and New York.

As of this writing, the National Rifle Association has filed notice of intent to appear as amicus for the Appellees.

B.    RULINGS UNDER REVIEW

The ruling under review is the Memorandum Decision and Order of the United States District Court for the District of Columbia, per the Hon. Frederick J. Scullin, Jr., Dist. Ct. Dkt. 13, entered May 18, 2015, granting Plaintiff-Appellees' motion for preliminary injunction. The decision is not yet reported, but is available at 2015 U.S. Dist. LEXIS 71383. The ruling under review being appealed is set forth in the Joint Appendix ("JA") at 228-50.

C.    RELATED CASES

The case on review has not been before this Court, and no related cases are known to be pending.

This case was related to *Palmer* v. *District of Columbia*, U.S. Dist. Ct., D.D.C. No. 09-1482-FJS. In *Palmer*, which involved the same Defendants, Plaintiff SAF, and Plaintiff SAF's members, the District Court struck down the city's statutory scheme addressing the carrying of handguns in public for self-defense. The District Court had enjoined the City's handgun carrying prohibition until a constitutional licensing system was in place. The case involved motions to enforce that order,

concerning the same regulations here at issue, which were pending before the District Court when this case was filed.

The two cases identified by amicus curiae Brady Center, et al., as related are not, in fact related. *Smith* v. *District of Columbia*, D.D.C. No. 1:15-CV-737-RCL, is a class action for damages arising from the City's enforcement of its previous handgun ban. As best as Plaintiffs understand it, *Common Purpose, USA, Inc.* v. *Lynch*, D.D.C. No. 1:15-CV-1327-KBJ, asserts, on a reading of the Federalist Papers, that the District of Columbia's firearms laws are unconstitutional because they tolerate private firearms ownership unconnected to militia service.

CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Second Amendment Foundation, Inc., ("SAF") has no parent corporations. No publicly traded company owns 10% or more of its stock.

SAF, a tax-exempt organization under § 501(c)(3) of the Internal Revenue Code, is a non-profit educational foundation incorporated in 1974 under the laws of the State of Washington. SAF seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs. SAF has over 650,000 members and supporters residing throughout the United States.

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases. . . . . . . . . . . . . .  i

Corporate Disclosure Statement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Glossary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxi

Statement of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statutes and Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        1.    Regulatory History. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        2.    Present Regulatory Landscape. . . . . . . . . . . . . . . . . . 6

        3.    The Regulatory Scheme's Application Against
               Plaintiffs.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        4.    Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.    Jurisdiction Is Not Optional. . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.   Requiring A "Good" or "Other Proper" Reason to Exercise the
      Right to Bear Arms is Unconstitutional. . . . . . . . . . . . . . . . . . . . 16

   A.   The Second Amendment Secures the Right to Carry
        Handguns in Public for Self-Defense. . . . . . . . . . . . . . . . . 16

      1.   Reviewing Text, Tradition, and Precedent, the Supreme
           Court Has Confirmed Plaintiffs' Right to Carry Arms for
           Self-Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      2.   Post-*Heller* Courts Largely Confirm That the
           Second Amendment Extends Beyond the Home. . . . . . . . 28

      3.   History Confirms *Heller*'s Holding That the Second
           Amendment Codified the Right to Carry Arms for Self-
           Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

              a.   The Statute of Northampton. . . . . . . . . . . . . . 33

              b.   American Gun Carrying Regulations. . . . . . . . 39

   B.   "Good" or "Proper" Reason Requirements Destroy Rights.  46

   C.   Defendants' Licensing Scheme Fails Any Level of
        Means-Ends Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

   D.   Lanier's Generalized Discretion to Deny Carry Licenses,
        and the "Good Reason"/"Other Proper Reason" Standard,
        Both Constitute Unlawful Prior Restraints. . . . . . . . . . . . . 62

III.  Defendants' Licensing Scheme Irreparably Harms Plaintiffs. . 66

IV.   The Balance of Equities Favors Granting Injunctive Relief. . . . 67

V.    The Public Interest Warrants Injunctive Relief. . . . . . . . . . . . . 71

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

vi

# TABLE OF AUTHORITIES

Cases

*Aamer* v. *Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Abdullah* v. *Obama*,
  753 F.3d 193 (D.C. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Andrews* v. *State*,
  50 Tenn. 165 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Bateman* v. *Perdue*,
  881 F. Supp. 2d 709 (E.D.N.C. 2012) . . . . . . . . . . . . . . . . . . . . . 30, 59

*Bd. of Trs.* v. *Fox*,
  492 U.S. 469 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Beal* v. *Stern*,
  184 F.3d 117 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Bliss* v. *Commonwealth*,
  12 Ky. 90 (1822) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Bonidy* v. *United States Postal Serv.*,
  790 F.3d 1121 (10th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Bsharah* v. *United States*,
  646 A.2d 993 (D.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*City of Lakewood* v. *Plain Dealer Publishing Co.*,
  486 U.S. 750 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65

*Authorities on which we chiefly rely are marked with an asterisk.

*City of Las Vegas* v. *Moberg*,
 82 N.M. 626, 485 P.2d 737 (N.M. Ct. App. 1971). . . . . . . . . . . . . . . 25

*Clark* v. *Jeter*,
 486 U.S. 456 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

*Cohens* v. *Virginia*,
 19 U.S. (6 Wheat.) 264 (1821). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Commonwealth* v. *Gouse*,
 461 Mass. 787, 965 N.E.2d 774 (2012). . . . . . . . . . . . . . . . . . . . . . 28

*Dickens* v. *Ryan*,
 688 F.3d 1054 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

\*District of Columbia* v. *Heller*,
 554 U.S. 570 (2008) . . .  2, 13, 17-27, 32, 34, 36, 38, 39, 41, 44, 46-49,
                       55, 61

*Drake* v. *Filko*,
 724 F.3d 426 (3d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . 20, 30, 48

*Dred Scott* v. *Sandford*,
 60 U.S. (19 How.) 393 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*English* v. *State*,
 35 Tex. 473 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Ex parte Thomas*,
 21 Okla. 770, 97 P. 260 (1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

\*Ezell* v. *City of Chicago*,
 651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . 12, 22, 63, 67

*FCC* v. *Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Fife* v. *State,*
    31 Ark. 455 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Fletcher* v. *Haas,*
    851 F. Supp. 2d 287 (D. Mass. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Gadomski* v. *Tavares,*
    113 A.3d 387 (R.I. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 54

*GeorgiaCarry.Org, Inc* v. *Georgia,*
    687 F.3d 1244 (11th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*GeorgiaCarry.Org, Inc.* v. *U.S. Army Corps of Eng'rs,*
    788 F.3d 1318 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Gillis* v. *United States,*
    400 A.2d 311 (D.C.1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Gordon* v. *Holder,*
    721 F.3d 638 (D.C. Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Heller* v. *District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) . . . . . . . . . . . . . . 10, 11, 14, 44, 55, 57

*Heller* v. *District of Columbia,* No. 14-7071,
    2015 U.S. App. LEXIS 16632
    (D.C. Cir. Sept. 18, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 60, 61

*Hertz* v. *Bennett,*
    294 Ga. 62, 751 S.E.2d 90 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Application of McIntyre,*
    552 A.2d 500 (Del. Super. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*In re Brickey*,
    8 Idaho 597, 70 P. 609 (1902) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 28

*\*Isaacson* v. *Horne*,
    716 F.3d 1213 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

*Johnson* v. *Eisentrager*,
    339 U.S. 763 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kachalsky* v. *Cnty. of Westchester*,
    701 F.3d 81 (2d. Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 48, 63

*King* v. *Hutchinson*,
    168 Eng. Rep. 273, 1 Leach 339 (1784) . . . . . . . . . . . . . . . . . . . . . . . 35

*Kuck* v. *Danaher*,
    822 F. Supp. 2d 109 (D. Conn. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Largent* v. *Texas*,
    318 U.S. 418 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Little* v. *United States*,
    989 A.2d 1096 (D.C. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Marbury* v. *Madison*,
    5 U.S. (1 Cranch) 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*McCullen* v. *Coakley*,
    134 S. Ct. 2518 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*McDonald* v. *City of Chicago*,
    561 U.S. 742 (2010) . . . . . . . . . . . . . . . . . . . . . . 16, 18, 20, 22, 28, 43

*Mills* v. *District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Moore v. Madigan,
   702 F.3d 933 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . 18, 25, 28, 33, 44

Morris v. United States Army Corps of Eng'rs,
   990 F. Supp. 2d 1082 (D. Idaho 2014) . . . . . . . . . . . . . . . . . . . . . . . . 30

Mosby v. Devine,
   851 A.2d 1031 (R.I. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Muscarello v. United States,
   524 U.S. 125 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Myers v. United States,
   272 U.S. 52 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Nat'l Rifle Ass'n of Am., Inc. v. McCraw,
   719 F.3d 338 (5th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Norris v. United States,
   687 F.2d 899 (7th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Nunn v. State,
   1 Ga. 243 (1846) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Owen v. State,
   31 Ala. 387 (1858). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

O'Neill v. State,
   16 Ala. 65 (1849) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Palmer v. District of Columbia,
   59 F. Supp. 3d 173 (D.D.C. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

Parker v. District of Columbia,
   478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . 2, 13, 20, 61, 63

*People* v. *Aguilar*,
    2013 IL 112116. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*People* v. *Zerillo*,
    219 Mich. 635, 189 N.W. 927 (1922).. . . . . . . . . . . . . . . . . . . . . . . . . 51

*Peruta* v. *Cnt'y of San Diego*,
    742 F.3d 1144 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . 16, 49, 58, 59

*Rex* v. *Knight*,
    38 Comb., 90 Eng. Rep. 330 (K.B. 1686) . . . . . . . . . . . . . . . . . . . . . . 34

*Schubert* v. *De Bard*,
    398 N.E.2d 1339 (Ind. App. 1980). . . . . . . . . . . . . . . . . . . . . . . 24, 51

*Simpson* v. *State*,
    13 Tenn. 356 (1833) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 38, 39

*Sir John Knight's Case*,
    87 Eng. Rep. 75 (K.B. 1686). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Speiser* v. *Randall*,
    357 U.S. 513 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*State ex rel. City of Princeton* v. *Buckner*,
    180 W. Va. 457, 377 S.E.2d 139 (1988). . . . . . . . . . . . . . . . . . . . . . 25

*State* v. *Bailey*,
    209 Conn. 322, 551 A.2d 1206 (1988) . . . . . . . . . . . . . . . . . . . . . . . 24

*State* v. *Barnett*,
    34 W. Va. 74, 11 S.E. 735 (1890). . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*State* v. *Blocker*,
    291 Or. 255, 630 P.2d 824 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . 20

*State* v. *Chandler*,
    5 La. Ann. 489 (1850). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*State* v. *Christian*,
    354 Or. 22, 307 P.3d 429 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . 20, 28

*State* v. *Hogan*,
    63 Ohio St. 202, 58 N.E. 572 (1900). . . . . . . . . . . . . . . . . . . . . . . 24, 37

*State* v. *Huntly*,
    25 N.C. (3 Ired.) 418 (1843) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 37

*State* v. *Jumel*,
    13 La. Ann. 399 (1858) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*State* v. *Kessler*,
    289 Or. 359, 614 P.2d 94 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*State* v. *Langford*,
    10 N.C. (3 Hawks) 381 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*State* v. *Lanier*,
    71 N.C. 288 (1874) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*State* v. *Reid*,
    1 Ala. 612 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 40, 49

*State* v. *Rosenthal*,
    55 A. 610 (Vt. 1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*State* v. *Schoultz*,
    25 Mo. 128 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*State* v. *Workman*,
    35 W. Va. 367, 14 S.E. 9 (1891). . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

xiii

*Staub* v. *City of Baxley*,
   355 U.S. 313 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Turner Broadcasting System, Inc.* v. *FCC*,
   520 U.S. 180 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 58

*United States* v. *Booker*,
   375 F.3d 508 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States* v. *Chester*,
   628 F.3d 673 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States* v. *Cruikshank*,
   92 U.S. 542 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 43

*United States* v. *Marzzarella*,
   614 U.S. 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Masciandaro*,
   638 F.3d 458 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States* v. *Miller*,
   307 U.S. 174 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States* v. *Skoien*,
   614 F.3d 638 (7th Cir. 2010) (en banc) . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Weaver*, No. 2:09-CR-00222,
   2012 U.S. Dist. LEXIS 29613 (S.D. W. Va. Mar. 7, 2012) . . . . . . . . 30

*Williams* v. *State*,
   417 Md. 479, 10 A.3d 1167 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Wilson* v. *State*,
   33 Ark. 557 (1878). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Woollard* v. *Gallagher*,
  712 F.3d 865 (4th Cir. 2013)................................ 29, 48

