[ORAL ARGUMENT SCHEDULED FOR NOVEMBER 20, 2015]

No. 15-7057

---

# In The United States Court of Appeals
# For the District of Columbia Circuit

---

BRIAN WRENN, JOSHUA AKERY, TYLER WHIDBY,
AND THE SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellees*,

v.

DISTRICT OF COLUMBIA AND CATHY L. LANIER,

*Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA (No. 1:15-cv-162-FJS)

---

**BRIEF OF AMICUS CURIAE NATIONAL RIFLE ASSOCIATION OF
AMERICA, INC. IN SUPPORT OF APPELLEES AND AFFIRMANCE**

---

Charles J. Cooper
David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com
*Counsel for Amicus Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), undersigned counsel certifies that:

(A) Parties and Amici. Except for the following, all parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellants: DC for Democracy, DC Vote, League of Women Voters of the District of Columbia, the Law Center to Prevent Gun Violence, Anthony A. Williams, the Violence Policy Center, the States of California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, and New York, Joyce Lee Malcolm, Robert J. Cottrol, Clayton Cramer, Nicholas Johnson, David Kopel, Alan Charles Kors, William Van Alstyne and the California Rifle and Pistol Association Foundation.

(B) Rulings Under Review. Reference to the ruling at issue appears in the Brief for Appellants. That ruling may be found on page 228 of the Joint Appendix, but it has not yet been published in the Federal Supplement.

(C) Related Cases. This case has not previously been heard on appeal before either this court or any other court. This case was filed in the district court as a related case to *Palmer v. District of Columbia*, No. 1:09-cv-1482-FJS (D.D.C. 2014), *appeal voluntarily dismissed*, No. 14-7180 (D.C. Cir. 2015). Counsel is aware of no other related cases within the meaning of Circuit Rule 28(a)(1)(C).

Dated: October 7, 2015

/s/ Charles J. Cooper
Charles J. Cooper

*Counsel for Amicus Curiae*

i

## CERTIFICATE IN SUPPORT OF SEPARATE BRIEF

Pursuant to Circuit Rule 29(d), Counsel certifies that it was impracticable for amicus National Rifle Association of America, Inc. ("NRA") to join in any other amicus brief in support of the Appellees. The NRA has a uniquely strong interest in the ability of its many members who reside in the District of Columbia to carry firearms outside the home for self-defense. Moreover, the NRA has significant expertise in Second Amendment issues, having filed briefs in the United States Supreme Court in both *District of Columbia v. Heller*, 554 U.S. 570 (2008) (as an amicus), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (as a party). It has also filed numerous amicus briefs on the specific questions at issue in this case, including in the Supreme Court and the Ninth, Fourth, and Seventh Circuits. *Drake v. Jerejian*, No. 13-827 (U.S. Feb. 12, 2014); *Woollard v. Gallagher*, No. 13-42 (U.S. Aug. 12, 2013); *Kachalsky v. Cacace*, No. 12-845 (U.S. Feb. 11, 2013); *Peruta v. County of San Diego*, No. 10-56971 (9th Cir. Apr. 30, 2015), ECF No. 256; *Woollard v. Gallagher*, No. 12-1437 (4th Cir. Aug. 6, 2012), ECF No. 86; *Shepard v. Madigan*, No. 12-1788 (7th Cir. May 10, 2012), ECF No. 26. The NRA respectfully submits that the perspective and expertise brought to bear in this brief will significantly assist this Court in deciding the constitutional issues before it.

Dated: October 7, 2015

/s/ Charles J. Cooper
Charles J. Cooper

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

The National Rifle Association of America, Inc. does not have a parent

corporation, nor does any publicly held corporation own 10% or more of its stock.

Dated: October 7, 2015                         /s/ Charles J. Cooper
                                               Charles J. Cooper

                                               *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ...............i

CERTIFICATE IN SUPPORT OF SEPARATE BRIEF ........................................ ii

CORPORATE DISCLOSURE STATEMENT ...................................................... iii

TABLE OF AUTHORITIES ................................................................................vi

GLOSSARY...........................................................................................................ix

INTEREST OF AMICUS CURIAE ........................................................................1

PERTINENT STATUTES AND REGULATIONS ...................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT ..........................................................................................................4

I.   The Second Amendment Protects the Right To Carry Firearms Outside the Home.........................................................................................................4

    a.   The Application of the Second Amendment Outside the Home Is Clear from the Provision's Plain Text...................................................5

    b.   The Second Amendment's History Confirms that It Protects the Right To Bear Arms in Public...............................................................6

    c.   The District of Columbia's Reliance on the Statute of Northampton and Its Various American-State Analogues Is Misplaced. ...................9

II.  Because It Strikes at the Very Core of the Rights Protected by the Second Amendment, the District's Ban Is Categorically Unconstitutional...............16

    a.   *Heller* Requires *Per Se* Invalidation of Categorical Bans on Core Second Amendment Conduct.............................................................17

b.      The District's Restriction on Public Carrying Amounts to a Total Ban on the Typical Exercise of Core Second Amendment Rights. .... 18

III.    The District's Ban Is Not Substantially Related to Any Interest It May Legitimately Hold, and It Thus Fails Any Measure of Constitutional Scrutiny. ........................................................................................ 24

      a.      The District's Ban Should Be Subject to Strict Scrutiny. ................... 24

      b.      The District's Ban Fails Any Level of Heightened Scrutiny. ............. 25

CONCLUSION ....................................................................................... 29

# TABLE OF AUTHORITIES*

**Cases**                                                             **Page**

*Aptheker v. Secretary of State*, 378 U.S. 500 (1964) ................................22

