**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

—————————

BRIAN WRENN, *et al.*,
*Plaintiffs-Appellees*,

v.

DISTRICT OF COLUMBIA, *et al.*,
*Defendants-Appellants.*

—————————

**On Appeal from an Order of the United States District Court
for the District of Columbia
Case No. 1:15-cv-00162 (FJS)**

—————————

**BRIEF OF *AMICI CURIAE* HISTORIANS, LEGAL SCHOLARS,
AND CRPA FOUNDATION IN SUPPORT OF
APPELLEES AND IN SUPPORT OF AFFIRMANCE**

—————————

STEPHEN P. HALBROOK
3925 CHAIN BRIDGE ROAD, SUITE 403
FAIRFAX, VA 22030
(703) 352-7276
protell@aol.com

DAN M. PETERSON
DAN M. PETERSON PLLC
3925 CHAIN BRIDGE ROAD, SUITE 403
FAIRFAX, VA 22030
(703) 352-7276
dan@danpetersonlaw.com

*Counsel for Amici Curiae*
(additional counsel on inside cover)

October 7, 2015

C. D. MICHEL
MICHEL & ASSOCIATES, P.C.
180 EAST OCEAN BLVD., SUITE 200
LONG BEACH, CA 90802
(562) 216-4444
cmichel@michellawyers.com

*Counsel for CRPA Foundation*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### Parties and *Amici*

All parties, intervenors, and amici appearing in this Court are listed in the Briefs for Appellants and Appellees, except for the following *amici* joining in this brief: Joyce Lee Malcolm, Robert J. Cottrol, Clayton Cramer, Nicholas Johnson, David B. Kopel, and the CRPA Foundation.

### Rulings Under Review

References to the rulings at issue appear in the Briefs for Appellants and Appellees.

### Related Cases

The case on review has not previously been before this Court or any other court, except the District Court case below. Counsel is aware of no related cases pending in this court or in any other court.

Counsel certify that a separate *amicus curiae* brief is necessary for the reasons stated in the *Interest of Amici Curiae*, below.

/s/ Stephen P. Halbrook
Stephen P. Halbrook

Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

CRPA Foundation has no parent company, and no publicly-held company owns 10% or more of its stock.

/s/ Stephen P. Halbrook
Stephen P. Halbrook

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF COUNSEL AS TO
PARTIES, RULINGS, AND RELATED CASES ....................................................i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF AUTHORITIES ...................................................................v

INTEREST OF AMICI CURIAE ..............................................................1

SUMMARY OF ARGUMENT ................................................................4

ARGUMENT ...........................................................................................5

I. THE STATUTE OF NORTHAMPTON DID NOT PROHIBIT
CARRYING ARMS PEACEABLY, BUT ONLY CARRYING
THEM TO TERRORIZE THE PEOPLE .................................................5

II. PEACEABLY CARRYING ARMS WAS NOT PROHIBITED
IN THE COLONIES, BUT WAS OFTEN REQUIRED BY LAW ........................12

III. NO STATE PROHIBITED THE PUBLIC CARRYING
OF ARMS IN THE EARLY REPUBLIC ...............................................14

IV. NINETEENTH CENTURY STATUTES REQUIRING
RECOGNIZANCE OR SURETIES WERE NOT
PROHIBITIONS ON PUBLIC CARRY ...............................................24

V. THE HANDFUL OF LATE NINETEENTH CENTURY
LAWS PROHIBITING CARRY IN SOME TOWNS WERE
UNUSUAL AND WERE IN RESPONSE TO TRANSITORY
CONDITIONS ........................................................................................25

CONCLUSION ......................................................................................28

CERTIFICATE OF COMPLIANCE.........................................................................30

CERTIFICATE OF SERVICE .............................................................................31

# TABLE OF AUTHORITIES[*]

**CASES**                                                           **Page**

**American**

*Bliss v. Commonwealth*, 12 Ken. (2 Litt.) 90 (1822) ...............................19

*\*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................................5, 14, 25

*Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) ............................19

*Nunn* v. *State*, 1 Ga. 243 (1846) ...............................................19

*State* v. *Chandler*, 5 La. Ann. 489 (1850) ...............................................19

*State v. Huntley*, 25 N.C. 418 (1843) ...............................................18

*State v. Reid*, 1 Ala. 612 (1840) ...............................................19

**English**

*Middlesex Sessions: Justices' Working Documents* (1751),
*at* http://bit.ly/1U8OhO7 ...............................................9

*Rex v. Dewhurst*, 1 State Trials, N.S. 529 (1820) ...............................................9

*Rex v. Harwood*, Quarter Sessions at Malton (Oct. 4-5, 1608),
*reprinted in* North Riding Record Society,
*Quarter Sessions Records* 132 (1884) ...............................................8

*Rex v. Knight*, 3 Mod. 117, 87 Eng. Rep. 75 (K.B. 1686) ...............................................7

*Rex v. Meade*, 19 L. Times Repts. 540 (1903) ...............................................10

---

[*] Authorities chiefly relied upon are marked with asterisks.

*Rex v. Smith*, 2 Ir. R. 190 (K.B. 1914) ...................................................................10

**CONSTITUTIONS**

U.S. Const. amend. II..........................................................................................5, 25

**STATUTES**

**American**

1852 Del. Laws 330, 333, ch. 97, § 13 ...................................................................15

1694 Mass. Laws 12, No. 6........................................................................................14

1795 Mass. Laws 436, ch. 2.......................................................................................15

1821 Me. Laws 285, ch. 76, § 1 ................................................................................15

1792 N.C. Laws 60, 61 ch. 3...............................................................................15, 16

1859 N.M. Laws 94, § 2 ............................................................................................14

1870 S.C. Laws 402, No. 288 ...................................................................................14

1801 Tenn. Laws 710, § 6..........................................................................................15

1786 Va. Laws 33, ch. 21 ..........................................................................................15

Act Forbidding and Punishing Affrays (Virginia 1786)..........................................15

Militia Act, C. XXVIII, 2d Cong., Sess. I (1792)...................................................20

**English**

The Assize of Arms (1181)........................................................................................10

