ORAL ARGUMENT SCHEDULED FOR NOVEMBER 20, 2015

No. 15-7057

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

BRIAN WRENN, *et al.*,
APPELLEES,

V.

DISTRICT OF COLUMBIA, *et al.*,
APPELLANTS.

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**REPLY BRIEF OF THE DISTRICT OF COLUMBIA AND
METROPOLITAN POLICE DEPARTMENT CHIEF CATHY LANIER**

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—The District of Columbia and Metropolitan Police Department Chief Cathy Lanier are appellants here and defendants below. Brian Wrenn, Joshua Akery, Tyler Whidby, and the Second Amendment Foundation, Inc., are appellees here and plaintiffs below. *Amici curiae* for appellants are the Brady Center to Prevent Gun Violence, the Law Center to Prevent Gun Violence, the Violence Policy Center, Everytown for Gun Safety, the D.C. Appleseed Center for Law & Justice, D.C. Democracy, D.C. Vote, the League of Women Voters of D.C., former Mayor Anthony Williams, and the states of Maryland, California, Connecticut, Illinois, Massachusetts, and New York. *Amici curiae* for appellees are the National Rifle Association of America and a group including the California Rifle and Pistol Association Foundation and Professors Joyce Lee Malcolm, Robert J. Cottrol, Clayton Cramer, Nicholas Johnson, and David B. Kopel.

B. *Rulings under review*.—The District and Chief Lanier appeal an order issued on May 18, 2015 by District Court Judge Frederick J. Scullin, Jr., granting plaintiffs' motion for a preliminary injunction (ECF Record Document 13).

C. *Related cases*.—In July 2014, in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), the district court (Scullin, J.) struck down the District's prohibition on the public carrying of handguns. An appeal was filed (No. 14-7180) but was voluntarily dismissed in light of amendments to the District's

gun laws. Plaintiffs filed this action as a "related case" in the district court, presumably because at that time a post-judgment motion was pending in *Palmer* that challenged the constitutionality of the amended law challenged here. That motion was denied on May 18, 2015.

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ................................................................1

ARGUMENT ..................................................................................3

    I.    The District Court's Legal Error Invalidates Its Analysis ...................3

    II.   Under A Proper View Of The Law, The District Is Likely To Prevail ................................................................................7

        A.    The "good reason" standard survives intermediate scrutiny ................................................................7

        B.    Plaintiffs are unlikely to succeed on their absolutist view .......12

            1.    The District's appeal does not ask whether the Second Amendment preserves a right to "bear arms" outside the home .................................................12

            2.    Federal appellate courts universally uphold the "good reason" standard ...................................................15

            3.    Historically, carrying in populated public places has been subject to strict regulation, as the District will demonstrate on a full record ...................................17

            4.    Prior restraint is inapplicable .........................................25

    III.   The District Court Wrongly Presumed Irreparable Harm To Plaintiffs And Then Balanced The Equities In Their Favor ..............26

        A.    Plaintiffs have not demonstrated irreparable harm ..................26

        B.    Plaintiffs cannot refute the irreparable harm the preliminary injunction will cause the District and the public .........................................................................28

CONCLUSION ...............................................................................31

# TABLE OF AUTHORITIES*

*Cases*

*Bonidy v. USPS*, 790 F.3d 1121 (10th Cir. 2015) ....................................................8

*\*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ..................................................... 7, 26, 27

*\*District of Columbia v. Heller*,
554 U.S. 570 (2008) ("*Heller I*") ................................. 10, 12, 14, 18, 19, 23, 24, 27

*\*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013), *cert. denied sub nom. Drake v. Jerejian*, 134 S. Ct. 2134 (2014) ................................................................. 11, 15, 25

*Gadomski v. Tavares*, 113 A.3d 387 (R.I. 2015) ....................................................16

*Gonzales v. Carhart*, 550 U.S. 124 (2007) .............................................................13

*Gordon v. Holder*, 632 F.3d 722 (D.C. Cir. 2010) ..................................................7

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) .................................................11

*\*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ............................ 4, 5, 6, 9, 12, 24, 25

*Heller v. District of Columbia*,
No. 08-1289 (D.C. Cir. Sep. 18, 2015) ("*Heller III*") ........................ 3, 5, 6, 8, 9, 17

*Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012) ......................................25

*\*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ........................ 4, 5, 9, 13

*\*Kachalsky v. Cnty. of Westchester*, 701 F.3d 101 (2d Cir. 2012), *cert. denied sub nom. Kachalsky v. Cacace*, 133 S. Ct. 1806 (2013) ............................ 11, 12, 15

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987).................9

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

*Lakewood v. Plain Dealer Publ'g*, 486 U.S. 750 (1998)..........................................26

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................27

*Maryland v. King*, 133 S. Ct. 1 (2012) ....................................................................28

*\*Mazurek v. Armstrong*, 520 U.S. 968 (1997)........................................... 18, 24, 25

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................................10

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ........................................... 15, 16

*New Comm Wireless Servs. v. SprintCom*, 287 F.3d 1 (1st Cir. 2002) ....................7

*Nken v. Holder*, 556 U.S. 418 (2009)................................................................ 27, 28

*NYSPRA, Inc. v. Cuomo*, No. 14-36 (2d Cir. Oct. 19, 2015) ..................................4, 9

*People v. Zerillo*, 189 N.W. 927 (Mich. 1922).......................................................17

*Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *vacated pending rehearing en banc*, 781 F.3d 1106 (9th Cir. 2015)......................................... 4, 5, 16

*Reichle v. Howards*, 132 S. Ct. 2088 (2012) ..........................................................13

*\*Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) ......................................... 3, 11

*Schubert v. De Bard*, 398 N.E.2d 1339 (Ind. Ct. App. 1980)..................................17