## Constitutional Provisions

Ala. Const. of 1819, art. I, § 27................................. 24

Conn. Const. art. I, § 15 (1819)................................. 24

Ky. Const. of 1799, art. XII, cl. 23.............................. 24

Mo. Const. of 1820, art. XIII, § 3. .............................. 24

N.C. Declaration of Rights § 17 (1776)........................... 24

Tenn. Const. of 1796, art. XI, § 26. ............................. 24

U.S. Const. amend. I .......................................... 47

U.S. Const. amend. II. ..................................... 17, 47

U.S. Const. amend. IV ......................................... 47

U.S. Const. amend. IX ......................................... 47

U.S. Const. amend. VI.......................................... 17

U.S. Const. art. III, § 2, cl. 1.................................. 16

Vt. Const. c. 1, art. 16 (1777) .................................. 24

Statutes and Rules

1 W. & M., Sess. 2, c.2, § 1 (1689)............................... 36

24 D.C.M.R. § 2333.1...................................... 7, 9

24 D.C.M.R. § 2333.2........................................ 7

24 D.C.M.R. § 2333.4........................................ 8

24 D.C.M.R. § 2334.1...................................... 8, 9

Ariz. H.B. 2036 § 9(B)(1), (2012), available at http://www.azleg.gov/
    legtext/50leg/2r/bills/hb2036s.pdf, archived at http://perma.cc/
    KA77-TMQ8 (last visited Sept. 30, 2015). ..................... 52

D.C. Act 17-690, 56 D.C. Reg. 1162 (Jan. 16, 2009)................. 6

D.C. Act 19-366, 59 D.C. Reg. 5691, 5697 (May 25, 2012)........... 6

D.C. Code § 22-4504. ..................................... 5, 6

D.C. Code § 22-4504(a) (2008)................................ 20

D.C. Code § 22-4506. ................................... 5, 6, 9

D.C. Code § 22-4506(a) .................................. 64, 65

D.C. Code § 7-2509.11.................................... 6, 64

D.C. Code § 7-2509.11(1)(A)................................. 47

Other Authorities

Alexi Mostrous, "White House Backs Right To Arms Outside
    Obama Events," *Washington Post*, Aug. 19, 2009,
    available at http://www.washingtonpost.com/wp-
    dyn/content/article/2009/08/18/AR2009081803
    416.html (last visited Sept. 30, 2015). . . . . . . . . . . . . . . . . . . . . . . . 62

BLACK'S LAW DICTIONARY (6th Ed. 1998). . . . . . . . . . . . . . . . . . . . . . 18

Brief for English/Early American Historians,
     Supreme Ct. No. 08-1521. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Brief of 34 Professional Historians, Supreme Ct. No. 08-1521. . . . . . . 32

Brief of Jack Rakove, et al., Supreme Ct. No. 07-290. . . . . . . . . . . . . . 32

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW
    IN FORCE IN KENTUCKY (1822). . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Clayton E. Cramer, *The Statute of Northampton (1328) and
    Prohibitions on the Carrying of Arms* (Sept. 19, 2015),
    available at SSRN: http://ssrn.com/abstract= 2662910
    or http://dx.doi.org/10.2139/ssrn.2662910 . . . . . . . . . . . . . . . . . 35, 36

Colin Greenwood, FIREARMS CONTROL: A STUDY OF
    ARMED CRIME AND FIREARMS CONTROL IN
    ENGLAND AND WALES (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

COLLECTED WORKS OF JAMES WILSON
    (K. Hall & M. Hall eds., 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Current Valid Tennessee Handgun Permits by County*,
    available at https://www.tn.gov/assets/entities/safety/
    attachments/Current_ HG_PermitHolders.pdf
    (last visited Sept. 30, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. Law & Pol. 191 (2006). . . . . . . . . . . . . . . . 24

FBI, *Uniform Crime Reports: Crime in the United States 2013*, Table 4, available at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/4tabledatadecoverviewpdf/table_4_crime_in_the_united_states_by_region_geographic_division_and_state_2012-2013.xls (last visited Sept. 30, 2015). . . . . . . . . . . . . . . 68

Florida Department of Agriculture and Consumer Services Division of Licensing, *Concealed Weapon or Firearm License Summary Report October 1, 1987 - August 31, 2015*, available at http://www.freshfromflorida.com/content/download/7499/118851/cw_monthly.pdf (last visited Sept. 30, 2015). . . . . . . . 70

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self- Defense with a Gun*, 86 J. Crim. L. & Criminology 150 (1995). . . . . . . . . . . . . . . . . . . . . . 66

Henry Campbell Black, A Dictionary of Law (1891). . . . . . . . . . . . . . . 46

John A. Dunlap, The New-York Justice (1815) . . . . . . . . . . . . . . . . . 37

Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right (1994). . . . . . . . . . . . . 35

L.A. Powe, Jr., *Guns, Words, and Constitutional Interpretation*, 38 Wm. & Mary L. Rev. 1311 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . 63

Michigan State Police Criminal Justice Information Center, *Concealed Pistol License Annual Report, July 1, 2012 to June 30, 2013*, available at http://www.michigan.gov/documents/msp/CPLAnnual_Report2013_463317_7.pdf (last visited Feb. 27, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Mike DeBonis, "Security, not street crime, at risk after
gun ruling, D.C. Police Chief Cathy Lanier says,"
*Washington Post*, July 30, 2014, available at
http://www.washingtonpost.com/local/dc-politics/
security-not-street-crime-at-risk-after-gun-ruling-
dc-police-chief-cathy- lanier-says/2014/07/30/f8b17e1c-
1808-11e4-9e3b-7f2f110c6265_story.html
(last visited Sept. 30, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

PAPERS OF JAMES MADISON (Robert Ruthland &
Charles Hobson eds. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

PAPERS OF THOMAS JEFFERSON (J. Boyd ed., 1950) . . . . . . . . . . . . . . . 23

Robert J. Cottrol and Raymond T. Diamond,
*"Never Intended to be Applied to the White Population":*
*Firearms Regulation and Racial Disparity—the*
*Redeemed South's Legacy to a National Jurisprudence?*,
70 CHI.-KENT L. REV. 1307 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Tennessee Dep't of Safety & Homeland Security,
*Handgun Carry Permit Statistics Calendar Year 2014*,
available at http://share.tn.gov/safety/stats/
DL_Handgun/Handgun/HandgunReport2014
Full.pdf (last visited Sept. 30, 2015). . . . . . . . . . . . . . . . . . . . . . . . 69

Texas Dep't of Public Safety, *Conviction Rates for Concealed Handgun*
*License Holders, Reporting Period 1/1/2012-12/31/2012*, available at
http://www.txdps.state.tx.us/RSD/CHL/Reports/ConvictionRates
Report2012.pdf (last visited Sept. 30, 2015). . . . . . . . . . . . . . . . . . 70

*Who Are American Citizens?*,
THE LIBERATOR, Jan. 21, 1859, at 10, col. 2 . . . . . . . . . . . . . . . . . . . 26

William Blackstone, COMMENTARIES ON THE
LAWS OF ENGLAND (1769) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

William Hawkins, TREATISE OF THE PLEAS OF THE CROWN (1716). . . . 35

WORKS OF THE HONOURABLE JAMES WILSON
    (Bird Wilson ed., 1804). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

xx

Glossary

DSA – Defendants-Appellants' Statutory Addendum

JA – Joint Appendix

PSA – Plaintiffs-Appellees' Statutory Addendum

SAF – Plaintiff-Appellee Second Amendment Foundation, Inc.

APPELLEES' BRIEF

STATEMENT OF ISSUES

1.  Does the Second Amendment secure a fundamental right to carry handguns in public for self-defense?

2.  May the City condition the issuance of handgun carry permits on proof of one's "good" or "proper" reason, beyond the constitutional self-defense interest, for exercising the fundamental right to bear arms?

STATUTES AND REGULATIONS

Except for various historical statutes cited below and included in Plaintiffs-Appellees' attached statutory addendum ("PSA"), all applicable statutes and regulations are contained in Defendants-Appellants' statutory addendum ("DSA").

STATEMENT OF THE CASE

Suppose that Washington, D.C. again banned the home possession of handguns, only this time, exempting a select few who proved to the police chief's satisfaction a particularly "good" or "proper" reason to possess handguns. A particularized burglary threat might suffice, but living in a high-crime neighborhood would not. Responding to the inevitable constitutional challenge, the City would again muster

1

studies supporting its belief that the presence of handguns in homes is disastrous. The City would then demand deference not only to its "factual" findings regarding the evils of home handgun possession, but also to its *legal* conclusion that its handgun rationing interest outweighs the individual interest in keeping handguns.

No court would find the law consistent with the Second Amendment right secured in *Parker* v. *District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), *aff'd sub nom District of Columbia* v. *Heller*, 554 U.S. 570 (2008) ("*Heller*"). The right to keep handguns, as much as any other right, would be meaningless if the City could declare it inherently harmful and thus prohibited unless the police believed that good reason existed for its enjoyment.

Of course, the Second Amendment secures not only the right to "keep" handguns, but also to "bear" them. That renders Washington a "right-to-carry" jurisdiction, a term employed throughout the City Council's report on the subject, and the City's brief here, in pejorative contradistinction to the challenged laws. *See also* Motion for Stay, June 11, 2015, at 17 ("Without this [regulation], the District becomes a

2

'right-to-carry' regime."). Indeed, the City presents the "good reason" requirement as a sort of favor, because "the Council concluded [that] *any* increase in public carrying increases the risk of public harm, regardless of whether the licensee can satisfy the 'good reason' standard." Appellants' Br. 12.

In other words, the City claims the power "to exercise some control over the quantity of handguns carried in public." Motion for Stay, June 11, 2015, at 17. For virtually everyone, that quantity is zero. And under the City's reasoning, it might again eliminate its symbolic licensing process altogether.

The City errs. It cannot ration Second Amendment rights. *Heller* v. *District of Columbia*, No. 14-7071, 2015 U.S. App. LEXIS 16632, at *35 (D.C. Cir. Sept. 18, 2015) ("*Heller III*"). To be sure, it retains the power to regulate the carrying of handguns in the interest of public safety. And Plaintiffs do not challenge the City's myriad laws governing registration, training, background checks, sensitive places, or restrictions on the types of guns that may be carried and the manner in which they are carried. But no "balancing test" allows the City to

3

declare a constitutional right a social evil, assign itself an interest in suppressing the right, and then demand deference to its self-serving conclusion that the right's severe rationing has proper constitutional "fit." Rather, if the Constitution means anything, it means that the City cannot target fundamental rights as undesirable, and that where fundamental rights are concerned, *judges*, not legislators, determine whether the legislators have gone too far. The District Court correctly found that the City's rights-rationing program must be enjoined.

 1. *Regulatory History*.

Until 1943, Americans were largely free to carry handguns in Washington, D.C. for self-defense without a license.

The District codified the common law of affray in 1818, forbidding the carrying of weapons "in terror of the country." DSA 58-59. As discussed *infra*, at 33-39, affray targeted menacing conduct, not the mere carrying of guns. The D.C. Code's March 8, 1855 codification provided that an individual going armed with, inter alia, a pistol,

> without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property . . . *may*, on complaint of any person having *reasonable cause* to fear an injury or

4

> breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months. . . .

PSA 8 (emphasis added). A November 4, 1857 enactment barred the carrying of all dangerous weapons, including handguns, DSA 64, but was replaced in 1858 by a narrower prohibition addressing only the concealed carrying of arms, DSA 65. A July 13, 1892 enactment continued the concealed carry prohibition, adding a prohibition on openly carrying arms "with intent to unlawfully use the same." DSA 66.

In 1932, Congress relaxed the concealed carry prohibition by authorizing the District's police chief to license concealed handgun carrying, on a "may issue" basis, by "suitable" individuals showing "good reason to fear injury to [one's] person or property or . . . other proper reason" to carry a gun, DSA 69, later codified at D.C. Code § 22-4506.[1] In 1943, the licensing requirement, eventually codified at Section 22-4504, was extended to require a license whether "carry[ing] openly or concealed." DSA 73.

---

[1] All statutory references are to the D.C. Code unless otherwise noted.

5

The licensing regime fell into desuetude by 1994, when the D.C.

Court of Appeals could hold that possession a handgun in public

constituted criminal probable cause because "[i]t is common knowledge

. . . that with very rare exceptions licenses to carry pistols have not

been issued in the District of Columbia for many years and are

virtually unobtainable." *Bsharah* v. *United States*, 646 A.2d 993, 996

n.12 (D.C. 1994). Section 22-4506, containing the Police Chief's

authority to license handgun carrying, was repealed, effective May 20,

2009. See D.C. Act 17-690, 56 D.C. Reg. 1162, 1165 (Jan. 16, 2009).

Section 22-4504 subsequently lost its reference to a license, becoming a

*de jure* prohibition on all handgun carriage in 2012. *See* D.C. Act

19-366, 59 D.C. Reg. 5691, 5697 (May 25, 2012).

    2.        *Present Regulatory Landscape*

Responding to the judgment striking down its handgun carry regime,

*Palmer* v. *District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), the

City revived Section 22-4506 in largely the same form that had existed

from 1932 to 2009, and restored Section 22-4504's allowance for

licensed handgun carriage. New Section 7-2509.11 provides that the

Police Chief "shall issue rules . . . including rules:

(1) To establish criteria for determining when an applicant has, pursuant to [Section 22-4506]:

"(A) Demonstrated a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life;

"(B) Demonstrated any other proper reason for carrying a concealed pistol, which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person;

Defendant Police Chief Lanier accordingly adopted regulations

regarding the licensing of individuals to carry handguns, including:

- "A person shall demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life." 24 D.C.M.R. § 2333.1;

- "For the purposes of satisfying the specifications of § 2333.1, a person shall allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person. The person shall also allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger." 24 D.C.M.R. § 2333.2;

- "The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry license." 24 D.C.M.R. § 2333.4; and

- "A person may allege any other proper reason that the Chief may accept . . . which may include: (a) Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person; or (b) The need for [an adult, immediate family member] to provide protection of a family member who . . . cannot act in defense of himself or herself, and the [incapacitated] family member . . . can demonstrate a good reason to fear injury to his or her person by showing a special need for self- protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life in the manner described in § 2333." 24 D.C.M.R. § 2334.1.