*Atwater v. Lago Vista*, 532 U.S. 318 (2001) ..........................................12

*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822) ...............................14

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ...............21

*Chune v. Piott*, 80 Eng. Rep. 1161 (K.B. 1615) ....................................11

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ........26

*Cox v. New Hampshire*, 312 U.S. 569 (1941) ........................................21

\* *District of Columbia v. Heller*,
    554 U.S. 570 (2008) ......... 1, 2, 3, 4, 5, 6, 7, 8, 10, 14, 16, 17, 19, 20, 22, 23, 25

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1856) ...........................8

*Employment Div., Dep't of Human Res. of Oregon v. Smith*,
    494 U.S. 872 (1990) ...............................................................................21

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992) ...............21

\* *Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) .........................................4, 17, 18, 24

*Kent v. Dulles*, 357 U.S. 116 (1958) .......................................................22

*King v. Dewhurst*, 1 St. Tr. 529 (Lancaster Assize 1820) ......................12

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ...........................5, 6

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ........................................25

\* *McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..........................3, 4, 17, 22, 24

\* *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) .............................6, 7, 18

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) ..........................20

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ..................20

*Nunn v. State*, 1 Ga. 243 (1846) .......................................................13, 14

\* *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014)...............6, 7, 13, 18

*Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52 (1976) ......22

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*Queen v. Soley*, 88 Eng. Rep. 935 (Q.B. 1701) ....................................12

\* *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1689)............................................11

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ..............24

*Simpson v. State*, 13 Tenn. 356 (1833) .........................................13

\* *Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686) ............................11

*State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843) ..........................................13

*State v. Reid*, 1 Ala. 612 (1840) ..............................................................14

*Staub v. City of Baxley*, 355 U.S. 313 (1958) .....................................21

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981) ....................21

*United States v. Virginia*, 518 U.S. 515 (1996) .........................................26, 27, 28

*Wrenn v. District of Columbia*, 2015 WL 3477748 (D.D.C. May 18, 2015) ..........26

## Constitutional, Statutory, and Legislative Materials

\* U.S. CONST. amend. II .........................................................................5, 16

D.C. CODE

    § 7-2509.11(1)...............................................3, 18, 19, 20, 23, 24

    § 22-4504(a) .........................................................................2

    § 22-4506(a) .....................................................................2, 23

An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165 ...........................................8

2 Edw. 3, 258, c. 3 (1328) .........................................................................9

1 W. & M., c. 2, § 7 (1689) .........................................................................10

## Other

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in* 6 MASTERPIECES OF ELOQUENCE 2569 (Hazeltine et al. eds., 1905) ..............15, 16

Abhay Aneja, John J. Donohue III, & Alexandria Zhang, *The Impact of Right to Carry Laws and the NRC Report* (Dec. 1, 2014) (unpublished manuscript), *available at* http://goo.gl/UOzB9H .................................................28

\* WILLIAM BLACKSTONE, COMMENTARIES ............................................7, 12

\* WILLIAM BLACKSTONE, COMMENTARIES (St. George Tucker ed., 1803)..........7, 15

\* WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (1716) .................12

THE WRITINGS OF THOMAS JEFFERSON (letter of Aug. 19, 1785)
(H. A. Washington ed., 1857)...........................................................................15

J. KENT, COMMENTARIES ON AMERICAN LAW (8th ed. 1855) ...................................14

Gary Kleck, *Comments on Aneja et al. (2014)* (Oct. 5, 2015) (unpublished
manuscript), *available at* http://goo.gl/9JeuLk...................................................28

\* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS (1994)...................................10, 11

JAMES PARKER, CONDUCTOR GENERALIS (1788) ...................................................15

\* WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF
AMERICA (1825)..........................................................................................14

JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED
STATES (1833)...........................................................................................20

BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND
REMINISCENCES (1872) ...............................................................................15

Violence Policy Center, *Concealed Carry Killers*,
http://concealedcarrykillers.org/ ....................................................................27

\* FIREARMS AND VIOLENCE: A CRITICAL REVIEW (Charles F. Wellford,
John V. Pepper, & Carol V. Petrie eds., 2004)..................................................28

JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON (1804) ............14

# GLOSSARY

NRA—National Rifle Association of America, Inc.

NRC—National Research Council of the National Academy of Sciences

VPC—Violence Policy Center

## INTEREST OF AMICUS CURIAE

The National Rifle Association of America, Inc. ("NRA") is the oldest civil rights organization in America, and the Nation's foremost defender of Second Amendment rights. Founded in 1871, the NRA has approximately five million members and is America's leading provider of firearms marksmanship and safety training for civilians. The NRA has a strong interest in this case because its outcome will affect the ability of the many NRA members who reside in the District of Columbia to exercise their fundamental right to carry a firearm.

Pursuant to Federal Rule of Appellate Procedure 29(c)(5), the NRA certifies that this brief was not written in whole or in part by counsel for any party, that no party or party's counsel made a monetary contribution to the preparation and submission of this brief, and that no person or entity other than the NRA, its members, and its counsel has made such a monetary contribution. All parties have consented to the filing of this brief.

## PERTINENT STATUTES AND REGULATIONS

All applicable statutes, etc., are contained in the Appellants' Statutory Addendum.