33 Henry VIII, c. 3 (1541) ......................................................................12

33 Henry VIII, c. 9 (1541) ......................................................................12

*Statute of Northampton, 2 Edw. III, c. 3 (1328)........... 4, 5, 6, 7, 14, 15, 17, 19, 23

Statutes for the City of London, 13 Edw. I (1285) ..................................26

**CODES AND COMPILATIONS**

CODE OF LAWS FOR THE DISTRICT OF COLUMBIA (1818) .........................................18

A COLLECTION OF ALL SUCH ACTS OF THE GENERAL
ASSEMBLY OF VIRGINIA, OF A PUBLIC AND PERMANENT
NATURE, AS ARE NOW IN FORCE (1803)..................................................16

A COLLECTION OF ALL THE PUBLIC ACTS OF ASSEMBLY
OF THE PROVINCE OF NORTH-CAROLINA (1752)......................................17

IREDELL, J., THE PUBLIC ACTS OF THE GENERAL ASSEMBLY
OF NORTH-CAROLINA  (F. Martin rev. 1804) ...........................................17

LAWS OF THE STATE OF NORTH-CAROLINA, INCLUDING THE
TITLES OF SUCH STATUTES AND PARTS OF STATUTES OF
GREAT BRITAIN AS ARE IN FORCE IN SAID STATE (1821)........................17

MARTIN, FRANÇOIS-XAVIER, A COLLECTION OF THE STATUTES
OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE
OF NORTH-CAROLINA (1792) ...................................................................16

PERPETUAL LAWS OF THE COMMONWEALTH
OF MASSACHUSETTS (1801)......................................................................16

REVISED CODE OF NORTH CAROLINA, Preface
of the Commissioners of 1838 (1855) ....................................................17

REVISED CODE OF NORTH CAROLINA (1855) .........................................................17

*REVISED CODE OF THE DISTRICT OF COLUMBIA (1857).........................................24

STATUTE LAWS OF THE STATE OF TENNESSEE (1831).............................................16

THE STATUTES: REVISED EDITION, HENRY III
TO JAMES II, A.D. 1235-6—1685 (1870) ...................................................6

## OTHER AUTHORITIES

BLACKSTONE, COMMENTARIES (1769) ....................................................11

BLIZARD, WILLIAM, DESULTORY REFLECTIONS
ON THE POLICE (1785) .........................................................................12

Blocher, Joseph, *Firearm Localism*, 123 YALE L.J. 82 (2013) ...............................26

BURLEIGH, ANNE, JOHN ADAMS (1969) ....................................................22

COKE, E., INSTITUTES OF THE LAWS OF ENGLAND ......................................8

CRAMER, CLAYTON, ARMED AMERICA (2006)....................................................20, 23

CRAMER, CLAYTON, CONCEALED WEAPON LAWS OF
THE EARLY REPUBLIC (1999) ..................................................................19

Decennial Census,
http://www.census.gov/prod/www/decennial.html .................................................27

ELLIOT, J., DEBATES IN THE SEVERAL STATE
CONVENTIONS (2d ed. 1836) ...................................................................21

HALBROOK, STEPHEN, THAT EVERY MAN BE ARMED (1984)............................11, 21

HALBROOK, STEPHEN, THE FOUNDERS' SECOND AMENDMENT (2008) ....................22

Halsey, Ashley Jr., *"George Washington's Favorite Guns,"* American Rifleman 23 (February 1968)...............................................21

Hawkins, William, A Treatise of the Pleas of the Crown (1716) .................8

Held, Robert, The Age of Firearms (1957) ......................................26

Henigan, Dennis, *The* Woollard *Decision and the Lessons of the Trayvon Martin Tragedy*, 71 Md. L. Rev. 1188 (2012) .................................14

Johnson, N. *et al.*, Firearms Law and the Second Amendment: Cases and Materials (2011).........................................13

Malcolm, Joyce Lee, To Keep and Bear Arms (1994) ....................................10

*A New English Dictionary on Historical Principles* (1928) (reissued as *The Oxford English Dictionary*, 1933) .................................7

Pollock, Frederick and Maitland, Frederic W., The History of English Law Before the Time of Edward I 421 (2d ed. 1898)...................................11

*The Right To Keep And Bear Arms*, Report of the Subcommittee on the Constitution, Committee on the Judiciary, U.S. Senate, 97th Cong., 2d Sess. 3 (1982) ..........................................13

Ruben, Eric & Cornell, Saul, *Firearm Regionalism and Public Carry*, 126 Yale L.J. Forum, (forthcoming)(2015), available at http://bit.ly/1U4WwLc .......................................14

Table 11. Population of the 100 Largest Urban Places: 1880, U.S. Bureau of the Census (1998), http://www.census.gov/population/www/documentation/twps0027/tab11.txt. ......27

Tayloe, Benjamin, Our Neighbors on LaFayette Square (1872)...................21

TUCKER, ST. GEORGE, BLACKSTONE'S COMMENTARIES App. 19 (1803)................20

UNGER, HARLOW GILES , LION OF LIBERTY (2010) ..................................................21

UNITED STATES CENSUS OFFICE, CENSUS REPORTS,
TWELFTH CENSUS OF THE UNITED STATES TAKEN
IN THE YEAR 1900 (1901) ...........................................................................................28

## INTEREST OF *AMICI CURIAE*[1]

*Joyce Lee Malcolm* is the Patrick Henry Professor of Constitutional Law and the Second Amendment at George Mason University School of Law. She is an historian and constitutional scholar whose work has focused on the development of individual rights in Great Britain and America, with particular emphasis on the right to keep and bear arms. In addition to scores of scholarly articles and book chapters, she has written seven books, including the definitive TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994), and the historical study GUNS AND VIOLENCE: THE ENGLISH EXPERIENCE (2002). A Fellow of the Royal Historical Society, her work has been widely cited in judicial opinions, including several citations in *District of Columbia v. Heller.*

*Robert J. Cottrol* is the Harold Paul Green Research Professor of Law at the George Washington University Law School, where he is Professor of Law, of History, and of Sociology. He has published five books, including BROWN V. BOARD OF EDUCATION: CASTE, CULTURE AND THE CONSTITUTION (2003), which won the Langum Project Prize for Historical Literature in 2003, and GUN CONTROL

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel, and no person other than *amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

AND THE CONSTITUTION: SOURCES AND EXPLORATIONS ON THE SECOND AMENDMENT (1994), for which he served as Editor.