*Simpson v. State*, 13 Tenn. 356 (Tenn. 1833) ........................................................19

*Turner Broad. Sys. v. FCC*, 512 U.S. 622 (1994) ("*Turner I*")...............................12

*\*Turner Broad. Sys. v. FCC*, 520 U.S. 180 (1997) ("*Turner II*") .............. 3, 4, 8, 11

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)........................ 8, 9, 18

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009) ....................................24

*Wisc. Gas v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)................................................27

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir.), *cert. denied*,
134 S. Ct. 422 (2013) ......................................................................... 11, 15

*Young v. Am. Mini Theatres*, 427 U.S. 50 (1976) ....................................10


## Statutes and Regulations

18 U.S.C. § 926A .......................................................................................14

D.C. Code § 7-2509.11(1) .........................................................................26

D.C. Code § 22-4504.01 ............................................................................14

D.C. Code § 22-4506(a) ............................................................................26

24 DCMR § 1202 .......................................................................................26

24 DCMR § 1221.6 .....................................................................................26

24 DCMR § 2333 ........................................................................................26


## Other Authorities

Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013) .......................... 23, 24

Patrick Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1 (2012) .................20

Patrick Charles, *The Statute of Northampton by the Late Eighteenth Century: Clarifying the Intellectual Legacy*,
41 Fordham Urb. L.J. City Square 10 (2013) ............................................ 19, 20, 21

John Donohue, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* (2014).................29

William Hawkins, 1 *Treatise of the Pleas of the Crown*, ch. 63 (1716)........... 21, 22

Eric M. Ruben & Saul A. Cornell, *Firearm Regionalism and Public Carry:
Placing Southern Antebellum Case Law in Context*,
125 Yale L.J. F. 121 (2015) ....................................................................... 20, 21, 23

Adam Winkler, *Scrutinizing the Second Amendment*,
105 Mich. L. Rev. 683 (2007)................................................................................17

# GLOSSARY

EA        Everytown Appendix

JA        Joint Appendix

RD        Record Document

## SUMMARY OF ARGUMENT

1.  The district court applied the wrong test—and therefore committed legal error—in assessing plaintiffs' likelihood of success on the merits.  It adopted intermediate scrutiny, but failed to apply that test correctly.  This error irrevocably taints the court's ultimate conclusion: that plaintiffs are so likely to prevail that they deserve full relief at the outset of litigation, despite their admission that they have no particular reason to fear physical harm without a public-carry license and despite the District of Columbia's interest in enforcing its public-safety law.  This indisputable error warrants vacatur or, at minimum, remand for reconsideration under true intermediate scrutiny (and before an authorized judge).

2.  Under that test, the District is likely to prevail.  It provided the requisite substantial evidence that the "good reason" standard will prevent crime and promote public safety.  This same evidence demonstrates that the standard is properly tailored.  Although the Council for the District of Columbia had strong evidence that public carrying comes at great societal cost, it enacted the "good reason" standard to ensure that the public will bear this cost for individuals with special self-defense needs.

Plaintiffs do not seriously dispute this evidence or the District's proffer of what it will show on a full record—or that the district court misunderstood intermediate scrutiny.  They instead ask this Court to radically depart from the

reasoning below in favor of a categorical ruling: that the Second Amendment codified an inviolable right to carry handguns on crowded city streets regardless of reason. But English and early-American laws generally imposed stricter regulation on public carrying than on home possession, especially in cities. These laws demonstrate that the District's "good reason" standard warrants nothing more rigorous than intermediate scrutiny, and that plaintiffs lack the clear entitlement to relief necessary to justify a preliminary injunction.

3. The equities favor the District. Plaintiffs claim irreparable harm to intangible interests like the "sense of security" they get from public carrying. But it is the right of self-defense that is central to the Second Amendment, not some inchoate feeling one gets from carrying a firearm. If no occasion arises where a handgun is needed for self-defense, its absence cannot cause irreparable harm.

In contrast, the District—and the public—will be irreparably harmed if the District cannot uniformly enforce its law. Indeed, plaintiffs do not dispute the District's evidence that, without the "good reason" standard, the District will likely experience substantially higher rates of gun violence.

Finally, plaintiffs argue that the public has no interest in the enforcement of an unconstitutional law. But the point of further proceedings is to see whether plaintiffs can prove this law unconstitutional. This case is in its infancy—the District has yet to conduct discovery, gather evidence, present experts, and submit a full argument to

the district court. And the public has spoken through its elected representatives, who have found the "good reason" standard essential for public safety. The interests of the public and the District are therefore aligned, and they strongly favor maintaining the status quo during litigation.

## ARGUMENT

### I. The District Court's Legal Error Invalidates Its Analysis.

The district court held that the "good reason" standard should be reviewed under intermediate scrutiny, then failed to apply that test as required by binding precedent. This legal error infects the court's entire discretionary analysis and requires vacatur.

Intermediate scrutiny is a two-prong test: "the District has to show, first, that it 'promotes a substantial governmental interest that would be achieved less effectively absent the regulation,' and second, that 'the means chosen are not substantially broader than necessary to achieve that interest.'" *Heller v. District of Columbia*, No. 08-1289, Maj.Op. 12 (D.C. Cir. Sep. 18, 2015) (petition for rehearing pending) ("*Heller III*"). This Court "afford[s] 'substantial deference to the predictive judgments of [the legislature],'" *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013), both "as to the harm to be avoided and to the remedial measures adopted for that end," *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 196 (1997) ("*Turner II*"). The Court's role is to "assure that … [the legislature] has

drawn reasonable inferences based on substantial evidence." *Heller v. District of Columbia*, 670 F.3d 1244, 1259 (D.C. Cir. 2011) ("*Heller II*"); *see NYSRPA, Inc. v. Cuomo*, No. 14-36, Slip Op. 38, 42 (2d Cir. Oct. 19, 2015).