3. *The Regulatory Scheme's Application Against Plaintiffs*

Brian Wrenn and Joshua Akery each possess validly registered handguns within the District of Columbia. Joint Appendix ("JA") 21, 23. Akery is licensed by Pennsylvania and Utah to carry a concealed handgun for self-defense. JA 21. Tyler Whidby possesses handguns that are registerable in the District of Columbia for carriage by non-residents, and holds a Florida license to carry a concealed handgun for self-defense. JA 25. These three individual Plaintiffs-Appellees are members of Plaintiff-Appellee Second Amendment Foundation, Inc.

8

("SAF"), a non-profit membership organization dedicated to advancing Second Amendment rights. JA 38.

Like other SAF members, Wrenn, Akery, and Whidby each qualify for a Washington, D.C. handgun carry license but for the "good reason" or "other proper reason" requirement, which they cannot satisfy. JA 21-26, 38-39. Nonetheless, they each applied to Defendant Lanier for a handgun carry license. JA 22, 24, 26. Wrenn and Akery could not show a "good reason" or "other proper reason" as Defendants require. JA 21-24. Whidby did not assert a "good reason," but believed he had "other proper reasons." JA 26.[2] Lanier denied each application for lack of "good" or "other proper" reason. JA 28-30.

4.    *Procedural History*.

Plaintiffs brought suit on February 3, 2015, challenging Section 22-4506's grant of discretion to deny licenses to otherwise qualified applicants, its requirement of a "good reason" or "other proper reason,"

---

[2]Whidby transports firearms and related inventory through the District in connection with his business as a federal firearms licensee; he wished to be able to defend his young children (at the time of his application, 24 D.C.M.R. § 2334.1 did not require that the family member to be protected demonstrate a special need under 24 D.C.M.R. § 2333.1); and he asserted self-defense as a "proper reason."

9

and the various provisions further enabling and defining these requirements, for violating their Second Amendment rights. On February 6, Plaintiffs moved for a preliminary injunction, which the District Court entered on May 18, 2015.

"[C]onsistent with its decision in *Palmer*, this Court again concludes that, although subject to traditional restrictions, there exists a right under the Second Amendment to carry handguns in public for self-defense." JA 235. The District Court then applied the familiar two-step approach to Second Amendment cases that this Court adopted in *Heller* v. *District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"). Surveying the District of Columbia's historical regulation of firearms carriage, the District Court concluded that Defendants failed to establish that the challenged provisions are longstanding, and that in any event, under *Heller II*, the "longstanding" inquiry is irrelevant because the provisions have more than a de minimis effect on the right to bear arms. JA 238.[3]

---

[3]Defendants below cited, inter alia, historical public discharge provisions that they do not invoke on appeal.

10

The District Court next determined that intermediate scrutiny would govern Plaintiffs' claims. JA 239. Applying *Heller II*, the District Court concluded that "to pass muster under intermediate scrutiny, the District of Columbia must demonstrate that its 'good reason'/'proper reason' requirement is not broader than necessary to achieve its substantial government interest in preventing crime and protecting public safety." JA 240. The District Court deferred to the City on the question of its important governmental interests, but not on the question of constitutional "fit." JA 240-41.

> [T]he issue here is not whether the District of Columbia's "good reason"/"proper reason" requirement is a reasonable or wise policy choice. Rather, the issue is whether this requirement, no matter how well intended, violates the Second Amendment.

JA 242-43.

> [A]fter reviewing the record in this case, the Court finds that Defendants have failed to demonstrate that there is any relationship, let alone a tight fit, between reducing the risk to other members of the public and/or violent crime and the District of Columbia's "good reason"/"proper reason" requirement.

JA 244. The District Court added that the City was free to impose time, place and manner regulations, but that the challenged scheme "goes far beyond establishing such reasonable restrictions." *Id.*

11

> Rather, for all intents and purposes, this requirement makes it impossible for the overwhelming majority of law-abiding citizens to obtain licenses to carry handguns in public for self-defense, thereby depriving them of their Second Amendment right to bear arms.

*Id.* Plaintiffs had thus established a likelihood of success on the merits.

The District Court next found that the Second Amendment, like the First, secures "intangible and unquantifiable interests" whose violation "cannot be compensated by damages." JA 245 (quoting *Ezell* v. *City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011)). The equities tipped in Plaintiffs' favor, considering the narrowness of their claims. JA 246-47. The same analysis determined that the public interest favored injunctive relief. JA 248.

Defendants appealed from this order on June 10, 2015.

### Standard of Review

"We review the district court's balancing of the preliminary injunction factors for abuse of discretion and review questions of law underlying the district court's decision de novo." *Abdullah* v. *Obama*, 753 F.3d 193, 197-98 (D.C. Cir. 2014).

12

Summary of Argument

It simply does not matter whether the City can "prove" that the carrying of handguns for self-defense by responsible, law-abiding citizens is socially harmful. The City might "prove" that any number of constitutional provisions are inadvisable. But if there is a *right* to bear arms—and assuredly, that right is constitutionally codified—that right might only be regulated, not rationed or destroyed. The Second Amendment would be meaningless if it merely required deference to the government's policies, or worse—if it required the Court to uphold or strike down whichever policies it believes advisable or unwise, as the case may be.

Individuals are constitutionally entitled to carry handguns in pubic for self-defense. That right is as valid in the Nation's capital as it is anywhere else. Rationing a fundamental right to a tiny subset of privileged individuals suspected by the Police Chief of having a sufficiently good "reason" to enjoy their *right* fails any constitutional test—as a flat destruction of the right, per *Parker* and *Heller*; under

*Heller II* means-ends scrutiny (including intermediate scrutiny); or as a prior restraint.

Given the irreparable nature of Plaintiffs' harm, the balance of the equities, and the strong public interest in safeguarding fundamental rights, the District Court's order granting injunctive relief should be affirmed.

ARGUMENT

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer* v. *Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quotations omitted).

## I.    JURISDICTION IS NOT OPTIONAL.

Before turning to the merits, Plaintiffs are constrained to address Defendants and their amici's suggestion, heard too often in this field, that the Court abdicate its duty because the prospect of securing

Second Amendment rights is too horrible to contemplate. Appellants' Br. 58; Brady Br. 9.

Jurisdiction is not optional. *Cohens* v. *Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821). Moreover, the Supreme Court is "one of final review, not of first view," and it does not ordinarily "rush to judgment without a lower court opinion." *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 529 (2009) (citation and internal quotation marks omitted). Even "[w]hen the Supreme Court says that it is not resolving an issue, it perforce confides the issue to the lower federal courts for the first pass at resolution." *United States* v. *Booker*, 375 F.3d 508, 513 (7th Cir. 2004), *aff'd*, 543 U.S. 220 (2005).

Plaintiffs share the sentiment for treading carefully in the Second Amendment area, but caution does not automatically favor restricting freedom. Presumably the Framers codified the right to bear arms because they believed it to have some social utility. "[M]iscalculat[ing] as to Second Amendment rights" might wrongly disarm individuals, leaving them vulnerable to "some unspeakably tragic act of mayhem." *United States* v. *Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011)

15

(Wilkinson, J., concurring). Alas, the Second Amendment does not "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald* v. *City of Chicago*, 561 U.S. 742, 790-91 (2010) (plurality opinion).

But Article III does require judges to decide cases "arising under [the] Constitution." U.S. Const. art. III, § 2, cl. 1. And for better or worse, the Supreme Court has already settled the basic issue presented: the Second Amendment extends beyond the home.

II.   REQUIRING A "GOOD" OR "OTHER PROPER" REASON TO EXERCISE THE RIGHT TO BEAR ARMS IS UNCONSTITUTIONAL.

A.   The Second Amendment Secures the Right to Carry Handguns in Public for Self-Defense.

Defendants' abandonment of their appeal in *Palmer* doubtless reflects their assessment of the theory that somehow, the right to bear arms at most secures the right to walk inside one's home with a weapon. Nonetheless, "[u]nderstanding the scope of the right is not just necessary, it is key" to evaluating the challenged provisions. *Peruta* v.

16

*Cnt'y of San Diego*, 742 F.3d 1144, 1167 (9th Cir. 2014), *reh'g en banc granted*, 781 F.3d 1106 (9th Cir. 2015).

"[K]eep and bear," U.S. Const. amend. II, describes two distinct concepts. *Cf.* U.S. Const. amend. VI ("speedy and public trial"). "It cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such construction is inadmissible, unless the words require it." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 174 (1803). "[T]he usual canon of [constitutional] interpretation . . . requires that real effect should be given to all the words it uses." *Myers* v. *United States*, 272 U.S. 52, 151 (1926) (citations omitted).

    1.    Reviewing Text, Tradition, and Precedent, the Supreme Court Has Confirmed Plaintiffs' Right to Carry Arms for Self-Defense.

In *Heller*, the City's theory of the Second Amendment as securing collective rather than individual action relied on reading the term "bear arms" as having a primarily militaristic idiomatic meaning. The Supreme Court was thus called upon to define that term—and held that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584 (citations omitted).

17

"[T]he natural meaning of 'bear arms'" as used in the Second Amendment, *id.*, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person," *id.* (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting); Black's Law Dictionary 214 (6th Ed. 1998)). Accordingly, the Court repeatedly referred to "the Second Amendment right, protecting only individuals' liberty to keep *and carry* arms." *Heller*, 554 U.S. at 604 (emphasis added); *see also id.* at 626.

Although "the need for defense of self, family, and property is most acute" in the home, *Heller*, 554 U.S. at 628, and the right to arms is secured "most notably for self-defense within the home," *McDonald*, 561 U.S. at 780 (plurality opinion), "that doesn't mean [the need] is not acute outside the home." *Moore* v. *Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. "Confrontations are not limited to the home," *Moore*, 702 F.3d at 936. "[G]iven the presumption that most citizens are law abiding, and

18

the reality that the need to defend oneself may suddenly arise in a host of locations outside the home," the "good/proper reason" regime is indeed the next "domino[] to be knocked off the table." *Heller*, 554 U.S. at 679-80 (Stevens, J., dissenting).

Although *Heller* involved a challenge to home handgun possession, the Supreme Court noted that its holding was not fact-bound. The "policy choices [taken] off the table . . . *include* the absolute prohibition of handguns held and used for self-defense in the home," *Heller*, 554 U.S. at 636 (emphasis added), but "since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field . . . ." *Id.* at 635. "[T]he Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates . . . were left open." *United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc); *cf. United States* v. *Marzzarella*, 614 U.S. 85, 92 (3d Cir. 2010) ("*Heller* delineates some" of the Second Amendment's "boundaries," which include "core" right "to possess non-dangerous weapons for self-defense in the home" and "to

possess firearms for other, as-yet-undefined, lawful purposes.").[4]

> [I]n [*Heller*], we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense, *and* we struck down a District of Columbia law that banned the possession of handguns in the home.

*McDonald*, 561 U.S. at 749-50 (emphasis added). The syntax is clear:

*Heller* applied its holding of a right rooted in self-defense in the specific

context of a home possession ban, but that application does not limit or

define the holding. *See Drake* v. *Filko*, 724 F.3d 426, 445 (3d Cir. 2013)

(Hardiman, J., dissenting); *accord State* v. *Blocker*, 291 Or. 255, 630

P.2d 824 (1981), *overruled in part on other grounds*, *State* v. *Christian*,

354 Or. 22, 307 P.3d 429 (2013).[5]

---

[4]Some misinterpret the direction that the District of Columbia "must issue [Heller] a license to carry [his handgun] in the home." *Heller*, 554 U.S. at 635. Heller challenged, among other provisions, former Section 22-4504(a) (2008), which had provided that carrying handguns *inside one's home* without a permit was a misdemeanor offense, in contrast to the felony offense of carrying a gun in public. Heller did *not* seek a permit to publicly carry a handgun. *Parker*, 478 F.3d at 400. The Court's reference to an in-home carry permit merely tracked Heller's prayer for relief. *See Heller*, 554 U.S. at 630-31.

[5]In *Blocker*, Oregon's Supreme Court rejected the argument that its earlier decision securing the right to possess arms did not extend beyond the home. "In [*State* v. *Kessler*, 289 Or. 359, 614 P.2d 94 (1980)] we started from the premise that under [Oregon's Second Amendment analog] a person has a right to bear arms for defense of self . . . We then

Had *Heller* intended to limit "bear arms" to the home, it would have been most natural to do so when explaining "that 'bear arms' did not refer only to carrying a weapon in an organized military unit." *Heller*, 554 U.S. at 585. Instead, the Court offered that

> Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right . . . as a recognition of the natural right of defense "of one's person *or* house" — what he called the law of "self preservation."

*Id.* (emphasis added) (quoting 2 COLLECTED WORKS OF JAMES WILSON 1142, and n.x (K. Hall & M. Hall eds., 2007)) (other citations omitted).