## INTRODUCTION AND SUMMARY OF ARGUMENT

When the People enshrined the right to "carry weapons in case of confrontation" for the "core lawful purpose of self-defense" in the Constitution,

1

*District of Columbia v. Heller*, 554 U.S. 570, 592, 630 (2008), they did not mean

to leave the freedom to exercise that right at the mercy of the very government

officials whose hands they sought to bind. No, "[t]he very enumeration of the right

takes out of the hands of government . . . the power to decide on a case-by-case

basis whether the right is *really worth* insisting upon." *Id.* at 634. But in the most

blatant disregard of this rule, the District of Columbia has claimed *precisely* this

power: to decide, on a case-by-case basis, whether an applicant for a license to

"carry weapons in case of confrontation," *id.* at 592, has, in the estimation of its

officials, shown "good reason" that a license should issue, D.C. CODE § 22-

4506(a). And worse still, the District has determined that a general desire to carry a

weapon for the purpose of self-defense is not a sufficiently good reason. It has thus

struck a balance *directly contrary* to the Constitution's demand that the right to

self-defense—"the *central component*" of the Second Amendment, *Heller*, 554

U.S. at 599—must be "elevate[d] above all other interests," *id.* at 635. The district

court was right to enjoin the District's law, and this Court should affirm that

decision.

　　The District of Columbia generally prohibits the carrying of handguns in

public, D.C. CODE § 22-4504(a), except by those individuals who obtain a permit

"to carry a pistol concealed upon [their] person," *id.* § 22-4506(a). And such a

permit is available only to those who can show a "good" or "proper reason for

carrying a pistol," *id.*, a requirement the District has elsewhere defined as demanding "at a minimum . . . a showing of a special need for self-protection distinguishable from the general community" or a "type[ ] of employment that require[s] the handling of cash or other valuable objects," D.C. CODE § 7-2509.11(1). The effect is to make it wholly illegal for typical law-abiding citizens to "carry weapons in case of confrontation." *Heller*, 554 U.S. at 592.

The District's determination that an ordinary concern for self-defense is not a sufficiently good reason for seeking a license, by nullifying the balance the People struck when they elevated the right to bear arms into the Constitution, is nothing less than a frontal assault on the core right protected by the Second Amendment. After all, it is in the very nature of a liberty right that those who seek to exercise it—for precisely the reasons the right was protected—do not have to persuade some government functionary anew that those reasons really are sufficient. And where, as here, it is clear that the government officials in charge have determined from the outset that those reasons *are not* sufficient, the right has become eclipsed entirely.

Throughout the constellation of American constitutional rights doctrine, courts have recognized that such "ask-permission-first" limitations are as serious an affront to liberty as an outright ban. If the right to bear arms is not to be "a second-class right, subject to an entirely different body of rules than the other Bill

3

of Rights guarantees," *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality), it must be treated no differently. And this means that the district court must be affirmed.

## ARGUMENT

In assessing a law challenged on Second Amendment grounds, this Court has adopted a "two-step approach," which asks "whether a particular provision impinges upon a right protected by the Second Amendment" and if so "whether the provision passes muster under the appropriate level of constitutional scrutiny." *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1252 (D.C. Cir. 2011). Here, text, history, and tradition uniformly indicate that the District's law impinges on a right that the Second Amendment protects. Indeed, the right in question is so close to the core of the Second Amendment—and the burden so heavy—that the District's law is, like the handgun-ban in *Heller* itself, *per se* unconstitutional. But even if this were not so, the District's ban would still fail constitutional scrutiny, since it is not narrowly tailored to achieve any interest the government may possess.

## I.    The Second Amendment Protects the Right To Carry Firearms Outside the Home.

The Supreme Court's watershed opinion in *Heller* is important not only for its outcome but for its methodology. "In interpreting [the Second Amendment's] text," the Court noted, "we are guided by the principle that [t]he Constitution was

written to be understood by the voters." *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (alteration in original) (quotation marks omitted). Accordingly, interpretation of the Second Amendment's words must look to the "normal and ordinary . . . meaning" that would "have been known to ordinary citizens in the founding generation." *Id.* at 576–77. And because the Second Amendment "codified a *pre-existing* right," interpretation of that constitutional provision must also look to "the historical background of the Second Amendment." *Id.* at 592. Here, the Second Amendment's text and history leave no doubt that that provision's protections do not subside when one leaves the home.

> a. **The Application of the Second Amendment Outside the Home Is Clear from the Provision's Plain Text.**

The substance of the Second Amendment right reposes in the twin verbs of the operative clause: "the right of the people to *keep* and *bear* Arms, shall not be infringed." U.S. CONST. amend. II (emphasis added). This turn-of-phrase is not, the Supreme Court has held, "some sort of term of art" with a "unitary meaning," but rather a conjoining of two related guarantees. *Heller*, 554 U.S. at 582–91. Interpreting the protections of the Second Amendment as confined to the home would read the second of these guarantees—the right to *bear* arms—out of the Constitution's text, for the right to *keep* arms standing alone would be sufficient to protect the right to have arms in the home. Any such interpretation would directly contradict the fundamental canon that "[i]t cannot be presumed that any clause in

5

the constitution is intended to be without effect." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803).

Furthermore, as the Court explained in *Heller*, "the natural meaning of 'bear arms' " is to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.' " 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting). And because "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage," the Constitution's explicit inclusion of the "right to *bear* arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). "[T]he idea of carrying a gun," after all, "does not exactly conjure up images of father stuffing a six-shooter in his pajama's pocket before heading downstairs to start the morning's coffee." *Peruta v. County of San Diego*, 742 F.3d 1144, 1152 (9th Cir. 2014), *reh'g en banc granted*, 2015 WL 1381752 (9th Cir. Mar. 26, 2015).