*Clayton E. Cramer* is the author of seven books and numerous scholarly articles published in law reviews and elsewhere. His historical books on the right to keep and bear arms include FOR THE DEFENSE OF THEMSELVES AND THE STATE: THE ORIGINAL INTENT AND JUDICIAL INTERPRETATION OF THE RIGHT TO KEEP AND BEAR ARMS (1994); CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM (1999); and ARMED AMERICA: THE REMARKABLE STORY OF HOW AND WHY GUNS BECAME AS AMERICAN AS APPLE PIE (2007).

*Nicholas Johnson* is Professor of Law at Fordham University School of Law. He is a co-author of FIREARMS LAW AND THE SECOND AMENDMENT: CASES AND MATERIALS (2011), the first law school casebook to provide comprehensive coverage of all aspects of firearms law. His latest book is the historical work NEGROES AND THE GUN: THE BLACK TRADITION OF ARMS (2014), which chronicles the history of black people defending themselves against violence.

*David B. Kopel* is Adjunct Professor of Advanced Constitutional Law at the University of Denver Sturm College of Law, and Research Director of the Independence Institute. He has published nineteen books, most of them relating to

2

firearms law, history, and the Second Amendment. He is co-author (with Professor Johnson) of FIREARMS LAW AND THE SECOND AMENDMENT (2011). He has authored more than 100 scholarly articles on a wide variety of topics, many of them on firearms laws.

*CRPA Foundation* is a non-profit 501(c)(3) corporation with headquarters in Fullerton, California. CRPA Foundation raises awareness about and defends the rights protected by the Second Amendment. It promotes firearm and hunting safety, and enhances marksmanship skills of individuals for self-protection, hunting, and competitive shooting. CRPA Foundation regularly supports scholarly and scientific research works, litigation, and other public interest efforts relating to firearms and Second Amendment rights.

*Heller* recognized that to determine the scope and meaning of the Second Amendment it was essential to examine historical English precedents and evidence from the Founding period and early Republic. Because this case turns on a similar analysis, this brief of eminent historians and legal scholars provides in-depth treatment and research which is not likely to be provided by other *amici*, which is not duplicative of the parties' briefs, and which *amici* believe should be of assistance to the Court.

# SUMMARY OF ARGUMENT

The District claims that the right to "bear arms" is not at the "core" of the Second Amendment because: "For as long as citizens have owned firearms, English and American law has restricted any right to carry in populated public places." That is inaccurate. The Statute of Northampton did not ban the peaceable carrying of arms, and instead was violated only when arms were carried "in affray of the peace," so as to cause fear or terror among the people. Case law in England down to the twentieth century consistently interpreted the Statute to include that element of the offense. For much of English history, every man was required to furnish himself with specified arms, and public practice with arms was encouraged.

In colonial America, various laws required men to go armed generally or on specified occasions. The District has identified only four states (Virginia, Massachusetts, Tennessee, and North Carolina) which had statutes similar to the Statute of Northampton in the years immediately following ratification, and only six prior to the Civil War. None of them barred lawful, peaceful carrying of arms. Only going armed to the terror of the people was prohibited.

In the first 25 years after ratification, no state restricted the carrying of weapons in public. Before the Mexican War, only a handful of states enacted concealed carry bans. Open carry was allowed in every state, and the carrying of

firearms was commonplace.  The first four Presidents all used or publicly carried firearms for protection or to engage in sport.

Statutes cited by the District allegedly requiring "reasonable cause" to carry a weapon were garden variety "surety to keep the peace" statutes, which were applicable only if the armed person's conduct gave a specific person "reasonable cause to fear an injury or breach of the peace."  The District omits this critical language.

The supposed distinction between populated and unpopulated areas, offered to justify heavy restrictions on carrying in the District, is not supported by the existence of handgun carry bans in a handful of mostly small towns in the Wild West, when nearly all major cities had no such laws.  That the District later passed a law banning possession of handguns did not save it from being declared unconstitutional in *Heller*.

## ARGUMENT

### I. THE STATUTE OF NORTHAMPTON DID NOT PROHIBIT CARRYING ARMS PEACEABLY, BUT ONLY CARRYING THEM TO TERRORIZE THE PEOPLE.

The District seeks to restrict the constitutional right to carry firearms outside the home by claiming that, if such right exists, it is not at the "core" of the Second Amendment. DC Br. 37.  The District asserts: "For as long as citizens have owned

firearms, English and American law has restricted any right to carry in populated public places." *Id.* at 39. The District and its *amici* present a thin historical narrative that distorts the actual history of the right to bear arms in England, the colonies, and the states after independence. In fact, the right to carry arms peaceably was always recognized. The District's citations support only the rule that carrying may not be in a manner which deliberately terrifies people. English law and practice show that Englishmen were obligated to possess arms, and to use them to suppress crime.

The District selectively quotes the English Statute of Northampton, passed in 1328 in a period of chaos and plague, and mischaracterizes it as a "public-carrying ban." DC Br. 40-42. To the contrary, as its text provides and as English courts interpreted it, the Statute only outlawed the use of force and arms to terrorize the people. The Statute of Northampton, 2 Edw. III, c. 3 (1328),[2] provided:

> [T]hat no man great nor small, of what condition soever he be, except the King's servants in his presence, and his ministers in executing of the King's precepts, or of their office, and such as be in their company assisting them, and also [upon a cry made for arms to keep the peace, and the same in such places where such acts happen,] be so hardy to come before the King's justices, or other of the King's ministers doing

---

[2] This quotation is from I THE STATUTES: REVISED EDITION, HENRY III TO JAMES II, A.D. 1235-6—1685 (1870). That official edition of the statutes of Great Britain contains the "law French" of the Statute of Northampton, as originally inscribed on the Great Roll, alongside the modern English translation.

their office, *with force and arms, nor bring no force in affray of the peace*, nor to go nor ride armed by night or by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere**,** upon pain to forfeit their armour[3] to the King, and their bodies to prison at the King's pleasure. (Emphasis added; remainder of statute omitted).