The district court held that intermediate scrutiny requires legislative deference in the first prong, but not the second. JA240. The Supreme Court directs otherwise. The second prong—whether a regulation is substantially broader than necessary—often involves "empirical question[s]," such as how effective the regulation will be in comparison to less-burdensome alternatives. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28-29, 33 (2010); *see Turner II*, 520 U.S. at 219-24. The Council answered such an "empirical question" when it found that the only alternative plaintiffs suggest—eliminating the "good reason" standard altogether—would lead to "substantially higher rates of aggravated assault, rape, robbery and murder." JA56.

The district court, however, refused to defer to this substantiated judgment, citing vacated *dicta* in *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *vacated pending reh'g en banc*, 781 F.3d 1106 (2015), which misread *Turner II* as according deference only on the first prong. 742 F.3d at 1177. But *Turner II* accorded substantial deference on the second prong—Congress's decision to adopt the challenged law over less-burdensome alternatives. D.C.Br.17-19. So did *Humanitarian Law Project*, which deferred to Congress's

4

"evaluation of the facts" and affirmed its judgment that a ban on speech supporting the humanitarian efforts of terrorist organizations was "necessary." 561 U.S. at 28-29, 33.

This deference is not a "rubber stamp," Pl.Br.57, but rigorous, as demonstrated by *Heller III*, Maj.Op. 21-23, 25-28. The Council's "authority and expertise in these matters do not automatically trump the Court's own obligation to secure the protection that the Constitution grants." *Humanitarian Law Project*, 561 U.S. at 34. "But when it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is marked,'" and "respect for the [Council's] conclusions is appropriate." *Id.*; *see Heller II*, 670 F.3d at 1259. By refusing to defer to the Council's predictions about whether the "good reason" standard was substantially more burdensome than necessary to prevent crime and promote public safety, the district court violated binding precedent.

But the court's error went deeper. Although it adopted the *Peruta* panel's erroneous interpretation of *Turner II*, the court did not even apply that test, which would defer on "whether there was a 'real harm' amounting to an important government interest *and* 'whether [the regulation] will alleviate it in a material way.'" *Peruta*, 742 F.3d at 1177 (emphasis added). *Heller II* applied this deference to the Council's judgment that a semi-automatic rifle ban would protect

5

police officers and control crime. 670 F.3d at 1262-63. *Heller III* similarly held that this Court "do[es] not … review de novo the District's evidence of the harm to be prevented *and the likely efficacy of the regulation in preventing that harm*." Maj.Op. 12 (emphasis added). At minimum, then, the district court was required to defer to the Council's judgment on the first prong: that the "good reason" standard will be effective in controlling crime and promoting public safety. *Id.* It refused even this, deferring only to the uncontroversial finding that the District had an "interest in preventing crime and protecting public safety." JA241. Finding the evidence that the "good reason" standard would promote this interest "inconclusive," the court found "no relationship" between the "good reason" standard and the interests it was enacted to promote. JA242n.11,243. This was legal error, one that plaintiffs make no effort to defend.

The error pervaded the court's analysis and invalidates its discretionary decision to grant a preliminary injunction. According proper deference, it is the District that will likely prevail on the merits, making the injunction inappropriate. At the least, proper deference would have rendered plaintiffs *less* likely to prevail than when the court substituted their judgment for the Council's. The legal error unquestionably and improperly tipped the scales. Even if the court had not applied a "sliding-scale approach," JA233, the error would have directly affected its balancing of the equities, because it "presumed" plaintiffs would suffer irreparable

harm based on the "intangible nature" of the right asserted. JA245. The error thus warps the court's entire analysis, making vacatur the only appropriate remedy. At minimum, the question should be remanded for reconsideration (before a properly appointed judge). *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 305 (D.C. Cir. 2006) (quoting *New Comm Wireless Servs. v. SprintCom*, 287 F.3d 1, 13 (1st Cir. 2002) ("Injunctive relief is, by its very nature, fact-sensitive and case-specific. For that reason, the court of appeals ordinarily will not uphold a preliminary injunction on a ground that was not fully addressed by the trial court.")); *see also Gordon v. Holder*, 632 F.3d 722, 725 (D.C. Cir. 2010).

## II. Under A Proper View Of The Law, The District Is Likely To Prevail.

### A. The "good reason" standard survives intermediate scrutiny.

The District has compelling interests in crime prevention and public safety, and it offered substantial evidence that the "good reason" standard will promote these interests. The Council cited the 2014 study by Professor Donohoe finding that "right-to-carry laws are associated with substantially higher rates of aggravated assault, rape, robbery and murder." JA56. It also relied on the predictive judgments of the New York, New Jersey, and Maryland legislatures, JA41,48&n.39; expert testimony, JA43-46; anecdotal evidence, JA57; and common sense, JA57.

The district court disregarded the Donohue study as "not conclusive." JA242&n.11. If so, however, deference must be given to the *Council's* view, not plaintiffs'. *See Turner II*, 520 U.S. at 199. And the court did not even acknowledge the Council's other evidence. *See Heller III*, Maj.Op. 24 (noting that substantial evidence can include "history, consensus, and simple common sense").