Indeed, *Heller* endorsed various sources that clearly saw a dimension to the right to bear arms distinct from home defense. *See Heller*, 554 U.S. at 615 ("[a]ll men, without distinction of color, have the right to keep and bear arms to defend their homes, families or themselves") (quotation omitted); *id.* at 616 ("right to bear arms for the defense of himself and family and his homestead") (quotation omitted); *id.* at 625

---

moved from that general proposition to the more particular one that a person had the constitutional right to have a billy in his home for defense." *Blocker*, 291 Or. at 259, 630 P.2d at 825-26 (citation and footnote omitted).

21

("weapons used by militiamen and weapons used in defense of person and home were one and the same") (quotation omitted).

And quite apart from carrying guns for self-defense, the Supreme Court has extolled some essential corollary Second Amendment rights that are difficult if not impossible to exercise inside the home. Owning a gun, even if only for home defense, inherently requires obtaining and maintaining proficiency in its use. "No doubt, a citizen who . . . practices in safe places the use of [his pistol] and in due time teaches his sons to do the same, exercises his individual right [to bear arms]." *Heller*, 554 U.S. at 619 (quotation omitted); *cf. Ezell*, 651 F.3d at 708 ("the right to maintain proficiency in firearm use [is] an important corollary to the meaningful exercise of the core right to possess firearms for self-defense."). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . . state constitutional guarantees [of the right to arms]." *McDonald*, 561 U.S. at 777 n.27 (citing *Heller*, 554 U.S. at 599)); *Heller*, 554 U.S. at 677 n.38 (majority secures right to arms for "self-defense, recreation, and other

lawful purposes") (Stevens, J., dissenting). People do not typically hunt game or practice shooting in their homes.

*Heller*'s understanding of "bear" comports with original meaning. For example, in 1785, Second Amendment author James Madison introduced in Virginia's legislature a hunting bill drafted by Thomas Jefferson. The bill provided that an offender would breach his recognizance "if, within twelve months . . . he shall *bear a gun* out of his inclosed ground, unless whilst performing military duty . . . ." *A Bill for Preservation of Deer* (1785), in 2 PAPERS OF THOMAS JEFFERSON 443-44 (J. Boyd ed., 1950) (emphasis added).

And "[i]n numerous instances, 'bear arms' was unambiguously used to refer to the carrying of weapons outside of an organized militia." *Heller*, 554 U.S. at 584. "The most prominent examples" of "bear arms" referring to individuals carrying "are those most relevant to the Second Amendment: Nine state constitutional provisions written in the 18th century or the first two decades of the 19th . . . ." *Id.* (footnote omitted).

None of these state constitutional provisions have been interpreted as relating solely to the home, but most, in addition to Pennsylvania's

provision as noted by *Heller*, were held to secure the public carrying of arms in at least some manner. *State* v. *Reid*, 1 Ala. 612 (1840) (interpreting Ala. Const. of 1819, art. I, § 27); *State* v. *Bailey*, 209 Conn. 322, 346, 551 A.2d 1206, 1218 (1988) (Conn. Const. art. I, § 15 (1819));[6] *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822) (Ky. Const. of 1799, art. XII, cl. 23); *State* v. *Schoultz*, 25 Mo. 128, 155 (1857) (Mo. Const. of 1820, art. XIII, § 3); *State* v. *Huntly*, 25 N.C. (3 Ired.) 418, 423 (1843) (N.C. Declaration of Rights § 17 (1776)); *Simpson* v. *State*, 13 Tenn. 356 (1833) (Tenn. Const. of 1796, art. XI, § 26); *State* v. *Rosenthal*, 55 A. 610 (Vt. 1903) (Vt. Const. c. 1, art. 16 (1777)).

The same conclusion—that people enjoy a right to publicly carry arms for self-defense—was also reached interpreting state constitutional arms-bearing provisions with predecessors dating to the early republic. *See State* v. *Hogan*, 63 Ohio St. 202, 219, 58 N.E. 572, 575 (1900); *Schubert* v. *De Bard*, 398 N.E.2d 1339, 1341 (Ind. App. 1980). Later state constitutional "bear arms" provisions are likewise

---

[6]Revised in 1956 to change "defence" to "defense." Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. LAW & POL. 191, 194 n.10 (2006).

understood. *See*, *e.g.*, *State ex rel. City of Princeton* v. *Buckner*, 180 W. Va. 457, 462, 377 S.E.2d 139, 144 (1988); *City of Las Vegas* v. *Moberg*, 82 N.M. 626, 627-28, 485 P.2d 737, 738-39 (N.M. Ct. App. 1971); *In re Brickey*, 8 Idaho 597, 599, 70 P. 609, 609 (1902). As the Seventh Circuit explained,

> The right to "bear" as distinct from the right to "keep" arms is unlikely to refer to the home. To speak of "bearing" arms within one's home would at all times have been an awkward usage. A right to bear arms thus implies a right to carry a loaded gun outside the home. And one doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home.

*Moore*, 702 F.3d at 936.

Apart from defining "bear arms," the Supreme Court described the right in terms that would make no sense were the right confined to one's home. Stating that the right is "not unlimited," in that there is no right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626 (citations omitted), the Court thus confirmed a right to carry some weapons, in some manner, for some purpose. The Court then listed as "presumptively lawful," *id.* at 627 n.26, "laws forbidding the carrying of firearms in sensitive

25

places," *id.*, at 626, such sensitive places presumably located outside the home, and supplying an exception proving the rule allowing handgun carrying in non-sensitive places. Likewise, concealed carrying prohibitions are also only "presumptively lawful," *id.*, the Court having reviewed the validity of such prohibitions as regulations of the manner in which guns are carried. *See discussion infra.*

*Heller*'s definition of "bear arms," and its recognition of the Second Amendment's application beyond the home, broke no new ground. The Supreme Court has long recognized the Second Amendment's public application. *Dred Scott* infamously reasoned that no Southern state would have adopted a constitution obligating it to respect "the full liberty" of African-Americans "to keep and carry arms wherever they went." *Dred Scott* v. *Sandford*, 60 U.S. (19 How.) 393, 417 (1857).[7]

---

[7]Abolitionists found *Dred Scott*'s enumeration of rights ironically underscored slavery's essential injustice. "[I]t is of these privileges and rights that the colored man is deprived, and it is of that deprivation he complains. I could find, sir, in that very *Dred Scott* decision, an enumeration, by the Supreme Court itself, of the rights guaranteed by the Constitution of the United States . . . Those rights are to bear arms . . . Of all these, in the express terms of the decision, the colored man is deprived . . ." *Who Are American Citizens?*, THE LIBERATOR, Jan. 21, 1859, at 10, col. 2 (quoting Massachusetts State Rep. Wells).

While *Dred Scott*'s odious holding as to citizenship was never correct, its recognition of citizens' right to publicly carry arms was no aberration. Reviewing an indictment for violating the Second Amendment rights of individuals disarmed and murdered while guarding a courthouse, "[w]e described the right protected by the Second Amendment as 'bearing arms for a lawful purpose.'" *Heller*, 554 U.S. at 620 (quoting *United States* v. *Cruikshank*, 92 U.S. 542, 553 (1876)) (footnotes omitted). Seventy-five years later, the Court observed that "during military occupation irreconcilable enem[ies] could [not] require the American Judiciary to assure them . . . [the] right to bear arms as in the Second [Amendment] . . . ." *Johnson* v. *Eisentrager*, 339 U.S. 763, 784 (1950). The reference was not limited to home self-defense. Indeed, the Supreme Court's first direct foray into Second Amendment law arose on an interstate highway. *United States* v. *Miller*, 307 U.S. 174, 175 (1939). The case was not dismissed for implicating conduct outside the home, but remanded for evidence as to whether the firearm merited constitutional protection. *Id.* at 178.

27

2.    Post-*Heller* Courts Largely Confirm That the
Second Amendment Extends Beyond the Home.

The Seventh Circuit struck down Illinois's total ban on the carrying
of handguns for self-defense. "The Supreme Court has decided that the
amendment confers a right to bear arms for self-defense, which is as
important outside the home as inside." *Moore*, 702 F.3d at 942. "To
confine the right to be armed to the home is to divorce the Second
Amendment from the right of self-defense described in *Heller* and
*McDonald*." *Id.* at 937.

Even circuits adopting the most parsimonious view of the right to
bear arms acknowledge or assume that the Second Amendment extends
beyond the home.[8] Taking a more deferential attitude toward the right
outside the home, the Second and Fourth Circuits upheld laws barring
the carrying of handguns by anyone lacking "proper cause" and "good
and substantial reason" to do so, respectively. *Kachalsky* v. *Cnty. of*

_____

[8] State high courts are split 4-3 in favor of acknowledging the right
outside the home. *Compare People* v. *Aguilar*, 2013 IL 112116, ¶ 20;
*Brickey*, 8 Idaho 597, 70 P. 609; *Christian*, 354 Or. at 44 n.11, 307 P.3d
at 443 n.11; *Hertz* v. *Bennett*, 294 Ga. 62, 65-66, 751 S.E.2d 90, 94
(2013) with *Commonwealth* v. *Gouse*, 461 Mass. 787, 802, 965 N.E.2d
774, 786 (2012); *Williams* v. *State*, 417 Md. 479, 496, 10 A.3d 1167,
1177 (2010); *Little* v. *United States*, 989 A.2d 1096, 1101 (D.C. 2010).

28

*Westchester*, 701 F.3d 81 (2d. Cir. 2012); *Woollard* v. *Gallagher*, 712

F.3d 865, 876 (4th Cir. 2013). Yet both courts insisted that their

conclusions assumed that the right extends beyond the home.

> Although the Supreme Court's cases applying the Second
> Amendment have arisen only in connection with prohibitions on the
> possession of firearms in the home, the Court's analysis suggests, as
> Justice Stevens's dissent in *Heller* and Defendants in this case before
> us acknowledge, that the Amendment must have *some* application in
> the very different context of the public possession of firearms. Our
> analysis proceeds on this assumption.

*Kachalsky*, 701 F.3d at 89 (footnote omitted). The Fourth Circuit did

not go quite this far, but for argument's sake "merely assume[d] that

the *Heller* right exists outside the home and that such right of Appellee

Woollard has been infringed." *Woollard*, 712 F.3d at 876.

The Fifth Circuit likewise apparently assumed a right to carry

handguns exists, upholding a prohibition on its exercise by adults aged

18-20 on account of their youth. *Nat'l Rifle Ass'n of Am., Inc.* v.

*McCraw*, 719 F.3d 338 (5th Cir. 2013). The Tenth Circuit termed the

Second Amendment's application outside the home "a reasonable

assumption." *Bonidy* v. *United States Postal Serv.*, 790 F.3d 1121, 1125

(10th Cir. 2015). "'[B]ear' certainly implies the possibility and even the

29

likelihood that the arms will be carried outside the home," and "[t]he

need for self-defense" upon which the right is predicated, "albeit less

acute, certainly exists outside the home as well." *Id.* (citations omitted).

The Eleventh Circuit has twice upheld carrying restrictions as properly

targeting specific places, rather than by denying the right's existence.

*GeorgiaCarry.Org, Inc.* v. *U.S. Army Corps of Eng'rs*, 788 F.3d 1318

(11th Cir. 2015); *GeorgiaCarry.Org, Inc* v. *Georgia*, 687 F.3d 1244 (11th

Cir. 2012).[9]

Alone among the federal courts, a Third Circuit panel majority found

that a law demanding "justifiable need" to carry a handgun "regulates

conduct falling outside the Second Amendment's guarantee." *Drake*,

724 F.3d at 434. The majority "recognize[d] that the Second

Amendment's individual right to bear arms *may* have some application

---

[9]*See also Morris* v. *United States Army Corps of Eng'rs*, 990 F.
Supp. 2d 1082, 1086 (D. Idaho 2014) (striking down gun carry ban);
*Bateman* v. *Perdue*, 881 F. Supp. 2d 709, 714 (E.D.N.C. 2012) (striking
down gun carry ban during emergencies, Second Amendment
"undoubtedly is not limited to the confines of the home"). "The fact that
courts may be reluctant to recognize the protection of the Second
Amendment outside the home says more about the courts than the
Second Amendment." *United States* v. *Weaver*, No. 2:09-CR-00222, 2012
U.S. Dist. LEXIS 29613, at *14 n.7 (S.D. W. Va. Mar. 7, 2012).

beyond the home." *Id.* at 431. But notwithstanding its "assum[ption] that the Second Amendment confers upon individuals some right to carry arms outside the home," and its assumption that the "justifiable need" prerequisite is incompatible with a right, the majority offered that enactment of the twentieth century regulation informed (and thus limited) the right's scope.

> 3.  History Confirms *Heller*'s Holding That the Second Amendment Codified the Right to Carry Arms for Self-Defense.

Defendants and their amici deny the right to bear arms' historical pedigree by citing to the unremarkable fact that the carrying of weapons has long been regulated. They rely heavily on the 1328 Statute of Northampton and its progeny; and various state and local regulations, largely those prohibiting the concealment of carried weapons. But if "[c]onstitutional law is very largely a prediction of how the Supreme Court will decide particular issues when presented to it for decision," *Norris* v. *United States*, 687 F.2d 899, 904 (7th Cir. 1982), this Court should be wary of their alternative historical narrative.