Limiting the Second Amendment to the home would thus do great violence to its text, and effectively read the term "bear" out of the Constitution altogether.

### b. The Second Amendment's History Confirms that It Protects the Right To Bear Arms in Public.

The historical understanding of the Second Amendment—at the time of its proposal and ratification, in the post-ratification early republic, and during the

aftermath of the Civil War—strongly supports what is obvious from the provision's text: it applies outside the home.

Begin with the founding era. "The commonsense reading of 'bear Arms' . . . finds support in several important constitutional treatises in circulation at the time of the Second Amendment's ratification," *Peruta*, 742 F.3d at 1154, including, most prominently, Blackstone's Commentaries. The common-law "right of having and using arms for self-preservation and defence," according to Blackstone, protected "the natural right of resistance and self-preservation." 1 WILLIAM BLACKSTONE, COMMENTARIES *139–40. "And one doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home." *Moore*, 702 F.3d at 936. Indeed, "the most important early American edition of Blackstone's Commentaries," *Heller*, 554 U.S. at 594, made clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms." 1 WILLIAM BLACKSTONE, COMMENTARIES App. n.D, at 289 (St. George Tucker ed., 1803) ("Tucker's Blackstone").

Moving to the early republic, the history of the interpretation of state-constitutional analogues to the Second Amendment during the first part of the nineteenth century confirms that the right to bear arms extended into the public square and boulevards. "Nine state constitutional provisions written in the 18th

century or the first two decades of the 19th . . . enshrined a right of citizens to 'bear arms in defense of themselves and the state' or 'bear arms in defense of himself and the state.' " *Heller*, 554 U.S. at 584–85 & n.8. Just as "it is clear from those formulations that 'bear arms' did not refer only to carrying a weapon in an organized military unit," *id*. at 585, it is likewise clear that "bear arms" did not refer only to toting a weapon from room to room in one's house.

Those who wrote and ratified the Fourteenth Amendment understood the right to bear arms in the same way. Indeed, Chief Justice Taney recoiled so strongly in the infamous *Dred Scott* case from recognizing African Americans as part of "We the People of the United States" precisely because he understood that doing so would entitle them "to keep and carry arms wherever they went." *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417 (1856). During Reconstruction, Congress labored mightily to entomb this legacy of prejudice—and to defeat the post-war South's attempts to deprive every "freedman, free negro or mulatto" of their right to "keep or carry fire-arms of any kind," An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165. This effort culminated in the adoption of the Fourteenth Amendment, which established that *all* Americans, regardless of race, are entitled to carry firearms in public to defend themselves.

c.    **The District of Columbia's Reliance on the Statute of Northampton and Its Various American-State Analogues Is Misplaced.**

The District's chief piece of historical evidence for its notion that "the pre-existing right that the Second Amendment codified did not encompass carrying in densely populated cities" is the medieval Statute of Northampton. Appellants' Br. 44 (emphasis omitted) (citation omitted) (quotation marks omitted). Adopted in England in the fourteenth century, that statute provided, *inter alia*, that "no Man great nor small" shall "go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere." 2 Edw. 3, 258, c. 3 (1328). And one of the District's amici, Everytown for Gun Safety, relies even more stridently on the Statute of Northampton and the various Northampton-replicas enacted on this side of the Atlantic in the seventeenth and eighteenth centuries, opining that these statutes show "a seven-century Anglo-American tradition of restricting public carry in populated areas." Br. of Amicus Curiae Everytown for Gun Safety 2 ("Everytown Br.").

This reliance on the Statute of Northampton is misplaced. By the time the English understanding of the right to keep and bear arms began to gel in the seventeenth century, the Statute of Northampton had been authoritatively narrowed to leave ample breathing room for the fundamental right to peacefully carry arms for self-defense. And when the States began to enact Northampton-analogues later

that century, they brought this narrow understanding of the statute's scope over as well.

1.    It is important to begin by noting that the Statute of Northampton was enacted over three-and-a-half centuries before the right to keep and bear arms for self-defense was recognized in England as having constitutional status. In reaction to King James II's efforts to disarm his protestant opponents, the English procured from William and Mary in the 1689 Declaration of Rights the guarantee that "the subjects which are Protestants may have arms for their defense suitable to their conditions and as allowed by law." 1 W. & M., c. 2, § 7 (1689); *see also* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 96–122 (1994) ("Malcolm"). Because this right was "one subjects did not have in existing law," *id.* at 122, the 1689 Declaration "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593. And by the time the right to keep and bear arms entered the English constitutional pantheon in this way, the Statute of Northampton was well-understood as regulating that right in a narrow and peripheral way, to the extent it had any continuing vitality at all.

The most explicit recognition of this narrowing of Northampton was prompted by the same series of events as the 1689 Declaration of Rights: James II's efforts to disarm his protestant detractors. King James hoped to use that ancient statute to disarm certain of his subjects, a power he first tested in a 1686

case against Sir John Knight, "a Bristol merchant and militant Anglican" who had led an effort to enforce the laws against Catholic worship. Malcolm 104. James had Knight brought before the King's Bench in a high-profile prosecution for violating the Statute of Northampton by going armed "into the Church of St. Michael in Bristol in the time of Divine Service." *Id.* at 104–05. The King's enterprising use of the statute was resoundingly rebuffed. The jury acquitted Knight, and Chief Justice Holt interpreted Northampton as merely declaratory of the common-law rule against "go[ing] armed *to terrify* the King's subjects." *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686) (emphasis added). "[T]ho' this statute be almost gone into desuetudinem," Holt added, "yet where the crime shall appear to be malo animo"—that is, with a specific, evil intent—"it will come within the Act (tho' now there be a general connivance to gentlemen to ride armed for their security)." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1689) (different reporter).