This was interpreted such that only carrying of arms "in affray of the peace," that is, in such manner as would cause fear or terror among the populace, violates the statute. In *Rex v. Knight*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686), the jury acquitted Sir John Knight of charges that he "did walk about the streets armed with guns" and that he went into a church with a gun, thereby "going or riding armed in affray of peace." The word "affray," used as a noun, meant "the state produced by sudden disturbance or attack; alarm; fright; terrror. Obs."[4] In accordance with that

---

[3] At the time, "armour" could include weapons in addition to a defensive covering such as chain mail. *A New English Dictionary on Historical Principles* (1928) (reissued as *The Oxford English Dictionary*, 1933) ("OED"). The third definition for "armour" is "*collect sing.* with *pl.* Military equipment or accoutrement, both offensive and defensive, in the widest sense; the whole apparatus of war. *Obs.* exc. in *Law.*" Under this entry is cited as an example: "**1809** Tomlins *Law Dict.* s.v., No go armed, in affray of the peace, on pain to forfeit their armour." For this entry, the earliest cited historical example is spelled "armure," as in the law French of the Statute of Northampton.

[4] Under the definition of "affray" cited above, the OED includes two historical examples of the usage "in affray," one contemporaneous with the Statute of Northampton. The examples are: "**1330** – *Chron.* 34 Northumberland was in affray for Edred comying…. **1523** Ld. Berners *Froissart* I. ccxv. 271 Wherof the pope and cardynalles were in great affray and drede…." In the entry for "affray" as a verb, the OED notes: "The [past participle] Affrayed, 'alarmed,' acquired the

accepted usage, "The Chief Justice said, that the meaning of the statute … was to punish people who go armed *to terrify the King's subjects.*"   *Id.*, 3 Mod. 118, 87 Eng. Rep. 76 (emphasis added).[5]

The three cases cited in the Everytown for Gun Safety Brief ("EGS Br.") at 7 do not establish that it was an offense to carry arms peaceably.  In the matter of James Harwood, the record stated:

> Forasmuch as the Court is informed of the outragious misdemeanours etc. of James Harwood of Danby, who goes armed and weaponed with a lance-staff plated with iron, pistolls, and other offensive weapons, *to the great terrour*…. a warrant be made to attach the said Harwood and him &c to be bound &c.

*Rex v. Harwood*, Quarter Sessions at Malton (Oct. 4-5, 1608) (ellipsis in original record; emphasis added), *reprinted in* North Riding Record Society, *Quarter Sess. Recs.* 132 (1884).  In quoting this record, the EGS Br. 7 omits the words "to the great terrour."

The anonymous case next mentioned (EGS Br. 7) is that of Sir Thomas Figett discussed in 3 E. COKE, E., INSTITUTES OF THE LAWS OF ENGLAND, c.73, 161.  The

meaning of 'in a state of fear,' and has since the 16th c. been treated as a distinct word: see Afraid."  Thus, to put the people or the peace "in affray" was to create a state of fear, terror, or being afraid.

[5] Hawkins confirmed that "no wearing of Arms is within the meaning of this Statute, unless it be accompanied with such Circumstances as are apt to terrify the people."  1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN, ch. 63, § 9 at 135-36 (1716).

offense charged was that Figett "went armed under his garments, *as well in the palace, as before the justice of the king's bench*; *for both which* upon complaint made, he was arrested [by the Chief Justice of King's Bench]." *Id.* (emphasis added). Figett's offense was going armed in the palace and before the justice, or in the Statute's words, coming "before the King's justices, or other of the King's ministers doing their office, with force and arms."

Nor does the third case cited (EGS Br. 7) provide support for the thesis that carrying arms peacefully was prohibited. At the Middlesex Session of Oyer and Terminer a jury convicted Edward Mullins of "going Armed with a Cutlass Contrary to the Statute." *Middlesex Sessions: Justices' Working Documents* (1751), available at http://bit.ly/1U8OhO7 . The record in the Oyer and Terminer case does not disclose the facts underlying the violation. However, the page cited shows that the Middlesex General Quarter Sessions court contemporaneously convicted Mullins of "making an Assault upon one John Jew...." *Id.* He was fined and committed to Newgate for both offenses. *Id.* Mullins was obviously not carrying arms peaceably.

The requirement of an intent to terrify the public was carried down to the nineteenth and twentieth centuries by English courts. *Rex* v. *Dewhurst*, 1 State Trials, N.S. 529, 601-02 (1820), explained: "But are arms suitable to the condition

9

of people in the ordinary class of life, and are they allowed by law?  A man has a clear right to protect himself when he is going singly or in a small party upon the road where he is travelling or going for the ordinary purposes of business."

The Statute was held applicable to one who made himself "a public nuisance by firing a revolver in a public place, with the result that the public were frightened or terrorized."  *Rex v. Meade*, 19 L. Times Repts. 540, 541 (1903).  But it did not apply to one who peaceably walked down a public road while armed with a loaded revolver, because the offense was "to ride or go armed without lawful occasion *in terrorem populi*...."  *Rex v. Smith*, 2 Ir. Rep. 190, 204 (K.B. 1914).  The court explained:

> The words "in affray of the peace" in the statute, being read forward into the "going armed," render the former words part of the description of the statutable offence.  The indictment, therefore, omits two essential elements of the offence – (1) That the going armed was without lawful occasion; and (2) that the act was *in terrorem populi.*

*Id*.

Thus, under English law before and after the founding period, carrying arms in public was an offense only if done to terrorize the people.

In fact, "[f]or much of English history … the emphasis was on extending and fixing the obligation to keep and supply militia weapons, not disarming Englishmen."  JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 4 (1994).  The

Assize of Arms, enacted in 1181, required all freemen to provide themselves with specified arms.  STEPHEN HALBROOK, THAT EVERY MAN BE ARMED 38 (1984).  "So keen were monarchs to develop a citizen-army that by 1252 not only freemen but the richer villeins were ordered to be armed, and in the years that followed unfree peasants were included as well."  MALCOLM at 4.  It was said that the state "pays little heed to the line between free and bond, it expects all men, not merely all freemen, to have arms…."  *Id.* (quoting I FREDERICK POLLOCK AND FREDERIC W. MAITLAND, THE HISTORY OF ENGLISH LAW BEFORE THE TIME OF EDWARD I 421 (2d ed. 1898)).