The District also offered substantial evidence for the second prong: that the "good reason" standard is not substantially more burdensome than necessary to prevent crime and promote public safety. Plaintiffs argue that there is no "fit" between the "good reason" standard and public safety because the standard "is not directed at dangerous people," but they cite only to inapposite district court cases concerning categorical bans on possession. Pl.Br.58-59. Plaintiffs also claim that "laws that focus on the alleged dangerousness inherent in the right's existence, rather than on some particular abuse or manifestation of that right, cannot pass intermediate scrutiny." Pl.Br.59. But plaintiffs' view is both ahistorical and incorrect. For centuries, governments have regulated firearms *precisely* because they are dangerous. *See infra* 18-24. That continues to this day. *See Bonidy v. USPS*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("The risk inherent in firearms … distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test, … which can be exercised without creating a direct risk to others."); *see United States v. Masciandaro*, 638

F.3d 458, 470 (4th Cir. 2011) ("[O]utside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense.").

In any event, the District's law *does* focus on a "particular … manifestation": carrying handguns on crowded city streets regardless of reason. Courts routinely affirm laws that focus on the inherent dangerousness of the exercise of a right, even when the actor means no harm. In the First Amendment context, *Humanitarian Law Project* upheld a content-based ban on *humanitarian* speech because it would incidentally benefit terrorist organizations and thus thwart public-safety efforts. 561 U.S. at 29. *Heller II* upheld a ban on assault weapons even though it did not distinguish between those who would or would not misuse them. 670 F.3d at 1262-64; *see also NYSRPA, Inc.*, Slip Op. 41. And "[c]ourts have consistently held that a State need not provide compensation when it diminishes or destroys the value of property"—protected under the Fifth Amendment—by "abating a public nuisance." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 492 n.22 (1987). The District's law focuses on the specific dangers associated with public carrying in an entirely urban jurisdiction, which this Court has acknowledged threatens public safety even when the carrier is not "dangerous." *Heller III*, Maj.Op. 21 (finding requirement that firearm registrant bring weapon to police station "more likely" to "threat[en]" "public

safety" due to "risk that the gun may be stolen" or that would-be registrant would be "arrested or even shot by a police officer seeing a 'man with a gun'" (brackets omitted)).

There is more than one way to tailor a law. "[A] city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems," *Young v. Am. Mini Theatres*, 427 U.S. 50, 71 (1976), and the Supreme Court has assured that its decisions do not preclude "state and local experimentation with reasonable firearms regulation," *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010). The Council found that the "good reason" standard "offers a reasonable[] balance[]" between public safety and individual self-defense needs. JA58. This flows naturally from its conclusion that right-to-carry jurisdictions encounter substantially higher rates of violent crime. If public carrying increases violent crime, escalates conflicts, and makes it more likely that innocent bystanders will be shot, it is reasonable to conclude that a law regulating public carrying is necessary to mitigate these harms. The Council then adopted the "good reason" standard, not because those who meet this standard pose less risk, but because the standard makes the law *less burdensome* to the "inherent right of self-defense." *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008) ("*Heller I*"). In *Turner II*, the Supreme Court found that Congress had properly tailored its

regulation to protect those most vulnerable to the burden it imposed. 520 U.S. at 216. The Council has done likewise here.

Plaintiffs do not challenge the validity of the District's evidence—they call it "immaterial." Pl.Br.59n.13. Nor do they challenge the evidence the District has proffered to demonstrate the need for a full record, D.C.Br.28-32—they call this "irrelevant." Pl.Br.59. They do not even seriously argue that the "good reason" standard would fail under a properly deferential application of intermediate scrutiny. *See* Pl.Br.53-60. Instead, they ask this Court to hold the "good reason" standard categorically unconstitutional and enter judgment in their favor. *See* Pl.Br.1 (statement of issues). But they have forfeited this claim by failing to move for judgment in the district court. RD 6-2; *see Schrader*, 704 F.3d at 991. Moreover, resolution of the ultimate merits is disfavored on appeal from a preliminary injunction. *See Gordon v. Holder*, 721 F.3d 638, 644-45 (D.C. Cir. 2013) ("[E]ven though Congress has provided for interlocutory review of preliminary injunctions, premature resolution of difficult constitutional questions is undesirable.").

The Supreme Court has not considered whether the Second Amendment protects a right to carry outside the home, much less decided the level of scrutiny to apply to public-carry laws, having denied certiorari in *Drake v. Jerejian*, 134 S. Ct. 2134 (2014), *Woollard v. Gallagher*, 134 S. Ct. 422 (2013), and *Kachalsky v.*

*Cacace*, 133 S. Ct. 1806 (2013). The categorical analysis plaintiffs propose only emphasizes the need for a full record. Before this Court can determine whether the "good reason" standard "destroys" a right, it must consider whether, during the Framing era, the right to keep and bear arms was "widely understood" to protect an inviolable right to carry a handgun on the streets of the country's most densely populated cities, regardless of reason. *Heller I*, 554 U.S. at 605. The historical evidence strongly suggests that it was not, but, as the competing historical *amici* briefs suggest, the historical materials are subject to debate. It makes no sense to undertake this significant inquiry on an appeal of a preliminary injunction, where the parties and *amici* are constrained by an expedited schedule and strict briefing limitations. For means-ends scrutiny, a full record is critical. Indeed, *Turner I* and *Heller II* remanded claims for additional factual development even after judgment had been entered. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 667-68 (1994); *Heller II*, 670 F.3d at 1259-60.

**B.    Plaintiffs are unlikely to succeed on their absolutist view.**

1.    The District's appeal does not ask whether the Second Amendment preserves a right to "bear arms" outside the home.

Plaintiffs argue that the "good reason" standard "eras[es] the Second Amendment wholesale throughout the entire city." Pl.Br.62. This is fallacy and overstatement, and it permeates their argument. They devote most of their brief to defeating a straw man, arguing that "the Second Amendment extends beyond the

12

home," Pl.Br.16-53, when the District has assumed (without conceding) as much, *see* D.C.Br.23-36. Plaintiffs then argue that the "good reason" standard categorically "destroys" this right. Pl.Br.58-62. What they claim is destroyed, however, is not the broad right to "bear arms" outside the home, but something much narrower, tailored to match exactly what the "good reason" standard precludes: carrying a handgun in a densely populated city, filled with unique, high-risk security targets, without any specific self-defense reason. *Cf. Humanitarian Law Project*, 561 U.S. at 28 (holding that issue was "more refined than" "whether the Government may prohibit pure political speech," as plaintiffs framed it).