Considering that their theories conflict with *Heller*'s definition of "bear arms," it is unsurprising that Defendants and amici's academic and other historians reject *Heller* itself. In *Heller*, for example, Professor Cornell argued that "[t]he private keeping of firearms was manifestly not the right that the framers of the Bill of Rights guaranteed in 1789." Brief of Jack Rakove, et al., Supreme Ct. No. 07-290, at 2. In *McDonald*, Cornell claimed that Chicago's handgun ban was "consistent with our nation's historical regulation of dangerous weapons," Brief of 34 Professional Historians, Supreme Ct. No. 08-1521, at 4, and that "[t]he passage of the Fourteenth Amendment did not reduce states' broad authority to regulate possession of arms," *id.* at 12.

Mr. Patrick Charles, the opposing briefing's most cited commentator, asked the Supreme Court to "correct its error" by overruling *Heller*. Brief for English/Early American Historians, Supreme Ct. No. 08-1521, at 3. Assailing the "discredited scholarship upon which *Heller* relied," Charles argued that the English right to arms "did not intend to protect an individual's right to possess, own, or use arms for private purposes

such as to defend a home against burglars (what, in modern times, we mean when we use the term "self-defense")." *Id*. at 2. "[A]rmed self-defense of the home by individuals acting for private interests was not the right enshrined in the Second Amendment." *Id*. at 4.

Accordingly, before considering Defendants' historical presentation, this Court should first review what the Supreme Court has already determined with respect to the subject, and the historical sources that the Supreme Court found persuasive. *Moore*, 702 F.3d at 941 ("we regard the historical issues as settled by *Heller*"); *id*. at 942 (court "disinclined to engage in another round of historical analysis to determine whether eighteenth-century America understood the Second Amendment to include a right to bear guns outside the home."). These sources, among others, confirm what the constitutional text should make obvious: Americans have a right to carry guns for self-defense.

### a. The Statute of Northampton

Referencing the Statute of Northampton, Blackstone offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good*

*people of the land*." 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148 (1769) (emphasis added). It was this offense that *Heller* spoke of in referencing "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *Heller*, 554 U.S. at 627 (citations omitted), as opposed to "bearing arms for a lawful purpose," *id.* at 620.

By the time of the American Revolution, affray's prohibition on the carrying of weapons applied only when done with evil intent. Sir John Knight, charged with entering a church "in the time of divine service, with a gun, to terrify the King's subjects," *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686), was notably acquitted. *Knight* held that Northampton's "meaning" was "to punish people who go armed to terrify the king's subjects." *Id.* The statute was "almost gone in desuetudinem" but "where the crime shall appear to be malo animo, it will come within the Act (tho' now there be a general connivance to gentlemen to ride armed for their security)." *Rex* v. *Knight*, 38 Comb., 90 Eng. Rep. 330 (K.B. 1686) (different reporter).

34

As the leading early-eighteenth century treatise explained,

> [N]o wearing of Arms is within the meaning of this Statute, unless it be accompanied with such circumstances as are apt to terrify the People; from whence it seems clearly to follow, that Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons . . . for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use of them, without causing the least Suspicion of an intention to commit any Act of Violence or Disturbance of the Peace . . . .

William Hawkins, 1 TREATISE OF THE PLEAS OF THE CROWN, ch. 63, § 9 (1716); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994). To the extent that the wearing of "arms" could in and of itself be considered alarming, the reference here was to armor. *See* Clayton E. Cramer, *The Statute of Northampton (1328) and Prohibitions on the Carrying of Arms* (Sept. 19, 2015) at 2, available at SSRN: http://ssrn.com/abstract= 2662910 or http://dx.doi.org/10.2139/ssrn.2662910 ("Cramer").[10]

---

[10]The opposing briefing's sources are not to the contrary. For example, amicus Everytown, at 12, cites *King* v. *Hutchinson*, 168 Eng. Rep. 273, 274, 1 Leach 339, 342 (1784) for the unremarkable proposition that firearms were considered "offensive" weapons. But *Hutchinson* did so by setting out *two* necessary elements for the crime there charged, namely, providing armed aid or assistance in smuggling. The case had nothing to do with carrying arms in public, as "the Smugglers were not seen to use any offensive weapons," and the

Another hurdle stood to Northampton's application, apart from its narrowing interpretation by English courts: the 1689 Declaration of Rights, which provided "[t]hat the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." 1 W. & M., Sess. 2, c.2, § 1 (1689). To avoid constitutional infirmity, military orders to disarm the citizens of London in response to the Gordon Riots of 1780 were construed narrowly to apply only to law-breakers. *See* Cramer, at 3-4.

Americans, too, accepted that menacing conduct was a necessary element of affray. Multiple sources *Heller* referenced in discussing the doctrine make this clear. "[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people*." 3 WORKS OF THE HONOURABLE JAMES WILSON 79 (Bird Wilson ed., 1804) (footnote omitted) (emphasis added). "It is

_____

incident took place at the yard of Hutchinson's house. 1 Leach at 340. Arms were "to be seized only if they were possessed for 'any purpose dangerous to the public peace." Cramer, at 5 (quoting Colin Greenwood, FIREARMS CONTROL: A STUDY OF ARMED CRIME AND FIREARMS CONTROL IN ENGLAND AND WALES 14 (1972)).

likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, *in such manner as will naturally cause terror to the people.*" John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) (emphasis added); *O'Neill* v. *State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, *and in such manner as to strike terror to the people*") (emphasis added); *State* v. *Lanier*, 71 N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or innocent" depending on whether people alarmed); *State* v. *Langford*, 10 N.C. (3 Hawks) 381 (1824) (affray when armed men fired guns at home of elderly widow, killing her dog).

Other opinions reflect that settled view. "A man may carry a gun for any lawful purpose, for business or amusement, but he cannot go about with that or any other dangerous weapon to terrify and alarm a peaceful people." *Hogan*, 63 Ohio St. at 219, 58 N.E. at 575-76; *Huntly*, 25 N.C. (3 Ired.) at 422-23 ("carrying of a gun per se constitutes no offence . . . perfect liberty" absent "wicked purpose").

37

Indeed, without viewing menacing conduct as an element of the crime, there is no way to reconcile affray's early American codification with the contemporaneous adoption of constitutional provisions securing the right to carry arms. *Heller*'s sources made this point, rejecting claims that the Statute of Northampton and its progeny can be read to limit the constitutional right to bear arms.

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land . . . . But here it should be remembered, that in this country the constitution guarranties [sic] to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *Heller*, 554 U.S. at 588 n.10 (quoting same).

"But suppose it to be assumed on any ground, that our ancestors adopted and brought over with them, this English statute, or portion of the common law, our constitution has completely abrogated it."

*Simpson*, 13 Tenn. at 359-60. Reciting Tennessee's Second Amendment analog, the state's high court continued:

> [N]either, after so solemn an instrument hath said the people may carry arms, can we be permitted to impute to the acts thus licensed,

such a necessarily consequent operation as terror to the people to be incurred thereby.

*Id.* at 360.

The same logic holds true for the Second Amendment. Madison's notes for introducing the Bill of Rights referenced various English Declaration deficiencies to be improved by his proposed amendments, including "arms to protestts,"12 PAPERS OF JAMES MADISON 193 (Robert Ruthland & Charles Hobson eds. 1977)—doubtless referring to the English right's limitation to Protestants, absent from his proposed version. Madison viewed the Bill of Rights as an improvement on their 1689 English counterpart, not as a reversion to 1328.

      b.   *American Gun Carrying Regulations*

*Heller* held that prohibitions on the carrying of concealed weapons are only "presumptively" constitutional. *Heller*, 554 U.S. at 627 n.26. As precedent *Heller* invoked confirmed, regulatory authority over weapons carrying allows for prohibiting concealment, but does not allow for the right's complete destruction. Upholding one concealed carry prohibition, Alabama's high court cautioned:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional.

*Reid*, 1 Ala. at 616-17.

Georgia's Supreme Court followed *Reid*, quashing an indictment for

publicly carrying a pistol that failed to specify how the gun was carried:

> so far as the act . . . seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*.

*Nunn* v. *State*, 1 Ga. 243, 251 (1846).

Tennessee's Supreme Court held unconstitutional the application of

a weapons carrying ban to a man carrying a revolver, declaring:

> If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence. We only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Andrews* v. *State*, 50 Tenn. 165, 187-88 (1871). And as *Heller* observed,

the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

*Heller*, 554 U.S. at 613 (quoting *State* v. *Chandler*, 5 La. Ann. 489, 490 (1850)). Other decisions reflected the rule of allowing concealed-carry prohibitions only as regulations of the manner of carrying guns. *See*, *e.g.*, *State* v. *Jumel*, 13 La. Ann. 399, 400 (1858) ("a measure of police, prohibiting only a *particular mode* of bearing arms which is found dangerous to the peace of society") (emphasis original); *Owen* v. *State*, 31 Ala. 387, 388 (1858) ("a mere regulation of the manner in which certain weapons are to be borne").[11]

Amicus Everytown makes much of Texas's 1871 pistol carrying prohibition, but that law did not reach *all* pistols. *See English* v. *State*, 35 Tex. 473, 476 (1871) (Second Amendment protects "holster pistols" and "side arms"); *see also Fife* v. *State*, 31 Ark. 455, 460-61 (1876)

---

[11]Amicus Everytown, at 19 & 26, suggests an 1887 West Virginia law barred all handgun carrying absent proof of good character and specific self-defense need (citing *State* v. *Barnett*, 34 W. Va. 74, 11 S.E. 735 (1890)). The law, however, was understood to address concealed carry. *See State* v. *Workman*, 35 W. Va. 367, 368, 371, 14 S.E. 9 (1891).

(distinguishing "army and navy repeaters" from prohibited "pistol");
*Andrews*, 50 Tenn. at 188 (carry ban fails "as to this weapon"); *Ex parte
Thomas*, 21 Okla. 770, 777-78, 97 P. 260, 263 (1908) ("horseman's
pistols" among protected "arms"). Such laws "render[ed] safe the high
quality, expensive, military issue handguns that many former
Confederate soldiers still maintained but that were often out of
financial reach for cash poor freedmen." Robert J. Cottrol and Raymond
T. Diamond, *"Never Intended to be Applied to the White Population":
Firearms Regulation and Racial Disparity—the Redeemed South's
Legacy to a National Jurisprudence?*, 70 CHI.-KENT L. REV. 1307, 1333
(1995) (footnote omitted).

Arkansas's Supreme Court summed up the general rule. Reciting
approval of time (no hunting or amusement on the Sabbath), place
(church, elections), and manner regulations (concealment), that court
added:

> But to prohibit the citizen from wearing or carrying a war arm [with
> exceptions] is an unwarranted restriction upon his constitutional
> right to keep and bear arms. If cowardly and dishonorable men
> sometimes shoot unarmed men with army pistols or guns, the evil
> must be prevented by the penitentiary and gallows, and not by a
> general deprivation of a constitutional privilege.

*Wilson* v. *State*, 33 Ark. 557, 560 (1878).

Laws providing that armed individuals *might* have been required to post a surety for their good behavior, for a limited time, if complainants could demonstrate "reasonable cause" to fear the armed individual, actually reversed the presumption and burden here challenged. Nor were such laws incompatible with the classic limitations on affray and the widely-secured constitutional right to bear arms.

To be sure, not every historical arms-bearing restriction or regulation was tested in court. But as discussed *supra*, numerous precedents limited the extent to which the carrying of arms was reached by various laws or constitutionally subject to restriction. Reliance on later nineteenth and twentieth century carrying restrictions (many less severe than the District's) is in any event inapposite, having been enacted by legislative bodies doubtless aware that they were not bound to respect Second Amendment rights. *See Cruikshank*, *supra* (Fourteenth Amendment does not apply Second Amendment as against the States), *overruled*, *McDonald*. Moreover, "future legislatures" could not override "the scope [rights] were

43

understood to have when the people adopted them," *Heller*, 554 U.S. at 634. Thus, "1791, the year the Second Amendment was ratified—[is] the critical year for determining the amendment's historical meaning." *Moore*, 702 F.3d at 935 (citations omitted); *but see Heller II*, 670 F.3d at 1253-54 ("longstanding" regulations dating to early twentieth century).

Even if relatively modern enactments could elucidate the understanding of a 1791 constitutional text that the legislators were advised to ignore, a smattering of such examples do not a consensus make. For example, early Ohio laws punished "any person" fourteen or older who "shall profanely curse or damn, or profanely swear by the name of God, Jesus Christ or the Holy Ghost;" PSA 2, and anyone who "shall exhibit any puppet show, wire dancing or tumbling, jugling [sic] or slight of hand, and shall ask or receive any money or other property for exhibiting the same . . . ." *Id.* at 3. Manchester, New Hampshire commanded that "[n]o person shall sing or repeat, or cause to be sung or repeated, any lewd, obscene, or profane songs, or shall repeat any lewd, obscene, or profane word, or write or mark in any manner" such word "or obscene or lascivious figure or representation, on any . . . thing

44

whatever." *Id.* at 5. But these laws prove only that some legislators do not share constitutional values, not that today, there is no First Amendment right to "profanely" invoke God, exhibit puppet shows, sing crude songs or render lascivious figures. The argument is even more difficult where, as here, the City and its allies offer judicially untested outliers deviating from contemporaneously enforced constitutional norms (where arms-bearing constitutional provisions were operative).