Other cases in the decades before and after *Rex v. Knight* shared Chief Justice Holt's narrow understanding of the Statute of Northampton's remaining sweep. Indeed, the statute was not actively enforced in the seventeenth century until Knight's case, Malcolm 184 n.36, and even when it was mentioned in passing, it was with the recognition that the statute only applied where arms were carried "in terrorem populi Regis"—with a design to terrify the King's subjects. *Chune v. Piott*, 80 Eng. Rep. 1161, 1162 (K.B. 1615). Cases from the eighteenth

and nineteenth centuries are in accord. *See Queen v. Soley*, 88 Eng. Rep. 935, 936–37 (Q.B. 1701) (illegal for "a number of men [to] assemble with arms, *in terrorem populi*"); *King v. Dewhurst*, 1 St. Tr. 529, 601–02 (Lancaster Assize 1820) ("A man has a clear right to protect himself [with arms] when he is going singly or in a small party upon the road where he is traveling or going for the ordinary purposes of business.").

The uniform opinion of respected contemporary legal commentators confirms that by the seventeenth century the Statute of Northampton's sweep had come to be understood as much narrower than its text would superficially suggest. Blackstone, for example, interpreted the Statute of Northampton as proscribing "[t]he offence of riding or going armed, with *dangerous or unusual weapons*," since such conduct "terrif[ied] the good people of the land." 4 BLACKSTONE COMMENTARIES *148–49 (emphasis added). And William Hawkins, in his "widely read Treatise of the Pleas of the Crown," *Atwater v. Lago Vista*, 532 U.S. 318, 331 (2001), similarly noted that "no wearing of Arms is within the meaning of this Statute, unless it be accompanied with such Circumstances as are apt to terrify the People," 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 136 (1716).

2.    The District and its amicus also contend that the Statute of Northampton's "broad prohibition" on public carrying was adopted "in various

state laws immediately following the ratification of the Constitution." Appellants' Br. 40; *see also* Everytown Br. 2. That claim also founders, because it is predicated on the mischaracterization of the statute's scope that we have just debunked. When the States imported Northampton from across the Atlantic, the contemporary English understanding of its limited reach came with it.

The early-American case law confirms that neither the Statute of Northampton nor the common law were understood to preclude carrying arms in public. The Tennessee Supreme Court, for example, explained in a mid-nineteenth-century case that because the state constitution "hath said the people may carry arms," it would be impermissible to "impute to the acts thus licensed such a necessarily consequent operation as terror to the people to be incurred thereby." *Simpson v. State*, 13 Tenn. 356, 360 (1833). In like form, the North Carolina Supreme Court explained that "the carrying of a gun *per se* constitutes no offence," because "*[f]or any lawful purpose . . . the citizen is at perfect liberty to carry his gun*. It is the wicked purpose—and the mischievous result—which essentially constitute the crime." *State v. Huntly*, 25 N.C. (3 Ired.) 418, 422–23 (1843) (emphasis added). As the panel majority in *Peruta* concluded after an exhaustive survey of the early-American case law, although "some courts approved limitations on the manner of carry outside the home, none approved a total destruction of the right to carry in public." 742 F.3d at 1160; *see also, e.g.*, *Nunn v. State*, 1 Ga. 243,

249–51 (1846); *State v. Reid*, 1 Ala. 612, 616–17 (1840); *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 91–93 (1822). Indeed, while courts generally approved concealed-carry restrictions that limited the manner in which arms could be borne, "[t]here [was] a great difference of opinion on the question" of whether such restrictions were "constitutional," 2 J. KENT, COMMENTARIES ON AMERICAN LAW *340 n.2 (8th ed. 1855)—a difference of opinion that would be inexplicable if the right to bear arms was understood as confined to the home.

As in the English context, the views of contemporary learned commentators confirm this understanding of Northampton's scope. In his "influential treatise," William Rawle, "a prominent lawyer who had been a member of the Pennsylvania Assembly that ratified the Bill of Rights," *Heller*, 554 U.S. at 607, wrote that "the carrying of arms abroad by an individual, *attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them*, would be sufficient cause to require him to give surety of the peace." WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 123 (1825) (emphasis added). Similarly, James Wilson, a leading Framer and Supreme-Court Justice, described Northampton in his widely-read Lectures on Law as reaching only the carrying of "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804). Other authorities were in accord. *See,*

*e.g.*, JAMES PARKER, CONDUCTOR GENERALIS 11 (1788) ("[N]o wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people . . . .").

Finally, the practices of the Founders themselves confirm that the right to carry firearms was hardly "broadly prohibited," Everytown Br. 2, in the Colonies or the early Republic. Judge St. George Tucker observed that, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 Tucker's Blackstone App. n.B, at 19. George Washington rode between Alexandria and Mount Vernon with pistols holstered to his horse's saddle, "[a]s was then the custom." *See* BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND REMINISCENCES 95 (1872). Thomas Jefferson advised his nephew to "[l]et your gun . . . be the constant companion on your walks." *See* 1 THE WRITINGS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785) (H. A. Washington ed., 1857). And even in defending the British soldiers charged in the Boston Massacre, John Adams conceded that, in this country, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm themselves at that time for their defence." John Adams, *First Day's Speech in Defence of the British Soldiers Accused of*

*Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6
MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds., 1905).