They were also required to use them in the pursuit of felons in the context of the "hue and cry" and the "watch and ward."  4 BLACKSTONE, COMMENTARIES *289-90 (1769).  "From at least the early Middle Ages, whenever a serious crime occurred villagers, 'readily appareled,' were to raise a 'hue and cry'" and pursue the culprit under penalty of a fine. MALCOLM at 2 (citation omitted).  The people were also required to keep watch and ward:

> Town gates were closed from sundown to sunrise, and each householder was required to take his turn keeping watch at night or ward during the day.  The watch was to be carried out "by men able of body, and sufficiently weaponed."

*Id.* at 3 (citation omitted).

The Recorder of London, the city's legal counsel, confirmed that having arms was "by the ancient laws of this kingdom, not only as a *right,* but as a *duty*; for all the subjects of the realm, who are able to bear arms, are bound to be ready, at all times, to assist the sheriff, and other civil magistrates, in the execution of the laws and the preservation of the public peace."  WILLIAM BLIZARD, DESULTORY REFLECTIONS ON THE POLICE 59-60 (1785).

Englishmen were further required to practice with arms.  "Villages were instructed to maintain targets or butts at which local men were to practice, first with the longbow, later with the musket." MALCOLM at 6 (citing 33 Henry VIII, c. 9 (1541)).  On pain of a fine, every family was required "to provide each son, at the age of seven, with a bow and two shafts and to see to it that the child knew how to use them." *Id.* (citing 33 Henry VIII, c. 3 (1541)).

These activities required much public carrying and exercise with arms.  The argument (EGS Br. 6) that the sight of someone carrying arms, without threats, violence, or disturbance of the peace, would necessarily terrify the people is insupportable.

## II.  PEACEABLY CARRYING ARMS WAS NOT PROHIBITED IN THE COLONIES, BUT WAS OFTEN REQUIRED BY LAW.

As was typical in the colonies, colonial Virginia did not restrict firearms.

Instead, it required men to have and carry them:

> In 1623, Virginia forbade its colonists to travel unless they were "well armed"; in 1631 it required colonists to engage in target practice on Sunday and to "bring their peeces to church." In 1658 it required every householder to have a functioning firearm within his house and in 1673 its laws provided that a citizen who claimed he was too poor to purchase a firearm would have one purchased for him by the government, which would then require him to pay a reasonable price when able to do so.

*The Right To Keep And Bear Arms*, Report of the Subcommittee on the Constitution, Committee on the Judiciary, U.S. Senate, 97th Cong., 2d Sess. 3 (1982) (citations omitted).

Ownership of arms was also required in colonial Massachusetts. "[T]he first session of the legislature ordered that not only freemen, but also indentured servants own firearms and in 1644 it imposed a stern 6 shilling fine upon any citizen who was not armed." *Id.* at 3 (citation omitted).

Other colonies had similar laws.[6] For example:

> A Newport [R.I.] law of 1639 provided that "noe man shall go two miles from the Towne unarmed, either with Gunn or Sword; and that none shall come to any public Meeting without his weapon."…. [I]n 1770, not long before the Revolution, the colony of Georgia felt it necessary "for the better security of the inhabitants" to require every white male resident "to carry firearms to places of public worship."

---

[6] See N. JOHNSON *et al.*, FIREARMS LAW AND THE SECOND AMENDMENT 101-09 (2011) (all colonies except Pennsylvania had some form of arms mandate).

MALCOLM at 139 (citations omitted).  Carrying arms was not prohibited; it was often mandatory.

### III.   NO STATE PROHIBITED THE PUBLIC CARRYING OF ARMS IN THE EARLY REPUBLIC.

The District next asserts that the "tradition of restricting both the concealed and the open carry of firearms in public places … was reflected in various state laws immediately following the ratification of the Constitution…."[7]  DC Br. 40 (quoting Dennis Henigan, *The* Woollard *Decision and the Lessons of the Trayvon Martin Tragedy*, 71 MD. L. REV. 1188, 1202 (2012)).[8]  The footnoted source for this quoted statement cites to *no* specific laws, but only references a forthcoming article.

The District then claims that "Massachusetts, Virginia, North Carolina, Tennessee, Maine, Delaware, New Mexico, and South Carolina all adopted the public carrying ban of the Statute of Northampton." DC Br. 40-41, citing Eric Ruben & Saul Cornell, *Firearm Regionalism and Public Carry*, 126 Yale L.J. Forum, (forthcoming), at 11 n.49 (2015), available at http://bit.ly/1U4WwLc (citing statutes); 1694 Mass. Laws 12, No. 6; 1859 N.M. Laws 94, § 2; and 1870 S.C. Laws 402, No. 288.  These latter three citations are to a colonial statute, an 1859

---

[7] "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them…." *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008).

[8] Dennis Henigan was Vice President of the Brady Center to Prevent Gun Violence.

New Mexico Territorial law, and a Reconstruction-era law of South Carolina, none of which relate to the period immediately following ratification. Ruben and Cornell's footnote 49 cites only six states.[9] One of those is Maine, which did not become a state until detached from Massachusetts in 1820.[10] The Delaware law cited is from 1852, which precedes the state constitutional adoption of the right to arms in 1987, and is not "immediately following ratification of the Constitution."[11]

Thus, the District has identified only four states (Virginia, Massachusetts, Tennessee, and North Carolina) which had statutes similar to the Statute of Northampton in the years immediately following ratification, and only six prior to the Civil War. None of them barred lawful, peaceful carrying of arms; all of them prohibited riding or going armed when doing so was in a manner to the terror of the people, citizens, or country.

Virginia's Act Forbidding and Punishing Affrays (1786) recited that no man

---

[9] They cite: 1786 Va. Laws 33, ch. 21; 1792 N.C. Laws 60, 61 ch. 3; 1795 Mass. Laws 436, ch. 2; 1801 Tenn. Laws 710, § 6; 1821 Me. Laws 285, ch. 76, § 1; 1852 Del. Laws 330, 333, ch. 97, § 13.