Plaintiffs' circular reasoning—defining a "right" as precisely what a law precludes, then arguing that it is *categorically* unconstitutional—could be used to evade means-ends scrutiny in any situation. A humanitarian organization could claim that, because it has a broad right to "pure political speech," its "right" to provide humanitarian speech to foreign terrorist organizations is "destroyed" by a material-aid ban. *But see Humanitarian Law Project*, 561 U.S. at 28-36. Or a woman could argue that, because she has a broad right to obtain an abortion, her "right" to a partial-birth abortion is "destroyed" by a law banning the procedure. *But see Gonzales v. Carhart*, 550 U.S. 124, 166-67 (2007). This is not how rights are analyzed. *Cf. Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012) (explaining

that, in qualified-immunity analyses, "right" must be established in a "particularized" sense, not as a "broad general proposition").

Assuming that the Second Amendment protects a right to "bear arms" outside the home, that right is not at the Amendment's core, and the "good reason" standard does not "destroy" it. The standard applies only in the District, a jurisdiction "completely contained in a dense urban setting" packed with "critical official and symbolic buildings, monuments, and events, and high-profile public officials." JA44,46. Of course, the Second Amendment applies in the District, *see* Pl.Br.62, but the right it codifies has always been sensitive to context. As a practical matter, "presumptively lawful" regulations, such as "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," make it impossible for many Americans to carry guns to work, school, or other sensitive places that make up their daily lives. *Heller I*, 554 U.S at 626. The District's unique status as the densely populated Nation's capital means that laws that are a poor fit in rural areas and wilderness may justifiably apply to the entire jurisdiction. Moreover, contrary to plaintiffs' claim (Pl.Br.22-23), a public-carry license is not needed to transport a properly secured firearm to a firing range, or outside the District for some other lawful purpose, such as hunting. D.C. Code § 22-4504.01; 18 U.S.C. § 926A. Nor does the standard "destroy" any individual's ability to carry an operable handgun in the District—*anyone* could at some point in

time find himself particularly threatened and therefore able to obtain a license to carry for self-defense.

> 2. Federal appellate courts universally uphold the "good reason" standard.

This lawsuit asks whether the "good reason" standard, applied in a densely populated city that is particularly vulnerable to security risks, violates the Second Amendment. No prior case has considered this question, and circuits considering the *statewide* application of the "good reason" standard uniformly uphold it. *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 101 (2d Cir. 2012).

Moreover, contrary to plaintiffs' claim, *Heller I* has not "settled the basic issue" of whether there is a Second Amendment right to carry "beyond the home." Pl.Br.16. As the Seventh Circuit explained in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), "the Supreme Court has not yet addressed th[at] question." *Id.* at 935. To be sure, *Moore* held that the "right to bear arms" "implies a right to carry" "outside the home," and that Illinois had not justified its statewide "flat ban" on public carrying. *Id.* at 936, 940. But *Moore* did not hold that the narrower asserted right at issue here—to carry a handgun in a densely populated city without a special self-defense reason—was likewise protected, much less inviolable. *See id.* at 942. And *Moore*'s historical analysis shows the importance of this distinction: it found a general right to carry despite England's Statute of Northampton (discussed

below) because American settlers had different self-defense needs than citizens in England, where there was "no wilderness" or "hostile Indians" and "the right to hunt was largely limited to landowners." *Id.* at 936. Thus, English law, which limited public carrying "in locations at which going armed was thought dangerous to public safety (such as in fairs or in the presence of judges)," did not establish that the Second Amendment right was limited to the home. *Id.*

*Moore* did refer to "a Chicagoan's" right to carry for self-defense, *id.* at 937, but it was not asked to rule on whether Chicago could limit public carrying within city limits to people with a special self-defense need. Indeed, it criticized the state's flat ban for not protecting those especially "vulnerable to being attacked" outside the home, like "[a] woman who is being stalked or has obtained a protective order against a violent ex-husband." *Id.* at 937. The District's law permits such people to carry in public.

Plaintiffs overstate matters when they claim that "four other courts have struck down" laws similar to the "good reason" standard. Pl.Br.48. They primarily rely on *Peruta*, which has been vacated. 781 F.3d 1106. And their state-court citations are inapposite. One reversed a license denial because the police chief wrongly conflated the "good reason" standard with "suitability," remanding for correct application of the (presumably lawful) standard. *Gadomski v. Tavares*, 113 A.3d 387, 388-93 (R.I. 2015). The others interpret *state* constitutions and do

not address the "good reason" standard. *Schubert v. De Bard*, 398 N.E.2d 1339, 1341 (Ind. Ct. App. 1980); *People v. Zerillo*, 189 N.W. 927, 928 (Mich. 1922).

Plaintiffs also are mistaken in claiming that the "good reason" standard is "indistinguishable" from the one-gun-per-30-days limit on handgun registration invalidated in *Heller III*. Pl.Br.60. The Court referred to "the *undoubted* constitutional right to keep arms (plural) *in the home*." *Heller III*, Maj.Op. 27 (emphasis added). Here, however, plaintiffs have not established an "undoubted" right to carry on crowded city streets regardless of reason, much less a right at the core of the Second Amendment, and they understandably do not suggest that they have a right to carry as many firearms as they please in public.