* * *

Plaintiffs hardly claim "an absolute right to carry a firearm without a good reason to do so." Appellants' Br. 14. The injunction Plaintiffs sought and obtained left untouched the City's handgun registration requirements, which are already more strict than what is often required to obtain a carry license in other jurisdictions; its training and background check requirements; and all other time, place and manner restrictions regulating the carrying of handguns. Moreover, Defendants remain free to adopt regulations allowing for permit denials where *the police* meet a burden of articulating why particular applications should

45

be denied, though the right's constitutional self-defense "reason" suffices for its exercise.

The District Court's injunction did not convert the City to a "right-to-carry" jurisdiction. The Second Amendment did that.

B.      "Good" or "Proper" Reason Requirements Destroy Rights.

As *Parker* and *Heller* demonstrated, balancing tests are not always required to evaluate a law's constitutionality. Laws directly contradicting a constitutional guarantee simply cannot stand.

"Rights" have long been "defined generally as 'powers of free action.'" Henry Campbell Black, A DICTIONARY OF LAW 1044 (1891). A "right" to do something only when the police determine one has a "good" or "proper" reason to do it, is not much of a right. People would scoff at "rights" to due process, or against unreasonable searches and seizures, provided the police chief agrees that someone has an unusually "good" or "proper" reason for their exercise. The right to bear arms is no different.

"[A] constitutional prohibition cannot be transgressed indirectly by the creation of a statutory presumption any more than it can be violated by direct enactment. The power to create presumptions is not a

46

means of escape from constitutional restrictions." *Speiser* v. *Randall*, 357 U.S. 513, 526 (1958) (citation omitted). So long as no reason exists to bar someone from carrying a handgun, Defendants' opinion about the right's wisdom is unimportant. Restricting the right to carry handguns only to those with a "good" or "proper" reason destroys any right to that conduct.

Moreover, constitutional rights are enjoyed by "the people." *See* U.S. Const. amend. II ("right of the people); U.S. Const. amend. I (same); U.S. Const. amend. IV (same); U.S. Const. amend. IX ("rights . . . retained by the people"). "[T]he term ['the people'] unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at, 580. Rights cannot be enjoyed only by those with a "special need . . . distinguishable from the general community." Section 7-2509.11(1)(A). Nor is the right purchased with the carriage of cash or valuables. The interest in self-defense is, after all, primarily an interest in defending human life, not material wealth.

Denying that the regulation, on its face, prohibits the "general community" from carrying handguns, *id.*, Defendants recast the law as

47

a *time* restriction; it purportedly "speaks not to *who* may carry a handgun, but *when* a handgun may be carried: after the applicant develops a non-speculative need for armed self-defense." Appellants' Br. 50. In other words, the law imposes a time restriction, allowing everyone to carry guns *after* obtaining a license, and for as long as the Chief allows. Alas, the Constitution secures a right to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, not in case the Police Chief issues a license. It guarantees the right to "be armed and ready for offensive or defensive conduct in a case of conflict with another person," *id.* at 584 (quotation omitted), not the right to fill forms when violently attacked.

As Defendants note, three courts have upheld similar enactments. *See Kachalsky*; *Drake*; *Woollard*. But this hardly represents an easy consensus. *Drake* was divided, and *Woollard* reversed a contrary opinion. Moreover, four other courts have struck down Defendants' level of licensing discretion as being essentially incompatible with a right to bear arms.

48

While *Peruta* has since been reheard en banc, the panel opinion, containing the considered judgment of two appellate judges, remains persuasive. *Peruta* addressed San Diego County's "good cause" policy for the issuance of handgun carry permits, which is essentially indistinguishable from that here at issue. *See Peruta*, 742 F.3d at 1148. And in *Peruta*, as here, a concealed carry license afforded the exclusive avenue for legally bearing arms. But the license did "not cover the scope of the right, which includes the right to carry *in case of public confrontation . . . .*" *Peruta*, 742 F.3d at 1169. As here, nearly everyone was precluded from exercising that right. *Id.*

The Second Amendment "is, in effect, destroyed when exercise of the right [to bear arms] is limited to a few people, in a few places, at a few times." *Id.* at 1170. "A statute which, under the pretense of regulating, amounts to a destruction of the right . . . would be clearly unconstitutional." *Id.* (quoting *Heller*, 554 U.S. at 629); *Reid*, 1 Ala. at 616-17. "*Heller* teaches that a near-total prohibition on keeping arms (*Heller*) is hardly better than a near-total prohibition on bearing them (this case), and vice versa. Both go too far." *Peruta*, 742 F.3d at 1170.

49

Rhode Island's Supreme Court "will not countenance any system of permitting under the Firearms Act that would be committed to the unfettered discretion of an executive agency." *Gadomski* v. *Tavares*, 113 A.3d 387, 390 (R.I. 2015) (quotation omitted). Accordingly, a licensing authority was barred from applying a "good reason"/"proper reason" requirement to review an applicant's "need" for a handgun carry license. *Id.* at 392. Authorities were required to detail their reasons for denying the license. "One does not need to be an expert in American history to understand the fault inherent in a gun-permitting system that would allow a licensing body carte blanche authority to decide who is worthy of carrying a concealed weapon." *Mosby* v. *Devine*, 851 A.2d 1031, 1050 (R.I. 2004).

Indiana's Court of Appeals rejected a licensing official's claim that a statutory "proper reason" requirement allowed him to reject handgun carry license applications for an applicant's insufficient self-defense interest. The court denied the licensing official "the power and duty to subjectively evaluate an assignment of 'self-defense' as a reason for desiring a license and the ability to grant or deny the license upon the

50

basis of whether the applicant 'needed' to defend himself." *Schubert*, 398 N.E.2d at 1341.

> Such an approach contravenes the essential nature of the constitutional guarantee. It would supplant a right with a mere administrative privilege which might be withheld simply on the basis that such matters as the use of firearms are better left to the organized military and police forces even where defense of the individual citizen is involved.

*Id.* (footnote omitted).

Finally, Michigan's Supreme Court struck down a statute prohibiting aliens from possessing revolvers without their Sheriff's consent. There, too, the licensing discretion was viewed as a destruction of a constitutional right to bear arms. "The exercise of a right guaranteed by the Constitution cannot be made subject to the will of the sheriff. The part of the act under which the prosecution was planted is not one of regulation but is one of prohibition and confiscation." *People* v. *Zerillo*, 219 Mich. 635, 639, 189 N.W. 927, 928 (1922). "The [provision] making it a crime for an unnaturalized, foreign-born resident to possess a revolver, unless so permitted by the sheriff, contravenes the guaranty of such right in the Constitution of the State and is void." *Id.* at 642, 928.

51

The notion that a right is destroyed, and thus violated, by schemes that allow authorities the discretion to determine whether an individual is entitled to exercise the right, is hardly limited to the Second Amendment. Arizona barred abortion at 20 weeks of gestation absent a doctor's certificate of "medical emergency," invoking "documented risks to women's health and the strong medical evidence that unborn children feel pain during an abortion at that gestational age." Ariz. H.B. 2036 § 9(B)(1), (2012), available at http://www.azleg.gov/legtext/50leg/2r/bills/hb2036s.pdf, archived at http://perma.cc/KA77-TMQ8 (last visited Sept. 30, 2015). The Ninth Circuit did not defer to the legislature's oversight of the medical profession, or the expert medical judgment of each doctor under the circumstances of each case.

> Allowing a *physician* to decide if abortion is medically necessary is not the same as allowing a *woman* to decide whether to carry her own pregnancy to term. Moreover, regulations involve limitations as to the mode and manner of abortion, not preclusion of the choice to terminate a pregnancy altogether.

*Isaacson* v. *Horne*, 716 F.3d 1213, 1217 (9th Cir. 2013).

Adapted to present circumstances, the holding would read:

Allowing *Defendant Lanier* to decide if carrying a handgun is
necessary for self-defense is not the same as allowing *Brian Wrenn*
to decide whether to carry his handgun. Moreover, regulations
involve limitations as to the mode and manner of carrying handguns,
not preclusion of the choice to carry a handgun altogether.

The Ninth Circuit explained that "[t]he presence of a medical
exception does not make an otherwise impermissible prohibition
constitutional. The adequacy of the medical exception has no bearing on
whether the prohibition is permissible in the first place." *Id.* at 1227.
Likewise, here, the presence of a "good reason" exception does not make
constitutional the prohibition on bearing arms for the core purpose of
self-defense. In *Isaacson*, a woman may not have had grounds for a
medical exception, but she had Supreme Court precedent securing post-
20 week abortions. Plaintiffs lack police-approved reasons to carry
guns, but they have a right to carry handguns for self-defense.

C.      Defendants' Licensing Scheme Fails Any Level of
        Means-Ends Scrutiny.

While the two-step process is not mandatory in every case, it could
not help Defendants here. Not until page 39 of their brief do
Defendants directly address step one of the two-step analysis,

suggesting that laws limiting handgun carrying in urban settings "are so longstanding that, on a full record" their law "will likely be held beyond the scope of the Second Amendment." Of course, that did not happen in two of the three cases upholding such laws, nor is a "full record" required to reveal which laws have been enacted and whether, even if they were as restrictive as the District's, they remain standing.

Considering the history of the right to bear arms and of carrying regulations, and the overwhelming prevalence of "shall issue" laws today, including in urban areas, Plaintiffs' challenge easily passes step one of the two-step method.[12]

Even were the challenged provision "longstanding," that inquiry is irrelevant, because "[a] plaintiff may rebut this presumption [of

---

[12]Defendants overstate the prevalence of may-issue laws, which restrict the totality of the right to bear arms in only six states: California, Hawaii, Maryland, Massachusetts, New Jersey and New York. Delaware allows for unlicensed open carrying. *In re Application of McIntyre*, 552 A.2d 500, 501 n.1 (Del. Super. 1988). Rhode Island's license is may-issue if sought from the Attorney General, but effectively shall-issue if sought from local authorities. *Gadomski*, 113 A.3d at 392. Connecticut's discretionary regime is likewise shall-issue in practice because the state bears the burden of showing a reason to reject applications, based on the applicant's demonstrated conduct. *Kuck* v. *Danaher*, 822 F. Supp. 2d 109, 128-29 (D. Conn. 2011).

longstanding lawfulness] by showing the regulation does have more than a de minimis effect upon his right." *Heller II*, 670 F.3d at 1253. The "good reason" requirement completely bars the right's exercise, at all times and places and in any manner, without exception.

As for the second step, "classifications affecting fundamental rights are given the most exacting scrutiny." *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). And the challenged laws indeed impact the Second Amendment at its core. *Heller*, 554 U.S. at 630 (the Second Amendment's "core lawful purpose [is] self-defense"); *id.* at 599 ("Individual self-defense . . . was the *central component* of the right itself"); *id.* at 628 ("the inherent right of self-defense has been central to the Second Amendment right").

But in the end, the particular standard of review is unimportant. Balancing tests balance rights against governmental interests, not considerations as to whether the right ought to exist. The Government cannot assign itself an interest in suppressing a right by "proving" that the right is inherently harmful.

"Intermediate" scrutiny does not help Defendants. While not as rigorous as strict scrutiny, intermediate scrutiny is nonetheless an exacting test that requires the government to show the challenged action is "'substantially related to an important governmental objective.'" *Clark*, 486 U.S. at 461. "[A] tight fit" between the regulation and the important or substantial governmental interest must be established—one "that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." *Bd. of Trs.* v. *Fox*, 492 U.S. 469, 480 (1989); *McCullen* v. *Coakley*, 134 S. Ct. 2518, 2535 (2014) (intermediate scrutiny requires that regulations be "narrowly tailored").

And "[s]ignificantly, intermediate scrutiny places the burden of establishing the required fit squarely upon the government." *United States* v. *Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (citing *Fox*, 492 U.S. at 480-81). Intermediate scrutiny requires *actual scrutiny*:

> [T]he District must establish a tight 'fit' between the registration requirements and an important or substantial governmental interest, a fit that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective . . . the means chosen [may] not [be] substantially broader than necessary to achieve that interest.

*Heller II*, 670 F.3d at 1258 (quotations omitted).

It is this last part that Defendants misunderstand. When this Court explained that the City "must establish a tight 'fit'" between its laws and valid interests, it did not mean that the City Council must satisfy *itself* of this fit; it meant, the City must prove this fit *in court*, with a *judge* deciding whether the fit meets constitutional standards. Defendants, however, seizing on the fact that courts defer to legislative findings, jump to the conclusion that courts must also defer to legislative assessments of constitutionality—and what legislature would admit to enacting an unconstitutional law?

The measuring of constitutional fit is a judicial, not legislative function. Deference is only owed to "traditional legislative authority to make predictive judgments." *Turner Broadcasting System, Inc.* v. *FCC*, 520 U.S. 180, 196 (1997) ("*Turner II*"). Neither the District Court, nor the Ninth Circuit opinion on which it relied, misquoted *Turner II*. And no decision of this Court holds that "intermediate scrutiny" is fancy legalese for "rubber stamp."

In Part II.A. of *Turner*, the Court applied deference to the legislature's judgment regarding the first portion of the intermediate

57

> scrutiny analysis: whether there was a "real harm" amounting to an important government interest and "whether [the statutory provisions at issue] will alleviate it in a material way." *Turner*, 520 U.S. at 195. But in Part II.B, when assessing "the fit between the asserted interests and the means chosen to advance them," the Court applied no such deference. *Id.* at 213. Instead, it required the government to prove that the statute did not burden the right "substantially more . . . than is necessary to further [the government's legitimate] interests." *Id.* at 214.

*Peruta*, 742 F.3d at 1177 (quotation omitted).