Far from broadly "restricting both the concealed and the open carry of
firearms in public places," Appellants' Br. 40, then, the States plainly understood
the limitations on the Statute of Northampton's scope when they enacted their own
versions of that provision. And so limited, these Northampton-analogues only
serve to confirm that the Founding generation understood the Second
Amendment's protection of "the right of the people to . . . *bear* Arms," U.S.
CONST. amend. II (emphasis added), to mean what it clearly says.

## II. Because It Strikes at the Very Core of the Rights Protected by the Second Amendment, the District's Ban Is Categorically Unconstitutional.

Given that the Second Amendment applies out-of-doors, *Heller* makes the
next analytical steps clear. Because the Second Amendment "elevates" the rights it
most centrally protects "above all other interests," infringements upon its "core
protection" must be held unconstitutional categorically, not "subjected to a
freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634–35. The
District's ban is just such an infringement of core Second Amendment conduct.
Accordingly, it is unconstitutional *per se*.

### a. *Heller* Requires *Per Se* Invalidation of Categorical Bans on Core Second Amendment Conduct.

Much of the post-*Heller* case law has focused on the level of scrutiny that ought to apply in Second Amendment challenges: whether restrictions on the right to keep and bear arms must be the *least-restrictive* means of furthering a *compelling* government interest, or must only be *substantially* related to an *important* objective. The Supreme Court itself has taken a very different tack. In *Heller*, the court *declined* the invitation to apply "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," 554 U.S. at 689–90 (Breyer, J., dissenting), holding instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text, *id.* at 635 (majority opinion). And in *McDonald*, the Court reaffirmed that *Heller* had deliberately and "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion).

To be sure, in *Heller II*, a panel of this Court concluded that laws burdening Second Amendment conduct should be subjected to scrutiny the stringency of which "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." 670 F.3d 1244, 1257 (D.C. Cir. 2011). *Heller II* also implicitly recognized, however, that this tiers-of-scrutiny

approach is not necessarily called for when a court is faced with a law—like the one struck down in *Heller*—that amounts to a "total prohibition" of core Second-Amendment conduct. *Heller II*, 670 F.3d at 336. Because such a "severe" restriction "would fail constitutional muster" under "any of the standards of scrutiny," it is unconstitutional *per se*. *See id.* (quoting *Heller*, 554 U.S. at 628–29). And the District's restriction on bearing arms in public is just such a law. *See, e.g.*, *Peruta*, 742 F.3d at 1170 (striking down ban on carrying arms categorically despite circuit precedent applying levels-of-scrutiny analysis in other Second Amendment cases); *Moore*, 702 F.3d at 942 (same).

b.    **The District's Restriction on Public Carrying Amounts to a Total Ban on the Typical Exercise of Core Second Amendment Rights.**

The District's regulation of the public carrying of firearms comes in the guise of a licensing requirement rather than a flat-out ban. But because the District makes licensure contingent on its discretionary assessment of whether an applicant has shown "good reason"—a requirement that it has concluded is not satisfied by the "general" "need for self-protection," D.C. CODE § 7-2509.11(1)(A)—it is no better than a complete prohibition. Though clad in sheep's clothing, the District's scheme is an unconstitutional wolf—flatly inconsistent with the Second Amendment. And this is clear not only as a matter of logic but also from the ordinary doctrinal rules that apply to a wide variety of constitutional rights. Indeed, it is clear from *Heller* itself.

1.     The District's demand that a citizen prove to its satisfaction that he has a good enough reason to carry a handgun is flatly inconsistent with the nature of the Second Amendment right. The existence of that right is itself reason enough for its exercise. The Constitution has conferred a right to armed self-defense, and the District is not free to deny a handgun permit to a trained, law-abiding citizen who has met every legitimate public-safety requirement but has failed to persuade some government functionary that his desire to exercise his constitutional right of armed self-defense is driven by more than the "general community['s]" desire "for self-protection." D.C. CODE § 7-2509.11(1)(A). A constitutional right to engage in conduct means *not having* to ask for permission to engage in that conduct. And this is all the more true where, as here, permission is denied as a matter of course to law-abiding, responsible adults.

Constitutional rights by their very nature and design are meant to settle, at least to some extent, the permissible scope of state power; they settle nothing at all if the state has limitless discretion to disregard them whenever it concludes that there is no "good reason" to abide by their limits. Put differently, the Second Amendment right has force *as a right* only if those who disagree with the central value choice made by those who adopted it—that an individual's interest in self-defense is of such paramount importance that the freedom "to possess and carry weapons in case of confrontation" must be given constitutional protection, *Heller*,

554 U.S. at 592—are bound to follow it in the teeth of that disagreement. By seizing the authority to veto the ordinary, law-abiding citizen's choice to carry a firearm based on nothing more than its estimation that the "need for self-protection [shared by] the general community," D.C. CODE § 7-2509.11(1)(A), is not a sufficiently persuasive reason, the District has thus struck at the heart of the Second Amendment.

2. These principles are deeply embedded in the law. Across a wide variety of constitutional rights, courts have recognized that the government has utterly failed to honor a right if it demands to know—and assess *de novo*—the reasons justifying each occasion of its exercise.

The rejection of this "ask-permission-first" type of restriction is most familiar in the context of the First Amendment's free speech guarantee. There, it has been understood for centuries that the most serious infringement on the right of free expression is the "prior restraint": a requirement that before you get permission to speak, you must explain to the government why what you have to say is worth hearing. *See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713–23 (1931); 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 732–44 (1833). While the state can require that you seek its approval before exercising your First Amendment rights for the purpose of regulating the

time, place, and manner of your speech, *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941), the Constitution simply will not brook a licensing scheme that leaves government officials with "uncontrolled discretion" to bar you from speaking because "they do not approve" of the proposed speech's "effects upon the general welfare," *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958).