[10] The Maine provision, similar to the Massachusetts statute discussed below, only operates against "such as shall ride or go armed *offensively*, to the *fear or terror of the good citizens of this State*…." 1821 ME. LAWS 285, ch. 76, § 1.

[11] The Delaware provision directed Justices of the Peace to act against "all affrayers, rioters, breakers and disturbers of the peace, and all who go armed *offensively* to the *terror of the people* …." 1852 LAWS OF THE STATE OF DELAWARE 330, 333, ch. 97, § 13 (emphasis added).

shall "go nor ride armed … *in terror of the country*…." A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC AND PERMANENT NATURE, AS ARE NOW IN FORCE, ch. 21, at 30 (1803) (emphasis added). The 1795 Massachusetts enactment punished "affrayers, rioters, and disturbers, or breakers of the peace," and "such as shall ride or go armed *offensively, to the fear or terror of the good citizens of this Commonwealth*…." 2 PERPETUAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 259 (1801) (emphasis added).

In 1801, Tennessee penalized any person who "shall publicly ride or go armed *to the terror of the people*, or privately carry any dirk, large knife, pistol or any other dangerous weapon, *to the fear or terror of any person*…." I THE STATUTE LAWS OF THE STATE OF TENNESSEE c. 22, § 6 (1831) (emphasis added).

What is misleadingly cited as "1792 N.C. Laws 60, 61 ch. 3" is not a codification of statutes or list of session laws actually passed by the North Carolina legislature, but rather is a work by François-Xavier Martin entitled A COLLECTION OF THE STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA (1792). Later compilers of the North Carolina laws said that this work "was utterly unworthy of the talents and industry of the distinguished compiler, omitting many statutes, always in force, and inserting many others, which never were, and never could have been in force, either in the Province, or in the

State." REVISED CODE OF NORTH CAROLINA, Preface of the Commissioners of 1838 xiii (1855).

In 1749, the North Carolina General Assembly adopted a list of English statutes, not including the Statute of Northampton. A COLLECTION OF ALL THE PUBLIC ACTS OF ASSEMBLY OF THE PROVINCE OF NORTH-CAROLINA c. I, 293, 295 (1752). A 1741 act, however, required constables to take an oath to arrest those "as, in your Sight, shall ride or go armed *offensively*, or shall commit or make any Riot, Affray, or other Breach of his Majesty's Peace." *Id.* c. V, 131 (emphasis added). The North Carolina statute book compiled after the Constitution was ratified did not include the Statute, although it included a similar constable's oath. I J. IREDELL, THE PUBLIC ACTS OF THE GENERAL ASSEMBLY OF NORTH-CAROLINA 47 (F. Martin rev. 1804). [12]

The Statute was included in a revision of North Carolina laws published in 1821. LAWS OF THE STATE OF NORTH-CAROLINA, INCLUDING THE TITLES OF SUCH STATUTES AND PARTS OF STATUTES OF GREAT BRITAIN AS ARE IN FORCE IN SAID STATE iv-vi, 87 (1821). Not long after, the General Assembly passed an act

---

[12] The original compilation of North Carolina statutes was made by James Iredell and published in 1791. See REVISED CODE OF NORTH CAROLINA xii-xiii (1855). The 1804 revised version by Martin added changes since then. Both of these volumes were officially approved by the legislature. *Id.*

declaring that the statutes of England or Great Britain shall cease to be in effect or force in North Carolina as of 1838.  *See State v. Huntley*, 25 N.C. 418, 420 (1843).

*Huntley* opined that going armed with unusual and dangerous weapons to the terror of the people was a common law offense, *id.* at 420-21, but distinguished that from the constitutional right to bear arms.  Noting that "there is scarcely a man in the community who does not own and occasionally use a gun of some sort," the Court held that:

> the carrying of a gun, per se, constitutes no offence. For any lawful purpose--either of business or amusement--the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result, which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people.

*Id.* at 422-23.

The District's version of the Statute also stated that no man shall "nor go, nor ride armed by night nor by day, in fairs, or markets, or in other places, *in terror of the country*…." CODE OF LAWS FOR THE DISTRICT OF COLUMBIA 253-54 (1818) (emphasis added). Such a law would be obviously constitutional; it furnishes no precedent for restricting peaceable carry.

The District further implies that in the post-ratification period, "[m]ost states enacted laws banning the carrying of concealed weapons."  DC Br. 41, citing

*Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 95 (2d Cir. 2012)  Yet in the first 25 years of the Republic, no state had a concealed or open carry ban.  Prior to the Mexican-American war, only eight states[13] restricted concealed carry in any way, and all of them permitted open carry of pistols, rifles, and shotguns.  The list of concealed carry statutes in *Kachalsky* embraces only a minority of states, most of those statutes were enacted in the late nineteenth century, and none of them banned carry of all firearms.

The handful of states that placed some limitation on concealed carry in the Early Republic underscores an important point: if the Statute of Northampton formed the basis for the "tradition of restricting both the concealed and the open carry of firearms in public places," DC Br. 40, then there was no need to pass concealed carry laws in those states where the Statute was in force.  As shown, the Statute and its American embodiments did not restrict carry *per se*, but only when

---

[13] Those eight states were Kentucky (1813), Louisiana (1813), Indiana (1820), Arkansas (1837-38), Georgia (1837), Tennessee (1838), Virginia (1838), and Alabama (1839).  *See* C. CRAMER, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC 2-3 (1999).  Not all of these banned carrying concealed firearms.  Tennessee's law applied only to Bowie knives and "Arkansas toothpicks," *id.* at 109-10, and Virginia's law applied only to persons who "habitually or generally" carried concealed weapons.  *Id.* at 114-15.  Kentucky's statute was declared unconstitutional.  *Bliss v. Commonwealth*, 12 Ken. (2 Litt.) 90 (1822).  Others were upheld because they allowed open carry.  *State v. Reid*, 1 Ala. 612 (1840); *Nunn* v. *State*, 1 Ga. 243 (1846); *State* v. *Chandler*, 5 La. Ann. 489 (1850).

done to the terror of the people.