3.   Historically, carrying in populated public places has been subject to strict regulation, as the District will demonstrate on a full record.

Plaintiffs urge this Court to abandon the district court's application of intermediate scrutiny and instead measure their likelihood of success under a categorical analysis; they compare the right to keep and bear arms with other constitutional rights. Pl.Br.46, 52-53. But courts do not apply a one-size-fits-all approach to constitutional scrutiny. *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 693-94 (2007). Different rights serve different purposes and have different scopes—the Fourth Amendment, for instance, uniquely applies to "unreasonable" searches and seizures. And some,

like the "*pre-existing* right" "codified" in the Second Amendment, are fleshed out through English and early-American statutes and common law, *Heller I*, 554 U.S. at 592, which affects the applicable level of scrutiny, *see Masciandaro*, 638 F.3d at 470.

*Heller I* left many Second Amendment questions unresolved. This Court need not answer them here, where plaintiffs' radical departure from the district court's analysis would require this Court to address centuries of legal history, spanning two continents, without the usual benefits of a trial record: comprehensive evidence, thorough briefing, expert testimony, and the district court's initial analysis. On this appeal of a preliminary injunction, it is enough to conclude that plaintiffs have not made a "clear showing" that they will prevail on the merits of their claim that the Second Amendment codified an inviolable right to carry handguns in densely populated cities without any special self-defense reason. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Even on this limited record, the historical evidence at least demonstrates that the "good reason" standard does not implicate the Second Amendment's *core*, making it inappropriate to apply any test more rigorous than intermediate scrutiny. When the Second Amendment was codified, there was no "widely understood" consensus that individuals had a right to carry in populated areas. *Heller I*, 554 U.S. at 605. England's 1328 Statute of Northampton stated that "no Man" shall

"come before the King's Justices … with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets." Everytown Appendix ("EA") 3. This language found its way into the statutes or common law of many early-American colonies, territories, and states. EA20-49; D.C.Br.41n.6.

Plaintiffs and their *amici* seize on the word "affray," arguing that the Statute banned "go[ing] … armed" only "in a manner which deliberately terrifies people."[1] HistoriansBr.6; *see* Pl.Br.33-35. This strained reading does not survive textual or historical scrutiny; instead, "affray" included frightening conduct that was not intended to be frightening. Historian Patrick Charles has examined the treatises, restatements, and prosecutorial records published from the sixteenth to early-eighteenth centuries and found it "abundantly clear … that the carrying of dangerous weapons in the public concourse—without the license of government—is what placed the people in great fear or terror, … not some particularized conduct." Charles, *The Statute of Northampton by the Late Eighteenth Century: Clarifying the Intellectual Legacy*, 41 Fordham Urb. L.J. City Square 10, 21 (2013)

---

[1] Plaintiffs alternatively argue, quoting *Simpson v. State*, 13 Tenn. 356 (Tenn. 1833), that "our constitution has completely abrogated [the Statute]." Pl.Br.38. But *Simpson* interprets Tennessee's constitution, and *Heller I* holds that the Second Amendment, in contrast, "codified a *pre-existing* right," a holding plaintiffs never acknowledge. 554 U.S. at 592.

("Charles 2013"); *see also* Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 16-25, 32-33 (2012) ("Charles 2012") (analyzing additional historical material). Carrying dangerous weapons in the public concourse was an "affray" *because* it was likely to cause terror. Charles 2013, *supra*, at 16; *see* Ruben & Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. F. 121, 129 (2015) (http://bit.ly/1U4WwLc) ("[T]errorizing the public was the consequence of going armed.").[2]

Plaintiffs' reading creates textual inconsistencies because the Statute explicitly excludes from its prohibition "the King's servants in his presence," "his ministers," and citizens summoned to "keep the peace." EA3; *see* EA22 (Virginia) (similar), 25-26 (North Carolina) (similar). These exclusions would be superfluous if the Statute only banned the deliberate misuse of weapons to terrify the people. There are no inconsistencies, however, when the Statute is read to prohibit carrying in the public concourse *because* it would cause terror. Public carrying by the

---

[2] Refusing to engage with the work of Charles and Cornell, plaintiffs urge this Court to disregard it because *Heller I* rejected their earlier analyses on whether the Second Amendment codified an individual right. Pl.Br.32-33. But *Heller I* addressed only particular conclusions of these respected scholars, not their entire bodies of work. Nor does the District ask this Court to accept their findings at face value—the publications provide thorough citations to source material, making their conclusions independently verifiable. And none of the conclusions the District urges this Court to draw conflicts with any Supreme Court holding.

King's servants in his presence, noblemen charged with keeping public order, and citizens responding to a "hue and cry" was expected (indeed required, *see* HistoriansBr.11) and therefore did not create affray in the manner of a civilian carrying dangerous weapons in a public concourse.

This interpretation is consistent with treatises written before and during the Framing era. *See* Charles 2013, *supra*, at 13-25; Ruben & Cornell, *supra*, at 129-30. Some substitute the word "terror" for "affray," but none articulate an element of intent. *See*, *e.g.*, Pl.Br.33-34 (quoting William Blackstone, who wrote that "going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land*"), 36 (quoting James Wilson, who wrote that a man could not "arm[] himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people*"), 37 (quoting John Dunlap) (similar).