Defendants invoke language in Part II.B referring to "a deliberate congressional choice to adopt the present levels of protection, *to which this Court must defer*," Appellants' Br. 17 (quoting *Turner II*, 580 [sic] U.S. at 219) (adding emphasis), and from this glean that deference is owed to any ultimate legislative choice. Not so. The "choice" here was "the degree to which [the Government's] interests should be promoted." *Turner II*, 520 U.S. at 219 (quotation omitted). Of course the City retains the discretion as to how much it wishes to protect its interests—but that choice is liable to be judicially tested for constitutionality.

When the City chooses extreme methods, going so far as to target the right itself, the result is unsurprising. "Good/proper reason" is not

directed at dangerous people, nor does it regulate the manner of carrying handguns, or impose any place restrictions. As Defendants freely admit, supra at 3, it amounts to nothing more than a rationing system. *Accord Peruta*, 742 F.3d at 1177-78. Firearms laws that focus on the alleged dangerousness inherent in the right's existence, rather than on some particular abuse or manifestation of that right, cannot pass intermediate scrutiny. *Fletcher* v. *Haas*, 851 F. Supp. 2d 287, 303 (D. Mass. 2012); *Bateman*, 881 F. Supp. 2d at 716.

Because barring the community at large from exercising a fundamental right cannot be a narrowly-tailored way of addressing misuse of that right, the extent of the record's development, now or later, is irrelevant. The courts cannot convene a constitutional convention to evaluate the Second Amendment's merits under the guise of an "intermediate scrutiny" trial. Defendants already attack the "more guns, less crime" hypothesis (that increased civilian gun use deters crime), but whether the District's law makes for good or bad policy is irrelevant.[13] Even were Plaintiffs to stipulate that carrying

---

[13]Plaintiffs happen to believe that the science behind "more guns, less crime" is sound, but that is immaterial for purposes of this case, as

handguns for self-defense is net negative for society, so what? It is also, like many controversial policies, enshrined in the Constitution.

The City's arguments here are indistinguishable from those it unsuccessfully made in *Heller III* in support of a different gun-rationing scheme. The City wished to limit consumers to one gun per month, in part on the theory that doing so "would further promote public safety by limiting the number of guns in circulation, as the District could reasonably conclude that more guns lead to more gun theft, more gun accidents, more gun suicides, and more gun crimes.'" *Heller III*, 2015 U.S. App. LEXIS 16632, at *33. Its expert testified that "the most effective method of limiting misuse of firearms, including homicide, suicide, and accidental injuries, is to limit the number of firearms present in a home," *id.* at *35, which sounds a great deal like the City's arguments here for reducing the presence of guns in public (something might happen).

---

is the fact that lawful defensive gun use is more frequent than unlawful gun use. The right to carry handguns for self-defense is a part of our constitutional fabric regardless of whether the Framers erred in placing it there.

> Accepting that as true, however, it does not justify restricting an individual's undoubted constitutional right to keep arms (plural) in his or her home, whether for self-defense or hunting or just collecting, because, taken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home.

*Id.* (citation omitted).

Likewise, if a right to carry arms exists—and it does—limiting the number of firearms being carried in public as a means of limiting misuse, even if effective, cannot be justified. This Court does not sit to "prove" that a constitutional provision is or is not desirable.[14] *Heller III* is dispositive.

Nor does the District's status as the seat of government change the analysis. "[T]he Supreme Court has unambiguously held that the Constitution and Bill of Rights are in effect in the District." *Parker*, 478 F.3d at 395 (citations omitted). Of course Defendants may prohibit the carrying of handguns in "government buildings" and other "sensitive places," *Heller*, 554 U.S. at 626, but that does not mean that they might prohibit carrying guns in a *city* containing government buildings.

---

[14]"Proof" here would be a figurative term, as Defendants concede that "it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." Appellants' Br. 25 (quoting Defendants' leading expert).

None of the District's allegedly unique features justify erasing the Second Amendment wholesale throughout the entire city. If historical regulations are important, it must be remembered that Congress allowed unlicensed open handgun carrying here as late as 1943. Moreover, government facilities, Presidents, important sites, and foreign dignitaries are found nationwide—and deranged or politically motivated assassins are unlikely to be influenced by gun regulations. As a White House Press Secretary once offered, state and local gun laws "don't change when the president comes to your state or locality."[15]

D.    Lanier's Generalized Discretion to Deny Carry Licenses, and the "Good Reason"/"Other Proper Reason" Standard, Both Constitute Unlawful Prior Restraints.

The common-sense proposition that a right becomes something else, of lesser stature, if it exists only at the government's pleasure, has an established legal definition:

It is settled by a long line of recent decisions of this Court that an ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled

---

[15]Alexi Mostrous, "White House Backs Right To Arms Outside Obama Events," *Washington Post*, Aug. 19, 2009, available at http://www.washingtonpost.com/wp-dyn/content/article/2009/08/18/AR2009081803416.html (last visited Sept. 30, 2015).

> will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

*Staub* v. *City of Baxley*, 355 U.S. 313, 322 (1958) (citations omitted).

Indeed, long before *Heller*, Prof. Powe reasoned that "[p]ossibly the Second Amendment can best be understood to incorporate a common law rule against prior restraints." L.A. Powe, Jr., *Guns, Words, and Constitutional Interpretation*, 38 Wm. & Mary L. Rev. 1311, 1384 (1997); *id.* at 1402 ("the rule against prior restraints offers a sound meaning [for the Second Amendment]").

Some authorities have erroneously asserted that prior restraint is exclusively a First Amendment doctrine, and on that ground hesitated to extend it to the Second Amendment context. *See*, *e.g.*, *Kachalsky*, 701 F.3d at 91-92. But courts "have already begun to adapt First Amendment doctrine to the Second Amendment context." *Ezell*, 651 F.3d at 706-07 (citations omitted); *see also Parker*, 478 F.3d at 399. And as the right to bear arms stands among "the freedoms which the Constitution guarantees," *Staub*, 355 U.S. at 322, Defendants' licensing regime constitutes an unlawful prior restraint in two respects.

63

First, Defendant Lanier enjoys wholly unbridled discretion to grant or deny applications, even when they satisfy all licensing criteria, including "good reason." The police chief "*may . . . issue*" a license to qualified applicants. Section 22-4506(a) (emphasis added). Nothing actually requires her to do so, and no rule purports to limit this ultimate level of discretion. The City Council understands the difference between "may" and "shall." While Lanier "may" issue licenses, she "shall" adopt a restrictive definition of "good reason" and "other proper reason." Section 7-2509.11.

Lanier may counter that she would, in fact, issue licenses to all fully qualified applicants, but "[t]his presumes the [Chief] will act in good faith and adhere to standards absent from the ordinance's face . . . the very presumption that the doctrine forbidding unbridled discretion disallows." *City of Lakewood* v. *Plain Dealer Publishing Co.*, 486 U.S. 750, 770 (1988) (citations omitted). Even were there limits to Section 22-4506(a)'s absolute "may . . . issue" discretion, they are not "made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Id.* (citations omitted). And

64

"we have never held that a federal litigant must await a state-court construction or the development of an established practice before bringing the federal suit." *Id.* at 770 n.11 (citation omitted).

Second, nothing bars Lanier from exercising the type of unbridled discretion sanctioned by Section 22-4506(a)'s absolute "may issue" language by simply claiming that an applicant failed to establish a "good" or "other proper reason" for the license. This requirement is among the impermissible "illusory 'constraints'" on licensing discretion amounting to "little more than a high-sounding ideal." *City of Lakewood*, 486 U.S. at 769-70; see, *e.g. Largent* v. *Texas*, 318 U.S. 418, 422 (1943) (striking down ordinance allowing speech permit where mayor "deems it proper or advisable"). It is not that Plaintiffs merely dislike the "standard." Plaintiffs dislike the "standard" because it is meaningless, and effectively supplants their *entitlement* to exercise a fundamental right for the purpose of self-defense with an administrative privilege dispensed at the Chief's boundless discretion.

> The existence of standards does not in itself preclude a finding of unbridled discretion, for the existence of discretion may turn on the looseness of the standards or the existence of a condition that

effectively renders the standards meaningless as to some or all persons subject to the prior restraint.

*Beal* v. *Stern*, 184 F.3d 117, 126 n.6 (2d Cir. 1999).

* * *

As a destruction of the right, as a prior restraint, and under any level of scrutiny, the "good/proper reason" requirement is unconstitutional.

## III.   DEFENDANTS' LICENSING SCHEME IRREPARABLY HARMS PLAINTIFFS.

"[T]he loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills* v. *District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quotation omitted). Though Defendants refuse to acknowledge any positive social value to carrying guns, "there seems little legitimate scholarly reason to doubt that defensive gun use is very common in the U.S., and that it probably is substantially more common than criminal gun use." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self- Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 180 (1995). Every American legal system recognizes a right to use handguns in

66

self-defense outside the home—including the District's. *Gillis* v. *United States*, 400 A.2d 311, 313 (D.C.1979).

Inability to access constitutionally-protected arms impacts one's sense of security—to say nothing of the irreparable harm resulting from a successful criminal attack that might have been averted with access to defensive arms. "The Second Amendment protects . . . intangible and unquantifiable interests . . . Infringements of this right cannot be compensated by damages." *Ezell*, 651 F.3d at 699 (citations and footnote omitted).

## IV.   THE BALANCE OF EQUITIES FAVORS GRANTING INJUNCTIVE RELIEF.

While Plaintiffs suffer irreparable harm by having their rights violated, enjoining that violation does not harm Defendants at all. Responding to *Palmer*'s elimination of the City's carry ban, Lanier offered, "Law-abiding citizens that register firearms, that follow the rules, are not our worry."[16]

---

[16]Mike DeBonis, "Security, not street crime, at risk after gun ruling, D.C. Police Chief Cathy Lanier says," *Washington Post*, July 30, 2014, available at http://www.washingtonpost.com/local/dc-politics/security-not-street-crime-at-risk-after-gun-ruling-dc-police-chief-cathy-lanier-says/2014/07/30/f8b17e1c-1808-11e4-9e3b-7f2f110c6265_story.html (last visited Sept. 30, 2015).

Hard data confirms Lanier's "not our worry" position, as well as Judge Reinhardt's observation that "[c]arrying a gun, which is a Second Amendment right . . . cannot legally lead to a finding that the individual is likely to murder someone; if it could, half or even more of the people in some of our states would qualify as likely murderers." *Dickens* v. *Ryan*, 688 F.3d 1054, 1085 (9th Cir. 2012) (Reinhardt, J., dissenting). For example, were Defendants correct about defensive handgun carrying, they would have perhaps shown a positive correlation between that activity and violent crime. But the relationship is inverse. In 2013, the United States experienced 367.9 violent crimes per 100,000 people.[17] But jurisdictions forbidding handgun carrying, or entirely restricting it on a "may issue" basis averaged 456.46 violent crimes per 100,000 people.[18]

---

[17]*See* FBI, *Uniform Crime Reports: Crime in the United States 2013*, Table 4, available at http://www.fbi.gov/about-us/cjis/ucr/ crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/4tabledatadecovervi ewpdf/table_4_crime_in_the_united_states_by_region_geographic_divisi on_and_state_2012-2013.xls (last visited Sept. 30, 2015).

[18]*Id.* (averaging Massachusetts, 404.0; New Jersey, 285.6; New York, 389.8; Illinois, 372.5 [Illinois began issuing permits on a shall-issue basis in 2014]; **District of Columbia, 1289.1**; Maryland, 467.8; California, 396.2; Hawaii, 245.3; and Puerto Rico, 257.8).

No wonder Defendants concede, per their leading expert, that "it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." *Supra*, n.14.

More critically, Defendants fail to show that law-abiding individuals licensed for defensive handgun carrying are more dangerous than the general community, an unlikely scenario considering licensing standards and the nature of people who would approach the police for a handgun license. Indeed, data tracking handgun licensees does not suggest that they pose any sort of meaningful public safety hazard. Through June 30, 2013, Michigan has issued 118,025 handgun carry licenses and revoked only 1402, barely over 1%, for any reason.[19] Tennessee, which currently has 513,498 handgun carry permits, revoked just 284 last year for any reason.[20] These revocations did not

---

[19]Michigan State Police Criminal Justice Information Center, *Concealed Pistol License Annual Report, July 1, 2012 to June 30, 2013*, available at http://www.michigan.gov/documents/msp/CPLAnnual_ Report2013_463317_7.pdf (last visited Sept. 30, 2015).

[20]*Current Valid Tennessee Handgun Permits by County*, available at https://www.tn.gov/assets/entities/safety/attachments/Current_ HG_PermitHolders.pdf (last visited Sept. 30, 2015); Tennessee Dep't of Safety & Homeland Security, *Handgun Carry Permit Statistics Calendar Year 2014*, at 5, available at http://share.tn.gov/safety/stats/

necessarily involve misuse of a firearm.

Texas and Florida, highly populated states with significant urban populations, who have issued handgun carry licenses for many years, are in accord. For 2013, of 50,869 total serious criminal convictions in Texas, only 158—or 0.3106%—involved individuals licensed to carry defensive handguns, though even these did not necessarily have anything to do with handguns or their public carriage.[21]

Since 1987, Florida has issued 2,704,293 handgun carry licenses, and has revoked only 9,173 for any reason—barely over a third of one percent—of which at least 917 were later reinstated. Through 2010, only 168 revocations in that state involved the use of a firearm, though not necessarily in a public setting or involving violence.[22]

_____

DL_Handgun/Handgun/HandgunReport2014Full.pdf (last visited Sept. 30, 2015).