The rule that the government can no more demand that you explain to its satisfaction your reasons for engaging in constitutionally protected conduct than it can ban such conduct altogether is also well-established in the free-exercise context. Of particular importance here, the government cannot arrogate to itself the authority to second-guess citizens' religious judgments. Those judgments are for citizens, and citizens alone, to make. Thus, while courts can determine whether an asserted religious conviction is an "honest" one, *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981), they cannot proceed to "question the centrality" or "plausibility" of that conviction, *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990); *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2778 (2014).

Finally, very similar considerations inform the Court's substantive-due-process doctrine. In the abortion context, the Court has insisted that the state may not require a woman to obtain her spouse's consent before terminating her

pregnancy during the first trimester, for "since the State cannot regulate or proscribe abortion during the first stage, . . . the State cannot delegate authority to any particular person, even the spouse, to prevent abortion during that same period." *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 69 (1976). And because the due process clause protects the right to travel, *Aptheker v. Secretary of State*, 378 U.S. 500, 505–07 (1964), it also limits the ability of the government to delegate "unbridled discretion to grant or withhold it," *Kent v. Dulles*, 357 U.S. 116, 129 (1958).

Though it is perhaps clearer in some of these doctrinal contexts than others, a shared principle unites all of them: if the government cannot prohibit certain conduct, it also cannot make you first explain your reasons for wanting to engage in it, at least if it retains the plenary discretion to conclude that those reasons do not suffice.

3.      Because the Second Amendment is not a "second-class right," *McDonald*, 561 U.S. at 780 (plurality opinion), it should also be unsurprising that the Court has already embraced the principle that the exercise of Second-Amendment rights cannot be conditioned on the government's discretionary, ad hoc weighing of that right's importance. "A Constitutional guarantee subject to future . . . assessments of its usefulness is no constitutional guarantee at all." *Heller*, 554 U.S. at 634. By necessity, "[t]he very enumeration of the right takes

out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* But the District has seized *precisely* this power. By requiring its residents to seek leave from its officials before bearing arms publicly, the District has delegated to those officials the unbridled power to ban any exercise of this core Second Amendment conduct for no reason other than their disapproval of that conduct.

Indeed, the District's restrictions here *embody* the danger this type of wholly-discretionary licensing regime poses to constitutionally protected conduct. Its conclusion that "the general community['s]" desire for self-defense is not sufficient reason for carrying firearms, D.C. CODE § 7-2509.11(1)(A), could not more brazenly contradict the choice the founding generation made when they elevated the right to bear arms to constitutional status. The Second Amendment is itself "the very *product* of an interest-balancing by the people," and those who ratified that provision thereby "elevate[d] above all other interests" the right to bear arms for "the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630, 635. The Constitution will simply not tolerate a regime where government officials are vested with the naked power to ignore the central choice the sovereign people made when they enshrined the Second Amendment in that document's text.

**III. The District's Ban Is Not Substantially Related to Any Interest It May Legitimately Hold, and It Thus Fails Any Measure of Constitutional Scrutiny.**

**a. The District's Ban Should Be Subject to Strict Scrutiny.**

Even if this Court concludes that the District's law is not *categorically* unconstitutional, because that law effectively amounts to a total ban on the exercise of the Second Amendment right to bear arms by typical, law-abiding citizens, it must at least be justified as necessary to advance the most compelling of government interests. It is well-established, after all, that "strict judicial scrutiny [is] required" if a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only specifically enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778.

This Court itself held in *Heller II* that "a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment" must be subjected to strict scrutiny. 670 F.3d at 1257. As shown above, the District's law—by *specifically rejecting* the ordinary "need for self-protection" as a reason that justifies bearing arms, D.C. CODE § 7-2509.11(1)(A)—substantially burdens the Second Amendment's core.

### b. The District's Ban Fails Any Level of Heightened Scrutiny.

Even if this Court concludes that only intermediate scrutiny applies, the District's law still fail constitutional muster. As the Supreme Court recently clarified, intermediate scrutiny demands that restrictions of constitutionally protected conduct be "narrowly tailored," *McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (2014); *see also id.* at 2542, 2548 (Scalia, J., concurring), possessing a "close fit between ends and means," *id.* at 2534 (majority opinion). Here, that close fit is absent.

As an initial matter, the District's law must fail any means-ends fit test as a matter of law, since the "means" Appellants have chosen effectively *extinguish* the right to bear arms. As demonstrated above, the District's "ask-permission-first" restriction is no better than an outright ban on carrying firearms in public; it applies indefinitely and it applies to the very "law-abiding, responsible citizens" that the Second Amendment was centrally designed to protect. *Heller*, 554 U.S. at 635. But the government cannot adopt a restriction that wholly and indefinitely prohibits the core conduct protected by the Second Amendment no matter *what* its reasons, since that would empty that constitutional protection of all meaningful content. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table," *id.* at 636, and surely the choice to completely prohibit the core conduct that the right was enshrined to protect is one of them.