Not only were firearms ubiquitous in the early Republic, but possessing them was mandatory for most men. The federal Militia Act of 1792 required "every free able-bodied white male citizen" aged 18 through 44 years to be enrolled in the militia, and to "provide himself with a good musket or firelock," "or with a good rifle," and to "appear so armed, accoutred and provided, when called out to exercise or into service." C. XXVIII, 2d Cong., Sess. I (1792). Carrying firearms was commonplace. In discussing a provision of English law that assembling a band of armed men could create a presumption of treason, the leading legal scholar of the time, St. George Tucker, made it clear that this did not apply in America:

> But ought that circumstance of itself, to create any such presumption in America, where the right to bear arms is recognized and secured in the constitution itself? In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side.

V St. George Tucker, Blackstone's Commentaries App. 19 (1803).

Enormous evidence exists that carrying and use of firearms was entirely ordinary, sometimes nearly universal, in colonial times and in the early Republic. *See* Clayton Cramer, Armed America (2006).

Patrick Henry stirred the Virginia Ratification Convention by declaring, "The

great object is, that every man be armed…. Everyone who is able may have a gun." 3 J. ELLIOT, DEBATES IN THE SEVERAL STATE CONVENTIONS 386 (2d ed. 1836). As a lawyer before the Revolution, Henry lived "just north of Hanover town, but close enough for him to walk to court, his musket slung over his shoulder to pick off small game for [his wife] Sarah's table." HARLOW GILES UNGER, LION OF LIBERTY 30 (2010).

George Washington owned perhaps 50 firearms, and some of his pistols, saddle holsters, and fowlers (shotguns) may be seen today at Mt. Vernon and West Point.[14] After the Revolutionary war ended, Washington and his servant Billy were riding on horseback from Alexandria to Mount Vernon. "As was then the custom, the General had holsters, with pistols in them, to his saddle." A ruffian forbade him from passing and threatened to shoot him. Washington handed his pistol to Billy, saying "If this person shoots me, do you shoot him," and rode on without incident.[15]

Our second President, John Adams, spent his youth playing games and sports, and "above all, in shooting, to which diversion I was addicted to a degree of ardor which I know not that I ever felt for any other business, study, or

---

[14] Ashley Halsey, Jr., *George Washington's Favorite Guns*, AMERICAN RIFLEMAN 23 (February 1968).
[15] BENJAMIN TAYLOE, OUR NEIGHBORS ON LAFAYETTE SQUARE 47 (1872).

amusement."[16]  A biographer states:

> John's zest for shooting prompted him to take his gun to school,
> secreting it in the entry so that the moment school let out he might dash
> off to the fields after crows and squirrels. [The schoolmaster's]
> scolding did not daunt him; he simply began to leave his gun at the
> home of an old woman who lived close by.[17]

Thomas Jefferson was an avid shooter and gun collector.  His memorandum books kept between 1768 and 1823 show numerous references to the acquisition of pistols, guns, muskets, rifles, fusils, gun locks and other gun parts, the repair of firearms, and the acquisition of ammunition.  Included were a pair of "Turkish pistols … so well made that I never missed a squirrel at 30 yds. with them."[18]

Jefferson carried one or both of these Turkish pistols when traveling as U.S. President.  In an 1803 letter, Jefferson wrote to an innkeeper at Orange Courthouse, between Monticello and Washington: "I left at your house … a pistol in a locked case, which no doubt was found in your bar after my departure. I have written to desire Mr. Randolph or Mr. Eppes to call on you for it, as they come on to Congress, to either of whom therefore be so good as to deliver it."[19] Jefferson hoped

---

[16]  ANNE BURLEIGH, JOHN ADAMS 8-9 (1969) (quoting III DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 257 (1961)).
[17]  *Id.* at 9 (citing III DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 258-59 n.6).
[18]  *See* references in STEPHEN HALBROOK, THE FOUNDERS' SECOND AMENDMENT 318 n.40 (2008).
[19]  Jefferson's letter to Randolph also survives.  Both letters are available on the

that Randolph or Eppes, both members of Congress, could bring the pistol to the White House. None of these eminent statesmen seems to have been aware that the "Statute of Northampton's public carrying ban" (DC Br. 42) rendered carrying of pistols illegal—because it did not.

James Madison, in a 1775 missive, extolled the marksmanship "skill of the Virginians" (including himself) with the rifle:

> The strength of this Colony will lie chiefly in the rifle-men of the Upland Counties, of whom we shall have great numbers…. The most inexpert hands rec[k]on it an indifferent shot to miss the bigness of a man's face at the distance of 100 Yards. I am far from being among the best & should not often miss it on a fair trial at that distance.

CLAYTON CRAMER, ARMED AMERICA 151 (2006) (quoting I JAMES MADISON, WILLIAM T. HUTCHINSON AND WILLIAM M.E. RACHAL, ED., THE PAPERS OF JAMES MADISON 153 (1962)).

The first four Presidents openly carried firearms. They obviously did not share the District's theory that a 1328 English statute made it illegal for them to do so in America.

---

Library of Congress website:
http://memory.loc.gov/cgi-bin/ampage?collId=mtj1&fileName=mtj1page029.db&recNum=210 and
http://memory.loc.gov/cgi-bin/ampage?collId=mtj1&fileName=mtj1page029.db&recNum=208

## IV. NINETEENTH CENTURY STATUTES REQUIRING RECOGNIZANCE OR SURETIES WERE NOT PROHIBITIONS ON PUBLIC CARRY.

The District contends that, similar to some states, D.C. law in 1857 provided that "public carrying was allowed only for people with 'reasonable cause to fear an assault or other injury or violence to his person.'" DC Br. 42. (citing Revised Code of the District of Columbia at 570). The District failed to quote essential language of the statute.

These laws were not restrictions on carrying, but were garden variety "surety to keep the peace" statutes. If an individual, by conduct or words, threatened another, or threatened to disturb the peace, he could be required to give a recognizance and find sureties to keep the peace. The District law empowered judges to "require persons to give security to keep the peace, or for their good behavior." THE REVISED CODE OF THE DISTRICT OF COLUMBIA c. 141, § 1 (1857). The law further provided that "Whenever complaint shall be made to any such magistrate that any person has *threatened to commit an offence* against the person or property of another" certain proceedings may be had, including that "he may be required to enter into a recognizance, with sufficient sureties, in such sum as the magistrate shall direct, to keep the peace towards all the people of this District, and

especially towards the person requiring such security…." *Id.* §§ 2, 4 (emphasis added). This applied to persons who "make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property," and those who "shall contend with hot and angry words, to the disturbance of the peace…." *Id.* § 15.