This interpretation also resolves the inconsistency created by plaintiffs' reading of William Hawkins's treatise. Pl.Br.35. They seize on his comment that "no wearing of arms is within the meaning of this Statute, unless it be accompanied by such circumstances as are apt to terrify the People," 1 *Treatise of the Pleas of the Crown*, ch.63, § 9 (1716), as imposing an intent requirement. But he also wrote that a man commits affray when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people,"

such as "in fairs" and "markets," and that he "cannot excuse the wearing of such Armor in Public[], by alleging that … he wears it for the Safety of his Person from Assault," *id.* §§ 4, 8, indicating that carrying alone violates the law when it is not within one of the Statute's enumerated exceptions. Hawkins then listed these exceptions, which would have been superfluous if intent to terrorize was required. *Id.* § 10. Under the proper reading of the Statute, these apparent inconsistencies disappear, and it makes sense for Hawkins to clarify that "Persons of Quality" could "wear[] common Weapons … for their Ornament or Defence, in such Places, and upon such Occupations, in which it is the common Fashion to make use of them, without causing the least suspicion of an Intent to commit any Act of Violence or Disturbance of the Peace." *Id.* § 9.

By the mid-1800s, several states had enacted a precursor to the "good reason" standard, making it unlawful to "go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury." EA52 (Massachusetts), 54 (Wisconsin), 55 (Maine), 58 (Michigan), 61 (Virginia), 64 (Minnesota), 68 (Oregon), 71 (Pennsylvania); *see* D.C. Statutory Addendum 62 (District of Columbia). Plaintiffs argue that these laws "reversed the presumption and burden here challenged." Pl.Br.43. To the contrary, these laws were consistently interpreted as a general restriction on public carrying without good cause to fear harm. EverytownBr.14-16. Moreover,

plaintiffs' argument misses the point: by the mid-1800s, public carrying without "good reason" was limited by numerous states in a way that home possession was not, suggesting that any related right was not at the Second Amendment's core. *Cf. Heller I*, 554 U.S at 605 (finding "interpret[ations] … in the century after [the Amendment's] enactment" "a critical tool of constitutional interpretation"). The history cannot be squared with plaintiffs' claim that the Second Amendment codified an *inviolable* right to carry in crowded public places regardless of reason.

Nor can plaintiffs establish a nationwide consensus through judicial decisions in the 1800s by courts in Alabama, Georgia, Tennessee, Louisiana, and Arkansas. Pl.Br.39-43. These come from "a time, place, and culture where slavery, honor, violence, and the public carrying of weapons were intertwined." Ruben & Cornell, *supra*, at 125. "The judges deciding the Southern right-to-carry cases were thus immersed in a social and legal atmosphere unique to the South." *Id.* at 128. "No similar judicial record exists in the North," where "public carry restrictions appear to have gone unchallenged." *Id.* at 127. And none of these cases address the specific regulation challenged here, which applies only in the District's densely populated setting and makes exception for individuals with a special self-defense need. Even if some states did not ban public carrying, *cities* historically had broad discretion to limit public carrying in populated places. Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82, 112-20 (2013). As *Heller I*

acknowledges, London broadly banned public carrying in 1704. 554 U.S. at 587 n.10. And in America, "[u]rban gun control was … a nationwide phenomenon, reaching from the harbors of Boston to the dusty streets of Tombstone." Blocher, *supra*, at 120.

Plaintiffs argue that "a smattering of such examples do not a consensus make," Pl.Br.44, and their *amici* argue (without citation) that the "largest cities … had no such ordinances," HistoriansBr.27. But the existence of strict regulations in some cities does not prove its non-existence in others. Nor do choices made by some localities prove other cities' choices unconstitutional. The historical record here is at least as persuasive as the evidence supporting other regulations found presumptively lawful in *Heller I*, like the ban on possession by felons, 554 U.S. at 626-27, whose history is neither uniform nor centuries old, *United States v. McCane*, 573 F.3d 1037, 1047-49 (10th Cir. 2009) (Tymkovich, J., concurring).

Indeed, it is *plaintiffs* who sought to alter the status quo through a preliminary injunction, and it is their burden to make a "clear showing" that they will prevail on the merits of this novel constitutional challenge.[3] *Mazurek*, 520

---

[3] Contrary to plaintiffs' view (Pl.Br.54-55), *Heller II* does not relieve them of their burden to prove that the Second Amendment protects the right to carry handguns on crowded city streets without good reason. Because the Amendment codified a "pre-existing" right, "certain types of firearms regulations … do not govern conduct within [its] scope." 670 F.3d at 1252. It is not enough to show

U.S. at 972. "What history demonstrates is that states often disagreed as to the scope of the right to bear arms." *Drake*, 724 F.3d at 431. And this disagreement itself demonstrates that, during the Framing era, public carrying *in cities*, without reasonable cause to fear assault, was not an inviolable right. If nothing else, this dispute shows the futility of asking the parties to resolve this question before it has been fully presented in the district court, and when the District has little time and space to respond to an entire *amicus* brief on the question.

4. Prior restraint is inapplicable.

Plaintiffs' invocation of prior restraint is misguided. It "is specific to the First Amendment" and stems from a concern that "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, [will] intimidate[] parties into censoring their own speech." *Hightower v. City of Boston*, 693 F.3d 61, 81 (1st Cir. 2012). It "is not a label that may be attached to allow any facial challenge, whatever the constitutional ground." *Id.* at 80. Thus, as the States explain, the doctrine has never been applied to the Second Amendment, and should not be adopted here. StatesBr.19-20.

Nor is it clear why plaintiffs pursue this claim. The doctrine's sole purpose is to give First Amendment plaintiffs standing to challenge a licensure requirement

some limit on how plaintiffs wish to use firearms; rather, plaintiffs must still show an effect on "the right" that is more than de minimis. *Id.* at 1253. That is the whole point of the first step of *Heller II*'s two-step analysis.

"without the necessity of first applying for, and being denied, a license." *Lakewood v. Plain Dealer Publ'g*, 486 U.S. 750, 755-56 (1998). Here, the named plaintiffs have been denied licenses—they do not need to invoke prior restraint for standing. JA28-30. And the Second Amendment Foundation apparently concedes that it lacks associational standing, *see* D.C.Br.54n.9, which renders any reliance on prior restraint moot.