[21]Texas Dep't of Public Safety, *Conviction Rates for Concealed Handgun License Holders, Reporting Period 1/1/2013-12/31/2013*, available at http://www.txdps.state.tx.us/RSD/CHL/Reports/Conviction RatesReport2013.pdf (last visited Sept. 30, 2015).

[22]Florida Department of Agriculture and Consumer Services Division of Licensing, *Concealed Weapon or Firearm License Summary Report October 1, 1987 - August 31, 2015*, available at http://www.fresh from florida.com/content/download/7499/118851/cw_monthly.pdf (last visited Sept. 30, 2015).

Individuals licensed to carry handguns in the States are routinely found to have inadvertently carried their arms in the District. The number of violent crimes they have committed or accidents they have caused while visiting the City is unknown.

V.    THE PUBLIC INTEREST WARRANTS INJUNCTIVE RELIEF.

It is "obvious" that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon* v. *Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (citations omitted).

CONCLUSION

The order should be affirmed.

Dated:   September 30, 2015    Respectfully submitted,

 /s/ Alan Gura
Alan Gura
GURA & POSSESSKY, PLLC
105 Oronoco Street, Suite 305
Alexandria, VA 22314
703.835.9085/703.997.7665

Counsel for Appellees

71

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,987 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Corel Wordperfect in 14-point Century Schoolbook font.

/s/ Alan Gura
Alan Gura

Certificate of Service

I certify that on this 30th day of September, 2015, I filed the

foregoing Brief electronically with the Clerk of the Court using the

CM/ECF System. I further certify that I will submit the required paper

copies to the Court. I further certify that counsel for Defendant-

Appellee is a registered CM/ECF user and will be served via the

CM/ECF system

I declare under penalty of perjury that the foregoing is true and

correct.

Executed this the 30th day of September, 2015.


/s/ Alan Gura
Alan Gura

Counsel for Appellees

Addendum

# ACTS

### OF

## *A GENERAL NATURE,*

### Enacted, revised and ordered to be re-printed,

### AT THE FIRST SESSION

### OF THE

# Twenty-Second General Assembly

### OF THE

# STATE OF OHIO,

## BEGUN AND HELD IN THE TOWN OF COLUMBUS,

## DECEMBER 1, 1823,

### AND IN THE TWENTY-SECOND YEAR OF SAID STATE.

STANFORD LIBRARY

### VOL. XXII.

————————●————————

#### PUBLISHED BY AUTHORITY.

————————●————————

## COLUMBUS:

### PRINTED BY P. H. OLMSTED.

### 1824.

Digitized by Google

Addendum 1

197

rant legally issued or by the order of some civil officer within the county on view or hearing; and shall be fined in a sum not exceeding twenty dollars; and any judge of the court of common pleas or justice of the peace within the proper county, be, and they are hereby empowered, authorized and required to proceed against and punish every person offending against the provisions of this act; and upon view, or hearing, may, or on information given on oath or affirmation, shall, if need be, issue his warrant to bring the body of the accused before him, and shall, in a summary way, inquire into the truth of the accusation; and if guilty, shall enforce the penalty of this act annexed to the offence: and said offender (if the said judge or justice should think necessary,) may be detained in custody and committed until sentence be performed: *Proviso.* That this section shall not be so construed as to deprive any religious society of the right of laying hands upon the person or persons who may be disturbing the congregation, and turning him or them out of their church or place of worship. **Proviso.**

Sec. 4. That if any person of the age of fourteen years or upwards, shall profanely curse or damn, or profanely swear by the name of God, Jesus Christ or the Holy Ghost, each and every person so offending, shall be fined in a sum not exceeding one dollar, nor less than twenty-five cents for every such offence. **Profane swearing.**

Sec. 5. That if any person or persons shall be found making or exciting any contention or disturbance at any tavern, court, election or other meeting of the citizens for the purpose of transacting or doing any business appertaining to or enjoined on them, the person or persons so offending, shall be fined in a sum not exceeding five dollars, nor less than fifty cents each, and if necessary, imprisoned until such meeting shall be ready to disperse: *Proviso,* The time for which such person or persons may be confined, shall not exceed six hours. **Exciting disturbance at court, &c.** **Proviso.**

Sec. 6. That if any person or persons shall play bullets along or across any street in any town or village within this state, or if any person or persons shall run any horse or horses within the limits of any such town or village, every person or persons so offending, shall be fined in a sum not exceeding five dollars nor less than fifty cents. **Bullets and horse racing in streets.**

Sec. 7. That if any keeper of a public house or retailer of spirituous liquors in this state, shall establish, keep, or permit to be kept upon his or their lots or premises, any nine pin alley, or shall in whole or in part be interested in any nine pin alley, upon the lot or premises of another, he or they shall, upon conviction thereof forfeit and pay to, and for the use of the proper township, not less than twenty-five, nor more than one hundred dollars: And this section **Nine pin alley**



Addendum 2

498

shall be construed to extend to any alley denominated a nine pin alley whether such alley is used for playing therein, a greater or less number than nine pins.

*Puppet shows and wire dancing for money.* Sec. 8. That if any person or persons shall exhibit any puppet show, wire dancing or tumbling, jugling or slight of hand within this state, and shall ask or receive any money or other property for exhibiting the same, every such person so offending, shall forfeit and pay for every such offence the sum of ten dollars.

*Destroying advertisements set up, &c.* Sec. 9. That if any person shall intentionally deface, obliterate, tear down or destroy in whole or in part any copy or transcript of or extract from any law or act of the United States or of this state, or any proclamation, publication, advertisement of notification, whatsoever, set up in any public place within this state, for the public information of any citizen, by the authority of any law or act of this state, such person shall, on conviction thereof, before any court having jurisdiction of the same, be fined in any sum not exceeding ten dollars, and may be committed to jail for a time not exceeding twenty four hours, at the discretion of the court.

*Selling spirits, &c. at or near religious assemblies.* Sec. 10. That if any person shall expose or offer for sale at any place where any religious society of people are collecting or collected together, for the purpose of religious worship, or within one mile thereof any spirituous liquor, cider or beer, such person may be arrested and detained in custody not exceeding six hours at any one time and shall be fined in a sum not exceeding twenty dollars: *Provided,* *Proviso.* That nothing in this act shall affect merchants, licensed tavern keepers, inkeepers, distillers or manufacturers of cider or beer, selling ardent spirits, cider or beer at their usual place of vending the same or at their residence.

*Fines how collected and paid.* Sec. 11. That all fines accruing under the provisions of this act shall be collected in the name of the state of Ohio, as in other cases of a breach of the peace, and be paid into the township treasury for the use of the townships in which the offence shall have been committed within twenty days after collected; and if any officer fail to pay over such fine by him collected agreeably to the provisions of this act, *Penalty for neglect.* such officer shall for any such neglect forfeit and pay into the township treasury double the amount of any fine or fines by him collected, to be recovered in a summary way before any justice of the peace having cognizance of the same at the suit of the township treasurer: *Provided,* That all *Proviso.* prosecutions under the provisions of this act shall be commenced within ten days after the offence shall have been committed, except prosecutions against justices for not paying over any fine or fines as aforesaid.

Sec. 12. That the act entitled "an act for the prevention of certain immoral practices," passed the third day of January, one thousand eight hundred and sixteen; and the act a-

Digitized by Google

Addendum 3

# THE
# CHARTER

### WITH ITS

## AMENDMENTS

### AND THE

# REVISED ORDINANCES,

### OF THE

# CITY OF MANCHESTER, *N.H.*

PUBLISHED UNDER THE AUTHORITY OF THE CITY COUNCIL.



MANCHESTER, N. H.,

HENRY A. GAGE & Co., PRINTERS.

## 1859.

Digitized by Google

Addendum 4

59

and to prosecute any person offending against any of its provisions.

SEC. 17. No person shall make any brawls or tumults, or, in any street, lane or alley, or public place, be guilty of any rude, indecent or disorderly conduct, or shall insult or wantonly impede any person passing thereon, or shall throw any stones, bricks, snowballs, or dirt, or play at ball or at any game at which ball is used.

SEC. 18. No person shall sing or repeat, or cause to be sung or repeated any lewd, obscene, or profane songs, or shall repeat any lewd, obscene, or profane words, or write or mark in any manner any obscene or profane word, or obscene or lascivious figure or representation, on any building, fence, wall, post or other thing whatever.

SEC. 19. No person shall wantonly injure or deface any building, fence, wall, post, sign-board, or sign, or any lamp-post, or lamp or lantern thereon, or shall wantonly cut or injure any tree standing in any street, highway or public place, or shall rob any garden or field of fruit or vegetables, or shall wantonly injure any trees, shrubs, or bushes growing in any street, common or square, garden, field, or yard, or shall, without lawful permission, climb on or over any fence of any garden or yard.

SEC. 20. No person shall, within the compact part of the city, fire or discharge any cannon, gun, pistol, or other fire-arms, or fire or discharge any rockets, squibs, crackers, or any preparation of gun-powder, (except by permission of the Mayor and Aldermen in writing,) or shall make any bonfire, or improperly use or expose any friction matches, or knowingly raise or repeat any false cry of fire.

SEC. 21. No person shall, within the view of any dwelling house, or of any public road or street, in the day time, bathe or swim without necessity, or expose his person indecently in dressing or undressing for the purpose of swimming or bathing or otherwise, without necessity.

THE

# REVISED CODE

OF THE

## DISTRICT OF COLUMBIA,

PREPARED

UNDER THE AUTHORITY OF THE ACT OF CONGRESS,

ENTITLED

"AN ACT TO IMPROVE THE LAWS OF THE DISTRICT OF COLUMBIA,
AND TO CODIFY THE SAME," APPROVED MARCH 8, 1855.

WASHINGTON:

A. O. P. NICHOLSON, PUBLIC PRINTER.

1857.

Addendum 6

Digitized by Google

Sec. 2. On the trial of every indictment, the party accused shall be allowed to be heard by counsel, and he may defend himself, and he shall have a right to produce witnesses and proofs in his favor, and to be confronted with the witnesses who are produced against him.

Sec. 3. No person indicted for an offence shall be convicted thereof, unless by confession of his guilt in open court, or by admitting the truth of the charge against him by his plea or demurrer, or by the verdict of a jury, accepted and recorded by the court.

Sec. 4. No person shall be held to answer on a second indictment for any offence of which he has been acquitted by the jury, upon the facts and merits, on a former trial; but such acquittal may be pleaded by him in bar of any subsequent prosecution for the same offence, notwithstanding any defect in the form or in the substance of the indictment on which he was acquitted.

Sec. 5. No person who is charged with any offence against the law, shall be punished for such offence, unless he shall have been duly and legally convicted thereof in a court having competent jurisdiction of the cause and of the person.

# CHAPTER 141.

## OF PROCEEDINGS TO PREVENT AND DETECT THE COMMISSION OF CRIMES.

Section
1. Officers authorized to keep the peace.
2. Complaint; how made.
3. Arrest.
4. Trial; recognizance to keep the peace.
5. Party; when to be discharged.
6. Refusing to recognise, to be committed.
7. Party, when discharged; and complainant, when to pay costs.
8. Payment of costs in other cases.
9. Appeal allowed.
10. On appeal, witnesses to recognise.
11. Proceedings upon an appeal.
12. Recognizance; when to remain in force.
13. Persons committed for not recognising; how discharged.
14. Recognizances to be transmitted to the court.

Section
15. Recognizances; when to be required on view of the court or magistrate.
16. Persons who go armed may be required to find sureties for the peace, &c.
17. Proceedings when person is suspected of selling liquor contrary to law.
18. Surety may surrender his principal, who may recognise anew.

SEARCH WARRANTS.

19. Search warrants for property stolen.
20. In what other cases to be issued.
21. } Warrant; to whom directed, and when
22. }   and how executed.
23. Property seized may be kept as evidence, and then restored to owner or destroyed.

Addendum 7

Digitized by Google

discharge the appellant, or may require the appellant to enter into a new recognizance, with sufficient sureties, in such sum and for such time as the court shall think proper, and may also make such order in relation to the costs of prosecution as may be deemed just and reasonable.

SEC. 12. If any party appealing shall fail to prosecute his appeal, his recognizance shall remain in full force and effect, as to any breach of the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as a security for any costs which shall be ordered by the court appealed to, to be paid by the appellant.

SEC. 13. Any person committed for not finding sureties, or refusing to recognise, as required by the court or magistrate, may be discharged by any judge or justice of the peace on giving such security as was required.

SEC. 14. Every recognizance taken pursuant to the foregoing provisions shall be transmitted by the magistrate to the criminal court on or before the first day of the next term, and shall be there filed by the clerk.

SEC. 15. Every person who shall, in the presence of any officer mentioned in the first section of this chapter, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person who, in the presence of such officer, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognise for keeping the peace, or being of good behavior, for a term not exceeding one year, and in case of refusal may be committed as before directed.

SEC. 16. If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided.

SEC. 17. If any justice of the peace suspect any person of selling, by retail, wine or ardent spirits, or a mixture thereof, contrary to law, he shall summon the person and such witnesses as he may think

Addendum 8

Digitized by Google