The District's ban fails constitutional muster as a matter of law for another reason as well. As the district court found, the District's "good reason" requirement has nothing to do with public safety, since there is no evidence that "it [is] less likely that those who meet this requirement will accidently shoot themselves or others or engage in criminal activity than those who cannot meet this requirement." *Wrenn v. District of Columbia*, 2015 WL 3477748, at *8 (D.D.C. May 18, 2015). Instead—as the District owns—its law reduces public handgun violence, if at all, only as a side-effect of its *true* aim: "reduc[ing] the number of handguns carried in public." Appellants' Br. 21. That end cannot justify its ban, since it is simply "not a permissible strategy" to reduce alleged negative effects of a constitutionally protected right by *indiscriminately reducing the number of people exercising the right. See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (Kennedy, J., concurring in judgment) (controlling opinion); *see also id.* ("Though the inference may be inexorable that a city could reduce secondary effects by reducing speech, . . . [t]he purpose and effect of a zoning ordinance must be to reduce secondary effects and not to reduce speech.").

Finally, even if these threshold objections are lain aside, the District's ban still fails. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of the government's objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996). "The burden of justification is demanding and

it rests entirely on the State." *Id.* Here, the District simply cannot meet that burden because the relevant social science fails to demonstrate that restrictions on concealed carriage of firearms reduce crime rates.

The debate over gun control has become so impassioned that it is often hard to sort legitimate social-scientific research from junk science.[1] But in 2004, the National Academy of Sciences' National Research Council ("NRC") conducted an exhaustive review of the *entire body* of social-scientific literature on firearms regulation in an effort to sort the wheat from the chaff and determine what inferences could be safely drawn from the current research. The NRC concluded

---

[1] Some sorting, however, is easy. For example, an amicus brief filed in support of the District's ban by three anti-gun groups—the Brady Center, the Law Center to Prevent Gun Violence, and the Violence Policy Center ("VPC")—relies prominently on a webpage maintained by the VPC, Violence Policy Center, *Concealed Carry Killers*, http://concealedcarrykillers.org/ (along with the pdf to which it links, the "VPC Webpage"), which it says shows that "since 2007, at least 750 people have been killed by individuals with concealed carry permits." Amicus Curiae Br. of Brady Center to Prevent Gun Violence, the Law Center to Prevent Gun Violence, and the Violence Policy Center 10–11. The "Concealed Carry Killers" webpage—which is not a scientific study but rather a collection of "vignettes" of "concealed carry incidents" that are "taken primarily from news reports," VPC Webpage—is vitiated by obvious errors. Most prominently, VPC's "tally" contains a significant number of incidents that do not speak at all to the comparative likelihood of concealed-carry permit holders to engage in public firearm violence. To take just two examples, the VPC includes (as of September 25, 2015—the page is continually updated): (i) 77 firearms-related killings that took place in *the gun-owner's home*, where the possession of a public carry permit is entirely irrelevant, and (ii) over 250 "vignettes" describing suicides, most of which do not even indicate that a firearm was used in the suicide. The VPC's tally of "Concealed Carry Killers" is a sham and proves nothing.

that "with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." FIREARMS AND VIOLENCE: A CRITICAL REVIEW 150 (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2004).

Indeed the principal study relied upon by the District itself, a 2014 article by law Professor John Donohue III, *explicitly reaffirmed* the NRC's judgment that the existing evidence is not sufficient to show *any causal link* between laws regulating public carrying of firearms and crime rates. Abhay Aneja, John J. Donohue III, & Alexandria Zhang, *The Impact of Right to Carry Laws and the NRC Report* 80 (Dec. 1, 2014) (unpublished manuscript), *available at* http://goo.gl/UOzB9H. Moreover, a leading expert has concluded that the Donohue study is a "misguided" one that "should be of no interest to anyone with a serious interest in the effects of gun control laws on violence" and that "does not provide any serious basis for reversing [the] conclusion" of "[b]etter studies . . . find[ing] that [right-to-carry] laws do not affect crime rates . . . ." Gary Kleck, *Comments on Aneja et al. (2014)* 17 (Oct. 7, 2015) (unpublished manuscript), *available at* http://goo.gl/9JeuLk. That hardly satisfies the District's "demanding" burden of showing that its law is "substantially related to the achievement" of its interest in public safety. *Virginia*, 518 U.S. at 533.

**CONCLUSION**

For the reasons given above, the NRA respectfully submits that the district court's judgment should be affirmed.


Dated: October 7, 2015                      Respectfully submitted,

                                            /s/ Charles J. Cooper
                                            Charles J. Cooper
                                            David H. Thompson
                                            Peter A. Patterson
                                            John D. Ohlendorf
                                            COOPER & KIRK, PLLC
                                            1523 New Hampshire Ave., NW
                                            Washington, D.C.  20036
                                            Tel: (202) 220-9600
                                            Fax: (202) 220-9601
                                            Email: ccooper@cooperkirk.com

                                            *Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of FED. R. APP. P. 29(d) because this brief contains 6988 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Dated: October 7, 2015

/s/ Charles J. Cooper
Charles J. Cooper

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of

Court for the United States Court of Appeals for the District of Columbia Circuit

by using the appellate CM/ECF system on October 7, 2015. I certify that service

will be accomplished by the appellate CM/ECF system on all parties or their

counsel, except for the following who will be served by First Class USPS Mail:

Karl A. Racine
Office of the Attorney General, District of Columbia
Office of the Solicitor General
441 4th Street, NW
One Judiciary Square, Sixth Floor
Washington, DC 20001

Walter A. Smith Jr.
DC Appleseed Center for Law and Justice
1111 14th Street, NW, Suite 510
Washington, DC 20005

Dated: October 7, 2015                    /s/ Charles J. Cooper
                                          Charles J. Cooper

                                          *Counsel for Amicus Curiae*