In the next section, it stated: "If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, *on complaint of any person having reasonable cause to fear an injury or breach of the peace*, be required to find sureties for keeping the peace for a term not exceeding six months…." *Id.* § 16 (emphasis added). The District's brief omits this italicized language. DC Br. 42. The statute was not a prohibition on carrying arms without reasonable cause, but only applied if the armed individual caused another to reasonably fear an injury or breach of the peace.

## V. THE HANDFUL OF LATE NINETEENTH CENTURY LAWS PROHIBITING CARRY IN SOME TOWNS WERE UNUSUAL AND WERE IN RESPONSE TO TRANSITORY CONDITIONS.

The alleged distinction between carrying in populated places as opposed to unpopulated places has no basis in history or tradition. The Supreme Court rejected claims for a watered-down Second Amendment in urban areas. *Heller*, 554 U.S. at

634 (rejecting dissent's argument for special rule "because the law is limited to an urban area").

The District asserts that "London began enacting gun-control laws '[a]s early as the 1300s.'" DC Br. 42-43 (citing Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82, 113 (2013)). Yet the law cited by Blocher was promulgated in 1285 and does not mention guns, which had not yet been invented in England or Europe.[20] The statute did not simply forbid going about the city streets "with Sword or Buckler, or other Arms for doing Mischief." EGS Br. 4. It prohibited *anyone* from being on the streets after curfew, except a "great man," "other lawful person of good repute," or their "certain messenger":

> [I]t is enjoined that none be so hardy to be found going or wandering about the Streets of the City, after curfew tolled at St. Martin's le Grand, with Sword or Buckler, or other Arms for doing mischief, or whereof evil suspicion might arise, *nor any in any other manner*, unless he be a great man or other lawful Person of good repute, or their certain messenger, having their Warrants to go from one to another, with Lanthorn [lantern] in hand.

Statutes for the City of London, 13 Edw. I (1285) (emphasis added).

The District then contends that "By the late 1800s, many cities completely

---

[20] "[T]he first firearms which could be considered crude but nonetheless truly functional guns appeared in the form of the early *matchlocks* … in the second quarter of the fifteenth century." ROBERT HELD, THE AGE OF FIREARMS 26 (1957).

banned public carrying." DC Br. 43 (citing ten ordinances nationwide). That statement should properly read: "almost no cities." Of the ten cities listed, only two (Syracuse and Nashville) appeared in Census Bureau's 1880 listing of the top *one hundred* most populous cities in the United States.[21] So, 98 cities had no carry restriction, but two did. The largest cities such as New York, Chicago, Philadelphia, St. Louis, Boston, Baltimore, Cleveland, Buffalo, San Francisco, Cincinnati, Pittsburgh, New Orleans, Detroit, Milwaukee, Louisville, Minneapolis-St. Paul, Indianapolis, Kansas City, and Denver had no such ordinances. Open and concealed carry was lawful in nearly all large cities.

In the censuses closest to the enactment of each ordinance in the other eight listed cities, their populations were:[22]

Nebraska City, Nebraska (1870):        6,050

Los Angeles, California (1880):        11,183

Salina, Kansas (1880):        3,111

Dallas, Texas (1890)        42,638

Rawlins, Wyoming (1890):        2,235

---

[21] Table 11. Population of the 100 Largest Urban Places: 1880, U.S. Bureau of the Census        (1998), http://www.census.gov/population/www/documentation/twps0027/tab11.txt.

[22] All census figures cited are available at http://www.census.gov/prod/www/decennial.html.

Checotah, (Oklahoma) (1890):          400 (est.)[23]

Wichita, Kansas (1900):               24,071

McKinney, Texas (1900):               4,342

In short, no basis exists for the District's attempt to read an urban/rural distinction into English and American weapons laws. What one *does* immediately notice about the ten cities cited by the District is that most were in the "Wild West," particularly in the cattle drive area extending from Texas through Kansas, and up into Nebraska and Wyoming. The passage of these ordinances was driven by short-lived local conditions—namely the frequent mass arrival of large numbers of transient cowboys eager for excitement in town. The laws do not show that carry bans are somehow justified in large urban areas.

## CONCLUSION

The District Court's order granting a preliminary injunction should be affirmed.

---

[23] In 1890, Oklahoma was not yet a state, and Checotah was a town in the Creek Nation territory. Figures for the 1890 census do not appear to be available, but in 1900 Checotah had a population of 805. I UNITED STATES CENSUS OFFICE, CENSUS REPORTS, TWELFTH CENSUS OF THE UNITED STATES TAKEN IN THE YEAR 1900 427 (1901). Since the population of the Creek Nation settlement had more than doubled between 1890 and 1900, *id.,* the population of Checotah was probably about 400 or fewer in 1890.

Respectfully submitted,

/s/ Stephen P. Halbrook
Stephen P. Halbrook
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
(703) 352-7276
protell@aol.com

/s/ Dan M. Peterson
Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
(703) 352-7276
dan@danpetersonlaw.com

*Counsel for Amici Curiae*

C. D. MICHEL
MICHEL & ASSOCIATES, P.C.
180 EAST OCEAN BLVD., SUITE 200
LONG BEACH, CA 90802
(562) 216-4444
cmichel@michellawyers.com

*Counsel for California Rifle and Pistol
Association Foundation*

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure. According to the word count feature of the word-processing system used to prepare the brief, it contains 6,818 words, exclusive of those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the foregoing brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6). It was prepared in a proportionately spaced typeface using 14-point Times New Roman font in Microsoft Word.

/s/ Stephen P. Halbrook
Stephen P. Halbrook

Counsel for *Amici Curiae*

Date: October 7, 2015

**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2015, an electronic PDF of the foregoing Brief of *Amici Curiae* Historians, Legal Scholars, and California Rifle and Pistol Association Foundation was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

/s/ Stephen P. Halbrook
Stephen P. Halbrook