In any event, the doctrine is inapplicable here, because the law does not give Chief Lanier "unfettered discretion." Pl.Br.50. The word "may" in D.C. Code § 22-4506(a) is cabined by D.C. Code § 7-2509.11(1), which requires rulemaking to "establish criteria for determining when an applicant has" demonstrated "good reason" and "suitability." The regulations issued under this statute provide unambiguous standards and guarantee substantive administrative and judicial review. 24 DCMR §§ 1202, 1221.6, 2333.1-4. Plaintiffs fail to show a need for a preliminary injunction in this regard.

## III. The District Court Wrongly Presumed Irreparable Harm To Plaintiffs And Then Balanced The Equities In Their Favor.

### A. Plaintiffs have not demonstrated irreparable harm.

Plaintiffs' failure to demonstrate irreparable harm independently warrants vacatur of the preliminary injunction. *England*, 454 F.3d at 297. Their brief says almost nothing about this critical factor. Pl.Br.66-67. They allude to the "sense of security" they miss when they cannot carry, Pl.Br.67, but it is not clear this even

26

amounts to the "concrete and particularized" injury required for standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), let alone the "high standard" this Court has set to demonstrate irreparable harm, *England*, 454 F.3d at 297. They note that they could be irreparably harmed by a "criminal attack" that "might have been averted with access to defensive arms," Pl.Br.27, but they concede that they have no particularized reason to fear such an attack, JA21-27. "[S]imply showing some 'possibility of irreparable injury'" is not enough. *Nken v. Holder*, 556 U.S. 418, 434-35 (2009); *see Wisc. Gas v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time.'").

Finally, plaintiffs repeat what the district court concluded—that they are irreparably harmed because they cannot enjoy their "intangible and unquantifiable" interests in public carrying. Pl.Br.67. But, as the District explained, the Second Amendment does not protect the same kind of "intangible" interests as the First. D.C.Br. 54-55. Instead, it is the "inherent right of self-defense" that is "central to the Second Amendment," not some inchoate feeling one gets from carrying a firearm. *See Heller I*, 554 U.S. at 628. If no occasion arises where a handgun is needed for self-defense, its absence cannot cause harm. Plaintiffs do not even respond.

**B.  Plaintiffs cannot refute the irreparable harm the preliminary injunction will cause the District and the public.**

"[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers).  And any irreparable injury to the District is an injury to the public interest.  *Cf. Nken*, 556 U.S. at 435.  Plaintiffs argue that the public has no interest in the enforcement of an unconstitutional law.  Pl.Br.71.  But, like so many of plaintiffs' arguments, that assumes the conclusion.  A determination on the constitutionality of the "good reason" provision can only be made after full development in the district court, including discovery, expert testimony, and full briefing.

The Council speaks for the people, and its position is plain: public carrying comes at a great societal cost, and the public should bear this cost only when an individual has a specific self-defense need.  JA58.  The District also has an interest in the uniform application of its laws, and the injunction would establish two different legal regimes: one for the named plaintiffs and members of the Second Amendment Foundation, and another for everyone else.

Plaintiffs notably do not respond to the District's explanation of how the district court was wrong in its discretionary balancing to consider the effect of the injunction to be "very limited."  D.C.Br.57.  Instead, they argue that the District is wrong about the risks associated with public carrying because FBI crime statistics

do not "show[] a positive correlation between that activity and violent crime," and "shall-issue" states have revoked only a small percentage of public-carry licenses. Pl.Br.68-70. But they made these same arguments in the district court, and they (again) do not respond to the District's brief, which thoroughly discredits the conclusions they draw from these statistics. D.C.Br.29-32.

Instead, plucking a statement by Professor Donohue out of context, plaintiffs argue that "it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." Pl.Br.69. In the next sentence, Donohue explained that he used the word "determine" to describe "the level of certainty one strives for in academic work," and that an inability to achieve scientific certainty "does not mean that one cannot offer conclusions at some lower level of certainty *such as 'more probable than not.'*" Donohue, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* 80 (2014) (emphasis added) (http://ssrn.com/abstract=2443681). "Since policymakers need to act, it is more useful to offer guidance as to which evidence is likely to be most reliable than to simply reject all evidence until the highest level of certainty has been attained." *Id.* He thus documented the robust evidence linking right-to-carry laws and crime rates. *Id.* at 2, 80-81.

District policymakers needed to act. This country is awash with gun violence (some by licensed carriers), and the District bears more than its share of the burden. The Council studied the problem and found, based on substantial evidence, that a marked increase in carrying was likely to "significantly increase rape, murder, and aggravated assault." JA56. This finding stands largely unrefuted here, and in any event is entitled to deference. Plaintiffs ask "so what?," Pl.Br.60, but these are life-and-death matters. The district court abused its discretion when it found that plaintiffs' intangible harms outweighed the District's very real ones.

## CONCLUSION

The order granting the preliminary injunction should be vacated.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

/s/ Holly M. Johnson
HOLLY M. JOHNSON
Assistant Attorney General
Bar Number 476331
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
(202) 715-7713 (fax)
October 2015                          holly.johnson@dc.gov

## CERTIFICATE OF SERVICE

I certify that on October 21, 2015, electronic copies of this reply brief were served through the Court's ECF system, to:

Alan Gura, Esq.
Gura & Possessky, PLLC
105 Oronoco Street, Suite 305
Alexandria, VA 22314

/s/ Holly M. Johnson
HOLLY M. JOHNSON

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 7,000 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point.

/s/ Holly M. Johnson
HOLLY M. JOHNSON